ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141
Email: andrew@mlolegal.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

THE DANIELS FAMILY 2001
REVOCABLE TRUST, Individually and
On Behalf of All Others Similarly Situated,

                 Plaintiff,

      v.

LAS VEGAS SANDS CORP., SHELDON
G. ADELSON, and PATRICK DUMONT,

                 Defendants.

**Case No.** 2:20-cv-1958

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff The Daniels Family 2001 Revocable Trust ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Las Vegas Sands Corp. ("Las Vegas Sands" or the "Company"), analysts' reports and advisories about the

Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Las Vegas Sands securities between February 27, 2016 and September 15, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Las Vegas Sands was founded in 1988 and is based in Las Vegas, Nevada.  The Company, together with its subsidiaries, develops, owns, and operates integrated resorts in Asia and the U.S., which offer various amenities.

3.      Las Vegas Sands' properties include, among others, the Marina Bay Sands resort in Singapore, which operates a casino.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) weaknesses existed in Marina Bay Sands' casino control measures pertaining to fund transfers; (ii) the Marina Bay Sands' casino was consequently prone to illicit fund transfers that implicated, among other issues, the transfer of customer funds to unauthorized persons and potential breaches in the Company's anti-money laundering procedures; (iii) the foregoing foreseeably increased the risk of litigation against the Company, as well as investigation and increased oversight by regulatory authorities; (iv) Las Vegas Sands had inadequate

disclosure controls and procedures; (v) consequently, all the foregoing issues were untimely disclosed; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On July 19, 2020, *Bloomberg News* reported that Las Vegas Sands had settled a lawsuit brought by a former patron, Wang Xi ("Xi"), meeting his demand for a S$9.1 million ($6.5 million) payment.  Xi reportedly sued the Marina Bay Sands casino in 2019 to recover S$9.1 million of his funds that the casino allegedly transferred to other patrons from his casino deposit accounts in 2015 without his approval, which triggered a probe into the casino by local authorities.  *Bloomberg News* also reported that the U.S. Department of Justice ("DOJ") "is also scrutinizing whether anti-money laundering procedures had been breached in the way the Singapore casino handles high rollers."

6.      On this news, Las Vegas Sands' stock price fell $1.41 per share, or 2.9%, to close at $47.28 per share on July 20, 2020.

7.      Then, on September 16, 2020, *Bloomberg* reported that Marina Bay Sands "has hired a law firm to conduct a new investigation into employee transfers of more than $1 billion in gamblers' money to third parties[.]"  The article quoted the Singapore Casino Regulatory Authority ("CRA") as stating that "there were weaknesses in [Marina Bay Sands'] casino control measures pertaining to fund transfers[.]"

8.      On this news, Las Vegas Sands' stock price fell $2.18 per share, or 4.2%, to close at $49.67 per share on September 16, 2020.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

CLASS ACTION COMPLAINT

3

**JURISDICTION AND VENUE**

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Las Vegas Sands is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

14.    Plaintiff, as set forth in the attached Certification, acquired Las Vegas Sands securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.    Defendant Las Vegas Sands is incorporated in Nevada, with principal executive offices located at 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109.  Las Vegas Sands' common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the symbol "LVS."

16.    Defendant Sheldon G. Adelson ("Adelson") has served as Las Vegas Sands' Chief Executive Officer at all relevant times.

17.     Defendant Patrick Dumont ("Dumont") has served as Las Vegas Sands' Executive Vice President and Chief Financial Officer since March 2016.  Before then, Dumont served as the Company's Senior Vice President, Corporate Finance and Strategy.

18.     Defendants Adelson and Dumont are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Las Vegas Sands' SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Las Vegas Sands' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Las Vegas Sands, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     Las Vegas Sands and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Las Vegas Sands was founded in 1988 and is based in Las Vegas, Nevada.  The Company, together with its subsidiaries, develops, owns, and operates integrated resorts in Asia and the U.S.  Its integrated resorts feature accommodations, gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants, and other amenities.

22.     Las Vegas Sands' properties include, among others, the Marina Bay Sands resort in Singapore, which operates a casino.  On August 23, 2006, the Company's wholly owned subsidiary, Marina Bay Sands Pte. Ltd. ("MBS"), entered into a development agreement (the "Development Agreement"), with the Singapore Tourism Board ("STB") to design, develop, construct and operate the Marina Bay Sands resort.  Under the Development Agreement, MBS, and by extension, Las Vegas Sands, were required to comply with certain laws and procedures regulated by the STB and CRA.

**Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on February 27, 2016.  On February 26, 2016, during after-market hours, Las Vegas Sands filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  With respect to the Development Agreement, the 2015 10-K assured investors, in relevant part, that MBS "must comply with comprehensive internal control standards or regulations concerning," *inter alia*, "branch office operations"; "casino operations including casino related financial transactions and patron disputes, issuance of credit and collection of debt, relationships with and permitted payments to junket operators"; "security and surveillance"; "compliance functions and the prevention of money laundering"; "periodic standard and other reports to the CRA"; and "those relating to social controls."

24.     In discussing "certain political and economic risks" regarding Las Vegas Sands' business in Singapore and related laws and regulations, the 2015 10-K simultaneously touted the Company's purported compliance with all such laws and regulations, stating, *inter alia*, that "[c]urrent . . . Singapore laws and regulations concerning gaming and gaming concessions and licenses are, for the most part, fairly recent and there is little precedent on the interpretation of these laws and regulations"; that Defendants "believe that [their] organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of . . . Singapore"; that "[t]hese laws and regulations are complex . . .

and could have a material adverse effect on [the Company's] financial condition, results of operations and cash flows"; and that Defendants' "activities in . . . Singapore are subject to administrative review and approval by various government agencies." Plainly, this risk warning was a generic, catch-all provision that was not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures, much less those pertaining to fund transfers at its Marina Bay Sands casino. Moreover, these risks were further downplayed by Defendants' assurances that their operations purportedly complied, in all material respects, with all applicable laws and regulations of Singapore.

25. With respect to Las Vegas Sands' disclosure controls and procedures, the 2015 10-K represented, in relevant part, that "[d]isclosure controls and procedures are designed to ensure that information required to be disclosed" in the Company's reports filed with the SEC under the Exchange Act "is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to the Company's management," including the Individual Defendants, "as appropriate, to allow for timely decisions regarding required disclosure"; and that the Individual Defendants "have evaluated the disclosure controls and procedures . . . of the Company as of December 31, 2015, and have concluded that they are effective at the reasonable assurance level."

26. In discussing these controls, the 2015 10-K contained generic, boilerplate representations that "any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met," that "the design of any control system is based in part upon certain assumptions about the likelihood of future events," and that "[b]ecause of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote." Plainly, these representations were also generic, catch-all provisions that were not tailored to Las Vegas Sands'

actual known risks regarding deficiencies in its casino control measures, much less those pertaining to fund transfers at its Marina Bay Sands casino.

27.     Appended as exhibits to the 2015 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "[t]he [2015 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2015 10-K] fairly presents, in all material respects, the financial condition and results of operations of Las Vegas Sands."

28.     On February 24, 2017, Las Vegas Sands filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K contained substantively the same statements as referenced in ¶¶ 23-26, *supra*, regarding MBS's obligations to comply with certain comprehensive casino-related internal control standards and regulations, including those covering fund transfers; generic, boilerplate representations concerning certain political and economic risks implicated by Las Vegas Sands' business in Singapore, including related laws and regulations, which were simultaneously downplayed by the Company's touted compliance with all such laws and regulations, and which were not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures; the Individual Defendants' conclusions that Las Vegas Sands' disclosure controls and procedures were effective at the reasonable assurance level for the period in question; and generic, boilerplate representations regarding risks inherent in "any" control system, regardless of its design, which were similarly not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures.

29.     Appended as exhibits to the 2016 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

30.     On February 23, 2018, Las Vegas Sands filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K").   The 2017 10-K also contained substantively the same statements as referenced in ¶¶ 23-26, *supra*, regarding MBS's obligations to comply with certain comprehensive casino-related internal control standards and regulations, including those covering fund transfers; generic, boilerplate representations concerning certain political and economic risks implicated by Las Vegas Sands' business in Singapore, including related laws and regulations, which were simultaneously downplayed by the Company's touted compliance with all such laws and regulations, and which were not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures; the Individual Defendants' conclusions that Las Vegas Sands' disclosure controls and procedures were effective at the reasonable assurance level for the period in question; and generic, boilerplate representations regarding risks inherent in "any" control system, regardless of its design, which were similarly not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures.

31.     Appended as exhibits to the 2017 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

32.     On February 22, 2019, Las Vegas Sands filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K").   The 2018 10-K, too, contained substantively the same statements as referenced in ¶¶ 23-26, *supra*, regarding MBS's obligations to comply with certain comprehensive casino-related internal control standards and regulations, including those covering fund transfers; generic, boilerplate representations concerning certain political and economic risks implicated by Las Vegas Sands' business in Singapore, including related laws and regulations, which were simultaneously

downplayed by the Company's touted compliance with all such laws and regulations, and which were not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures; the Individual Defendants' conclusions that Las Vegas Sands' disclosure controls and procedures were effective at the reasonable assurance level for the period in question; and generic, boilerplate representations regarding risks inherent in "any" control system, regardless of its design, which were similarly not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures.

33.     Appended as exhibits to the 2018 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

34.     On February 7, 2020, Las Vegas Sands filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K").  The 2019 10-K, as with the Company's other annual reports during the Class Period, contained substantively the same statements as referenced in ¶¶ 23-26, *supra*, regarding MBS's obligations to comply with certain comprehensive casino-related internal control standards and regulations, including those covering fund transfers; generic, boilerplate representations concerning certain political and economic risks implicated by Las Vegas Sands' business in Singapore, including related laws and regulations, which were simultaneously downplayed by the Company's touted compliance with all such laws and regulations, and which were not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures; the Individual Defendants' conclusions that Las Vegas Sands' disclosure controls and procedures were effective at the reasonable assurance level for the period in question; and generic, boilerplate representations regarding risks inherent in "any" control system, regardless of its design, which were similarly not tailored to Las Vegas Sands' actual known risks regarding deficiencies in its casino control measures.

35.     Additionally, in discussing Las Vegas Sands' ongoing legal proceedings and related commitments and contingencies, the 2019 10-K represented, in relevant part, that "[t]he Company is involved in other litigation in addition to" litigation with Asian American Entertainment Corporation, Limited, "arising in the normal course of business"; that "[m]anagement has made certain estimates for potential litigation costs based upon consultation with legal counsel"; and that, while "[a]ctual results could differ from these estimates," management's opinion was that "such litigation and claims will not have a material effect on the Company's financial condition, results of operations and cash flows." Notably, this section failed to mention litigation with the Company's former patron, Xi, much less the impact such litigation could have on the Company's business, reputation, and financial condition, or the investigations that might result from such litigation into the Company's deficient casino control measures.

36.     Appended as exhibits to the 2019 10-K were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

37.     The statements referenced in ¶¶ 23-36, *supra*, were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) weaknesses existed in Marina Bay Sands' casino control measures pertaining to fund transfers; (ii) the Marina Bay Sands' casino was consequently prone to illicit fund transfers that implicated, among other issues, the transfer of customer funds to unauthorized persons and potential breaches in the Company's anti-money laundering procedures; (iii) the foregoing foreseeably increased the risk of litigation against the Company, as well as investigation and increased oversight by regulatory authorities; (iv) Las Vegas Sands had inadequate disclosure controls and procedures; (v) consequently, all the foregoing issues were untimely disclosed;

and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

38.     On July 19, 2020, *Bloomberg News* published an article reporting that Las Vegas Sands had reached a $6.5 million settlement with Xi, a former patron of the Company's Marina Bay Sands casino, regarding allegations that the casino had transferred his funds to third parties from his casino deposit accounts without his consent.   Specifically, that article stated, in relevant part, that "[t]he Singapore casino run by billionaire [Defendant] Adelson's Las Vegas Sands Corp. has agreed to settle a lawsuit brought by a former patron, meeting his demand for a S$9.1 million ($6.5 million) payment"; that Xi "sued the Singapore casino last year to recover S$9.1 million that he said was sent to other patrons in 2015 without his approval"; that "[t]he Singapore Police Force also investigated [Xi]'s complaint"; that "[t]he out-of-court settlement in June ends a dispute that helped trigger probes of the Singapore casino by local authorities"; that the DOJ "is also scrutinizing whether anti-money laundering procedures had been breached in the way the Singapore casino handles high rollers"; and that "[t]he Justice Department in January issued a grand jury subpoena to a former compliance chief of [MBS], seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls, according to a copy of the subpoena seen by Bloomberg News."

39.     On this news, Las Vegas Sands' stock price fell $1.41 per share, or 2.9%, to close at $47.28 per share on July 20, 2020.

40.     Then, on September 16, 2020, *Bloomberg News* published another article reporting that MBS had hired a law firm to investigate employee transfers of more than $1 billion.   Specifically, the article stated, in relevant part, that Las Vegas Sands' "Singapore casino has hired a law firm to conduct a new investigation into employee transfers of more than $1 billion in gamblers' money to third parties";

that this law firm "was appointed after Singapore police began a probe of third-party transfers at" MBS; that the review "adds to scrutiny of the casino by the [DOJ] and Singapore authorities after [Xi] sued the firm last year"; and that "[t]he U.S. Attorney's Office . . . interviewed a former compliance chief of [MBS] in July as part of the justice department's probe into whether anti-money laundering procedures had been breached in handling high rollers."

41.     The *Bloomberg News* article also disclosed how a prior investigation had focused on the conduct of certain MBS employees, affiliates, and junket operators, stating, in relevant part, that the money transfers at issue "are sometimes made through so-called junket operators, which provide transportation, hotels and credit to high rollers"; that "[w]hile the junkets are generally more strictly controlled in Singapore, an earlier probe by [MBS] and the Hogan Lovells law firm found instances of employees not complying with proper standards by filling in payment details on pre-signed or photo-copied authorization forms" and "also uncovered cases in which original documents were destroyed"; that "[d]uring the Hogan Lovells review covering 2013-2017, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties worth about S$1.4 billion"; that MBS "called on Hogan Lovells' team . . . after the [CRA] started its probe following the 2019 lawsuit from" Xi; that "[o]f the transactions scrutinized in the Hogan Lovells review, letters authorizing transfers worth S$365 million from multiple patrons bore signatures that appeared to be similar, facilitating numerous transfers"; that "[o]ne group of employees was involved in S$763 million in transfers"; and "[t]hat concentration in just a handful of staff failed to draw the requisite attention."

42.     Additionally, the Bloomberg News article cited the CRA, noting that "[i]n a response to a Bloomberg News inquiry, the CRA said it concluded the casino didn't breach requirements in th[e] [Xi] case," although "there were weaknesses in MBS' casino control measures pertaining to fund transfers"; that the regulator "takes a serious view of such matters and had directed MBS to strengthen its control

measures, which MBS has since undertaken"; and that the "CRA will continue to exercise close oversight to ensure that MBS' measures are effective."

43.    Finally, the *Bloomberg News* article cited statements by MBS, which represented, in relevant part, that "when issues regarding the handling of client transfers were raised, the company thoroughly reviewed the matter and concluded that no patron funds were transferred in a manner that was contrary to the client's intent"; that "MBS continues to work closely with its regulators to monitor MBS's compliance with all legal obligations"; that MBS "told the regulator that it had strengthened its control process in April 2018 to ensure that gamblers authorize each fund transfer, and that the requests are approved by the casino's compliance department"; and that "[e]mployees also receive training to spot and report suspicious behavior and any unlicensed junket-related activities."

44.    On this news, Las Vegas Sands' stock price fell $2.18 per share, or 4.2%, to close at $49.67 per share on September 16, 2020.

45.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Las Vegas Sands securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Las Vegas Sands securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Las Vegas Sands or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Las Vegas Sands;

- whether the Individual Defendants caused Las Vegas Sands to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Las Vegas Sands securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Las Vegas Sands securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Las Vegas Sands securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*,

406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

55.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

56.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Las Vegas Sands securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Las Vegas Sands securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above,

including statements made to securities analysts and the media that were designed to influence the market for Las Vegas Sands securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Las Vegas Sands' finances and business prospects.

59.     By virtue of their positions at Las Vegas Sands, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Las Vegas Sands, the Individual Defendants had knowledge of the details of Las Vegas Sands' internal affairs.

61.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Las Vegas Sands. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Las Vegas Sands' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Las Vegas Sands securities was

artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Las Vegas Sands' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Las Vegas Sands securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

62.     During the Class Period, Las Vegas Sands securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Las Vegas Sands securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Las Vegas Sands securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Las Vegas Sands securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**SECOND CLAIM FOR RELIEF**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

65.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     During the Class Period, the Individual Defendants participated in the operation and management of Las Vegas Sands, and conducted and participated, directly and indirectly, in the conduct of Las Vegas Sands' business affairs.  Because of their senior positions, they knew the adverse non-public information about Las Vegas Sands' misstatement of income and expenses and false financial statements.

67.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Las Vegas Sands' financial condition and results of operations, and to correct promptly any public statements issued by Las Vegas Sands which had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Las Vegas Sands disseminated in the marketplace during the Class Period concerning Las Vegas Sands' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Las Vegas Sands to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Las Vegas Sands within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Las Vegas Sands securities.

69.     Each of the Individual Defendants, therefore, acted as a controlling person of Las Vegas Sands.  By reason of their senior management positions and/or being directors of Las Vegas Sands, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Las

Vegas Sands to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Las Vegas Sands and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Las Vegas Sands.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 22, 2020

Respectfully submitted,

**MUEHLBAUER LAW OFFICE, LTD.**

*/s/ Andrew R. Muehlbauer*
ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141

Email: andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**PORTNOY LAW FIRM**
Lesley F. Portnoy, Esq.
(*pro hac vice* application forthcoming)
8240 Beverly Blvd., Suite 9
Los Angeles, California 90048
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorneys for Plaintiff*