John P. Aldrich, Esq.
NV Bar No. 6877
**Aldrich Law Firm, Ltd.**
7866 West Sahara Ave.
Las Vegas, NV 89117
Tel: (702) 853-5490
jaldrich@johnaldrichlawfirm.com

Shannon L. Hopkins (To Be Admitted *Pro Hac Vice*)
Gregory M. Nespole (To Be Admitted *Pro Hac Vice*)
Sebastiano Tornatore (To Be Admitted *Pro Hac Vice*)
**Levi & Korsinsky, LLP**
1111 Summer Street, Suite 403
Stamford, Ct 06905
Tel: (203) 992-4523

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| THE DANIELS FAMILY 2001 REVOCABLE TRUST, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-01958-GMN-EJY |
| Plaintiff, | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| LAS VEGAS SANDS CORP., SHELDON G. ADELSON, and PATRICK DUMONT, | **<u>JURY TRIAL DEMANDED</u>** |
| Defendants. | |

## **TABLE OF CONTENTS**

I.  SUMMARY OF THE ACTION ........................................................................................... 1

II. JURISDICTION AND VENUE ......................................................................................... 5

III. THE PARTIES ................................................................................................................. 6

    A.  Co-Lead Plaintiffs ................................................................................................ 6

    B.  Defendants ........................................................................................................... 6

IV. LVS' OPERATIONS AND ITS POSITION WITHIN THE GLOBAL GAMING
INDUSTRY ..................................................................................................................... 9

    A.  LVS is a Global Player in the Highly Lucrative Casino Space ........................... 9

    B.  In 2006, Singapore Embraces a Tightly Regulated Gaming Industry and LVS Secures
Licensing to Operate One of Only Two Casinos in the Entire Country – the Marina
Bay Sands ........................................................................................................... 10

    C.  Despite the Strict Regulatory Environment, Marina Bay Sands Quickly Becomes the
Most Important Part of LVS' Portfolio, Driving Nearly a Quarter of all Casino
Revenues and an Even Greater Percentage of EBITDA ................................... 13

V.  IN AN EFFORT TO CURB FALLING CASINO REVENUES AND EXPAND ITS PLAYER
POOL, MBS ENGAGES IN A PERVASIVE OPERATION WHEREBY IT MOVES FUNDS
BETWEEN PLAYER ACCOUNTS WITHOUT PERMISSION OR KNOWLEDGE TO
BOTH MANUFACTURE NEW "HIGH ROLLERS" AND TO CLANDESTINELY PAY
ILLEGAL JUNKET OPERATORS ................................................................................ 14

    A.  Chinese and Singaporean Regulations Make it Difficult for MBS' Main Player Pool to
Bring Money to Singapore ................................................................................. 15

    B.  VIP Betting Volume Drops Significantly in Singapore in the Wake of a Chinese
Government Anti-Corruption Campaign ............................................................ 17

    C.  MBS Employees Move Hundreds of Millions of Dollars Between Player Accounts
Without Authorization in an Effort to Falsely Qualify Subprime Players as Premium to
Extend High Lines of Credit .............................................................................. 19

    D.  MBS Allowed Illegal Junkets to Operate in its Casino While Outwardly Denying
Involvement. ...................................................................................................... 26

VI. RISING BAD DEBT EXPENSES AND CUSTOMER BACKLASH TO THE ILLICIT
TRANSFER PRACTICES .............................................................................................. 30

    A.  LVS' Bad Debt Expense and Write-Offs Continue to Rise as the Company Bankrolls
Subprime Gamblers with Little Recourse for Collectability ............................ 30

    B.  MBS High Roller Wang Xi Files Suit Against the Company, Alleging Millions in
Unauthorized Transfers and Setting Off Investigations in Both Singapore and the
United States ...................................................................................................... 32

VII. DEFENDANTS MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS
THROUGHOUT THE CLASS PERIOD ........................................................................ 33

AMENDED COMPLAINT

A.  False and Misleading Statements Regarding LVS' Issuance of Credit and the Collectability of Receivables .................................................................................. 34

B.  False and Misleading Statements Related to the Use of Junkets at MBS .................... 53

C.  False and Misleading Statements About the Wang Xi Lawsuit and the Unauthorized Transfer Claim .................................................................................. 55

D.  False Statements Related to Disclosure Controls and Procedures ............................... 57

VIII.  THE TRUTH IS REVEALED OVER SEVERAL PARTIAL DISCLOSURES ..................... 58

IX.  A POST-CLASS PERIOD REPORT BY *BLOOMBERG* SHEDS FURTHER LIGHT ON THE TRANSFER SCHEME AND MBS' RESPONSE ........................................................ 63

X.  ADDITIONAL ALLEGATIONS DEMONSTRATING DEFENDANTS' SCIENTER ......... 64

A.  The Individual Defendants' Knowledge and/or Recklessness ...................................... 65

1.  Former MBS Employees Confirm that the Unauthorized Transfer Practice and Use of Junkets was Widespread and Well-Known ........................................... 65

2.  MBS is a Major Contributor of LVS' Total Revenue and EBITDA that was Closely Monitored by the Individual Defendants ............................................. 66

3.  The Company's Own Internal Probes Confirm the Internal Transfer Practice 67

4.  Ongoing Investigations by the DOJ and Singapore Police are Indicative of Scienter ............................................................................................... 67

5.  MBS Operated Under Heavy Regulatory Scrutiny, Supporting an Inference of Scienter Where it Skirted those Regulations .................................................. 68

6.  Frequent Turnover in MBS' Compliance Division, Including in its Highest Post, Supports an Inference of Scienter .......................................................... 69

7.  LVS' Past Regulatory and Employee Issues Indicate a "Tone at the Top" that Values Revenue at all Costs ........................................................................ 70

8.  LVS Maintains Both a Board and Operational Compliance Committee to Oversee Each of its Casino Properties, Including MBS .................................... 72

B.  The Individual Defendants Were Motivated to Commit Fraud in Order to Continue the Appearance of Success in Singapore, as the Company's Exclusivity was Set to Expire in 2017 ......................................................................................... 77

C.  The Individual Defendants Were Motivated to Manufacture Artificial Growth in Singapore Where Organic Growth was Otherwise Hamstrung by Government Regulations ........................................................................................... 78

D.  Corporate Scienter is Additionally Supported by the Acts of LVS' Employees .......... 79

XI.  LOSS CAUSATION ............................................................................................... 80

XII.  PRESUMPTION OF RELIANCE ............................................................................. 83

XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR ..................................................... 85

XIV.  CLASS ACTION ALLEGATIONS ..................................................................... 86

XV.  COUNTS.......................................................................................... 87

XVI.  PRAYER FOR RELIEF ............................................................................ 89

XVII.  JURY DEMAND ................................................................................. 90

CERTIFICATE OF SERVICE ............................................................................ 91

Court-appointed Co-Lead Plaintiffs Carl S. Ciaccio and Donald M. DeSalvo ("Plaintiffs") bring this action against Las Vegas Sands Corp. ("Las Vegas Sands," "LVS," or the "Company"); LVS' former Chief Executive Officer Sheldon G. Adelson;[1] LVS' Chief Financial Officer Patrick Dumont; and LVS' former Chief Operating Officer and now Chief Executive Officer Robert Glen Goldstein (collectively, "Defendants") pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all persons and entities other than Defendants and their affiliates who purchased or otherwise acquired shares of the common stock of Las Vegas Sands between February 27, 2016 and September 15, 2020, inclusive (the "Class Period").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and beliefs are based on the investigation of their undersigned attorneys, which included, among other things: (i) review and analysis of LVS' public filings with the SEC; (ii) review and analysis of LVS' other public statements, including press releases and interviews with various news sources; (iii) interviews of confidential witnesses ("CWs") with substantial non-public knowledge of the facts alleged herein; (iv) review and analysis of reports of securities and financial analysts, news articles, and other commentary concerning LVS and the industry in which it operates; and (v) review of pertinent court filings. Plaintiffs' Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.   SUMMARY OF THE ACTION

1.    LVS is the largest casino operator in the world, with net revenues of more than $13.7 billion in 2019. These revenues were primarily derived from casinos operating in Las Vegas, the Marina Bay Sands in Singapore ("Marina Bay Sands" or "MBS"), and casinos in the Macao Special Administrative Region ("Macao") of the People's Republic of China ("China").

---

[1] Defendant Adelson passed away during the pendency of this action and his estate is now represented by his wife, Dr. Miriam Adelson, in her capacity as special administrator. Plaintiffs' motion to substitute parties pursuant to Federal Rule of Civil Procedure 25 is forthcoming.

2.      Since it opened in 2010, the Marina Bay Sands has proven to be a stalwart of LVS' portfolio, contributing upwards of a quarter of all LVS casino revenues (despite being just one of ten casino properties operated by the Company), with EBITDA margins often exceeding 50%.

3.      As one of only two casinos licensed to operate in Singapore for an initial exclusivity period of ten years, MBS was well-positioned to capitalize on the burgeoning casino industry in Asia, particularly among Chinese "high rollers" attracted to the opulence of MBS and Singapore as compared to the broader mass market appeal of Macao.

4.      Tight regulatory restrictions in both Singapore and China, however, made it difficult for Chinese nationals to bring the large sums of money into Singapore necessary to satisfy their betting needs. In response, MBS became reliant on extending large lines of credit to these premium players, forming an informal bank at the casino that both lent money to players and allowed these individuals to "bank" their winnings on a private ledger maintained at MBS far away from any watchful eyes of the players' home governments, especially China.

5.      The problem was that MBS' lending decisions were not based on the VIP's financial condition, ability to repay, or even MBS' ability to collect, as many of these Chinese "whales" were judgment proof given mainland China's refusal to enforce gambling debts. Instead, large credit lines were extended based on the whims and relationships of senior employees in MBS' Finance and International Marketing departments, oftentimes without any oversight and in violation of MBS' internal underwriting standards.  These massive lines of unsecured credit often violated the casino's own anti-money laundering and know-your-customer (KYC) procedures.

6.      The extension of these credit lines was no secret.  LVS readily acknowledged that the extension of credit was an important aspect of MBS' operation, noting in its annual report for 2010 that the "percentage [of table games play conducted on a credit basis] is expected to increase as we increase the credit extended to our premium players and as our operations ramp up at Marina Bay Sands."  The practice, however, would soon draw the scrutiny of regulators in China.

7.      Specifically, the Chinese Communist Party ("CCP"), led by president Xi Jinping, launched an anti-corruption crackdown in 2012 that threatened to derail MBS and the Singapore gaming industry. In connection with this probe, the CCP investigated and charged hundreds of thousands of

Chinese nationals with circumventing China's strict currency regulations and engaging in corrupt activity, including the acceptance of bribes at home in China that the recipient then sought to launder through the VIP tables at casinos throughout Macao and Singapore. The CCP also noted that it would be cracking down on casino marketing efforts made directly to Chinese citizens in China, slowing the flow of Chinese gamblers to these gambling destinations.

8.     China's efforts to curb the outflow of money into foreign casinos reverberated throughout Asia, hitting hard both MBS and Resorts World at Sentosa Pte. Ltd. ("Senstosa") – the only other licensed casino in Singapore. Sentosa responded by creating incentive packages and loosening credit restrictions in an effort to lure back premium players.

9.     LVS, through defendant Adelson, scoffed at the maneuver, claiming that Genting Bhd. ("Genting") (the operator of Sentosa) was attempting to "buy the business" because they were incapable of "competing on the basis of a quality product."

10.    Behind the scenes, however, MBS devised its own scheme to reverse its declining VIP numbers – a scheme that lies at the core of this securities fraud class action.

11.    To bolster its softening business at MBS, LVS began to secretly move money between the in-house accounts of their VIP patrons without the patron's permission or knowledge, thereby opening the door to otherwise ineligible players to borrow and lose large sums of money in MBS' private gaming rooms. Exacerbating matters was MBS' association with illegal junkets – organizations largely outlawed in Singapore (except for two which have never been permitted to operate at MBS) and whose primary purpose is to bring high rollers to casino properties in exchange for a commission paid by the casino.

12.    The scheme involved the unauthorized movement of hundreds of millions of dollars between customer accounts to falsely accredit otherwise subprime borrowers, qualifying these individuals for higher lines of credit and greater possible returns for the casino when these individual's lost at high stakes tables.

13.    To carry out the scheme, MBS employees obtained signed, but otherwise blank, letters of authorization (the document necessary to carry out a customer-to-customer transfer at MBS) from unsuspecting patrons at MBS. These employees then used these documents to move money between

customer accounts without proper authorization, providing the necessary paper trail falsely justifying the extension of credit and allowing borrowers to escape any governmental scrutiny related to cash transfers out of China and into Singapore.

14.     Additionally, and in an effort to skirt currency regulations, MBS employees worked directly with junket operators who would illegally shepherd Chinese "whales" to Singapore, pass them off to a member of MBS' International Marketing Department, and then collect their commissions. The practice stood in stark contrast to the casino's outward proclamation that it did not engage with any junkets in Singapore.

15.     While the unauthorized transfer practice may have artificially buoyed MBS' premium player segment for a short time, it had the concurrent effect of sending LVS' bad debt write-offs soaring, as the Company was forced to write off $1.61 billion in bad debt between 2013 and 2020, with a former MBS executive telling *Bloomberg* that $717 million (or **nearly 62%**) of that amount was directly attributable to write-offs at MBS.

16.     Furthermore, MBS' unauthorized transfer practice was uncovered by a former MBS patron and Chinese national named Wang Xi who alleged that the casino had misappropriated approximately $6.1 million USD from his accounts through 22 separate transactions between October and December 2015. These transfers were carried out through letters of authorization that appeared to either be forged or photocopied. Mr. Wang eventually sued in September 2019 to recover his millions, setting off a chain reaction of investigations by the United States Department of Justice, Singapore Police, and Singapore's Casino Regulatory Authority ("CRA") before MBS determined to settle with Wang in exchange for *full* payment of the claimed amount.

17.     As confirmed by former employee CWs interviewed for the purpose of this Action and corroborated by sources cited by *Bloomberg* in several articles published after the filing of the Wang complaint, the unauthorized transfer practice and use of junkets was pervasive at MBS and the casino's toothless compliance function did not conduct any meaningful oversight or stop it. When employees did seek to elevate and address the issue, such as a former MBS compliance executive cited by *Bloomberg* who was interviewed by the Company during its internal probe, they were told to stand down and then faced retaliation, with this executive failing to have his contract renewed.

18.     These efforts to marginalize compliance were in fact part of a larger "tone at the top" that discounted regulatory compliance in favor of greater profits. In actuality, LVS has been cited numerous times for its compliance failures and was required to strengthen its compliance function in 2017 as part of a settlement with the SEC regarding a Foreign Corrupt Practices Act ("FCPA") violation. This settlement required amendments to the Company's internal compliance procedures, as well as the regulatory scrutiny under which MBS operated and the importance of the casino to LVS' entire portfolio (among other factors), all support a finding of Defendants' scienter.

19.     As a result of internal investigations conducted by both LVS and global law firm Hogan Lovells, it was determined that between 2013 and 2017, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in an amount totaling approximately SGD$1.4 billion. Of this total amount, transfers accounting for SGD$365 million (or **more than 26%**) were effectuated using bogus letters of authorization bearing signatures that appeared similar and were likely photocopied.

20.     Additionally, Hogan Lovells concluded that one group of employees carried out more than half of the third-party transfers themselves in an amount totaling SGD$763 million, further raising the specter of impropriety.

21.     Despite purportedly uncovering this unauthorized transfer process by 2018, LVS remained silent until the filing of Wang's suit, the publication of which caused a $1.20 per share decline in the Company's common stock.  Thereafter, the truth about MBS' compliance failures and the breadth of the unauthorized transfer process dripped into the market over the course of several partial disclosures, sending LVS' stock price down and harming Plaintiffs and the Class.

## II.     <u>JURISDICTION AND VENUE</u>

22.     The claims asserted herein arise pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. §78aa.  In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the

facilities of a national securities exchange. LVS trades in an efficient market on the New York Stock Exchange ("NYSE").

24.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District. Additionally, Defendant LVS maintains executive offices in this District at 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

## III.   THE PARTIES

### A.   Co-Lead Plaintiffs

25.   Plaintiff Carl S. Ciaccio and Plaintiff Donald M. DeSalvo were appointed as Co-Lead Plaintiffs by the Court pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3), on January 5, 2021. (ECF No. 19)

26.   Plaintiff Carl S. Ciaccio, as previously set forth in his certification supporting the Motion for Appointment as Co-Lead Plaintiffs and Approval of Selection of Counsel (ECF No. 11-1), incorporated by reference herein, purchased LVS securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27.   Plaintiff Donald M. DeSalvo, as previously set forth in his certification supporting the Motion for Appointment as Co-Lead Plaintiffs and Approval of Selection of Counsel (ECF No. 11-1), incorporated by reference herein, purchased LVS securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### B.   Defendants

28.   Defendant LVS was founded in 1988, is incorporated in Nevada, and maintains its principal offices at 3355 Las Vegas Boulevard South, Las Vegas, Nevada, 89109. LVS' common stock trades on the New York Stock Exchange under the ticker symbol "LVS." LVS describes itself as a "global developer of destination properties ('Integrated Resorts') that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants and other amenities." LVS operates integrated resorts in the United States, Singapore, and Macao.

29.     Defendant Sheldon G. Adelson ("Adelson") was the founder, chairman of the board of directors (the "Board"), and chief executive officer of LVS at all times relevant to this Action. Adelson, his family members and trusts and other entities established for the benefit of Adelson and/or his family members (collectively, the "Principal Stockholder and His Family") beneficially owned approximately 57% of LVS' outstanding common stock as of December 31, 2019. As the majority shareholder, the Principal Stockholder and His Family exercised significant influence over the LVS business policies and affairs, including the composition of LVS' Board and any action requiring approval of LVS stockholders. Defendant Adelson passed away during the pendency of this Action. A motion to substitute Dr. Miriam Adelson, in her capacity as special administrator for the estate of Sheldon G. Adelson, as the proper party pursuant to Rule 25 of the Federal Rules of Civil Procedure is forthcoming.

30.     Defendant Patrick Dumont ("Dumont") has been LVS' Executive Vice President and Chief Financial Officer from March 28, 2016 through the time this action was filed. Dumont was previously LVS' Vice President of Corporate Strategy from June 2010 to August 2013, Senior Vice President of Finance and Strategy from September 2013 to March 2016. Dumont has also served as LVS' principal financial officer since February 23, 2016.

31.     Defendant Robert Glen Goldstein ("Goldstein") was previously the President and Chief Operating Officer, and a member of the Board, of LVS from January 1, 2015 until January 26, 2021. On January 26, 2021, Goldstein was named Chief Executive Officer of LVS following Adelson's death.

32.     Defendants Adelson, Dumont, and Goldstein are collectively referred to herein as the "Individual Defendants" and, together with LVS, as the "Defendants."

33.     Each Individual Defendant, by virtue of his high-level position with LVS, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his respective tenure with the Company, as alleged herein.  As alleged below in Sections VII and X, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants.  Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or

ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

34.     As executive officers of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

35.     Each of the Individual Defendants, because of his position of control and authority as an executive officer of LVS, was able to and did control the content of the SEC filings, press releases, and other public statements that LVS issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

36.     Each of the Individual Defendants, because of his position of control and authority as an executive officer of LVS, had access to the adverse undisclosed information about LVS' business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other LVS officers and employees, attendance at LVS' management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about LVS materially false or misleading.

37.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of LVS securities by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding LVS' products, business, operations, and management, and the intrinsic value

of LVS securities; and (ii) caused Plaintiffs and members of the Class to acquire LVS common stock at artificially inflated prices.

## IV.   LVS' OPERATIONS AND ITS POSITION WITHIN THE GLOBAL GAMING INDUSTRY

### A.   LVS is a Global Player in the Highly Lucrative Casino Space

38.   Over the past several decades, the "Las Vegas Sands" name has become synonymous with gaming, not just in Las Vegas, but globally, as it has become the largest casino company worldwide, with annual revenues of $13.74 billion in 2019 according to Statista – nearly one billion dollars more than its next largest competitor, MGM Resorts.

39.   According to the Company, it is not just its casinos that have led to its success, but the development and maintenance of "destination properties" (referred to by LVS as "Integrated Resorts") "that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants and other amenities."

40.   LVS seeks to differentiate its Integrated Resorts from other standalone casinos by employing a convention-based marketing strategy that targets business travelers during lower-mid-week periods, while catering to leisure or vacation travelers on the weekends.

41.   While the Integrated Resorts may provide additional amenities, like malls and restaurants, making them attractive destinations for meetings, incentives, conventions, and exhibits (or "MICE" in LVS parlance), at its core remains LVS' casino portfolio, with gaming facilities in the United States, Macao, and Singapore.

42.   In the United States, LVS properties include the Venetian Resort Las Vegas and the Sands Expo and Convention Center (the "Las Vegas Operating Properties"). On March 3, 2021, the Company announced that it had reached an agreement to sell its Las Vegas Operating Properties for $6.25 billion, with defendant Goldstein stating, "Asia remains the backbone of this company and our developments in Macao and Singapore are the center of our attention." LVS also previously owned and operated the Sands Casino Resort Bethlehem in Pennsylvania before selling the property in 2019.

43.     In Macao, LVS operates a collection of Integrated Resorts, including: The Venetian Macao Resort Hotel; The Londoner Macao; The Parisian Macao; The Plaza Macao and Four Seasons Hotel Macao, Cotai Strip (the "Four Seasons Hotel Macao"); and the Sands Macao.

44.     In Singapore, LVS owns and operates the Marina Bay Sands – one of only two casino properties licensed to operate in the country.

45.     The customer focus of each of these casinos can be roughly split in half between "mass market" gamers and "VIP and premium players."

46.     The "mass market" segment of gamers includes those weekend travelers who visit LVS' (or any) gaming property for a vacation, often wager with any cash they have brought with them and depart having won or lost relatively small amounts. The mass market focus is particularly true in LVS' Macao properties, where LVS properties had a market share of approximately 30% while largely catering to mass market gamers, typically from mainland China.

47.     On the other end of the spectrum sit LVS' VIP and premium players – high rollers enticed to spend large amounts of money at LVS properties that provide players with luxury amenities and premium service levels, including luxury accommodations, restaurants, lounges, invitation-only clubs and private gaming salons. Unlike the mass market gamers who generally wager with "non-rolling chips" purchased from the casino with cash, these VIPs are typically extended lines of credits and bankrolled through the use of "rolling chips" – special non-negotiable chips not directly exchangeable for cash that allow a casino to monitor a specific VIP's gaming success or lack thereof. MBS was specifically designed to cater to these high-end players.

**B.**     **In 2006, Singapore Embraces a Tightly Regulated Gaming Industry and LVS Secures Licensing to Operate One of Only Two Casinos in the Entire Country – the Marina Bay Sands**

48.     In or about 2006, the government of Singapore, hoping to boost its own tourism industry, solicited proposals from several gaming companies for the development of two integrated resorts that would be permitted to operate casinos in the small city-state.

49.     An exclusivity period contained within Singapore's original request for proposal provided that only two licensees would be granted the right to operate a casino in Singapore during an

initial ten-year period, expiring February 28, 2017. This exclusivity period is codified in Section 41 of Singapore's Casino Control Act ("CCA").

50.     In May 2006, Singapore selected Las Vegas Sands to build and operate the first of these two planned resorts.

51.     On August 23, 2006, Las Vegas Sands' wholly owned subsidiary, Marina Bay Sands Pte. Ltd., entered into an agreement (the "Development Agreement") with the Singapore Tourism Board ("STB") to design, develop, construct, and operate an integrated resort in Singapore. Pursuant to the Development Agreement, MBS received concessions that permitted MBS to own and operate a casino within the integrated resort – a first in the country, as gambling had been outlawed decades prior.

52.     Singapore later selected Malaysian gambling and leisure group Genting to build the second planned integrated resort. Genting was awarded similar concessions, allowing Genting to operate a casino within its planned resort, Sentosa. The concessions MBS and Sentosa received from Singapore, along with the exclusivity period, created an effective duopoly in Singapore's gaming industry. In 2019, Singapore officials announced the exclusivity period would be extended to the end of 2030.

53.     Prior to the development of MBS and Sentosa, Singapore had no lawfully operating casinos due to a nearly 40-year ban on gambling.

54.     Singapore's decision to permit the development of casinos was premised on a strict regulatory scheme intended to prevent the growth of organized crime, loan sharking, and other vices that frequently accompany the gaming industry.

55.     Prior to awarding gaming concessions to MBS and Sentosa, Singapore promulgated the Casino Control Regulations ("CCR") pursuant to the CCA.

56.     Singapore also created and empowered a regulatory body, the Casino Regulatory Authority ("CRA") to, *inter alia*, license and regulate the operation of casinos, approve any system of controls and administrative accounting procedures of casinos, and supervise the operation of casinos, including the persons responsible for operations and the conduct of gaming within casinos.

57.     The CCA requires MBS to "establish and implement a system of internal controls for the casino operations which satisfies the prescribed internal control requirements." CCA § 138. The CCR

specifies that the CRA will issue the Internal Controls Code for Casino Operators and the Internal Controls Code for International Market Agents.

58.     The CCA requires MBS to perform due diligence to detect or prevent money laundering and the financing of terrorism. Under this provision of the CCA, MBS must conduct due diligence whenever a patron opens an account, completes a transaction involving $10,000 or more, receives a sum of $5,000 or more in a single transaction, has reasonable suspicion that a patron is engaged in any money laundering or terrorism financing activity, has doubts about the veracity or adequacy of any information previously obtained about a patron, or as otherwise prescribed under the regulations.

59.     With only a few exceptions, the CCA prohibits MBS from lending money, extending credit, providing money or chips as part of a transaction involving a credit card, or accepting a wager made by any means other than money or chips. MBS may provide chips on credit to patrons who are not citizens or permanent residents of Singapore, Singapore residents who are "premium players," or to international marketing agents as part of their job.

60.     The CCA also limits marketing arrangements at MBS. No person can engage in a casino marketing arrangement wherein any type of commission or rebate is paid for the gaming activities of a casino patron unless that person is licensed as an international marketing agent. Additionally, no person can extend chips on credit to a patron as part of a marketing arrangement unless that person is licensed as an international marketing agent.

61.     The CCA requires that all employees of MBS whose functions are related to the conduct or supervision of gaming activities must be licensed with the CRA. In seeking a license for an employee, MBS is required to certify to the CRA that the employee seeking to be licensed is competent to exercise the functions specific to the employee's position.

62.     Marina Bay Sands, as a wholly owned subsidiary of Las Vegas Sands, is also required to comply with US regulations that require MBS to implement internal controls, file suspicious activity reports, prevent money laundering, follow generally accepted accounting principles, and comply with other regulations.

C.   **Despite the Strict Regulatory Environment, Marina Bay Sands Quickly Becomes the Most Important Part of LVS' Portfolio, Driving Nearly a Quarter of all Casino Revenues and an Even Greater Percentage of EBITDA**

63.    From the outset, Marina Bay Sands became and remained LVS' most profitable property and reporting segment by a significant margin. In its first four months of operation, between the time MBS opened its doors in August 2010 and the end of that year, MBS generated over $1 billion in revenue with an EBITDA margin of 51%.

64.    MBS has generated an average of $3 billion in revenue in every year of operation since 2010. And since opening in 2010, more than 70% of MBS' total revenues were derived from casino operations.

| | MBS' Casino Revenue as Percentage of Total Revenue | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| MBS Casino Revenues | 1,062 | 2,365 | 2,272 | 2,363 | 2,574 | 2,315 | 2,164 | 2,333 | 2,178 | 2,167 |
| MBS Total Revenues | 1,263 | 2,922 | 2,886 | 2,968 | 3,214 | 2,952 | 2,791 | 3,134 | 3,069 | 3,101 |
| Casino as % of Total Revenue | 84% | 81% | 79% | 80% | 80% | 78% | 78% | 74% | 71% | 70% |

65.    Although MBS' parent had at least six other casinos operating over the last ten years, MBS' casino revenues frequently accounted for as much as a quarter of LVS' total casino revenues.

| | MBS and LVS Casino Revenues | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| MBS Casino Revenues | 1,062 | 2,365 | 2,272 | 2,363 | 2,574 | 2,315 | 2,164 | 2,333 | 2,178 | 2,167 |
| LVS Casino Revenues | 5,533 | 7,437 | 9,008 | 11,387 | 12,004 | 9,083 | 8,771 | 9,086 | 9,819 | 9,828 |
| MBS Casino / LVS Casino Revenues | 19% | 32% | 25% | 21% | 21% | 25% | 25% | 26% | 22% | 22% |

66.    In addition to providing an outsized amount of revenue to its parent, MBS was the most efficient reporting segment, with EBITDA margins exceeding 50% in eight of the last ten years. In comparison, LVS' second most profitable reporting segment, The Venetian Macao, achieved a 40% EBITDA margin only once during its entire history of operation.

| | EBITDA Margins for LVS Reporting Segments | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| **Singapore - Marina Bay Sands** | **50.8%** | **52.4%** | **47.3%** | **46.6%** | **53.6%** | **51.1%** | **50.0%** | **56.0%** | **55.1%** | **53.6%** |
| Macao - The Venetian Macao | 33.6% | 36.2% | 37.6% | 38.9% | 38.3% | 36.1% | 38.5% | 38.7% | 39.7% | 40.1% |
| Macao - The Londoner Macao | - | - | 20.3% | 27.4% | 31.9% | 29.8% | 32.0% | 33.0% | 35.3% | 35.4% |
| Macao - The Parisian Macao | - | - | - | - | - | - | 28.7% | 29.6% | 31.6% | 33.0% |
| Macao - The Plaza and Four Seasons | 22.8% | 32.1% | 26.5% | 28.6% | 33.8% | 35.2% | 37.8% | 39.7% | 36.4% | 39.3% |
| Macao - Sands Macao | 26.7% | 27.4% | 28.0% | 29.3% | 28.9% | 25.7% | 25.7% | 27.8% | 27.4% | 27.9% |
| Macao - Ferry Operations and Other | (22.1%) | (10.3%) | (10.8%) | (2.8%) | 2.6% | 14.4% | 20.3% | 13.0% | 11.3% | (6.8%) |
| US - Las Vegas Operating Properties | 25.6% | 25.2% | 23.9% | 23.2% | 21.2% | 20.2% | 22.7% | 23.6% | 23.4% | 26.8% |
| US - Sands Bethlehem | 19.5% | 22.7% | 24.2% | 24.8% | 23.8% | 24.8% | 25.8% | 26.1% | 21.6% | 22.9% |

67.     Marina Bay Sands' exceptional revenue generation and EBITDA margins resulted in MBS contributing more to LVS' earnings than any other reporting segment in eight of the last ten years.

| | Reporting Segments' Contribution to LVS' EBITDA | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| **Singapore - Marina Bay Sands** | **28.8%** | **43.3%** | **36.0%** | **29.1%** | **31.8%** | **36.1%** | **33.7%** | **35.8%** | **32.0%** | **30.8%** |
| Macao - The Venetian Macao | 36.3% | 29.0% | 30.2% | 31.5% | 28.5% | 25.9% | 26.3% | 23.1% | 26.1% | 26.1% |
| Macao - The Londoner Macao | - | - | 5.6% | 15.5% | 18.5% | 15.6% | 14.9% | 12.9% | 14.4% | 13.5% |
| Macao - The Parisian Macao | - | - | - | - | - | - | 2.8% | 8.4% | 9.2% | 10.1% |
| Macao - The Plaza and Four Seasons | 5.1% | 6.2% | 7.6% | 6.4% | 6.9% | 5.8% | 5.3% | 4.8% | 5.0% | 6.4% |
| Macao - Sands Macao | 14.3% | 10.0% | 9.2% | 7.6% | 6.3% | 5.4% | 4.2% | 3.6% | 3.4% | 3.2% |
| Macao - Ferry Operations and Other | (1.1%) | (0.4%) | (0.4%) | (0.1%) | 0.1% | 0.6% | 0.8% | 0.4% | 0.3% | (0.1%) |
| US - Las Vegas Operating Properties | 13.9% | 9.4% | 8.7% | 7.4% | 5.8% | 7.3% | 8.6% | 8.0% | 7.5% | 9.0% |
| US - Sands Bethlehem | 2.6% | 2.6% | 3.0% | 2.6% | 2.2% | 3.3% | 3.5% | 3.0% | 2.2% | 1.0% |
| **Total EBITDA** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

68.     MBS' extraordinary profitability, driven primarily by the casino's performance, made MBS one of the most important properties in LVS' portfolio. Accordingly, MBS was one of LVS' core operations.

69.     Beginning with fiscal year 2015, however, MBS began to experience declining casino revenues. Casino revenues declined 10%, 7%, 7%, and 1% in 2015, 2016, 2018, and 2019, respectively. While MBS' casino generated $2.57 billion of revenue in 2014, that amount dropped to $2.17 billion in 2019, or over 15%.

| | MBS' Casino Revenues, % Change Year-On-Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Casino Revenues | 1,062 | 2,365 | 2,272 | 2,363 | 2,574 | 2,315 | 2,164 | 2,333 | 2,178 | 2,167 |
| % Change, Year-On-Year | | 123% | -4% | 4% | 9% | -10% | -7% | 8% | -7% | -1% |

## V.     IN AN EFFORT TO CURB FALLING CASINO REVENUES AND EXPAND ITS PLAYER POOL, MBS ENGAGES IN A PERVASIVE OPERATION WHEREBY IT MOVES FUNDS BETWEEN PLAYER ACCOUNTS WITHOUT PERMISSION OR KNOWLEDGE TO BOTH MANUFACTURE NEW "HIGH ROLLERS" AND TO CLANDESTINELY PAY ILLEGAL JUNKET OPERATORS

70.     After entering the Singapore market with gusto upon the opening of MBS in 2010, LVS' casino revenues in that country plateaued and then began declining within a few years of opening, as MBS competed for market share not only with Sentosa in Singapore (the only other licensed casino in the country), but also with Macao, as the primary player pool for both Singapore and Macao is drawn from mainland China.

71.     According to the Singapore Tourism Board, mainland China is the largest country of origin of tourists visiting Singapore, accounting for 3.4 million of the 18.5 million visitors to Singapore in 2018.

72.     However, monetary regulations and other rules in both China and Singapore erect significant hurdles for Chinese gamblers seeking to bet big at MBS.

**A.     Chinese and Singaporean Regulations Make it Difficult for MBS' Main Player Pool to Bring Money to Singapore**

73.     Throughout all its properties, LVS has always courted high rollers, even creating its VIP-only Paiza membership program that grants these gamblers access to exclusive gaming suites and showers them with special amenities.

74.     However, to finance their actual gambling in Singapore, these VIP gamers are often dependent on lines of credit to circumvent tourist currency restrictions.

75.     The Chinese government has instituted a strict cap, restricting Chinese nationals from transferring out of the country more than $50,000 USD in any given year. Additionally, individuals from China are limited to the amount of money they can physically take on their person upon exiting the country to RMB$20,000 (or approximately $3,083 USD).

76.     Singapore requires individuals arriving in country to declare at customs any amount exceeding SGD$20,000 (approximately $15,000 USD). Further, Singapore's foreign currency reporting laws require any transfer into the country of more than SGD$5,000 (approximately $3,700 USD) be reported to the government as an anti-money laundering safeguard.

77.     In seeking to circumvent similar restrictions, casinos in Macao turned to the use of junkets – unaffiliated middlemen who connect high value gamblers (often in mainland China) with casino operators.  These junkets will collect a set amount in China and provide the gambler with credit redeemable at their destination to be used at the casino. The junket's ledgers are then adjusted according to the gambler's performance at the casino (*i.e.* whether they have won or lost) and accounts settled upon the bettor's return home. For their part, these junkets are paid a commission by the casinos – a "finder's fee" for getting these valuable whales (and their money) into a position to bet big.

78. However, these junkets are also often linked to the less desirable aspects of the casino industry, including organized crime and money laundering.

79. For this reason, Singapore has sought to marginalize such practices in that country, licensing just two junkets (known in country as "International Market Agents") in 2012 who are permitted only to operate through Sentosa, but not MBS.

80. Publicly, MBS has stated that it prohibits any association with any junket or junket-like operation, with former LVS CEO Sheldon Adelson stating in 2012 that "[t]here's no reason for us to go after that kind of junket," and likening the licensed junkets in Singapore to the Company's own internal salespeople.

81. Instead of relying on junkets, MBS purports to use the extension of credit to its high value VIP customers to get them in the door.

82. The extension of credit to VIPs was an essential part of MBS' business, with LVS acknowledging in its annual report filed on Form 10-K with the SEC for 2010 that the "percentage [of table games play conducted on a credit basis] is expected to increase as we increase the credit extended to our premium players and as our operations ramp up at Marina Bay Sands."

83. This credit, often signified by the extension of an instrument known as a "marker," is unsecured, with table games players typically extended more credit than slot players, and high-stakes players receiving more credit than those who wager less. As a result, and as the Company has acknowledged in various of its annual reports, "[h]igh-end gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a significant positive or negative impact on cash flow and earnings in a particular quarter."

84. After getting these high rollers through the door and onto one of MBS' exclusive high-stakes tables, MBS then morphed into an informal bank – facilitating transfers between these customers' in-house accounts, allowing these individuals to stash away winnings from the watchful eye of their home country.

85. Additionally, MBS allowed for the transfer of funds from customer-to-customer through their MBS house account, creating a private ledger whereby debts could be settled in Singapore among purportedly cooperating parties without triggering any regulatory currency restrictions.

86.     The need for such a system that encouraged private ordering and repayment of the extraordinary credit lines extended to these Chinese whales was paramount to MBS, as LVS recognized in its SEC filings that MBS "may not be able to collect gaming debts because, among other reasons, courts of certain jurisdictions do not enforce gaming debts. To the extent [MBS'] gaming customers' assets are situated in such jurisdictions, [MBS] may not be able to take enforcement action against such assets to facilitate collection of gaming receivables." In actuality, the real issue laid in the inability to enforce any Singapore judgment in China (except in Hong Kong). Even still, a judgment in Singapore for casino debt remains a civil offense not punishable by any jail time and it is all but impossible for MBS to collect on assets located in mainland China.

87.     Despite LVS' previous assertion that credit-based gaming was expected to increase as MBS' operations ramped up, the percentage of table games conducted on a credit basis actually fell in MBS' first four years, from 35.20% to 29.30%, largely coinciding with total casino revenue at the facility stagnating:

| MBS Revenues Stagnate as Credit-Based Wagers Fall | | | | |
|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 |
| Total Casino Revenue at MBS | 1,062 | 2,365 | 2,272 | 2,363 |
| Revenue, Percent Change, Year-on-Year | | 122.6% | -3.9% | 4.0% |
| % of Table Games Played on Credit Basis | 35.2% | 34.5% | 33.2% | 29.3% |

**B.     VIP Betting Volume Drops Significantly in Singapore in the Wake of a Chinese Government Anti-Corruption Campaign**

88.     Since opening in 2010, MBS (and Singapore's gaming sector in general) has been largely dependent on Chinese players, especially high rollers, visiting the country.  CMC Markets analyst Demond Chua noted in November 2014 that "Chinese high rollers contribute to about half of MBS' premium segment revenue."[2]

89.     While the flow of funds from these whales helped spur MBS' entry into the new market, there was a marked shift beginning in 2012 when Chinese President Xi Jinping instituted broad anti-corruption policies that directly impacted gambling by members of the Chinese Communist Party.

---

[2] https://www.todayonline.com/business/mbs-lashes-out-casinos-face-dwindling-vip-pie

90.     Following several years of investigation, hundreds of thousands of CCP members were charged with corruption, including accepting bribes that they laundered through the VIP tables at casinos throughout Macao and Singapore.

91.     The CCP under President Xi also made clear that it would be limiting efforts of foreign casinos to lure Chinese gamblers, with CCP deputy bureau chief at the Ministry of Public Security Hua Jingfeng stating in 2015:

> Some foreign countries see our nation as an enormous market, and we have investigated a series of cases. A fair number of neighbouring countries have casinos, and they have set up offices in China to attract and drum up interest from Chinese citizens to go abroad and gamble. This will also be an area that we will crack down on.[3]

92.     The end result was a plateau in MBS and Singapore's casino revenues, with LVS publicly espousing a focus on the mass market segment while scrambling behind the scenes to continue catering to China's high stakes players.

93.     With a dwindling number of VIP gamers entering Singapore following President Xi's anti-corruption crackdown, MBS soon found itself competing with Sentosa – the only other casino operator in Singapore – for market share among these premium players.

94.     For example, in the third quarter of 2014, Genting (the owner of Sentosa) announced a 42% decline in net profit and a 17% decline in overall revenue, noting that premium player-business specifically underperformed during the period. These results came on the heels of LVS' own reported results for the quarter, wherein it was announced that MBS casino revenues fell 8.7% as VIP betting volume plunged almost 34%.

95.     CMC Markets Analyst Desmond Chua stated that the results were the new normal, noting, "[w]ith that slowdown [of Chinese VIP gamblers to Singapore] and with Asian governments, such as Japan, Korea and the Philippines, also keen to set up the gaming industry, I believe the boom years that we saw previously are now over — even though the casinos will remain profitable in the long term."[4]

---

[3] https://www.businessinsider.com.au/xi-declares-war-on-global-gambling-firms-2015-2

[4] https://www.todayonline.com/business/mbs-lashes-out-casinos-face-dwindling-vip-pie

96.     While LVS does not specifically disclose the amount of credit it extends in a given year, it does report net account receivables for its casino segment – a rough indicator of loans extended. An analysis of these figures shows that the Company's extension of credit exploded with the opening of MBS in 2011, with LVS accounts receivable increasing more than 93% in 2011 (the first full year of operation for MBS) and continuing to rise into 2012 before beginning to taper off and actually decline beginning in 2014 – as the CCP's anti-corruption crackdown ramped up and the party began issuing warnings to the gaming industry that illicit activities involving Chinese nationals would not be tolerated:

| | Accounts Receivable, Net (in millions) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | All LVS Casinos | | | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Casino Accounts Receivable | 318 | 439 | 715 | 1,381 | 2,061 | 2,111 | 1,958 | 1,721 | 1,186 | 837 | 763 | 858 |
| Percent Change, Year-on-Year | | 38% | 63% | 93% | 49% | 2% | -7% | -12% | -31% | -29% | -9% | 12% |

97.     Genting's response to the slowing flow of high stakes players from China was to make credit more easily available to these VIP players in an effort to increase market share. Adelson scoffed at such a move, stating on an analyst call on October 15, 2014 that "[m]aybe one day, [Genting will] get used to competing on the basis of a quality product, if they ever build one, and they won't have to buy the business," indicating that LVS would not engage in a race-to-the-bottom with respect to credit extensions.

98.     But in actuality, and in response to its failure to capture the critical mass of VIP gamers originally envisioned at MBS (as directly correlated with the percentage of table games conducted on a credit basis), MBS embraced a secret scheme of unauthorized internal transfers between customer accounts, all in an effort to falsely accredit subprime gamblers so they would be eligible to participate in  the extension of credit lines to facilitate high-stakes gambling.

## C.     MBS Employees Move Hundreds of Millions of Dollars Between Player Accounts Without Authorization in an Effort to Falsely Qualify Subprime Players as Premium to Extend High Lines of Credit

99.     With the flow of high rollers from China declining and MBS' competition in Singapore offering more attractive travel and credit packages to entice gamers, MBS embarked on a different strategy.  Rather than compete for market share among the limited number of high rollers still visiting

Singapore to play, MBS simply moved the goalposts and extended credit to otherwise subprime borrowers, thereby manufacturing new "premium players" on paper.

100.   Under Singapore's Casino Control Act, MBS is prohibited from extending credit to casino patrons, with only a few exceptions. Under one such exception, MBS is permitted to extend casino credit to persons who qualify as "Premium Players."

101.   A patron qualifies as a "premium player" when he opens a deposit account with the casino and deposits at least SGD$100,000 (approximately $75,000 USD) – known as the "front money deposit."

102.   Once qualified as a "premium player" at MBS, a gambler may draw down on large lines of credit, unlock the associated amenities of being a member of the Paiza club, and obtain access to VIP private gaming salons.

103.   The process for acquiring such loans is simple, with one former premium player at MBS telling a newspaper that acquiring lines of credit in the VIP room is "easy to get and happens often, as long as you are a premium player and you qualify for the loans."[5]

104.   However, unbeknownst to LVS investors, beginning in 2013, MBS began operating a financial shell game between customer accounts, seeking to accredit as many individuals as "premium players" as possible. Once afforded premium player status, these gamblers had access to increased credit lines which facilitated high stakes bets (and the associated larger potential return for MBS).

105.   The process seemed simple enough, but partially depended on MBS' uber wealthy clientele overlooking the missing money from their accounts. While transfers of hundreds of thousands of dollars might raise the antennae of a typical gamer, MBS' high net worth clients are anything but, typically wagering at least SGD$10,000 per hand, and sometimes up to SGD$1.5 million at a time on baccarat in the VIP rooms.[6]

106.   MBS employees leveraged these millions of dollars in captive accounts between 2013 and 2018, getting patrons to sign blank "Letters of Authorization" (the approval document necessary to

---

[5] https://www.asiaone.com/singapore/nicest-money-lenders-singapore

[6] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

transfer money between customer accounts), then filling in the amount of the transfer and other details as necessary.

107.   MBS employees took a low-tech approach to the shell game, simply photocopying the signed, but blank form, and using it over and over again to conduct the transfers.

108.   MBS employed this scheme to solve its declining number of high roller and VIP gamers by transferring money from unsuspecting whales to subprime gamers, thereby instantly qualifying them as premium players on paper. These subprime gamers could not afford the front money deposit themselves, could not otherwise qualify for casino credit, or were seeking to avoid the watchful eye of their home government.

109.   Creating this new crop of otherwise unjustified premium players with access to massive lines of credit presented MBS with problems beyond violating local gambling rules.  Specifically, MBS had exposed itself and its parent to increasing amounts of bad debt it would suffer at the hands of these new subprime borrowers and the attendant write-offs

110.   Based on MBS' own internal investigation, as carried out by the law firm of Hogan Lovells, from 2013 to 2017, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in an amount totaling approximately SGD$1.4 billion. Of this total amount, transfers accounting for SGD$365 million (or **more than 26%**) were effectuated through the use of letters of authorization bearing signatures that appeared similar and were likely photocopied.

111.   Additionally, Hogan Lovells concluded that one group of employees carried out more than half of the third party transfers themselves in an amount totaling SGD$763 million.

112.   Plaintiffs' confidential witnesses corroborate the pervasive and unchecked scheme throughout the Class Period. CW-1, a former Anti-Money Laundering Specialist in MBS' compliance department from January 2014 to March 2015, described a wholly ineffective compliance function that was bent to the will of the Finance and International Marketing Departments – the very same groups who could open MBS' coffers to gamers.

113.   In her role at MBS, CW-1 was tasked with managing an in-depth review of client account openings, deposits, and transfers. Surprisingly, CW-1 was the *only* MBS employee doing so, reporting to a Compliance Manager (who had no previous experience in compliance), who then reported up to

MBS' Chief Compliance Officer. In fact, CW-1 recalls that when she began working at MBS the compliance function was barely functional, as there were no appropriate guidelines or procedures in place.

114.    In looking at customer transactions, CW-1's job was ostensibly to flag any suspicious activity for inclusion in Suspicious Transaction Reports filed with the Singapore financial authorities when, for example, Singapore's statutory foreign currency reporting threshold was exceeded by any transfer at the casino. According to this witness, MBS alone submitted thousands of these Suspicious Transaction Reports per year.

115.    CW-1 also dealt with customer-to-customer transfers first-hand, as members of MBS' International Marketing Department known as "Relationship Managers," along with those in the Finance Department, would work together to force through approval of transfers to high value Chinese gamblers at the casino. According to CW-1, these individuals were hamstrung by China's and Singapore's currency restrictions and it was up to MBS' Relationship Managers to get money into these individuals' hands by any. To do so, MBS Relationship Managers would work with the Finance Department and transfer money to the player in need from the account of a different high roller at the casino.

116.    CW-1 states that she did not believe these transfers to have been authorized by the client from whose account money was being transferred, but she was always given a weak backstory by the MBS Relationship Manager of some sort of nexus between the two players, including vague details of supposed newfound friendships or a claim that the recipient of the funds was otherwise owed a private debt from the other gambler. CW-1 tried her best to probe behind these stories to determine their veracity, but she recalls being reliant on the representations of the Relationship Managers who presented minimal paperwork that could have been forged and who were the only available source of information, as CW-1 was not allowed to contact the casino patrons for follow up. Instead, it was the Relationship Managers – the same individuals who were paid commissions and bonuses based on the individuals they brought into casino and, thus, had no motive to turn away any big money player – who were tasked with the Know-Your-Customer (KYC) procedures.  CW-1 recalled that many of these Relationship Managers previously worked in Macao and seemed to have long-standing relationships with these high-stakes gamblers, who were often shuttled between Macao and Singapore in LVS' private fleet of jets.

117.    CW-1 stated that these unauthorized transfers between customer accounts occurred "all the time" and she had no recourse, but to note the transaction in order for the Finance Department to file a Suspicious Transaction Report with the regulator. But at MBS, CW-1 stated, "no one cared," and management took no action to curb the practice, with CW-1's manager (the Compliance Manager who reported directly to the Chief Compliance Officer) telling her to back off from filing so many reports and asking why she would not accept the reasoning the Relationship Managers provided.  She also recalled having lunch with a senior member of the Compliance department who told the witness that she needed to "learn to behave" herself and to "not be so outspoken" when it came to suspicious transactions at MBS. It was CW-1's view that no actions were taken about these transactions "because a lot of people knew and those who knew had a hand in it."

118.    Instead, the entire compliance function at MBS was "not taken seriously" according to CW-1, and internal reporting at the casino regarding compliance issues was described as "very poor." CW-1's account is corroborated by MBS' own admissions to the Singapore CRA, when the casino wrote the regulator to explain the steps it had instituted in 2018 to curb the unauthorized transfer process that had impacted hundreds of millions of dollars over the previous eight years.

119.    In this letter, MBS touted the steps it took to increase scrutiny over all transfers, including the new requirement that all transfer letters had fresh "wet ink" signatures (as opposed to photocopies) and that staff received a verbal confirmation from the patron before moving any funds out of their account. Additionally, MBS touted that these transfers would now be "subject to enhanced due diligence checks which will include . . . [a] declaration of the relationship between the patrons and the reasons for the patron making the third-party payment." MBS further told the CRA that employees would be receiving training to spot and report suspicious behavior and that all transfer requests would have to be approved by the casino's compliance department.[7]

120.    Of course, as these new requirements were instituted in mid-2018, this means that throughout much of the Class Period MBS' compliance function *was not capable or empowered* to carry out even these most basic due diligence functions, as described by CW-1.

---

[7] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

121.    CW-1 did state, however, that during her time at MBS she participated in several meetings with LVS' Global Chief Compliance Officer during which the suspicious transfers between patron accounts and the related number of STRs were discussed.  According to this witness, these meetings occurred every one to three months during her tenure (and six to eight times total) and were attended by the Global Chief Compliance Officer, MBS' chief financial officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, as well as Daphne Hearn, who took over the role of MBS Chief Compliance Officer in September 2014. According to CW-1, the issue of the unusually high number of STRs coming from MBS was discussed and CW-1 and other attendees often raised why so many reports were required, only to never have a solution presented or addressed.

122.    CW-1 was hardly alone in recognizing the utter compliance failure at MBS, as a former MBS Compliance executive noted during the casino's internal investigation into the transfers that he raised the issue internally at MBS in an effort to address it, but was urged by the operations and legal teams to back off, with the executive then leaving MBS when his contract was not renewed by the casino.[8] Such retaliatory action comports with what CW-1 witnessed during her time at MBS, as she saw Robert Clifford, the Chief Compliance Officer who hired her, fired from his role just a month-and-a-half after the witness' employment commenced. According to CW-1, while MBS claimed the departure was voluntary, everyone knew that Clifford was "definitely fired" because security and legal personnel were at the meeting where his sudden departure was announced. In her time at MBS, CW-1 recalls three to four individuals being fired in retaliation for raising the problem of the suspicious transfers, always under the guise of supposed "performance issues."

123.    Compliance stood in stark contrast to MBS' Finance Department which held "a lot of power" according to CW-1. CW-2, a former credit officer on the gaming side in MBS' Finance Department from 2013 to 2016, corroborates CW-1's account. As part of his job, CW-2 was tasked with conducting know-your-customer due diligence on MBS patrons who wished to use credit to gamble.

[8] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

Notably, none of CW-2's training involved how to report unethical activity or behavior observed at MBS.

124.    When an MBS customer wished to draw a line of credit from the house, they filled out a new customer application and provided any required documentation. CW-2 would then evaluate the prospective borrower's creditworthiness through a database called CentralCredit – a database purportedly employed throughout the gaming world to track a player's gambling history at other casinos. However, CW-2 made clear that the decision to extend or not extend credit to an individual came down from above, with VP-level or higher members of the International Marketing Department often having the last say as to how much credit would actually be granted based on the executive's personal relationship with the gambler.

125.    As a player's casino credit was determined not by his actual financial condition, but by who he knew, MBS employees (and especially those in the International Marketing Department) were particularly vulnerable to unethical behavior. CW-2 recalled witnessing examples of that during his time at MBS. For instance, he witnessed a returning VIP gambler from China attempt to hand thousands of dollars directly to a director from the International Marketing Department at MBS, which CW-2 inferred was a "thank you" for helping push through the gambler's credit application. Rather than decline the cash, the International Marketing director suggested that the two take their business to the returning player's room to escape any surveillance on the casino floor. Yet, because MBS had no internal system to report such unethical conduct, CW-2 was left powerless until he ultimately decided to depart the casino on his own and move away from such "shady" activities.

126.    CW-2 stated that, during his tenure, seven out of every ten customers who applied for credit at MBS were from mainland China.

127.    In discussing the unauthorized transfer activity at MBS, CW-2 stated that letters of authorization were often filled out and signed "at the cage" – the portion of the Finance Department that directly released funds to players. According to CW-2, oftentimes the cage "did not even tell compliance" about these transactions.

128.    From a compliance perspective, CW-1 stated that, not every high-stakes gambler would receive the full line of credit they originally sought. As such, it was her belief that the patron-to-patron

transfers could have been used to fill the gap for these individuals, or transfers were made into accounts from a third party to cover debt already incurred. The witness recalls inquiring about what the casino does about debt it was unable to collect and was told "we just write it off."

129.     Further, CW-1 stated that during her time at MBS, issues with Chinese politically exposed persons (PEPs) arose as a result of the Chinese government's anti-corruption crackdown. According to this witness, many of the Chinese high rollers were lower-level PEPs, such as members of the legislative assembly or a district member of the CCP. CW-1 recalled that, after some internal discussion and determination that these players were not "high level," they would be allowed to gamble at MBS. However, they were not extended formal credit and their accounts were often funded through suspicious transfers from other patrons.

**D.     MBS Allowed Illegal Junkets to Operate in its Casino While Outwardly Denying Involvement.**

130.     In addition to its manufacturing of high rollers through the unauthorized transfer process, MBS employees directly coordinated with illegal junkets stealthily operating at MBS without a license.

131.     Despite LVS' public proclamations that junkets were not operating at MBS, former MBS employees and gamblers at the casino paint a much different picture.

132.     For example, a former marketing executive at MBS told Bloomberg reporters that MBS had no choice but to call on the junkets when it first opened in order to attract VIPs because of a lack of local contacts.[9]

133.     Defenses asserted in several lawsuits initiated by MBS to recover gaming debts from allegedly delinquent former patrons also belie MBS' "no junkets" claim.

134.     For example, Japanese businessman Takami Shinichi asserted as his defense in 2012 that he only gained access to MBS' VIP gaming rooms (and lines of credit) with the assistance and financial fronting of a Nevada-licensed junket operator, meaning that the debt MBS asserted he owed was

---

[9] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

unenforceable because he was not a "premium player" under Singapore law when he first began gaming at MBS.[10]

135.    Li Chi Yan also asserted a junket-related defense in MBS' debt recovery action filed against him in the High Court of Hong Kong Special Administrative Region, Action No. 997 of 2017. In its suit against Chinese national Li, MBS claimed that it extended SGD$700,000 in markers and SGD$100,000 in a Premium Player Qualification Withdrawal Slip to Li in 2015. Of the SGD$800,000 lent, SGD$478,927 allegedly remained outstanding and due. Li, however, claimed his actual creditor was not LVS, but junkets operated by three individuals named Dai Deming, Chan Lo Shag, and Jimmy Wai. According to Li, these men would accompany him to MBS and lend him money to play as part of an agreement to share winnings and repay losses. While the High Court of Hong Kong ordered payment of the balance to MBS in its November 2017 order, it noted that "[t]he defence as to identity of the creditor is more than shadowy." In support of its finding of "shadowy" happenings at MBS, the court specifically cited Li's assertion that he directed a payment to Mr. Dai in partial satisfaction of the claimed debt just days after gambling at MBS, but never remitted payment directly to the casino. Despite not sending payment to the casino, Li's MBS account was credited in an amount commensurate with his payment to Mr. Dai. MBS denied the junket claim, instead stating that the three individuals identified by Li as junket operators were either patrons of the casino (in the case of Dai and Chan) or a marketing employee of LVS (in the case of Wai).

136.    Luo Shandong, in the action captioned *Marina Bay Sands Pte Ltd. V. Luo Shandong*, [2018] SGHC 40, Suite 706 of 2017, pending in the High Court of the Republic of Singapore, went even further in asserting his defense based on junket operations as MBS. In 2018, Luo appealed a finding of summary judgment against him, seeking to take MBS to trial to challenge the validity of the SGD$3.5 million MBS claimed he owed. However, Luo was not seeking to render the debt unenforceable, but instead defended on the premise that he had already paid back the amount to a junket named Tian Du Gaming Promotion Co. ("Tian Du"), who was operating with MBS' blessing as its agent to assist in circumventing exchange control regulations. In support of his claim, Luo presented an affidavit from an

---

[10] https://app.hedgeye.com/insights/19156-the-m3-s-pore-1st-junkets-mbs-junket-claim?with_category=6%27A%3D0

individual named Liu Jian, the former manager of Tian Du, who affirmed that Tian Du collected money from Luo on behalf of MBS, but that the money was not used to settle Luo's debt because of a supposed dispute between Tian Du and MBS. Luo's defense necessarily implicated a question of agency between MBS and the illegal junket Tian Du, and the Singapore court ordered the matter to proceed to trial.

137.    The junket activities described by these former MBS patrons before and during the Class Period dovetail with the recollection of CW-2, who stated that, soon after commencing his employment with MBS in 2013, he learned about the role junkets play in facilitating Chinese gamblers' access to capital at MBS. Based on multiple conversations with friends in the junket business in Macao, CW-2 soon learned that Chinese patrons who wished to gamble at MBS would approach junket operators in Macao (where junkets are legal) and make arrangements to fund the Macao junket's mainland China accounts. From there, it was business-as-usual for the junket, who made the necessary travel and accommodation arrangements for the VIP to get to Singapore and welcomed at MBS.

138.    CW-2 noted that "[t]here are no licensed junkets at Marina Bay Sands, but there are still some that operate there discreetly without a license." Doing so, according to this witness, required the cooperation of MBS employees, as, typically, a Macao junket operator would "refer" a wealthy Chinese customer to an MBS International Marketing employee (the same individuals who controlled whether credit would be extended to a patron regardless of the results of the financial background check). According to CW-2, it was then "common for MBS customers to transfer funds to the junkets in order to pay a commission to the junket" – a fact this witness knows well based on his personal friendships with junket operators in Macao.

139.    CW-2 also noted that junket operators would sometimes physically accompany their customers to MBS, noting that he had seen his friends who operate a Macao junket on premises in Singapore to personally introduce players to members of MBS' International Marketing Department. CW-2's recollection comports with the assertions of Li Chi Yan in his suit, where he claimed the three junket operators accompanied him to MBS and which MBS defended against by claiming two of the individuals were purportedly MBS patrons and the third a marketing employee of LVS.

140.    Finally, CW-2 noted that, while MBS did not publicly support the use of junkets, he personally observed internal inconsistencies in procedures related to a high-spending customer's losses

that seemingly endorsed the junket operation. Specifically, CW-2 stated that if a VIP customer was approved for credit and won, the customer would "exchange the chips for cash." However, if the customer lost, "the sum of money [that was lost] is deducted from the junket account," adding that the casino would "chase the customer" even though "the money has been deducted from the junket account." "It's not supposed to happen this way, but it happens," stated CW-2 with regards to MBS' junket use.

141.   CW-1 was exposed to MBS' relationship with junkets within weeks of starting her position. Coming into the casino world without any previous industry experience, the witness was quickly brought up to speed by her co-workers in the Compliance and Finance departments, who explained the role junkets play with respect to high rollers. CW-1 also recalled being in security surveillance rooms as part of her compliance duties and having known junket affiliates pointed out to her. Despite these individuals illegally operating within MBS without a license, she was unaware of any investigation into junkets during her time at the casino. CW-1 suspected that unlicensed junkets were opening and using personal accounts at MBS to conduct their business, but the witness' manager did not allow her to investigate any of these individuals further and, instead, instructed her to follow the limited STR process. According to this witness, members of MBS' Legal and Finance teams "100% knew" that there were junkets operating at the casino, but she was unaware of any steps taken to curb the practice. In fact, the witness believed that any personnel who asked questions about the junket operations was at risk for losing his or her job and it was her ethical concerns regarding the suspicious transfers ultimately led her to depart MBS as quickly as she did.

142.   In the same manner that MBS' compliance function was kept powerless by other forces at LVS and MBS to stop the unauthorized transfers between customer accounts, it also lacked the tools or strength to identify and curb illegal junket activity. This supposedly changed in April 2018, when MBS amended its internal procedures and stated to the CRA that, pursuant to these changes, "[e]mployees also receive training to spot and report suspicious behavior and any unlicensed junket-related activities." Of course, this means that prior to April 2018 (including during the Class Period), MBS employees were not equipped to either spot or report illegal junket activity, fostering an environment where these nefarious actors were allowed to prosper.

143.    Further, because junket operations were illegal at the casino, MBS was unable to pay these illegal junket operators through legitimate means like, for example, other LVS properties in Macao. Instead, CW-1 stated that she believed MBS possibly disguised these payments to junkets through the use of unauthorized customer-to-customer transfers.

## VI.    RISING BAD DEBT EXPENSES AND CUSTOMER BACKLASH TO THE ILLICIT TRANSFER PRACTICES

### A.    LVS' Bad Debt Expense and Write-Offs Continue to Rise as the Company Bankrolls Subprime Gamblers with Little Recourse for Collectability

144.    MBS' widespread practice of using unauthorized transfers to create premium players allowed MBS to extend credit to many patrons who would not have otherwise qualified for credit.

145.    While the unauthorized fund transfers allowed MBS to technically comply with the credit limitation provisions of the CCA and CCR, casino patrons' use of credit to place wagers was still subject to the firm's internal underwriting standards, at least in theory.

146.    In practice, however, casino patrons frequently obtained more credit from MBS than MBS' own internal underwriting standards supported.

147.    For MBS, the probability of collection of debt issued to patrons from mainland China is exceptionally low because gambling debts are legally unenforceable in Chinese courts. Thus, when CW-2 and his coworkers were instructed to approve credit for patrons from mainland China whose financial statements and background checks did not satisfy MBS' internal underwriting standards, the likelihood of a bad debt write-off increased.

148.    Further, by engaging in a system of internal and unauthorized customer-to-customer transfers involving the funds of unwitting casino patrons, MBS was able to funnel money to illegal junkets operating within the casino without detection from any regulatory body. These payments could then be written-off as uncollectable bad debt.

149.    MBS' scheme of using unauthorized third-party transfers to technically comply with legal limitations on extending credit to certain patrons, coupled with the willingness of management to ignore internal underwriting standards, resulted in a tremendous amount of bad debt expense for MBS. A *Bloomberg* article described it thusly:

> While it's not clear how much money the unauthorized transfers and unpaid debts cost Marina Bay Sands, from 2013 through March 2020 the casino wrote off $717 million

AMENDED COMPLAINT
30

from 928 accounts, according to an internal document seen by Bloomberg. A former Sands executive says typical losses for a casino that size are $20 million to $30 million a year. The peak write-offs were in 2015 to 2017, the years immediately following the biggest transfers, while 67% of the dollar value was tied to Chinese clients, the document shows.[11]

150.   These write-off figures for MBS alone are even more jarring in context, as *all* account receivable write-offs taken by LVS across all properties over the same period, as reported in the Company's SEC filings, totaled $1.61 billion – meaning **nearly 62%** of write-offs during the period stemmed from MBS:

| | Provision for Doubtful Accounts and Write-Offs (in millions) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | All LVS Casinos | | | | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Balance at Beginning of Year | 33 | 61 | 119 | 182 | 275 | 492 | 630 | 673 | 637 | 576 | 442 | 324 | 282 |
| Provision for Doubtful Accounts | 42 | 104 | 98 | 151 | 239 | 238 | 187 | 156 | 173 | 96 | 5 | 30 | 99 |
| Write-Offs, Net of Receoveries | (14) | (46) | (35) | (57) | (23) | (100) | (143) | (192) | (234) | (230) | (123) | (72) | (67) |
| Balance at End of Year | 61 | 119 | 182 | 275 | 492 | 630 | 673 | 637 | 576 | 442 | 324 | 282 | 314 |

151.   MBS' scheme to circumvent legal restrictions on credit wagers helped to keep credit-based wagering as a percentage of table drop volume artificially high from 2010 through 2017. Because these credit-wagers were made by patrons who should not have been extended credit under MBS' internal underwriting criteria, LVS' allowance for doubtful accounts rose from 25.1% of gross receivables in 2010 to 51.5% in 2017. Accordingly, LVS' write-offs skyrocketed from $34.6 million in 2010 to $234 million in 2016.

| | Credit-Based Wagering at MBS, LVS' Allowance for Doubtful Accounts & Writeoffs | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| MBS, Credit Wagers as % of Volume | 35.2% | 34.5% | 33.2% | 29.3% | 31.0% | 33.1% | 28.6% | 34.1% | 16.0% | 23.9% |
| LVS ADA, % of Gross Receivables | 25.1% | 22.2% | 27.7% | 36.2% | 33.8% | 36.4% | 47.7% | 51.5% | 41.1% | 32.3% |
| Writeoffs (in millions) | (34.6) | (57.2) | (22.7) | (99.7) | (143.2) | (192.3) | (234.0) | (230.0) | (123.0) | (72.0) |

152.   The extraordinarily high write-offs prompted LVS to limit the practice of unauthorized third-party transfers in 2018 and to reduce the amount of credit extended to casino patrons. Coincidentally, in 2018 when credit-based wagers were cut from 34.1% of table drop volume in the previous year to only 16% of table drop volume, casino revenues also fell more than 7%.

---

[11] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

B.   **MBS High Roller Wang Xi Files Suit Against the Company, Alleging Millions in Unauthorized Transfers and Setting Off Investigations in Both Singapore and the United States**

153.   On September 26, 2019, Chinese national and VIP gambler Wang Xi filed a statement of claim in the High Court of Singapore against MBS, claiming that the casino misappropriated SGD$9.1 million (approximately $6.1 million USD) from his account through unauthorized transfers to other MBS patrons.

154.   According to Wang, the amount was pilfered from his account through 22 separate transactions made between October and December 2015 and carried out through letters of authorization that appeared to either be forged or photocopied. However, when Wang attempted to verify the authenticity of the letters, he was provided only copies and told that the originals had been destroyed through the casino's Macao affiliate for "reasons of confidentiality."

155.   The high-profile lawsuit quickly grabbed the attention of both the news media and the government in both Singapore and the United States.

156.   It was later reported by *Bloomberg* that, in January 2020, the United States Department of Justice issued a grand jury subpoena to a chief compliance officer at MBS, "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls."

157.   Additionally, in May 2020, *Bloomberg* broke the news that the Singapore police were investigating Wang's claims and the unauthorized transfer activity at MBS.

158.   Finally, in June 2020, *Bloomberg* noted that the Singapore CRA had commenced its own investigation, with the regulator commenting to the media source that it was "committed to ensuring that the casinos in Singapore, including Marina Bay Sands, remain free from criminal influence or exploitation, and takes a serious view of any allegations of unauthorized money transfers."

159.   Further, and unbeknownst to the investing public, LVS hired international law firm Hogan Lovells to conduct an internal probe into the transfer allegations. The Hogan Lovells probe uncovered instances of employees not complying with proper standards by filling in payment details on pre-signed or photocopied authorization forms. Additionally, the Hogan Lovells probe determined that, of the more than 3,000 letters of authorization accounting for more than SGD$1.4 billion in customer-to-customer transfers executed between 2013 and 2017, letters authorizing transfers for SGD$365

million (or more than 26%) bore signatures that appeared similar – supporting the inference that these were likely photocopied duplicates and unauthorized.

160.     In a letter to the CRA, MBS claimed to have conducted its own review and amended its compliance procedures in April 2018, effectively ending the unauthorized transfer practice. To do so, according to MBS, it instituted basic and fundamental compliance policies previously missing at the casino, including a requirement that transfer letters have fresh "wet ink" signatures and that the staff receive verbal confirmation from a patron before moving any funds.

161.     Given that MBS instituted these compliance changes in April 2018, it is reasonable to infer that it carried out its internal investigation at some point prior to that, identifying the material weakness in its compliance controls and the significant number of impacted party-to-party transfers between 2013 and 2017 that served as the impetus for such change. However, at no point did MBS or LVS ever publicly disclose these findings, leaving shareholders in the dark about this practice and the fundamental flaws in MBS' controls.

## VII.     DEFENDANTS MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS THROUGHOUT THE CLASS PERIOD[12]

162.     Throughout the Class Period, Defendants made several false and misleading statements of material fact, or omitted to state material facts necessary to make the statements made not misleading, about LVS' and MBS' operations, including the unauthorized transfer problem that had run rampant in Singapore.

163.     These statements were made in the following LVS Annual Reports filed on Form 10-K with the SEC:

- Form 10-K filed after the close of trading on February 26, 2016 for Fiscal Year 2015, signed by Sheldon G. Adelson, Robert G. Goldstein, and Patrick Dumont, among others (the "2015 Annual Report");

---

[12] The portions of quoted text presented in this section in **bolded, underline** are alleged to be false and misleading, in violation of the federal securities laws.  The remaining text is provided for context and as further support for any alleged omission.

- Form 10-K filed on February 24, 2017 for Fiscal Year 2016, signed by Sheldon G. Adelson, Robert G. Goldstein, and Patrick Dumont, among others (the "2016 Annual Report");

- Form 10-K filed on February 23, 2018 for Fiscal Year 2017, signed by Sheldon G. Adelson, Robert G. Goldstein, and Patrick Dumont, among others (the "2017 Annual Report");

- Form 10-K filed on February 22, 2019 for Fiscal Year 2018 with the SEC, signed by Sheldon G. Adelson, Robert G. Goldstein, and Patrick Dumont, among others (the "2018 Annual Report"); and

- Form 10-K filed on February 7, 2020 for Fiscal Year 2019 with the SEC, signed by Sheldon G. Adelson, Robert G. Goldstein, and Patrick Dumont, among others (the "2019 Annual Report").

164.    The 2015 Annual Report, 2016 Annual Report, 2017 Annual Report, 2018 Annual Report, and 2019 Annual Report are collectively referred to herein as the "Annual Reports."

165.    In addition to the Annual Reports, false and misleading statements were issued by Defendants or Company representatives in various quarterly SEC filings, on earnings calls, and at investor conferences, as more specifically alleged herein.

A.    **False and Misleading Statements Regarding LVS' Issuance of Credit and the Collectability of Receivables**

166.    In the Annual Reports, LVS made materially false and misleading statements about LVS' policies and procedures for extending credit. LVS also made materially false and misleading statements related to the collectability of receivables.

167.    In the Annual Reports, LVS told investors that extension of credit to a casino patron is dependent upon the patron's financial resources and ability to repay the debt:

We extend credit to those customers **whose level of play and financial resources warrant**, in the opinion of management, an extension of credit.

168.    LVS repeated this statement twice in each of the Annual Reports, with the exception of the 2019 Annual Report, where the statement was made only once.

169.     But despite LVS' repeated claim that the Company extended credit to patrons "whose […] financial resources warrant," management at MBS regularly told credit managers specifically to exclude financial resources as a factor in determining whether to extend credit to certain patrons, or overrode any credit analysis, as reported by CW-2. *See* ¶¶ 123-25, *supra*.

170.     LVS also included the following cautionary language in its Annual Reports:

We extend credit to a large portion of our customers and we may not be able to collect gaming receivables from our credit players.

**We conduct our gaming activities on a credit and cash basis.** Any such credit we extend is unsecured. Table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than players who tend to wager lesser amounts. High-end gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a significant positive or negative impact on cash flow and earnings in a particular quarter.

During the year ended December 31, [], approximately [] of our table games drop at our Macao properties, Marina Bay Sands and our Las Vegas properties, respectively, was from credit-based wagering. **We extend credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit. These large receivables could have a significant impact on our results of operations if deemed uncollectible.**

171.     Defendants' statements were false and misleading because the business model extending credit to gamblers was built on a scheme to falsely accredit otherwise subprime borrowers through the unauthorized movement of hundreds of millions of dollars between accounts. To carry out the scheme, MBS employees obtained signed, but otherwise blank letters of authorization (the document necessary to carry out a customer-to-customer transfer at MBS) from unsuspecting wealthy patrons at MBS. These employees then used these documents to move money between customer accounts without proper authorization, providing the necessary paper trail falsely justifying the extension of credit to otherwise subprime borrowers and allowing these borrowers to escape any governmental scrutiny related to cash transfers out of China and into Singapore.

172.     LVS made additional materially false and misleading statements in the Annual Reports when discussing the difficulty of collecting debts in foreign jurisdictions:

While gaming debts evidenced by a credit instrument, including what is commonly referred to as a "marker," and judgments on gaming debts are enforceable under the current laws of Nevada, and Nevada judgments on gaming debts are enforceable in all states under the Full Faith and Credit Clause of the U.S. Constitution, other jurisdictions

around the world, including jurisdictions our gaming customers may come from, may determine, or have determined, enforcement of gaming debts is against public policy. Although courts of some foreign nations will enforce gaming debts directly and the assets in the U.S. of foreign debtors may be reached to satisfy a judgment, judgments on gaming debts from courts in the U.S. and elsewhere are not binding in the courts of many foreign nations.

In particular, we expect our Macao operations will be able to enforce gaming debts only in a limited number of jurisdictions, including Macao. To the extent our Macao gaming customers and gaming promoters are from other jurisdictions, our Macao operations may not have access to a forum in which it will be possible to collect all gaming receivables because, among other reasons, courts of many jurisdictions do not enforce gaming debts and our Macao operations may encounter forums that will refuse to enforce such debts. Moreover, under applicable law, our Macao operations remain obligated to pay taxes on uncollectible winnings from customers.

**It is also possible our Singapore operations may not be able to collect gaming debts because, among other reasons, courts of certain jurisdictions do not enforce gaming debts. To the extent our Singapore gaming customers' assets are situated in such jurisdictions, our Singapore operations may not be able to take enforcement action against such assets to facilitate collection of gaming receivables.**

**Even where gaming debts are enforceable, they may not be collectible. Our inability to collect gaming debts could have a significant adverse effect on our results of operations and cash flows.**

173.    LVS' cautionary language is materially misleading because it focuses only on the difficulty of collecting in foreign jurisdictions, excluding the risks of non-collectability arising from MBS' then-existing subprime lending practices. Moreover, the few paragraphs not focused on collection in foreign jurisdictions are boilerplate statements with no discussions of the risks that had already materialized and were known to MBS and LVS management.

174.    LVS also made materially false and misleading statements in the Annual Reports related to the manner in which it determined its provision for doubtful accounts. In the Annual Reports, LVS stated:

The amount of this provision can vary over short periods of time because of factors specific to the customers who owe us money from gaming activities at any given time. **We believe the amount of our provision for doubtful accounts in the future will depend upon the state of the economy, our credit standards, our risk assessments and the judgment of our employees responsible for granting credit.**

175.   LVS' foregoing statements were materially false and misleading because the provision for doubtful accounts was not dependent on the judgment of LVS employees responsible for granting credit. Instead, as revealed by CW-2, management at MBS routinely short-circuited the credit approval process and promoted subprime lending to patrons who would not have been extended credit if the decision were left to the judgment of the employees responsible for granting credit. Further, unauthorized transfers from client accounts were being used to falsely credential individuals who otherwise would have been ineligible to receive credit under MBS' underwriting standards – factors that necessarily impacted the provision for doubtful accounts as these individuals began to default and their debt became uncollectible.

176.   Additionally, at several points throughout the Class Period, Defendants included in their SEC filings a discussion of LVS' recovery for doubtful accounts and a historical explanation for any improving condition thereof. These false and misleading statements included:

- <u>August 4, 2017</u> – Form 10-Q, signed by Sheldon G. Adelson and Patrick Dumont: "The provision for doubtful accounts was $54 million for the six months ended June 30, 2017, compared to $88 million for the six months ended June 30, 2016. **The decrease resulted from** increased collections of previously reserved customer balances during the six months ended June 30, 2017, as compared to the prior year period, and **continuing improvement in the quality of casino credit currently being extended.** The amount of this provision can vary over short periods of time because of factors specific to the customers who owe us money from gaming activities at any given time. **We believe that the amount of our provision for doubtful accounts in the future will depend upon the state of the economy, our credit standards, our risk assessments and the judgment of our employees responsible for granting credit**."

- <u>November 3, 2017</u> – Form 10-Q, signed by Sheldon G. Adelson and Patrick Dumont: "The provision for doubtful accounts was $77 million for the nine months ended September 30, 2017, compared to $139 million for the nine months ended September 30, 2016. **The decrease resulted from** increased collections of previously reserved customer balances during the nine months ended September 30, 2017, as compared to the prior year period, and **continuing improvement in the quality of casino credit currently being extended.** The amount of this provision can vary over short periods of time because of factors specific to the customers who owe us money from gaming activities at any given time. **We believe that the amount of our provision for doubtful accounts in the future will depend upon the state of the economy, our credit standards, our risk assessments and the judgment of our employees responsible for granting credit."**

- <u>February 23, 2018</u> – the 2017 Annual Report – "The provision for doubtful accounts was $96 million for the year ended December 31, 2017, compared to $173 million for

1  the year ended December 31, 2016. **The decrease resulted from** increased collections
2  of previously reserved customer balances during year ended December 31, 2017, as
3  compared to the prior year period, and **continuing improvement in the quality of casino
   credit currently being extended.** The amount of this provision can vary over short
4  periods of time because of factors specific to the customers who owe us money from
   gaming activities at any given time. **We believe that the amount of our provision for
5  doubtful accounts in the future will depend upon the state of the economy, our credit
   standards, our risk assessments and the judgment of our employees responsible for
6  granting credit."**

7  • <u>July 25, 2018</u> – Form 10-Q, signed by Sheldon G. Adelson and Patrick Dumont: "The
     recovery of doubtful accounts was $9 million for the six months ended June 30, 2018,
8    compared to the provision for doubtful accounts of $54 million for the six months
9    ended June 30, 2017. **The decrease resulted from** increased collections of previously
     reserved customer balances during the six months ended June 30, 2018, as compared to
10   the prior year period, and **continuing improvement in the quality of casino credit
     currently being extended.** The amount of this provision can vary over short periods of
11   time because of factors specific to the customers who owe us money from gaming
12   activities at any given time. **We believe that the amount of our provision for doubtful
     accounts in the future will depend upon the state of the economy, our credit
13   standards, our risk assessments and the judgment of our employees responsible for
     granting credit.**

14 
15 • <u>October 26, 2018</u> – Form 10-Q, signed by Sheldon G. Adelson and Patrick Dumont: "The
     provision for doubtful accounts was $5 million for the three months ended September 30,
16   2018, compared to $23 million for the three months ended September 30, 2017.
     **The decrease primarily resulted from** increased collections of previously reserved
17   customer balances and **continuing improvement of the quality of casino credit
     currently being extended.** The amount of this provision can vary over short periods of
18   time because of factors specific to the customers who owe us money from gaming
19   activities. **We believe the amount of our provision for doubtful accounts in the future
     will depend upon the state of the economy, our credit standards, our risk
20   assessments and the judgment of our employees responsible for granting credit.**

21 • <u>February 22, 2019</u>– the 2018 Annual Report: The provision for doubtful accounts was $5
     million for the year ended December 31, 2018, compared to $96 million for the year
22   ended December 31, 2017. **The decrease resulted from** increased collections of
     previously reserved customer balances during year ended December 31, 2018, as
23   compared to the prior year period, and **continued improvement in the quality of casino
24   credit currently being extended.** The amount of this provision can vary over short
     periods of time because of factors specific to the customers who owe us money from
25   gaming activities at any given time. **We believe the amount of our provision for
     doubtful accounts in the future will depend upon the state of the economy, our credit
26   standards, our risk assessments and the judgment of our employees responsible for
     granting credit.**

27 
28

177.    Each of these similar statements was materially false and misleading by omission, as Defendants failed to mention the reason for the continued improvement in the quality of casino credit being extended: the slowing and ultimate discontinuation of the unauthorized transfer practice in early 2018, meaning MBS was no longer extending credit to subprime recipients, necessarily slowing the amount of uncollectible debt arising therefrom.

178.    Further, Defendant's descriptions of LVS' Accounts Receivable and Credit Risk in several of its SEC filings throughout the Class Period were materially false and misleading:

- February 26, 2016 – 2015 Annual Report – "Accounts receivable are comprised of casino, hotel and other receivables, which do not bear interest and are recorded at cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to its junkets in Macao, which receivables can be offset against commissions payable to the respective junkets.** Business or economic conditions, the legal enforceability of gaming debts, or other significant events in foreign countries could affect the collectability of receivables from customers and junkets residing in these countries."

- February 24, 2017 – 2016 Annual Report – "Accounts receivable are comprised of casino, hotel and other receivables, which do not bear interest and are recorded at cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to its junkets in Macao, which receivables can be offset against commissions payable to the respective junkets.** Business or economic conditions, the legal enforceability of gaming debts, or other significant events in foreign countries could affect the collectability of receivables from customers and junkets residing in these countries."

- February 23, 2018 – 2017 Annual Report – "Accounts receivable are comprised of casino, hotel and other receivables, which do not bear interest and are recorded at cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to junket operators in Macao, which receivables can be offset against commissions payable to the respective junket operators.** Business or economic conditions, the legal enforceability of gaming debts, or other significant events in foreign countries could affect the collectability of receivables from customers and junket operators residing in these countries."

- February 22, 2019 – 2018 Annual Report – "Accounts receivable are comprised of casino, hotel and other receivables, which do not bear interest and are recorded at cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to gaming promoters in Macao, which receivables can be offset against commissions payable to the respective gaming promoters.** Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries."

- <u>February 7, 2020</u> – 2019 Annual Report – "Accounts receivable are comprised of casino, hotel and other receivables, which do not bear interest and are recorded at cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to gaming promoters in Macao, which receivables can be offset against commissions payable to the respective gaming promoters.** Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries."

- <u>April 24, 2020</u> – Form 10-Q signed by Sheldon G. Adelson and Patrick Dumont: "Accounts receivable are comprised of casino, hotel, mall and other receivables, which do not bear interest and are recorded at amortized cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to gaming promoters in Macao.** These receivables can be offset against commissions payable to the respective gaming promoters. Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries."

- <u>July 24, 2020</u> – Form 10-Q signed by Sheldon G. Adelson and Patrick Dumont: "Accounts receivable is comprised of casino, hotel, mall and other receivables, which do not bear interest and are recorded at amortized cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to gaming promoters in Macao.** These receivables can be offset against commissions payable to the respective gaming promoters. Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries."

179.    Each of the statements identified in the preceding paragraph were materially false and misleading because Defendants failed to disclose that the ultimate driver of the extension of credit at MBS was not a background check or the investigation of a patron's creditworthiness, but instead that patron's relationship with the casino's International Marketing Department, who ultimately could (and did) override any objective analysis in favor of extending credit to important casino customers. Moreover, the statements concerning the extension of credit to approved customers premised on "background checks" and "investigations of creditworthiness" were false and misleading because credit was being extended pursuant to the operation of a scheme that involved the unauthorized movement of hundreds of millions of dollars between customer accounts to falsely accredit otherwise subprime borrowers.  Further, the discussion of accounts receivable wholly omits any mention of the association

and payments to junkets in Singapore, rendering the discussion of MBS' relationship with junkets in Macao incomplete.

180.    Further, at the J.P. Morgan Gaming, Lodging, Restaurant & Leisure Management Access Forum on March 10, 2016, then-LVS President and Chief Operating Officer Robert Goldstein fielded questions from analysts about LVS. In discussing the extension of credit to VIPs in Singapore and the impact of the credit regulations, Goldstein stated:

*Unknown Analyst*
Do you think some of the VIP's are prone to [indiscernible]?

*Robert Glen Goldstein*
No. I don't think that's the case. I think that's a myth created by somebody. And the reason I say that is, the same impediments that make it difficult to gamble in Macao are present in our property in Cotai – I mean, Singapore. I can't speak to places I don't operate. I can't speak to the Philippines or Korean casino, but I don't believe so, and I'll tell you why. First of all, there's a natural bias to want to go to Macaos, closest, most comfortable culturally. Two, you still have to move the money. If you want to bet $1 million, you have to move that, transfer that cash, and that's a problem whether you're in a Singapore or Korea, the government is still watching, observing, so that's an issue. Three, I don't think it's as if – I think people, it's moving money out of China, it's respecting the government. It seems so simple, in a way. It's like watching these presidential debates. It always seem so simple when you – I'll fix this and do that. But it is not that simple to move money and not that simple to comply and not that simple to get to Singapore and be a high roller there. **No, the answer is, I've not seen evidence of that. In fact, if anything, I say, today it's harder to move money than ever, especially in our hotels because we're very compliant and we're very proud of our compliance record.** Two, I think it's really hard to make money today. It's a different world over there than it was a couple short years ago. And I think, three, there's a rethinking of spending because maybe you see less opportunity to earn money, you rethink how you spend money and comments – and now who you are, whether you're working for a living as a – in any job, you've got to say, what's my inflow-outflow. I think a lot of people in China and throughout Asia are stopping and rethinking, recalibrating how they spend their cash. So I don't think any of these has been a huge beneficiary to what's happened in China. I think that's a myth.

*Unknown Analyst*
What about [indiscernible]? Has that been an issue? [indiscernible]

*Robert Glen Goldstein*
Yes. Because we're very much a – probably the biggest reason why. **We're very much asked the question where does it come from, who are you, how do you get credit, how do you – if a person wants a line of credit or wants to move money, we're probably the first line of defense. In fact, I think we're more aggressive than the government in terms of monitoring that. We're a big believer that compliance is critical. We've embraced it the last 4 years, 5 years, and we don't fear it. We**

**embrace it, accept it. It's part of our world today.** There was a time couple years ago, people would say, well it won't last, your compliance. It's a worldwide phenomenon. It's happening in banks throughout the world. **It's happening in Las Vegas, in Hong Kong, Singapore.** So I don't think the high-end business, even when things get better and you're making more money and you want to gamble, will ever lose the compliance focus that we have today. I think most operators, good operators do. You got to have a long-term perspective, and if you're going to sustain your business, you must be compliance-focused. Most of you are too young to remember, but many years ago here in Las Vegas, there's a Reg. 6A, and the whole idea $10,000, you have to declare it. And people in Las Vegas thought the world came to an end. Basically, we were going to close the place, put the lights out. And you survive these things and you move on. That's the world today.

181.    The statements identified above were materially false and misleading because, at the same time Goldstein was espousing LVS' purported compliance focus, specifically with respect to overseeing money transfers into Singapore, MBS' team on the ground was employing a business model that sought to extend credit to gamblers built on a scheme to falsely accredit otherwise subprime borrowers through the unauthorized movement of hundreds of millions of dollars between accounts. To carry out the scheme, MBS employees obtained signed, but otherwise blank letters of authorization (the document necessary to carry out a customer-to-customer transfer at MBS) from unsuspecting wealthy patrons at MBS. These employees then used these documents to move money between customer accounts without proper authorization, providing the necessary paper trail falsely justifying the extension of credit to otherwise subprime borrowers and allowing these borrowers to escape any governmental scrutiny related to cash transfers out of China and into Singapore.

182.    In response to an analyst question about the gaming volumes at MBS during the second quarter of 2016 during an earnings call on July 25, 2016, Defendant Goldstein stated:

*Thomas Glassbrooke Allen*
        Can you give us some more color on the softness that you saw in the Singapore gaming volumes, both on the mass and the VIP side. And then any color on just the outlook for that property will be helpful.

*Robert Glen Goldstein*
        Tom, it's Rob. **Clearly, the VIP volume, I think, reflects a global phenomenal slowdown at the $5 million-plus customer. Rolling volume is very soft relative to the past at $6,740,000.** We held well, which is encouraging, **but volumes are off and it's off primarily in that $5 million-plus high-end rolling customer.** I think that's reflected in Macao as well as Las Vegas, and maybe that's a global slowdown. I'm not sure how to explain that. But we've always fit [ph] super-concentrated, and we could see it bounce. **But I would think that's going to be a tough segment for the foreseeable future.** On the mass table side, clearly we missed our usual $4.7 million, $4.8 million. That's the

first time in 2 years we've missed the game to $4.7 million, $4.8 million. The question is, is that a short-term blip, the 90-day miss, or is that a trend we don't know at this point. That's the more interesting one to me. I think the rolling business speaks for itself, and that's explainable throughout the world. This one is only explainable to our property. We've kind of done very, very well in that segment. We'll stay hyperfocused in that segment. **We'll continue to have salespeople and products against that segment.** That is our focus. I want to believe we'll return July and August and September back to $4.7 million, $4.8 million. That's where we want to be. Our goal long-term is $5 million a day. It's a blip. It's a miss this quarter. But I don't believe it's a trend, I hope it's not, and want to wait and see what the future holds. The property overall – I think the other confusing part to me is our slot business was up and our [indiscernible] actually improved Q-on-Q and year-on-year. So that's encouraging. Our retail business remains flat or actually up a bit. Our hotel business is very strong, leading the market in ADR and occupancy and RevPAR. So the other indicators in Singapore are pretty positive. The miss is purely in the table game side and primarily in the mass table side. No way to give you an accurate prediction of where that bounces back to $4.7 million, $4.8 million, $4.9 million. I'm sure hoping so. But other indicators are positive. Again, rooms, retail, slot machines, ETGs, all positive. As you identified, the miss is in the table games side.

183.   The above-identified statements in Goldstein's response to the analyst's question were false and misleading because they misrepresented the true state of VIP gaming volume (identified in LVS parlance as "rolling volume") at MBS at the time. While rolling volume was soft during the quarter, as acknowledged, Goldstein did not disclose MBS' ongoing efforts to combat that issue – using its internal marketing salespeople and illegal junkets to buoy the segment with high rollers, even if it meant manufacturing these gamblers through the use of unauthorized transfers as part of a concerted scheme to open up lines of credit for otherwise uncreditworthy patrons. Therefore, Goldstein's statement about the historical and then-existing practices at MBS ("We'll **continue** to have salespeople and products against the [$5-million-plus high end rolling segment]") was materially false and misleading by omission.

184.   On a November 3, 2016 earnings call for the third quarter of 2016, Sheldon Adelson stated the following in response to an analyst's question regarding LVS' competitive advantage over the only other casino operator in Singapore:

*Joseph Richard Greff*
Two questions, one on Macao and then one on the Singapore. On Macao, can you talk about what the competitive response has been since The Parisian opened, both from newer properties and older existing ones? And then on Singapore, mass win per day of $4.8 million in the 3Q showed some nice sequential growth. Can you talk about what's driving that? And is it just seasonality? Or is there something more than just seasonality?

*Robert Glen Goldstein*
It's Rob. I'll take Singapore first. As you know, we had a weak quarter last quarter in that most critical segment, the non-rolling slot ETG segment. We're disappointed, and we were honest about that 3 months ago. We're very happy to see it return to what's been the status quo for a couple of years, that $4.8-plus million a day at a 60-plus percent margin. I really – we said more activity on the floor, both foreign – mostly foreign activity. We have more overnight stays from Indonesia and Malaysia driving that, really encouraging because, as we said to you time and time again maybe ad nauseam, that, that is the segment that drives MBS. So it was a great return for the quarter, solid performance, more foreign visitation, more use of the MBS room product. And I think the aberration of the Q2 is behind us, so feel very good about that, a little bit of a sign of relief after weeks of Q2.

*Sheldon Gary Adelson*
We've - I just want to add on, we've always been the EBITDA leader in Macao. We have never once been even second. We've always been first. Galaxy has done a very good job of getting into the market, but we're still twice as big they are in EBITDA. **Same thing in Singapore. They – I think, our duopoly just came out with a – with earnings yesterday. Did I hear it right, that we're double what they are?**

*Robert Glen Goldstein*
About 74%.

*Sheldon Gary Adelson*
**We're 74% of the market. There's got to be something we're doing right and our competitors are not doing.** And now that we've got this behemoth one-stop shop for everything unprecedented in the world, I think we're going to continue to have high hotel occupancy and continued increases in our gaming market.

185.    The above-identified statements from Adelson were materially false and misleading by omission because they failed to disclose what LVS was doing in Singapore to attract its 74% market share that Sentosa was not: engaging in the unauthorized transfer practice to credential and finance a new crop of high rollers, while shielding them from any government inquiry and, at the same time, associating with illegal junkets to bring VIPs to MBS' private gaming rooms.

186.    In response to an analyst's question about MBS player composition on an earnings call for the first quarter of 2017 on April 26, 2017, Defendant Goldstein stated:

*Joseph Richard Greff*
Great. Rob, given the strength of the VIP market in Macao, obviously, not necessarily seeing it in the 1Q numbers. But are you starting to see that segment in Las Vegas pick up? And are seeing incrementally more Mainland Chinese VIP players flock to Marina Bay Sands?

*Robert Glen Goldstein*

I'll start with the Las Vegas. Joe, our approach in Las Vegas, we're seeing a better gaming environment, but I think it's still dwarfed by the power of the lodging story in Las Vegas. I'm not going to say that there's a pickup here and there, but I don't think it's broad based, and I don't think it's that impactful. We're still in Las Vegas experiencing nicely a great quarter. We made some money in the VIP segment, obviously Chinese New Year's. We certainly made money in the slot business, but our focus in Las Vegas remains – our concentration of profit remains in the lodging side. We had a tremendous – we're back to – finally made it back to 2008 or 2007 in terms of ADR and RevPAR. So yes, there's a lift but I wouldn't consider it material at this point into Las Vegas from China. **MBS, I got to take a minute just recognize how strong I feel about the performance there.** I think it's extraordinary that we did $388 million normalized **without having a strong VIP business over there.** Frankly, what's really compelling about MBS is this is a product that the – it's the benchmark product for all new jurisdictions to look at, both aesthetically and from an operating perspective. In a rather difficult environment because of the downturn of GGR, headwinds from the currency perspective, I think MBS is just extraordinary to have a run rate of 1 4, 1 5, maybe better. To be the shining star in the development world and operational side of our business. I'm very proud of our results there. **But no, it's not driven by VIP out of Mainland China. The diversification, geographic diversification of MBS is just compelling.** We deal with a lot more business coming out of Malaysia and Indonesia, Korea, Japan. In fact, I think last I looked, the contribution from China fell under 20%, which is both terrific in one regard and also, **it might make for a good story when VIP reemerges into MBS.** But you have to take a look at MBS and be – I'm a very proud of our results, the $388 million normalized, 1 4, 1 5, 1 6, a great mall sale in the horizon. It's just a great business over there. We lead the market in ADR. We lead – where 70% of the EBITDA composite goes to MBS. **And so I think it's just a great story all these years later. And it's not really being helped that much by VIP out of China, from both a Rolling or Non-Rolling perspective. So that's the story as far as how we see MBS in Las Vegas.**

187.    Goldstein's statements about MBS' historical reliance on VIPs from China was materially false and misleading. As recalled by CW-2, during his time at MBS seven out of ten credit applications came from Chinese nationals, evidencing the importance of this critical sect of gamblers to MBS' VIP segment. Further, as alleged herein, the ongoing unauthorized transfer practice specifically benefited Chinese VIPs attempting to shield their winnings and money transfers from any government onlookers. Finally, Goldstein's historical reference to MBS' performance "without having a strong VIP business over there [in Singapore]" was materially false and misleading when MBS was engaging in the unauthorized transfer practice to boost that same VIP segment.

188.    In response to an analyst question regarding growth at MBS during Sanford C. Bernstein & Co., LLC's 33rd Annual Strategic Conference 2017 on May 31, 2017, Defendant Goldstein stated:

*Vitaly Umansky*
So maybe if we can head down south a little bit to Singapore. Marina Bay Sands continues to be the dominant property in the duopoly down there. But I think on the nongaming side, hotel rooms, MICE business, retail has been doing extraordinarily well. Gaming has kind of held its own, but the growth has been basically nonexistent. It's been fairly, fairly uninspiring. Do you think that market, and MBS in particular, has the ability to kind of have a growth engine on the gaming side? And if so, what do you need to do to make that growth materialize?

*Robert Glen Goldstein*
One thing you have to do with MBS that's a little tricky is to make sure you separate – you write the total GGR in that market has been declining. No argument. However, the mass, premium-mass business actually is on the incline, and that's where our profitability is. So you're right, what was once a rolling market that we thought could reach a $100 billion for the 2 properties, it's more like a market – it's like maybe a $50 billion, $60 billion rolling. But again, the margins in rolling, as you know, are limited because the – it's a weak margin business so the constitution is back to customer. The truth of the matter is we make an awful lot of our money in that market just like Macao with mass, premium-mass. And that market is growing actually. And in fact, we're – we have some capacity issues there. So as long as you stay focused on that segment of the market, we're making more money in Singapore than we ever thought we could make with this GGR decline. What would bring it back would be a rebirth of high-end gaming, especially out of China and Japan and Korea coming into Singapore. We're thrilled to be making $1.4 billion, $1.5 billion there. Very happy with it. Could it get to $2 billion with '20? I don't see it happening next couple of years. I see us being able to sustain our run rate. It may grow a little bit with more hotel – higher hotel rates. Our retail business gets better and better and our premium-mass business. **But to your point, it's hard to see a real catalyst other than a return to more rolling business there. I don't see it happening in any big way in Singapore for the next 2 years.**

189.    Goldstein's above-identified statements were materially false and misleading by omission, as he failed to disclose LVS' primary historical effort over the several years preceding the statement to combat the softening rolling (VIP) business: the unauthorized transfer practice and the association with illegal junkets operating in Singapore.

190.    When discussing MBS' performance on the July 26, 2017 earnings call for the second quarter of 2017, Adelson stated:

*Sheldon Gary Adelson*
Now moving on to Marina Bay Sands in Singapore. We delivered an excellent quarter at Marina Bay Sands, with EBITDA of USD 492 million, our second highest quarterly EBITDA since opening. **The quarter was marked by a particularly strong performance in the VIP gaming segment**, where rolling volumes increased by 29%

over the prior year as well as our retail mall businesses, where tenant sales grew by 11% over the prior year.

191.    Further, in response to an analyst question on the same earnings call, Goldstein stated:

*Joseph Richard Greff*

A question for you guys. Obviously, the VIP business was rip-roaring at Marina Bay Sands. What drove that? Is it a different marketing approach? Is it credit? Is it macro-driven? How concentrated or how broad-based was the rolling chip strength that you saw?

*Robert Glen Goldstein*

Sure. Well let's be clear, **we obviously had a stellar quarter, which was driven by the rolling segmen**t and we had stronger volumes and above-average hold percentage which helped MBS too. I think it was our second best quarter in the history of the property since we opened. The nonrolling...

*Sheldon Gary Adelson*

It was 7 years ago.

*Robert Glen Goldstein*

Yes, a long time ago. The nonrolling table and slot ETG volumes were stable, although they didn't grow, a little bit disappointing. And the lodging component was softer than usual because the Singapore lodging market is softer. But I think this quarter reflects the many opportunities of profit we have to drive our business at MBS. Even taking out ex the large whole percentage, we delivered about $385 million of normalized EBITDA, which sets up the potential for a huge year this year at MBS. **There's nothing new there in terms of marketing strategies. What we are doing is reducing commissions in the rolling segment to enhance our profitability, enhance our margins.** We successfully keep pushing back on the commissions and testing the waters to see how far we can go. You'll see that enhanced profitability in the rolling segment this quarter, and we play lucky. Let's be clear, we had a lot of luck this quarter. Probably about $100 million of increased hold. But having said that, we're very pleased in a quarter where the usual drivers were absent, we didn't see the big lodging component, we didn't see the big component coming out of the nonrolling slot ETG segment. We still delivered great results **and it was all about the very high end and playing a bit lucky**. But I would again look at the commission structure and how it's changing. I think we run about 65/35 in terms of the composite market EBITDA in Singapore. And so we're very proud of the results there, albeit our traditional drivers were a little absent this quarter.

192.    In response to an analyst question on the reported growth at MBS, Goldstein stated:

*Robert Glen Goldstein*

Yes, as we addressed, **Singapore had an unusual quarter because we did have large volumes relative to the past and past year or so on the rolling**, and obviously, when you hold well, that skews things a bit. But I think if you step back, maybe even with the rather soft lodging market and a softer nonrolling table segment in the market, we did pretty well. Margins held up pretty well. And again, I think the power of MBS is

AMENDED COMPLAINT
47

evident this quarter by the fact that we had less traditional drivers, yet we had the high end emerge, and we held lucky. So I think margins like that are reasonable, and you can believe them in the long term.

193.    These statements made on the July 26, 2017 earnings call identified in the preceding three paragraphs were each materially false and misleading because Defendants failed to disclose the main driver of that VIP gaming segment: MBS' unauthorized transfer practice, which was getting VIPs into the casino and facilitating their play through the improper extension of credit, in conjunction with MBS' coordination with illegal junkets operating within its casino.

194.    Further, on the same earnings call and in response to a question about volatility for the rolling chip (VIP) volume, Goldstein stated:

*Harry Croyle Curtis*
Yes. That was where I was going is, do you think we're in a more stable environment now? Because historically, that rolling chip volume has been quite volatile?

*Robert Glen Goldstein*
Yes, I think it's been stable the last year or 2. As you know, it's fallen off terrifically from the early days when there was belief we could do $50 million or $60 million. But I think currently running in the $35-plus million range, I think that's realistic. **As you know, and I think it bears repeating, that this is a highly concentrated segment, that a couple of dozen players can make a difference in a quarter.** But we feel like we're running at a more stable rate the last 3 quarters within the 8 2, 8 9, 8 7 range. But bear in mind, a year ago, we dropped down to 6 7, so a big increase year-on-year. **But this market, especially in Singapore, is like Las Vegas, 10, 20 people can make a difference. And so I would caution you always to keep in mind it's volatile and concentrated.**

195.    In discussing the volatility and concentration of the VIP market, Goldstein's above-identified statements were materially false and misleading because they failed to disclose that MBS had artificially boosted those figures throughout the Class Period through the use of the unauthorized transfer practice and through the engagement of junkets and, therefore, volatility was all but guaranteed.

196.    On the January 24, 2018 earnings call for the fourth quarter and full year 2017, Goldstein again discussed the volatility within the VIP market at MBS, stating in response to an analyst's question:

*Felicia Rae Kantor Hendrix*
Okay. So that's helpful. And then just switching gears, Singapore, Rob. You have highlighted previously that VIP, the volumes could be volatile there. So I was just wondering if the decline year-over-year there was just due to the normal ebbs and flows in your business or anything else. And then also on the mass side, you did better than

what we were looking for in the quarter, but the volumes were also lower year-over-year as well. So I was just wondering if you could comment on that.

*Robert Glen Goldstein*

Sure. I have 2 thoughts on Singapore. One is we're extremely pleased with the result this year, and $1.7 billion is a pretty extraordinary result. Yet I would caution, either realize that **Singapore has – is the – is not growing on the rolling side. In fact, it declined a bit. And as we mentioned ad nauseam, it's highly concentrated and continues to rely on a too small segment of customers to drive it. So we're not seeing growth in that segment.** We are seeing extraordinary management. I'm really pleased with the **team over there. They did an excellent job of controlling costs, commissions, everything across the board to create these big numbers that came out of MBS this year.** I'd also agree with you that we're not seeing growth in the mass segment. They – it's hovering around $4.4 million, $4.5 million, $4.6 million for the last 8 quarters, and I am disappointed we haven't seen more growth out of Singapore. I don't know why I would say otherwise into the future. I don't see why it would be any catalyst in the near future to drive that. Singapore is a wonderful success story. But at this point, it's just a very large producer of EBITDA without growth prospects in the near future. So we would applaud management's efforts this year to create $1.7 billion. It could have been a lot less. And yet, I'm hoping we'll see growth to make it easier in the future to create some more growth, be it Rolling or Non-Rolling. Your points are appreciated and agree with.

197.    Later in the same earnings call Goldstein stated:

*Robin Margaret Farley*

Great. I wonder if you could just sort of speculate out loud a little bit on why you think the VIP volumes aren't growing in Singapore, just given the improvement we've seen from other VIP play in Macao, just why that's not happening in Singapore.

*Robert Glen Goldstein*

Okay, Robin, and I'll take my best shot at this. **First of all, we've always said it's concentrated to not thousands but hundreds of players. I also think that Singapore is somewhat a victim of you've got some competition in the region. I think the Philippines have grown a lot. The Highlands have been renovated nicely. I think you've got – Macao is going to be a very, very important destination for people coming out of Korea and even Japan. Much more – I think it's much easier to go to Macao than Singapore for lobby, premium mass Chinese play. I have to point to those examples. As well as you know, we've had some – we have to be very careful. We cannot remarket Indonesia. That's become increasingly more difficult, and so we're very cautious. We run our business that way. We take no risks with marketing. We take no risks with collections. We take no risks we think are unnecessary. You're right. I think the growth in Macao is driven by premium mass Chinese business out of Mainland China that I think is opting to go to very, very nice resorts in Macao that are attracting a lot of attention. It's also easier to do business in Macao in terms of credit, money movement, et cetera. So I think we're the victim of a very strong Macao market, an increasingly strong competitive market, be it the Highlands, be it Philippines, et cetera. We're not far from giving up. I mean, the property made $1.7 billion, not too bad. And as you know, my bigger**

AMENDED COMPLAINT
49

**concern is not in the rolling but in the premium mass and the non-rolling because that's where most of our profit resides and most of our margins are 60-plus. That's more concerning, and that's a mix that comes out of – there's a decline in Singaporean patrons but also a decline in other markets around us. So as much as we focus on rolling, I think the non-rolling is more disturbing. You can't grow that number beyond $4.5 million, $4.6 million for the last 7, 8 quarters. We're going to keep at it. We got a very good team on the ground there. We'll keep looking at cost, but obviously, love to see some top line growth. And that's the best indications or best thoughts I can give you on the growth prospects for Singapore.**

198.     The statements identified in the preceding two paragraphs from Defendant Goldstein on the January 24, 2018 call were materially false and misleading because they failed to include the primary driver of VIP growth at MBS to that point, and the primary impediment to it going forward – the unauthorized transfer practice was able to successfully bring new VIPs through the door for a short-term rolling segment figures, but the practice was being phased out and eventually entirely curbed in early 2018.

199.     On the April 25, 2018 earnings call and in response to an analyst question about EBITDA growth at MBS, Goldstein stated:

*Joseph Richard Greff*
        Great. That's helpful. And then, for Marina Bay Sands, you have on Page 25 of the slide deck, on a hold-adjusted basis, EBITDA grew 11% year-over-year. If you were to neutralize for FX and collections activity, what was that – I guess you would neutralize it in both periods, what was that EBITDA growth?

*Robert Glen Goldstein*
        It came down to 4 20. Hold-normalized, I think we showed 4 20 for the quarter. **And as you can tell by the numbers, there's deceleration in the rolling segments. Disappointing that, that segment has slowed down quite a bit.** We held very well. The other aspects of our business looks strongly. Patrick referenced the sales per square foot in the mall, the ADR, the lodging business holding up nicely. And our slots ETGs non-rolling business is decent at 4.7, but there's a slowdown at the top line in terms of the – that's a pretty soft quarter. We just played very lucky against that business and I hope we see it return to a better day. But right now, that's a soft spot in Singapore. The rest of the business looks pretty decent.

200.     Goldstein's statement about the decelerating rolling segment was materially false and misleading as it failed to disclose that the unauthorized transfer practice, which had been ongoing at MBS for several years prior and was responsible for artificially boosting the rolling segment, had been

halted during the early portion of 2018, negatively impacting the segment and causing the slow down

identified by Goldstein as "disappointing."

201.   Similarly, in response to an analyst question during an earnings call on July 25, 2020,

Goldstein stated:

*Thomas Glassbrooke Allen*

Can you talk about the Singapore performance in the quarter? Mass trends look
to have grown pretty strongly, but obviously, VIP fell significantly. So can you just talk
about what's going on there, and how should we think about the future?

*Robert Glen Goldstein*

Sure. As you see, MBS stood about 3 68 for the quarter. We ran – our business
ran very well there with the exception you've called out. The hotel rev at 97% at $418
million. RevPAR, $405 million. Retail, [ however ], I think its best quarter ever at $1,753
sales per square foot. And non-rolling slots, as you mentioned, got to – non-rolling slots
tables got to $4.8 million per day, with margins hanging up in the low 60s. So – And that
is, of course, the main driver of our success. **The weak link in that performance was
the rolling segment, and we had our lowest rolling volume in our history at under
$6 billion, and we held about in the range, 2.4 but down last – from last quarter's
4.77.** We've always represented this is a highly concentrated quarter, and this quarter,
there was no concentration. **The business was soft, and there's no denying it.** We are
working towards looking what we can do to improve that. Even with that weakness, this
place still shows about $1.5 billion annualized run rate, which is acceptable. The question
is how can you drive more business in here? And the answer is twofold. We've got to
keep ramping our premium mass business, which clearly is the real driver of the
underlying EBITDA. And we've got to work harder to figure out how to get better-
quality play in from the rolling segment. Again, it's concentrated. It's confusing to us at
times how it jumps up some quarters to $7 billion, $8 billion, $9 billion and then tumbles
like this quarter. We're not happy with it. We plan to work at it. We're looking at our
suite product. We need to renovate some suite product. The competition for that segment
is strong regionally, Macao and Australia, et cetera. But we're not pleased with that
rolling segment performance. We've got work to do, and there's no other excuse, and
we've got to keep looking at how to improve it. And we certainly don't want to give up
on it because next thing you know, we could have an $8 billion or $9 billion quarter this
year. But clearly, that's the weak link in the performance at MBS.

202.   Goldstein's statements were materially false and misleading because they failed to

address the reason that the rolling segment was so weak during the quarter: the discontinuance of the

unauthorized transfer practice and the impact on the extension of credit to the very same VIPs that

previously propelled the rolling segment's success at MBS, as well as LVS' broad compliance procedure

changes instituted during the quarter that made it more difficult to skirt regulations.

203.    A different analyst pressed Goldstein on the quarterly performance during the July 25, 2018 earnings call, to which he responded:

*Stephen White Grambling*
     I guess just a follow-up on Marina Bay Sands. Have you seen any change in the competitive environment, specifically there within the market? And I guess, has anything changed from a promotional intensity? And how do you think about that as a lever?

*Robert Glen Goldstein*
     Not really. I think the market remains – We **– I don't see competitive problems there as far as Genting. It does a very good job in the market. But we continue to run our business as we see fit. Our concern with ourselves, with our product was getting the right kind of the team out in the field to get the rolling segment we're missing.** But we're very pleased with our $4.8 million a day. [intelligible] Sheldon referenced the mall sales, extraordinary. Hotel is sold out. If anything, we lack in that market, Stephen, it's more capacity. What's frustrating is we just need more – we'd love to have more sleeping rooms and more gaming capacity. Slots there do terrific numbers, and it's hard to see that as a competitive problem. It's simply a problem of capacity. We have built a building that's always full. Retail's full. Slots, ETGs, 80%, 90% occupancy at weekends. **So I don't think it's a competitive problem in terms of pressures from Genting. We just try to do a better job in our rolling segment.**

204.    These statements were materially false and misleading because, in discussing the competitive environment and the impact on MBS' rolling segment, Goldstein omitted any reference to the then-discontinued practice of engaging in unauthorized transfers so as to improperly bolster the VIP segment through the improper extension of credit – the halting of which in 2018 was then reverberating through MBS' VIP business.

205.    Goldstein's statements on the October 24, 2018 earnings call for the third quarter of 2018 were similarly misleading when he stated, in response to an analyst inquiring about continued VIP issues at MBS:

*Carlo Santarelli*
     Great. And then, just one quick follow-up. With respect to Marina Bay Sands, obviously, first quarter, tremendous margins. Last 2 quarters, margins under pressure a little bit. I know you guys, obviously, have lapped some of the commission stuff that you did on the VIP side. But is there anything else that's kind of influencing the margins there? Or is that just really boiling down more to business mix on a quarter-by-quarter basis?

*Robert Glen Goldstein*
     Well, business mix is always important at MBS, but I got to take a moment to say that we – I think it's a misunderstood product, and is our profit drivers there. We – our

AMENDED COMPLAINT
52

first driver there, as you know, is base mass, and that's premium mass slot, ETG. It runs 60-plus-percent quarter after quarter. We wish it could make more money, but we're capacity constrained, unfortunately. But that is the #1. It's $1 billion of contribution plus, and so that's the #1 thing. The other business that drives like crazy is hotel, food and beverage, which runs consistently $95 million with, again, extraordinarily good margins. Our retail business, which is $160 million, $170 million, again, retail business is always a high-margin business. **<u>The outlier is the VIP business.</u>** And what's ironic as we go back and do some work in what we're doing there, **<u>the team there has effectively grown the margin by double from a 15%, 16% business to a 30-plus-percent business.</u>** The struggle there is growing the top line. **<u>And so as you know, we've struggled there, and we're going to keep struggling. It's not a growth business in terms of the rolling business</u>**. But I guess, we're proud of Macao. We've got the margins at, roughly – we think they're exceptional, $1.5 billion, $1.6 billion, $1.7 billion properties, hard to find. Not many of those around. So we're thrilled with that business. We wish we could have more ability to grow it, and we wish – but can't raise rates a whole lot more. We can't – we're winning the slots, something like normal slots are up to $800 a unit. I just don't know what else we can do at Marina Bay Sands, but we'll take $1.6 billion, $1.7 billion. It's, as Sheldon says, it's a living. So we're trying. But I don't – I think our mix is – the only thing that – those 4 segments **<u>that is vulnerable to margin pressures, is the rolling piece.</u>** We're consistent every other business, from retail, hotel rooms, food and beverage, and base mass and rolling. So a great business. We just need to get more capacity.

206. Goldstein's above-identified statements were materially false and misleading because they omitted the primary reason that MBS' VIP segment was dealing with pressure in the prior quarter: after five years, MBS could no longer rely on the unauthorized transfer scheme, as the practice had been halted earlier in the year and new compliance programs instituted to prevent the artificial boosting and extension of credit to subprime borrowers.

**B. <u>False and Misleading Statements Related to the Use of Junkets at MBS</u>**

207. LVS made materially false and misleading statements in the Annual Reports related the activities of junket operators at LVS' casinos, reporting that LVS depended on junket operators for a significant portion of gaming revenues in Macao, but failing to disclose that LVS also relied on junket operators for a material portion of gaming revenues in Singapore.

208. In the 2015 Annual Report, 2016 Annual Report, and 2017 Annual Report, LVS stated:

**<u>We are dependent upon gaming junket operators for a significant portion of our gaming revenues in Macao.</u>** […]

**<u>Junket operators, which promote gaming and draw high-roller customers to casinos, are responsible for a significant portion of our gaming revenues in Macao.</u>** With the increased number of gaming facilities in Macao, the competition for relationships with junket operators has increased. Our gaming revenue associated with

junket operators is in decline and may continue to decline in the future. There can be no assurance that we will be able to maintain, or grow, our relationships with junket operators. If we are unable to maintain or grow our relationships with junket operators, or if the junket operators experience financial difficulties or are unable to develop or maintain relationships with our high-roller customers, our ability to grow our gaming revenues will be hampered.

209.    LVS made identical statements in the 2018 Annual Report and 2019 Annual Report, but replaced the phrase "junket operators" with "gaming promoters":

**Gaming promoters, which promote gaming and draw VIP patrons to casinos, are responsible for a portion of our gaming revenues in Macao.** With the increased number of gaming facilities in Macao, the competition for relationships with gaming promoters has increased. There can be no assurance we will be able to maintain, or grow, our relationships with gaming promoters. If we are unable to maintain or grow our relationships with gaming promoters, or if the gaming promoters experience financial difficulties or are unable to develop or maintain relationships with our VIP patrons, our ability to grow our gaming revenues will be hampered.

210.    LVS' foregoing statements related to its dependence on junket operators or gaming promoters were materially false and misleading because, although they disclosed LVS' dependence on junket operators and gaming promoters for a significant portion of gaming revenues at its Macao casinos, Defendants failed to disclose that gaming revenues at MBS were also materially dependent on junket operators and gaming promoters, as alleged herein.

211.    LVS also made materially false and misleading statements in the Annual Reports related its practice of extending credit to junket operators:

**The Company also extends credit to junket operators in Macao, which receivables can be offset against commissions payable to the respective junket operators [or gaming promoters]. Business or economic conditions, the legal enforceability of gaming debts, or other significant events in foreign countries could affect the collectability of receivables from customers and junket operators [or gaming promoters] residing in these countries.**

212.    LVS' foregoing statements were materially false and misleading because, while they disclosed LVS' practice of extending credit to junket operators or gaming promoters in Macao, LVS failed to disclose the same practice occurred at MBS and its accompanying credit risks.

213.    On the July 26, 2017 earnings call, and in response to an analyst from Deutsche Bank's question about MBS' performance, Goldstein stated:

*Carlo Santarelli*

Great. And then if I just could go back to one point you made, I just want to make sure I heard it right. You talked a little bit about MBS and kind of what you're doing on the VIP side. And did I hear you correct in saying your – *obviously no junkets in the market, so every relationship is direct.* Your rebates or commissions to your VIP customers, you've been kind of pulling back on them a little bit. So even on normalized fold going forward, your margin profile within VIP should be improved?

*Robert Glen Goldstein*

**Exactly correct. We continue to cut back commissions at our second bite at the apple, and you've identified it perfectly, yes.**

214.    Goldstein's affirmation of the analyst's question was materially false and misleading because MBS had been working with illegal junkets in Singapore for years, as confirmed by CW-1, CW-2, and sources interviewed by *Bloomberg*, contrary to the affirmed representation from the analyst that there were "obviously no junkets in the market."

**C.    False and Misleading Statements About the Wang Xi Lawsuit and the Unauthorized Transfer Claim**

215.    During the Class Period, Defendants and the Company generally refrained from speaking about the unauthorized transfers or any investigation carried out at MBS to determine the scope of the issue. However, on June 10, 2020, Daniel J. Briggs, the Senior Vice President of Investor Relations for LVS attended Stifel, Nicolaus & Company, Incorporated's 2020 Virtual Cross Sector Insight Conference on behalf of the Company. During this conference, and in response to a question from Stifel analyst Steven Moyer Wieczynski, Mr. Briggs stated the following:

*Steven Moyer Wieczynski*

So I got to ask the question, and I don't know how much you can say. But obviously, there was news about a DOJ investigation that popped up. I think it was a couple of weeks ago in Singapore. And again, not sure how much you can say about that, but any color there would be greatly appreciated.

*Daniel J. Briggs*

Sure. Sure. I mean this is a situation where – let me frame this out by saying, number one, the company is deeply committed to leading in compliance. And we want to be a leader in compliance, and we spend a lot of money and hire a lot of really expensive experienced people from financial services institutions and the Department of Justice and the FBI and all sorts of other law enforcement agencies that give us a great feel for how we can lead in compliance and make sure that we're not doing anything that's untoward and inappropriate.

In this specific situation, we had a – we have a customer who is a disgruntled customer and not a good person. **I don't want to get into the details of it, but this person has mistreated staff and had been very inappropriate, and we basically banned him from the building. And that customer didn't like being banned, wants to come back and play, has been fighting with us to try to figure out a way to come back and play. He's paid us all of the debt that he owed us, but we have continued to ban him because of his mistreatment of some of our employees. And then he has threatened, "Well, I'm going to get a lawyer and we're going to make as much trouble as possible." So that's what's happened. We'll see.**

**We don't know of any investigation that's happening right now. We've heard that this guy is trying to illustrate some things that he believes were inappropriate in the past. We don't believe that we've done anything inappropriate with respect to this customer other than not letting him back in the building because he's mistreated folks.**

So we'll see what happens. We're very, very close to the CRA. We talk to the CRA almost on a daily basis. The CRA is the Casino Regulatory Authority in Singapore. And we're very close with them and want to make sure that, that relationship is very deep and strong and it is. So we'll work through this thing and figure out what it is. But it's coming from a disgruntled customer. Whether there's anything underneath it, I think it's still too early to say.

216.   Mr. Briggs' statements, made on behalf of LVS at a conference during which he was representing the Company, were materially false and misleading when made. As of the date these statements, the Company had already conducted its own investigation into the unauthorized transfer practice complained of by Wang Xi[13] and retained Hogan Lovells to do similarly. The Hogan Lovells findings lent credence to Mr. Wang's allegations, largely corroborating the methods for misappropriation through the transfer scheme alleged in the lawsuit. Further, LVS and MBS had already instituted sweeping compliance procedure changes in 2018 in response to the unauthorized transfers practice identified by Hogan Lovells. Finally, just one month later in July 2020, LVS and MBS would settle the lawsuit with Wang Xi in exchange for *full payment* of his claimed missing amount. Each of these facts illustrates the falsity of Mr. Briggs' statement, particularly his claim that "[w]e don't believe

---

[13] While Mr. Briggs never specifically identified Wang Xi as the individual in question, subsequent reporting by *Bloomberg* reporting indicates that Mr. Wang threw a glass at an MBS staff member. *See* https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers. Given Wang's then-pending suit against the Company, the identified locale (Singapore) and the referenced DOJ investigation (as reported by *Bloomberg* in the context of the Wang suit), it is reasonable to infer that Mr. Briggs was discussing Mr. Wang.

that we've done anything inappropriate with respect to this customer other than not letting him back in the building because he's mistreated folks."

### D.   <u>False Statements Related to Disclosure Controls and Procedures</u>

217.   LVS made materially false and misleading statements in the Annual Reports related to disclosure controls and procedures. In each of the Annual Reports, LVS highlighted the importance of having adequate disclosure controls and procedures and assured investors that LVS' disclosure controls and procedures were effective:

> Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. **The Company's Chief Executive Officer and its Principal Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of [], and have concluded that they are effective at the reasonable assurance level.**

218.   LVS' foregoing statements related to the adequacy of its disclosure controls and procedures were materially false and misleading because LVS repeatedly failed to timely disclose information that was required to be disclosed by the Company, such as LVS' lack of effective internal controls and the hundreds of unauthorized transfers of patron money accounting for hundreds of millions of dollars.

219.   LVS also made statements in the Annual Reports that purported to warn investors of the limitations of any system of controls:

> **It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.**

220.   LVS' foregoing statements related to the limitations of any system of controls were materially false and misleading because the cautionary language was simply a boilerplate statement that

did not disclose that LVS' disclosure and control procedures were not reasonably effective and did not promote the timely disclosure of information that the Company was required to disclose.

## VIII.   <u>THE TRUTH IS REVEALED OVER SEVERAL PARTIAL DISCLOSURES</u>

221.   The truth about MBS' activities related to the unauthorized transfers between customer accounts and the casino's use of junkets or junket-like operations leaked into the market over the course of several partial disclosures.

222.   On September 26, 2019, Wang Xi filed his statement of claim in the High Court of Singapore, seeking to recover SGD$9.1 million (or approximately $6.6 million USD) that he claimed MBS transferred to other unknown casino patrons without his authorization through 22 transfers made between October and December 2015. On the same day, LVS' stock price declined, closing at $55.88 per share – a $1.20 decline over the prior day's close.

223.   Reports of Wang's lawsuit began circulating on October 10, 2019, when *Bloomberg* author Chanyaporn Chanjaroen published an article titled "Singapore Sands Sued by Chinese Ex-Client Claiming $6.6 Million."[14] While the October 10, 2019 article was limited, it did provide some initial details of the allegations of Wang's complaint. According to this article, MBS had told Wang that it had received signed authorization letters from him in Macao for the disputed transactions – a fact that Wang denied, asserting the letters were forgeries, as his signature had been copied and pasted onto the document. When Wang insisted on seeing the original documents, MBS stated that they had been destroyed by the casino's Macao affiliate for "reasons of confidentiality."

224.   On May 12, 2020, *Bloomberg* broke the news that, in response to Wang's lawsuit, the Singapore police commenced a probe and were investigating the unauthorized transfer activity at MBS. On this news, LVS' stock price dropped from a close of $48.50 on May 11, 2020 to $45.96 on May 12, 2020.

---

[14] https://www.bloomberg.com/news/articles/2019-10-10/singapore-sands-sued-by-chinese-ex-client-claiming-6-6-million

225.   Then, on June 4, 2020, Chanyaporn Chanjaroen and Tom Schoenberg of *Bloomberg* published an article titled "Adelson's Singapore Casino Probed Over Laundering Controls,"[15] not only affirming its previous reporting of the Singapore police investigation into MBS, but announcing for the first time that LVS was being probed by the United States Department of Justice to determine "whether anti-money laundering regulations were breached in the way [LVS] handled the accounts of top gamblers."

226.   According to this article, the United States Department of Justice issued a grand jury subpoena to a former compliance chief of MBS in January 2020 (i.e., three months after Wang initiated his suit against the casino) "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls." In the context of this grand jury process, prosecutors asked this former compliance head to produce records related to any such regulatory violations, including the use of gambling junkets and third-party lending using casino credit.

227.   The June 4 *Bloomberg* article further reported that Wang's allegations and the possible practice of unauthorized transfers at MBS had drawn the attention of the CRA who, in response to a *Bloomberg* inquiry, stated it was "committed to ensuring that the casinos in Singapore, including Marina Bay Sands, remain free from criminal influence or exploitation, and takes a serious view of any allegations of unauthorized money transfers."

228.   The June 4 article also cites an individual with knowledge of the internal investigation carried out at MBS related to these transfers, stating:

> Marina Bay's internal probe found instances of its group employees violating accepted transfer procedures by filling in payment details on pre-signed or photo-copied authorization forms, according to a person familiar with the matter. It also uncovered cases in which original documents were destroyed, the person said.

229.   The unauthorized transfer activity supposedly stopped in April 2018, according to a source cited in the June 4 article, when MBS amended its procedures.

230.   Despite mounting evidence to the contrary, a Marina Bay Sands spokesman quoted in the June 4 article claimed that when the "allegations related to the mishandling of 'letters of

---

[15] https://www.bloomberg.com/news/articles/2020-06-04/adelson-s-singapore-casino-probed-over-money-laundering-controls

authorization' were made, the company thoroughly reviewed the matter," and that "[t]he review concluded that no patron funds were transferred in a manner that was contrary to a patron's intent."

231.   The June 4 article was then updated at 2:08 am EDT on June 5, 2020, adding reference to the November 2019 report of the Financial Action Task Force (FATF) - a global anti-money laundering watchdog who urged Singapore to tighten its controls, particularly with respect to its casinos and real estate agents in its report:

> In its 4th round [mutual evaluation report], Singapore was rated [Partially Compliant] with R.22, based on deficiencies with regard to the inadequate customer due diligence (CDD) requirements applicable to casinos, real estate agents, [Precious Stone and Metal Dealers] and accountants, and the fact that the record-keeping obligations for real estate agents and accountants were not provided by law.
>
> * * *
>
> Pursuant the legislation of Precious Stones and Precious Metals (Prevention of Money Laundering and Terrorism Financing) Act (PSPM (PMLTF) Act), the amendments to its Accounting Act and relevant subsidiary legislation and amendments, Singapore has addressed most of the deficiencies related to public accountants and PSMDs. **Singapore has indicated that they will be taking further steps, but as of now, deficiencies related to real estate agents and casinos remain unaddressed. Given the inherently higher risk of casinos, as recognised in the country's national risk assessment (NRA) and MER, moderate shortcomings are still affecting the [Designated Nonfinancial Businesses and Professions] sectors**.
>
> **Singapore has not addressed all of the identified deficiencies and moderate shortcomings still exist. Singapore therefore remains rated Partially Compliant with R.22.**

232.   The findings of the FATF were amplified, and their impact on the CRA disclosed for the first time, on June 7, 2020 when *Bloomberg* author Chanyaporn Chanjaroen published an article titled "Singapore Mulls Tighter Anti-Money Laundering Rules for Casinos." According to this article, the CRA was "considering tighter regulations at its casinos in an effort to prevent money laundering and financing terrorism," and the regulator had already requested (but not required) that casino operators lower the threshold for cash transactions triggering due diligence review from the legislatively mandated SGD$10,000 to SGD$5,000. While the CRA denied that the review of the legislative threshold for due diligence was triggered by the investigation into Wang's allegations against MBS, *Bloomberg* noted that the timing conspicuously coincided with its own report of a week earlier regarding the United States

Department of Justice investigation into MBS related to its anti-money laundering controls and the handling of its player accounts and its publicizing of the claims of the Wang lawsuit.

233.   Then, after the close of market on July 19, 2020, *Bloomberg* published a new article authored by Chanyaporn Chanjaroen titled "Sheldon Adelson's Singapore Casino Ends Suit with $6.5 Million Payment," announcing that MBS had agreed to a confidential settlement with Wang Xi in exchange for full payment of his demand – SGD$9.1 million, according to a source familiar with the matter. LVS' stock price responded to the news by dropping from $48.69 on July 17, 2020 (the last trading day before the news) to a close of $47.28 on July 20, 2020.

234.   While the Wang settlement included a "non-admission" of liability from both sides according to *Bloomberg*'s source, it was the filing of the suit, as well as *Bloomberg*'s reporting thereof, that appears to have spurred investigations in both Singapore and the United States into MBS' practices.

235.   On September 16, 2020, *Bloomberg* published a new article from Chanyaporn Chanjaroen and Andrea Tan titled "Adelson's Singapore Casino hires Law Firm to Probe $1 Billion Transfers."[16] In this article, *Bloomberg* revealed for the first time that LVS had hired the well-known Singapore law firm of Davinder Singh Chambers LLC to conduct a new investigation into employee transfers of more than $1 billion in gamblers' money to third parties, citing sources familiar with the matter.

236.   According to the September 16 article:

> The review by one of Singapore's best-known law firms adds to scrutiny of the casino by the U.S. Department of Justice and Singapore authorities after a patron sued the firm last year alleging that S$9.1 million ($6.7 million) of his money was transferred to other gamblers without his knowledge. The lawsuit was settled out of court in June, with the casino agreeing to reimburse the full amount. There was a "non-admission" of liability from both sides.

237.   The September 16 article also disclosed that, while the CRA had completed its investigation into MBS and concluded that it did not breach requirements related to Wang's claims, "there were weaknesses in MBS' casino control measures pertaining to fund transfers."

---

[16] https://www.bloomberg.com/news/articles/2020-09-16/adelson-s-casino-hires-law-firm-to-probe-1-billion-in-transfers

238.     Further, in a statement to *Bloomberg*, the CRA stated that it "takes a serious view of such matters and had directed MBS to strengthen its control measures, which MBS has since undertaken. CRA will continue to exercise close oversight to ensure that MBS' measures are effective."

239.     The measures taken by MBS, as referenced by the CRA in its statement, were presumably the April 2018 changes to internal procedures "to ensure that gamblers authorize each fund transfer, and that the requests are approved by the casino's compliance department," as described in the September 16 article based on an inside source. Additionally, pursuant to these procedure changes, "[e]mployees also receive training to spot and report suspicious behavior and any unlicensed junket-related activities."

240.     While the CRA had concluded its review, the Singapore police declined to comment for the article, stating that it does not comment on *ongoing* investigations.

241.     Further, the September 16 article noted that Davinder Singh was actually the *second* major law firm retained by LVS to conduct an internal investigation into the unauthorized transfer practice. While *Bloomberg* earlier published articles referencing an "internal probe" conducted at MBS, the September 16 article disclosed for the first time that an additional probe was conducted by Hogan Lovells.

242.     According to the September 16 article, the earlier Hogan Lovells probe uncovered instances of employees not complying with proper standards by filling in payment details on pre-signed or photocopied authorization forms. Additionally, and for the first time, the magnitude of the malfeasance was disclosed, as Hogan Lovells determined that, from 2013 to 2017, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in an amount totaling approximately SGD\$1.4 billion (or approximately \$1.05 billion USD). Of these transactions, letters authorizing transfers for SGD\$365 million (approximately \$275 million USD) from multiple casino guests bore signatures that appeared similar – thus, corroborating the earlier allegations of Wang that MBS employees were employing a system of copying signatures to conduct unauthorized transfers. Further troubling was the fact that, according to the September 16 article and the Hogan Lovells review, "[o]ne group of employees was involved in S\$763 million in transfers" – meaning just a "handful of staff" were able to carry out the activities.

243.   LVS' stock price responded negatively to learning this news, dropping from a close of $51.85 on September 15, 2020 to $49.67 on September 16, 2020.

## IX.   A POST-CLASS PERIOD REPORT BY *BLOOMBERG* SHEDS FURTHER LIGHT ON THE TRANSFER SCHEME AND MBS' RESPONSE

244.   After the close of trading on December 21, 2020, *Bloomberg* published a new article from Chanyaporn Chanjaroen and David Scanlan titled "Adelson's Singapore Casino Paid a Price for Courting China's 'Whales.'"[17] In this article, *Bloomberg* recounted the facts of the Wang suit and the scope of the third-party transfers at MBS (more than 3,400 transfers accounting for more than SGD$1.64 billion between October 2010 through December 2018), but also provided new insight into the outcome of the Company's internal investigation into the matter:

> A problem for Marina Bay is that several employees appear to have highjacked the process from about 2013 to 2018. They would get the patrons to sign a blank authorization form to get things started, then fill in the amount of the transfer and other details for subsequent wires. At times they'd use photocopies of the same document on multiple occasions to expedite the moves, copy signatures if needed, and destroy the originals after the funds were sent, the people say.

> Marina Bay management was largely unaware of the transfer problem until 2018, according to a former compliance executive who was interviewed as part of an internal investigation. ***When the executive brought up the issue and tried to tackle it, the operations and legal teams urged him to back off.  Later, his contract was not renewed, the official told the law firm conducting the investigation.***

> Marina Bay Sands says it's cut back on third-party transfers and tightened security over their usage. Documents seen by Bloomberg show the amount of transfers dropped to just six in 2018 from a peak of 1,011 in 2014.

245.   The December 21 article also shed additional light on the changes to internal MBS procedures instituted in 2018 to combat the unauthorized transfer problem, including such basic diligence requirements like "ensuring that all transfer letters had fresh 'wet ink' signatures and that staff received a verbal confirmation from the patron before moving any funds."

246.   Further, as set forth in the December 21 article and quoting from MBS' letter to the CRA regarding its increased security practices, third-party transfers would now be "subject to enhanced due diligence checks which will include screening of the patron and third-party for junket affiliation and

---

[17] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

declaration of the relationship between the patrons and the reasons for the patron making the third-party payment."

247.    MBS' reference to junket-related due diligence was particularly of note, given LVS' prior stance that it prohibited any junket activity in MBS. Instead, and as set forth in the December 21 article and based on documents reviewed by *Bloomberg*, MBS employees were working directly with junkets to attract Chinese gamblers. These documents corroborated previous allegations made by former MBS patron Luo Shandong who, in response to being sued by MBS for SGD$3.5 million, asserted that no debt was owed because he already paid the money to Tian Du, a junket company operating in MBS' VIP lounge alleged to have been providing credit and collecting repayments on behalf of MBS.

248.    A former marketing executive at MBS interviewed by *Bloomberg* corroborated the use of junkets, indicating that the casino had to call in the illegal operations when MBS first opened because of a lack of local contacts.

249.    Finally, the December 21 article contextualized the impact the unauthorized transfer activities and overextension of credit had at MBS, stating "from 2013 through March 2020 the casino wrote off $717 million from 928 accounts, according to an internal document seen by Bloomberg." These write-offs dwarfed the expected $20 to $30 million per year for a casino the size of MBS, as estimated by a former Sands executive cited by *Bloomberg*. Further, "[t]he peak write-offs were in 2015 to 2017, the years immediately following the biggest transfers, while 67% of the dollar value was tied to Chinese clients," according to documents seen by *Bloomberg*.

250.    LVS' stock price responded negatively to the news, dropping from a closing price of $56.88 per share on December 21, 2020 (prior to the news' release after hours) to $56.26 on December 22, 2020.

## X.    ADDITIONAL ALLEGATIONS DEMONSTRATING DEFENDANTS' SCIENTER

251.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing

public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

252.    The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer of LVS and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings.  As a result, each could falsify the information that reached the public about the Company's business and performance.

253.    Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's unauthorized transfer scheme and relationship with illegal junkets. Such actions allowed LVS to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to LVS as the Individual Defendants were among LVS' most senior management and were acting within the scope of their employment.

A.    **The Individual Defendants' Knowledge and/or Recklessness**

1.    **Former MBS Employees Confirm that the Unauthorized Transfer Practice and Use of Junkets was Widespread and Well-Known**

254.    As alleged herein, several former employees of MBS have confirmed that the unauthorized transfer practice and the use of illegal junkets was widespread and well-known at MBS.

255.    Specifically, two of Plaintiffs' CWs corroborate the accounts of additional former employees cited by *Bloomberg* beginning in 2019, including a former compliance executive who brought up the issue and tried to tackle it while still working for MBS, only to be urged by the operations and legal teams to back down, then resulting in his contract not being renewed with the casino. Additionally, a former marketing executive at MBS interviewed by *Bloomberg* confirmed the use of junkets, indicating that MBS called on these illegal operations from the very beginning.

256.    Further, the magnitude of the unauthorized transfer process, as uncovered by MBS' own internal investigations and that of its retained counsel, Hogan Lovells, lends to the inference of scienter where more than 26% of these transactions were being effectuated pursuant to improperly obtained or suspicious letters of authorization and implicated hundreds of millions of dollars.

### 2.   MBS is a Major Contributor of LVS' Total Revenue and EBITDA that was Closely Monitored by the Individual Defendants

257.   At all times relevant to this Action, MBS' casino performance was an important revenue center and EBITDA contributor to LVS, with more than a fifth of revenue coming from this single casino, and EBITDA margins far outpacing any other casino property in LVS' portfolio.

258.   Because of its importance to LVS, the Individual Defendants paid close attention to MBS' performance, specifically reporting and answering questions about Singapore and MBS on every analyst call.

259.   Further, in every annual report filed on Form 10-K issued by the Company during the Class Period, LVS stated:

> We maintain an allowance, or reserve, for doubtful casino accounts at our operating casino resorts in Macao, Singapore and the U.S., ***which we regularly evaluate. We specifically analyze the collectability of each account with a balance over a specified dollar amount***, based upon the age of the account, the customer's financial condition, collection history and any other known information, and we apply standard reserve percentages to aged account balances under the specified dollar amount. We also monitor regional and global economic conditions and forecasts in our evaluation of the adequacy of the recorded reserves.

260.   Since the Company in its SEC filings stated that it "regularly evaluate[d]" the allowance for doubtful casino accounts, and because the write-offs related to bad debt incurred at MBS as a result of the unauthorized transfer practice were exponentially higher than the expected amounts for a casino of that size, accounting for nearly 62% of LVS' total write-offs between 2013 and 2020, it is reasonable to infer the unauthorized transfer activities and interaction with junkets were either known or recklessly disregarded by the Individual Defendants, supporting an inference of their scienter.

261.   Furthermore, throughout its SEC filings, LVS recognized the impact extending credit to players has on its financials, including in its provision for doubtful accounts and associated write-offs. According to a former executive interviewed by *Bloomberg*, write-offs from doubtful accounts stemming from MBS accounted for $717 million of the $1.16 billion written off by LVS from 2013 to 2020, or ***nearly 62%***. The shear fact that write-offs were so heavily concentrated in a single LVS property and were multiple times higher than the $20 to $30 million per year expected for a casino of MBS' size supports an inference of the Individual Defendants' scienter.

262.    Given the outsized role MBS played in LVS' portfolio, and the magnitude of the unauthorized transfers in the context of total internal transfers carried out at MBS, the Individual Defendants either knew or recklessly disregarded the unauthorized transfer scheme occurring at MBS.

### 3.    The Company's Own Internal Probes Confirm the Internal Transfer Practice

263.    As would only be disclosed through various *Bloomberg* articles, there were several probes conducted internally at LVS that each confirmed the pervasive unauthorized transfer practice.

264.    Specifically, MBS claimed to have conducted its own probe that ultimately led it to amend its compliance procedures and protocols in 2018, instituting for the first time basic due diligence and employee education requirements designed to identify suspicious activity and close avenues to abuse that led to the unauthorized transfer system.

265.    Then, LVS retained Hogan Lovells to conduct an independent probe. The Hogan Lovells probe uncovered instances of employees not complying with proper standards by filling in payment details on pre-signed or photocopied authorization forms. Additionally, the Hogan Lovells probe determined that, of the more than 3,000 letters of authorization accounting for more than SGD$1.4 billion in customer-to-customer transfers executed between 2013 and 2017, letters authorizing transfers for SGD$365 million (or more than 26%) bore signatures that appeared similar – supporting the inference that these were likely photocopied duplicates and unauthorized.

266.    Finally, in 2020, LVS retained a second law firm, Davinder Singh, to conduct a second investigation of the unauthorized transfers at MBS, having already paid Hogan Lovells to conduct a similar investigation.

267.    The presence of multiple internal probes all centered on the same facts (which are alleged to have occurred years earlier) evidences the Individual Defendants' recklessness in not uncovering such activity earlier and actual knowledge following the completion of the internal undisclosed probes, and supports an inference of the Individual Defendants' scienter.

### 4.    Ongoing Investigations by the DOJ and Singapore Police are Indicative of Scienter

268.    As a result of the unauthorized transfer practice, investigations into MBS were commenced by the United States Department of Justice, Singapore Police, and Singapore CRA.

269.    In January 2020, the United States Department of Justice issued a grand jury subpoena to a former compliance chief of MBS "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls." In the context of this grand jury process, prosecutors also asked this former compliance head to produce records related to any such regulatory violations, including the use of gambling junkets and third-party lending using casino credit. The pendency of the grand jury process and DOJ investigation into MBS was first reported by *Bloomberg* in June 2020,[18] with individuals familiar with the process indicating to *Bloomberg* reporters (who also saw the confidential subpoena) that the investigation was "likely in its early stage."

270.    *Bloomberg* further announced in May 2020 that the Singapore police had commenced a probe in response to the Wang lawsuit regarding the unauthorized transfer of funds between accounts. The Singapore police declined comment in a September 16, 2020 *Bloomberg* article, indicating that it did not comment on *ongoing* investigations.

271.    Additionally, allegations of authorized transfers at MBS triggered an investigation by the CRA, which concluded in or around September 2020 that, while MBS did not breach requirements related to Wang's claims, "there were weaknesses in MBS' casino control measures pertaining to fund transfers." Further, in a statement to *Bloomberg*, the CRA stated that it "takes a serious view of such matters and had directed MBS to strengthen its control measures, which MBS has since undertaken. CRA will continue to exercise close oversight to ensure that MBS' measures are effective."

272.    The fact that the activity alleged herein triggered external investigations by several disparate organizations, and that two of those three investigations appear to have been ongoing at the end of the Class Period, supports an inference of the Individual Defendants' scienter.

**5.    MBS Operated Under Heavy Regulatory Scrutiny, Supporting an Inference of Scienter Where it Skirted those Regulations**

---

[18] https://www.bloomberg.com/news/articles/2020-06-04/adelson-s-singapore-casino-probed-over-money-laundering-controls

273.     As alleged herein, MBS operates under significant regulatory scrutiny in Singapore, particularly with respect to its money lending practices. Further, as one of only two licensed casino operators in the country, it is reasonable to believe that the CRA pays close attention to MBS and that MBS must, in turn, maintain well-functioning policies and procedures to satisfy their regulatory requirements.

274.     However, what has become clear is that during the Class Period, several MBS functions, including its compliance arm, totally failed to prevent the unauthorized transfers uncovered by the casino and its outside counsel's probes. Where MBS' compliance function was wholly deficient and incapable of meeting the requirements of the regulatory environment in which it operated, and the Individual Defendants were both aware of those regulatory restrictions and knew or recklessly disregarded the internal control shortcomings, the Individual Defendants' scienter can be inferred.

### 6.     Frequent Turnover in MBS' Compliance Division, Including in its Highest Post, Supports an Inference of Scienter

275.     Additionally, frequent turnover within MBS' compliance department, including at its highest level with the chief compliance officer, supports an inference of scienter.

276.     In its June 4, 2020 article, *Bloomberg* noted that MBS had at least six chief compliance officers in the prior decade.[19]

277.     Additionally, a former compliance executive interviewed as part of the internal investigation at MBS stated he had attempted to bring up and rectify the issues surrounding the unauthorized transfers, only to be told to back off by the operations and legal teams.[20] Later, his contract with MBS went unrenewed and he was out of a job.

278.     These warnings from above were not limited only to compliance executives, however, as CW-1 recalled being told by a manager in the Compliance department to avoid submitting so many suspicious transaction reports, effectively limiting the scope of the compliance function. Likewise, CW-

[19] https://www.bloomberg.com/news/articles/2020-06-04/adelson-s-singapore-casino-probed-over-money-laundering-controls

[20] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

2 recalled the significant power wielded by the International Marketing Department and the absence of any internal reporting system to address unethical or improper behavior among MBS employees.

### 7. LVS' Past Regulatory and Employee Issues Indicate a "Tone at the Top" that Values Revenue at all Costs

279.    LVS and the Individual Defendants also cultivated a "tone at the top" that showed a willingness to sacrifice regulatory compliance (and possible fines) in exchange for casino growth.

280.    For example, in 2013, LVS agreed to return over $47 million to the United States Government to avoid criminal prosecution and conclude an investigation into whether employees at LVS' Venetian-Palazzo hotel in Las Vegas failed to alert authorities that a high stakes gambler later linked to international drug trafficking was making numerous large and suspicious deposits.[21]

281.    In April 2016, LVS agreed to pay $9 million to end a five-year SEC probe into whether LVS violated the Foreign Corrupt Practices Act ("FCPA") when it transferred tens of millions of dollars to a "consultant" who served as a middleman to LVS' business interests in China and Macao.[22] As set forth in the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Finds, and Imposing a Cease-and-Desist Order filed April 7, 2016 in the Administrative Proceeding captioned *In the Matter of Las Vegas Sands Corp.*, File No. 3-17204, LVS "did not devise and maintain a reasonable system of internal accounting controls over operations in Macao and China to ensure that access to assets was permitted and that transactions were executed in accordance with management's authorization; in addition, that transactions were recorded as necessary to maintain accountability for assets, particularly with regard to the accounts payable process, the purchasing process, due diligence, and controls surrounding contracts."

282.    In response to the SEC's probe, LVS purportedly hired a new general counsel and new heads of internal audit and compliance functions and established "a new Board of Directors Compliance Committee and increased the compliance and accounting budgets."

---

[21] https://www.justice.gov/usao-cdca/pr/operator-venetian-resort-las-vegas-agrees-return-over-47-million-after-receiving-money

[22] https://www.sec.gov/news/pressrelease/2016-64.html

283.    In addition to payment of the fine, LVS was also required to retain an independent consultant within sixty days of the SEC's order (i.e. by June 2016) for a period of two years. This consultant was required to have the following minimum qualifications: demonstrated expertise with respect to the FCPA, including experience counseling on FCPA issues;; experience designing and/or reviewing corporate compliance policies, procedures, and internal controls, including FCPA-specific policies, procedures and internal controls.

284.    Further, the consultant's responsibility for the two-year engagement period was to "review and evaluate [LVS'] internal controls, record-keeping and financial reporting policies and procedures ('Policies and Procedures') as they relate to its compliance with the books and records, internal accounting controls, and anti-bribery provisions of the FCPA ('the FCPA Policies') and to make recommendations." The consultant was also tasked with "consider[ing] whether the ethics and compliance function has sufficient resources, authority, and independence, and provides sufficient training and guidance."

285.    According to the SEC's order, this consultant would be required to issue a written report within six months of retention and review of LVS' policies and procedures: "(a) summarizing its review and evaluation, and (b) if necessary, making recommendations based on its review and evaluation that are reasonably designed to improve [LVS'] Policies and Procedures." This report was required to be provided to LVS' Board of Directors and LVS was required to adopt any recommendations from the compliance consultant, or agreed-upon alternatives, within six months.

286.    As this consultant was required to be retained, and would have been at LVS for much of the Class Period and was required to report on LVS' compliance function and its shortcomings within six months of engagement, it is reasonable to infer that the consultant likely uncovered and raised to LVS management the ongoing compliance deficiencies at MBS that resulted in the unauthorized transfers and which likely contributed to later compliance protocol adjustments in April 2018.

287.    Relatedly, in 2017, LVS agreed to pay nearly $7 million to resolve the FCPA investigation into the Company by the United States Department of Justice, entering into a non-prosecution agreement.

288.     Additionally, in 2016, LVS settled a six-year-old wrongful termination lawsuit instituted by Steve Jacobs, the former CEO of Las Vegas Sands China. In his suit, Jacobs claimed he was fired for refusing to carry out illegal demands made by Defendant Adelson, including an order that Jacobs conduct secret investigations into the affairs of Macao's government officials so the information could be used as leverage in future dealings.[23] The confidential settlement was reported to have been in excess of $75 million.[24]

289.     Each of these facts illustrates a culture at the highest levels of LVS exhibiting disregard for regulatory restrictions, supporting an inference of the Individual Defendants' scienter.

### 8.    LVS Maintains Both a Board and Operational Compliance Committee to Oversee Each of its Casino Properties, Including MBS

290.     According to its SEC filings, throughout the Class Period LVS maintained both a Board Compliance Committee and an Operational Compliance Committee, each of which was tasked with overseeing and monitoring the compliance operations at LVS' portfolio casinos, including MBS.

291.     According to the LVS Proxy Statement filed on Form DEF 14A with the SEC on April 22, 2016, the Board Compliance Committee:

> operates under a written charter and **assists the Board in overseeing [LVS'] compliance program** with respect to: (a) **compliance with the laws and regulations applicable to the Company's business, including gaming laws**; and (b) compliance with the Company's Code of Business Conduct and Ethics, its Anti-Corruption Policy Including Guidelines on Travel and Entertainment Expenses and Customer Complimentaries for Government Officials, its Statement on Reporting Ethical Violations, its anti-money laundering policies and related policies and procedures applicable to the Company's team members, officers, directors and other agents.

292.     The charter for the compliance committee was subsequently amended several times throughout the Class Period. Based on the charter adopted for the Board Compliance Committee on July 25, 2017,[25] the Compliance Committee's purpose was:

---

[23] https://www.forbes.com/sites/robertolsen/2011/03/02/las-vegas-sands-reveals-sec-probe-into-macau-business/?sh=f32bbe93defa

[24] https://www.wsj.com/articles/las-vegas-sands-to-pay-more-than-75-million-to-settle-suit-filed-by-former-macau-ceo-1464752315

[25] https://s21.q4cdn.com/635845646/files/doc_downloads/committee-charters/new/Compliance-Committee-Charter-July-2017.pdf

The Compliance Committee (the "Committee") **shall assist the Board in overseeing the Company's compliance program** with respect to: (a) compliance with the laws and regulations applicable to the Company's business, including gaming laws; and (b) compliance with the Company's Code of Business Conduct and Ethics, its Anti-Corruption Policy, its Statement on Reporting Ethical Violations, its anti-money laundering policies and related policies and procedures (collectively, the "Policies") applicable to the Company's team members, officers, directors, and other agents.

293.     Further, the committee was granted the following authority and responsibilities:

1.  Provide oversight as needed to **ensure that the Company's compliance program effectively prevents and/or detects violations by the Company's team members, officers, directors, and other agents of law, regulation, the Policies, and any special conditions imposed on the Company by any governmental or regulatory authority**.

2.  **Oversee the compliance review process** to ensure that the vendors (including consultants) and customers with which the Company does business are entities/individuals: (a) that will cooperate with appropriate regulatory authorities; (b) that are "suitable" or "qualified" as those terms are used by applicable gaming and other authorities; and (c) whose role with the Company is not likely to result, in the judgment of the Committee, in the Company's failure to obtain, maintain, renew or qualify for a license, concession, contract, franchise or other governmental or regulatory approval with respect to the operation or conduct of the Company's business.

3.  **Review resources assigned to the Company's compliance program to assess their adequacy relative to the program's effectiveness**.

4.  Periodically meet separately with the Company's Global Chief Compliance Officer and **receive reports of relevant conduct, misconduct, and such other issues as the Global Chief Compliance Officer deems appropriate**. The Global Chief Compliance Officer **shall report to the Committee** potential criminal acts and serious violations of the Policies committed by the Company's team members, officers, directors, and other agents, including vendors and customers, and all disciplinary actions and remedial measures involving compliance infractions as soon as practicable after the Global Chief Compliance Officer becomes aware of them and no later than the next scheduled meeting of the Committee.

5.  Review annually the list of charitable donations, political contributions and lobbying expenditures.

6.  Receive in its discretion **reports from management on internal messaging to team members regarding the Company's commitment to behavior and practices that comply with law, as well as the Company's efforts to promote a culture of compliance**.

7.  Review and discuss with the Global Chief Compliance Officer the quarterly reports in connection with the Company's team member confidential hotline.

AMENDED COMPLAINT
73

8. **Review and discuss with the Global Chief Compliance Officer the quarterly reports of the Company's internal Operational Compliance Committee meetings**.

9. Review periodic reports on matters of which the **Company has sought advice from external legal counsel or professional consultants in the areas of anticorruption, anti-money laundering and other compliance matters** and review briefings from the Company regarding recent legal or regulatory changes in these areas.

10. Review with the Global Chief Compliance Officer any **correspondence with regulatory or government agencies** that raise material issues regarding the Company's compliance program.

11. **Review and assess the adequacy of the Policies at least annually** and recommend to the Board any changes deemed appropriate by the Committee.

12. Review and assess the adequacy of this Charter annually and recommend to the Board any changes deemed appropriate by the Committee.

13. Review its own performance annually.

14. Perform any other activities consistent with this Charter, the Company's bylaws and governing law, as the Committee or the Board deems appropriate.

294. The Compliance Committee charter also provided that the committee would report periodically to the whole Board "(a) following meetings of the Committee, (b) with respect to such other matters as are relevant to the discharge of the Committee's duties and responsibilities, and (c) with respect to such recommendations as the Committee may deem appropriate from time to time."

295. On July 24, 2018, a similar version of charter was adopted[26] with one telling amendment – the purpose of the committee was amended to include reference to the Company's Reporting and Non-Retaliation Policy, an important inclusion as, prior to the amendment, a former LVS compliance executive informed the Company of the unauthorized transfer issues only be told by the operations and legal departments to back off, then have his contract not renewed:

> The Compliance Committee (the "Committee") shall assist the Board in overseeing the Company's compliance program with respect to: (a) compliance with the laws and regulations applicable to the Company's business, including gaming laws; and (b) compliance with the Company's Code of Business Conduct and Ethics, its Anti-Corruption Policy, its Anti-Money Laundering Policy, **and its Reporting and Non-Retaliation Policy** (collectively, the "Policies") applicable to the Company's directors, officers, team members, contractors and agents.

---

[26] https://s21.q4cdn.com/635845646/files/doc_downloads/committee-charters/2018/Compliance-Committee-charter-July-24-2018.pdf

296.    Then, on July 23, 2019, a new charter was adopted,[27] substantively amending the authority and responsibilities to mandate that the committee meet on a quarterly basis (as opposed to previous language which used the nebulous term "periodically"). Further, new provisions were added to the committee's responsibilities, providing that it must:

> 10. Receive summary reports from management or the Global Chief Compliance Officer that directors, officers, employees in high-risk and control functions, and, where appropriate, agents and business partners, have completed periodic compliance training and confirmed compliance with Company policies and procedures.

> * * *

> 13. Review, based upon the recommendation of the Global Chief Compliance Officer, the scope and plan of the work to be done by the compliance group and the responsibilities, budget and staffing needs of the compliance group.

> 14. Review on an annual basis the performance of the compliance group and the Global Chief Compliance Officer.

297.    As the purpose of the Board Compliance Committee was to oversee and report on compliance issues across LVS' portfolio to the Board, and Defendant Adelson sat atop the Board as its Chairman and Defendant Goldstein a Board member, it is reasonable to infer that the Board Compliance Committee both learned of and reported the unauthorized transfer process, supporting an inference of defendants Adelson's and Goldstein's scienter.

298.    Additionally, LVS maintained a Non-Board Operational Compliance Committee, described in its SEC filings as follows:

> The Company has an operational compliance committee (the "Operational Compliance Committee") that operates under a written regulatory Compliance Program approved by the Nevada Gaming Control Board. The Company created the Operational Compliance Committee to **exercise its best efforts to identify and evaluate situations arising in the course of the Company's businesses, wherever conducted, which may have an adverse effect upon its objectives or those of gaming control and thereby cause concern to any gaming authority**. The Operational Compliance Committee **monitors the Company's activities so as to assist the Company's senior management** with regard to the Company's **(a) business associations**, that is, to protect the Company from associations with persons denied licensing or other related approvals, or who may be deemed unsuitable to be associated with the Company; **(b) business practices and**

---

[27] https://s21.q4cdn.com/635845646/files/doc_downloads/committee-charters/2019/Compliance-Committee-Charter-Final-July-23-2019.pdf

**procedures; (c) compliance with any special conditions imposed upon the Company's license(s);** (d) reports submitted to gaming authorities; and **(e) compliance with the laws, regulations and orders of governmental agencies having jurisdiction over the Company's gaming or business activities**. The Company's Senior Vice President and Chief Compliance Officer is the Chair of the Operational Compliance Committee. The Operational Compliance Committee also has an independent member who is not otherwise employed by the Company and who possesses a background in and extensive experience with gaming control in Nevada. The remaining members of the Operational Compliance Committee are employees of the Company.

299. This description of the Operational Compliance Committee in the Company's proxy statement was amended in 2017 to indicate that the chair of the Operational Compliance Committee "provides quarterly updates to the Compliance Committee."

300. The 2020 Proxy Statement filed with the SEC on April 1, 2020 amended this description, making clear that "[t]he Company has operational compliance committees (the 'Operational Compliance Committees') **for each of its gaming operations** in Las Vegas, Macao, and **Singapore**."

301. Further, CW-1 stated that, during her tenure at MBS, she attended six to eight meetings (approximately every one to three months) with LVS' Global Chief Compliance Officer, MBS' chief financial officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, as well as Daphne Hearn, who took over the role of MBS Chief Compliance Officer in September 2014. According to CW-1, the issue of the unusually high number of STRs coming from MBS was discussed and CW-1 and other attendees often raised why so many reports were required, only to never have a solution presented or addressed.

302. At the time of these meetings, LVS maintained its operational compliance committee, atop which the Global Chief Compliance Officer sat, with the stated goal of "assist[ing] the Company's senior management." As such, it is reasonable to infer that knowledge of the suspicious transfer practice that ultimately spurred these six to eight meetings attended by CW-1 ultimately made its way to defendants Adelson, Dumont, and Goldstein – the very members of senior management the operational compliance committee was designed to assist.

303. As, at all relevant times, LVS maintained an operational compliance committee designated to oversee the compliance function at MBS and to monitor ongoing casino activities for the benefit of LVS' senior management (necessarily including defendant Adelson as CEO, defendant

Dumont as CFO, and defendant Goldstein as COO), the scienter of the Individual Defendants can be inferred with respect to the unauthorized transfer process and association with junkets in Singapore.

### B.    The Individual Defendants Were Motivated to Commit Fraud in Order to Continue the Appearance of Success in Singapore, as the Company's Exclusivity was Set to Expire in 2017

304.    LVS' exclusive license to operate as one of only two casinos in Singapore was set to expire in 2017. As part of the casino license review process, Section 45 of the Casino Control Act states:

**Matters to be considered in determining applications**

**45.**—(1)  The Authority shall not grant an application for a casino licence unless the Authority is satisfied that ***the applicant, and each associate of the applicant***, is a suitable person to be concerned in or associated with the management and operation of a casino.

(2)  In particular, the Authority shall consider whether —

| | |
|---|---|
| (*a*) | each such person is of good repute, having regard to character, honesty and integrity; |
| (*b*) | each such person is of sound and stable financial background; |
| (*c*) | in the case of an applicant that is not a natural person, the applicant has, or has arranged, a satisfactory ownership, trust or corporate structure; |
| (*d*) | the applicant has or is able to obtain financial resources that are adequate to ensure the financial viability of the proposed casino and the services of persons who have sufficient experience in the management and operation of a casino; |
| (*e*) | the applicant has sufficient business ability to establish and maintain a successful casino; |
| (*f*) | ***any of those persons has any business association with any person, body or association who or which, in the opinion of the Authority, is not of good repute having regard to character, honesty and integrity or has undesirable or unsatisfactory financial resources***; |
| (*g*) | each director, partner, trustee, executive officer and secretary and any other officer or person determined by the Authority to be associated or connected with the ownership, administration or management of the operations or business of the applicant is a suitable person to act in that capacity; |
| (*h*) | any person proposed to be engaged or appointed to manage or operate the casino is a suitable person to act in that capacity; |
| (*ha*) | ***the applicant is a suitable person to develop, maintain and promote the integrated resort (of which the casino is a part) as a*** |

*compelling tourist destination which meets prevailing market demand and industry standards and contributes to the tourism industry in Singapore; and*

(*i*)  any other matter that may be prescribed.

305.  Given the nature of MBS' position in Singapore as one of just two licensed casinos, the Individual Defendants were uniquely motivated to perpetrate the fraud alleged herein so as to maintain MBS as a "compelling tourist destination" for the purposes of its license renewal, and to then continue to hide the true nature of the unauthorized transfer activity and association with illegal junkets by MBS employees to avoid any licensure backlash.

306.  Notably, while exclusivity for MBS in Singapore ended in 2017, the period was not extended until 2019, with the CRA presumably conducting its review of MBS in the intervening period.

**C.**   **The Individual Defendants Were Motivated to Manufacture Artificial Growth in Singapore Where Organic Growth was Otherwise Hamstrung by Government Regulations**

307.  As part of its original deal with the Singaporean government to secure the licensing to operate in the country, LVS agreed that it would limit its interactions with Singaporean citizens or permanent residents by enforcing a casino entry levy (currently SGD$150 for a 24-hour period and SGD$3,000 for a year) and restricted the extension of credit to those citizens or permanent residents who qualified as "premium players."

308.  This meant that MBS was predominantly focused on attracting tourists, who necessarily need a place to sleep when visiting the casino. This presented a bottleneck for LVS in Singapore, as MBS was already running near full capacity.  As described by LVS Senior Vice President of Investor Relations Daniel Briggs at J.P. Morgan's Gaming, Lodging, Restaurant & Leisure Management Access Forum on March 8, 2018:

*Joseph Richard Greff*
Great. Next question? So let's talk a little bit about Marina Bay Sands in Singapore. How – can that property grow cash flows without having any increase in revenue-generating inputs like traditional hotel rooms?

*Daniel J. Briggs*
So Marina Bay Sands has been another huge success for us. It is generating, I think, $1.6 billion, $1.7 billion last year. We held a little heavy but it just makes a tremendous amount of money. We did invest $5.5 billion in the building, so it's been a very, very big investment. Its retail business is growing very nicely. Year-over-year our

tenant sales per square foot is up actually 15%. So it's rare that you have a mall and – a mall that's actually growing at 15%, but we've got great customers at Marina Bay Sands and it's a beautiful place to be, a trophy asset. **The gaming business is not going to grow from Singaporeans. So Singapore has designed the market so that, effectively, it's – they're discouraging local people to come into the casino. So that avenue of growth is not available to us and we're happy that it's not. And this was the agreement when we went into Singapore. We knew that it was built for foreigners, for tourists. So growing in the mass business is going to be very difficult. If we had more hotel rooms, we could absolutely grow more because weekends and holidays during peak periods, with more hotel inventory, you will get benefit throughout the property.** We don't have anything to announce yet with respect to that. We would love to add more hotel, more retail, more entertainment, more convention and exhibition there, but we don't have anything to announce today other than our interest in doing that, which the government is aware of. Can it grow from here? I think VIP is seeing a nice resurgence globally. Obviously, we talked about the Macao VIP market going from $30 billion to $12 billion during the contraction and now growing back to $16 billion – $15 billion, $16 billion in Macao. **In Singapore, that VIP market between the 2 operators there, it's a duopoly, probably peaked at about $3 billion and then contracted to maybe $1.5 billion. Today, it's probably growing, going more toward, say, $2 billion. So it can grow. I think the one thing that happened in Singapore that really increased our profitability over the last year or so is it that we've been very disciplined and prudent about our reinvestment rate in VIP**, and our competitor there has also been very disciplined and prudent. So I think the EBITDA production in that market has increased for both of the operators in VIP. That's something we'd like to see continue. And if the VIP business does grow, naturally, that's a place where we could continue to benefit. But I would just warn everyone that VIP is going to be more cyclical than a basic mass business and rich people tend to spend little less money when their property values go down or there's a contraction in the economic cycle, and so you will see, I think, a little more volatility in the earnings power that comes from the VIP segment.

309.    Defendant Goldstein echoed the sentiment on a July 25, 2018 analyst call, stating in response to an analyst's question regarding the competitive landscape in Singapore that the "[h]otel is sold out. If anything, we lack in that market, Stephen, it's more capacity. What's frustrating is we just need more – we'd love to have more sleeping rooms and more gaming capacity."

310.    Without the means to derive organic growth through additional mass gaming (e.g. more hotel rooms), the Individual Defendants and Company management were motivated to engage in the scheme alleged herein, and issue the false and misleading statements, to artificially bolster MBS' VIP gaming segment.

D.    **Corporate Scienter is Additionally Supported by the Acts of LVS' Employees**

311.    In addition to the inference of LVS' scienter stemming from the above-alleged scienter of Individual Defendants Adelson, Dumont, and Goldstein, LVS' corporate scienter is further evidenced by the actions of its employees.

312.     As set forth herein, MBS employees oversaw a pervasive scheme of unauthorized transfers totaling hundreds of millions of dollars and spanning several years.

313.     Further, members of MBS' Finance and International Marketing departments were allowed to operate unchecked by MBS' ineffective Compliance department.

314.     When employees sought to put a halt to the unauthorized transfer practice, they were told to back down and pushed out of their positions, as described by the former MBS compliance executive in his interview in connection with LVS' internal probe.

315.     Several former employees of MBS have stated the casino's use of junkets to lure high rollers was common.

316.     Further, given the outsized role MBS played in LVS' portfolio, and the magnitude of the unauthorized transfers in the context of total internal transfers carried out at MBS, LVS employees either knew or recklessly disregarded the unauthorized transfer scheme occurring at MBS.

317.     Additionally, the Company maintained both a Board Compliance Committee and Operational Compliance Committee responsible for overseeing compliance at LVS' portfolio casinos, including at MBS. Members of these committees either knew or recklessly disregarded the ongoing unauthorized transfer practice, as evidenced by both their required responsibilities and the fact that a former compliance executive specifically reported the issue, only to be told to back off and later have his contract not renewed.

318.     Further, the requirements agreed to by the Company as part of its April 7, 2016 settlement with the SEC in the Administrative Proceeding captioned *In the Matter of Las Vegas Sands Corp.*, File No. 3-17204, necessarily required the Company to adopt a strengthened system of compliance oversight, resulting in several high-ranking members of LVS either knowing or recklessly disregarding the ongoing unauthorized transfer practice at MBS.

319.     As MBS was an essential part of LVS' business and operated within its core operation of casinos, the scienter of LVS can be inferred from the action of its employees.

## XI.     <u>LOSS CAUSATION</u>

320.     At all relevant times, the market for LVS securities was open, well-developed, and efficient. During the Class Period, Defendants named in this Action materially misled the investing

public by publicly issuing false and/or misleading statements and/or omitting material facts necessary to make their statements, as set forth herein, not false and/or misleading, thereby inflating the price of LVS securities.  These material misstatements and omissions concerned the regulatory compliance and risks associated with one of the Company's primary profit centers, MBS. Defendants' materially false or misleading statements and omissions of material fact, as alleged above in Section VII, caused the price of LVS' securities to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiffs and other Class Period purchasers of LVS' securities.

321.    Plaintiffs and other members of the Class purchased or otherwise acquired LVS securities relying upon the integrity of the market for LVS stock and market information related to the Company and have been damaged thereby.

322.    As Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of LVS' securities was removed, and the price of LVS' shares fell or traded lower than the market and LVS' peers on the same day.

323.    The first partial corrective disclosure occurred on September 26, 2019, when Wang Xi filed his statement of claim in the High Court of Singapore, alleging that MBS had improperly transferred approximately $6.6 million USD from his account to other patrons at MBS without his permission between October and December 2015. On the same day, LVS' stock price declined, closing at $55.88 per share – a $1.20 decline over the prior day's close.

324.    News of Wang's lawsuit was amplified by news media on October 10, 2019, when Bloomberg published its article titled "Singapore Sands Sued by Chinese Ex-Client Claiming $6.6 Million" before market open. As the article was largely publicizing the previously-filed suit, the impact to the Company's stock price laid in comparison to its peer index, as LVS stock underperformed on the date compared to its peers.

325.    Then, on May 12, 2020, *Bloomberg'*s pre-market announcement that Singapore's police force was probing Mr. Wang's claims against MBS sent LVS' stock tumbling – from a close of $48.50 on May 11, 2020 to $45.96 on May 12, 2020.

326.    The truth regarding MBS' unauthorized transfer practice, and the investigations stemming therefrom, continued to make their way into the market on June 4, 2020 when *Bloomberg* published its article mid-day, breaking the news that the Department of Justice was investigating MBS, in addition to the Singapore police and CRA. This article was then updated on June 5, 2020 before market open to include additional information about Singapore's anti-money laundering weaknesses. The June 7, 2020 *Bloomberg* article similarly highlighted the reaction of the CRA to Wang's allegations against MBS, as the regulator was requesting its two casino operators to voluntarily conduct greater due diligence on its customers.   The result on each of these days was LVS stock underperforming as compared to its peers, as signified by a lower log return for LVS stock on each of these dates compared to the return of its peer index and adjusting for the market index, resulting in residual loss to Plaintiffs and the Class:[28]

| Date | LVS Price | LVS Log Return | Market Index Log Return | Peer Index Log Return | Explained Return | Residual Return | Residual $ Return |
|---|---|---|---|---|---|---|---|
| 6/4/2020 | $   52.35 | 1.08% | -0.32% | 2.40% | 2.17% | -1.10% | $   (0.56) |
| 6/5/2020 | $   52.97 | 1.18% | 2.60% | 2.19% | 1.98% | -0.81% | $   (0.42) |
| 6/8/2020 | $   55.64 | 4.92% | 1.35% | 5.85% | 5.21% | -0.29% | $   (0.15) |

327.    After the market closed on July 19, 2020, *Bloomberg* broke the news that MBS had settled with Mr. Wang, agreeing to pay him the entirety of the amount allegedly transferred out of his account without authorization. LVS' stock responded to this news, and the fact that the Company paid in full to settle a claim it had previously denied as having merit, negatively, dropping from $48.69 on July 17, 2020 (the last trading day before the news) to a close of $47.28 on July 20, 2020.

328.    During the trading day on September 16, 2020, *Bloomberg* issued an article publicizing that LVS retained Davinder Singh to conduct a second investigation of the unauthorized transfers at MBS and had already previously retained Hogan Lovells to conduct a similar investigation. Further, this article informed the investing public of the outcome of that Hogan Lovells investigation, disclosing that more than 3,000 transfers between 2013 to 2017 accounting for more than $1.05 billion USD were at issue, with more than $275 million USD worth of these transactions raising red flags during the probe.

---

[28] Plaintiffs' loss causation analysis based on these dates is derived from a preliminary event study analysis and regression modeling and is subject to modification.

LVS' stock price responded negatively to learning this news, dropping from a close of $51.85 on September 15, 2020 to $49.67 on September 16, 2020.

329.    Finally, after the close of market on December 21, 2020, *Bloomberg* issued a new article recounting the facts of the Wang lawsuit and providing new insight into the outcome of the Company's internal investigation into the matter, including the recollection of a former MBS compliance executive who was urged by the operations and legal teams to "back off" after he sought to address the issue of the unauthorized transfers.

330.    Additionally, the December 21 article highlighted how lacking MBS' internal compliance procedures were prior to the casino's 2018 changes, showing that MBS employees were failing to carry out even the most basic of due diligence on their customers because internal procedures did not require it.

331.    Further, the December 21 article contextualized the impact of the unauthorized transfer activities and extensions of credit, citing internal MBS documents that showed MBS wrote off $717 million in bad debt from 2013 through March 2020 – multiple times higher than the $20 to $30 million per year expected for a casino of its size.

332.    LVS' stock price responded negatively to the news, dropping from a closing price of $56.88 per share on December 21, 2020 (prior to the news' release after hours) to $56.26 on December 22, 2020.

333.    As a result of their purchases of LVS stock during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price movements in LVS stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

## XII.    PRESUMPTION OF RELIANCE

334.    At all relevant times, the market for LVS securities was efficient for the following reasons:

(a) LVS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b) As a regular issuer, LVS filed periodic reports with the SEC and NYSE;

(c) LVS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) LVS was followed by more than six securities analysts employed by major brokerage firms during the Class Period (including Deutsche Bank AG, Barclays Bank PLC, JPMorgan Chase & Co, UBS Investment Bank, BofA Securities, and Goldman Sachs Group, Inc.) who participated in the Company's Class Period earnings calls and wrote reports which were distributed to those brokerage firms' sales force and certain customers and each of these reports was publicly available and entered the public marketplace;

(e) According to the Company's SEC filings, LVS had approximately 794 million and 763 million shares outstanding as of February 22, 2016 and October 21, 2020, respectively, with an average of 4.4 million shares trading daily on the NYSE and a public float in excess of 320 million shares;

(f) During the Class Period, LVS common stock averaged a weekly trading volume of 22 million shares, translating to an average weekly turnover of approximately 3% of the outstanding shares;

(g) During the Class Period, the Company was eligible to register and sell its common stock pursuant to a Form S-3 shelf registration statement and, in fact, filed automatic shelf registrations for "well-known seasoned issuers" on November 3, 2014; November 3, 2017; and November 3, 2020;

(h) During the Class Period, the Company's stock price reacted to new information; and

(i) LVS has a market capitalization exceeding $45 billion.

335.    As a result of the foregoing, the market for LVS securities promptly digested current material information regarding LVS from all publicly available sources and reflected such information in LVS' stock price. Under these circumstances, all purchasers of LVS securities during the Class Period suffered similar injury through their purchase of LVS securities at artificially inflated prices, and a presumption of reliance applies.

336.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

337.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

338.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

339.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements regarding, inter alia, (i) MBS' compliance functions and the use of a pervasive system of unauthorized customer-to-customer transfers; (ii) MBS employees' relationship with illegal junkets operating within MBS; and (iii) the impact of the foregoing on MBS' rising bad debt issues. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by LVS were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

340.    To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

# XIV.   CLASS ACTION ALLEGATIONS

341.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired LVS common stock during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

342.    Excluded from the Class are LVS and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

343.    Because LVS had more than 700 million shares of common stock outstanding during the Class Period, and because its securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by LVS or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

344.    Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

345.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

346.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

(a) Whether Defendants violated the federal securities laws, as alleged herein;

(b) Whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about LVS' business and operations;

(c) Whether the price of LVS' securities was artificially inflated during the Class Period; and

(d) The extent to which members of the Class have sustained damages and the proper measure of damages.

347.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**XV.    COUNTS**

<div align="center">

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against LVS and the Individual Defendants**

</div>

348.    Plaintiffs reallege each allegation as if fully set forth herein.

349.    This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against LVS and the Individual Defendants (the "Count I Defendants").

350.    The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

351.    The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

352.    The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

353.    As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

354.    LVS is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of LVS in taking the actions alleged herein.

355.    Plaintiffs and the Class purchased LVS securities, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects.  In so doing, Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Plaintiffs and the Class were damaged as a result of their reliance on the Count I Defendants' false statements, misrepresentations and omissions of material facts.

356.    At the time of the Count I Defendants' false statements, misrepresentations and omissions, Plaintiffs and the Class were unaware of their falsity and believed them to be true. Plaintiffs and the Class would not otherwise have purchased LVS securities had they known the truth about the matters discussed above.

357.    By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

358.    As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of LVS securities.

### COUNT II
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

359.    Plaintiffs reallege each allegation as if fully set forth herein.

360.    This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against each of the Individual Defendants (the "Count II Defendants").

361.    Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of LVS, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.  The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class' investments in LVS securities within the meaning of §20(a)

of the Exchange Act.  Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

362.   The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

363.   The Count II Defendants knew or recklessly disregarded the fact that LVS' representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

364.   By virtue of their high-level positions and their participation in and awareness of LVS' operations and public statements, the Count II Defendants were able to and did influence and control LVS' decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

365.   The Count II Defendants had the power to control or influence the statements made giving rise to the securities laws violations alleged herein, and as set forth more fully above.

366.   As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

367.   As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of LVS securities.

## XVI.   <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as representatives of the Class;

B.   Awarding Plaintiffs and the members of the Class damages, including interest;

C.   Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such other relief as the Court may deem just and proper.

**XVII.  JURY DEMAND**

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: March 8, 2021                          Respectfully submitted,

**ALDRICH LAW FIRM, LTD.**

*/s/John P. Aldrich*
John P. Aldrich, Esq.
NV Bar No. 6877
7866 West Sahara Ave.
Las Vegas NV 89117
Tel.  702.853.5490
Fax.  702.227.1975
Email:  jaldrich@johnaldrichlawfirm.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
        (*pro hac vice* forthcoming)
Gregory M. Nespole
        (*pro hac vice* forthcoming)
Sebastiano Tornatore
        (*pro hac vice* forthcoming)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gnespole@zlk.com
Email: stornatore@zlk.com

*Counsel for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2021, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the email addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

**ALDRICH LAW FIRM, LTD.**

*/s/John P. Aldrich*
John P. Aldrich, Esq.

*Counsel for Plaintiffs*