# EXHIBIT 6

# LVS 2020 Form 10-K (filed 2/5/2021)

# EXHIBIT 6

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**
**Commission file number 001-32373**

# LAS VEGAS SANDS CORP.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Nevada** | **27-0099920** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |
| **3355 Las Vegas Boulevard South** | |
| **Las Vegas, Nevada** | **89109** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(702) 414-1000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock ($0.001 par value) | LVS | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | | | |
|---|---|---|---|---|---|
| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ | Emerging Growth Company | ☐ |
| Non-Accelerated Filer | ☐ | Smaller Reporting Company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

As of June 30, 2020, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $15,059,203,280 based on the closing sale price on that date as reported on the New York Stock Exchange.

The Company had 763,842,938 shares of common stock outstanding as of February 2, 2021.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement to be used in connection with the registrant's 2021 Annual Meeting of Stockholders are incorporated into Part III (Item 10 through Item 14) of this Annual Report on Form 10-K.

000741

**Las Vegas Sands Corp.**
**Table of Contents**

| | | | Page |
|---|---|---|---|
| PART I | | | |
| ITEM 1 | — | BUSINESS | 3 |
| ITEM 1A | — | RISK FACTORS | 22 |
| ITEM 1B | — | UNRESOLVED STAFF COMMENTS | 36 |
| ITEM 2 | — | PROPERTIES | 36 |
| ITEM 3 | — | LEGAL PROCEEDINGS | 37 |
| ITEM 4 | — | MINE SAFETY DISCLOSURES | 37 |
| PART II | | | |
| ITEM 5 | — | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 38 |
| ITEM 6 | — | SELECTED FINANCIAL DATA | 40 |
| ITEM 7 | — | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 42 |
| ITEM 7A | — | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 65 |
| ITEM 8 | — | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 67 |
| ITEM 9 | — | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 120 |
| ITEM 9A | — | CONTROLS AND PROCEDURES | 120 |
| ITEM 9B | — | OTHER INFORMATION | 121 |
| PART III | | | |
| ITEM 10 | — | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 121 |
| ITEM 11 | — | EXECUTIVE COMPENSATION | 121 |
| ITEM 12 | — | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 121 |
| ITEM 13 | — | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 121 |
| ITEM 14 | — | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 121 |
| PART IV | | | |
| ITEM 15 | — | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 122 |
| ITEM 16 | — | FORM 10-K SUMMARY | 129 |
| SIGNATURES | | | 130 |

000742

PART I

**ITEM 1. —** *BUSINESS*

**Our Company**

Las Vegas Sands Corp. ("LVSC," or together with its subsidiaries "we" or the "Company") is a Fortune 500 company and the leading global developer of destination properties ("Integrated Resorts") that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants and other amenities.

We currently own and operate Integrated Resorts in Asia and the United States. We believe our geographic diversity, best-in-class properties and convention-based business model provide us with the best platform in the hospitality and gaming industry to continue generating growth and cash flow while simultaneously pursuing new development opportunities. Our unique convention-based marketing strategy allows us to attract business travelers during the slower mid-week periods while leisure travelers occupy our properties during the weekends. Our convention, trade show and meeting facilities, combined with the on-site amenities offered at our Macao, Singapore and Las Vegas Integrated Resorts, provide flexible and expansive space for meetings, incentives, conventions and exhibitions ("MICE").

We focus on the mass market, which comprises our most profitable gaming segment. We believe the mass market segment will continue to deliver long-term growth as a result of the introduction of more high-quality gaming facilities and non-gaming amenities into our markets, particularly in Asia.

Our properties also cater to high-end players by providing them with luxury amenities and premium service levels. These amenities include luxury accommodations, restaurants, lounges, invitation-only clubs and private gaming salons. In each of the regions where we operate, the Paiza brand is associated with certain of these exclusive facilities and represents an important part of our VIP gaming marketing strategy. We also offer players club loyalty programs at our properties, which provide access to rewards, privileges and members-only events. Additionally, we believe being in the retail mall business and, specifically, owning some of the largest retail properties in Asia will provide meaningful value for us, particularly as the retail market in Asia continues to grow.

Through our 69.9% ownership of Sands China Ltd. ("SCL"), we own and operate a collection of Integrated Resorts in the Macao Special Administrative Region ("Macao") of the People's Republic of China ("China"). These properties include The Venetian Macao Resort Hotel ("The Venetian Macao"); The Londoner Macao; The Parisian Macao; The Plaza Macao and Four Seasons Hotel Macao, Cotai Strip (the "Four Seasons Hotel Macao"); and the Sands Macao.

In Singapore, we own and operate the iconic Marina Bay Sands, which opened in 2010 and is one of Singapore's major tourist, business and retail destinations.

Our properties in the United States include The Venetian Resort Las Vegas, a luxury resort on the Las Vegas Strip, and the Sands Expo and Convention Center (the "Sands Expo Center," and together with The Venetian Resort Las Vegas, the "Las Vegas Operating Properties") in Las Vegas, Nevada.

We are dedicated to being a good corporate citizen, anchored by the core values of serving people, planet and communities. We strive to deliver a positive working environment for our team members worldwide and pledge to promote the advancement of aspiring team members through a range of educational partnerships, grants and leadership training. We also drive social impact through the Sands Cares charitable giving and community engagement program, and environmental performance through the award-winning Sands ECO360 global sustainability program ("Sands ECO360"). Through Sands ECO360, we develop and implement environmental practices to protect natural resources, offer our team members a safe and healthy work environment, and enhance the resort experiences of our guests. In 2020, we were named to the Dow Jones Sustainability North America Index and to the Dow Jones Sustainability World Index, recognizing our leadership and performance across economic, environmental and social areas. In addition, CDP's annual A List names the world's leading companies in the area of environmental transparency and performance. For the third consecutive year, we have been named to the A List for both CDP Water Security and CDP Climate Change. We are committed to creating and investing in industry-leading policies and procedures to safeguard our patrons, partners, employees and neighbors. Project Protect is our

3

000743

Table of Contents

responsible gaming, anti-human trafficking and financial crime prevention program. Our industry-leading Integrated Resorts provide substantial contributions to our host communities including growth in leisure and business tourism, sustained job creation and ongoing financial opportunities for local small and medium-sized businesses.

LVSC was incorporated in Nevada in August 2004. Our common stock is traded on the New York Stock Exchange (the "NYSE") under the symbol "LVS." Our principal executive office is located at 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109 and our telephone number at that address is (702) 414-1000. Our website address is *www.sands.com*. The information on our website is not part of this Annual Report on Form 10-K.

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, proxy statements and other Securities and Exchange Commission ("SEC") filings, and any amendments to those reports and any other filings we file with or furnish to the SEC under the Securities Exchange Act of 1934 are made available free of charge on our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC and are also available at the SEC's web site address at *www.sec.gov*.

Investors and others should note we announce material financial information using our investor relations website (*https://investor.sands.com*), our company website, SEC filings, investor events, news and earnings releases, public conference calls and webcasts. We use these channels to communicate with our investors and the public about our company, our products and services, and other issues.

In addition, we post certain information regarding SCL, a subsidiary of LVSC with ordinary shares listed on The Stock Exchange of Hong Kong Limited, from time to time on our company website and our investor relations website. It is possible the information we post regarding SCL could be deemed to be material information.

The contents of these websites are not intended to be incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file or furnish with the SEC, and any reference to these websites are intended to be inactive textual references only.

This Annual Report on Form 10-K contains certain forward-looking statements. See "Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations — Special Note Regarding Forward-Looking Statements."

Our principal operating and developmental activities occur in three geographic areas: Macao, Singapore and the United States. Management reviews the results of operations for each of its operating segments, which generally are our Integrated Resorts. In Macao, our operating segments are: The Venetian Macao; The Londoner Macao; The Parisian Macao; The Plaza Macao and Four Seasons Hotel Macao; and Sands Macao. In Singapore, our operating segment is Marina Bay Sands. In the United States, our operating segment is the Las Vegas Operating Properties. Through May 30, 2019, the Sands Casino Resort Bethlehem (the "Sands Bethlehem") was included as an operating segment. We also have ferry operations and various other operations that are ancillary to our Macao properties (collectively, "Ferry Operations and Other") that we present to reconcile to our consolidated statements of operations and financial condition. In addition to our reportable segments noted above, management also reviews construction and development activities for each of our primary projects currently under development, which include the expansion and rebranding of Sands Cotai Central to The Londoner Macao, the MBS Expansion Project (as later defined) and our Las Vegas condominium project (for which construction currently is suspended) in the United States.

From February 2020 through the date of this report, our operations were significantly impacted by a global pandemic (the "COVID-19 Pandemic"). While the details of this impact have been disclosed throughout this document, the following discussion of our business focuses on execution of our business strategies in a non-pandemic environment based on the assumption the global impact of the COVID-19 Pandemic will eventually diminish and our operations will recover as travel and tourism improves in our markets.

**Strengths and Strategies**

We believe we have a number of strengths that differentiate our business from our competitors, including:

**Substantial and diversified cash flow from existing operations.** Our Integrated Resorts in Macao, Singapore and the U.S. have contributed 55%, 35% and 10% of our total adjusted property EBITDA, respectively, during the

4

000744

Table of Contents

previous five years. In each of these jurisdictions, our cash flow from operations was derived from a combination of gaming and non-gaming sources, including retail malls, hotel, food and beverage, entertainment and MICE.

**Diversified, high quality Integrated Resort offerings with substantial non-gaming amenities.** Our Integrated Resorts feature non-gaming attractions and amenities including world-class entertainment, expansive retail offerings and market-leading MICE facilities. These attractions and amenities enhance the appeal of our Integrated Resorts, contributing to visitation, length of stay and customer spending at our resorts. The broad appeal of our market-leading Integrated Resort offerings in our various markets enables us to serve the widest array of customer segments in each market.

**Market leadership in the growing high-margin mass market gaming segment.** In our gaming business, we focus on the high-margin mass gaming segment. Our combined SCL properties had the highest percentage of gaming win from mass tables and slots of the Macao operators, with an average market share of approximately 30% during the previous five years. Management estimated our mass market table revenues typically generate a gross margin approximately four times higher than the gross margin on our VIP table revenues in Macao. Additionally, gross gaming revenue from mass tables and slots has contributed to approximately two-thirds of total gross gaming revenue at Marina Bay Sands during the previous five years.

**Established brands with broad regional and international market awareness and appeal.** The opening of The Venetian Macao provided the foundation and cornerstone for the Cotai Strip and marked a step-change for the Macao gaming market more broadly. Through a combination of its range and scale of facilities and its distinctive theming, The Venetian Macao has remained the foremost example of a themed Integrated Resort in Macao. Recognition has also been garnered by The Parisian Macao, our property with its iconic replica of the Eiffel Tower and other themed attractions. Both of these European-themed Integrated Resorts attract broad brand awareness both regionally and globally, which we expect will continue with the opening of The Londoner Macao over the course of 2021. Marina Bay Sands is an iconic part of the Singapore skyline and is often featured prominently in filmed entertainment and other media.

**Experienced management team with a proven track record.** Mr. Sheldon G. Adelson was our founder, chairman and chief executive officer. Mr. Adelson created the MICE-based Integrated Resort and pioneered its development in the Las Vegas and Singapore markets, as well as in Macao, where he planned and developed the Cotai Strip. Mr. Robert G. Goldstein, our Chairman and Chief Executive Officer, has been an integral part of the Company's executive team from the beginning, joining Mr. Adelson before The Venetian Resort Las Vegas was constructed. Mr. Goldstein is one of the most respected and experienced executives in our industry today. Mr. Patrick Dumont, our President and Chief Operating Officer, has been with the Company for more than ten years, including the last five as our Executive Vice-president and Chief Financial Officer, and has prior experience in corporate finance and management. Our management team is focused on delivering growth, increasing our return on invested capital, balance sheet strength, preserving the Company's financial flexibility to pursue development opportunities and continuing to execute return of capital to stockholders.

**Unique MICE and entertainment facilities.** Our market-leading MICE and entertainment facilities contribute to our markets' diversification and appeal to business and leisure travelers while diversifying our cash flows and increasing revenues and profit. Our approximately 5.2 million square feet of global MICE space is designed to meet the needs of meeting planners and corporate events and trade show organizers from around the world. Our experience and expertise in this industry supports our ability to drive leisure and business tourism to our markets. The live entertainment program at our properties, specifically in Asia, has been a key traffic driver and has established us as a leader in the field of tourism and leisure activities.

Building on our key strengths, we seek to enhance our position as the leading developer and operator of Integrated Resorts and casinos by continuing to implement the following business strategies:

**Developing and diversifying our Integrated Resort offerings to include a full complement of products and services to cater to different market segments.** Our Integrated Resorts include MICE space, retail, dining and entertainment facilities and a range of hotel offerings, including branded suites and hotel rooms, to cater to different segments of our markets. We are able to leverage the recognition and the sales, marketing and reservation capabilities of premier hotel brands to attract a wide range of customers in different market segments to our properties. We believe our partnerships with renowned hotel management partners, our diverse Integrated Resort

000745

offerings and the convenience and accessibility of our properties will continue to increase the appeal of our properties to both the business and leisure customer segments.

**Leveraging our scale of operations to create and maintain an absolute cost advantage.** Management expects to benefit from lower unit costs due to the economies of scale inherent in our operations. Opportunities for lower unit costs include, but are not limited to: lower utility costs; more efficient staffing of hotel and gaming operations; and centralized transportation, marketing and sales, and procurement. In addition, our scale allows us to consolidate certain administrative functions.

**Focusing on the high-margin mass market gaming segment, while continuing to provide luxury amenities and high service levels to our VIP and premium players.** The scale and product mix of our Integrated Resort properties allow us to participate very effectively in all segments of the market. We believe the mass market segment will continue to exhibit long-term growth as a result of the introduction of more high-quality gaming facilities and non-gaming amenities into our various markets, accompanied by supportive long-term trends in business and leisure tourism. Our properties are positioned to harness future growth in the mass market that comprise our most profitable gaming segment, while delivering the immersive destination resort experiences that create loyalty with VIP and premium players.

**Identifying targeted investment opportunities to drive growth across our portfolio.** We will continue to invest in the expansion of our facilities and the enhancement of the leisure and business tourism appeal of our property portfolio. Our planned development projects include the renovation, expansion and rebranding of Sands Cotai Central into The Londoner Macao, the addition of suites at the Londoner Court and the expansion of Marina Bay Sands.

## Our Operations

### *Macao*

The Venetian Macao is the anchor property of our Cotai Strip development and is located approximately two miles from the Taipa Ferry Terminal on Macao's Taipa Island and six miles from the bridge linking Hong Kong, Macao and Zhuhai. The Venetian Macao includes approximately 374,000 square feet of gaming space with approximately 620 table games and 920 slot machines and electronic table games ("ETGs"). The Venetian Macao features a 39-floor luxury hotel tower with over 2,900 elegantly appointed luxury suites and the Shoppes at Venetian, approximately 943,000 square feet of unique retail shopping with more than 340 stores featuring many international brands and home to 60 restaurants and food outlets featuring an international assortment of cuisines. In addition, The Venetian Macao has approximately 1.2 million square feet of convention facilities and meeting room space, an 1,800-seat theater, the 15,000-seat Cotai Arena that hosts world-class entertainment and sporting events and a Paiza Club.

The Londoner Macao (previously Sands Cotai Central), our largest Integrated Resort on the Cotai Strip, is located across the street from The Venetian Macao, The Parisian Macao and The Plaza Macao and Four Seasons Hotel Macao. The Londoner Macao is the result of our previously announced renovation, expansion and rebranding of Sands Cotai Central, which included the addition of extensive thematic elements both externally and internally. This project is being delivered in phases, which started in 2020 and will continue through 2021. Upon completion, The Londoner Macao will include some of London's most recognizable landmarks, such as the Houses of Parliament and The Elizabeth Tower (commonly known as "Big Ben"). Our retail offerings will be expanded and rebranded as the Shoppes at Londoner. The resort will also feature the Londoner Court with approximately 370 luxury suites; construction of the Londoner Court is now complete and we expect it to open later in 2021. The Integrated Resort opened in phases beginning in April 2012 and features four hotel towers. The first hotel tower includes (i) approximately 650 five-star rooms and suites under the Conrad brand and (ii) The Londoner Macao Hotel, which opened in January 2021, with 600 London-themed suites, including 14 exclusive Suites by David Beckham. The second hotel tower consists of approximately 1,800 rooms and suites under the Sheraton brand. The third hotel tower consists of approximately 2,100 rooms and suites under the Sheraton brand. The fourth hotel tower consists of approximately 400 rooms and suites under the St. Regis brand. The Integrated Resort includes approximately 351,000 square feet of gaming space with approximately 470 table games and 700 slot machines and ETGs, approximately 369,000 square feet of meeting space, a 1,701-seat theater, approximately 525,000 square feet

6

000746

of retail space with more than 130 stores and home to more than 40 restaurants and food outlets featuring an international assortment of cuisines.

On September 13, 2016, we opened The Parisian Macao, which is connected to The Venetian Macao and The Plaza Macao and Four Seasons Hotel Macao, and includes approximately 248,000 square feet of gaming space with approximately 270 table games and 850 slot machines and ETGs. The Parisian Macao also features approximately 2,500 rooms and suites and the Shoppes at Parisian, approximately 296,000 square feet of unique retail shopping with more than 130 stores featuring many international brands and home to 24 restaurants and food outlets featuring an international assortment of cuisines. Other non-gaming amenities at The Parisian Macao include a meeting room complex of approximately 63,000 square feet and a 1,200-seat theater. Directly in front of The Parisian Macao, and connected via a covered walkway to the main building, is a half-scale authentic re-creation of the Eiffel Tower containing a viewing platform and restaurant.

The Plaza Macao and Four Seasons Hotel Macao, which is located adjacent to The Venetian Macao, has approximately 127,000 square feet of gaming space with approximately 140 table games and 20 slot machines and ETGs at its Plaza Casino. The Plaza Macao and Four Seasons Hotel Macao also has 360 elegantly appointed rooms and suites managed by FS Macau Lda., several food and beverage offerings, and conference and banquet facilities. The Shoppes at Four Seasons includes approximately 244,000 square feet of retail space and is connected to the Shoppes at Venetian. The Plaza Macao and Four Seasons Hotel Macao also features 19 ultra-exclusive Paiza Mansions, which are individually designed and made available by invitation only. The Grand Suites at Four Seasons opened in October 2020 and features 289 luxury suites. We initiated VIP gaming operations in this space in the first quarter of 2020.

The Sands Macao, the first U.S. operated Las Vegas-style casino in Macao, is situated near the Macao-Hong Kong Ferry Terminal on a waterfront parcel centrally located between Macao's Gongbei border gate with China and Macao's central business district. The Sands Macao includes approximately 212,000 square feet of gaming space with approximately 150 table games and 530 slot machines and ETGs. The Sands Macao also includes a 289-suite hotel tower, spa facilities, several restaurants and entertainment areas, and a Paiza Club.

We operate the gaming areas within our Macao properties pursuant to a 20-year gaming subconcession that expires in June 2022. See "Regulation and Licensing — *Macao Concession and Our Subconcession*."

### Singapore

Marina Bay Sands features approximately 2,600 rooms and suites located in three 55-story hotel towers. Atop the three towers is the Sands SkyPark, an extensive outdoor recreation area with a 150-meter infinity swimming pool and leading restaurant and nightlife brands. The Integrated Resort offers approximately 160,000 square feet of gaming space with approximately 600 table games and 2,050 slot machines and ETGs; The Shoppes at Marina Bay Sands, an enclosed retail, dining and entertainment complex with signature restaurants from world-renowned chefs; an event plaza and promenade; and an art/science museum. Marina Bay Sands also includes approximately 1.2 million square feet of meeting and convention space and a state-of-the-art theater for top Broadway shows, concerts and gala events.

We operate the gaming area within our Singapore property pursuant to a 30-year casino concession provided under a development agreement entered into in August 2006. See "Regulation and Licensing — *Development Agreement with Singapore Tourism Board*."

In April 2019, our wholly owned subsidiary, Marina Bay Sands Pte. Ltd. ("MBS") entered into an additional development agreement (the "Second Development Agreement") with the Singapore Tourism Board (the "STB") pursuant to which MBS has agreed to construct a development, which will include a hotel tower with approximately 1,000 rooms and suites, a rooftop attraction, convention and meeting facilities and a state-of-the-art live entertainment arena with approximately 15,000 seats (the "MBS Expansion Project"). The Second Development Agreement provides for a total project cost of approximately 4.5 billion Singapore dollars ("SGD," approximately $3.4 billion at exchange rates in effect on December 31, 2020). We amended our 2012 Singapore Credit Facility to provide for the financing of the development and construction costs, fees and other expenses related to the MBS Expansion Project pursuant to the Second Development Agreement. On June 18, 2020, we further amended our 2012 Singapore Credit Facility to, among other things, extend to June 30, 2021, the deadline for delivering the construction costs estimate and the construction schedule for the MBS Expansion Project.

7

000747

### *Las Vegas*

Our Las Vegas Operating Properties is an Integrated Resort that includes The Venetian Resort Las Vegas and the Sands Expo Center.

The Venetian Resort Las Vegas features three hotel towers. The Venetian Tower is a 35-story three-winged luxury hotel tower with 3,015 suites. The second tower is an adjoining 1,013-suite, 12-story Venezia Tower. The Palazzo Tower has 3,064 suites situated in a 50-story luxury hotel tower, which features modern European ambience and design, and is directly connected to The Venetian Tower and Sands Expo Center. The Venetian Resort Las Vegas has approximately 225,000 square feet of gaming space and includes approximately 210 table games and 1,480 slot machines and ETGs. The Venetian Resort Las Vegas features a variety of amenities for its guests, including a Paiza Club, several theaters and Canyon Ranch SpaClub.

The Venetian Resort Las Vegas features an enclosed retail, dining and entertainment complex, referred to as the Grand Canal Shoppes. The portion of the complex located within The Venetian Tower (previously known as "The Grand Canal Shoppes") and the portion located within The Palazzo Tower (previously known as "The Shoppes at The Palazzo") were sold to GGP Limited Partnership ("GGP") in 2004 and 2008, respectively.

Sands Expo Center is one of the largest overall trade show and convention facilities in the United States (as measured by net leasable square footage), with approximately 1.2 million gross square feet of exhibit and meeting space. We also own an approximately 1.1 million-gross-square-foot meeting and conference facility that links Sands Expo Center to The Venetian Resort Las Vegas. Together, we offer approximately 2.3 million gross square feet of state-of-the-art exhibition and meeting facilities that can be configured to provide small, mid-size or large meeting rooms and/or accommodate large-scale multi-media events or trade shows.

We are working with Madison Square Garden Company ("MSG") to bring a 400,000-square-foot venue built specifically for music and entertainment to Las Vegas. MSG is currently building the MSG Sphere at The Venetian, an 18,000-seat venue, which will be located near, with connectivity to, the Las Vegas Operating Properties and is currently expected to open in 2023.

### Our Markets

### *Macao*

Macao is the largest gaming market in the world and the only market in China to offer legalized casino gaming. According to Macao government statistics issued publicly on a monthly basis by the Gaming Inspection and Coordination Bureau (commonly referred to as the "DICJ"), annual gross gaming revenues were 60.44 billion patacas in 2020 (approximately $7.57 billion at exchange rates in effect on December 31, 2020), a 79.3% decrease compared to 2019 due to the impact of the COVID-19 Pandemic.

We welcomed approximately 6 million visitors to Macao in 2020, compared to the approximately 39 million visitors in 2019. We believe visitation will return to pre-pandemic levels and will continue to experience meaningful long-term growth. We believe this growth will be driven by a variety of factors, including the movement of Chinese citizens to urban centers in China, continued growth of the Chinese outbound tourism market, the increased utilization of existing transportation infrastructure, the introduction of new transportation infrastructure and the continued increase in hotel room inventory in Macao and neighboring Hengqin Island. There has been significant investment announced and recently completed by concessionaires and subconcessionaires in new resort development projects on Cotai. These new resorts should help increase the critical mass on Cotai and further drive Macao's transformation into a leading business and leisure tourism hub in Asia.

Table games are the dominant form of gaming in Asia, with Baccarat being the most popular game. We continue to experience Macao market-leading visitation and are focused on driving high-margin mass market gaming, while providing luxury amenities and high service levels to our VIP and premium players. We intend to continue to introduce more modern and popular products that appeal to the Asian marketplace and believe our high-quality gaming product has enabled us to capture a meaningful share of the overall Macao gaming market across all types of players.

000748

Case 2:20-cv-01958-CDS-EJY   Document 59-1   Filed 05/07/21   Page 10 of 137
Table of Contents

*Proximity to Major Asian Cities*

Visitors from Hong Kong, southeast China, Taiwan and other locations in Asia can reach Macao in a relatively short time, using a variety of transportation methods, and visitors from more distant locations in Asia can take advantage of short travel times by air to Zhuhai, Shenzhen, Guangzhou or Hong Kong (followed by a road, ferry or helicopter trip to Macao). In addition, numerous air carriers fly directly into Macao International Airport from many major cities in Asia.

Macao draws a significant number of customers who are visitors or residents of Hong Kong. One of the major methods of transportation to Macao from Hong Kong is the jetfoil ferry service, including our ferry service, Cotai Water Jet. The Hong Kong-Zhuhai-Macao Bridge (the "HZMB") which connects Hong Kong, Macao and Zhuhai has reduced the travel time between Hong Kong and Macao from one hour by ferry to approximately 45 minutes on the road. The HZMB is part of the Greater Bay Area Initiatives and plays a key role in connecting the cities in the Greater Bay Area, facilitating the visitation to Macao. Macao is also accessible from Hong Kong by helicopter.

*Competition in Macao*

Gaming in Macao is administered by the government through concessions awarded to three different concessionaires and three subconcessionaires, of which we are one. No additional concessions have been granted by the Macao government since 2002; however, if the Macao government were to allow additional gaming operators in Macao through the grant of additional concessions or subconcessions, we would face additional competition. The concessionaires are Sociedade de Jogos de Macau S.A., Wynn Resorts (Macau), S.A. and Galaxy Casino Company Limited ("Galaxy"), with MGM Grand Paradise, S.A., Melco PBL Jogos (Macau), S.A. and our Company operating under subconcessions.

Our Macao operations also face competition from other gaming and resort destinations, both in Asia and globally.

**Singapore**

Singapore is regarded as having the most developed financial and transportation infrastructure in the Southeast Asia region. Singapore has established itself as a destination for both business and leisure visitors, offering convention and exhibition facilities as well as world-class shopping malls and hotel accommodations. In 2006, after a competitive bid process, the Singapore government awarded two concessions to develop and operate two integrated resorts. We were awarded the concession for the Marina Bay site, which is adjacent to Singapore's central business district, and Genting International was awarded the second site, located on Singapore's Sentosa Island.

Based on figures released by the STB, Singapore welcomed approximately 4 million international visitors in the twelve months ended November 30, 2020 (the latest information publicly available at the time of filing), a 76.6% decrease compared to the same period in 2019 due to the impact of the COVID-19 Pandemic. Tourism receipts are estimated to have reached SGD 27.7 billion (approximately $20.9 billion at exchange rates in effect on December 31, 2020) in 2019 (the latest information publicly available at the time of filing). The Casino Regulatory Authority (the "CRA"), the gaming regulator in Singapore, does not disclose gaming revenue for the market and thus no official figure exists.

We believe Marina Bay Sands is ideally positioned within Singapore to cater to both business and leisure visitors. The Integrated Resort is centrally located within a 20-minute drive from Singapore's Changi International Airport and near the Marina Bay Cruise Center, a deep-water cruise ship terminal, and Bayfront station, a mass rapid transit station. Marina Bay Sands is also located near several entertainment attractions, including the Gardens by the Bay botanical gardens and the Singapore Sports Hub, a sports complex featuring the 55,000-seat National Stadium.

Baccarat is the preferred table game in both VIP and mass gaming. Additionally, contributions from slot machines and from mass gaming, including ETG offerings, have enhanced the growth of the market. As Marina Bay Sands and the Singapore market as a whole continue to mature, we expect to broaden our visitor base to continue to capture visitors from around the world.

*Proximity to Major Asian Cities*

Approximately 100 airlines operate in Singapore, connecting it to some 400 cities in approximately 100 countries. In the twelve months ended November 30, 2020 (the latest information publicly available at the time of

9

000749

Table of Contents

filing), 18 million passengers passed through Singapore's Changi Airport, a 73.8% decrease as compared to the same period in 2019 due to the impact of the COVID-19 Pandemic. In 2019, Changi Jewel, a multi-use retail, hotel and food and beverage destination, opened at Changi Airport, and work is currently underway to expand the number of runways and open a fifth terminal, which would increase passenger capacity. Based on figures released by the STB, the largest source markets for visitors to Singapore in 2020 were China and Indonesia. The STB's methodology for reporting visitor arrivals does not recognize Malaysian citizens entering Singapore by land, although this method of visitation is generally thought to be substantial.

*Competition in Singapore*

Gaming in Singapore is administered by the government through the award of licenses to two operators, our Company and Resorts World Sentosa, which is 100% owned by Genting Singapore PLC. The CRA is required to ensure there will not be more than two casino licenses until January 1, 2031.

Our Singapore operations also face competition from other gaming and resort destinations, both in Asia and globally.

**Las Vegas**

Based on figures released by the Las Vegas Convention and Visitors Authority (the "LVCVA"), Las Vegas welcomed 21 million visitors during the twelve months ended November 30, 2020 (the latest information publicly available at the time of filing).

The Las Vegas hotel/casino industry is highly competitive. Hotels on the Las Vegas Strip compete with other hotels on and off the Las Vegas Strip, including hotels in downtown Las Vegas. In addition, there are large projects in Las Vegas in the development stage or currently suspended and, when opened, may target the same customers as we do. Major competitors in Las Vegas continue to implement and evaluate opportunities to expand casino, hotel and convention offerings.

We also compete with legalized gaming from casinos located on Native American tribal lands, including those located in California and, to some extent, with other hotel/casino facilities in Nevada, with hotel/casino and other resort facilities elsewhere in the country and the world, and with Internet gaming and state lotteries. In addition, certain states have legalized, and others may legalize, casino gaming in specific areas.

Las Vegas generally competes with trade show and convention facilities located in and around major U.S. cities. Within Las Vegas, the Sands Expo Center competes with the Las Vegas Convention Center (the "LVCC"), which currently has approximately 4.6 million gross square feet of convention and exhibit facilities. In addition to the LVCC, some of our Las Vegas competitors have convention and conference facilities that compete with our Las Vegas Operating Properties. Based on figures released by the LVCVA, over 2 million convention delegates visited Las Vegas during the twelve months ended November 30, 2020 (the latest information publicly available at the time of filing) and over 6 million during the year ended December 31, 2019.

**Retail Mall Operations**

We own and operate retail malls at our Integrated Resorts at The Venetian Macao, The Londoner Macao, The Parisian Macao, The Plaza Macao and Four Seasons Hotel Macao, Sands Macao and Marina Bay Sands. Upon completion of all phases of The Londoner Macao, we will own approximately 2.7 million square feet of gross retail space. Management believes being in the retail mall business and, specifically, owning some of the largest retail properties in Asia will provide meaningful value for us, particularly as the retail market in Asia continues to grow. As further described in "Part II — Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 12 — Mall Activities," the Grand Canal Shoppes were sold to GGP (now owned by Brookfield Property Partners L.P., "Brookfield") and are not owned or operated by us.

Our malls are designed to complement our other unique amenities and service offerings provided by our Integrated Resorts. Our strategy is to seek out desirable tenants that appeal to our customers and provide a wide variety of shopping options. We generate our mall revenue primarily from leases with tenants through base minimum rents, overage rents and reimbursements for common area maintenance ("CAM") and other expenditures. For further information related to the financial performance of our malls, see "Part II — Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations."

000750

The tables below set forth certain information regarding our mall operations on the Cotai Strip and at Marina Bay Sands as of December 31, 2020. These tables do not reflect subsequent activity in 2021.

| Mall Name | Total GLA[1] | Selected Significant Tenants |
|---|---|---|
| Shoppes at Venetian | 812,936[2] | Zara, Victoria's Secret, Uniqlo, Tiffany & Co., Rolex, H&M, Michael Kors, Bvlgari, Polo Ralph Lauren, Lululemon, FURLA, Foot Locker |
| Shoppes at Londoner | 525,206[3] | Marks & Spencer, Kid's Cavern, Zara, Omega, Nike, Chow Tai Fook, Apple, Bottega Veneta |
| Shoppes at Parisian | 295,963 | Alexander McQueen, Zadig & Voltaire, Versace Jeans Couture, Antonia, Arc'teryx, Champion |
| Shoppes at Four Seasons | 244,104 | Cartier, Chanel, Louis Vuitton, Hermès, Gucci, Dior, Versace, Zegna, Loro Piana, Saint Laurent, Balenciaga, Loewe, Roger Vivier |
| The Shoppes at Marina Bay Sands | 620,330[4] | Louis Vuitton, Zara, Chanel, Gucci, Dior, Burberry, Prada, Fendi, Moncler, Hermès, Cartier, Apple |

(1)  Represents Gross Leasable Area in square feet.

(2)  Excludes approximately 130,000 square feet of space on the fifth floor currently not on the market for lease.

(3)  The Shoppes at Londoner will feature up to an estimated 600,000 square feet of gross leasable area upon completion of all phases of the renovation, rebranding and expansion to The Londoner Macao.

(4)  Excludes approximately 230,000 square feet of space operated by the Company.

The following table reflects our tenant representation by category for our mall operations as of December 31, 2020:

| Category | Square Feet | % of Square Feet | | Representative Tenants |
|---|---|---|---|---|
| Fashion (luxury, women's, men's, mixed) | 801,366 | 37 | % | Louis Vuitton, Dior, Gucci, Versace, Chanel, Hermès, Balenciaga, Loewe, Saint Laurent, Burberry, Prada, Moncler |
| Restaurants and lounges | 386,149 | 18 | % | Lei Garden, Cé La Vi, North, Blossom |
| Multi-Brands | 251,147 | 11 | % | Duty Free Americas, The Atrium |
| Fashion accessories and footwear | 150,210 | 7 | % | Coach, Rimowa, Michael Kors, FURLA, Oakley & Spectacle Hut, Charles & Keith |
| Lifestyle, sports and entertainment | 200,032 | 9 | % | Manchester United, Adidas, Lululemon, Under Armour, Nike, Foot Locker |
| Jewelry | 159,392 | 7 | % | Bvlgari, Omega, Cartier, Rolex, Tiffany & Co., Chaumet |
| Health and beauty | 82,008 | 4 | % | Sephora, Sa Sa, Chanel, Helena Rubinstein, SkinCeuticals |
| Banks and services | 52,267 | 2 | % | Bank of China, ICBC |
| Home furnishing and electronics | 71,228 | 3 | % | Apple, Samsung, Zara Home |
| Specialty foods | 28,884 | 1 | % | Godiva, Haagen Dazs, Jason's Deli |
| Arts and gifts | 12,278 | 1 | % | Emporio di Gondola |
| Total | 2,194,961 | 100 | % | |

11

000751

**Human Capital**

*Talent Management*

We directly employ approximately 46,000 employees worldwide, including approximately 44,500 full-time employees, and hire additional temporary employees on an as-needed basis. Of our full-time employees, approximately 50% are female.

Our success depends in large part upon our ability to attract, retain, train, manage and motivate skilled managers and employees at our properties. Our strategy is to be the employer of choice by ensuring a thriving workforce built on integrity and opportunity and to support our employees' personal, professional and financial well-being. We strive to enhance our culture by creating a safe environment that consists of an inclusive and diverse workforce where all employees are treated fairly and equally and can excel in the performance of their duties. Some examples of key programs and initiatives we have implemented to attract, develop and retain our diverse workforce include:

- Competitive pay;
- Healthcare: medical/prescription, dental, vision, short-term disability, life and accidental death and disability insurance options at no premium cost; group healthcare insurance; and other support for both physical and mental health, such as a free Employee Assistance Program for employees and their household at SCL, or the MyWellness Connection program in Las Vegas, which provides information regarding nutrition, disease management, stress reduction and injury prevention;
- Retirement benefits: all eligible employees are able to participate in retirement planning schemes, which may include contributions from the employer, as well as the employee;
- Diversity, Equity and Inclusion Program: through well-established policies, procedures, hiring practices and support systems, we promote diversity, equity and inclusion and integrate these values into our company;
- Subsidized child care programs for employees, including access to onsite centers in Las Vegas;
- On-site provision of meals for employees;
- Training and development: through Sands Academy, our global training and development platform, we provide courses, learning tools, coaching opportunities and one-on-one consulting to help employees fulfill their potential, as well as provide tuition reimbursement; and
- Coverage of all COVID-19 Pandemic testing and treatment under all of the Company's medical plans at no cost to the employees and their dependents.

Our employees are not covered by collective bargaining agreements, except as discussed below with respect to certain Sands Expo Center employees. We believe we have good relations with our employees and any relevant union.

Certain unions have engaged in confrontational and obstructive tactics at some of our properties, including contacting potential customers, tenants and investors, objecting to various administrative approvals and informational picketing, and may continue these tactics in the future. Although we believe we will be able to operate despite such tactics, no assurance can be given we will be able to do so or the failure to do so would not have a material adverse effect on our financial condition, results of operations and cash flows. Although no assurances can be given, if employees decide to be represented by labor unions, management does not believe such representation would have a material effect on our financial condition, results of operations and cash flows.

Certain culinary personnel are hired from time to time to provide services for trade shows and conventions at Sands Expo Center and are covered under a collective bargaining agreement between Sands Expo Center and the Local Joint Executive Board of Las Vegas, for and on behalf of Culinary Workers Union, Local 226 and Bartenders Union, Local No. 165. This collective bargaining agreement expired in December 2000, but automatically renews on an annual basis. As a result, Sands Expo Center is operating under the terms of the expired bargaining agreement with respect to these employees.

12

000752

Table of Contents

*Health and Safety*

During 2020, we focused significant attention on the effective handling of the COVID-19 Pandemic. We implemented new protocols and processes designed to limit the spread of the virus. These include the use of hand sanitizers and face masks, new cleaning and disinfecting regimes, testing and tracing and the implementation of social distancing measures in restaurants, bars, gaming, recreation and back of the house areas. We have made physical changes to our properties, such as the installation of thermal screening points at entrances and changes to our heating, ventilation and air conditioning ("HVAC") systems. The latter included the installation of "hospital grade" filters and the use of more fresh air from outside to prevent the recirculation of virus particles and other pathogens. In the midst of the COVID-19 Pandemic-related challenges, we have supported our employees by forgoing furloughs and layoffs and maintaining steady paychecks and health benefits.

**Commitment to Environmental Sustainability**

We focus significant attention on minimizing our environmental impact with the goal of reducing the environmental footprint of our existing properties and offsetting the impact of new developments. Through Sands ECO360, we endeavor to adapt to emerging trends, support new technologies and foster environmental stewardship in the areas of green buildings, environmentally responsible operations and green meetings and events. The program is aligned with the United Nations Sustainable Development Goals and other key environmental standards in the areas of energy, water, waste, procurement, food and transportation.

Our Environmental, Social and Governance Report is available on our website and contains further information on our environmental sustainability performance, including data indices that reflect the reporting requirements of the Global Reporting Initiative and the Sustainability Accounting Standards Board. The contents of the Report and our website are not intended to be incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file or furnish with the SEC, and any reference to the Report and our website are intended to be inactive textual references only.

In addition to our internal initiatives, we have developed the Drop by Drop Project, a collaborative water stewardship initiative in conjunction with Clean the World Foundation. The Drop by Drop Project is designed to encourage sustainability in our local regions and reinvests capital from our water stewardship efforts into innovative water projects in Las Vegas, Macao and Singapore.

We were the only U.S.-based casino and gaming company to be named on the Dow Jones Sustainability World Index 2020 and North America Index 2020. We were one of only 16 companies in North America to be included on the A List for both CDP Climate Change and Water Security in 2020.

**Development Projects**

We regularly evaluate opportunities to improve our product offerings, such as refreshing our meeting and convention facilities, suites and rooms, retail malls, restaurant and nightlife mix and our gaming areas, as well as other revenue generating additions to our Integrated Resorts.

*Macao*

Construction work on the conversion of Sands Cotai Central into the new destination Integrated Resort, The Londoner Macao, is progressing. This project is being delivered in phases, which started in 2020 and will continue throughout 2021. Upon completion, The Londoner Macao will feature new attractions and features internally and externally from London, including some of London's most recognizable landmarks, such as the Houses of Parliament and The Elizabeth Tower (commonly known as "Big Ben"). The Londoner Macao Hotel opened in January 2021 with approximately 600 London-themed suites, including 14 exclusive Suites by David Beckham. The resort will also feature the Londoner Court with approximately 370 luxury suites; construction of the Londoner Court is now complete and we expect it to open in 2021. Our retail offerings will be expanded and rebranded as the Shoppes at Londoner.

We anticipate the total costs associated with The Londoner Macao development project described above and the recently completed The Grand Suites at Four Seasons to be approximately $2.2 billion. The ultimate costs and completion dates for The Londoner Macao development is subject to change as we complete the project. See "Item

13

000753

Table of Contents

1A — Risk Factors — Risks Related to Our Business — *There are significant risks associated with our construction projects.*"

### Singapore

In April 2019, MBS entered into the Second Development Agreement with the STB pursuant to which MBS has agreed to construct a development, which will include a hotel tower with approximately 1,000 rooms and suites, a rooftop attraction, convention and meeting facilities and a state-of-the-art live entertainment arena with approximately 15,000 seats. The Second Development Agreement provides for a total project cost of approximately SGD 4.5 billion (approximately $3.4 billion at exchange rates in effect on December 31, 2020), which investment must be completed within eight years from the effective date of the agreement. The amount of the total project cost will be finalized as we complete design and development and begin construction. We amended our 2012 Singapore Credit Facility to provide for the financing of the development and construction costs, fees and other expenses related to the MBS Expansion Project pursuant to the Second Development Agreement. On June 18, 2020, we further amended our 2012 Singapore Credit Facility, which among other things, extends to June 30, 2021, the deadline for delivering the construction costs estimate and the construction schedule for the MBS Expansion Project.

### United States

We began constructing a high-rise residential condominium tower (the "Las Vegas Condo Tower"), located on the Las Vegas Strip within The Venetian Resort Las Vegas. In 2008, we suspended construction activities for the project due to reduced demand for Las Vegas Strip condominiums and the overall decline in general economic conditions. We continue to evaluate the highest return opportunity for the project. The impact of the suspension on the estimated overall cost of the project is currently not determinable with certainty. Should management decide to abandon the project, we could record a charge for some portion of the $130 million in capitalized construction costs (net of depreciation) as of December 31, 2020.

### Other

We continue to evaluate additional development projects in each of our markets and pursue new development opportunities globally.

## Regulation and Licensing

### Macao Concession and Our Subconcession

In June 2002, the Macao government granted one of three concessions to operate casinos in Macao to Galaxy. During December 2002, we entered into a subconcession agreement with Galaxy, which was approved by the Macao government. The subconcession agreement allows us to develop and operate certain casino projects in Macao, including Sands Macao, The Venetian Macao, The Plaza Macao and Four Seasons Hotel Macao, The Londoner Macao and The Parisian Macao, separately from Galaxy. Under the subconcession agreement, we are obligated to operate casino games of chance or games of other forms in Macao.

If the Galaxy concession is terminated for any reason, our subconcession will remain in effect. The subconcession may be terminated by agreement between Galaxy and us. Galaxy is not entitled to terminate the subconcession unilaterally; however, the Macao government, after consultation with Galaxy, may terminate the subconcession under certain circumstances. Galaxy has developed, and may continue to develop, hotel and casino projects separately from us.

We are subject to licensing and control under applicable Macao law and are required to be licensed by the Macao gaming authorities to operate a casino. We must pay periodic and regular fees and taxes, and our gaming license is not transferable. We must periodically submit detailed financial and operating reports to the Macao gaming authorities and furnish any other information the Macao gaming authorities may require. No person may acquire any rights over the shares or assets of Venetian Macau Limited ("VML"), SCL's wholly owned subsidiary, without first obtaining the approval of the Macao gaming authorities. Similarly, no person may enter into possession of its premises or operate them through a management agreement or any other contract or through step in rights without first obtaining the approval of, and receiving a license from, the Macao gaming authorities. The transfer or creation of encumbrances over ownership of shares representing the share capital of VML or other rights relating to such shares, and any act involving the granting of voting rights or other stockholders' rights to persons other than the

000754

Table of Contents

original owners, would require the approval of the Macao government and the subsequent report of such acts and transactions to the Macao gaming authorities.

Our subconcession agreement requires, among other things: (i) approval of the Macao government for transfers of shares in VML, or of any rights over or inherent to such shares, including the grant of voting rights or other stockholder's rights to persons other than the original owners, as well as for the creation of any charge, lien or encumbrance on such shares; (ii) approval of the Macao government for transfers of shares, or of any rights over such shares, in any of our direct or indirect stockholders, provided that such shares or rights are directly or indirectly equivalent to an amount that is equal to or higher than 5% of VML's share capital; and (iii) that the Macao government be given notice of the creation of any encumbrance or the grant of voting rights or other stockholder's rights to persons other than the original owners on shares in any of the direct or indirect stockholders in VML, provided that such shares or rights are equivalent to an amount that is equal to or higher than 5% of VML's share capital. The requirements in provisions (ii) and (iii) above will not apply, however, to securities listed as tradable on a stock exchange.

The Macao gaming authorities may investigate any individual who has a material relationship to, or material involvement with, us to determine whether our suitability and/or financial capacity is affected by this individual. LVSC and SCL shareholders with 5% or more of the share capital, directors and some of our key employees must apply for and undergo a finding of suitability process and maintain due qualification during the subconcession term, and accept the persistent and long-term inspection and supervision exercised by the Macao government. VML is required to notify the Macao government immediately should VML become aware of any fact that may be material to the appropriate qualification of any shareholder who owns 5% of the share capital, or any officer, director or key employee. Changes in licensed positions must be reported to the Macao gaming authorities, and in addition to their authority to deny an application for a finding of suitability or licensure, the Macao gaming authorities have jurisdiction to disapprove a change in corporate position. If the Macao gaming authorities were to find one of our officers, directors or key employees unsuitable for licensing, we would have to sever all relationships with that person. In addition, the Macao gaming authorities may require us to terminate the employment of any person who refuses to file appropriate applications.

Any person who fails or refuses to apply for a finding of suitability after being ordered to do so by the Macao gaming authorities may be found unsuitable. Any stockholder found unsuitable who holds, directly or indirectly, any beneficial ownership of the common stock of a company incorporated in Macao and registered with the Macao Companies and Moveable Assets Registrar (a "Macao registered corporation") beyond the period of time prescribed by the Macao gaming authorities may lose their rights to the shares. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to be a stockholder or to have any other relationship with us, we:

- pay that person any dividend or interest upon its shares;

- allow that person to exercise, directly or indirectly, any voting right conferred through shares held by that person;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require that unsuitable person to relinquish its shares.

The Macao gaming authorities also have the authority to approve all persons owning or controlling the stock of any corporation holding a gaming license.

In addition, the Macao gaming authorities require prior approval for the creation of liens and encumbrances over VML's assets and restrictions on stock in connection with any financing.

The Macao gaming authorities must give their prior approval to changes in control of VML through a merger, consolidation, stock or asset acquisition, management or consulting agreement or any act or conduct by any person whereby he or she obtains control. Entities seeking to acquire control of a Macao registered corporation must satisfy the Macao gaming authorities concerning a variety of stringent standards prior to assuming control. The Macao gaming authorities may also require controlling stockholders, officers, directors and other persons having a material relationship or involvement with the entity proposing to acquire control, to be investigated and licensed as part of the approval process of the transaction.

15

000755

The Macao gaming authorities may consider some management opposition to corporate acquisitions, repurchases of voting securities and corporate defense tactics affecting Macao gaming licensees, and the Macao registered corporations affiliated with such operations, to be injurious to stable and productive corporate gaming.

The subconcession agreement requires the Macao gaming authorities' prior approval of any recapitalization plan proposed by VML's Board of Directors. The Chief Executive of Macao could also require VML to increase its share capital if he deemed it necessary.

The Macao government also has the right, after consultation with Galaxy, to unilaterally terminate the subconcession agreement at any time upon the occurrence of specified events of default. In addition, we must comply with various covenants and other provisions under the subconcession.

The subconcession agreement also allows the Macao government to request various changes in the plans and specifications of our Macao properties and to make various other decisions and determinations that may be binding on us. For example, the Macao government has the right to require that we contribute additional capital to our Macao subsidiaries or that we provide certain deposits or other guarantees of performance in any amount determined by the Macao government to be necessary. VML is limited in its ability to raise additional capital by the need to first obtain the approval of the Macao gaming and governmental authorities before raising certain debt or equity.

If our subconcession is terminated in the event of a default, the casinos and gaming-related equipment would be automatically transferred to the Macao government without compensation to us and we would cease to generate any revenues from these operations. In many of these instances, the subconcession agreement does not provide a specific cure period within which any such events may be cured and, instead, we would rely on consultations and negotiations with the Macao government to give us an opportunity to remedy any such default.

The Sands Macao, The Venetian Macao, The Plaza Macao and Four Seasons Hotel Macao, The Londoner Macao and The Parisian Macao are being operated under our subconcession agreement. This subconcession excludes the following gaming activities: mutual bets, lotteries, raffles, interactive gaming and games of chance or other gaming, betting or gambling activities on ships or planes. Our subconcession is exclusively governed by Macao law. We are subject to the exclusive jurisdiction of the courts of Macao in case of any dispute or conflict relating to our subconcession.

Our subconcession agreement expires on June 26, 2022. Unless our subconcession is extended, on that date, the casinos and gaming-related equipment will automatically be transferred to the Macao government without compensation to us and we will cease to generate any revenues from these operations. Beginning on December 26, 2017, the Macao government may redeem our subconcession by giving us at least one-year prior notice and by paying us fair compensation or indemnity.

Under our subconcession, we are obligated to pay to the Macao government an annual premium with a fixed portion and a variable portion based on the number and type of gaming tables employed and gaming machines operated by us. The fixed portion of the premium is equal to 30 million patacas (approximately $4 million at exchange rates in effect on December 31, 2020). The variable portion is equal to 300,000 patacas per gaming table reserved exclusively for certain kinds of games or players, 150,000 patacas per gaming table not so reserved and 1,000 patacas per electrical or mechanical gaming machine, including slot machines (approximately $37,570, $18,785 and $125, respectively, at exchange rates in effect on December 31, 2020), subject to a minimum of 45 million patacas (approximately $6 million at exchange rates in effect on December 31, 2020). We also have to pay a special gaming tax of 35% of gross gaming revenues and applicable withholding taxes. We must also contribute 4% of our gross gaming revenue to utilities designated by the Macao government, a portion of which must be used for promotion of tourism in Macao. This percentage may be subject to change in the future.

Currently, the gaming tax in Macao is calculated as a percentage of gross gaming revenue; however, unlike Nevada, gross gaming revenue does not include deductions for credit losses. As a result, if we extend credit to our customers in Macao and are unable to collect on the related receivables from them, we have to pay taxes on our winnings from these customers even though we were unable to collect on the related receivables. If the laws are not changed, our business in Macao may not be able to realize the full benefits of extending credit to our customers.

In August 2018, we received an additional exemption from Macao's corporate income tax on profits generated by the operation of casino games of chance for the period of January 1, 2019 through June 26, 2022, the date our

16

000756

Table of Contents

subconcession agreement expires. Additionally, we entered into an agreement with the Macao government in April 2019, effective through June 26, 2022, providing for an annual payment of 38 million patacas (approximately $5 million at exchange rates in effect on December 31, 2020) as a substitution for a 12% tax otherwise due from VML shareholders on dividend distributions paid from VML gaming profits. We intend to request extensions of these tax arrangements, however, there is no assurance we will receive the additional agreement.

### Development Agreement with Singapore Tourism Board

On August 23, 2006, MBS entered into a development agreement, as amended by a supplementary agreement on December 11, 2009 (the "Development Agreement"), with the STB to design, develop, construct and operate the Marina Bay Sands. The Development Agreement includes a concession for MBS to own and operate a casino within the Integrated Resort. In addition to the casino, the Integrated Resort includes, among other amenities, a hotel, a retail complex, a convention center and meeting room complex, theaters, restaurants and an art/science museum. MBS is one of two companies awarded a concession to operate a casino in Singapore. Under the request for proposals to develop an integrated resort at Marina Bay, Singapore, during an initial ten-year exclusive period (the "Exclusivity Period") only two licensees were granted the right to operate a casino in Singapore, which expired on February 28, 2017. In connection with entering into the Development Agreement, MBS entered into a 60-year lease with the STB for the parcels underlying the project site and entered into an agreement with the Land Transport Authority of Singapore for the provision of necessary infrastructure for rapid transit systems and road works within and/or outside the project site. During the Exclusivity Period, the Company, which is currently the 100% indirect shareholder of MBS, must continue to be the single largest entity with direct or indirect controlling interest of at least 20% in MBS, unless otherwise approved by the CRA.

The term of the casino concession provided under the Development Agreement is for 30 years commencing from the date the Development Agreement was entered into, or August 23, 2006. In order to renew the casino concession, MBS must give notice to the STB and other relevant authorities in Singapore at least five years before its expiration in August 2036. The Singapore government may terminate the casino concession prior to its expiration in order to serve the best interests of the public, in which event fair compensation will be paid to MBS.

In April 2019, MBS and the STB entered into the Second Development Agreement pursuant to which MBS has agreed to construct a second large-scale development, the MBS Expansion Project, located adjacent to Marina Bay Sands, comprising of additional MICE facilities, a hotel tower with approximately 1,000 rooms and suites, a rooftop attraction, convention and meeting facilities and a state-of-the-art live entertainment arena with approximately 15,000 seats. The Second Development Agreement provides for a total project cost of approximately SGD 4.5 billion (approximately $3.4 billion at exchange rates in effect on December 31, 2020). The amount of the total project cost will be finalized as we complete design and development and begin construction. In connection with the Second Development Agreement, MBS entered into a lease with the STB for the parcels of land underlying the project (the "Land"). In April 2019 and in connection with the lease, MBS provided various governmental agencies in Singapore the required premiums, deposits, stamp duty, goods and services tax and other fees in an aggregate amount of approximately SGD 1.54 billion (approximately $1.14 billion at exchange rates in effect at the time of the transaction). We amended our 2012 Singapore Credit Facility to provide for the financing of the development and construction costs, fees and other expenses related to the MBS Expansion Project pursuant to the Development Agreement. On June 18, 2020, MBS entered into an amendment letter to the 2012 Singapore Credit Facility, which among other things, extends to June 30, 2021, the deadline for delivering the construction costs estimate and the construction schedule for the MBS Expansion Project.

The Development Agreement contains, among other things, restrictions limiting the use of the leased land to the development and operation of the project, requirements that MBS obtain prior approval from the STB in order to subdivide the hotel and retail components of the project, prohibitions on any such subdivision during the Exclusivity Period and limitations on MBS' ability to assign the lease or sub-lease any portion of the land during the Exclusivity Period. In addition, the Development Agreement contains events of default, including, among other things, the failure of MBS to perform its obligations under the Development Agreement and events of bankruptcy or dissolution.

Employees whose job duties relate to the operations of the casino are required to be licensed by the relevant authorities in Singapore. MBS also must comply with comprehensive internal control standards or regulations concerning advertising; branch office operations; the location, floor plans and layout of the casino; casino operations

17

000757

Table of Contents

including casino-related financial transactions and patron disputes, issuance of credit and collection of debt, relationships with and permitted payments to gaming promoters; security and surveillance; casino access by Singaporeans and non-Singaporeans; compliance functions and the prevention of money laundering; periodic standard and other reports to the CRA; and those relating to social controls including the exclusion of certain persons from the casino.

There is a goods and services tax of 7% imposed on gross gaming revenue and a casino tax of 15% imposed on the gross gaming revenue from the casino after reduction for the amount of goods and services tax, except in the case of gaming by premium players, in which case a casino tax of 5% is imposed on the gross gaming revenue generated from such players after reduction for the amount of the goods and services tax. The casino tax rates will not be changed until March 1, 2022. The provision for bad debts arising from the extension of credit granted to gaming patrons is not deductible against gross gaming revenue when calculating the casino tax, but is deductible for the purposes of calculating the goods and services tax (subject to the prevailing law). MBS is permitted to extend casino credit to persons who are not Singapore citizens or permanent residents, but is not permitted to extend casino credit to Singapore citizens or permanent residents except to premium players.

The key constraint imposed on the casino under the Development Agreement is the total size of the gaming area, which must not be more than 15,000 square meters (approximately 161,000 square feet). The following are not counted towards the gaming area: back of house facilities, reception, restrooms, food and beverage areas, retail shops, stairs, escalators and lift lobbies leading to the gaming area, aesthetic and decorative displays, performance areas and major aisles. The casino located within Marina Bay Sands may not have more than 2,500 gaming machines, but there is no limit on the number of tables for casino games permitted in the casino.

Under the Casino Control Act, as amended (the "Singapore Act"), a casino operator may be subject to a financial penalty, for each ground of disciplinary action which amounts to a serious breach, of a sum not exceeding 10% of the annual gross gaming revenue (as defined in the Singapore Act) of the casino operator for the financial year immediately preceding the date the financial penalty is imposed.

The Singapore Act also requires future applicants and/or renewals for a casino license to be a suitable person to develop, maintain and promote the Integrated Resort as a compelling tourist destination that meets prevailing market demand and industry standards and contributes to the tourism industry in Singapore. The Singapore government has established an evaluation panel that will assess applicants and report to the CRA on this aspect of the casino licensing requirements.

The Second Development Agreement contains provisions relating to the construction of the MBS Expansion Project and associated deadlines for completion, insurance and limitations on MBS' ability to assign the lease or sub-let any portion of the Land. In addition, the Second Development Agreement contains events of default, including, among other things, the failure of MBS to perform its obligations under the Second Development Agreement. The Second Development Agreement also contains, among other things, restrictions limiting the use of the Land to the development and operation of the MBS Expansion Project and requirements that MBS obtain the prior approval of the STB in order to subdivide the Land or any building thereon, which approval, if given, will be subject to such terms and conditions as may be determined by the STB.

The Second Development Agreement makes provision for certain benefits and entitlements conferred on MBS on specified terms and conditions. Among these, upon the achievement of certain milestones, MBS will be entitled to make available an additional 1,000 gaming machines over and above its existing 2,500 gaming machines. On October 7, 2019, MBS was granted entitlement to make available 500 of these additional 1,000 gaming machines. In addition, under the Second Development Agreement, MBS is granted approval for the change of use of the area comprising the whole of the 55th floor of MBS' hotel tower 1, or such other areas as may be agreed within hotel tower 1, to be developed and used as part of MBS' casino; and MBS is granted an option to purchase an additional 2,000 square meters of casino gaming area at a price to be determined by the relevant Singapore government authority upon written request by MBS to exercise the option. In addition, the Second Development Agreement contemplates that for a period of not less than 10 years commencing no sooner than March 1, 2022, the rate of casino tax applicable to MBS will not exceed specified tiered rates; there shall not be more than two casino licenses in force under the Casino Control Act at any time prior to January 1, 2031; and for a period of five years from the date of the Second Development Agreement, the entry levy payable by a Singapore citizen or permanent resident for entry into the casino will not exceed SGD 150 for a 24-hour period and SGD 3,000 for a 12-month period. The

000758

Table of Contents

Second Development Agreement also provides for MBS to be entitled to compensation by STB for any losses or damages suffered under certain conditions and events related to the above-described benefits and entitlements. The Second Development Agreement further provides MBS must maintain compliance with the material terms of the Second Development Agreement to obtain the above-described benefits and entitlements.

### State of Nevada

The ownership and operation of casino gaming facilities in the State of Nevada are subject to the Nevada Gaming Control Act and the regulations promulgated thereunder (collectively, the "Nevada Act") and various local regulations. Our gaming operations are also subject to the licensing and regulatory control of the Nevada Gaming Commission (the "Nevada Commission"), the Nevada Gaming Control Board (the "Nevada Board") and the Clark County Liquor and Gaming Licensing Board (the "CCLGLB" and together with the Nevada Commission and the Nevada Board, the "Nevada Gaming Authorities").

The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy that are concerned with, among other things:

- the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity;

- the establishment and maintenance of responsible accounting practices and procedures;

- the maintenance of effective controls over the financial practices of licensees, including establishing minimum procedures for internal fiscal affairs and the safeguarding of assets and revenues, providing reliable record-keeping and requiring the filing of periodic reports with the Nevada Gaming Authorities;

- the prevention of cheating and fraudulent practices; and

- the establishment of a source of state and local revenues through taxation and licensing fees.

Any change in such laws, regulations and procedures could have an adverse effect on our Las Vegas operations.

Las Vegas Sands, LLC ("LVSLLC") is licensed by the Nevada Gaming Authorities to operate the resort hotel. The gaming license requires the periodic payment of fees and taxes and is not transferable. LVSLLC is also registered as an intermediary company of Venetian Casino Resort, LLC ("VCR"). VCR is licensed as a manufacturer and distributor of gaming devices and as a key employee of LVSLLC. LVSLLC and VCR are collectively referred to as the "licensed subsidiaries." LVSC is registered with the Nevada Commission as a publicly traded corporation (the "registered corporation"). As such, we must periodically submit detailed financial and operating reports to the Nevada Gaming Authorities and furnish any other information the Nevada Gaming Authorities may require. No person may become a stockholder of, or receive any percentage of the profits from, the licensed subsidiaries without first obtaining licenses and approvals from the Nevada Gaming Authorities. Additionally, the CCLGLB has taken the position it has the authority to approve all persons owning or controlling the stock of any corporation controlling a gaming licensee. We, and the licensed subsidiaries, possess all state and local government registrations, approvals, permits and licenses required in order for us to engage in gaming activities at The Venetian Resort Las Vegas.

The Nevada Gaming Authorities may investigate any individual who has a material relationship to or material involvement with us or the licensed subsidiaries to determine whether such individual is suitable or should be licensed as a business associate of a gaming licensee. Officers, directors and certain key employees of the licensed subsidiaries must file applications with the Nevada Gaming Authorities and may be required to be licensed by the Nevada Gaming Authorities. Our officers, directors and key employees who are actively and directly involved in the gaming activities of the licensed subsidiaries may be required to be licensed or found suitable by the Nevada Gaming Authorities.

The Nevada Gaming Authorities may deny an application for licensing or a finding of suitability for any cause they deem reasonable. A finding of suitability is comparable to licensing; both require submission of detailed personal and financial information followed by a thorough investigation. The applicant for licensing or a finding of suitability, or the gaming licensee by whom the applicant is employed or for whom the applicant serves, must pay all the costs of the investigation. Changes in licensed positions must be reported to the Nevada Gaming Authorities, and

19

000759

Table of Contents

in addition to their authority to deny an application for a finding of suitability or licensure, the Nevada Gaming Authorities have jurisdiction to disapprove a change in a corporate position.

If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or to have an inappropriate relationship with us or the licensed subsidiaries, we would have to sever all relationships with such person. In addition, the Nevada Commission may require us or the licensed subsidiaries to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

We, and the licensed subsidiaries, are required to submit periodic detailed financial and operating reports to the Nevada Commission. Substantially all of our and our licensed subsidiaries' material loans, leases, sales of securities and similar financing transactions must be reported to or approved by the Nevada Commission.

If it were determined we or a licensed subsidiary violated the Nevada Act, the registration and gaming licenses we then hold could be limited, conditioned, suspended or revoked, subject to compliance with certain statutory and regulatory procedures. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Act at the discretion of the Nevada Commission. Further, a supervisor could be appointed by the Nevada Commission to operate the casinos, and, under certain circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the casinos) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any gaming registration or license or the appointment of a supervisor could (and revocation of any gaming license would) have a material adverse effect on our gaming operations.

Any beneficial or record holder of our securities, regardless of the number of shares owned, may be required to file an application, be investigated, and have its suitability as a beneficial holder of our voting securities determined if the Nevada Commission has reason to believe such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. The applicant must pay all costs of investigation incurred by the Nevada Gaming Authorities in conducting any such investigation.

The Nevada Act requires any person who acquires more than 5% of our voting securities to report the acquisition to the Chair of the Nevada Board. The Nevada Act requires beneficial owners of more than 10% of our voting securities apply to the Nevada Commission for a finding of suitability within thirty days after the Chair of the Nevada Board mails the written notice requiring such filing. Under certain circumstances, an "institutional investor" as defined in the Nevada Act, which acquires more than 10%, but not more than 25%, of our voting securities "for investment purposes only" and meets other regulatory requirements (subject to certain additional holdings as a result of certain debt restructurings), may apply to the Nevada Commission for a waiver of such finding of suitability.

If the beneficial holder of securities who must be found suitable is a corporation, partnership or trust, it must submit detailed business and financial information including a list of beneficial owners. The applicant is required to pay all costs of investigation.

Any person who fails or refuses to apply for a finding of suitability or a license within thirty days after being ordered to do so by the Nevada Commission or the Chair of the Nevada Board may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any stockholder found unsuitable who holds, directly or indirectly, any ownership of the common stock of a registered corporation beyond such period of time as may be prescribed by the Nevada Commission may be guilty of a criminal offense. We are subject to disciplinary action if, after we receive notice that a person is unsuitable to be a stockholder or to have any other relationship with us or a licensed subsidiary, we, or any of the licensed subsidiaries:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right conferred through securities held by that person;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require such unsuitable person to relinquish his or her voting securities including, if necessary, the purchase for cash at fair market value.

Our charter documents include provisions intended to help us comply with these requirements.

20

000760

Table of Contents

The Nevada Commission may, in its discretion, require the holder of any debt security of a registered corporation to file an application, be investigated and be found suitable to own the debt security of such registered corporation. If the Nevada Commission determines a person is unsuitable to own such security, then pursuant to the Nevada Act, the registered corporation can be sanctioned, including the loss of its approvals, if without the prior approval of the Nevada Commission, it:

- pays to the unsuitable person any dividend, interest, or any distribution whatsoever;

- recognizes any voting right by such unsuitable person in connection with such securities; or

- pays the unsuitable person remuneration in any form.

We are required to maintain a current stock ledger in Nevada that may be examined by the Nevada Gaming Authorities at any time. If any securities are held in trust by an agent or by a nominee, the record holder may be required to disclose the identity of the beneficial owner to the Nevada Gaming Authorities and we are also required to disclose the identity of the beneficial owner to the Nevada Gaming Authorities. A failure to make such disclosure may be grounds for finding the record holder unsuitable. We are also required to render maximum assistance in determining the identity of the beneficial owner.

We cannot make a public offering of any securities without the prior approval of the Nevada Commission if the securities or the proceeds from the offering are intended to be used to construct, acquire or finance gaming facilities in Nevada, or to retire or extend obligations incurred for such purposes. On November 15, 2018, the Nevada Commission granted us prior approval to make public offerings for a period of three years, subject to certain conditions (the "shelf approval"). The shelf approval, however, may be rescinded for good cause without prior notice upon the issuance of an interlocutory stop order by the Chair of the Nevada Board. The shelf approval does not constitute a finding, recommendation, or approval by the Nevada Commission or the Nevada Board as to the investment merits of any securities offered under the shelf approval. Any representation to the contrary is unlawful.

Changes in our control through a merger, consolidation, stock or asset acquisition, management or consulting agreement, or any act or conduct by any person whereby he or she obtains control, shall not occur without the prior approval of the Nevada Commission. Entities seeking to acquire control of a registered corporation must satisfy the Nevada Board and the Nevada Commission concerning a variety of stringent standards prior to assuming control of such registered corporation. The Nevada Commission may also require controlling stockholders, officers, directors and other persons having a material relationship or involvement with the entity proposing to acquire control, to be investigated and licensed as part of the approval process of the transaction.

The Nevada legislature has declared that some corporate acquisitions opposed by management, repurchases of voting securities and corporate defense tactics affecting Nevada gaming licensees, and registered corporations that are affiliated with those operations, may be injurious to stable and productive corporate gaming. The Nevada Commission has established a regulatory scheme to ameliorate the potentially adverse effects of these business practices upon Nevada's gaming industry and to further Nevada's policy to:

- assure the financial stability of corporate gaming operators and their affiliates;

- preserve the beneficial aspects of conducting business in the corporate form; and

- promote a neutral environment for the orderly governance of corporate affairs.

Approvals are, in certain circumstances, required from the Nevada Commission before we can make exceptional repurchases of voting securities above the current market price thereof and before a corporate acquisition opposed by management can be consummated.

The Nevada Act also requires prior approval of a plan of recapitalization proposed by the Board of Directors in response to a tender offer made directly to our stockholders for the purposes of acquiring control of the registered corporation.

License fees and taxes, computed in various ways depending upon the type of gaming or activity involved, are payable to the State of Nevada and to Clark County, Nevada. Depending upon the particular fee or tax involved, these fees and taxes are payable monthly, quarterly or annually and are based upon:

- a percentage of the gross revenues received;

21

000761

Table of Contents

- the number of gaming devices operated; or

- the number of table games operated.

The tax on gross gaming revenues received is generally 6.75% for the State of Nevada and 0.55% for Clark County. In addition, an excise tax is paid by us on charges for admission to any facility where certain forms of live entertainment are provided. VCR is also required to pay certain fees and taxes to the State of Nevada as a licensed manufacturer and distributor.

We have deposited with the Nevada Board, and thereafter maintain, a revolving fund in the amount of $50,000 to pay the expenses of any investigation by the Nevada Board into our participation in such gaming operations outside of Nevada. The revolving fund is subject to increase or decrease at the discretion of the Nevada Commission. We are also required to comply with certain reporting requirements on such operation and are subject to disciplinary action by the Nevada Commission if the foreign gaming operations knowingly violate any laws of any foreign jurisdiction pertaining to such foreign gaming operation, fail to conduct such foreign gaming operation in accordance with the standards of honesty and integrity required of Nevada gaming operations, engage in activities harmful to the State of Nevada or its ability to collect gaming taxes and fees, or employ a person in such foreign operation who has been denied a license or a finding of suitability in Nevada on the ground of personal unsuitability or who has been found guilty of cheating at gambling.

The sale of alcoholic beverages by the licensed subsidiaries on the casino premises and at the Sands Expo Center is subject to licensing, control and regulation by the applicable local authorities. Our licensed subsidiaries have obtained the necessary liquor licenses to sell alcoholic beverages. All licenses are revocable and are not transferable. The agencies involved have full power to limit, condition, suspend or revoke any such licenses, and any such disciplinary action could (and revocation of such licenses would) have a material adverse effect on our operations.

**Agreements Relating to the Malls in Las Vegas**

For a discussion of each of our malls in Las Vegas, see "Part II — Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 12 — Mall Activities."

*Restated Reciprocal Easement, Use and Operating Agreement*

Our business plan calls for each of The Venetian Resort Las Vegas, Sands Expo Center and the Grand Canal Shoppes, though separately owned, to be integrally related components of one facility (the "LV Integrated Resort"). In establishing the terms for the integrated operation of these components, the Fourth Amended and Restated Reciprocal Easement, Use and Operating Agreement, dated as of February 29, 2008, by and among Interface Group-Nevada, Inc., Grand Canal Shops II, LLC, Phase II Mall Subsidiary, LLC, VCR and Palazzo Condo Tower, LLC (the "REA") sets forth agreements regarding, among other things, encroachments, easements, operating standards, maintenance requirements, insurance requirements, casualty and condemnation, joint marketing and the sharing of some facilities and related costs. Subject to applicable law, the REA binds all current and future owners of all portions of the LV Integrated Resort. Accordingly, subject to applicable law, the obligations in the REA will "run with the land" if any of the components change hands.

**ITEM 1A. — *RISK FACTORS***

You should carefully consider the risk factors set forth below as well as the other information contained in this Annual Report on Form 10-K in connection with evaluating the Company. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also have a material adverse effect on our business, financial condition, results of operations and cash flows. Certain statements in "Risk Factors" are forward-looking statements. See "Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations — Special Note Regarding Forward-Looking Statements."

000762

**Risks Related to Our Business**

*The COVID-19 Pandemic has materially adversely affected the number of visitors to our facilities and disrupted our operations, and we expect this adverse impact to continue until the COVID-19 Pandemic is contained.*

We expect the impact of the disruptions resulting from the impact of the COVID-19 Pandemic, including the extent of their adverse impact on our financial and operational results, will be dictated by the length of time such disruptions continue. Although all our properties are currently open, we cannot predict whether future closures would be appropriate or could be mandated. Even once travel advisories and restrictions are modified or cease to be necessary, demand for Integrated Resorts may remain weak for a significant length of time and we cannot predict if or when the gaming and non-gaming activities of our properties will return to pre-outbreak levels of volume or pricing. In particular, future demand for Integrated Resorts may be negatively impacted by the adverse changes in the perceived or actual economic climate, including higher unemployment rates, declines in income levels and loss of personal wealth or reduced business spending for MICE resulting from the impact of the COVID-19 Pandemic. In addition, we cannot predict the impact the COVID-19 Pandemic will have on our mall tenants in Macao and Singapore.

Our businesses would also be impacted should the disruptions from the COVID-19 Pandemic lead to prolonged changes in consumer behavior or could impact our current construction projects in Macao and Singapore. There are certain limitations on our ability to mitigate the adverse financial impact of these matters, such as the fixed costs at our properties, the access to construction labor due to immigration restrictions or construction materials due to vendor supply chain delays. The COVID-19 Pandemic also makes it more challenging for management to estimate the future performance of our businesses, particularly over the near to medium term. Any of these events may continue to disrupt our ability to staff our business adequately, could continue to generally disrupt our operations or construction projects and, if the global response to contain the COVID-19 Pandemic escalates or is unsuccessful, would have a material adverse effect on our business, financial condition, results of operations and cash flows.

The COVID-19 Pandemic has had, and will continue to have, a material adverse effect on our results of operations and cash flows. Given the uncertainty around the extent and timing of the potential future spread or mitigation of the COVID-19 Pandemic and around the imposition or relaxation of protective measures, we cannot reasonably estimate the impact on our future results of operations, cash flows or financial condition.

*Our business is particularly sensitive to reductions in discretionary consumer and corporate spending as a result of downturns in the economy.*

Consumer demand for hotel/casino resorts, trade shows and conventions and for the type of luxury amenities we offer is particularly sensitive to downturns in the economy and the corresponding impact on discretionary spending. Changes in discretionary consumer spending or corporate spending on conventions and business travel could be driven by many factors, such as: perceived or actual general economic conditions; fear of exposure to a widespread health epidemic, such as the COVID-19 Pandemic; any weaknesses in the job or housing market; credit market disruptions; high energy, fuel and food costs; the increased cost of travel; the potential for bank failures; perceived or actual disposable consumer income and wealth; fears of recession and changes in consumer confidence in the economy; or fear of war, political instability, civil unrest or future acts of terrorism. These factors could reduce consumer and corporate demand for the luxury amenities and leisure and business activities we offer, thus imposing additional limits on pricing and harming our operations.

*Natural or man-made disasters, an outbreak of highly infectious or contagious disease, political instability, civil unrest, terrorist activity or war could materially adversely affect the number of visitors to our facilities and disrupt our operations.*

So-called "Acts of God," such as typhoons and rainstorms, particularly in Macao, and other natural disasters, man-made disasters, outbreaks of highly infectious or contagious diseases, political instability, civil unrest, terrorist activity or war may result, and in the case of the COVID-19 Pandemic, have resulted, in decreases in travel to and from, and economic activity in, areas in which we operate, and may adversely affect, and the COVID-19 Pandemic has adversely affected, the number of visitors to our properties. Any of these events may disrupt our ability to staff our business adequately, could generally disrupt our operations and could have a material adverse effect on our

23

000763

Table of Contents

business, financial condition, results of operations and cash flows. Although we have insurance coverage with respect to some of these events, we cannot assure you any such coverage will provide any coverage or be sufficient to indemnify us fully against all direct and indirect costs, including any loss of business that could result from substantial damage to, or partial or complete destruction of, any of our properties.

***Our business is sensitive to the willingness of our customers to travel.***

We are dependent on the willingness of our customers to travel. Only a small amount of our business is and will be generated by local residents. Most of our customers travel to reach our Macao, Singapore and Las Vegas properties. Infectious diseases may severely disrupt, and in the case of the COVID-19 Pandemic, have severely disrupted, domestic and international travel, which would result in a decrease in customer visits to Macao, Singapore and Las Vegas, including our properties. Regional political events, acts of terrorism or civil unrest, including those resulting in travelers perceiving areas as unstable or an unwillingness of governments to grant visas, regional conflicts or an outbreak of hostilities or war could have a similar effect on domestic and international travel. Management cannot predict the extent to which disruptions from these types of events in air or other forms of travel would have on our business, financial condition, results of operations and cash flows.

***We are subject to extensive regulations that govern our operations in any jurisdiction where we operate.***

We are required to obtain and maintain licenses from various jurisdictions in order to operate certain aspects of our business, and we are subject to extensive background investigations and suitability standards in our gaming business. We also will become subject to regulation in any other jurisdiction where we choose to operate in the future. There can be no assurance we will be able to obtain new licenses or renew any of our existing licenses, or if such licenses are obtained, such licenses will not be conditioned, suspended or revoked; and the loss, denial or non-renewal of any of our licenses could have a material adverse effect on our business, financial condition, results of operations and cash flows. See "Item 1 — Business — Regulation and Licensing" for further description of regulations that govern our operations.

We are subject to regulations imposed by the Foreign Corrupt Practices Act (the "FCPA"), which generally prohibits U.S. companies and their intermediaries from making improper payments to foreign officials for the purpose of obtaining or retaining business. We entered into a comprehensive civil administrative settlement with the SEC on April 7, 2016, and a non-prosecution agreement with the Department of Justice (the "DOJ") on January 19, 2017, which resolved all inquiries related to these government investigations and included ongoing reporting obligations to the DOJ through January 2020. Any violation of the FCPA could have a material adverse effect on our business, financial condition, results of operations and cash flows.

We also deal with significant amounts of cash in our operations and are subject to various reporting and anti-money laundering regulations. U.S. governmental authorities have evidenced an increased focus on the gaming industry and compliance with anti-money laundering laws and regulations. For instance, we are subject to regulation under the Currency and Foreign Transactions Reporting Act of 1970, commonly known as the "Bank Secrecy Act" ("BSA"), which, among other things, requires us to report to the Financial Crimes Enforcement Network ("FinCEN") certain currency transactions in excess of applicable thresholds and certain suspicious activities where we know, suspect or have reason to suspect such transactions involve funds from illegal activity or are intended to violate federal law or regulations or are designed to evade reporting requirements or have no business or lawful purpose. In addition, under the BSA, we are subject to various other rules and regulations involving reporting, recordkeeping and retention. Our compliance with the BSA is subject to periodic audits by the U.S. Treasury Department, and we may be subject to substantial civil and criminal penalties, including fines, if we fail to comply with applicable regulations. We are also subject to similar regulations in Singapore and Macao, as well as regulations set forth by the gaming authorities in the areas in which we operate. Any such laws and regulations could change or could be interpreted differently in the future, or new laws and regulations could be enacted. Any violation of anti-money laundering laws or regulations, or any accusations of money laundering or regulatory investigations into possible money laundering activities, by any of our properties, employees or customers could have a material adverse effect on our business, financial condition, results of operations and cash flows.

24

Table of Contents

***Certain Nevada gaming laws apply to our gaming activities and associations in other jurisdictions where we operate or plan to operate.***

Certain Nevada gaming laws also apply to our gaming activities and associations in jurisdictions outside the State of Nevada. We are required to comply with certain reporting requirements concerning our current and proposed gaming activities and associations occurring outside the State of Nevada, including Macao, Singapore and other jurisdictions. We will also be subject to disciplinary action by the Nevada Commission if we fail to comply with Nevada gaming laws that govern our operations, as further described in "Item 1 — Business — Regulation and Licensing — State of Nevada."

The gaming authorities in other jurisdictions where we operate or plan to operate, including in Macao and Singapore, exercise similar powers for purposes of assessing suitability in relation to our activities in other gaming jurisdictions where we do business.

***We depend primarily on our properties in three markets for all of our cash flow.***

We currently do not have material operations other than our Macao, Singapore and Las Vegas properties. As a result, we are primarily dependent upon our properties for all of our cash.

Given our operations are currently conducted primarily at properties in Macao, Singapore and Las Vegas and a large portion of our planned development is in Macao and Singapore, we are subject to greater risk than if we were more diversified. The risks to which we will have exposure include the following:

- local economic and competitive conditions;
- natural or man-made disasters, pandemics, epidemics, outbreaks of contagious or infectious diseases, such as the COVID-19 Pandemic, political instability, civil unrest, terrorist activity or war;
- inaccessibility due to inclement weather, road construction or closure of primary access routes;
- decline in air passenger traffic due to higher ticket costs, suspension of flights or fears concerning air travel;
- changes in local and state governmental laws and regulations, including gaming laws and regulations;
- changes in the availability of water; and
- a decline in the number of visitors to Macao, Singapore or Las Vegas.

***We are a parent company and our primary source of cash is and will be distributions from our subsidiaries.***

We are a parent company with limited business operations of our own. Our main asset is the capital stock of our subsidiaries. We conduct most of our business operations through our direct and indirect subsidiaries. Accordingly, our primary sources of cash are dividends and distributions with respect to our ownership interests in our subsidiaries derived from the earnings and cash flow generated by our operating properties. Our subsidiaries' payments to us will be contingent upon their earnings and upon other business considerations. If the global response to contain COVID-19 escalates, or is unsuccessful, our subsidiaries' ability to generate sufficient earnings and cash flow to pay dividends or distributions in the future may be negatively impacted. For example, on April 17, 2020, SCL announced it will not pay a final dividend for 2019.

In addition, our Macao and Singapore credit agreements, under certain circumstances, may limit or prohibit certain payments of dividends or other distributions to us. We expect future debt instruments for the financing of future developments may contain similar restrictions.

***Our debt instruments, current debt service obligations and substantial indebtedness may restrict our current and future operations.***

Our current debt service obligations contain, or any future debt service obligations and instruments may contain, a number of restrictive covenants that impose significant operating and financial restrictions on us, including restrictions on our ability to:

- incur additional debt, including providing guarantees or credit support;
- incur liens securing indebtedness or other obligations;
- dispose of certain assets;
- make certain acquisitions;

25

000765

Table of Contents

- pay dividends or make distributions and make other restricted payments, such as purchasing equity interests, repurchasing junior indebtedness or making investments in third parties;
- enter into sale and leaseback transactions;
- engage in any new businesses;
- issue preferred stock; and
- enter into transactions with our stockholders and our affiliates.

In addition, our Macao, Singapore and U.S. credit agreements contain various financial covenants. See "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt" for further description of these covenants.

As of December 31, 2020, we had $14.01 billion of long-term debt outstanding, net of original issue discount and deferred offering costs (excluding those costs related to our revolving facilities). This indebtedness could have important consequences to us. For example, it could:

- make it more difficult for us to satisfy our debt service obligations;
- increase our vulnerability to general adverse economic and industry conditions;
- impair our ability to obtain additional financing in the future for working capital needs, capital expenditures, development projects, acquisitions or general corporate purposes;
- require us to dedicate a significant portion of our cash flow from operations to the payment of principal and interest on our debt, which would reduce the funds available for our operations and development projects;
- limit our flexibility in planning for, or reacting to, changes in the business and the industry in which we operate;
- place us at a competitive disadvantage compared to our competitors that have less debt; and
- subject us to higher interest expense in the event of increases in interest rates.

Subject to applicable laws, including gaming laws, and certain agreed upon exceptions, our Singapore debt is secured by liens on substantially all of the assets of our Singapore operations.

Our ability to timely refinance and replace our indebtedness in the future will depend upon general economic and credit market conditions, approval required by local government regulators, adequate liquidity in the global credit markets, the particular circumstances of the gaming industry, and prevalent regulations and our cash flow and operations, in each case as evaluated at the time of such potential refinancing or replacement. For example, we have a principal amount of $63 million in long-term debt maturing during each of the two years ending December 31, 2022 and $1.86 billion, $1.89 billion and $3.36 billion in long-term debt maturing during the years ending December 31, 2023, 2024 and 2025, respectively. If we are unable to refinance or generate sufficient cash flow from operations to repay our indebtedness on a timely basis, we might be forced to seek alternate forms of financing, dispose of certain assets or minimize capital expenditures and other investments, or reduce dividend payments. There is no assurance any of these alternatives would be available to us, if at all, on satisfactory terms, on terms that would not be disadvantageous to us, or on terms that would not require us to breach the terms and conditions of our existing or future debt agreements.

We may attempt to arrange additional financing to fund the remainder of our planned, and any future, development projects. If we are required to raise additional capital in the future, our access to and cost of financing will depend on, among other things, global economic conditions, conditions in the global financing markets, the availability of sufficient amounts of financing, our prospects and our credit ratings. If our credit ratings were to be downgraded, or general market conditions were to ascribe higher risk to our rating levels, our industry, or us, our access to capital and the cost of any debt financing would be further negatively impacted. In addition, the terms of future debt agreements could include more restrictive covenants, or require incremental collateral, which may further restrict our business operations or be unavailable due to our covenant restrictions then in effect. There is no guarantee that debt financings will be available in the future to fund our obligations, or that they will be available on terms consistent with our expectations. Our current debt service obligations contain a number of restrictive covenants that impose significant operating and financial restrictions on us, and our Macao, Singapore and U.S. credit agreements contain various financial covenants. SCL, MBS and LVSC have each entered into a waiver and

26

000766

Table of Contents

amendment request letter with their lenders to waive certain of their financial requirements through January 1, 2022 for SCL and December 31, 2021 for both MBS and LVSC.

### *The LIBOR calculation method may change and LIBOR is expected to be phased out after 2021.*

Some of our credit facilities calculate interest on the outstanding principal balance using London Interbank Offered Rate ("LIBOR"). On July 27, 2017, the United Kingdom Financial Conduct Authority (the "FCA") announced it would phase out LIBOR as a benchmark by the end of 2021. In the meantime, actions by the FCA, other regulators or law enforcement agencies may result in changes to the method by which LIBOR is calculated. While the expectation is that LIBOR will cease to exist, the future of LIBOR at this time is uncertain. If LIBOR ceases to exist, we may need to renegotiate our credit facilities that reference LIBOR as a factor in determining the interest rate. At this time, it is not possible to predict the effect on our financial condition, results of operations and cash flows of any such changes or any other reforms to LIBOR that may be enacted in the United Kingdom or elsewhere.

### *We are subject to fluctuations in foreign currency exchange rates.*

We record transactions in the functional currencies of our reporting entities. Because our consolidated financial statements are presented in U.S. dollars, we translate revenues and expenses, as well as assets and liabilities, into U.S. dollars at exchange rates in effect during or at the end of each reporting period, which subjects us to foreign currency translation risks. The strengthening of the U.S. dollar against the functional currencies of our foreign operations could have an adverse effect on our U.S. dollar financial results.

In certain instances, our entities whose functional currency is the U.S. dollar may enter, and will continue to enter, into transactions that are denominated in a currency other than U.S. dollars. At the date that such transaction is recognized, each asset and liability arising from the transaction is measured and recorded in U.S. dollars using the exchange rate in effect at that date. At each balance sheet date, recorded monetary balances denominated in a currency other than U.S. dollars are adjusted to U.S. dollars using the exchange rate at the balance sheet date, with gains or losses recorded in other income (expense), which subjects us to foreign currency transaction risks.

We are a parent company whose primary source of cash is distributions from our subsidiaries. Fluctuations in the U.S. dollar/SGD exchange rate, the U.S. dollar/Macao pataca exchange rate and/or the U.S. dollar/Hong Kong Dollar ("HKD") exchange rate could have a material adverse effect on the amount of dividends and distributions from our Singapore and Macao operations.

On July 21, 2005, the People's Bank of China announced the renminbi will no longer be pegged to the U.S. dollar, but will be allowed to float in a band (and, to a limited extent, increase in value) against a basket of foreign currencies. We cannot assure you the Hong Kong dollar will continue to be pegged to the U.S. dollar and the Macao pataca will continue to be pegged to the Hong Kong dollar or the current peg rate for these currencies will remain at the same level. The floating of the renminbi and possible changes to the pegs of the Macao pataca and/or the Hong Kong dollar may result in severe fluctuations in the exchange rate for these currencies. Any change in such exchange rates could have a material adverse effect on our operations and on our ability to make payments on certain of our debt instruments. We do not currently hedge foreign currency risk related to the Hong Kong dollar, renminbi or pataca; however, we maintain a significant amount of our operating funds in the same currencies in which we have obligations, thereby reducing our exposure to currency fluctuations.

### *We extend credit to a large portion of our customers and we may not be able to collect gaming receivables from our credit players.*

We conduct our gaming activities on a credit and cash basis. Any such credit we extend is unsecured. Table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than players who tend to wager lesser amounts.

During the year ended December 31, 2020, approximately 24.0%, 14.6% and 68.8% of our table games drop at our Macao properties, Marina Bay Sands and our Las Vegas properties, respectively, was from credit-based wagering. We extend credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit. These large receivables could have a significant impact on our results of operations if deemed uncollectible.

27

000767

While gaming debts evidenced by a credit instrument, including what is commonly referred to as a "marker," and judgments on gaming debts are enforceable under the current laws of Nevada, and Nevada judgments on gaming debts are enforceable in all states under the Full Faith and Credit Clause of the U.S. Constitution, other jurisdictions around the world, including jurisdictions our gaming customers may come from, may determine, or have determined, enforcement of gaming debts is against public policy. Although courts of some foreign nations will enforce gaming debts directly and the assets in the U.S. of foreign debtors may be reached to satisfy a judgment, judgments on gaming debts from courts in the U.S. and elsewhere are not binding in the courts of many foreign nations.

In particular, we expect our Macao operations will be able to enforce gaming debts only in a limited number of jurisdictions, including Macao. To the extent our Macao gaming customers and gaming promoters are from other jurisdictions, our Macao operations may not have access to a forum in which it will be possible to collect all gaming receivables because, among other reasons, courts of many jurisdictions do not enforce gaming debts and our Macao operations may encounter forums that will refuse to enforce such debts. Moreover, under applicable law, our Macao operations remain obligated to pay taxes on uncollectible winnings from customers.

It is also possible our Singapore operations may not be able to collect gaming debts because, among other reasons, courts of certain jurisdictions do not enforce gaming debts. To the extent our Singapore gaming customers' assets are situated in such jurisdictions, our Singapore operations may not be able to take enforcement action against such assets to facilitate collection of gaming receivables.

Even where gaming debts are enforceable, they may not be collectible. Our inability to collect gaming debts could have a significant adverse effect on our results of operations and cash flows.

***Win rates for our gaming operations depend on a variety of factors, some beyond our control, and the winnings of our gaming customers could exceed our casino winnings.***

The gaming industry is characterized by an element of chance. In addition to the element of chance, win rates are also affected by other factors, including players' skill and experience, the mix of games played, the financial resources of players, the spread of table limits, the volume of bets played and the amount of time played. Our gaming profits are mainly derived from the difference between our casino winnings and the casino winnings of our gaming customers. Since there is an inherent element of chance in the gaming industry, we do not have full control over our winnings or the winnings of our gaming customers. If the winnings of our gaming customers exceed our winnings, we may record a loss from our gaming operations, which could have a material adverse effect on our financial condition, results of operations and cash flows.

***We face the risk of fraud and cheating.***

Our gaming customers may attempt or commit fraud or cheat in order to increase winnings. Acts of fraud or cheating could involve the use of counterfeit chips or other tactics, possibly in collusion with our employees. Internal acts of cheating could also be conducted by employees through collusion with dealers, surveillance staff, floor managers or other casino or gaming area staff. Failure to discover such acts or schemes in a timely manner could result in losses in our gaming operations. In addition, negative publicity related to such schemes could have an adverse effect on our reputation, potentially causing a material adverse effect on our business, financial condition, results of operations and cash flows.

***Our operations face significant competition, which may increase in the future.***

The hotel, resort and casino businesses in Macao, Singapore and Las Vegas are highly competitive. Our Macao properties compete with numerous other casinos located within Macao. Additional Macao facilities announced by our competitors and the increasing capacity of hotel rooms in Macao could add to the competitive dynamic of the market.

Our Macao and Singapore operations will also compete to some extent with casinos located elsewhere in Asia, including South Korea, Malaysia, Philippines, Australia, Cambodia and elsewhere in the world, including Las Vegas, as well as online gaming and cruise ships that offer gaming. Our operations also face increased competition from new developments in Malaysia, Australia and South Korea. In addition, certain countries have legalized, and others may in the future legalize, casino gaming, including Japan, Taiwan, Thailand and Vietnam.

000768

Table of Contents

Our Las Vegas operations compete, to some extent, with other hotel/casino facilities in Nevada, casinos located on Native American tribal lands, including those in California, as well as hotel/casinos and other resort facilities and vacation destinations elsewhere in the United States and around the world. Our Sands Expo Center provides recurring demand for mid-week room nights for business travelers who attend meetings, trade shows and conventions in Las Vegas and presently competes with other large convention centers, including convention centers in Las Vegas and other cities. To the extent these competitors are able to capture a substantially larger portion of the trade show and convention business, there could be a material adverse effect on our business, financial condition, results of operations and cash flows.

The proliferation of gaming venues and gaming activities, such as online gaming, as well as renovations and expansions by our competitors, and their ability to attract customers away from our properties could have a material adverse effect on our financial condition, results of operations and cash flows.

## Risks Associated with Our International Operations

### *There are significant risks associated with our construction projects.*

We previously announced the renovation, expansion and rebranding of Sands Cotai Central into The Londoner Macao, the addition of approximately 370 luxury suites in the Londoner Court and the MBS Expansion Project in Singapore. These development projects and any other construction projects we undertake will entail significant risks. Construction activity requires us to obtain qualified contractors and subcontractors, the availability of which may be uncertain. Construction projects are subject to cost overruns and delays caused by events outside of our control or, in certain cases, our contractors' control, such as shortages of materials or skilled labor, unforeseen engineering, environmental and/or geological problems, work stoppages, weather interference, unanticipated cost increases and unavailability of construction materials or equipment. Construction, equipment or staffing problems or difficulties in obtaining any of the requisite materials, licenses, permits, allocations and authorizations from governmental or regulatory authorities could increase the total cost, delay, jeopardize, prevent the construction or opening of our projects, or otherwise affect the design and features. Construction contractors or counterparties for our current projects may be required to bear certain cost overruns for which they are contractually liable, and if such counterparties are unable to meet their obligations, we may incur increased costs for such developments. In addition, the number of ongoing projects and their locations throughout the world present unique challenges and risks to our management structure. If our management is unable to manage successfully our worldwide construction projects, it could have a material adverse effect on our financial condition, results of operations and cash flows.

The anticipated costs and completion dates for our current projects are based on budgets, designs, development and construction documents and schedule estimates are prepared with the assistance of architects and other construction development consultants and are subject to change as the design, development and construction documents are finalized and as actual construction work is performed. A failure to complete our projects on budget or on schedule may have a material adverse effect on our financial condition, results of operations and cash flows.

### *We will stop generating any gaming revenues from our Macao operations if we cannot secure an extension of our subconcession in 2022 or if the Macao government exercises its redemption right.*

Our subconcession agreement expires on June 26, 2022. Unless our subconcession is extended, all of VML's casino premises and gaming-related equipment will be transferred automatically to the Macao government on that date without compensation to us and we will cease to generate gaming revenues from these operations. Beginning on December 26, 2017, the Macao government may redeem the subconcession agreement by providing us at least one-year prior notice. In the event the Macao government exercises this redemption right, we are entitled to fair compensation or indemnity. The amount of this compensation or indemnity will be determined based on the amount of gaming and non-gaming revenue generated by The Venetian Macao during the tax year prior to the redemption multiplied by the number of remaining years before expiration of the subconcession. We cannot assure you we will be able to renew or extend our subconcession agreement on terms favorable to us or at all. We also cannot assure you that if our subconcession is redeemed, the compensation paid will be adequate to compensate us for the loss of future revenues.

29

000769

***Our Macao subconcession and Singapore concession can be terminated under certain circumstances without compensation to us.***

The Macao government has the right, after consultation with Galaxy Casino Company Limited, to unilaterally terminate our subconcession in the event of VML's serious non-compliance with its basic obligations under the subconcession and applicable Macao laws. Upon termination of our subconcession, our casinos and gaming-related equipment would automatically be transferred to the Macao government without compensation to us and we would cease to generate any revenues from these operations. The loss of our subconcession would prohibit us from conducting gaming operations in Macao, which would have a material adverse effect on our business, financial condition, results of operations and cash flows.

The development agreements between MBS and the STB contains events of default that could permit the STB to terminate the agreement without compensation to us. If the development agreements are terminated, we could lose our right to operate the Marina Bay Sands and our investment in Marina Bay Sands could be lost.

***The number of visitors to Macao, particularly visitors from mainland China, may decline or travel to Macao may be disrupted.***

Our VIP and mass market gaming customers typically come from nearby destinations in Asia, including mainland China, Hong Kong, South Korea and Japan. Increasingly, a significant number of gaming customers come to our casinos from mainland China. Any slowdown in economic growth or changes of China's current restrictions on travel and currency movements could further disrupt the number of visitors from mainland China to our casinos in Macao as well as the amounts they are willing and able to spend while at our properties.

Policies and measures adopted from time to time by the Chinese government include restrictions imposed on exit visas granted to residents of mainland China for travel to Macao and Hong Kong. These measures have, and any future policy developments implemented may have, the effect of reducing the number of visitors to Macao from mainland China, which could adversely impact tourism and the gaming industry in Macao.

***The Macao and Singapore governments could grant additional rights to conduct gaming in the future and increase competition we face.***

We hold a subconcession under one of only six gaming concessions and subconcessions authorized by the Macao government to operate casinos in Macao through June 26, 2022. We hold one of two licenses granted by the Singapore government to operate a casino in Singapore during an exclusive period expiring on January 1, 2031. If the Macao government were to allow additional gaming operators in Macao or the Singapore government were to license additional casinos, we would face additional competition, which could have a material adverse effect on our financial condition, results of operations and cash flows.

***Conducting business in Macao and Singapore has certain political and economic risks.***

Our business development plans, financial condition, results of operations and cash flows may be materially and adversely affected by significant political, social and economic developments in Macao and Singapore, and by changes in policies of the governments or changes in laws and regulations or their interpretations. Our operations in Macao and Singapore are also exposed to the risk of changes in laws and policies that govern operations of companies based in those countries. Jurisdictional tax laws and regulations may also be subject to amendment or different interpretation and implementation, thereby having an adverse effect on our profitability after tax. These changes may have a material adverse effect on our financial condition, results of operations and cash flows.

Current Macao and Singapore laws and regulations concerning gaming and gaming concessions and licenses are, for the most part, fairly recent and there is little precedent on the interpretation of these laws and regulations. We believe our organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of Macao and Singapore. These laws and regulations are complex and a court or an administrative or regulatory body may in the future render an interpretation of these laws and regulations, or issue regulations, which differs from our interpretation and could have a material adverse effect on our financial condition, results of operations and cash flows.

In addition, our activities in Macao and Singapore are subject to administrative review and approval by various government agencies. We cannot assure you we will be able to obtain all necessary approvals, which may have a

000770

Table of Contents

material adverse effect on our long-term business strategy and operations. Macao and Singapore laws permit redress to the courts with respect to administrative actions; however, such redress is largely untested in relation to gaming issues.

The Macao government approved smoking control legislation, which prohibits smoking in casinos. This legislation permits casinos to maintain designated smoking rooms opened to the public, as long as such rooms comply with certain conditions, namely that no gaming equipment is installed within a three-meter radius from their entrance doors, that they are physically separated from the remaining areas and that no activity other than smoking is conducted inside the rooms, including gaming. Such legislation may deter potential gaming customers who are smokers from frequenting casinos in jurisdictions with smoking bans such as Macao. Such laws and regulations could change or could be interpreted differently in the future. We cannot predict the future likelihood or outcome of similar legislation or referendums in other jurisdictions where we operate or the magnitude of any decrease in revenues as a result of such regulations, though any smoking ban could have an adverse effect on our business, financial condition, results of operations and cash flows.

***Our tax arrangements with the Macao government may not be extended on terms favorable to us or at all beyond their June 26, 2022 expiration dates.***

We have had the benefit of a corporate tax exemption in Macao, which exempts us from paying the 12% corporate income tax on profits generated by the operation of casino games, but does not apply to our non-gaming activities. We will continue to benefit from this tax exemption through June 26, 2022, the date our subconcession agreement expires. Additionally, we entered into an agreement with the Macao government in April 2019, effective through June 26, 2022, providing an annual payment as a substitution for a 12% tax otherwise due from VML shareholders on dividend distributions paid from VML gaming profits.

***We are dependent upon gaming promoters for a portion of our gaming revenues in Macao.***

Gaming promoters, which promote gaming and draw VIP patrons to casinos, are responsible for a portion of our gaming revenues in Macao. There can be no assurance we will be able to maintain, or grow, our relationships with gaming promoters. If we are unable to maintain or grow our relationships with gaming promoters, or if the gaming promoters experience financial difficulties or are unable to develop or maintain relationships with our VIP patrons, our ability to grow our gaming revenues will be hampered.

If gaming promoters attempt to negotiate changes to our operational agreements, including higher commissions, it could result in higher costs for us, loss of business to a competitor or loss of relationships with gaming promoters. Given regulatory requirements and certain economic and other factors occurring in the region, gaming promoters may encounter difficulties in attracting patrons to come to Macao, resulting in decreased gaming volume at our Macao properties. Credit already extended by gaming promoters to their patrons may become increasingly difficult for them to collect. This inability to attract sufficient patrons, grant credit and collect amounts due in a timely manner could negatively affect gaming promoters' activities, cause gaming promoters to wind up or liquidate their operations or result in gaming promoters leaving Macao. The above factors affecting gaming promoters could have a material adverse effect on our business, financial condition, results of operations and cash flows.

In addition, the quality of gaming promoters with whom we have relationships is important to our reputation and our ability to continue to operate in compliance with our gaming licenses. While we strive for excellence in our associations with gaming promoters, we cannot assure you the gaming promoters with whom we are associated will meet the high standards we insist upon. If a gaming promoter falls below our standards, we may suffer reputational harm, as well as worsening relationships with, and possible sanctions from, gaming regulators with authority over our operations. In the event a gaming promoter does not meet its financial obligations, there can be no assurance we may not incur financial exposure.

***We are subject to limitations of the pataca exchange markets and restrictions on the export of the renminbi.***

Our revenues in Macao are denominated in patacas, the legal currency of Macao, and Hong Kong dollars. The Macao pataca is pegged to the Hong Kong dollar and, in many cases, is used interchangeably with the Hong Kong dollar in Macao. Although currently permitted, we cannot assure you patacas will continue to be freely exchangeable

31

000771

Table of Contents

into U.S. dollars. Also, our ability to convert large amounts of patacas into U.S. dollars over a relatively short period may be limited.

We are currently prohibited from accepting wagers in renminbi, the legal currency of China. There are also restrictions on the remittance of the renminbi from mainland China and the amount of renminbi that can be converted into foreign currencies, including the pataca and Hong Kong dollar. Restrictions on the remittance of the renminbi from mainland China may impede the flow of gaming customers from mainland China to Macao, inhibit the growth of gaming in Macao and negatively impact our gaming operations. There is no assurance that incremental mainland Chinese regulations will not be promulgated in the future that have the effect of restricting or eliminating the remittance of renminbi from mainland China. Further, if any new mainland Chinese regulations are promulgated in the future that have the effect of permitting or restricting (as the case may be) the remittance of renminbi from mainland China, then such remittances will need to be made subject to the specific requirements or restrictions set out in such rules.

### *VML may have financial and other obligations to foreign workers managed by its contractors under government labor quotas.*

The Macao government has granted VML a quota to permit it to hire foreign workers. VML has effectively assigned the management of this quota to its contractors for the construction of our Cotai Strip projects. VML, however, remains ultimately liable for all employer obligations relating to these employees, including for payment of wages and taxes and compliance with labor and workers' compensation laws. VML requires each contractor to whom it has assigned the management of part of its labor quota to indemnify VML for any costs or liabilities VML incurs as a result of such contractor's failure to fulfill employer obligations. VML's agreements with its contractors also contain provisions that permit it to retain some payments for up to one year after the contractors' complete work on the projects. We cannot assure you VML's contractors will fulfill their obligations to employees hired under the labor quotas or to VML under the indemnification agreements, or the amount of any indemnification payments received will be sufficient to pay for any obligations VML may owe to employees managed by contractors under VML's quotas. Until we make final payments to our contractors, we have offset rights to collect amounts they may owe us, including amounts owed under the indemnities relating to employer obligations. After we have made the final payments, it may be more difficult for us to enforce any unpaid indemnity obligations.

### *The transportation infrastructure in Macao may not be adequate to accommodate increased future demand of visitors to Macao.*

Macao is in the process of expanding its transportation infrastructure to service the increased number of visitors to Macao. If the planned expansions of transportation facilities to and from Macao are delayed or not completed, and Macao's transportation infrastructure is insufficient to meet the demands of an increased volume of visitors to Macao, the desirability of Macao as a business and leisure tourism destination, as well as the results of operations of our Macao properties, could be negatively impacted.

## Risks Associated with Our U.S. Operations

### *A breach by the owner of the Grand Canal Shoppes of any of its material agreements with us could have a material adverse effect on our financial condition.*

Venetian Casino Resort, LLC, is party to the Fourth Amended and Restated Reciprocal Easement, Use and Operating Agreement, dated as of February 29, 2008 ("REA") with Brookfield, owner and operator of the Grand Canal Shoppes. In establishing the terms for the integrated operation of these companies, the REA sets forth agreements regarding, among other things, encroachments, easements, operating standards, maintenance requirements, insurance requirements, casualty and condemnation, joint marketing and the sharing of some facilities and related costs. If Brookfield substantially breaches its obligations under the REA, such breaches could have a material adverse effect on our financial condition.

## Risks Related to Stock Ownership and Stockholder Matters

### *The interests of our principal stockholders in our business may be different from yours.*

Mr. Adelson, his family members and trusts and other entities established for the benefit of Mr. Adelson's family members (collectively our "Principal Stockholders") beneficially owned approximately 57% of our

000772

Table of Contents

outstanding common stock as of December 31, 2020. Accordingly, our Principal Stockholders exercise significant influence over our business policies and affairs, including the composition of our Board of Directors and any action requiring the approval of our stockholders, including the adoption of amendments to our articles of incorporation and the approval of a merger or sale of substantially all of our assets. The concentration of ownership may also delay, defer or even prevent a change in control of our company and may make some transactions more difficult or impossible without the support of our Principal Stockholders. The interests of our Principal Stockholders may differ from your interests.

*Conflicts of interest may arise because certain of our directors and officers are also directors of SCL.*

In November 2009, our subsidiary, SCL, listed its ordinary shares on The Main Board of The Stock Exchange of Hong Kong Limited (the "SCL Offering"). We currently own 69.9% of the issued and outstanding ordinary shares of SCL. As a result of SCL having stockholders who are not affiliated with us, we and certain of our officers and directors who also serve as officers and/or directors of SCL may have conflicting fiduciary obligations to our stockholders and to the minority stockholders of SCL. Decisions that could have different implications for us and SCL, including contractual arrangements we have entered into or may in the future enter into with SCL, may give rise to the appearance of a potential conflict of interest.

*Certain Nevada gaming regulations apply to beneficial owners of our voting securities.*

Any person who acquires beneficial ownership of more than 10% of our voting securities will be required to apply to the Nevada Commission for a finding of suitability within 30 days after the Chair of the Nevada Board mails a written notice requiring the filing. Under certain circumstances, an "institutional investor" as defined under the regulations of the Nevada Commission, which acquires beneficial ownership of more than 10%, but not more than 25%, of our voting securities (subject to certain additional holdings as a result of certain debt restructurings or stock repurchase programs under the Nevada Act), may apply to the Nevada Commission for a waiver of such finding of suitability requirement if the institutional investor holds our voting securities only for investment purposes. In addition, any beneficial owner of our voting securities, regardless of the number of shares beneficially owned, may be required at the discretion of the Nevada Commission to file an application for a finding of suitability as such. In either case, a finding of suitability is comparable to licensing and the applicant must pay all costs of investigation incurred by the Nevada Gaming Authorities in conducting the investigation.

Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Authorities may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any stockholder found unsuitable who holds, directly or indirectly, any ownership of the common stock of a registered corporation beyond such period of time as may be prescribed by the Nevada Commission may be guilty of a criminal offense. We are subject to disciplinary action if, after we receive notice a person is unsuitable to be a stockholder or to have any other relationship with us or a licensed subsidiary, we, or any of the licensed subsidiaries:

- pay that person any dividend or interest upon any voting securities;
- allow that person to exercise, directly or indirectly, any voting right conferred through securities held by that person;
- pay remuneration in any form to that person for services rendered or otherwise; or
- fail to pursue all lawful efforts to require such unsuitable person to relinquish his or her voting securities including, if necessary, purchasing them for cash at fair market value.

## Human Capital Related Risk Factors

*We depend on the continued services of key officers.*

Our historical success was principally dependent on our founder, Chairman and Chief Executive Officer, Sheldon G. Adelson. On January 12, 2021, we announced the passing of Mr. Adelson. On January 26, 2021, we announced Mr. Goldstein was appointed Chairman and Chief Executive Officer and Patrick Dumont was appointed President and Chief Operating Officer. Our ability to maintain our competitive position is dependent to a large degree on the services of our senior management team, including Robert G. Goldstein and Patrick Dumont. The loss of their services or the services of our other senior managers, or the inability to attract and retain additional senior management personnel could have a material adverse effect on our business.

33

000773

***We compete for limited management and labor resources in Macao and Singapore, and policies of those governments may also affect our ability to employ imported managers or labor.***

Our success depends in large part upon our ability to attract, retain, train, manage and motivate skilled managers and employees at our properties. The Macao government requires we only hire Macao residents in our casinos for certain employee roles, including as dealers. In addition, we are required in Macao to obtain visas and work permits for managers and employees we seek to employ from other countries. There is significant competition in Macao and Singapore for managers and employees with the skills required to perform the services we offer and competition for these individuals in Macao is likely to increase as other competitors expand their operations.

We may have to recruit managers and employees from other countries to adequately staff and manage our properties and certain Macao government policies affect our ability to hire non-resident managers and employees in certain job classifications. Despite our coordination with the Macao labor and immigration authorities to ensure our management and labor needs are satisfied, we may not be able to recruit and retain a sufficient number of qualified managers or employees for our operations or the Macao labor and immigration authorities may not grant us the necessary visas or work permits.

If we are unable to obtain, attract, retain and train skilled managers and employees, and obtain any required visas or work permits for our skilled managers and employees, our ability to adequately manage and staff our existing properties and planned development projects could be impaired, which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

***Labor actions and other labor problems could negatively impact our operations.***

From time to time, we have experienced attempts by labor organizations to organize certain of our non-union employees. We cannot provide any assurance we will not experience additional and successful union activity in the future. The impact of any union activity is undetermined and could have a material adverse effect on our business, financial condition, results of operations and cash flows.

**General Risk Factors**

***We may fail to establish and protect our IP rights.***

We endeavor to establish, protect and enforce our IP, including our trademarks, copyrights, patents, domain names, trade secrets and other confidential and proprietary information. There can be no assurance, however, the steps we take to protect our IP will be sufficient. If a third party successfully challenges our trademarks, we could have difficulty maintaining exclusive rights. If a third party claims we have infringed, currently infringe, or could in the future infringe upon its IP rights, we may need to cease use of such IP, defend our rights or take other steps. In addition, if third parties violate their obligations to us to maintain the confidentiality of our proprietary information or there is a security breach or lapse, or if third parties misappropriate or infringe upon our IP, our business may be affected. Our inability to adequately obtain, maintain or defend our IP rights for any reason could have a material adverse effect on our business, financial condition and results of operations.

***Our insurance coverage may not be adequate to cover all possible losses that our properties could suffer and our insurance costs may increase in the future.***

We have comprehensive property and liability insurance policies for our properties in operation, as well as those in the course of construction, with coverage features and insured limits we believe are customary in their breadth and scope. Market forces beyond our control may nonetheless limit the scope of the insurance coverage we can obtain or our ability to obtain coverage at reasonable rates. Certain types of losses, generally of a pandemic or catastrophic nature, such as infectious disease, such as the COVID-19 Pandemic, earthquakes, hurricanes and floods, or terrorist acts, or certain liabilities may be, or are, uninsurable or too expensive to justify obtaining insurance. As a result, we may not be successful in obtaining insurance without increases in cost or decreases in coverage levels. In addition, in the event of a substantial loss, the insurance coverage we carry may not be sufficient to pay the full market value or replacement cost of our lost investment or in some cases could result in certain losses being totally uninsured. As a result, we could lose some or all of the capital we have invested in a property, as well as the anticipated future revenue from the property, and we could remain obligated for debt or other financial obligations related to the property.

000774

Table of Contents

Certain of our debt instruments and other material agreements require us to maintain a certain minimum level of insurance. Failure to satisfy these requirements could result in an event of default under these debt instruments or material agreements.

### *We are subject to changes in tax laws and regulations.*

We are subject to taxation and regulation by various government agencies, primarily in Macao, Singapore and the U.S. (federal, state and local levels). From time to time, U.S. federal, state, local and foreign governments make substantive changes to income tax, indirect tax and gaming tax rules and the application of these rules, which could result in higher taxes than would be incurred under existing tax law or interpretation, such as the casino tax rates in Singapore that will increase and move to a tiered structure on March 1, 2022. In particular, government agencies may make changes that could reduce the profits we can effectively realize from our non-U.S. operations. Like most U.S. companies, our effective income tax rate reflects the fact that income earned and reinvested outside the U.S. is taxed at local rates, which are often lower than U.S. tax rates.

If changes in tax laws and regulations were to significantly increase the tax rates on gaming revenues or income, these changes could increase our tax expense and liability, and therefore, could have a material adverse effect on our financial condition, results of operations and cash flows.

### *Failure to maintain the integrity of our information and information systems or comply with applicable privacy and data security requirements and regulations could harm our reputation and adversely affect our business.*

Our business requires the collection and retention of large volumes of data and non-electronic information, including credit card numbers and other information in various information systems we maintain and in those maintained by third parties with whom we contract and may share data. We also maintain internal information about our employees and information relating to our operations. The integrity and protection of that information are important to us. Our collection of such information is subject to extensive private and governmental regulation.

Privacy and cybersecurity laws and regulations are developing and changing frequently, and vary significantly by jurisdiction. We may incur significant costs in our efforts to comply with the various applicable privacy and cybersecurity laws and regulations as they emerge and change. Compliance with applicable privacy laws and regulations also may adversely impact our ability to market our products, properties, and services to our guests and patrons. Non-compliance by us, or potentially by third parties with which we share information, with any applicable privacy and cybersecurity law or regulation, including accidental loss, inadvertent disclosure, unauthorized access or dissemination, or breach of security may result in damage to our reputation and could subject us to fines, penalties, required corrective actions, lawsuits, payment of damages, or restrictions on our use or transfer of data.

We have experienced a sophisticated criminal cybersecurity attack in the past and may experience with more frequency global cybersecurity and information security threats, which may range from uncoordinated individual attempts to sophisticated and targeted measures directed at us. There has been an increase in criminal cybersecurity attacks against companies where customer and company information has been compromised and company data has been destroyed. Our information systems and records, including those we maintain with third-party service providers, may be subject to cyber-attacks and information security breaches. Cyber-attacks and information security breaches may include attempts to access information, computer malware such as viruses, denial of service, ransomware attacks that encrypt, exfiltrate, or otherwise render data unusable or unavailable in an effort to extort money or other consideration as a condition to purportedly returning the data to a usable form, operator errors or misuse, or inadvertent releases of data or documents, and other forms of electronic and non-electronic information security breaches. Our data security measures are reviewed regularly and we rely on proprietary and commercially available systems, software, tools, and monitoring to provide security for processing, transmission, and storage of customer and employee information. We also rely extensively on computer systems to process transactions, maintain information, and manage our businesses. Our third-party information system service providers and other third parties that share data with us pursuant to contractual agreements also face risks relating to cybersecurity and privacy, and we do not directly control any of such parties' information security or privacy operations. For example, the systems currently used for the transmission and approval of payment card transactions, and the technology utilized in payment cards themselves, are determined and controlled by the payment card industry, not us. Our gaming operations rely heavily on technology services provided by third parties. In the event there is an interruption of these

000775

services to us, it may have an adverse effect on our operations and financial condition. Disruptions in the availability of our computer systems, or those of third parties we engage to provide gaming operating systems for the facilities we operate, through cybersecurity attacks or otherwise, could impact our ability to service our customers and adversely affect our sales and the results of operations.

A significant theft, destruction, loss or fraudulent use of information maintained by us or by a third-party service provider could have an adverse effect on our reputation, cause a material disruption to our operations and management team and result in remediation expenses (including liability for stolen assets or information, repairing system damage and offering incentives to customers or business partners to maintain their relationships after an attack) and regulatory fines, penalties and corrective actions, or lawsuits by regulators, third-party service providers, third parties that share data with us pursuant to contractual agreements and/or people whose data is or may be impacted. Such theft, destruction, loss or fraudulent use could also result in litigation by stockholders. Advances in computer software capabilities and encryption technology, new tools, and other developments, including continuously evolving attack methods that may exploit vulnerabilities based on these advances, may increase the risk of a security breach or other intrusion. In addition, we may incur increased cybersecurity and privacy protection costs that may include organizational changes, deploying additional personnel and protection technologies, training employees and engaging third-party experts and consultants. There can be no assurance the insurance the Company has in place relating to cybersecurity and privacy risks will be sufficient in the event of a major cybersecurity or privacy event. Any of these events could have a material adverse effect on our business, financial condition, results of operations and cash flows.

**Because we own real property, we are subject to extensive environmental regulation.**

We have incurred and will continue to incur costs to comply with environmental requirements, such as those relating to discharges into the air, water and land, the handling and disposal of solid and hazardous waste and the cleanup of properties affected by hazardous substances. Under these and other environmental requirements, we may be required to investigate and clean up hazardous or toxic substances or chemical releases at our properties and may be held responsible to governmental entities or third parties, as an owner or operator, for property damage, personal injury and investigation and cleanup costs incurred by them in connection with any contamination. These laws typically impose cleanup responsibility and liability without regard to whether the owner or operator knew of or caused the presence of the contaminants. The costs of investigation, remediation or removal of those substances may be substantial, and the presence of those substances, or the failure to remediate a property properly, may impair our ability to use our properties.

## ITEM 1B. — *UNRESOLVED STAFF COMMENTS*

None.

## ITEM 2. — *PROPERTIES*

We have received concessions from the Macao government to build on a six-acre land site for the Sands Macao and the sites on which The Venetian Macao, The Plaza Macao and Four Seasons Hotel Macao, The Londoner Macao and The Parisian Macao are located. We do not own these land sites in Macao; however, the land concessions grant us exclusive use of the land. Land concessions in Macao generally have an initial term of 25 years with automatic extensions of 10 years thereafter in accordance with Macao law. As specified in the land concessions, we are required to pay premiums, which are either payable in a single lump sum upon acceptance of our land concessions by the Macao government or in seven semi-annual installments, as well as annual rent for the term of the land concession, which may be revised every five years by the Macao government. In October 2008, the Macao government amended our land concession to separate the retail and hotel portions of The Plaza Macao and Four Seasons Hotel Macao parcel and allowed us to subdivide the parcel into four separate components, consisting of retail; hotel/casino; an apart-hotel tower; and parking areas. In consideration for the amendment, we paid an additional land premium of approximately $18 million and will pay adjusted annual rent over the remaining term of the concession, which increased slightly due to the revised allocation of parcel use. See "Part II — Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 5 — Leasehold Interests in Land, Net" for more information on our payment obligation under these land concessions.

000776

Table of Contents

Under the Development Agreement with the STB, we paid SGD 1.20 billion (approximately $756 million at exchange rates in effect at the time of the transaction) in premium payments for the 60-year lease of the land on which the Marina Bay Sands is located. In connection with the Second Development Agreement with the STB, we paid $963 million in premium payments for the lease of the parcels of land underlying the proposed MBS Expansion Project site, which will be effective until August 21, 2066.

We own an approximately 63-acre parcel of land on which our Las Vegas Operating Properties are located and an approximately 19-acre parcel of land located to the east of the 63-acre parcel. We own these parcels of land in fee simple, subject to certain easements, encroachments and other non-monetary encumbrances.

In March 2004, we entered into a long-term lease with a third party for the airspace over which a portion of The Shoppes at The Palazzo was constructed (the "Leased Airspace"). In January 2008, we acquired fee title from the same third party to the airspace above the Leased Airspace (the "Acquired Airspace") in order to build the Las Vegas Condo Tower, a high-rise residential condominium tower that was being constructed on the Las Vegas Strip within The Venetian Resort Las Vegas. In February 2008, in connection with the sale of The Shoppes at The Palazzo, GGP acquired control of the Leased Airspace. We continue to retain fee title to the Acquired Airspace in order to resume building when demand and market conditions improve.

**ITEM 3. — *LEGAL PROCEEDINGS***

For a discussion of legal proceedings, see "Part II — Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 14 — Commitments and Contingencies — Litigation."

**ITEM 4. — *MINE SAFETY DISCLOSURES***

Not applicable.

000777

**PART II**

**ITEM 5. —** *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*

**Market Information**

The Company's common stock trades on the NYSE under the symbol "LVS." As of February 2, 2021, there were 763,842,938 shares of our common stock outstanding that were held by 309 stockholders of record.

**Preferred Stock**

We are authorized to issue up to 50,000,000 shares of preferred stock. Our Board of Directors is authorized, subject to limitations prescribed by Nevada law and our articles of incorporation, to determine the terms and conditions of the preferred stock, including whether the shares of preferred stock will be issued in one or more series, the number of shares to be included in each series and the powers, designations, preferences and rights of the shares. Our Board of Directors also is authorized to designate any qualifications, limitations or restrictions on the shares without any further vote or action by the stockholders. The issuance of preferred stock may have the effect of delaying, deferring or preventing a change in control of our Company and may adversely affect the voting and other rights of the holders of our common stock, which could have an adverse impact on the market price of our common stock.

**Dividends**

Our ability to declare and pay dividends on our common stock is subject to the requirements of Nevada law. In addition, we are a parent company with limited business operations of our own. Accordingly, our primary sources of cash are dividends and distributions with respect to our ownership interest in our subsidiaries derived from the earnings and cash flow generated by our operating properties.

Our subsidiaries' long-term debt arrangements place restrictions on their ability to pay cash dividends to the Company. This may restrict our ability to pay cash dividends other than from cash on hand. See "Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations — Restrictions on Distributions" and "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt."

*Common Stock Dividends*

In April 2020, we suspended our quarterly dividend program due to the impact of the COVID-19 Pandemic.

**Recent Sales of Unregistered Securities**

There have not been any sales by the Company of equity securities in the last three fiscal years that have not been registered under the Securities Act of 1933.

**Purchases of Equity Securities by the Issuer**

In June 2018, the Company's Board of Directors authorized the repurchase of $2.50 billion of its outstanding common stock, which was to expire in November 2020. In October 2020, the Company's Board of Directors authorized the extension of the expiration date of the remaining repurchase amount of $916 million to November 2022. During the year ended December 31, 2020, no shares of our common stock were repurchased under this program. All repurchases under the stock repurchase program are made from time to time at our discretion in accordance with applicable federal securities laws. All share repurchases of our common stock have been recorded as treasury shares.

000778

Table of Contents

**Performance Graph**

The following performance graph compares the performance of our common stock with the performance of the Standard & Poor's 500 Index and the Dow Jones US Gambling Index, during the five years ended December 31, 2020. The graph plots the changes in value of an initial $100 investment over the indicated time period, assuming all dividends are reinvested. The stock price performance in this graph is not necessarily indicative of future stock price performance.



| | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 |
|---|---|---|---|---|---|---|
| Las Vegas Sands Corp. | $ 100.00 | $ 128.75 | $ 175.38 | $ 137.56 | $ 191.80 | $ 168.78 |
| S&P 500 | $ 100.00 | $ 111.95 | $ 136.38 | $ 116.67 | $ 130.39 | $ 202.96 |
| Dow Jones US Gambling Index | $ 100.00 | $ 128.19 | $ 179.66 | $ 124.66 | $ 183.94 | $ 164.92 |

The performance graph should not be deemed filed or incorporated by reference into any other Company filing under the Securities Act of 1933 or the Exchange Act of 1934, except to the extent the Company specifically incorporates the performance graph by reference therein.

39

000779

## ITEM 6. — *SELECTED FINANCIAL DATA*

The following reflects selected historical financial data that should be read in conjunction with "Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and notes thereto included elsewhere in this Annual Report on Form 10-K. The historical results are not necessarily indicative of the results of operations to be expected in the future.

We adopted ASC 842, Leases, effective January 1, 2019, on a prospective basis. See "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 13 — Leases" for further information regarding these changes. Total assets for the years ended December 31, 2018, 2017 and 2016 were not revised and are presented in accordance with ASC 840, Leases, and related interpretations.

| | Year Ended December 31, | | | | |
| | 2020[1] | 2019[2] | 2018[3] | 2017[4] | 2016[5] |
|---|---|---|---|---|---|
| | (In millions, except per share data) | | | | |
| **STATEMENT OF OPERATIONS DATA** | | | | | |
| Net revenues | $ 3,612 | $ 13,739 | $ 13,729 | $ 12,728 | $ 11,271 |
| Operating expenses | 5,300 | 10,041 | 9,978 | 9,264 | 8,769 |
| Operating income (loss) | (1,688) | 3,698 | 3,751 | 3,464 | 2,502 |
| Interest income | 21 | 74 | 59 | 16 | 10 |
| Interest expense, net of amounts capitalized | (536) | (555) | (446) | (327) | (274) |
| Other income (expense) | 22 | 23 | 26 | (94) | 31 |
| Gain on sale of Sands Bethlehem | — | 556 | — | — | — |
| Loss on modification or early retirement of debt | — | (24) | (64) | (5) | (5) |
| Income (loss) before income taxes | (2,181) | 3,772 | 3,326 | 3,054 | 2,264 |
| Income tax (expense) benefit | 38 | (468) | (375) | 209 | (239) |
| Net income (loss) | (2,143) | 3,304 | 2,951 | 3,263 | 2,025 |
| Net (income) loss attributable to noncontrolling interests | 458 | (606) | (538) | (455) | (346) |
| Net income (loss) attributable to Las Vegas Sands Corp. | $ (1,685) | $ 2,698 | $ 2,413 | $ 2,808 | $ 1,679 |
| Per share data: | | | | | |
| Basic and diluted earnings (loss) per share | $ (2.21) | $ 3.50 | $ 3.07 | $ 3.55 | $ 2.11 |
| Cash dividends declared per common share[6] | $ 0.79 | $ 3.08 | $ 3.00 | $ 2.92 | $ 2.88 |
| **OTHER DATA** | | | | | |
| Capital expenditures | $ 1,330 | $ 1,216 | $ 949 | $ 837 | $ 1,398 |

| | December 31, | | | | |
| | 2020[7] | 2019[8] | 2018[9] | 2017 | 2016 |
|---|---|---|---|---|---|
| | (In millions) | | | | |
| **BALANCE SHEET DATA** | | | | | |
| Total assets | $ 20,807 | $ 23,199 | $ 22,547 | $ 20,687 | $ 20,469 |
| Long-term debt | $ 13,931 | $ 12,422 | $ 11,874 | $ 9,344 | $ 9,428 |
| Total Las Vegas Sands Corp. stockholders' equity | $ 2,973 | $ 5,187 | $ 5,684 | $ 6,486 | $ 6,177 |

_____

(1)  During the year ended December 31, 2020, operations in each of our jurisdictions were significantly impacted by the COVID-19 Pandemic.

000780

Table of Contents

(2) We completed the sale of Sands Bethlehem on May 31, 2019. Results of operations include Sands Bethlehem through May 30, 2019. During the year ended December 31, 2019, we recorded a gain on the sale of Sands Bethlehem of $556 million.

(3) During the year ended December 31, 2018, we recorded a $64 million loss on early retirement of debt primarily due to the retirement of the 2016 VML Credit Facility in connection with the issuance of the SCL Senior Notes.

(4) During the year ended December 31, 2017, we recorded a nonrecurring non-cash income tax benefit of $526 million due to U.S. tax reform enacted at the end of 2017. We also revised the estimated useful lives of certain assets to better reflect the estimated periods during which these assets are expected to remain in service, resulting in a decrease in depreciation and amortization expense and an increase in operating income of $112 million, and an increase in net income attributable to Las Vegas Sands Corp. of $72 million, or earnings per share of $0.09 on a basic and diluted basis.

(5) During the year ended December 31, 2016, we recorded pre-opening expenses of $130 million driven by the opening of The Parisian Macao in September 2016, a nonrecurring corporate expense of $79 million and a loss on disposal or impairment of assets of $79 million primarily related to the write-off of costs related to the Las Vegas Condo Tower, as well as other dispositions at the Company's various operating properties.

(6) During the years ended December 31, 2020, 2019, 2018, 2017 and 2016, we paid dividends of $0.79, $3.08, $3.00, $2.92 and $2.88, respectively, per common share as part of a regular cash dividend program.

(7) During the year ended December 31, 2020, SCL issued two series of unsecured notes in an aggregate principal amount of $1.50 billion. See "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt."

(8) During the year ended December 31, 2019, LVSC issued four series of unsecured notes in an aggregate principal amount of $4.0 billion, a portion of which was used to repay in full the outstanding borrowings under the 2013 U.S. Credit Facility and repurchase shares of our common stock. See "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt."

(9) During the year ended December 31, 2018, SCL issued three series of unsecured notes in an aggregate principal amount of $5.50 billion, a portion of which was used to repay in full the outstanding borrowings under the 2016 VML Credit Facility, and amended our U.S. Credit Facility to increase the amount of the term loans by $1.35 billion. See "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt."

000781

Table of Contents

**ITEM 7. — *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS***

The following discussion should be read in conjunction with, and is qualified in its entirety by, the audited consolidated financial statements and the notes thereto, and other financial information included in this Form 10-K. Certain statements in this "Management's Discussion and Analysis of Financial Condition and Results of Operations" are forward-looking statements. See "Special Note Regarding Forward-Looking Statements."

**Overview**

We view each of our Integrated Resorts as an operating segment. Our operating segments in Macao consist of The Venetian Macao; The Londoner Macao; The Parisian Macao; The Plaza Macao and Four Seasons Hotel Macao; and the Sands Macao. Our operating segment in Singapore is Marina Bay Sands. Our operating segments in the U.S. consist of the Las Vegas Operating Properties, which includes The Venetian Resort Las Vegas and the Sands Expo Center, and, through May 30, 2019, Sands Bethlehem.

During 2020, we had achieved milestones in advancing several of our strategic objectives. We continued progress on our key development projects in Macao for the conversion of Sands Cotai Central into The Londoner Macao and we opened The Grand Suites at Four Seasons in October 2020, featuring gaming spaces and 289 luxury suites. In Singapore, we initiated development activities associated with the MBS Expansion Project. Finally, we continued to strengthen our balance sheet with the issuance of SCL 2026 and 2030 Senior Notes to provide funds for incremental liquidity and general corporate purposes.

**COVID-19 Pandemic**

In early January 2020, an outbreak of a respiratory illness caused by a novel coronavirus was identified and the disease has since spread rapidly across the world causing the World Health Organization to declare on March 12, 2020, the outbreak of a pandemic (the "COVID-19 Pandemic"). As a result, people across the globe were advised to avoid non-essential travel. Steps were also taken by various countries, including those in which we operate, to restrict inbound international travel and implement closures of non-essential operations, including our Integrated Resorts for certain periods in 2020 in each of the jurisdictions in which we operate, to contain the spread of the virus.

Visitation to Macao decreased substantially throughout 2020 as a result of various government policies limiting travel. Travel restrictions and quarantine requirements have been varying in response to changes in circumstances in other countries. A complete ban on entry, or a need to undergo enhanced quarantine requirements depending on the person's residency and their recent travel history, remains in place for Macao residents, foreign workers residing in Macao and international travelers from countries other than mainland China.

Beginning December 21, 2020, all travelers who have been to any overseas territory, including Hong Kong, but not including mainland China or Taiwan, in the past 14 days will be subject to a 21-day compulsory quarantine at a designated location when arriving in Macao. Those travelers arriving from mainland China or Taiwan will be subject to a 14-day quarantine. People from low risk cities in China may enter Macao quarantine free, subject to them holding the appropriate travel documents, a negative COVID-19 test result and a green health-code. All other foreign nationals, including those holding a temporary work permit, are still not permitted to enter Macao. The China Individual Visit Scheme ("China IVS") recommenced for certain regions from August 12, 2020, and was extended to more jurisdictions within mainland China effective September 23, 2020. General travel restrictions within mainland China continue to exist and are updated and revised based on evolving public health consideraions within China.

Following suspension of all gaming operations on February 5, 2020 by the Macao government, our Macao casino operations resumed on February 20, 2020, except for operations at The Londoner Macao, which resumed on February 27, 2020. Additional health safeguards, such as the requirement to present a negative COVID-19 test certificate prior to entering the casino, have been implemented, as well as the ongoing limitation on the number of seats per table game, slot machine spacing, temperature checks and mandatory mask protection. Management is currently unable to determine when these measures will be modified or cease to be necessary.

000782

Some of our Macao hotel facilities were also closed during the casino suspension in response to the drop in visitation and, with the exception of the Conrad Macao, Cotai Strip which reopened on June 13, 2020, these hotels were gradually reopened from February 20, 2020. In support of the Macao government's initiatives to fight the COVID-19 Pandemic, we provided one tower (approximately 2,000 hotel rooms) for quarantine purposes at the Sheraton Grand Macao Hotel, Cotai Strip to the Macao government to house individuals who returned to Macao. This tower has been utilized for quarantine purposes on several occasions including from March 28 to April 30, 2020; from June 7 to August 14, 2020; from December 20, 2020 until February 6, 2021; and will resume on February 20, 2021 until further notice.

Operating hours at restaurants across our Macao properties are continuously being adjusted in line with movements in guest visitation. The majority of retail outlets in the various shopping malls are open with reduced operating hours. The timing and manner in which these areas will return to full operation are currently unknown.

The Hong Kong government temporarily closed the Hong Kong China Ferry Terminal in Kowloon on January 30, 2020, and the Hong Kong Macao Ferry Terminal in Hong Kong on February 4, 2020. In response, we have suspended our Macao ferry operations between Macao and Hong Kong. The timing and manner in which our normal ferry operations will be able to resume are currently unknown.

Our operations in Macao have been significantly impacted by the lack of visitation to Macao. The Macao government announced total visitation from mainland China to Macao decreased 83.0% for 2020, as compared to 2019. The Macao government also announced gross gaming revenue decreased by 79.3% for 2020, as compared to 2019.

Beginning on April 7, 2020, the Singapore government suspended all casino and non-essential operations, including all operations at Marina Bay Sands, due to the COVID-19 Pandemic. Our Singapore operations were permitted to reopen beginning on June 19, 2020; however, this only included certain restaurants and retail mall operations. The casino operations reopened on July 1, 2020; however, entry was initially limited to annual levy holders and certain Sands Rewards Club ("SRC") members. The casino opened to all SRC members as of July 9, 2020, and to the public as of October 23, 2020. All operations are currently subject to capacity limitations.

On May 28, 2020, in support of the Singapore government's initiatives to fight the COVID-19 Pandemic, Marina Bay Sands entered into an agreement with the Singapore government to utilize all three hotel towers to house Singapore residents for quarantine upon their initial return from other jurisdictions. The government's use of the first tower ceased on June 26, 2020, while usage of the second and third towers continued through July 26, 2020. Beginning on July 17, 2020, the first tower reopened for normal operations, while the second and third towers reopened on August 1, 2020. On September 7, 2020, the STB announced that event organizers would be allowed to apply for pilot events with limited capacities of up to 250 attendees from October 1, 2020. The date on which nightlife venues may reopen is unknown at this time. In December 2020, Singapore entered phase 3 of reopening, which, among other things, increased our casino operating capacity for Marina Bay Sands from 3,000 players to 3,750 players.

Visitation to Marina Bay Sands declined significantly due to the COVID-19 Pandemic. The STB announced for the 12 months ended November 30, 2020 (the latest information publicly available at the time of filing), total visitation to Singapore decreased approximately 76.6%, as compared to the same period in 2019.

The Nevada government suspended all casino and non-essential operations, including all operations at the Las Vegas Operating Properties, beginning on March 18, 2020, due to the COVID-19 Pandemic. The Nevada government allowed casinos to reopen on June 4, 2020, under strict guidelines issued by the Gaming Control Board and the State of Nevada. We reopened the casino, suites within The Venetian Tower and The Palazzo Tower, and select food and beverage outlets on June 4, 2020, with certain operations subject to reduced capacity. Beginning October 1, 2020, the limit for both public and private events increased from 50 people to the lesser of 250 people or 50% of the room's capacity (excluding employees, organizers and performers) provided social distancing measures and various safety and related protocols were followed. MICE events for more than 250 people, but no more than 1,000 people, were allowed subject to certain requirements. Larger venues, defined as having more than a 2,500 fixed-seating capacity, were allowed to host a gathering of 10% of their total capacity provided they met additional requirements. As a result of these requirements and lack of customer demand in connection with the impact of the

000783

Table of Contents

COVID-19 Pandemic, we have not held any MICE events at our Las Vegas Operating Properties since reopening on June 4, 2020.

In November 2020, the Nevada government tightened capacity and other restrictions, which included, among other things, a 25% capacity limit for gaming establishments and the lesser of 25% or 50 people for MICE events. These increased restrictions will be in place until at least February 14, 2021.

Visitation to our Las Vegas Operating Properties declined due to the COVID-19 Pandemic. The LVCVA announced for the 12 months ended November 30, 2020 (the latest information publicly available at the time of filing), total visitation to Las Vegas decreased 49.8%, as compared to the same period in 2019. The LVCVA also announced for the 12 months ended November 30, 2020 (the latest information publicly available at the time of filing), gross gaming revenue for the Las Vegas Strip decreased 38.5%, as compared to the same period in 2019.

In connection with reopening the Singapore and Las Vegas properties, we are adhering to social distancing requirements, which include reduced seating at table games and a decreased number of active slot machines on the casino floor. Additionally, there is uncertainty around the impact the COVID-19 Pandemic will continue to have on operations in future periods. For example, there have been a number of MICE event cancellations or rescheduling through the end of 2021 and there may be additional restrictions placed on our other services, such as nightclubs and entertainment venues for our Las Vegas properties.

If our Integrated Resorts are not permitted to resume normal operations, travel restrictions such as those related to inbound travel from other countries are not modified or eliminated, the China IVS and other visa programs are suspended or the global response to contain the COVID-19 Pandemic escalates or is unsuccessful, our operations, cash flows and financial condition will be additionally and materially impacted.

While each of our properties is currently open and operating at reduced levels due to lower visitation and the implementation of required safety measures as described above, the current economic and regulatory environment on a global basis and in each of our jurisdictions continues to evolve. We cannot predict the manner in which governments will react as the global and regional impact of COVID-19 changes over time, which could significantly alter our current operations.

We have a strong balance sheet and sufficient liquidity in place, including total cash and cash equivalents balance, excluding restricted cash and cash equivalents, of $2.12 billion and access to $1.50 billion, $2.02 billion and $448 million of available borrowing capacity from our LVSC Revolving Facility, 2018 SCL Revolving Facility and the 2012 Singapore Revolving Facility, respectively, and SGD 3.69 billion (approximately $2.79 billion at exchange rates in effect on December 31, 2020) under our Singapore Delayed Draw Term Facility, exclusively for capital expenditures for the MBS Expansion Project, as of December 31, 2020. On January 25, 2021, SCL entered into an agreement with lenders to increase commitments under the 2018 SCL Credit Facility by HKD 3.83 billion (approximately $494 million at exchange rates in effect on the date of this transaction). Subsequently, on January 29, 2021, SCL drew down $29 million and HKD 2.13 billion (approximately $274 million at exchange rates in effect on January 29, 2021) under this facility for general corporate purposes, resulting in remaining available borrowing capacity of $2.21 billion. We believe we are able to support continuing operations, complete the major construction projects that are underway and respond to the current COVID-19 Pandemic challenges. We have taken various mitigating measures to manage through the current environment, including a cost and capital expenditure reduction program to minimize cash outflow of non-essential items.

**Key Operating Revenue Measurements**

Operating revenues at The Venetian Macao, The Londoner Macao, The Parisian Macao, The Plaza Macao and Four Seasons Hotel Macao, Marina Bay Sands and our Las Vegas Operating Properties are dependent upon the volume of customers who stay at the hotel, which affects the price charged for hotel rooms and our gaming volume. Operating revenues at Sands Macao are principally driven by casino customers who visit the property on a daily basis.

Management utilizes the following volume and pricing measures in order to evaluate past performance and assist in forecasting future revenues. The various volume measurements indicate our ability to attract customers to our Integrated Resorts. In casino operations, win and hold percentages indicate the amount of revenue to be expected based on volume. In hotel operations, average daily rate and revenue per available room indicate the demand for

44

000784

rooms and our ability to capture that demand. In mall operations, base rent per square foot indicates our ability to attract and maintain profitable tenants for our leasable space.

The following are the key measurements we use to evaluate operating revenues:

*Casino revenue measurements for Macao and Singapore:* Macao and Singapore table games are segregated into two groups: Rolling Chip play (composed of VIP players) and Non-Rolling Chip play (mostly non-VIP players). The volume measurement for Rolling Chip play is non-negotiable gaming chips wagered and lost. The volume measurement for Non-Rolling Chip play is table games drop ("drop"), which is net markers issued (credit instruments), cash deposited in the table drop boxes and gaming chips purchased and exchanged at the cage. Rolling Chip and Non-Rolling Chip volume measurements are not comparable as they are two distinct measures of volume. The amounts wagered and lost for Rolling Chip play are substantially higher than the amounts dropped for Non-Rolling Chip play. Slot handle, also a volume measurement, is the gross amount wagered for the period cited.

We view Rolling Chip win as a percentage of Rolling Chip volume, Non-Rolling Chip win as a percentage of drop and slot hold (amount won by the casino) as a percentage of slot handle. Win or hold percentage represents the percentage of Rolling Chip volume, Non-Rolling Chip drop or slot handle that is won by the casino and recorded as casino revenue. Our win and hold percentages are calculated before discounts, commissions, deferring revenue associated with our loyalty programs and allocating casino revenues related to goods and services provided to patrons on a complimentary basis. Our Rolling Chip win percentage is expected to be 3.15% to 3.45% in Macao and Singapore. Actual win percentage may vary from our expected win percentage and historical win and hold percentages. Generally, slot machine play is conducted on a cash basis. In Macao and Singapore, 24.0% and 14.6%, respectively, of our table games play was conducted on a credit basis for the year ended December 31, 2020.

*Casino revenue measurements for the U.S.:* The volume measurements in the U.S. are slot handle, as previously described, and table games drop, which is the total amount of cash and net markers issued deposited in the table drop box. We view table games win as a percentage of drop and slot hold as a percentage of slot handle. Our win and hold percentages are calculated before discounts, commissions, deferring revenue associated with our loyalty programs and allocating casino revenues related to goods and services provided to patrons on a complimentary basis. Based upon our mix of table games, our table games are expected to produce a win percentage of 18% to 26% for Baccarat and 16% to 24% for non-Baccarat. Actual win percentage may vary from our expected win percentage and historical win and hold percentages. Similar to Macao and Singapore, slot machine play is generally conducted on a cash basis. Approximately 68.8% of our table games play at our Las Vegas Operating Properties was conducted on a credit basis for the year ended December 31, 2020.

*Hotel revenue measurements:* Performance indicators used are occupancy rate (a volume indicator), which is the average percentage of available hotel rooms occupied during a period and average daily room rate ("ADR", a price indicator), which is the average price of occupied rooms per day. Available rooms exclude those rooms unavailable for occupancy during the period due to renovation, development or other requirements (such as government mandated closure, lodging for team members and usage by the Macao and Singapore governments for quarantine measures). The calculations of the occupancy rate and ADR include the impact of rooms provided on a complimentary basis. Revenue per available room ("RevPAR") represents a summary of hotel ADR and occupancy. Because not all available rooms are occupied, ADR is normally higher than RevPAR. Reserved rooms where the guests do not show up for their stay and lose their deposit, or where guests check out early, may be re-sold to walk-in guests.

*Mall revenue measurements:* Occupancy, base rent per square foot and tenant sales per square foot are used as performance indicators. Occupancy represents gross leasable occupied area ("GLOA") divided by gross leasable area ("GLA") at the end of the reporting period. GLOA is the sum of: (1) tenant occupied space under lease and (2) tenants no longer occupying space, but paying rent. GLA does not include space currently under development or not on the market for lease. Base rent per square foot is the weighted average base or minimum rent charge, excluding rent concessions, in effect at the end of the reporting period for all tenants that would qualify to be included in occupancy. Tenant sales per square foot is the sum of reported comparable sales for the trailing 12 months divided by the comparable square footage for the same period. Only tenants that have been open for a minimum of 12 months are included in the tenant sales per square foot calculation.

000785

**Year Ended December 31, 2020 Compared to the Year Ended December 31, 2019**

*Summary Financial Results*

Our financial results were adversely impacted by decreased visitation at each of our operating properties due to the COVID-19 Pandemic. See "COVID-19 Pandemic" for further information. Net revenues for the year ended December 31, 2020 were $3.61 billion, compared to $13.74 billion for the year ended December 31, 2019. Operating loss was $1.69 billion, compared to operating income of $3.70 billion for the year ended December 31, 2019. Net loss was $2.14 billion for the year ended December 31, 2020, compared to net income of $3.30 billion for the year ended December 31, 2019.

*Operating Revenues*

Our net revenues consisted of the following:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2020 | 2019 | Percent Change |
|  | (Dollars in millions) | | |
| Casino | $ 2,268 | $ 9,828 | (76.9)% |
| Rooms | 498 | 1,752 | (71.6)% |
| Food and beverage | 283 | 897 | (68.5)% |
| Mall | 381 | 716 | (46.8)% |
| Convention, retail and other | 182 | 546 | (66.7)% |
| Total net revenues | $ 3,612 | $ 13,739 | (73.7)% |

Consolidated net revenues were $3.61 billion for the year ended December 31, 2020, a decrease of $10.13 billion compared to $13.74 billion for the year ended December 31, 2019, due to decreases of $7.12 billion, $1.84 billion and $940 million at our Macao operations, Marina Bay Sands and our Las Vegas Operating Properties, respectively. The decreases were driven by decreased visitation and temporary property closures as a result of the COVID-19 Pandemic, as described above. Additionally, there was a $227 million decrease due to the sale of Sands Bethlehem on May 31, 2019.

46

000786

Table of Contents

Net casino revenues decreased $7.56 billion compared to the year ended December 31, 2019, driven by temporary property closures and decreased visitation once our properties reopened as a result of the COVID-19 Pandemic described above. Additionally, casinos at each of our properties continue to operate at a reduced capacity due to social distancing measures. Revenues at our Macao operations and Marina Bay Sands decreased $5.85 billion and $1.30 billion, respectively, driven by decreases in Non-Rolling Chip drop and Rolling Chip volume, while revenues at our Las Vegas Operating Properties decreased $217 million due to decreases in table games drop and win percentage and slot handle. Additionally, there was a decrease of $199 million attributable to the sale of Sands Bethlehem on May 31, 2019. The following table summarizes the results of our casino activity:

| | Year Ended December 31, | | |
| | 2020 | 2019 | Change |
| | (Dollars in millions) | | |
| **Macao Operations:** | | | |
| *The Venetian Macao* | | | |
| Total casino revenues | $ 531 | $ 2,875 | (81.5) % |
| Non-Rolling Chip drop | $ 1,925 | $ 9,275 | (79.2) % |
| Non-Rolling Chip win percentage | 25.4 % | 26.2 % | (0.8)pts |
| Rolling Chip volume | $ 3,775 | $ 25,715 | (85.3) % |
| Rolling Chip win percentage | 3.12 % | 3.29 % | (0.17)pts |
| Slot handle | $ 1,041 | $ 3,952 | (73.7) % |
| Slot hold percentage | 4.2 % | 4.8 % | (0.6)pts |
| *The Londoner Macao* | | | |
| Total casino revenues | $ 192 | $ 1,541 | (87.5) % |
| Non-Rolling Chip drop | $ 881 | $ 6,586 | (86.6) % |
| Non-Rolling Chip win percentage | 22.6 % | 22.7 % | (0.1)pts |
| Rolling Chip volume | $ 167 | $ 5,364 | (96.9) % |
| Rolling Chip win percentage | 5.85 % | 3.36 % | 2.49 pts |
| Slot handle | $ 531 | $ 4,107 | (87.1) % |
| Slot hold percentage | 4.3 % | 4.2 % | 0.1 pts |
| *The Parisian Macao* | | | |
| Total casino revenues | $ 180 | $ 1,376 | (86.9) % |
| Non-Rolling Chip drop | $ 844 | $ 4,522 | (81.3) % |
| Non-Rolling Chip win percentage | 23.1 % | 23.1 % | — pts |
| Rolling Chip volume | $ 3,141 | $ 16,121 | (80.5) % |
| Rolling Chip win percentage | 1.13 % | 3.43 % | (2.30)pts |
| Slot handle | $ 763 | $ 4,217 | (81.9) % |
| Slot hold percentage | 3.7 % | 3.7 % | — pts |
| *The Plaza Macao and Four Seasons Hotel Macao* | | | |
| Total casino revenues | $ 159 | $ 650 | (75.5) % |
| Non-Rolling Chip drop | $ 544 | $ 1,473 | (63.1) % |
| Non-Rolling Chip win percentage | 24.6 % | 24.4 % | 0.2 pts |
| Rolling Chip volume | $ 3,656 | $ 13,368 | (72.7) % |
| Rolling Chip win percentage | 2.46 % | 3.88 % | (1.42)pts |
| Slot handle | $ 37 | $ 518 | (92.9) % |
| Slot hold percentage | 4.6 % | 6.0 % | (1.4)pts |

47

000787

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | 2020 | | 2019 | Change |
| **Sands Macao** | | | | |
| Total casino revenues | $ 107 | $ | 576 | (81.4) % |
| Non-Rolling Chip drop | $ 451 | $ | 2,634 | (82.9) % |
| Non-Rolling Chip win percentage | 18.7 % | | 18.3 % | 0.4 pts |
| Rolling Chip volume | $ 1,361 | $ | 4,605 | (70.4) % |
| Rolling Chip win percentage | 2.44 % | | 2.52 % | (0.08)pts |
| Slot handle | $ 549 | $ | 2,596 | (78.9) % |
| Slot hold percentage | 3.1 % | | 3.3 % | (0.2)pts |
| **Singapore Operations:** | | | | |
| **Marina Bay Sands** | | | | |
| Total casino revenues | $ 872 | $ | 2,167 | (59.8) % |
| Non-Rolling Chip drop | $ 2,111 | $ | 5,194 | (59.4) % |
| Non-Rolling Chip win percentage | 18.6 % | | 20.7 % | (2.1)pts |
| Rolling Chip volume | $ 9,495 | $ | 29,504 | (67.8) % |
| Rolling Chip win percentage | 3.56 % | | 3.40 % | 0.16 pts |
| Slot handle | $ 8,915 | $ | 14,183 | (37.1) % |
| Slot hold percentage | 4.4 % | | 4.6 % | (0.2)pts |
| **U.S. Operations:** | | | | |
| **Las Vegas Operating Properties** | | | | |
| Total casino revenues | $ 227 | $ | 444 | (48.9) % |
| Table games drop | $ 1,258 | $ | 1,945 | (35.3) % |
| Table games win percentage | 13.2 % | | 19.2 % | (6.0)pts |
| Slot handle | $ 1,951 | $ | 2,960 | (34.1) % |
| Slot hold percentage | 8.0 % | | 8.2 % | (0.2)pts |

In our experience, average win percentages remain fairly consistent when measured over extended periods of time with a significant volume of wagers, but can vary considerably within shorter time periods as a result of the statistical variances associated with games of chance in which large amounts are wagered.

000788

Table of Contents

Room revenues decreased $1.25 billion compared to the year ended December 31, 2019. The decrease was primarily a result of temporary property closures and decreased visitation at each of our properties due to the COVID-19 Pandemic. Additionally, certain rooms within The Londoner Macao and Marina Bay Sands were utilized for quarantine purposes and certain rooms across our Macao properties were used by team members due to travel restrictions. The following table summarizes the results of our room activity:

| | Year Ended December 31, | | | | Change |
|---|---|---|---|---|---|
| | **2020** | | **2019** | | |
| | (Room revenues in millions) | | | | |
| **Macao Operations:** | | | | | |
| *The Venetian Macao* | | | | | |
| Total room revenues | $ | 46 | $ | 222 | (79.3) % |
| Occupancy rate | | 27.2 % | | 95.9 % | (68.7)pts |
| Average daily room rate (ADR) | $ | 197 | $ | 227 | (13.2) % |
| Revenue per available room (RevPAR) | $ | 53 | $ | 217 | (75.6) % |
| *The Londoner Macao* | | | | | |
| Total room revenues | $ | 42 | $ | 320 | (86.9) % |
| Occupancy rate | | 18.3 % | | 96.8 % | (78.5)pts |
| Average daily room rate (ADR) | $ | 164 | $ | 160 | 2.5 % |
| Revenue per available room (RevPAR) | $ | 30 | $ | 155 | (80.6) % |
| *The Parisian Macao* | | | | | |
| Total room revenues | $ | 33 | $ | 130 | (74.6) % |
| Occupancy rate | | 27.3 % | | 97.2 % | (69.9)pts |
| Average daily room rate (ADR) | $ | 145 | $ | 159 | (8.8) % |
| Revenue per available room (RevPAR) | $ | 39 | $ | 155 | (74.8) % |
| *The Plaza Macao and Four Seasons Hotel Macao*[1] | | | | | |
| Total room revenues | $ | 17 | $ | 41 | (58.5) % |
| Occupancy rate | | 28.5 % | | 91.3 % | (62.8)pts |
| Average daily room rate (ADR) | $ | 394 | $ | 332 | 18.7 % |
| Revenue per available room (RevPAR) | $ | 113 | $ | 303 | (62.7) % |
| *Sands Macao* | | | | | |
| Total room revenues | $ | 6 | $ | 18 | (66.7) % |
| Occupancy rate | | 39.4 % | | 99.8 % | (60.4)pts |
| Average daily room rate (ADR) | $ | 157 | $ | 175 | (10.3) % |
| Revenue per available room (RevPAR) | $ | 62 | $ | 175 | (64.6) % |
| **Singapore Operations:** | | | | | |
| *Marina Bay Sands* | | | | | |
| Total room revenues | $ | 136 | $ | 404 | (66.3) % |
| Occupancy rate | | 69.1 % | | 97.6 % | (28.5)pts |
| Average daily room rate (ADR) | $ | 313 | $ | 450 | (30.4) % |
| Revenue per available room (RevPAR) | $ | 216 | $ | 439 | (50.8) % |
| **U.S. Operations:** | | | | | |
| *Las Vegas Operating Properties* | | | | | |
| Total room revenues | $ | 218 | $ | 610 | (64.3) % |
| Occupancy rate | | 56.3 % | | 95.3 % | (39.0)pts |
| Average daily room rate (ADR) | $ | 220 | $ | 251 | (12.4) % |
| Revenue per available room (RevPAR) | $ | 124 | $ | 239 | (48.1) % |

_____

(1)    Includes The Grand Suites at Four Seasons, which opened in October 2020.

000789

Food and beverage revenues decreased $614 million compared to the year ended December 31, 2019. The decrease was primarily due to decreases of $239 million, $220 million and $144 million at our Macao properties, our Las Vegas Operating Properties and Marina Bay Sands, respectively, as a result of the COVID-19 Pandemic described above.

Mall revenues decreased $335 million compared to the year ended December 31, 2019. The decrease was primarily due to $272 million in rent concessions granted to our mall tenants in Macao and Singapore, as well as a $59 million decrease in overage rents resulting from lower traffic in our malls as a result of the COVID-19 Pandemic. Our Macao Operations were also impacted by lower occupancy due to the impact of the COVID-19 Pandemic.

For further information related to the financial performance of our malls, see "Additional Information Regarding our Retail Mall Operations." The following table summarizes the results of our malls on the Cotai Strip in Macao and in Singapore:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | | 2019 | | Change |
| | (Mall revenues in millions) | | | | |
| **Macao Operations:** | | | | | |
| *Shoppes at Venetian* | | | | | |
| Total mall revenues | $ | 125 | $ | 253 | (50.6) % |
| Mall gross leasable area (in square feet) | | 812,936 | | 812,938 | — % |
| Occupancy | | 83.8 % | | 91.4 % | (7.6)pts |
| Base rent per square foot | $ | 302 | $ | 277 | 9.0 % |
| Tenant sales per square foot[1] | $ | 794 | $ | 1,709 | (53.5) % |
| *Shoppes at Londoner*[2] | | | | | |
| Total mall revenues | $ | 37 | $ | 70 | (47.1) % |
| Mall gross leasable area (in square feet) | | 525,206 | | 525,222 | — % |
| Occupancy | | 83.9 % | | 90.1 % | (6.2)pts |
| Base rent per square foot | $ | 96 | $ | 107 | (10.3) % |
| Tenant sales per square foot[1] | $ | 409 | $ | 934 | (56.2) % |
| *Shoppes at Parisian* | | | | | |
| Total mall revenues | $ | 27 | $ | 53 | (49.1) % |
| Mall gross leasable area (in square feet) | | 295,963 | | 295,920 | — % |
| Occupancy | | 78.5 % | | 86.2 % | (7.7)pts |
| Base rent per square foot | $ | 156 | $ | 149 | 4.7 % |
| Tenant sales per square foot[1] | $ | 349 | $ | 785 | (55.5) % |
| *Shoppes at Four Seasons* | | | | | |
| Total mall revenues | $ | 79 | $ | 151 | (47.7) % |
| Mall gross leasable area (in square feet) | | 244,104 | | 242,425 | 0.7 % |
| Occupancy | | 94.9 % | | 95.0 % | (0.1)pts |
| Base rent per square foot | $ | 540 | $ | 544 | (0.7) % |
| Tenant sales per square foot[1] | $ | 2,744 | $ | 5,478 | (49.9) % |
| **Singapore Operations:** | | | | | |
| *The Shoppes at Marina Bay Sands* | | | | | |
| Total mall revenues | $ | 112 | $ | 185 | (39.5) % |
| Mall gross leasable area (in square feet) | | 620,330 | | 593,714 | 4.5 % |
| Occupancy | | 98.2 % | | 96.4 % | 1.8 pts |
| Base rent per square foot | $ | 258 | $ | 270 | (4.4) % |
| Tenant sales per square foot[1] | $ | 1,053 | $ | 2,062 | (48.9) % |

Note:   This table excludes the results of mall operations at Sands Macao.

000790

Table of Contents

(1)    Tenant sales per square foot is the sum of reported comparable sales for the trailing 12 months divided by the comparable square footage for the same period.

(2)    The Shoppes at Londoner will feature up to approximately 600,000 square feet of gross leasable area upon completion of all phases of the renovation, rebranding and expansion to The Londoner Macao.

Convention, retail and other revenues decreased $364 million compared to the year ended December 31, 2019, driven by decreases of $111 million, $102 million and $61 million at our Las Vegas Operating Properties, Macao properties and Marina Bay Sands, respectively, as a result of the cancellation of MICE events and decreased visitation across our properties due to the COVID-19 Pandemic described above. Additionally, there was a $76 million decrease related to our ferry operations, due to the temporary closure of the Hong Kong China Ferry Terminal since late January 2020 and the Hong Kong Macao Ferry Terminal since early February 2020 in response to the COVID-19 Pandemic.

### Operating Expenses

Our operating expenses consisted of the following:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2020 | 2019 | Percent Change |
| | | (Dollars in millions) | | |
| Casino | $ | 1,758 | $    5,304 | (66.9)% |
| Rooms | | 271 | 444 | (39.0)% |
| Food and beverage | | 371 | 702 | (47.2)% |
| Mall | | 59 | 78 | (24.4)% |
| Convention, retail and other | | 149 | 304 | (51.0)% |
| Provision for credit losses | | 99 | 30 | 230.0 % |
| General and administrative | | 1,093 | 1,502 | (27.2)% |
| Corporate | | 168 | 313 | (46.3)% |
| Pre-opening | | 19 | 34 | (44.1)% |
| Development | | 18 | 24 | (25.0)% |
| Depreciation and amortization | | 1,160 | 1,165 | (0.4)% |
| Amortization of leasehold interests in land | | 55 | 51 | 7.8 % |
| Loss on disposal or impairment of assets | | 80 | 90 | (11.1)% |
| Total operating expenses | $ | 5,300 | $    10,041 | (47.2)% |

Operating expenses were $5.30 billion for the year ended December 31, 2020, a decrease of $4.74 billion compared to $10.04 billion for the year ended December 31, 2019. The decrease was primarily driven by a $3.55 billion decrease in casino expenses. Additionally, general and administrative expenses decreased $409 million and food and beverage expenses decreased $331 million. The decreases were mainly driven by the COVID-19 Pandemic described above. Although management has implemented certain cost reduction programs, operating margins in each business segment were negatively impacted due to employee and other costs incurred during this period of decreased visitation and property closures. We have maintained our staffing levels across our jurisdictions through significantly reduced visitation. The level of payroll costs during 2020 were reduced by $109 million in connection with the Job Support Scheme in Singapore and the Employee Retention Credit under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in the U.S. We have also implemented payroll cost saving initiatives across each of our properties, including utilization of paid time off and voluntary unpaid leave. Finally, our bonus and incentive expense in 2020 decreased $262 million from 2019 due to not meeting certain performance criteria due to impact of the COVID-19 Pandemic.

Casino expenses decreased $3.55 billion compared to the year ended December 31, 2019. The decrease was primarily attributable to a decrease of $3.06 billion in gaming taxes due to decreased casino revenues, as previously described. Additionally, the sale of Sands Bethlehem in May 2019 resulted in a $127 million decrease.

51

000791

Table of Contents

Room expenses decreased $173 million compared to the year ended December 31, 2019. The decrease was driven by decreases of $90 million, $54 million and $27 million at our Macao properties, our Las Vegas Operating Properties and Marina Bay Sands, respectively. These decreases are consistent with the reduction in room revenue.

Food and beverage expenses decreased $331 million compared to the year ended December 31, 2019, due to decreases of $135 million, $99 million and $87 million at our Macao properties, our Las Vegas Operating Properties and Marina Bay Sands, respectively. These decreases are consistent with the reduction in food and beverage revenues.

Convention, retail and other expenses decreased $155 million compared to the year ended December 31, 2019, driven by a $69 million decrease related to the temporary closure of the ferry terminals as previously described. Additionally, our Macao properties, Las Vegas Operating Properties and Marina Bay Sands decreased $35 million, $31 million and $17 million, respectively, as a result of the COVID-19 Pandemic described above.

The provision for credit losses was $99 million for the year ended December 31, 2020, compared to $30 million for the year ended December 31, 2019. The increase was driven by the aging of receivables for premium players at our Macao properties and Marina Bay Sands during 2020, as travel restrictions have limited the ability for patrons to redeem markers. The amount of this provision can vary over short periods of time because of factors specific to the customers who owe us money from gaming activities at any given time. We believe the amount of our provision for credit losses in the future will depend upon the state of the economy, our credit standards, our risk assessments and the judgment of our employees responsible for granting credit.

General and administrative expenses decreased $409 million compared to the year ended December 31, 2019, due to decreases of $169 million, $116 million and $92 million at our Macao properties, Marina Bay Sands and our Las Vegas Operating Properties, respectively. The decreases were primarily driven by decreases in marketing, payroll and property operation costs. Additionally, the sale of Sands Bethlehem in May 2019 resulted in a $32 million decrease.

Corporate expenses decreased $145 million compared to the year ended December 31, 2019. The decrease was primarily driven by a nonrecurring legal settlement recorded in 2019 and a decrease in payroll costs as described above.

Pre-opening expenses represent personnel and other costs incurred prior to the opening of new ventures, which are expensed as incurred. Development expenses include the costs associated with our evaluation and pursuit of new business opportunities, which are also expensed as incurred.

Loss on disposal or impairment of assets was $80 million for the year ended December 31, 2020, compared to $90 million for the year ended December 31, 2019. The loss for the year ended December 31, 2020, consisted primarily of asset disposals and demolition costs related to The Londoner Macao. The loss for the year ended December 31, 2019, consisted primarily of a $65 million impairment of our ferries in Macao.

000792

Table of Contents

***Segment Adjusted Property EBITDA***

The following table summarizes information related to our segments (see "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 17 — Segment Information" for discussion of our operating segments and a reconciliation of consolidated adjusted property EBITDA to net income/loss):

| | Year Ended December 31, | | Percent Change |
|---|---|---|---|
| | **2020** | **2019** | |
| | (Dollars in millions) | | |
| Macao: | | | |
| The Venetian Macao | $ (53) | $ 1,407 | (103.8)% |
| The Londoner Macao | (184) | 726 | (125.3)% |
| The Parisian Macao | (131) | 544 | (124.1)% |
| The Plaza Macao and Four Seasons Hotel Macao | 33 | 345 | (90.4)% |
| Sands Macao | (76) | 175 | (143.4)% |
| Ferry Operations and Other | (20) | (8) | 150.0 % |
| | (431) | 3,189 | (113.5)% |
| Marina Bay Sands | 383 | 1,661 | (76.9)% |
| United States: | | | |
| Las Vegas Operating Properties | (124) | 487 | (125.5)% |
| Sands Bethlehem[1] | — | 52 | (100.0)% |
| | (124) | 539 | (123.0)% |
| Consolidated adjusted property EBITDA[2] | $ (172) | $ 5,389 | (103.2)% |

(1)  We completed the sale of Sands Bethlehem on May 31, 2019. Results of operations include Sands Bethlehem through May 30, 2019.

(2)  Consolidated adjusted property EBITDA, which is a non-GAAP financial measure, is used by management as the primary measure of the operating performance of our segments. Consolidated adjusted property EBITDA is net income/loss before stock-based compensation expense, corporate expense, pre-opening expense, development expense, depreciation and amortization, amortization of leasehold interests in land, gain or loss on disposal or impairment of assets, interest, other income or expense, gain on sale of Sands Bethlehem, gain or loss on modification or early retirement of debt and income taxes. Consolidated adjusted property EBITDA is a supplemental non-GAAP financial measure used by management, as well as industry analysts, to evaluate operations and operating performance. In particular, management utilizes consolidated adjusted property EBITDA to compare the operating profitability of our operations with those of our competitors, as well as a basis for determining certain incentive compensation. Integrated Resort companies have historically reported adjusted property EBITDA as a supplemental performance measure to GAAP financial measures. In order to view the operations of their properties on a more stand-alone basis, Integrated Resort companies, including Las Vegas Sands Corp., have historically excluded certain expenses that do not relate to the management of specific properties, such as pre-opening expense, development expense and corporate expense, from their adjusted property EBITDA calculations. Consolidated adjusted property EBITDA should not be interpreted as an alternative to income from operations (as an indicator of operating performance) or to cash flows from operations (as a measure of liquidity), in each case, as determined in accordance with GAAP. We have significant uses of cash flow, including capital expenditures, dividend payments, interest payments, debt principal repayments and income taxes, which are not reflected in consolidated adjusted property EBITDA. Not all companies calculate adjusted property EBITDA in the same manner. As a result, our presentation of consolidated adjusted property EBITDA may not be directly comparable to similarly titled measures presented by other companies.

000793

Adjusted property EBITDA at our Macao operations decreased $3.62 billion compared to the year ended December 31, 2019, due to a decrease in operations driven by government-mandated travel restrictions, property closures and overall reduced visitation since late January 2020 resulting from the COVID-19 Pandemic.

Adjusted property EBITDA at Marina Bay Sands decreased $1.28 billion compared to the year ended December 31, 2019, due to a decrease in operations, driven by the temporary closure of the property and reduced visitation resulting from the COVID-19 Pandemic.

Adjusted property EBITDA at our Las Vegas Operating Properties decreased $611 million compared to the year ended December 31, 2019, primarily due to no MICE events after the first quarter of 2020 and decreased room and casino revenues driven by the temporary closure of the properties and overall reduced visitation resulting from the COVID-19 Pandemic.

### Interest Expense

The following table summarizes information related to interest expense:

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| | (Dollars in millions) | | | |
| Interest cost | $ | 544 | $ | 549 |
| Add — imputed interest on deferred proceeds from sale of The Shoppes at The Palazzo | | 13 | | 15 |
| Less — capitalized interest | | (21) | | (9) |
| Interest expense, net | $ | 536 | $ | 555 |
| Cash paid for interest | $ | 440 | $ | 471 |
| Weighted average total debt balance | $ | 13,412 | $ | 12,154 |
| Weighted average interest rate | | 4.1 % | | 4.5 % |

Interest cost decreased $5 million compared to the year ended December 31, 2019, resulting primarily from decreases in our weighted average interest rate, offset by the increase in weighted average total debt balance. The decrease in weighted average interest rate was due to a decrease in the Singapore Offer Rate ("SOR"). The weighted average debt balance increased in connection with the issuance of the SCL 2026 and 2030 Senior Notes in June 2020 and borrowings on the Singapore Delayed Draw Term Loan in September 2020 (see "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt").

### Other Factors Affecting Earnings

Other income was $22 million for the year ended December 31, 2020, compared to $23 million during the year ended December 31, 2019. Other income during the year ended December 31, 2020, was primarily attributable to $20 million of foreign currency transaction gains, driven by the U.S. dollar-denominated debt held by SCL.

Our income tax benefit was $38 million on a loss before income taxes of $2.18 billion for the year ended December 31, 2020, resulting in a (1.7%) effective income tax rate. This compares to a 12.4% effective income tax rate for the year ended December 31, 2019. The effective income tax rate for the year ended December 31, 2019, would have been 9.5% without the discrete income tax expense of $161 million resulting from the sale of Sands Bethlehem. The income tax benefit for the year ended December 31, 2020, reflects a 17% statutory tax rate on our Singapore operations, a 21% corporate income tax rate on our U.S. operations, and a zero percent tax rate on our Macao gaming operations due to our income tax exemption in Macao. Our U.S. operations recorded a tax benefit associated with the pre-tax book losses incurred for the year ended December 31, 2020. Our U.S. tax benefit was partially offset by a valuation allowance recorded on certain U.S. foreign tax credits, which we no longer expect to utilize due to lower royalty income resulting from a decrease in revenues from our Macao and Singapore operations compared to prior estimates. Our Macao non-gaming operations had a non-cash income tax expense of $14 million due to the reversal of certain deferred tax assets related to fixed assets, which were primarily disposed of as part of The Londoner Macao project.

54

000794

Table of Contents

The net loss attributable to our noncontrolling interests was $458 million for the year ended December 31, 2020, compared to net income attributable to our noncontrolling interest of $606 million for the year ended December 31, 2019. These amounts were primarily related to the noncontrolling interest of SCL.

### Additional Information Regarding our Retail Mall Operations

The following tables summarize the results of our mall operations on the Cotai Strip and at Marina Bay Sands for the years ended December 31, 2020 and 2019:

| | Shoppes at Venetian | | Shoppes at Four Seasons | | Shoppes at Cotai Central | | Shoppes at Parisian | | The Shoppes at Marina Bay Sands | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (In millions) | | | | | | | | | |
| **For the year ended December 31, 2020** | | | | | | | | | | |
| Mall revenues: | | | | | | | | | | |
| Minimum rents[1] | $ | 192 | $ | 121 | $ | 37 | $ | 34 | $ | 137 |
| Overage rents | | 13 | | 10 | | 4 | | 2 | | 11 |
| Rent concessions[2] | | (111) | | (61) | | (22) | | (20) | | (56) |
| Total overage rents and rent concessions | | (98) | | (51) | | (18) | | (18) | | (45) |
| CAM, levies and direct recoveries | | 31 | | 9 | | 18 | | 11 | | 20 |
| Total mall revenues | | 125 | | 79 | | 37 | | 27 | | 112 |
| Mall operating expenses: | | | | | | | | | | |
| Common area maintenance | | 11 | | 4 | | 6 | | 4 | | 13 |
| Marketing and other direct operating expenses | | 5 | | 5 | | 2 | | 3 | | 5 |
| Mall operating expenses | | 16 | | 9 | | 8 | | 7 | | 18 |
| Property taxes[3] | | 2 | | — | | — | | — | | 2 |
| Provision for credit losses | | 1 | | — | | 1 | | — | | — |
| Mall-related expenses[4] | $ | 19 | $ | 9 | $ | 9 | $ | 7 | $ | 20 |
| **For the year ended December 31, 2019** | | | | | | | | | | |
| Mall revenues: | | | | | | | | | | |
| Minimum rents[1] | $ | 194 | $ | 110 | $ | 39 | $ | 37 | $ | 135 |
| Overage rents | | 26 | | 31 | | 13 | | 3 | | 24 |
| CAM, levies and direct recoveries | | 33 | | 10 | | 18 | | 13 | | 26 |
| Total mall revenues | | 253 | | 151 | | 70 | | 53 | | 185 |
| Mall operating expenses: | | | | | | | | | | |
| Common area maintenance | | 16 | | 6 | | 8 | | 6 | | 17 |
| Marketing and other direct operating expenses | | 8 | | 3 | | 3 | | 5 | | 6 |
| Mall operating expenses | | 24 | | 9 | | 11 | | 11 | | 23 |
| Property taxes[3] | | 1 | | — | | — | | — | | 6 |
| Provision for credit losses | | — | | 1 | | — | | — | | — |
| Mall-related expenses[4] | $ | 25 | $ | 10 | $ | 11 | $ | 11 | $ | 29 |

Note:   This table excludes the results of our mall operations at Sands Macao and Sands Bethlehem, which was sold in May 2019.

(1)   Minimum rents include base rents and straight-line adjustments of base rents.

(2)   Rent concessions were provided to tenants as a result of the COVID-19 Pandemic and the related impact on mall operations.

(3)   Commercial property that generates rental income is exempt from property tax for the first six years for newly constructed buildings in Cotai. Each property is also eligible to obtain an additional six-year exemption,

000795

Table of Contents

provided certain qualifications are met. To date, The Venetian Macao, The Plaza Macao and Four Seasons Hotel Macao, The Londoner Macao and The Parisian Macao have obtained a second exemption. The exemption for The Venetian Macao and The Plaza Macao and Four Seasons Hotel Macao expired in August 2019 and August 2020, respectively, and the exemption for The Londoner Macao and The Parisian Macao will be expiring in December 2027 and September 2028, respectively.

(4)     Mall-related expenses consist of CAM, marketing fees and other direct operating expenses, property taxes and provision for credit losses, but excludes depreciation and amortization and general and administrative costs.

It is common in the mall operating industry for companies to disclose mall net operating income ("NOI") as a useful supplemental measure of a mall's operating performance. Because NOI excludes general and administrative expenses, interest expense, impairment losses, depreciation and amortization, gains and losses from property dispositions, allocations to noncontrolling interests and provision for income taxes, it provides a performance measure that, when compared year over year, reflects the revenues and expenses directly associated with owning and operating commercial real estate properties and the impact on operations from trends in occupancy rates, rental rates and operating costs.

In the table above, we believe taking total mall revenues less mall-related expenses provides an operating performance measure for our malls. Other mall operating companies may use different methodologies for deriving mall-related expenses. As such, this calculation may not be comparable to the NOI of other mall operating companies.

**Year Ended December 31, 2019 Compared to the Year Ended December 31, 2018**

A discussion of changes in our results of operations between 2019 and 2018 has been omitted from this Form 10-K and can be found in "Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations — Year Ended December 31, 2019 Compared to the Year Ended December 31, 2018" of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019.

000796

**Liquidity and Capital Resources**

*Cash Flows — Summary*

Our cash flows consisted of the following:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| | (In millions) | | |
| Net cash generated from (used in) operating activities | $ (1,312) | $ 3,038 | $ 4,701 |
| Cash flows from investing activities: | | | |
| Net proceeds from sale of Sands Bethlehem | — | 1,161 | — |
| Capital expenditures | (1,330) | (1,216) | (949) |
| Proceeds from disposal of property and equipment | 1 | 5 | 19 |
| Acquisition of intangible assets | — | (53) | — |
| Net cash used in investing activities | (1,329) | (103) | (930) |
| Cash flows from financing activities: | | | |
| Proceeds from exercise of stock options | 24 | 54 | 79 |
| Repurchase of common stock | — | (754) | (905) |
| Dividends paid and noncontrolling interest payments | (911) | (3,000) | (2,979) |
| Proceeds from long-term debt | 1,945 | 4,000 | 7,593 |
| Repayments of long-term debt | (467) | (3,536) | (5,178) |
| Payments of financing costs | (31) | (132) | (132) |
| Net cash generated from (used in) financing activities | 560 | (3,368) | (1,522) |
| Effect of exchange rate on cash, cash equivalents and restricted cash | (24) | 14 | (18) |
| Increase (decrease) in cash, cash equivalents and restricted cash and cash equivalents | (2,105) | (419) | 2,231 |
| Cash, cash equivalents and restricted cash and cash equivalents at beginning of year | 4,242 | 4,661 | 2,430 |
| Cash, cash equivalents and restricted cash and cash equivalents at end of year | $ 2,137 | $ 4,242 | $ 4,661 |

A discussion of changes in cash flows between 2019 and 2018 has been omitted from this Form 10-K and can be found in "Item 7 — Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019.

*Cash Flows — Operating Activities*

Table games play at our properties is conducted on a cash and credit basis, while slot machine play is primarily conducted on a cash basis. Our rooms, food and beverage and other non-gaming revenues are conducted primarily on a cash basis or as a trade receivable, resulting in operating cash flows being generally affected by changes in operating income and accounts receivable. For the year ended December 31, 2020, cash used in operations was $1.31 billion, a decrease of $4.35 billion compared to $3.04 billion of cash flow from operations for the year ended December 31, 2019. The main factor driving this decrease was the impact of the COVID-19 Pandemic on our operations, which significantly reduced visitation to our properties and caused the temporary shutdown of all of our properties at various times during 2020 as described above. The COVID-19 Pandemic impacted our working capital, which was a cash outflow during the year ended December 31, 2020 as the amount of receivables collected was less than the settlement of operating accrued liabilities and the outstanding chip liability was significantly reduced in 2020. In addition, cash flow from operations in the prior year were impacted by the land lease payment made in 2019 in connection with the MBS Expansion Project.

000797

Table of Contents

### Cash Flows — Investing Activities

Capital expenditures for the year ended December 31, 2020, totaled $1.33 billion, including $1.06 billion in Macao, which consisted of $739 million for The Londoner Macao, $157 million for The Plaza Macao and Four Seasons Hotel Macao primarily for The Grand Suites at Four Seasons and $140 million for The Venetian Macao; $164 million in Singapore; $103 million at our Las Vegas Operating Properties; and $5 million for corporate and other activities.

Capital expenditures for the year ended December 31, 2019, totaled $1.22 billion, including $762 million in Macao, which consisted of $298 million for The Plaza Macao and Four Seasons Hotel Macao primarily for The Grand Suites at Four Seasons, $282 million for The Londoner Macao and $131 million for The Venetian Macao; $198 million at our Las Vegas Operating Properties; $195 million in Singapore; and $61 million for corporate and other activities.

### Cash Flows — Financing Activities

Net cash flows generated from financing activities were $560 million for the year ended December 31, 2020, which was primarily attributable to the issuance of $1.50 billion of unsecured notes at SCL, partially offset by $911 million in dividend payments.

Net cash flows used in financing activities were $3.37 billion for the year ended December 31, 2019, which was primarily attributable to $3.0 billion in dividend payments, $754 million in common stock repurchases and $132 million in payments of financing costs, partially offset by proceeds of $495 million from the issuance of the 2025 LVSC Senior Notes.

As of December 31, 2020, we had $3.96 billion available for borrowing under our U.S., Macao and Singapore revolving facilities, net of letters of credit. Additionally, we had $2.79 billion available for borrowing under the 2012 Singapore Delayed Draw Term Facility to finance construction costs incurred in connection with the MBS Expansion Project.

### Capital Financing Overview

We fund our development projects primarily through borrowings from our debt instruments (see "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt") and operating cash flows.

In June 2020, SCL issued, in a private offering, two series of senior unsecured notes in an aggregate principal amount of $1.50 billion. The net proceeds from the offering were used for incremental liquidity and general corporate purposes. (see "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt — Corporate and U.S. Related Debt — SCL Senior Notes").

Our U.S., SCL and Singapore credit facilities, as amended, contain various financial covenants, which include maintaining a maximum leverage ratio or net debt, as defined, to trailing twelve-month adjusted earnings before interest, income taxes, depreciation and amortization, as defined. In September 2020, LVSC entered into an amendment, pursuant to which lenders, among other things, removed LVSC's requirement to maintain a maximum leverage ratio as of the last day of the fiscal quarter during the period beginning on October 31, 2020, through and including December 31, 2021. In March 2020, SCL entered into a waiver and amendment request letter, pursuant to which lenders, among other things, waived SCL's requirement to ensure the leverage ratio does not exceed 4.0x and the interest coverage ratio is greater than 2.50x for any period beginning on, and including, January 1, 2020 and ending on, and including, July 1, 2021 (other than with respect to the financial year ended December 31, 2019). In September 2020, SCL entered into a waiver extension and amendment request letter, pursuant to which the aforementioned waiver period was extended to January 1, 2022. In June 2020, MBS entered into an amendment letter, such that MBS will not have to comply with the leverage or interest coverage covenants for the financial quarters ending, and including, September 30, 2020 through, and including, December 31, 2021.

Any defaults under our debt agreements would allow the lenders, in each case, to exercise their rights and remedies as defined under their respective agreements. If the lenders were to exercise their rights to accelerate the due dates of the indebtedness outstanding, there can be no assurance we would be able to repay or refinance any

000798

amounts that may become due and payable under such agreements, which could force us to restructure or alter our operations or debt obligations.

We held unrestricted cash and cash equivalents of $2.12 billion and restricted cash and cash equivalents of $16 million as of December 31, 2020, of which approximately $1.21 billion of the unrestricted amount is held by non-U.S. subsidiaries. Of the $1.21 billion, approximately $946 million is available to be repatriated to the U.S., and we do not expect withholding taxes or other foreign income taxes to apply should these earnings be distributed in the form of dividends or otherwise. The remaining unrestricted amounts held by non-U.S. subsidiaries are not available for repatriation primarily due to dividend requirements to third-party public stockholders in the case of funds being repatriated from SCL. We believe the cash on hand and cash flow generated from operations, as well as the $3.96 billion available for borrowing under our U.S., Macao and Singapore credit facilities, net of outstanding letters of credit, and SGD 3.69 billion (approximately $2.79 billion at exchange rates in effect on December 31, 2020) under the 2012 Singapore Delayed Draw Term Facility, as of December 31, 2020, will be sufficient to maintain compliance with the financial covenants of our credit facilities and fund our working capital needs, committed and planned capital expenditures, development opportunities and debt obligations. In the normal course of our activities, we will continue to evaluate global capital markets to consider future opportunities for enhancements of our capital structure. On January 25, 2021, we increased the amount available under the SCL revolving credit facility by HKD 3.83 billion (approximately $494 million in exchange rates in effect at the time of transaction) to further enhance our liquidity. Subsequently, on January 29, 2021 SCL drew down $29 million and HKD 2.13 billion (approximately $274 million at exchange rates in effect on January 29, 2021) under this facility for general corporate purposes, resulting in remaining available borrowing capacity of $2.21 billion.

During the quarter ended March 31, 2020, we paid a quarterly dividend of $0.79 per common share as part of a regular cash dividend program and recorded $603 million as a distribution against retained earnings.

On February 21, 2020, SCL paid a dividend of 0.99 HKD to SCL stockholders (a total of $1.03 billion, of which we retained $717 million during the year ended December 31, 2020).

We have suspended our quarterly dividend program and SCL did not pay a final dividend for 2019 due to the impact of the COVID-19 Pandemic.

In June 2018, our Board of Directors authorized the repurchase of $2.50 billion of our outstanding common stock, which was to expire in November 2020. In October 2020, our Board of Directors authorized the extension of the expiration date of the remaining repurchase amount of $916 million to November 2022. During the year ended December 31, 2020, no shares of our common stock were repurchased under this program. All share repurchases of our common stock have been recorded as treasury stock. Repurchases of our common stock are made at our discretion in accordance with applicable federal securities laws in the open market or otherwise. The timing and actual number of shares to be repurchased in the future will depend on a variety of factors, including our financial position, earnings, cash flows, legal requirements, other investment opportunities and market conditions.

000799

**Aggregate Indebtedness and Other Contractual Obligations**

Our total long-term indebtedness and other contractual obligations are summarized below as of December 31, 2020:

| | 2021 | 2022 - 2023 | 2024 - 2025 | Thereafter | Total |
|---|---|---|---|---|---|
| | | | Payments Due by Period[1] | | |
| | | | (In millions) | | |
| **Long-Term Debt Obligations[2]** | | | | | |
| LVSC Senior Notes | $ — | $ — | $ 2,250 | $ 1,750 | $ 4,000 |
| SCL Senior Notes | — | 1,800 | 1,800 | 3,400 | 7,000 |
| 2012 Singapore Credit Facility | 63 | 126 | 1,182 | 1,702 | 3,073 |
| Singapore Delayed Draw Term Facility | — | — | 16 | 31 | 47 |
| Finance Leases, Including Imputed Interest | 14 | 11 | 1 | — | 26 |
| Fixed Interest Payments | 476 | 946 | 718 | 614 | 2,754 |
| Variable Interest Payments[3] | 55 | 107 | 97 | 15 | 274 |
| **Contractual Obligations** | | | | | |
| Operating Leases, Including Imputed Interest[4] | 36 | 54 | 46 | 514 | 650 |
| Mall Deposits[5] | 70 | 48 | 21 | 10 | 149 |
| Macao Annual Premium[6] | 41 | 21 | — | — | 62 |
| Other[7] | 108 | 136 | 99 | 204 | 547 |
| Total | $ 863 | $ 3,249 | $ 6,230 | $ 8,240 | $ 18,582 |

(1) As of December 31, 2020, we had a $71 million liability related to uncertain tax positions; we do not expect this liability to result in a payment of cash within the next 12 months. We are unable to reasonably estimate the timing of the liability in individual years beyond 12 months due to uncertainties in the timing of the effective settlement of tax positions; therefore, such amounts are not included in the table.

(2) See "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 8 — Long-Term Debt" for further details on these financing transactions and "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 13 — Leases" for further details on finance leases.

(3) Based on the 1-month rate as of December 31, 2020, Singapore Swap Offer Rate ("SOR") of 0.13% plus the applicable interest rate spread in accordance with the respective debt agreements.

(4) We are party to certain operating leases for real estate and various equipment, which primarily include $331 million related to long-term land leases in Macao with an anticipated lease term of 50-years, $132 million related to a 99-year lease agreement (83 years remaining) for a parking structure located adjacent to The Venetian Resort Las Vegas and $70 million related to certain leaseback agreements related to the sale of the Grand Canal Shoppes. See "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 13 — Leases" for further details on operating leases.

(5) Mall deposits consist of refundable security deposits received from mall tenants.

(6) In addition to the 39% gross gaming win tax in Macao (which is not included in this table as the amount we pay is variable in nature), we are required to pay an annual premium with a fixed portion and a variable portion, which is based on the number and type of gaming tables and gaming machines we operate. Based on the gaming tables and gaming machines in operation as of December 31, 2020, the annual premium payable to the Macao government is approximately $41 million for the year ended December 31, 2021 and approximately $21 million through the termination of the gaming subconcession in June 2022.

000800

Table of Contents

(7) Primarily consists of all other non-cancellable contractual obligations and primarily relates to certain hotel and restaurant management and service agreements. The amounts exclude open purchase orders with our suppliers that have not yet been received as these agreements generally allow us the option to cancel, reschedule and adjust terms based on our business needs prior to the delivery of goods or performance of services.

## Off-Balance Sheet Arrangements

We have not entered into any transactions with special purpose entities, nor have we engaged in any derivative transactions.

## Restrictions on Distributions

We are a parent company with limited business operations. Our main asset is the stock and membership interests of our subsidiaries. Certain of our debt instruments contain restrictions that, among other things, limit the ability of certain subsidiaries to incur additional indebtedness, issue disqualified stock or equity interests, pay dividends or make other distributions, repurchase equity interests or certain indebtedness, create certain liens, enter into certain transactions with affiliates, enter into certain mergers or consolidations or sell certain assets of our Company without prior approval of the lenders or noteholders.

## Special Note Regarding Forward-Looking Statements

This report contains forward-looking statements made pursuant to the Safe Harbor Provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include the discussions of our business strategies and expectations concerning future operations, margins, profitability, liquidity and capital resources. In addition, in certain portions included in this report, the words: "anticipates," "believes," "estimates," "seeks," "expects," "plans," "intends" and similar expressions, as they relate to our Company or management, are intended to identify forward-looking statements. Although we believe these forward-looking statements are reasonable, we cannot assure you any forward-looking statements will prove to be correct. These forward-looking statements involve known and unknown risks, uncertainties and other factors beyond our control, which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. These factors include, among others, the risks associated with:

- the uncertainty of the extent, duration and effects of the COVID-19 Pandemic and the response of governments and other third parties, including government-mandated property closures, increased operational regulatory requirements or travel restrictions, on our business, results of operations, cash flows, liquidity and development prospects;

- general economic and business conditions in the U.S. and internationally, which may impact levels of disposable income, consumer spending, group meeting business, pricing of hotel rooms and retail and mall tenant sales;

- disruptions or reductions in travel and our operations due to natural or man-made disasters, pandemics, epidemics or outbreaks of infectious or contagious diseases, political instability, civil unrest, terrorist activity or war;

- the uncertainty of consumer behavior related to discretionary spending and vacationing at our Integrated Resorts in Macao, Singapore and Las Vegas;

- the extensive regulations to which we are subject and the costs of compliance or failure to comply with such regulations;

- our ability to maintain our gaming licenses and subconcession in Macao, Singapore and Las Vegas;

- new developments, construction projects and ventures, including our Cotai Strip developments and MBS Expansion Project;

- regulatory policies in China or other countries in which our customers reside, or where we have operations, including visa restrictions limiting the number of visits or the length of stay for visitors from China to

61

000801

Table of Contents

Macao, restrictions on foreign currency exchange or importation of currency, and the judicial enforcement of gaming debts;

• the ability of our subsidiaries to make distribution payments to us;

• our leverage, debt service and debt covenant compliance, including the pledge of certain of our assets (other than our equity interests in our subsidiaries) as security for our indebtedness and ability to refinance our debt obligations as they come due or to obtain sufficient funding for our planned, or any future, development projects;

• fluctuations in currency exchange rates and interest rates;

• increased competition for labor and materials due to planned construction projects in Macao and Singapore and quota limits on the hiring of foreign workers;

• our ability to compete for limited management and labor resources in Macao and Singapore, and policies of those governments may also affect our ability to employ imported managers or labor from other countries;

• our dependence upon properties primarily in Macao, Singapore and Las Vegas for all of our cash flow;

• the passage of new legislation and receipt of governmental approvals for our operations in Macao and Singapore and other jurisdictions where we are planning to operate;

• our insurance coverage may not be adequate to cover all possible losses that our properties could suffer and our insurance costs may increase in the future;

• our ability to collect gaming receivables from our credit players;

• our relationship with gaming promoters in Macao;

• our dependence on chance and theoretical win rates;

• fraud and cheating;

• our ability to establish and protect our intellectual property rights;

• conflicts of interest that arise because certain of our directors and officers are also directors of SCL;

• government regulation of the casino industry (as well as new laws and regulations and changes to existing laws and regulations), including gaming license regulation, the requirement for certain beneficial owners of our securities to be found suitable by gaming authorities, the legalization of gaming in other jurisdictions and regulation of gaming on the internet;

• increased competition in Macao and Las Vegas, including recent and upcoming increases in hotel rooms, meeting and convention space, retail space, potential additional gaming licenses and online gaming;

• the popularity of Macao, Singapore and Las Vegas as convention and trade show destinations;

• new taxes, changes to existing tax rates or proposed changes in tax legislation and the impact of U.S. tax reform;

• the continued services of our key officers;

• any potential conflict between the interests of our Principal Stockholders and us;

• labor actions and other labor problems;

• our failure to maintain the integrity of our information and information systems or comply with applicable privacy and data security requirements and regulations could harm our reputation and adversely affect our business;

• the completion of infrastructure projects in Macao;

• our relationship with Brookfield or any successor owner of the Grand Canal Shoppes; and

• the outcome of any ongoing and future litigation.

000802

Table of Contents

All future written and verbal forward-looking statements attributable to us or any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. New risks and uncertainties arise from time to time, and it is impossible for us to predict these events or how they may affect us. Readers are cautioned not to place undue reliance on these forward-looking statements. We assume no obligation to update any forward-looking statements after the date of this report as a result of new information, future events or developments, except as required by federal securities laws.

**Critical Accounting Policies and Estimates**

The preparation of our consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires our management to make estimates and judgments that affect the reported amounts of assets and liabilities, revenues and expenses, and related disclosures of contingent assets and liabilities. These estimates and judgments are based on historical information, information currently available to us and on various other assumptions management believes to be reasonable under the circumstances. Actual results could vary from those estimates and we may change our estimates and assumptions in future evaluations. Changes in these estimates and assumptions may have a material effect on our results of operations and financial condition. We believe the critical accounting policies discussed below affect our more significant judgments and estimates used in the preparation of our consolidated financial statements.

*Provision for Expected Credit Losses*

We maintain a provision for expected credit losses on casino, hotel and mall receivables and regularly evaluate the balances. We apply standard reserve percentages to aged account balances, which are grouped based on shared credit risk characteristics and days past due. The reserve percentages are based on estimated loss rates supported by historical observed default rates over the expected life of the receivable and are adjusted for forward-looking information. We also specifically analyze the collectability of each account with a balance over a specified dollar amount, based upon the age of the account, the customer's financial condition, collection history and any other known information and adjust the aforementioned reserve with the results from the individual reserve analysis. We also monitor regional and global economic conditions and forecasts, which include the impact of the COVID-19 Pandemic, in our evaluation of the adequacy of the recorded reserves.

During the year ended December 31, 2020, there has been a delay in payments on casino receivables due to the inability of patrons to travel to our properties or to accomplish financial transactions due to the travel restrictions caused by the COVID-19 Pandemic. The collection of casino receivables has also been impacted by liquidity issues faced by certain patrons also stemming from the COVID-19 Pandemic. We have increased the provision for credit losses in each jurisdiction accordingly to account for the expected credit losses due to the COVID-19 Pandemic. Although we believe the provision on our casino receivables is adequate as of December 31, 2020, it is possible our provisions could increase if we experience further delays on payments from patrons.

Account balances are written off against the provision when we believe it is probable the receivable will not be recovered. Credit or marker play was 24.0%, 14.6% and 68.8% of table games play at our Macao properties, Marina Bay Sands and Las Vegas Operating Properties, respectively, during the year ended December 31, 2020. Our provision for casino credit losses was 58.3% and 32.3% of gross casino receivables as of December 31, 2020 and 2019, respectively. The credit extended to gaming promoters can be offset by the commissions payable to said gaming promoters, which is considered in the establishment of the provision for credit losses. Our provision for credit losses from our hotel and other receivables is not material.

*Litigation Accrual*

We are subject to various claims and legal actions. We estimate the accruals for these claims and legal actions based on all relevant facts and circumstances currently available and include such accruals in other accrued liabilities in the consolidated balance sheets when it is determined such contingencies are both probable and reasonably estimable.

*Property and Equipment*

As of December 31, 2020, we had net property and equipment of $15.11 billion, representing 72.6% of our total assets. We depreciate property and equipment on a straight-line basis over their estimated useful lives. The estimated useful lives are based on the nature of the assets as well as current operating strategy and legal

63

000803

considerations, such as contractual life. Future events, such as property expansions, property developments, new competition or new regulations, could result in a change in the manner in which we use certain assets requiring a change in the estimated useful lives of such assets. The estimated useful lives of assets are periodically reviewed and adjusted as necessary on a prospective basis.

For assets to be held and used (including projects under development), fixed assets are reviewed for impairment whenever indicators of impairment exist. If an indicator of impairment exists, we first group our assets with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities (the "asset group"). Secondly, we estimate the undiscounted future cash flows directly associated with and expected to arise from the completion, use and eventual disposition of such asset group. We estimate the undiscounted cash flows over the remaining useful life of the primary asset within the asset group. If the undiscounted cash flows exceed the carrying value, no impairment is indicated. If the undiscounted cash flows do not exceed the carrying value, then an impairment is measured based on fair value compared to carrying value, with fair value typically based on a discounted cash flow model. If an asset is still under development, future cash flows include remaining construction costs.

To estimate the undiscounted cash flows of our asset groups, we consider all potential cash flows scenarios, which are probability weighted based on management's estimates given current conditions. Determining the recoverability of our asset groups is judgmental in nature and requires the use of significant estimates and assumptions, including estimated cash flows, probability weighting of potential scenarios, costs to complete construction for assets under development, growth rates and future market conditions, among others. Future changes to our estimates and assumptions based upon changes in macro-economic factors, regulatory environments, operating results or management's intentions may result in future changes to the recoverability of our asset groups.

Due to the substantial reduction in cash flows generated from our operating properties and the ongoing travel restrictions due to the COVID-19 Pandemic, we determined a triggering event occurred in 2020 and an impairment assessment was warranted for our asset groups in Macao, Singapore and Las Vegas. We tested our long-lived assets held for use at our operating properties in Macao, Singapore and Las Vegas for recoverability as of December 31, 2020, resulting in no impairment as the estimated undiscounted future cash flows exceeded their carrying values. We believe we made reasonable estimates and judgments in performing the analysis in light of the uncertainties surrounding the COVID-19 Pandemic; however, should the effects of the COVID-19 Pandemic persist for a prolonged duration and projected operating results further decline in future periods, we could be required to recognize an impairment loss.

For assets to be held for sale, the fixed assets (the "disposal group") are measured at the lower of their carrying amount or fair value less cost to sell. Losses are recognized for any initial or subsequent write-down to fair value less cost to sell, while gains are recognized for any subsequent increase in fair value less cost to sell, but not in excess of the cumulative loss previously recognized. Any gains or losses not previously recognized that result from the sale of the disposal group shall be recognized at the date of sale. Fixed assets are not depreciated while classified as held for sale.

### Income Taxes

We are subject to income taxes in the U.S. (including federal and state) and numerous foreign jurisdictions in which we operate. We record income taxes under the asset and liability method, whereby deferred tax assets and liabilities are recognized based on the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and attributable to operating loss and tax credit carryforwards.

Our foreign and U.S. tax rate differential reflects the fact that U.S. tax rates are higher than the statutory tax rates in Singapore and Macao of 17% and 12%, respectively. In August 2018, we received an additional exemption from Macao's corporate income tax on profits generated by the operation of casino games of chance for the period January 1, 2019 through June 26, 2022, the date our subconcession agreement expires. Additionally, we entered into an agreement with the Macao government in April 2019, effective through June 26, 2022, providing for an annual payment of 38 million patacas (approximately $5 million at exchange rates in effect on December 31, 2020) that is a substitution for a 12% tax otherwise due from VML shareholders on dividend distributions paid from VML gaming

64

000804

Table of Contents

profits. We intend to request extensions of these tax arrangements; however, there is no assurance we will receive these extensions.

Accounting standards regarding income taxes require a reduction of the carrying amounts of deferred tax assets by a valuation allowance, if based on the available evidence, it is "more-likely-than-not" such assets will not be realized. Accordingly, the need to establish valuation allowances for deferred tax assets is assessed at each reporting period based on a "more-likely-than-not" realization threshold. This assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carryforward periods, our experience with operating loss and tax credit carryforwards not expiring and tax planning strategies.

We recorded a valuation allowance on the net deferred tax assets of certain foreign jurisdictions of $342 million and $279 million as of December 31, 2020 and 2019, respectively, and a valuation allowance on certain net deferred tax assets of our U.S. operations of $4.58 billion and $4.51 billion as of December 31, 2020 and 2019, respectively. Due to the impact of the COVID-19 Pandemic and the resulting reduction in estimated royalty income from an expected decrease in our Macao and Singapore operations, we recorded a valuation allowance on certain U.S. foreign tax credits, which we no longer expect to utilize during the period 2021 through 2027 before their expiration. We believe we made reasonable estimates and judgments in performing the analysis in light of the uncertainties surrounding the COVID-19 Pandemic; however, should the effects of the COVID-19 Pandemic persist for a prolonged duration, we could be required to record additional valuation allowances. Management will reassess the realization of deferred tax assets each reporting period and consider the scheduled reversal of deferred tax liabilities, sources of taxable income and tax planning strategies. To the extent the financial results of these operations improve and it becomes "more-likely-than-not" the deferred tax assets are realizable, we will be able to reduce the valuation allowance in the period such determination is made, as appropriate.

Significant judgment is required in evaluating our tax positions and determining our provision for income taxes. During the ordinary course of business, there are many transactions for which the ultimate tax determination is uncertain. Accounting standards regarding uncertainty in income taxes provides a two-step approach to recognizing and measuring uncertain tax positions. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is "more-likely-than-not" the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely, based solely on the technical merits, of being sustained on examinations. We recorded unrecognized tax benefits of $131 million and $134 million as of December 31, 2020 and 2019, respectively. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustments and for which actual outcomes may be different.

Our major tax jurisdictions are the U.S., Macao, and Singapore. We could be subject to examination for tax years beginning in 2016 in Macao and Singapore and tax years 2010 through 2015 and 2017 through 2019 in the U.S.

U.S. tax reform made significant changes to U.S. income tax laws including lowering the U.S. corporate tax rate to 21% effective beginning in 2018 and transitioning from a worldwide tax system to a territorial tax system resulting in dividends from our foreign subsidiaries not being subject to U.S. income tax and therefore, no longer generating U.S. foreign tax credits.

### *Recent Accounting Pronouncements*

See related disclosure at "Item 8 — Financial Statements and Supplementary Data — Notes to Consolidated Financial Statements — Note 2 — Summary of Significant Accounting Policies — Recent Accounting Pronouncements."

## ITEM 7A. — *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

Market risk is the risk of loss arising from adverse changes in market rates and prices, such as interest rates, foreign currency exchange rates and commodity prices. Our primary exposures to market risk are interest rate risk associated with our long-term debt and foreign currency exchange rate risk associated with our operations outside the United States, which we may manage through the use of futures, options, caps, forward contracts and similar

000805

Table of Contents

instruments. We do not hold or issue financial instruments for trading purposes and do not enter into derivative transactions that would be considered speculative positions.

As of December 31, 2020, the estimated fair value of our long-term debt was approximately $15.15 billion, compared to its contractual value of $14.12 billion. The estimated fair value of our long-term debt is based on recent trades, if available, and indicative pricing from market information (level 2 inputs). A hypothetical 100 basis point change in market rates would cause the fair value of our long-term debt to change by $557 million. A hypothetical 100 basis point change in SOR would cause our annual interest cost on our long-term debt to change by approximately $31 million.

Foreign currency transaction gains for the year ended December 31, 2020, were $22 million primarily due to U.S. dollar denominated debt issued by SCL and by Singapore dollar denominated intercompany debt reported in U.S. dollars. We may be vulnerable to changes in the U.S. dollar/SGD and U.S. dollar/pataca exchange rates. Based on balances as of December 31, 2020, a hypothetical 10% weakening of the U.S. dollar/SGD exchange rate would cause a foreign currency transaction loss of approximately $23 million and a hypothetical 1% weakening of the U.S. dollar/pataca exchange rate would cause a foreign currency transaction loss of approximately $67 million. The pataca is pegged to the Hong Kong dollar and the Hong Kong dollar is pegged to the U.S. dollar (within a narrow range). We maintain a significant amount of our operating funds in the same currencies in which we have obligations thereby reducing our exposure to currency fluctuations.

000806

**ITEM 8. —** *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

**INDEX TO FINANCIAL STATEMENTS**

**Financial Statements:**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 68 |
| Consolidated Balance Sheets at December 31, 2020 and 2019 | 71 |
| Consolidated Statements of Operations for each of the three years in the period ended December 31, 2020 | 72 |
| Consolidated Statements of Comprehensive Income (Loss) for each of the three years in the period ended December 31, 2020 | 73 |
| Consolidated Statements of Equity for each of the three years in the period ended December 31, 2020 | 74 |
| Consolidated Statements of Cash Flows for each of the three years in the period ended December 31, 2020 | 75 |
| Notes to Consolidated Financial Statements | 77 |
| Financial Statement Schedule: | |
| Schedule II — Valuation and Qualifying Accounts | 119 |

The financial information included in the financial statement schedule should be read in conjunction with the consolidated financial statements. All other financial statement schedules have been omitted because they are not applicable or the required information is included in the consolidated financial statements or the notes thereto.

67

000807

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of Las Vegas Sands Corp.:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Las Vegas Sands Corp. and subsidiaries (the "Company") as of December 31, 2020 and 2019, the related consolidated statements of operations, comprehensive income (loss), equity, and cash flows, for each of the three years in the period ended December 31, 2020, and the related notes and the financial statement schedule listed in the Index at Item 15(a)(2) (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 5, 2021, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

**Valuation of Casino Receivables — Refer to Notes 2 and 3 to the financial statements**

*Critical Audit Matter Description*

As discussed in Note 2 to the financial statements, accounts receivable at December 31, 2020 include credit extended to casino patrons and gaming promoters. The Company records a provision for credit losses based on the amount of expected credit losses. The Company applies standard reserve percentages to aged account balances, which are grouped based on shared credit risk characteristics and days past due. The reserve percentages are based on estimated loss rates supported by historical observed default rates over the expected life of the receivable and are adjusted for forward-looking information. The Company also specifically analyzes the collectability of each account

68

000808

Table of Contents

with a balance over a specified dollar amount, based upon the age of the account, the customer's financial condition, collection history, and any other known information and adjusts the aforementioned reserve with the results from the individual reserve analysis.

Auditing the valuation of accounts receivable involved a high degree of subjectivity in evaluating management's judgments related to the collectability of patron and gaming promoter accounts receivable, especially as it relates to the evaluation of patron and gaming promoter assets available to repay amounts owed.

*How the Critical Audit Matter Was Addressed in the Audit*

We planned and performed the following procedures in connection with forming our overall opinion on the financial statements:

- We tested the operating effectiveness of controls over the granting of casino credit, controls over the collection processes and management's review controls over the assessment of the collectability of casino receivables, including the information used by management in those controls.

- For a selection of casino receivables, we (1) obtained evidence related to payment history and correspondence with patron or gaming promoter, (2) evaluated management's use of this information in establishing a provision for credit losses, and (3) examined subsequent settlement, if any.

- Performed a retrospective analysis of historical reserves evaluating subsequent collections and write-offs.

/s/ Deloitte & Touche LLP


Las Vegas, Nevada
February 5, 2021


We have served as the Company's auditor since 2013.

000809

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of Las Vegas Sands Corp.:

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Las Vegas Sands Corp. and subsidiaries (the "Company") as of December 31, 2020, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control — Integrated Framework (2013) issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2020 of the Company and our report dated February 5, 2021, expressed an unqualified opinion on those financial statements and financial statement schedule.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Deloitte & Touche LLP

Las Vegas, Nevada
February 5, 2021

000810

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

|  | | December 31, | | |
|---|---|---|---|---|
|  | | 2020 | | 2019 |
|  | | (In millions, except par value) | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 2,121 | $ | 4,226 |
| Restricted cash and cash equivalents | | 16 | | 16 |
| Accounts receivable, net of provision for credit losses of $314 and $282 | | 338 | | 844 |
| Inventories | | 32 | | 37 |
| Prepaid expenses and other | | 137 | | 182 |
| Total current assets | | 2,644 | | 5,305 |
| Property and equipment, net | | 15,109 | | 14,844 |
| Deferred income taxes, net | | 318 | | 282 |
| Leasehold interests in land, net | | 2,256 | | 2,272 |
| Intangible assets, net | | 25 | | 42 |
| Other assets, net | | 455 | | 454 |
| Total assets | $ | 20,807 | $ | 23,199 |
| **LIABILITIES AND EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 98 | $ | 149 |
| Construction payables | | 342 | | 334 |
| Other accrued liabilities | | 1,706 | | 2,396 |
| Income taxes payable | | 87 | | 275 |
| Current maturities of long-term debt | | 76 | | 70 |
| Total current liabilities | | 2,309 | | 3,224 |
| Other long-term liabilities | | 497 | | 513 |
| Deferred income taxes | | 188 | | 183 |
| Deferred amounts related to mall sale transactions | | 344 | | 350 |
| Long-term debt | | 13,931 | | 12,422 |
| Total liabilities | | 17,269 | | 16,692 |
| Commitments and contingencies (Note 14) | | | | |
| Equity: | | | | |
| Preferred stock, $0.001 par value, 50 shares authorized, zero shares issued and outstanding | | — | | — |
| Common stock, $0.001 par value, 1,000 shares authorized, 833 shares issued, 764 shares outstanding | | 1 | | 1 |
| Treasury stock, at cost, 69 shares | | (4,481) | | (4,481) |
| Capital in excess of par value | | 6,611 | | 6,569 |
| Accumulated other comprehensive income (loss) | | 29 | | (3) |
| Retained earnings | | 813 | | 3,101 |
| Total Las Vegas Sands Corp. stockholders' equity | | 2,973 | | 5,187 |
| Noncontrolling interests | | 565 | | 1,320 |
| Total equity | | 3,538 | | 6,507 |
| Total liabilities and equity | $ | 20,807 | $ | 23,199 |

The accompanying notes are an integral part of these consolidated financial statements.

71

000811

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2020 | 2019 | 2018 | |
| | | (In millions, except per share data) | | | |
| Revenues: | | | | | |
| Casino | $ | 2,268 | $ 9,828 | $ | 9,819 |
| Rooms | | 498 | 1,752 | | 1,733 |
| Food and beverage | | 283 | 897 | | 865 |
| Mall | | 381 | 716 | | 690 |
| Convention, retail and other | | 182 | 546 | | 622 |
| Net revenues | | 3,612 | 13,739 | | 13,729 |
| Operating expenses: | | | | | |
| Casino | | 1,758 | 5,304 | | 5,448 |
| Rooms | | 271 | 444 | | 438 |
| Food and beverage | | 371 | 702 | | 673 |
| Mall | | 59 | 78 | | 79 |
| Convention, retail and other | | 149 | 304 | | 336 |
| Provision for credit losses | | 99 | 30 | | 5 |
| General and administrative | | 1,093 | 1,502 | | 1,483 |
| Corporate | | 168 | 313 | | 202 |
| Pre-opening | | 19 | 34 | | 6 |
| Development | | 18 | 24 | | 12 |
| Depreciation and amortization | | 1,160 | 1,165 | | 1,111 |
| Amortization of leasehold interests in land | | 55 | 51 | | 35 |
| Loss on disposal or impairment of assets | | 80 | 90 | | 150 |
| | | 5,300 | 10,041 | | 9,978 |
| Operating income (loss) | | (1,688) | 3,698 | | 3,751 |
| Other income (expense): | | | | | |
| Interest income | | 21 | 74 | | 59 |
| Interest expense, net of amounts capitalized | | (536) | (555) | | (446) |
| Other income | | 22 | 23 | | 26 |
| Gain on sale of Sands Bethlehem | | — | 556 | | — |
| Loss on modification or early retirement of debt | | — | (24) | | (64) |
| Income (loss) before income taxes | | (2,181) | 3,772 | | 3,326 |
| Income tax (expense) benefit | | 38 | (468) | | (375) |
| Net income (loss) | | (2,143) | 3,304 | | 2,951 |
| Net (income) loss attributable to noncontrolling interests | | 458 | (606) | | (538) |
| Net income (loss) attributable to Las Vegas Sands Corp. | $ | (1,685) | $ 2,698 | $ | 2,413 |
| Earnings (loss) per share: | | | | | |
| Basic | $ | (2.21) | $ 3.50 | $ | 3.07 |
| Diluted | $ | (2.21) | $ 3.50 | $ | 3.07 |
| Weighted average shares outstanding: | | | | | |
| Basic | | 764 | 771 | | 786 |
| Diluted | | 764 | 771 | | 786 |

The accompanying notes are an integral part of these consolidated financial statements.

000812

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | |
| | (In millions) | | | | | |
| Net income (loss) | $ | (2,143) | $ | 3,304 | $ | 2,951 |
| Currency translation adjustment | | 37 | | 42 | | (58) |
| Total comprehensive income (loss) | | (2,106) | | 3,346 | | 2,893 |
| Comprehensive (income) loss attributable to noncontrolling interests | | 453 | | (611) | | (534) |
| Comprehensive income (loss) attributable to Las Vegas Sands Corp. | $ | (1,653) | $ | 2,735 | $ | 2,359 |

The accompanying notes are an integral part of these consolidated financial statements.

73

000813

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF EQUITY**

| | Las Vegas Sands Corp. Stockholders' Equity | | | | | | |
|---|---|---|---|---|---|---|---|
| | Common Stock | Treasury Stock | Capital in Excess of Par Value | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Noncontrolling Interests | Total |
| | | | | (In millions) | | | |
| **Balance at January 1, 2018** | $ 1 | $ (2,818) | $ 6,580 | $ 14 | $ 2,709 | $ 1,141 | $ 7,627 |
| Net income | — | — | — | — | 2,413 | 538 | 2,951 |
| Currency translation adjustment | — | — | — | (54) | — | (4) | (58) |
| Exercise of stock options | — | (4) | 74 | — | — | 9 | 79 |
| Stock-based compensation | — | — | 26 | — | — | 4 | 30 |
| Repurchase of common stock | — | (905) | — | — | — | — | (905) |
| Dividends declared ($3.00 per share) (Note 9) | — | — | — | — | (2,352) | (627) | (2,979) |
| **Balance at December 31, 2018** | 1 | (3,727) | 6,680 | (40) | 2,770 | 1,061 | 6,745 |
| Net income | — | — | — | — | 2,698 | 606 | 3,304 |
| Currency translation adjustment | — | — | — | 37 | — | 5 | 42 |
| Exercise of stock options | — | — | 43 | — | — | 11 | 54 |
| Stock-based compensation | — | — | 31 | — | — | 4 | 35 |
| Disposition of interest in majority-owned subsidiary, net of taxes | — | — | (185) | — | — | 266 | 81 |
| Repurchase of common stock | — | (754) | — | — | — | — | (754) |
| Dividends declared ($3.08 per share) and noncontrolling interest payments (Note 9) | — | — | — | — | (2,367) | (633) | (3,000) |
| **Balance at December 31, 2019** | 1 | (4,481) | 6,569 | (3) | 3,101 | 1,320 | 6,507 |
| Net loss | — | — | — | — | (1,685) | (458) | (2,143) |
| Currency translation adjustment | — | — | — | 32 | — | 5 | 37 |
| Exercise of stock options | — | — | 22 | — | — | 2 | 24 |
| Stock-based compensation | — | — | 19 | — | — | 4 | 23 |
| Other | — | — | 1 | — | — | — | 1 |
| Dividends declared ($0.79 per share) (Note 9) | — | — | — | — | (603) | (308) | (911) |
| **Balance at December 31, 2020** | $ 1 | $ (4,481) | $ 6,611 | $ 29 | $ 813 | $ 565 | $ 3,538 |

The accompanying notes are an integral part of these consolidated financial statements.

74

000814

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ (2,143) | $ 3,304 | $ 2,951 |
| Adjustments to reconcile net income (loss) to net cash generated from (used in) operating activities: | | | |
| Depreciation and amortization | 1,160 | 1,165 | 1,111 |
| Amortization of leasehold interests in land | 55 | 51 | 35 |
| Amortization of deferred financing costs and original issue discount | 43 | 33 | 35 |
| Amortization of deferred gain on mall sale transactions | (5) | (5) | (5) |
| Loss on modification or early retirement of debt | — | 24 | 64 |
| Loss on disposal or impairment of assets | 46 | 82 | 149 |
| Gain on sale of Sands Bethlehem | — | (556) | — |
| Stock-based compensation expense | 22 | 35 | 30 |
| Provision for credit losses | 99 | 30 | 5 |
| Foreign exchange gain | (20) | (21) | (26) |
| Deferred income taxes | (33) | 157 | 113 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 402 | (150) | (119) |
| Other assets | (6) | (63) | (25) |
| Leasehold interests in land | — | (969) | (15) |
| Accounts payable | (51) | (26) | 8 |
| Other liabilities | (881) | (53) | 390 |
| Net cash generated from (used in) operating activities | (1,312) | 3,038 | 4,701 |
| **Cash flows from investing activities:** | | | |
| Net proceeds from sale of Sands Bethlehem | — | 1,161 | — |
| Capital expenditures | (1,330) | (1,216) | (949) |
| Proceeds from disposal of property and equipment | 1 | 5 | 19 |
| Acquisition of intangible assets | — | (53) | — |
| Net cash used in investing activities | (1,329) | (103) | (930) |
| **Cash flows from financing activities:** | | | |
| Proceeds from exercise of stock options | 24 | 54 | 79 |
| Repurchase of common stock | — | (754) | (905) |
| Dividends paid and noncontrolling interest payments | (911) | (3,000) | (2,979) |
| Proceeds from long-term debt (Note 8) | 1,945 | 4,000 | 7,593 |
| Repayments of long-term debt (Note 8) | (467) | (3,536) | (5,178) |
| Payments of financing costs | (31) | (132) | (132) |
| Net cash generated from (used in) financing activities | 560 | (3,368) | (1,522) |
| Effect of exchange rate on cash, cash equivalents and restricted cash | (24) | 14 | (18) |
| Increase (decrease) in cash, cash equivalents and restricted cash and cash equivalents | (2,105) | (419) | 2,231 |
| Cash, cash equivalents and restricted cash and cash equivalents at beginning of year | 4,242 | 4,661 | 2,430 |
| Cash, cash equivalents and restricted cash and cash equivalents at end of year | $ 2,137 | $ 4,242 | $ 4,661 |

000815

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **2018** | |
| | (In millions) | | | | | |
| **Supplemental disclosure of cash flow information:** | | | | | | |
| Cash payments for interest, net of amounts capitalized | $ | 419 | $ | 462 | $ | 326 |
| Cash payments for taxes, net of refunds | $ | 196 | $ | 253 | $ | 264 |
| Changes in construction payables | $ | 8 | $ | 145 | $ | 37 |

The accompanying notes are an integral part of these consolidated financial statements.

76

000816

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### Note 1 — Organization and Business of Company

Las Vegas Sands Corp. ("LVSC" or together with its subsidiaries, the "Company") is incorporated in Nevada and its common stock is traded on the New York Stock Exchange under the symbol "LVS."

The ordinary shares of the Company's subsidiary, Sands China Ltd. ("SCL," the indirect owner and operator of the majority of the Company's operations in the Macao Special Administrative Region ("Macao") of the People's Republic of China) are listed on The Main Board of The Stock Exchange of Hong Kong Limited. The shares were not, and will not be, registered under the Securities Act of 1933, as amended, and may not be offered or sold in the U.S. absent a registration under the Securities Act of 1933, as amended, or an applicable exception from such registration requirements.

### COVID-19 Pandemic

In early January 2020, an outbreak of a respiratory illness caused by a novel coronavirus was identified and the disease has since spread rapidly across the world causing the World Health Organization to declare the outbreak of a pandemic on March 12, 2020 (the "COVID-19 Pandemic"). As a result, people across the globe were advised to avoid non-essential travel. Steps were also taken by various countries, including those in which we operate, to restrict inbound international travel and implement closures of non-essential operations to contain the spread of the virus.

#### *Macao*

Visitation to Macao decreased substantially throughout 2020 as a result of various government policies limiting travel. Travel restrictions and quarantine requirements have been varying in response to changes in circumstances in other countries. A complete ban on entry, or a need to undergo enhanced quarantine requirements depending on the person's residency and their recent travel history, remains in place for Macao residents, foreign workers residing in Macao and international travelers from countries other than mainland China.

Beginning December 21, 2020, all travelers who have been to any overseas territory, including Hong Kong, but not including mainland China or Taiwan, in the past 14 days will be subject to a 21-day compulsory quarantine at a designated location when arriving in Macao. Those travelers arriving from mainland China or Taiwan will be subject to a 14-day quarantine. People from low risk cities in China may enter Macao quarantine free, subject to them holding the appropriate travel documents, a negative COVID-19 test result and a green health-code. All other foreign nationals, including those holding a temporary work permit, are still not permitted to enter Macao. The China Individual Visit Scheme ("China IVS") recommenced for certain regions from August 12, 2020, and was extended to more jurisdictions within mainland China effective September 23, 2020. General travel restrictions within mainland China continue to exist and are updated and revised based on evolving public health consideraions within China.

Following suspension of all gaming operations on February 5, 2020 by the Macao government, the Company's Macao casino operations resumed on February 20, 2020, except for operations at The Londoner Macao, which resumed on February 27, 2020. Additional health safeguards, such as the requirement to present a negative COVID-19 test certificate prior to entering the casino, have been implemented, as well as the ongoing limitation on the number of seats per table game, slot machine spacing, temperature checks and mandatory mask protection. The Company is currently unable to determine when these measures will be modified or cease to be necessary.

Some of the Company's Macao hotel facilities were also closed during the casino suspension in response to the drop in visitation and, with the exception of the Conrad Macao, Cotai Strip, which reopened on June 13, 2020, these hotels were gradually reopened from February 20, 2020. In support of the Macao government's initiatives to fight the COVID-19 Pandemic, the Company provided one tower (approximately 2,000 hotel rooms) at the Sheraton Grand Macao Hotel, Cotai Strip to the Macao government to house individuals who returned to Macao for quarantine purposes. This tower has been utilized for quarantine purposes on several occasions including from March 28 to April 30, 2020; from June 7 to August 14, 2020; from December 20, 2020 until February 6, 2021; and will resume on February 20, 2021 until further notice.

000817

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

Operating hours at restaurants across the Company's Macao properties are continuously being adjusted in line with movements in guest visitation. The majority of retail outlets in the Company's various shopping malls are open with reduced operating hours. The timing and manner in which these areas will return to full operation are currently unknown.

The Hong Kong government temporarily closed the Hong Kong China Ferry Terminal in Kowloon on January 30, 2020, and the Hong Kong Macao Ferry Terminal in Hong Kong on February 4, 2020. In response, the Company suspended its Macao ferry operations between Macao and Hong Kong. The timing and manner in which the Company's normal ferry operations will be able to resume are currently unknown.

Our operations in Macao have been significantly impacted by the lack of visitation to Macao. The Macao government announced total visitation from mainland China to Macao decreased 83.0% for 2020, as compared to 2019. The Macao government also announced gross gaming revenue decreased by 79.3% for 2020, as compared to 2019.

### Singapore

Beginning on April 7, 2020, the Singapore government suspended all casino and non-essential operations, including all operations at Marina Bay Sands, due to the COVID-19 Pandemic. The Company's Singapore operations were permitted to reopen beginning on June 19, 2020; however, this only included certain restaurants and retail mall operations. The casino operations reopened on July 1, 2020; however, entry was initially limited to annual levy holders and certain Sands Rewards Club ("SRC") members. The casino opened to all SRC members as of July 9, 2020, and to the public as of October 23, 2020. All operations are currently subject to limited capacities.

On May 28, 2020, in support of the Singapore government's initiatives to fight the COVID-19 Pandemic, Marina Bay Sands entered into an agreement with the Singapore government to utilize all three hotel towers to house Singapore residents upon their initial return from other jurisdictions for quarantine. The government's use of the first tower ceased on June 26, 2020, while usage of the second and third towers continued through July 26, 2020. Beginning on July 17, 2020, the first tower reopened for normal operations, while the second and third towers reopened on August 1, 2020. On September 7, 2020, the Singapore Tourism Board ("STB") announced that event organizers are allowed to apply for pilot events with limited capacities of up to 250 attendees from October 1, 2020. The date on which nightlife venues may reopen is unknown at this time. In December 2020, Singapore entered phase 3 of reopening, which, among other things, increased our casino operating capacity from 3,000 players to 3,750 players.

Visitation to Marina Bay Sands declined significantly due to the COVID-19 Pandemic. The STB announced for the 12 months ended November 30, 2020 (the latest information publicly available at the time of filing), total visitation to Singapore decreased approximately 76.6%, as compared to the same period in 2019.

### Las Vegas

The Nevada government suspended all casino and non-essential operations, including all operations at the Las Vegas Operating Properties, as later defined, beginning on March 18, 2020, due to the COVID-19 Pandemic. The Nevada government allowed casinos to reopen on June 4, 2020, under strict guidelines issued by the Gaming Control Board and the State of Nevada. The Company reopened the casino suites, within The Venetian Tower and The Palazzo Tower, and select food and beverage outlets on June 4, 2020, with certain operations subject to reduced capacity. Beginning October 1, 2020, the limit for both public and private events increased from 50 people to the lesser of 250 people or 50% of the room's capacity (excluding employees, organizers and performers) provided social distancing measures and various safety and related protocols were followed. Meetings, incentives, conventions and exhibitions ("MICE") for more than 250 people, but no more than 1,000 people, were allowed subject to certain requirements. Larger venues, defined as having more than a 2,500 fixed-seating capacity, were allowed to host a gathering of 10% of their total capacity provided they met additional requirements. Despite these allowances, there have been no MICE events at the Company's Las Vegas Operating Properties since reopening on June 4, 2020.

In November 2020, the Nevada government tightened capacity and other restrictions, which included, among other things, a 25% capacity limit for gaming establishments and the lesser of 25% or 50 people for MICE events. These increased restrictions will be in place until at least February 14, 2021.

000818

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

Visitation to the Company's Las Vegas Operating Properties declined due to the COVID-19 Pandemic. The Las Vegas Convention and Visitors Authority ("LVCVA") announced for the 12 months ended November 30, 2020 (the latest information publicly available at the time of filing), total visitation to Las Vegas decreased 49.8%, as compared to the same period in 2019. The LVCVA also announced for the 12 months ended November 30, 2020 (the latest information publicly available at the time of filing), gross gaming revenue for the Las Vegas Strip decreased 38.5%, as compared to the same period in 2019.

*Summary*

The disruptions arising from the COVID-19 Pandemic had a significant adverse impact on the Company's financial condition, operations and cash flows during the year ended December 31, 2020. The duration and intensity of this global health emergency and related disruptions are uncertain. Given the dynamic nature of these circumstances, the impact on the Company's consolidated results of operations, cash flows and financial condition may continue to be material in the future, but cannot be reasonably estimated at this time as it is unknown when the COVID-19 Pandemic will end, when or how quickly the current travel and operational restrictions will be modified or cease to be necessary and the resulting impact on the Company's business and the willingness of tourism customers to spend on travel and entertainment and business customers to spend on MICE.

While each of the Company's properties are currently open and operating at reduced levels due to lower visitation and the implementation of required safety measures, the current economic and regulatory environment on a global basis and in each of the Company's jurisdictions continues to evolve. The Company cannot predict the manner in which governments will react as the global and regional impact of the COVID-19 Pandemic changes over time, which could significantly alter the Company's current operations.

The Company has a strong balance sheet and sufficient liquidity in place, including total cash and cash equivalents balance, excluding restricted cash and cash equivalents, of $2.12 billion and access to $1.50 billion, $2.02 billion and $448 million of available borrowing capacity from the LVSC Revolving Facility, 2018 SCL Revolving Facility and the 2012 Singapore Revolving Facility, respectively, and 3.69 billion Singapore dollars ("SGD," approximately $2.79 billion at exchange rates in effect on December 31, 2020) under the Singapore Delayed Draw Term Facility, exclusively for capital expenditures for the MBS Expansion Project, as later defined, as of December 31, 2020. On January 25, 2021, SCL entered into an agreement with lenders to increase commitments under the 2018 SCL Credit Facility by Hong Kong Dollars ("HKD") 3.83 billion (approximately $494 million at exchange rates in effect on the date of this transaction). Subsequently, on January 29, 2021, SCL drew down $29 million and HKD 2.13 billion (approximately $274 million at exchange rates in effect on January 29, 2021) under this facility for general corporate purposes, resulting in remaining available borrowing capacity of $2.21 billion. The Company believes it is able to support continuing operations, complete the major construction projects that are underway and respond to the current COVID-19 Pandemic challenges. The Company has taken various mitigating measures to manage through the current environment, including a cost and capital expenditure reduction program to minimize cash outflow of non-essential items.

**Operations**

The Company is a developer of destination properties ("Integrated Resorts") that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants and other amenities.

*Macao*

The Company currently owns 69.9% of SCL, which includes the operations of The Venetian Macao Resort Hotel ("The Venetian Macao"), The Londoner Macao, The Parisian Macao, The Plaza Macao and Four Seasons Hotel Macao, Cotai Strip (the "Four Seasons Hotel Macao"), Sands Macao and other ancillary operations that support these properties, as further discussed below. The Company operates the gaming areas within these properties pursuant to a 20-year gaming subconcession agreement, which expires in June 2022.

The Venetian Macao anchors the Cotai Strip, the Company's master-planned development of Integrated Resorts on an area of approximately 140 acres in Macao. The Venetian Macao includes a 39-floor luxury hotel with over 2,900 suites; approximately 374,000 square feet of gaming space; a 15,000-seat arena; an 1,800-seat theater; a

79

000819

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

Paiza Club, a mall with retail and dining space of approximately 943,000 square feet; and a convention center and meeting room complex of approximately 1.2 million square feet.

The Londoner Macao (previously Sands Cotai Central) is the Company's largest Integrated Resort on the Cotai Strip and is located across the street from The Venetian Macao, The Parisian Macao and The Plaza Macao and Four Seasons Hotel Macao. The Integrated Resort opened in phases beginning April 2012 and features four hotel towers. The first hotel tower includes (i) approximately 650 five-star rooms and suites under the Conrad brand and (ii) The Londoner Macao Hotel, which opened in January 2021, with 600 London-themed suites, including 14 exclusive Suites by David Beckham. The second hotel tower consists of approximately 1,800 rooms and suites under the Sheraton brand. The third hotel tower consists of approximately 2,100 rooms and suites under the Sheraton brand. The fourth hotel tower consists of approximately 400 rooms and suites under the St. Regis brand. Within The Londoner Macao, the Company also owns and currently operates approximately 351,000 square feet of gaming space, approximately 369,000 square feet of meeting space and approximately 525,000 square feet of retail space, as well as entertainment and dining facilities. The Londoner Macao is the result of our previously announced renovation, expansion and rebranding of Sands Cotai Central as described below.

The Parisian Macao is an Integrated Resort connected to The Venetian Macao and The Plaza Macao and Four Seasons Hotel Macao, which includes approximately 248,000 square feet of gaming space. The Parisian Macao also features approximately 2,500 rooms and suites; approximately 296,000 square feet of retail and dining space; a meeting room complex of approximately 63,000 square feet; and a 1,200-seat theater.

The Plaza Macao and Four Seasons Hotel Macao features 360 rooms and suites managed and operated by FS Macau Lda. and is located adjacent and connected to The Venetian Macao. Within the Integrated Resort, the Plaza Casino features approximately 127,000 square feet of gaming space; 19 Paiza mansions; retail space of approximately 244,000 square feet, which is connected to the mall at The Venetian Macao; several food and beverage offerings; and conference, banquet and other facilities. The Grand Suites at Four Seasons opened in October 2020 and features 289 luxury suites. The Company initiated VIP gaming operations in this space in the first quarter of 2020.

The Sands Macao, the first Las Vegas-style casino in Macao, offers approximately 212,000 square feet of gaming space and a 289-suite hotel tower, as well as several restaurants, VIP facilities, a theater and other high-end services and amenities.

### *Singapore*

The Company owns and operates the Marina Bay Sands in Singapore, which features three 55-story hotel towers (totaling approximately 2,600 rooms and suites), the Sands SkyPark (which sits atop the hotel towers and features an infinity swimming pool and several dining options), approximately 160,000 square feet of gaming space, an enclosed retail, dining and entertainment complex of approximately 800,000 net leasable square feet, a convention center and meeting room complex of approximately 1.2 million square feet, a theater and a landmark iconic structure at the bay-front promenade that contains an art/science museum. The Company recently announced an expansion project at Marina Bay Sands, as further described below.

### *United States*

#### *Las Vegas*

The Company owns and operates The Venetian Resort Hotel Casino ("The Venetian Resort Las Vegas"), with three hotel towers, which include The Venetian Tower, a Renaissance Venice-themed resort; the adjoining Venezia Tower; The Palazzo Tower, a resort featuring modern European ambience and design; and an expo and convention center of approximately 1.2 million square feet (the "Sands Expo Center," together with The Venetian Resort Las Vegas, the "Las Vegas Operating Properties"). The Las Vegas Operating Properties, situated on the Las Vegas Strip, is an Integrated Resort with approximately 7,100 suites; approximately 225,000 square feet of gaming space; 2.3 million gross square feet of state-of-the-art exhibition and meeting facilities that can be configured to provide small, mid-size or large meeting rooms and/or accommodate large-scale multi-media events or trade shows.

The Company is working with Madison Square Garden Company ("MSG") to bring a 400,000-square-foot venue built specifically for music and entertainment to Las Vegas. MSG is currently building the MSG Sphere at

80

000820

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

The Venetian, an 18,000-seat venue, which will be located near, with connectivity to, the Las Vegas Operating Properties and is currently expected to open in 2023.

**Development Projects**

The Company regularly evaluates opportunities to improve its product offerings, such as refreshing its meeting and convention facilities, suites and rooms, retail malls, restaurant and nightlife mix and its gaming areas, as well as other anticipated revenue generating additions to the Company's Integrated Resorts.

*Macao*

Construction work on the conversion of Sands Cotai Central into the new destination Integrated Resort, The Londoner Macao, is progressing. This project is being delivered in phases, which started in 2020 and will continue throughout 2021. Upon completion, The Londoner Macao will feature new attractions and features internally and externally from London, including some of London's most recognizable landmarks, such as the Houses of Parliament and The Elizabeth Tower (commonly known as "Big Ben"). The Londoner Macao Hotel opened in January 2021 with approximately 600 London-themed suites, including 14 exclusive Suites by David Beckham. The resort will also feature the Londoner Court with approximately 370 luxury suites; construction of the Londoner Court is now complete and is expected to open in 2021. The Company's retail offerings will be expanded and rebranded as the Shoppes at Londoner.

The Company anticipates the total costs associated with The Londoner Macao development projects described above and the recently completed The Grand Suites at Four Seasons to be approximately $2.2 billion. The ultimate costs and completion dates for The Londoner Macao development is subject to change as the Company completes the project.

*Singapore*

In April 2019, the Company's wholly owned subsidiary, Marina Bay Sands Pte. Ltd. ("MBS"), entered into the Second Development Agreement with the Singapore Tourism Board pursuant to which MBS has agreed to construct a development, which will include a hotel tower with approximately 1,000 rooms and suites, a rooftop attraction, convention and meeting facilities and a state-of-the-art live entertainment arena with approximately 15,000 seats (the "MBS Expansion Project"). The Second Development Agreement provides for a total project cost of approximately SGD 4.5 billion (approximately $3.4 billion at exchange rates in effect on December 31, 2020), which investment must be completed within eight years from the effective date of the agreement. The amount of the total project cost will be finalized as the Company completes design and development and begins construction.

*United States*

The Company was constructing a high-rise residential condominium tower (the "Las Vegas Condo Tower"), located on the Las Vegas Strip within The Venetian Resort Las Vegas. In 2008, the Company suspended construction activities for the project due to reduced demand for Las Vegas Strip condominiums and the overall decline in general economic conditions. The Company continues to evaluate the highest return opportunity for the project. The impact of the suspension on the estimated overall cost of the project is currently not determinable with certainty. Should demand and conditions fail to improve or management decides to abandon the project, the Company could record a charge for some portion of the $130 million in capitalized construction costs (net of depreciation) as of December 31, 2020.

*Other*

The Company continues to evaluate current development projects in each of its markets and pursue new development opportunities globally.

**Note 2 — Summary of Significant Accounting Policies**

**Principles of Consolidation**

The consolidated financial statements include the accounts of the Company, its majority-owned subsidiaries and variable interest entities in which the Company is the primary beneficiary. All intercompany balances and transactions have been eliminated in consolidation.

000821

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

## Use of Estimates

The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires the Company to make estimates and judgments that affect the reported amounts of assets and liabilities, revenues and expenses, and related disclosures of contingent assets and liabilities. These estimates and judgments are based on historical information, information currently available to the Company and on various other assumptions that the Company believes to be reasonable under the circumstances. Actual results could vary from those estimates.

## Cash and Cash Equivalents

Cash and cash equivalents consist of cash and short-term investments with original maturities of less than 90 days. Such investments are carried at cost, which is a reasonable estimate of their fair value. Cash equivalents are placed with high credit quality financial institutions and are primarily in money market funds. Restricted cash represents those amounts contractually reserved for substantial mall-related repairs and maintenance expenditures. The estimated fair value of the Company's cash equivalents is based on level 1 inputs (quoted market prices in active markets).

## Accounts Receivable and Credit Risk

Accounts receivable is comprised of casino, hotel, mall and other receivables, which do not bear interest and are recorded at amortized cost. The Company extends credit to approved casino customers following background checks and investigations of creditworthiness. The Company also extends credit to gaming promoters in Macao. These receivables can be offset against commissions payable to the respective gaming promoters. Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries.

Accounts receivable primarily consists of casino receivables. Other than casino receivables, there is no other concentration of credit risk with respect to accounts receivable. The Company believes the concentration of its credit risk in casino receivables is mitigated substantially by its credit evaluation process, credit policies, credit control and collection procedures, and also believes there are no concentrations of credit risk for which a provision has not been established. Although management believes the provision is adequate, it is possible the estimated amount of cash collections with respect to accounts receivable could change.

## Inventories

Inventories consist primarily of food, beverage, retail products and operating supplies, which are stated at the lower of cost or net realizable value. Cost is determined by the weighted average and specific identification methods.

## Property and Equipment

Property and equipment are stated at cost, net of accumulated depreciation and amortization, and accumulated impairment losses, if any. Depreciation and amortization are provided on a straight-line basis over the estimated useful lives of the assets, which do not exceed the lease term for leasehold improvements, as follows:

| | | | | |
|---|---|---|---|---|
| Land improvements, building and building improvements | 10 | to | 50 | years |
| Furniture, fixtures and equipment | 3 | to | 20 | years |
| Leasehold improvements | 3 | to | 15 | years |
| Transportation | 5 | to | 20 | years |

The estimated useful lives are based on the nature of the assets as well as current operating strategy and legal considerations, such as contractual life, and are periodically reviewed. Future events, such as property expansions, property developments, new competition or new regulations, could result in a change in the manner in which the Company uses certain assets requiring a change in the estimated useful lives of such assets.

Maintenance and repairs that neither materially add to the value of the asset nor appreciably prolong its life are charged to expense as incurred. Gains or losses on disposition of property and equipment are included in the consolidated statements of operations.

000822

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

The Company evaluates its property and equipment and other long-lived assets for impairment in accordance with related accounting standards. For assets to be disposed of, the Company recognizes the asset to be sold at the lower of carrying value or fair value less costs of disposal. Fair value for assets to be disposed of is estimated based on comparable asset sales, solicited offers or a discounted cash flow model.

Fixed assets are reviewed for impairment whenever indicators of impairment exist. Determining the recoverability of the Company's asset groups is judgmental in nature and requires the use of significant estimates and assumptions, including estimated cash flows, probability weighting of potential scenarios, costs to complete construction for assets under development, growth rates and future market conditions, among others. Future changes to the Company's estimates and assumptions based upon changes in macro-economic factors, regulatory environments, operating results or management's intentions may result in future changes to the recoverability of these asset groups.

**Leases**

Management determines if a contract is, or contains, a lease at inception or modification of a contract. A contract is, or contains, a lease if the contract conveys the right to control the use of an identified asset for a period in exchange for consideration. Control over the use of the identified asset means the lessee has both (a) the right to obtain substantially all of the economic benefits from the use of the asset and (b) the right to direct the use of the asset.

Finance and operating lease right-of-use ("ROU") assets and liabilities are recognized based on the present value of future minimum lease payments over the expected lease term at commencement date. As the implicit rate is not determinable in most of the Company's leases, management uses the Company's incremental borrowing rate based on the information available at commencement date in determining the present value of future payments. The expected lease terms include options to extend or terminate the lease when it is reasonably certain the Company will exercise such option. Lease expense for minimum lease payments is recognized on a straight-line basis over the expected lease term.

The Company's lease arrangements have lease and non-lease components. For leases in which the Company is the lessee, the Company accounts for the lease components and non-lease components as a single lease component for all classes of underlying assets (primarily real estate). Leases in which the Company is the lessor are substantially all accounted for as operating leases and the lease components and non-lease components are accounted for separately. Leases with an expected term of 12 months or less are not accounted for on the balance sheet and the related lease expense is recognized on a straight-line basis over the expected lease term.

**Capitalized Interest and Internal Costs**

Interest costs associated with major construction projects are capitalized and included in the cost of the projects. When no debt is incurred specifically for construction projects, interest is capitalized on amounts expended using the weighted average cost of the Company's outstanding borrowings. Capitalization of interest ceases when the project is substantially complete or construction activity is suspended for more than a brief period. During the years ended December 31, 2020, 2019 and 2018, the Company capitalized $21 million, $9 million and $3 million, respectively, of interest expense.

During the years ended December 31, 2020, 2019 and 2018, the Company capitalized approximately $44 million, $34 million and $31 million, respectively, of internal costs, consisting primarily of compensation expense for individuals directly involved with the development and construction of property.

**Deferred Financing Costs and Original Issue Discounts**

Certain direct and incremental costs and discounts incurred in obtaining loans are capitalized and amortized to interest expense based on the terms of the related debt instruments using the effective interest method.

**Leasehold Interests in Land**

Leasehold interests in land represent payments for the use of land over an extended period of time. The leasehold interests in land are amortized on a straight-line basis over the expected term of the related lease agreements.

83

000823

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Revenue Recognition**

Revenue from contracts with customers primarily consists of casino wagers, room sales, food and beverage transactions, rental income from the Company's mall tenants, convention sales and entertainment and ferry ticket sales. These contracts can be written, oral or implied by customary business practices.

Gross casino revenue is the aggregate of gaming wins and losses. The commissions rebated to gaming promoters and premium players for rolling play, cash discounts and other cash incentives to patrons related to gaming play are recorded as a reduction to gross casino revenue. Gaming contracts include a performance obligation to honor the patron's wager and typically include a performance obligation to provide a product or service to the patron on a complimentary basis to incentivize gaming or in exchange for points earned under the Company's loyalty programs.

For wagering contracts that include complimentary products and services provided by the Company to incentivize gaming, the Company allocates the relative stand-alone selling price of each product and service to the respective revenue type. Complimentary products or services provided under the Company's control and discretion, which are supplied by third parties, are recorded as an operating expense.

For wagering contracts that include products and services provided to a patron in exchange for points earned under the Company's loyalty programs, the Company allocates the estimated fair value of the points earned to the loyalty program liability. The loyalty program liability is a deferral of revenue until redemption occurs. Upon redemption of loyalty program points for Company-owned products and services, the stand-alone selling price of each product or service is allocated to the respective revenue type. For redemptions of points with third parties, the redemption amount is deducted from the loyalty program liability and paid directly to the third party. Any discounts received by the Company from the third party in connection with this transaction are recorded to other revenue.

After allocation to the other revenue types for products and services provided to patrons as part of a wagering contract, the residual amount is recorded to casino revenue as soon as the wager is settled. As all wagers have similar characteristics, the Company accounts for its gaming contracts collectively on a portfolio basis versus an individual basis.

Hotel revenue recognition criteria are met at the time of occupancy. Food and beverage revenue recognition criteria are met at the time of service. Convention revenues are recognized when the related service is rendered or the event is held. Deposits for future hotel occupancy, convention space or food and beverage services contracts are recorded as deferred revenue until the revenue recognition criteria are met. Cancellation fees for convention contracts are recognized upon cancellation by the customer and are included in other revenues. Ferry and entertainment revenue recognition criteria are met at the completion of the ferry trip or event, respectively. Revenue from contracts with a combination of these services is allocated pro rata based on each service's relative stand-alone selling price.

Revenue from leases is primarily recorded to mall revenue and is generated from base rents and overage rents received through long-term leases with retail tenants. Base rent, adjusted for contractual escalations, is recognized on a straight-line basis over the term of the related lease. Overage rent is paid by a tenant when its sales exceed an agreed upon minimum amount and is not recognized by the Company until the threshold is met.

*Contract and Contract Related Liabilities*

The Company provides numerous products and services to its customers. There is often a timing difference between the cash payment by the customers and recognition of revenue for each of the associated performance obligations. The Company has the following main types of liabilities associated with contracts with customers: (1) outstanding chip liability, (2) loyalty program liability and (3) customer deposits and other deferred revenue for gaming and non-gaming products and services yet to be provided.

The outstanding chip liability represents the collective amounts owed to gaming promoters and patrons in exchange for gaming chips in their possession. Outstanding chips are expected to be recognized as revenue or redeemed for cash within one year of being purchased. The loyalty program liability represents a deferral of revenue until patron redemption of points earned. The loyalty program points are expected to be redeemed and recognized as revenue within one year of being earned. Due to travel restrictions resulting from the COVID-19 Pandemic, the Company temporarily extended the redemption period of these points for patrons not able or willing to visit its

84

000824

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

properties located in Macao and Singapore. The required redemption period is expected to be reinstated during 2021. Customer deposits and other deferred revenue represent cash deposits made by customers for future services provided by the Company. With the exception of mall deposits, which typically extend beyond a year based on the terms of the lease, the majority of these customer deposits and other deferred revenue are expected to be recognized as revenue or refunded to the customer within one year of the date the deposit was recorded.

The following table summarizes the liability activity related to contracts with customers:

|  | Outstanding Chip Liability | | Loyalty Program Liability | | Customer Deposits and Other Deferred Revenue[1] | |
|  | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 |
|---|---|---|---|---|---|---|
|  | (In millions) | | | | | |
| Balance at January 1 | $ 540 | $ 551 | $ 68 | $ 66 | $ 724 | $ 827 |
| Balance at December 31 | 211 | 540 | 68 | 68 | 751 | 724 |
| Increase (decrease) | $ (329) | $ (11) | $ — | $ 2 | $ 27 | $ (103) |

_____

(1) Of this amount, $152 million, $154 million and $152 million as of December 31, 2020 and 2019 and January 1, 2019, respectively, relates to mall deposits that are accounted for based on lease terms usually greater than one year.

**Gaming Taxes**

The Company is subject to taxes based on gross gaming revenue in the jurisdictions in which it operates, subject to applicable jurisdictional adjustments. These gaming taxes, including the goods and services tax in Singapore, are an assessment on the Company's gaming revenue and are recorded as a casino expense in the accompanying consolidated statements of operations. These taxes were $834 million, $3.98 billion and $4.09 billion for the years ended December 31, 2020, 2019 and 2018, respectively.

**Pre-Opening and Development Expenses**

The Company accounts for costs incurred in the development and pre-opening phases of new ventures in accordance with accounting standards regarding start-up activities. Pre-opening expenses represent personnel and other costs incurred prior to the opening of new ventures and are expensed as incurred. Development expenses include the costs associated with the Company's evaluation and pursuit of new business opportunities, which are also expensed as incurred.

**Advertising Costs**

Costs for advertising are expensed the first time the advertising takes place or as incurred. Advertising costs included in the accompanying consolidated statements of operations were $42 million, $123 million and $132 million for the years ended December 31, 2020, 2019 and 2018, respectively.

**Corporate Expenses**

Corporate expense represents payroll, travel, legal fees, professional fees and various other expenses not allocated or directly related to the Company's Integrated Resort operations and related ancillary operations.

**Foreign Currency**

The functional currency of most of our foreign subsidiaries is the local currency in which the subsidiary operates. Balance sheet accounts are translated at the exchange rate in effect at each balance sheet date and income statement accounts are translated at the average exchange rates during the year. Translation adjustments resulting from this process are recorded to other comprehensive income (loss).

Gains or losses from foreign currency remeasurements that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in other income (expense).

000825

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Comprehensive Income (Loss) and Accumulated Other Comprehensive Income (Loss)**

Comprehensive income (loss) includes net income (loss) and all other non-stockholder changes in equity, or other comprehensive income (loss). The balance of accumulated other comprehensive income (loss) consisted solely of foreign currency translation adjustments.

**Earnings (Loss) Per Share**

The weighted average number of common and common equivalent shares used in the calculation of basic and diluted earnings (loss) per share consisted of the following:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2020 | 2019 | 2018 |
|  | (In millions) | | |
| Weighted average common shares outstanding (used in the calculation of basic earnings (loss) per share) | 764 | 771 | 786 |
| Potential dilution from stock options and restricted stock and stock units | — | — | — |
| Weighted average common and common equivalent shares (used in the calculation of diluted earnings (loss) per share) | 764 | 771 | 786 |
| Antidilutive stock options excluded from the calculation of diluted earnings (loss) per share | 9 | 3 | 2 |

**Stock-Based Employee Compensation**

Stock-based compensation cost is measured at the grant date, based on the calculated fair value of the award, and is recognized over the employee's requisite service period (generally the vesting period of the equity grant). The Company's stock-based employee compensation plans are more fully discussed in "Note 15 — Stock-Based Employee Compensation."

**Income Taxes**

The Company is subject to income taxes in the U.S. (including federal and state) and numerous foreign jurisdictions in which it operates. The Company records income taxes under the asset and liability method, whereby deferred tax assets and liabilities are recognized based on the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and attributable to operating loss and tax credit carryforwards.

Accounting standards regarding income taxes require a reduction of the carrying amounts of deferred tax assets by a valuation allowance, if based on the available evidence, it is "more-likely-than-not" such assets will not be realized. Accordingly, the need to establish valuation allowances for deferred tax assets is assessed at each reporting period based on a "more-likely-than-not" realization threshold. This assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carryforward periods, the Company's experience with operating loss and tax credit carryforwards not expiring and tax planning strategies.

Management will reassess the realization of deferred tax assets each reporting period and consider the scheduled reversal of deferred tax liabilities, sources of taxable income and tax planning strategies. To the extent the financial results of these operations improve and it becomes "more-likely-than-not" the deferred tax assets are realizable, the Company will be able to reduce the valuation allowance in the period such determination is made as appropriate.

Significant judgment is required in evaluating the Company's tax positions and determining its provision for income taxes. During the ordinary course of business, there are many transactions for which the ultimate tax determination is uncertain. The Company considers many factors when evaluating and estimating its tax positions and tax benefits, which may require periodic adjustments and for which actual outcomes may be different.

000826

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Accounting for Derivative Instruments and Hedging Activities**

Accounting standards require an entity to recognize all derivatives as either assets or liabilities in the balance sheet and measure those instruments at fair value. If specific conditions are met, a derivative may be designated as a hedge of specific financial exposures. The accounting for changes in fair value of a derivative depends on the intended use of the derivative and, if used in hedging activities, on its effectiveness as a hedge. In order to qualify for hedge accounting, the underlying hedged item must expose the Company to risks associated with market fluctuations and the financial instrument used must be designated as a hedge and must reduce the Company's exposure to market fluctuation throughout the hedge period.

Changes in market rates and prices, such as interest rates, foreign currency exchange rates and commodity prices, can impact the Company's results of operations. The Company's primary exposures to market risk are interest rate risk associated with long-term debt and foreign currency exchange rate risk associated with the Company's operations outside the United States. The Company has a policy aimed at managing interest rate risk associated with its current and anticipated future borrowings and foreign currency exchange rate risk associated with operations of its foreign subsidiaries. This policy enables the Company to use any combination of interest rate swaps, futures, options, caps, forward contracts and similar instruments. The Company does not hold or issue financial instruments for trading purposes and does not enter into derivative transactions that would be considered speculative positions.

In August 2018, the Company entered into interest rate swap agreements (the "IR Swaps"), which qualified and were designated as fair value hedges, swapping fixed-rate for variable-rate interest to hedge changes in the fair value of the 2023, 2025 and 2028 SCL Senior Notes. These IR Swaps had a total notional value of $5.50 billion and expired in August 2020. During the years ended December 31, 2020, 2019 and 2018, the Company recorded $53 million, $23 million and $9 million, respectively, as a reduction to interest expense related to the realized amount associated with the IR Swaps.

**Recent Accounting Pronouncements**

On January 1, 2020, the Company adopted the guidance under the accounting standard update ("ASU") 2016-13 issued in June 2016 by the Financial Accounting Standards Board ("FASB"). The ASU revised the methodology for measuring credit losses on financial instruments and the timing of when such losses are recorded. The adoption, which was applied on a modified retrospective basis, did not have a material impact on the Company's financial condition and results of operations and therefore did not result in an adjustment to retained earnings as of January 1, 2020.

**Note 3 — Accounts Receivable, Net**

Accounts receivable consists of the following:

|  | December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
|  | (In millions) | |
| Casino | $ 527 | $ 858 |
| Rooms | 15 | 88 |
| Mall | 49 | 93 |
| Other | 61 | 87 |
|  | 652 | 1,126 |
| Less — provision for credit losses | (314) | (282) |
|  | $ 338 | $ 844 |

87

000827

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

The following table shows the movement in the provision for credit losses recognized for accounts receivable that occurred during the period:

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (In millions) | |
| Balance at beginning of year | $ 282 | $ 324 |
| Current period provision for credit losses | 99 | 30 |
| Write-offs | (70) | (74) |
| Recoveries of receivables previously written-off | — | 1 |
| Exchange rate impact | 3 | 1 |
| Balance at end of period | $ 314 | $ 282 |

**Note 4 — Property and Equipment, Net**

Property and equipment consists of the following:

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (In millions) | |
| Land and improvements | $ 637 | $ 650 |
| Building and improvements | 18,014 | 17,662 |
| Furniture, fixtures, equipment and leasehold improvements | 4,843 | 4,520 |
| Transportation | 525 | 520 |
| Construction in progress | 2,074 | 1,507 |
| | 26,093 | 24,859 |
| Less — accumulated depreciation and amortization | (10,984) | (10,015) |
| | $ 15,109 | $ 14,844 |

The property and equipment sold to GGP totaling $179 million (net of $119 million of accumulated depreciation) as of December 31, 2020, will continue to be recorded on the Company's consolidated balance sheet and will continue to be depreciated in the Company's consolidated statement of operations. See "Note 12 — Mall Activities — The Shoppes at The Palazzo."

During the year ended December 31, 2020, the Company recognized a loss on disposal or impairment of assets of $80 million, consisting primarily of $56 million for asset write-offs and demolition costs related to the Londoner Macao. During the years ended December 31, 2019 and 2018, the Company recognized a loss on disposal or impairment of assets of $90 million and $150 million, respectively, primarily consisting of a $65 million due to the ferry impairment charge as a result of the decline in passenger volume and $128 million in write-off of costs related to The Grand Suites at Four Seasons, as well as other dispositions at the Company's operating properties, respectively.

Depreciation expense was $1.14 billion, $1.15 billion and $1.10 billion for the years ended December 31, 2020, 2019 and 2018, respectively.

000828

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Note 5 — Leasehold Interests in Land, Net**

Leasehold interests in land consist of the following:

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| | (In millions) | |
| Marina Bay Sands | $ 2,024 | $ 1,986 |
| The Londoner Macao | 295 | 293 |
| The Venetian Macao | 242 | 242 |
| The Plaza Macao and Four Seasons Hotel Macao | 106 | 106 |
| The Parisian Macao | 89 | 89 |
| Sands Macao | 37 | 38 |
| | 2,793 | 2,754 |
| Less — accumulated amortization | (537) | (482) |
| | $ 2,256 | $ 2,272 |

The Company amortizes the leasehold interests in land on a straight-line basis over the expected term of the lease, which includes automatic extensions in Macao as discussed further below. Amortization expense of $55 million, $51 million and $35 million was included in amortization of leasehold interests in land expense for the years ended December 31, 2020, 2019 and 2018, respectively. The estimated future amortization expense over the expected term of the lease is approximately $53 million for each of the five years in the period ending December 31, 2025 and $2.18 billion thereafter at exchange rates in effect on December 31, 2020.

Land concessions in Macao generally have an initial term of 25 years with automatic extensions of 10 years thereafter in accordance with Macao law. The Company anticipates a useful life of 50 years related to the land concessions in Macao. The Company has received land concessions from the Macao government to build on the sites on which Sands Macao, The Venetian Macao, The Plaza Macao and Four Seasons Hotel Macao, The Londoner Macao and The Parisian Macao are located. The Company does not own these land sites in Macao; however, the land concessions grant the Company exclusive use of the land. As specified in the land concessions, the Company is required to pay premiums for each parcel, as well as make annual rent payments in the amounts and at the times specified in the land concessions. The rent amounts may be revised every five years by the Macao government. For the Company's future rental payment obligations, see "Note 13 — Leases."

Land concessions in Singapore have an initial term of 60 years. The Company has received land concessions from the Singapore Tourism Board to build on the sites on which Marina Bay Sands and the future MBS Expansion Project are located. The Company does not own these land sites in Singapore; however, the land concessions grant the Company exclusive use of the land. As specified in the land concessions, the Company was required to prepay the premiums for each parcel.

In April 2019, and in connection with the Second Development Agreement, MBS paid $963 million for the additional land concession in connection with the MBS Expansion Project.

**Note 6 — Intangible Assets, Net**

Intangible assets consist of the following:

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| | (In millions) | |
| Marina Bay Sands gaming license | $ 55 | $ 53 |
| Trademarks and other | 1 | 1 |
| | 56 | 54 |
| Less — accumulated amortization | (31) | (12) |
| Total intangible assets, net | $ 25 | $ 42 |

89

000829

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

In April 2019, the Company paid SGD 72 million (approximately $53 million at exchange rates in effect at the time of the transaction) to the Singapore Casino Regulatory Authority (the "CRA") as part of the process to renew its gaming license at Marina Bay Sands. This license is being amortized over its three-year term, which expires in April 2022, and is renewable upon submitting an application, paying the applicable license fee and meeting the requirements as determined by the CRA.

Amortization expense was $17 million, $17 million and $16 million for the years ended December 31, 2020, 2019 and 2018, respectively. The estimated future amortization expense is approximately $18 million and $6 million for the years ending December 31, 2021 and 2022, respectively.

**Note 7 — Other Accrued Liabilities**

Other accrued liabilities consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (In millions) | |
| Customer deposits | $ 614 | $ 582 |
| Outstanding chip liability | 211 | 540 |
| Payroll and related | 205 | 378 |
| Accrued interest payable | 179 | 165 |
| Taxes and licenses | 155 | 389 |
| Other accruals | 342 | 342 |
| | $ 1,706 | $ 2,396 |

90

000830

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

### Note 8 — Long-Term Debt

Long-term debt consists of the following:

| | December 31, | | |
| --- | --- | --- | --- |
| | 2020 | | 2019 |
| | (In millions) | | |
| **Corporate and U.S. Related[1]:** | | | |
| 3.200% Senior Notes due 2024 (net of unamortized original issue discount and deferred financing costs of $11 and $14, respectively) | $ 1,739 | $ | 1,736 |
| 2.900% Senior Notes due 2025 (net of unamortized original issue discount and deferred financing costs of $4 and $5, respectively) | 496 | | 495 |
| 3.500% Senior Notes due 2026 (net of unamortized original issue discount and deferred financing costs of $10 and $12, respectively) | 990 | | 988 |
| 3.900% Senior Notes due 2029 (net of unamortized original issue discount and deferred financing costs of $8) | 742 | | 742 |
| Other | 3 | | — |
| **Macao Related[1]:** | | | |
| 4.600% Senior Notes due 2023 (net of unamortized original issue discount and deferred financing costs of $9 and $11, respectively, and a positive cumulative fair value adjustment of $11 for 2019) | 1,791 | | 1,800 |
| 5.125% Senior Notes due 2025 (net of unamortized original issue discount and deferred financing costs of $11 and $13, and a positive cumulative fair value adjustment of $11 for 2019) | 1,789 | | 1,798 |
| 3.800% Senior Notes due 2026 (net of unamortized original issue discount and deferred financing costs of $8) | 792 | | — |
| 5.400% Senior Notes due 2028 (net of unamortized original issue discount and deferred financing costs of $16 and $19, respectively, and a positive cumulative fair value adjustment of $12 for 2019) | 1,884 | | 1,893 |
| 4.375% Senior Notes due 2030 (net of unamortized original issue discount and deferred financing costs of $10) | 690 | | — |
| Other | 21 | | 17 |
| **Singapore Related[1]:** | | | |
| 2012 Singapore Credit Facility — Term (net of unamortized deferred financing costs of $50 and $54, respectively) | 3,023 | | 3,023 |
| 2012 Singapore Delayed Draw Term Facility (net of unamortized deferred financing costs of $1) | 46 | | — |
| Other | 1 | | — |
| | 14,007 | | 12,492 |
| Less — current maturities | (76) | | (70) |
| Total long-term debt | $ 13,931 | $ | 12,422 |

_____

(1) Unamortized deferred financing costs of $91 million and $100 million as of December 31, 2020 and 2019, respectively, related to the Company's revolving credit facilities and the undrawn portion of the Singapore Delayed Draw Term Facility are included in other assets, net in the accompanying consolidated balance sheets.

**Corporate and U.S. Related Debt**

*LVSC Senior Notes*

On July 31, 2019, LVSC issued, in a public offering, three series of senior unsecured notes in an aggregate principal amount of $3.50 billion, consisting of $1.75 billion of 3.200% Senior Notes due August 8, 2024 (the "2024 LVSC Senior Notes"), $1.0 billion of 3.500% Senior Notes due August 18, 2026 (the "2026 LVSC Senior Notes")

000831

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

and $750 million of 3.900% Senior Notes due August 8, 2029 (the "2029 LVSC Senior Notes"). A portion of the net proceeds from the offering was used to repay in full the outstanding borrowings under the 2013 U.S. Credit Facility.

On November 25, 2019, LVSC issued, in a public offering, a senior unsecured note in an aggregate principal amount of $500 million of 2.900% Senior Notes due June 25, 2025 (the "2025 LVSC Senior Notes" and, together with the 2024 LVSC Senior Notes, 2026 LVSC Senior Notes and the 2029 LVSC Senior Notes, the "LVSC Senior Notes"). A portion of the net proceeds from the offering was used for general corporate purposes, including repurchases of shares of the Company's common stock.

There are no interim principal payments on the LVSC Senior Notes and interest is payable semi-annually in arrears on each February 8 and August 8, commencing on February 8, 2020, with respect to the 2024 LVSC Notes and 2029 LVSC Notes, on each February 18 and August 18, commencing on February 18, 2020, with respect to the 2026 Notes, and on each June 25 and December 25, commencing on June 25, 2020, with respect to the 2025 Notes.

The LVSC Senior Notes are senior unsecured obligations of LVSC. Each series of LVSC Senior Notes rank equally in right of payment with all of LVSC's other unsecured and unsubordinated obligations, if any. None of LVSC's subsidiaries guarantee the LVSC Senior Notes.

The LVSC Senior Notes were issued pursuant to an indenture, dated July 31, 2019, as amended with respect to each of the series of the LVSC Senior Notes (the "Indenture"), between LVSC and U.S. Bank National Association, as trustee. The Indenture contains covenants, subject to customary exceptions and qualifications, that limit the ability of LVSC and its subsidiaries to, among other things, incur liens, enter into sale and leaseback transactions and consolidate, merge, sell or otherwise dispose of all or substantially all of the Company's assets on a consolidated basis. The Indenture also provides for customary events of default.

*LVSC Revolving Facility*

On August 9, 2019, LVSC entered into a revolving credit agreement with the arrangers and lenders named therein and The Bank of Nova Scotia, as administrative agent for the lenders (the "LVSC Revolving Credit Agreement"), pursuant to which the lenders provided unsecured, revolving credit commitments to LVSC in an aggregate principal amount of $1.50 billion (the "LVSC Revolving Facility"), which are available until August 9, 2024, and include a $150 million sub-facility for letters of credit. LVSC may utilize the proceeds of the loans for general corporate purposes and working capital requirements of LVSC and its subsidiaries and any other purpose not prohibited by the LVSC Revolving Credit Agreement. As of December 31, 2020, the Company had $1.50 billion of available borrowing capacity under the LVSC Revolving Facility, net of outstanding letters of credit.

The revolving loans bear interest at the Company's option, at either, an adjusted Eurodollar rate, plus an applicable margin ranging from 1.125% to 1.550% per annum, or at an alternative base rate, plus an applicable margin ranging from 0.125% to 0.550% per annum, in each case, based on LVSC's corporate family credit rating. As of December 31, 2020, the applicable margin for revolving loans with reference to an adjusted Eurodollar rate is 1.4% per annum and the applicable margin for revolving loans with reference to an alternative base rate is 0.4% per annum. LVSC is also required to pay a quarterly commitment fee on the undrawn portion of the LVSC Revolving Facility, which commitment fee ranges from 0.125% to 0.250% per annum, based on the LVSC's corporate family credit rating. As of December 31, 2020, the commitment fee is 0.200% per annum.

The LVSC Revolving Credit Agreement contains customary affirmative and negative covenants for facilities of this type, subject to customary exceptions and thresholds that limit the ability of (a) LVSC and its restricted subsidiaries to, among other things, (i) incur liens, (ii) enter into sale and leaseback transactions and (iii) sell, lease, sub-lease or otherwise dispose of any core facility (as defined in the LVSC Revolving Credit Agreement), (b) certain restricted subsidiaries of LVSC to incur indebtedness and (c) LVSC to merge, consolidate, liquidate or sell all or substantially all of its assets. The LVSC Revolving Credit Agreement also requires LVSC to maintain a maximum consolidated leverage ratio of 4.0x as of the last day of each fiscal quarter. The LVSC Revolving Credit Agreement also contains customary events of default, including payment defaults, cross defaults to material debt, bankruptcy and insolvency, breaches of covenants and inaccuracy of representations and warranties, subject to customary grace periods.

On September 23, 2020, LVSC entered into an amendment agreement (the "Amendment") with lenders to the LVSC Revolving Credit Agreement. Pursuant to the Amendment, the LVSC Revolving Credit Agreement was

92

000832

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

amended to (a) remove the requirement to maintain a maximum consolidated leverage ratio of 4.0x as of the last day of any fiscal quarter of LVSC during the period commencing on October 31, 2020, through and including December 31, 2021 (such period, the "Relevant Period"); (b) include a requirement for LVSC to maintain a minimum liquidity of $350 million as of the last day of each month during the Relevant Period; and (c) include a limitation on LVSC's ability to declare or pay any dividend or other distribution during the period commencing on the closing date of the amendment, through and including December 31, 2021, unless liquidity is greater than $1.0 billion on a pro forma basis after giving effect to such dividend or distribution. Pursuant to the Amendment, LVSC agreed to pay a customary fee to the lenders that consented.

*2013 U.S. Credit Facility*

The Company, entered into a credit agreement (the "2013 U.S. Credit Facility"), which pursuant to various amendments, provided for a $3.51 billion term loan (the "2013 Extended U.S. Term B Facility") and a $1.15 billion revolving facility (the "2013 Extended U.S. Revolving Facility," and together with the 2013 Extended U.S. Term B Facility, the "2013 U.S. Credit Facility"). Borrowings under the 2013 Extended U.S. Term B Facility were used for working capital requirements and general corporate purposes, including to make any investment or payment not specifically prohibited by the terms of the loan documents.

The Company paid standby fees of 0.2% per annum on the undrawn amounts under the 2013 Extended U.S. Revolving Facility. The weighted average interest rate on the 2013 U.S. Credit Facility was 4.2% and 3.9% for the years ended December 31, 2019 and 2018, respectively.

As previously described, the proceeds from the LVSC Senior Notes were used to repay the outstanding borrowings under the 2013 U.S. Credit Facility and the facility was terminated. As a result, the Company recorded a $22 million loss on early retirement of debt during the year ended December 31, 2019.

**Macao Related Debt**

*SCL Senior Notes*

On August 9, 2018, SCL issued, in a private offering, three series of senior unsecured notes in an aggregate principal amount of $5.50 billion, consisting of $1.80 billion of 4.600% Senior Notes due August 8, 2023 (the "2023 SCL Senior Notes"), $1.80 billion of 5.125% Senior Notes due August 8, 2025 (the "2025 SCL Senior Notes") and $1.90 billion of 5.400% Senior Notes due August 8, 2028 (the "2028 SCL Senior Notes"). A portion of the net proceeds from the offering was used to repay in full the outstanding borrowings under the 2016 VML Credit Facility (defined below). There are no interim principal payments on the 2023, 2025 or 2028 SCL Senior Notes and interest is payable semi-annually in arrears on each February 8 and August 8, commencing on February 8, 2019.

On June 4, 2020, SCL issued, in a private offering, two series of senior unsecured notes in an aggregate principal amount of $1.50 billion, consisting of $800 million of 3.800% Senior Notes due January 8, 2026 (the "2026 SCL Senior Notes") and $700 million of 4.375% Senior Notes due June 18, 2030 (the "2030 SCL Senior Notes" and together with the 2023 SCL Senior Notes, 2025 SCL Senior Notes, 2026 SCL Senior Notes and 2028 SCL Senior Notes, the "SCL Senior Notes"). The net proceeds from the offering were used for incremental liquidity and general corporate purposes. There are no interim principal payments on the 2026 or 2030 SCL Senior Notes and interest is payable semi-annually in arrears on January 8 and July 8, commencing on January 8, 2021, with respect to the 2026 SCL Senior Notes, and on June 18 and December 18, commencing on December 18, 2020, with respect to the 2030 SCL Senior Notes.

The SCL Senior Notes are senior unsecured obligations of SCL. Each series of notes rank equally in right of payment with all of SCL's existing and future senior unsecured debt and will rank senior in right of payment to all of SCL's future subordinated debt, if any. The notes will be effectively subordinated in right of payment to all of SCL's future secured debt (to the extent of the value of the collateral securing such debt) and will be structurally subordinated to all of the liabilities of SCL's subsidiaries. None of SCL's subsidiaries guarantee the notes.

The 2023, 2025 and 2028 SCL Senior Notes were issued pursuant to an indenture, dated August 9, 2018 (the "SCL Indenture") and the 2026 and 2030 SCL Senior Notes were issued pursuant to an indenture, dated June 4, 2020 (the "2020 SCL Indenture"), between SCL and U.S. Bank National Association, as trustee. Upon the occurrence of certain events described in these indentures, the interest rate on the SCL senior notes may be adjusted. Both indentures contain covenants, subject to customary exceptions and qualifications, that limit the ability of SCL

93

000833

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

and its subsidiaries to, among other things, incur liens, enter into sale and leaseback transactions and consolidate, merge, sell or otherwise dispose of all or substantially all of SCL's assets on a consolidated basis. The indentures also provide for customary events of default.

*2018 SCL Credit Facility*

On November 20, 2018, SCL entered into a facility agreement with the arrangers and lenders named therein and Bank of China Limited, Macau Branch, as agent for the lenders, (the "2018 SCL Credit Facility") pursuant to which the lenders made available a $2.0 billion revolving unsecured credit facility to SCL (the "2018 SCL Revolving Facility"). The facility is available until July 31, 2023, and SCL may draw loans under the facility, which may consist of general revolving loans (consisting of a United States dollar component and a Hong Kong dollar component) or loans drawn under a swing-line loan sub-facility (denominated in either United States dollars or Hong Kong dollars). SCL may utilize the loans for general corporate purposes and working capital requirements of SCL and its subsidiaries. As of December 31, 2020, the Company had $2.02 billion of available borrowing capacity under the 2018 SCL Revolving Facility.

Loans under the 2018 SCL Revolving Facility bear interest calculated by reference to (1) in the case of general revolving loans denominated in United States dollars, the London Interbank Offered Rate ("LIBOR"), (2) in the case of loans denominated in United States dollars drawn under the swing-line loan sub-facility, a United States dollar alternate base rate (determined by reference to, among other things, the United States dollar prime lending rate and the Federal Funds Effective Rate), (3) in the case of general revolving loans denominated in Hong Kong dollars, the Hong Kong Interbank Offered Rate ("HIBOR") or (4) in the case of loans denominated in Hong Kong dollars drawn under the swing-line loan sub-facility, a Hong Kong dollar alternate base rate (determined by reference to, among other things, the Hong Kong dollar prime lending rate), in each case, plus a margin that is determined by reference to the consolidated leverage ratio as defined in the 2018 SCL Credit Facility. The initial margin for general revolving loans is 2.0% per annum and the initial margin for loans drawn under the swing-line loan sub-facility is 1.0% per annum. SCL is also required to pay a commitment fee of 0.60% per annum on the undrawn amounts under the 2018 SCL Revolving Facility.

The 2018 SCL Credit Facility contains affirmative and negative covenants customary for similar unsecured financings, including, but not limited to, limitations on indebtedness secured by liens on principal properties and sale and leaseback transactions. The 2018 SCL Credit Facility also requires SCL to maintain a maximum ratio of total indebtedness to adjusted EBITDA of 4.0x throughout the life of the facility and a minimum ratio of adjusted EBITDA to net interest expense (including capitalized interest) of 2.5x throughout the life of the facility.

On March 27, 2020, SCL entered into a waiver and amendment request letter (the "Waiver Letter") with respect to certain provisions of the 2018 SCL Credit Facility, pursuant to which lenders (a) waived the requirements for SCL to comply with the requirements that SCL ensure the maximum consolidated leverage ratio does not exceed 4.0x and minimum consolidated interest coverage ratio of 2.5x for any quarterly period ending during the period beginning on, and including, January 1, 2020 and ending on, and including, July 1, 2021 (the "SCL Relevant Period") (other than with respect to the financial year ended on December 31, 2019); (b) waived any default that may arise as a result of any breach of said requirements during the SCL Relevant Period (other than with respect to the financial year ended on December 31, 2019); and (c) extended the period of time during which SCL may supply the agent with (i) its audited consolidated financial statements for the financial year ended on December 31, 2019, to April 30, 2020; and (ii) its audited consolidated financial statements for the financial year ending on December 31, 2020, to April 30, 2021. Pursuant to the Waiver Letter, SCL agreed to pay a customary fee to the lenders that consented.

On September 11, 2020, SCL entered into a waiver extension and amendment request letter (the "Waiver Extension Letter") with respect to certain provisions of the 2018 SCL Credit Facility, pursuant to which lenders agreed to (a) extend the SCL Relevant Period such that it ends on, and includes, January 1, 2022 instead of July 1, 2021; and (b) amend and restate the 2018 SCL Credit Facility in the form attached to the Waiver Extension Letter, which contains the following amendments: (1) it provides SCL with the option to increase the total borrowing capacity by an aggregate amount of up to $1.0 billion; and (2) it imposes a restriction on the ability of SCL to declare or make any dividend payment or similar distribution at any time during the period from (and including) July 1, 2020 to (and including) January 1, 2022, if at such time (x) the total borrowing capacity exceeds $2.0 billion by operation of the increase referred to above; and (y) the maximum consolidated leverage ratio is greater than 4.0x,

94

000834

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

unless, after giving effect to such payment, the sum of (i) the aggregate amount of cash and cash equivalents of SCL on such date; and (ii) the aggregate amount of the undrawn facility under the 2018 SCL Credit Facility and unused commitments under other credit facilities of SCL is greater than $2.0 billion. Pursuant to the Waiver Extension Letter, SCL agreed to pay a customary fee to the lenders that consented.

The 2018 SCL Credit Facility also contains certain events of default (some of which are subject to grace and remedy periods and materiality qualifiers), including, but not limited to, events relating to SCL's gaming operations and the loss or termination of certain land concession contracts.

On January 25, 2021, SCL entered into an agreement with lenders to increase commitments under the 2018 SCL Credit Facility by HKD 3.83 billion (approximately $494 million at exchange rates in effect on the date of this transaction). Subsequently, on January 29, 2021, SCL drew down $29 million and HKD 2.13 billion (approximately $274 million at exchange rates in effect on January 29, 2021) under this facility for general corporate purposes, resulting in remaining available borrowing capacity of $2.21 billion.

### 2016 VML Credit Facility

Two subsidiaries of the Company, VML US Finance LLC, the Borrower, and Venetian Macau Limited ("VML"), as guarantor, entered into a credit agreement (the "2016 VML Credit Facility"), which pursuant to various amendments, provided for a $4.12 billion term loan (the "2016 VML Term Loans"), a $269 million non-extended term loan (the "2016 Non-Extended VML Term Loans") and a $2.0 billion revolving facility (the "2016 VML Revolving Facility," and together with the 2016 VML Term Loans and the 2016 Non-Extended VML Term Loans, the "2016 VML Credit Facility"). Borrowings under the 2016 VML Term Loans were used for working capital requirements and general corporate purposes, including to make any investment or payment not specifically prohibited by the terms of the loan documents.

The Company paid standby fees of 0.5% per annum on the undrawn amounts under the 2016 VML Revolving Facility. The weighted average interest rate on the 2016 VML Credit Facility was 3.1% for the year ended December 31, 2018.

As previously described, a portion of the proceeds from the SCL Senior Notes was used to repay the outstanding borrowings under the 2016 VML Credit Facility. As a result, the Company recorded a $52 million loss on early retirement of debt during the three months ended September 30, 2018.

On November 20, 2018, effective as of November 21, 2018, the 2016 VML Credit Facility was terminated. As a result, the Company recorded a $9 million loss on early retirement of debt during the three months ended December 31, 2018.

**Singapore Related Debt**

### 2012 Singapore Credit Facility

In June 2012, MBS entered into a SGD 5.10 billion (approximately $3.85 billion at exchange rates in effect on December 31, 2020) credit agreement (the "2012 Singapore Credit Facility"), providing for a fully funded SGD 4.60 billion (approximately $3.48 billion at exchange rates in effect on December 31, 2020) term loan (the "2012 Singapore Term Facility") and a SGD 500 million (approximately $378 million at exchange rates in effect on December 31, 2020) revolving facility (the "2012 Singapore Revolving Facility") that was available until November 25, 2017, which included a SGD 100 million (approximately $76 million at exchange rates in effect on December 31, 2020) ancillary facility (the "2012 Singapore Ancillary Facility"). Borrowings under the 2012 Singapore Credit Facility were used to repay the outstanding balance under the previous Singapore credit facility.

During August 2014, MBS amended its 2012 Singapore Credit Facility, pursuant to which consenting lenders of borrowings under the 2012 Singapore Term Facility extended the maturity to August 28, 2020, and consenting lenders of borrowings under the 2012 Singapore Revolving Facility extended the maturity to February 28, 2020.

During March 2018, MBS amended its 2012 Singapore Credit Facility, which refinanced the facility in an aggregate amount of SGD 4.80 billion (approximately $3.63 billion at exchange rates in effect on December 31, 2020), pursuant to which consenting lenders of borrowings under the 2012 Singapore Term Facility extended the maturity to March 29, 2024, and consenting lenders of borrowings under the 2012 Singapore Revolving Facility extended the maturity to September 29, 2023.

95

000835

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

On August 30, 2019, MBS amended and restated its 2012 Singapore Credit Facility (the "Third Amendment and Restatement Agreement"). The Third Amendment and Restatement Agreement extended (a) the maturity date of the term loans under the 2012 Singapore Term Facility to August 31, 2026, and (b) the termination date of the revolving credit commitments under the 2012 Singapore Revolving Facility to February 27, 2026, and also increased the principal amount of revolving credit commitments by an additional SGD 250 million (approximately $189 million at exchange rates in effect on December 31, 2020) for a total aggregate principal amount of SGD 750 million (approximately $567 million at exchange rates in effect on December 31, 2020). As of December 31, 2020, MBS had SGD 592 million (approximately $448 million at exchange rates in effect on December 31, 2020) of available borrowing capacity under the 2012 Singapore Revolving Facility, net of outstanding letters of credit, primarily consisting of a banker's guarantee in connection with the MBS Expansion Project for SGD 153 million (approximately $116 million at exchange rates in effect on December 31, 2020).

Under the Third Amendment and Restatement Agreement, certain lenders committed to provide a new delayed draw term loan facility (the "Singapore Delayed Draw Term Facility") in an aggregate principal amount of SGD 3.75 billion (approximately $2.83 billion at exchange rates in effect on December 31, 2020), which will be available to MBS until December 30, 2024, to finance costs associated with the MBS Expansion Project. The loans borrowed under the Singapore Delayed Draw Term Facility will mature on August 31, 2026. During the year ended December 31, 2020, MBS borrowed SGD 62 million (approximately $46 million at exchange rates in effect at the time of the transaction) under the Singapore Delayed Draw Term Facility. As of December 31, 2020, SGD 3.69 billion (approximately $2.79 billion at exchange rates in effect on December 31, 2020) remains available to be drawn under the Singapore Delayed Draw Term Facility.

As a result of the Third Amendment and Restatement Agreement, the Company recorded a $2 million loss on modification of debt during the year ended December 31, 2019.

The indebtedness under the 2012 Singapore Credit Facility is collateralized by a first-priority security interest in substantially all of MBS's assets, other than capital stock and similar ownership interests, certain furniture, fixtures and equipment and certain other excluded assets.

The term loans under the 2012 Singapore Term Facility are subject to interim quarterly amortization payments, beginning with the fiscal quarter ending December 31, 2019, in an amount equal to (i) until and including the fiscal quarter ending September 30, 2024, 0.5% of the principal amount outstanding on June 30, 2019 (the "Term Facility Restatement Date"), (ii) for the fiscal quarter ending December 31, 2024, 3.0% of the principal amount outstanding on the Term Facility Restatement Date, (iii) for the fiscal quarters ending March 31, 2025 through September 30, 2025, 5.0% of the principal amount outstanding on the Term Facility Restatement Date, and (iv) for the fiscal quarters ending December 31, 2025 through June 30, 2026, 18.0% of the principal amount outstanding on the Term Facility Restatement Date. On the maturity date of August 31, 2026, MBS is required to repay all remaining amounts outstanding on the Singapore Term Facility.

Loans under the Singapore Delayed Draw Term Facility are subject to interim quarterly amortization payments, beginning with the fiscal quarter ending March 31, 2025, in an amount equal to (i) until and including the fiscal quarter ending September 30, 2025, 5.0% of the principal amount outstanding on December 30, 2024 (the "Delayed Draw Term Facility Restatement Date"), and (ii) for each fiscal quarter from December 31, 2025, until and including June 30, 2026, 18.0% of the principal amount outstanding on the Delayed Draw Term Facility Restatement Date. On the maturity date of August 31, 2026, MBS is required to repay all remaining amounts outstanding on the Singapore Delayed Draw Term Facility.

Under the Third Amendment and Restatement Agreement, outstanding loans bear interest at the Singapore Swap Offered Rate ("SOR") plus an applicable margin that is fixed at 1.65% per annum until September 30, 2020, and will range from 1.15% to 1.85% per annum thereafter, based on MBS's consolidated leverage ratio (interest rate set at approximately 2.0% as of December 31, 2020). MBS pays a standby commitment fee of 35% to 40% of the spread per annum on all undrawn amounts under the 2012 Singapore Revolving Facility. The weighted average interest rate for the 2012 Singapore Credit Facility was 2.2%, 3.2% and 2.6% for the years ended December 31, 2020, 2019 and 2018.

Under the Third Amendment and Restatement Agreement, MBS must comply with a maximum consolidated leverage ratio of 4.5x on the last day of each fiscal quarter from August 30, 2019, until twelve months following the

000836

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

date on which a temporary occupation permit is issued with respect to the MBS Expansion Project. Thereafter, MBS must comply with a maximum consolidated leverage ratio of 4.0x as of the last day of each fiscal quarter through maturity.

On June 18, 2020, MBS or the "Borrower," entered into an amendment letter (the "Amendment Letter") with DBS Bank Ltd. ("DBS"), as agent. The Amendment Letter amends the facility agreement originally dated as of June 25, 2012 (as amended, restated, amended and restated, supplemented and otherwise modified, the "Facility Agreement"), among the Borrower, the lenders party thereto, DBS, as the agent, and the other parties thereto.

The Amendment Letter (a) modifies the financial covenant provisions under the Facility Agreement such that the Borrower will not have to comply with the leverage or interest coverage covenants for the financial quarters ending, and including, September 30, 2020 through, and including, December 31, 2021 (the "Waiver Period"); (b) extends to June 30, 2021, the deadline for delivering the construction costs estimate and the construction schedule for the MBS Expansion Project; and (c) permits the Borrower to make dividend payments during the Waiver Period of (i) an unlimited amount if the ratio of its debt to consolidated adjusted EBITDA is lower than or equal to 4.25x and (ii) up to SGD 500 million per fiscal year if the ratio of its debt to consolidated adjusted EBITDA is higher than 4.25x, subject to the additional requirements that (a) the aggregate amount of the Borrower's cash plus Facility B availability is greater than or equal to SGD 800 million immediately following such dividend payment and (b) the Borrower's interest coverage ratio is higher than 3.0x. Pursuant to the Amendment Letter, MBS agreed to pay a customary fee to the lenders that consented thereto.

**Debt Covenant Compliance**

As of December 31, 2020, management believes the Company was in compliance with all debt covenants.

**Cash Flows from Financing Activities**

Cash flows from financing activities related to long-term debt and finance lease obligations are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| Proceeds from 2026 and 2030 SCL Senior Notes | $ 1,496 | $ — | $ — |
| Proceeds from 2018 SCL Credit Facility | 403 | — | — |
| Proceeds from 2012 Singapore Credit Facility - Delayed Draw Term | 46 | — | — |
| Proceeds from LVSC Senior Notes | — | 4,000 | — |
| Proceeds from 2023, 2025 and 2028 SCL Senior Notes | — | — | 5,500 |
| Proceeds from 2013 U.S. Credit Facility | — | — | 1,347 |
| Proceeds from 2016 VML Credit Facility | — | — | 746 |
| | $ 1,945 | $ 4,000 | $ 7,593 |
| | | | |
| Repayments on 2018 SCL Credit Facility | $ (404) | $ — | $ — |
| Repayments on 2012 Singapore Credit Facility | (60) | (47) | (65) |
| Repayments on 2013 U.S. Credit Facility | — | (3,484) | (26) |
| Repayments on 2016 VML Credit Facility | — | — | (5,083) |
| Repayments on HVAC Equipment Lease and Other Long-Term Debt | (3) | (5) | (4) |
| | $ (467) | $ (3,536) | $ (5,178) |

97

000837

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Scheduled Maturities of Long-Term Debt**

Maturities of long-term debt outstanding as of December 31, 2020, are summarized as follows:

|  | Long-term Debt |
|---|---|
|  | (In millions) |
| 2021 | $ 63 |
| 2022 | 63 |
| 2023 | 1,863 |
| 2024 | 1,892 |
| 2025 | 3,356 |
| Thereafter | 6,883 |
| Total | $ 14,120 |

**Fair Value of Long-Term Debt**

The estimated fair value of the Company's long-term debt as of December 31, 2020 and 2019, was approximately $15.15 billion and $13.21 billion, respectively, compared to its contractual value of $14.12 billion and $12.58 billion, respectively. The estimated fair value of our long-term debt is based on recent trades, if available, and indicative pricing from market information (level 2 inputs).

**Note 9 — Equity**

**Preferred Stock**

The Company is authorized to issue up to 50,000,000 shares of preferred stock. The Company's Board of Directors is authorized, subject to limitations prescribed by Nevada law and the Company's articles of incorporation, to determine the terms and conditions of the preferred stock, including whether the shares of preferred stock will be issued in one or more series, the number of shares to be included in each series and the powers, designations, preferences and rights of the shares. The Company's Board of Directors also is authorized to designate any qualifications, limitations or restrictions on the shares without any further vote or action by the stockholders.

**Common Stock**

*Dividends*

In April 2020, the Company suspended the quarterly dividend program due to the impact of the COVID-19 Pandemic.

On March 26, 2020, the Company paid a dividend of $0.79 per common share as part of a regular cash dividend program. During the year ended December 31, 2020, the Company recorded $603 million as a distribution against retained earnings (of which $342 million related to Mr. Adelson (the "Principal Stockholder") and his family and the remaining $261 million related to all other stockholders).

On March 28, June 27, September 26 and December 26, 2019, the Company paid a dividend of $0.77 per common share as part of a regular cash dividend program. During the year ended December 31, 2019, the Company recorded $2.37 billion as a distribution against retained earnings (of which $1.33 billion related to the Principal Stockholder and his family and the remaining $1.04 billion related to all other stockholders).

On March 30, June 28, September 27 and December 27, 2018, the Company paid a dividend of $0.75 per common share as part of a regular cash dividend program. During the year ended December 31, 2018, the Company recorded $2.35 billion as a distribution against retained earnings (of which $1.30 billion related to the Principal Stockholder and his family and the remaining $1.05 billion related to all other stockholders).

*Share Repurchases*

In June 2018, the Company's Board of Directors authorized the repurchase of $2.50 billion of its outstanding common stock, which was to expire in November 2020. In October 2020, the Company's Board of Directors authorized the extension of the expiration date of the remaining repurchase amount of $916 million to November 2022. Repurchases of the Company's common stock are made at the Company's discretion in accordance with

98

000838

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

applicable federal securities laws in the open market or otherwise. The timing and actual number of shares to be repurchased in the future will depend on a variety of factors, including the Company's financial position, earnings, legal requirements, other investment opportunities and market conditions. During the year ended December 31, 2020, no shares of its common stock were repurchased. During the years ended December 31, 2019 and 2018, the Company repurchased 12,556,635 and 14,998,127 shares, respectively, of its common stock for $754 million and $905 million, respectively, (including commissions) under the Company's current program. All share repurchases of the Company's common stock have been recorded as treasury stock.

In addition to the shares repurchased under the share repurchase program, during the year ended December 31, 2019, the Company repurchased 1,927 shares, in satisfaction of tax withholding and exercise price obligations on stock option exercises.

*Rollforward of Shares of Common Stock*

A summary of the outstanding shares of common stock is as follows:

| | |
|---|---:|
| Balance as of January 1, 2018 | 789,484,987 |
| Exercise of stock options | 1,007,551 |
| Issuance of restricted stock | 10,296 |
| Vesting of restricted stock units | 5,000 |
| Repurchase of common stock | (15,044,620) |
| Balance as of December 31, 2018 | 775,463,214 |
| Exercise of stock options | 569,224 |
| Issuance of restricted stock | 11,039 |
| Repurchase of common stock | (12,558,562) |
| Balance as of December 31, 2019 | 763,484,915 |
| Exercise of stock options | 342,700 |
| Issuance of restricted stock | 17,512 |
| Forfeiture of unvested restricted stock | (2,189) |
| Balance as of December 31, 2020 | 763,842,938 |

**Noncontrolling Interests**

*SCL*

On April 17, 2020, SCL announced it will not pay a final dividend for 2019 due to the impact of the COVID-19 Pandemic.

On February 21, 2020, SCL paid a dividend of 0.99 HKD to SCL stockholders (a total of $1.03 billion, of which the Company retained $717 million during the year ended December 31, 2020).

On February 22 and June 21, 2019, SCL paid a dividend of HKD 0.99 and HKD 1.00 per share, respectively, to SCL stockholders (a total of $2.05 billion, of which the Company retained $1.44 billion during the year ended December 31, 2019).

On February 23 and June 22, 2018, SCL paid a dividend of HKD 0.99 and HKD 1.00 per share, respectively, to SCL stockholders (a total of $2.05 billion, of which the Company retained $1.44 billion during the year ended December 31, 2018).

*Other*

During the years ended December 31, 2019 and 2018, the Company distributed $17 million and $12 million, respectively, to certain of its noncontrolling interests. Of the amount distributed during the year ended December 31, 2019, $11 million related to payments to the Company's minority interest partners to purchase their interests in connection with the sale of Sands Casino Resort Bethlehem ("Sands Bethlehem").

000839

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Note 10 — Income Taxes**

Consolidated income (loss) before taxes and noncontrolling interests for domestic and foreign operations is as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| Foreign | $ (1,614) | $ 3,145 | $ 3,164 |
| Domestic | (567) | 627 | 162 |
| Total income (loss) before income taxes | $ (2,181) | $ 3,772 | $ 3,326 |

The components of the income tax expense (benefit) are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| **Foreign:** | | | |
| Current | $ 7 | $ 245 | $ 245 |
| Deferred | 3 | (10) | (12) |
| **Federal:** | | | |
| Current | (11) | 33 | 15 |
| Deferred | (35) | 145 | 135 |
| **State:** | | | |
| Current | (2) | 33 | 2 |
| Deferred | — | 22 | (10) |
| Total income tax expense (benefit) | $ (38) | $ 468 | $ 375 |

The reconciliation of the statutory federal income tax rate and the Company's effective tax rate is as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| Statutory federal income tax rate | (21.0)% | 21.0 % | 21.0 % |
| Increase (decrease) in tax rate resulting from: | | | |
| Change in valuation allowance | 9.8 % | 2.7 % | 4.5 % |
| Foreign and U.S. tax rate differential | 6.7 % | (5.6)% | (6.5)% |
| Tax exempt (income) loss of foreign subsidiary | 2.1 % | (8.0)% | (8.3)% |
| Other, net | 0.7 % | 2.3 % | 0.6 % |
| Effective tax rate | (1.7)% | 12.4 % | 11.3 % |

The Company enjoys an income tax exemption in Macao that exempts the Company from paying corporate income tax on profits generated by gaming operations. The Company will continue to benefit from this tax exemption through June 26, 2022, the date VML's subconcession agreement expires. Had the Company not received the income tax exemption in Macao, consolidated net income attributable to LVSC would have been reduced by $200 million and $184 million, and diluted earnings per share would have been reduced by $0.26 and $0.23 per share for the years ended December 31, 2019 and 2018, respectively. The VML gaming losses incurred during 2020 did not generate a tax benefit because they are not subject to tax. This results in an increase in the Company's overall effective tax rate. In April 2019, the Company entered into a renewed agreement with the Macao government, which is effective through June 26, 2022, and provides for an annual payment of 38 million patacas (approximately $5 million at exchange rates in effect on December 31, 2020) as a substitution for a 12% tax otherwise due from VML shareholders on dividend distributions paid from VML gaming profits. In September 2013, the Company and the Internal Revenue Service entered into a Pre-Filing Agreement providing the Macao special gaming tax (35% of gross gaming revenue) qualifies as a tax paid in lieu of an income tax and could be claimed as a U.S. foreign tax credit.

000840

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

The Company's foreign and U.S. tax rate differential reflects the fact that the U.S. tax rate of 21% is higher than the statutory tax rates in Singapore and Macao of 17% and 12%, respectively.

The Tax Cuts and Jobs Act (the "Act" or "U.S. tax reform") made significant changes to U.S. income tax laws including lowering the U.S. corporate tax rate to 21% effective beginning in 2018 and transitioning from a worldwide tax system to a territorial tax system resulting in dividends from the Company's foreign subsidiaries not being subject to U.S. income tax and therefore, no longer generating U.S. foreign tax credits. During the year ended December 31, 2018, the Company recorded a tax expense of $57 million resulting from guidance by the Internal Revenue Service ("IRS") related to certain international provisions of U.S. tax reform.

The primary tax affected components of the Company's net deferred tax assets are as follows:

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (In millions) | |
| **Deferred tax assets:** | | |
| U.S. foreign tax credit carryforwards | $        4,812 | $        4,791 |
| Net operating loss carryforwards | 466 | 283 |
| Stock-based compensation | 16 | 15 |
| Provision for credit losses | 14 | 14 |
| Deferred gain on mall sale transactions | 12 | 13 |
| Accrued expenses | 10 | 23 |
| Pre-opening expenses | 7 | 9 |
| Other | — | 1 |
| | 5,337 | 5,149 |
| Less — valuation allowances | (4,922) | (4,786) |
| Total deferred tax assets | 415 | 363 |
| **Deferred tax liabilities:** | | |
| Property and equipment | (274) | (251) |
| Prepaid expenses | (4) | (5) |
| Other | (7) | (8) |
| Total deferred tax liabilities | (285) | (264) |
| Deferred tax assets, net | $        130 | $        99 |

U.S. tax reform required the Company to compute a one-time mandatory tax on the previously unremitted earnings of its foreign subsidiaries during the year ended December 31, 2017. This one-time deemed repatriation of these earnings did not result in a cash tax liability for the Company as the incremental U.S. taxable income was fully offset by the utilization of the U.S. foreign tax credits generated as a result of the deemed repatriation. In addition, the deemed repatriation generated excess U.S. foreign tax credits, which were carried forward to tax years 2018 and beyond. The Company's U.S. foreign tax credit carryforwards were $4.87 billion and $4.84 billion as of December 31, 2020 and 2019, respectively, which will begin to expire in 2022. There was a valuation allowance of $4.58 billion and $4.51 billion as of December 31, 2020 and 2019, respectively, provided on certain net U.S. deferred tax assets, as the Company believes these assets do not meet the "more-likely-than-not" criteria for recognition. The Company's U.S. net operating loss carryforward was $568 million as of December 31, 2020, which does not have an expiration date. Net operating loss carryforwards for the Company's foreign subsidiaries were $2.84 billion and $2.31 billion as of December 31, 2020 and 2019, respectively, which began to expire in 2021. There are valuation allowances of $342 million and $279 million as of December 31, 2020 and 2019, respectively, provided on the net deferred tax assets of certain foreign jurisdictions, as the Company believes these assets do not meet the "more-likely-than-not" criteria for recognition.

Undistributed earnings of subsidiaries are accounted for as a temporary difference, except deferred tax liabilities are not recorded for undistributed earnings of foreign subsidiaries deemed to be indefinitely reinvested in foreign jurisdictions. U.S. tax reform required the Company to compute a tax on previously unremitted earnings of its foreign subsidiaries upon transition from a worldwide tax system to a territorial tax system during the year ended December 31, 2017. The Company expects these earnings to be exempt from U.S. income tax if distributed as these

000841

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

earnings were taxed during the year ended December 31, 2017, under U.S. tax reform. The Company does not consider current year's tax earnings and profits of its foreign subsidiaries to be indefinitely reinvested. Beginning with the year ended December 31, 2015, the Company's major foreign subsidiaries distributed, and may continue to distribute, earnings in excess of their current year's tax earnings and profits in order to meet the Company's liquidity needs. As of December 31, 2020, the amount of earnings and profits of foreign subsidiaries the Company does not intend to repatriate was $2.58 billion. The Company does not expect withholding taxes or other foreign income taxes to apply should these earnings be distributed in the form of dividends or otherwise.

A reconciliation of the beginning and ending amounts of unrecognized tax benefits, is as follows:

|  | December 31, | | |
|---|---|---|---|
|  | 2020 | 2019 | 2018 |
|  | (In millions) | | |
| Balance at the beginning of the year | $ 134 | $ 118 | $ 92 |
| Additions to tax positions related to prior years | — | 1 | 2 |
| Reductions to tax positions related to prior years | (14) | — | — |
| Additions to tax positions related to current year | 11 | 15 | 24 |
| Balance at the end of the year | $ 131 | $ 134 | $ 118 |

As of December 31, 2020, 2019 and 2018, unrecognized tax benefits of $60 million, $53 million and $67 million, respectively, were recorded as reductions to the U.S. foreign tax credit deferred tax asset. As of December 31, 2020, 2019 and 2018, unrecognized tax benefits of $71 million, $81 million and $51 million, respectively, were recorded in other long-term liabilities.

Included in the unrecognized tax benefit balance as of December 31, 2020, 2019 and 2018, are $123 million, $115 million and $103 million, respectively, of uncertain tax benefits that would affect the effective income tax rate if recognized.

The Company's major tax jurisdictions are the U.S., Macao and Singapore. The Company could be subject to examination for tax years beginning in 2016 in Macao and Singapore and tax years 2010 through 2015 and 2017 through 2019 in the U.S. The Company believes it has adequately reserved and provided for its uncertain tax positions; however, there is no assurance the taxing authorities will not propose adjustments that are different from the Company's expected outcome and it could impact the provision for income taxes.

The Company recognizes interest and penalties, if any, related to unrecognized tax positions in the provision for income taxes in the accompanying consolidated statement of operations. Interest and penalties of $7 million, $5 million and $3 million were accrued as of December 31, 2020, 2019 and 2018, respectively. The Company does not expect a significant increase or decrease in unrecognized tax benefits over the next twelve months.

**Note 11 — Fair Value Measurements**

Under applicable accounting guidance, fair value is defined as the exit price, or the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants as of the measurement date. Applicable accounting guidance also establishes a valuation hierarchy for inputs in measuring fair value that maximizes the use of observable inputs (inputs market participants would use based on market data obtained from sources independent of the Company) and minimizes the use of unobservable inputs (inputs that reflect the Company's assumptions based upon the best information available in the circumstances) by requiring the most observable inputs be used when available. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities. Level 2 inputs are quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active, and inputs (other than quoted prices) that are observable for the assets or liabilities, either directly or indirectly. Level 3 inputs are unobservable inputs for the assets or liabilities. Categorization within the hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

Cash equivalents, which are short-term investments with original maturities of less than 90 days, had an estimated fair value of $726 million and $2.26 billion as of December 31, 2020 and 2019, respectively. The estimated fair value of the Company's cash equivalents is based on level 1 inputs (quoted market prices in active markets).

102

000842

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Note 12 — Mall Activities**

**The Grand Canal Shoppes at The Venetian Resort Las Vegas**

In April 2004, the Company entered into an agreement to sell the portion of the Grand Canal Shoppes located within The Venetian Tower (formerly referred to as "The Grand Canal Shoppes") and lease certain restaurant and other retail space at the casino level of The Venetian Tower (the "Master Lease") to GGP for approximately $766 million (the "Mall Sale"). The Mall Sale closed in May 2004, and the Company realized a gain of $418 million in connection with the Mall Sale. Under the Master Lease agreement, the Company leased nineteen retail and restaurant spaces on the casino level within The Venetian Tower to GGP for 89 years with annual rent of one dollar and GGP assumed the various tenant operating leases for those spaces. In accordance with related accounting standards, the Master Lease agreement does not qualify as a sale of the real property assets, which real property was not separately legally demised. Accordingly, $109 million of the transaction has been deferred as prepaid operating lease payments to the Company, which will amortize into income on a straight-line basis over the 89-year lease term. During each of the years ended December 31, 2020, 2019 and 2018, $1 million of this deferred item was amortized and included in convention, retail and other revenue. In addition, the Company agreed with GGP to: (i) continue to be obligated to fulfill certain lease termination and asset purchase agreements; (ii) lease theater space located within The Grand Canal Shoppes from GGP for a period of 25 years with fixed minimum rent of $3 million per year with cost of living adjustments; (iii) operate the Gondola ride under an operating agreement for a period of 25 years for an annual fee of $4 million; and (iv) lease certain office space from GGP for a period of 10 years, subject to extension options, with annual rent of approximately $1 million. The lease payments under clauses (ii) through (iv) above are subject to automatic increases beginning on the sixth lease year. In accordance with related accounting standards, a portion of the transaction must be deferred in an amount equal to the present value of the minimum lease payments set forth in the lease back agreements. This deferred gain will be amortized to reduce lease expense on a straight-line basis over the lives of the leases. During each of the years ended December 31, 2020, 2019 and 2018, $3 million of this deferred item was amortized as an offset to convention, retail and other expense.

**The Shoppes at The Palazzo**

The Company contracted to sell a portion of the Grand Canal Shoppes located within The Palazzo Tower (formerly referred to as The Shoppes at The Palazzo) to GGP pursuant to a purchase and sale agreement dated as of April 12, 2004, as amended (the "Amended Agreement") and under the terms of the settlement with GGP on June 24, 2011, the Company retained $295 million of proceeds received and participates in certain potential future revenues earned by GGP. Pursuant to the Amended Agreement, the Company agreed with GGP to lease certain spaces located within The Shoppes at The Palazzo. As the transaction has not been accounted for as a sale in accordance with related accounting standards, $224 million of the mall sale transaction has been recorded as deferred proceeds from the sale as of December 31, 2020, which accrues interest at an imputed interest rate, offset by (i) imputed rental income and (ii) rent payments made to GGP related to those spaces leased back from GGP.

In the Amended Agreement, the Company agreed to lease certain restaurant and retail space on the casino level of The Palazzo Tower to GGP pursuant to a master lease agreement ("The Palazzo Master Lease"). Under The Palazzo Master Lease, which was executed concurrently with, and as a part of, the closing on the sale of The Shoppes at The Palazzo to GGP on February 29, 2008, the Company leased nine restaurant and retail spaces on the casino level within The Palazzo Tower to GGP for 89 years with annual rent of one dollar and GGP assumed the various tenant operating leases for those spaces. In accordance with related accounting standards, The Palazzo Master Lease does not qualify as a sale of the real property assets, which real property was not separately legally demised. Accordingly, $23 million of the mall sale transaction has been deferred as prepaid operating lease payments to the Company, which will amortize into income on a straight-line basis over the 89-year lease term.

**Note 13 — Leases**

*Lessee*

The Company has operating and finance leases for various real estate (including the Macao and Singapore leasehold interests in land) and equipment. Certain of these lease agreements include rental payments based on a percentage of sales over specified contractual amounts, rental payments adjusted periodically for inflation and rental payments based on usage. The Company's leases include options to extend the lease term by one month to 40 years.

103

000843

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

The Company's lease agreements do not contain any material residual value guarantees or material restrictive covenants.

Leases recorded on the balance sheet consist of the following (excluding the Macao and Singapore leasehold interests in land assets; see "Note 5 — Leasehold Interests in Land, Net"):

| | | December 31, | | | |
|---|---|---|---|---|---|
| Leases | Classification on the Balance Sheet | 2020 | | 2019 | |
| | | (In millions) | | | |
| **Assets** | | | | | |
| Operating lease ROU assets | Other assets, net | $ | 178 | $ | 190 |
| Finance lease ROU assets | Property and equipment, net[1] | $ | 18 | $ | 17 |
| **Liabilities** | | | | | |
| Current | | | | | |
|    Operating | Other accrued liabilities | $ | 29 | $ | 28 |
|    Finance | Current maturities of long-term debt | $ | 13 | $ | 8 |
| Noncurrent | | | | | |
|    Operating | Other long-term liabilities | $ | 294 | $ | 305 |
|    Finance | Long-term debt | $ | 12 | $ | 9 |

(1)  Finance lease ROU assets are recorded net of accumulated depreciation of $13 million and $6 million as of December 31, 2020 and 2019, respectively.

Other information related to lease term and discount rate is as follows:

| | December 31, | |
|---|---|---|
| | 2020 | 2019 |
| **Weighted Average Remaining Lease Term** | | |
|    Operating leases | 31.4 years | 31.6 years |
|    Finance leases | 2.3 years | 2.3 years |
| **Weighted Average Discount Rate** | | |
|    Operating leases[1] | 4.6 % | 4.6 % |
|    Finance leases | 3.0 % | 3.8 % |

(1)  Upon adoption of the new lease standard, discount rates used for existing operating leases were established on January 1, 2019.

000844

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

The components of lease expense are as follows:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2020 | | 2019 | |
|  | (In millions) | | | |
| **Operating lease cost:** | | | | |
| Amortization of leasehold interests in land | $ | 55 | $ | 51 |
| Operating lease cost | | 30 | | 34 |
| Short-term lease cost | | 10 | | 19 |
| Variable lease cost[1] | | (1) | | 5 |
| **Finance lease cost:** | | | | |
| Amortization of ROU assets | | 9 | | 5 |
| Interest on lease liabilities | | 1 | | 1 |
| Total lease cost | $ | 104 | $ | 115 |

_____

(1)  Lease concessions were received for the year ended December 31, 2020, as a result of the COVID-19 Pandemic.

As of December 31, 2020, the Company has short-term lease commitments of $44 million. Expenses incurred under operating lease agreements, including amortization of leasehold interest in land and those that are short-term and variable in nature, totaled $94 million for the year ended December 31, 2018.

Supplemental cash flow information related to leases is as follows:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2020 | | 2019 | |
|  | (In millions) | | | |
| **Cash paid for amounts included in the measurement of lease liabilities:** | | | | |
| Operating cash flows for operating leases | $ | 35 | $ | 40 |
| Operating cash flows for finance leases | $ | — | $ | 1 |
| Financing cash flows for finance leases | $ | 3 | $ | 5 |
| **Right-of-use assets obtained in exchange for lease liabilities:** | | | | |
| Operating leases | $ | 10 | $ | 14 |
| Finance leases | $ | 24 | $ | 17 |

Maturities of lease liabilities are summarized as follows:

|  | Operating Leases | | Finance Leases | |
|---|---|---|---|---|
|  | (In millions) | | | |
| **Year ending December 31,** | | | | |
| 2021 | $ | 36 | $ | 14 |
| 2022 | | 30 | | 8 |
| 2023 | | 24 | | 3 |
| 2024 | | 24 | | 1 |
| 2025 | | 22 | | — |
| Thereafter | | 514 | | — |
| Total future minimum lease payments | | 650 | | 26 |
| Less — amount representing interest | | (327) | | (1) |
| Present value of future minimum lease payments | | 323 | | 25 |
| Less — current lease obligations | | (29) | | (13) |
| Long-term lease obligations | $ | 294 | $ | 12 |

000845

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

*Lessor*

The Company leases space at several of its Integrated Resorts to various third parties as part of its mall operations that are recorded within mall revenues, as well as restaurant and retail space and land that are recorded within convention, retail and other revenues. These leases are non-cancelable operating leases with remaining lease periods that vary from one month to 50 years. The leases include minimum base rents with escalated contingent rent clauses.

Lease revenue consists of the following:

| | Year Ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 | | | | 2019 | | | |
| | Mall | | Other | | Mall | | Other | |
| | (In millions) | | | | | | | |
| Minimum rents | $ | 523 | $ | 8 | $ | 518 | $ | 15 |
| Overage rents | | 39 | | 1 | | 98 | | 2 |
| Rent concessions[1] | | (272) | | (2) | | — | | — |
| Total overage rents and rent concessions | | (233) | | (1) | | 98 | | 2 |
| | $ | 290 | $ | 7 | $ | 616 | $ | 17 |

_____

(1)  Rent concessions were provided for the periods presented to tenants as a result of the COVID-19 Pandemic and the impact on mall and other operations.

Overage rents amounted to $88 million for the year ended December 31, 2018.

Future minimum rentals (excluding the escalated contingent rent clauses) on non-cancelable leases are as follows:

| | Mall | | Other | |
|---|---|---|---|---|
| | (In millions) | | | |
| **Year ending December 31,** | | | | |
| 2021 | $ | 466 | $ | 9 |
| 2022 | | 361 | | 6 |
| 2023 | | 277 | | 5 |
| 2024 | | 213 | | 3 |
| 2025 | | 160 | | 2 |
| Thereafter | | 463 | | 3 |
| Total minimum future rentals | $ | 1,940 | $ | 28 |

The cost and accumulated depreciation of property and equipment the Company is leasing to third parties is as follows:

| | December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| | (In millions) | | | |
| Property and equipment, at cost | $ | 1,405 | $ | 1,320 |
| Accumulated depreciation | | (578) | | (532) |
| Property and equipment, net | $ | 827 | $ | 788 |

000846

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Note 14 — Commitments and Contingencies**

**Litigation**

The Company is involved in other litigation in addition to those noted below, arising in the normal course of business. Management has made certain estimates for potential litigation costs based upon consultation with legal counsel. Actual results could differ from these estimates; however, in the opinion of management, such litigation and claims will not have a material effect on the Company's financial condition, results of operations and cash flows.

*Asian American Entertainment Corporation, Limited v. Venetian Macau Limited, et al.*

On February 5, 2007, Asian American Entertainment Corporation, Limited ("AAEC" or "Plaintiff") brought a claim (the "Prior Action") in the U.S. District Court for the District of Nevada (the "U.S. District Court") against Las Vegas Sands, Inc. (now known as Las Vegas Sands, LLC ("LVSLLC")), Venetian Casino Resort, LLC ("VCR") and Venetian Venture Development, LLC, which are subsidiaries of the Company, and William P. Weidner and David Friedman, who are former executives of the Company. The Prior Action sought damages based on an alleged breach of agreements entered into between AAEC and the aforementioned defendants for their joint presentation of a bid in response to the public tender held by the Macao government for the award of gaming concessions at the end of 2001. The U.S. District Court entered an order dismissing the Prior Action on April 16, 2010.

On January 19, 2012, AAEC filed another claim (the "Macao Action") with the Macao Judicial Court (Tribunal Judicial de Base) against VML, LVS (Nevada) International Holdings, Inc. ("LVS (Nevada)"), LVSLLC and VCR (collectively, the "Defendants"). The claim was for 3.0 billion patacas (approximately $376 million at exchange rates in effect on December 31, 2020). The Macao Action alleges a breach of agreements entered into between AAEC and LVS (Nevada), LVSLLC and VCR (collectively, the "U.S. Defendants") for their joint presentation of a bid in response to the public tender held by the Macao government for the award of gaming concessions at the end of 2001. On July 4, 2012, the Defendants filed their defense to the Macao Action with the Macao Judicial Court and amended the defense on January 4, 2013.

On March 24, 2014, the Macao Judicial Court issued a Decision (Despacho Seneador) holding that AAEC's claim against VML is unfounded and that VML be removed as a party to the proceedings, and the claim should proceed exclusively against the U.S. Defendants. On May 8, 2014, AAEC lodged an appeal against that decision.

On June 5, 2015, the U.S. Defendants applied to the Macao Judicial Court to dismiss the claims against them as res judicata based on the dismissal of the Prior Action. On March 16, 2016, the Macao Judicial Court dismissed the defense of res judicata. An appeal against that decision was lodged by U.S. Defendants on April 7, 2016. As of the end of December 2016, all appeals (including VML's dismissal and the res judicata appeals) were being transferred to the Macao Second Instance Court. On May 11, 2017, the Macao Second Instance Court notified the parties of its decision of refusal to deal with the appeals at the present time. The Macao Second Instance Court ordered the court file be transferred back to the Macao Judicial Court. Evidence gathering by the Macao Judicial Court commenced by letters rogatory, which was completed on March 14, 2019, and the trial of this matter was scheduled for September 2019.

On July 15, 2019, AAEC submitted a request to the Macao Judicial Court to increase the amount of its claim to 96.45 billion patacas (approximately $12.08 billion at exchange rates in effect on December 31, 2020), allegedly representing lost profits from 2004 to 2018, and reserving its right to claim for lost profits up to 2022 in due course at the enforcement stage.

On September 2, 2019, the U.S. Defendants moved to revoke the legal aid granted to AAEC, which excuses AAEC from paying its share of court costs. On September 4, 2019, the Macao Judicial Court deferred ruling on the U.S. Defendants' motion regarding legal aid until the entry of final judgment. The U.S. Defendants appealed that deferral on September 17, 2019. On September 26, 2019, the Macao Judicial Court rejected that appeal on procedural grounds. The U.S. Defendants requested clarification of that order on October 29, 2019. By order dated December 4, 2019, the Macao Judicial Court stated it would reconsider the U.S. Defendants' motion to revoke legal aid and, as part of that reconsideration, it would reanalyze portions of the record, seek an opinion from the Macao Public Prosecutor regarding the propriety of legal aid and consult with the trial court overseeing AAEC's separate

107

000847

Table of Contents

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

litigation against Galaxy Entertainment Group Ltd., Galaxy Entertainment Group S.A. and Messrs. Weidner and Friedman, individually. The Macao Judicial Court denied the motion to revoke legal aid on January 14, 2020.

On September 4, 2019, the Macao Judicial Court allowed AAEC's request to increase the amount of its claim. On September 17, 2019, the U.S. Defendants appealed the decision granting AAEC's request. On September 26, 2019, the Macao Judicial Court accepted that appeal and it is currently pending before the Macao Second Instance Court.

On June 18, 2020, the U.S. Defendants moved to reschedule the trial, which had been scheduled to begin on September 16, 2020, due to travel disruptions and other extraordinary circumstances resulting from the ongoing COVID-19 Pandemic. The Macao Judicial Court granted that motion and rescheduled the trial to begin on June 16, 2021.

The Macao Action is in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. The Company intends to defend this matter vigorously.

### *The Daniels Family 2001 Revocable Trust v. LVSC, et al.*

On October 22, 2020, The Daniels Family 2001 Revocable Trust, a putative purchaser of the Company's shares, filed a purported class action complaint in the U.S. District Court against LVSC, Sheldon G. Adelson and Patrick Dumont. The complaint asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and alleges that LVSC made materially false or misleading statements, or failed to disclose material facts, from February 27, 2016 through September 15, 2020, with respect to its operations at the Marina Bay Sands, its compliance with Singapore laws and regulations, and its disclosure controls and procedures. On January 5, 2021, the U.S. District Court entered an order appointing Carl S. Ciaccio and Donald M. DeSalvo as co-lead plaintiffs. Pursuant to a scheduling order entered by the U.S. District Court, the plaintiffs anticipate filing an amended complaint on or before March 8, 2021. The Company anticipates bringing a motion to dismiss the amended complaint on or before May 7, 2021. All briefing on the motion to dismiss is scheduled to be completed by August 5, 2021. This action is in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any. The Company intends to defend this matter vigorously.

### *Turesky v. Sheldon G. Adelson, et al.*

On December 28, 2020, Andrew Turesky filed a putative shareholder derivative action on behalf of the Company in the U.S. District Court, against Sheldon G. Adelson, Patrick Dumont, Robert G. Goldstein, Irwin Chafetz, Micheline Chau, Charles D. Forman, Steven L. Gerard, George Jamieson, Charles A. Koppelman, Lewis Kramer and David F. Levi, all of whom are current or former directors and/or officers of LVSC. The complaint asserts claims for breach of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of Sections 10(b), 14(a) and 20(a) of the Exchange Act and for contribution under Sections 10(b) and 21D of the Exchange Act. The Company's response to the complaint is currently due on or before February 24, 2021. This action is in a preliminary stage and management has determined that based on proceedings to date, it is currently unable to determine the probability of the outcome of this matter or the range of reasonably possible loss, if any.

### Macao Subconcession

Under the Macao subconcession, the Company is obligated to pay to the Macao government an annual premium with a fixed portion and a variable portion based on the number and type of gaming tables it employs and gaming machines it operates. The fixed portion of the premium is equal to 30 million patacas (approximately $4 million at exchange rates in effect on December 31, 2020). The variable portion is equal to 300,000 patacas per gaming table reserved exclusively for certain kinds of games or players, 150,000 patacas per gaming table not so reserved and 1,000 patacas per electrical or mechanical gaming machine, including slot machines (approximately $37,570, $18,785 and $125, respectively, at exchange rates in effect on December 31, 2020), subject to a minimum of 45 million patacas (approximately $6 million at exchange rates in effect on December 31, 2020). The Company is also obligated to pay a special gaming tax of 35% of gross gaming revenues and applicable withholding taxes. The Company must also contribute 4% of its gross gaming revenue to utilities designated by the Macao government, a

108

000848

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

portion of which must be used for promotion of tourism in Macao. Based on the number and types of gaming tables employed and gaming machines in operation as of December 31, 2020, the Company was obligated under its subconcession to make minimum future payments of approximately $41 million during the year ending December 31, 2021, and approximately $21 million during the year ending December 31, 2022.

**Note 15 — Stock-Based Employee Compensation**

The Company has two equity award plans for grants of options to purchase the Company's common stock and ordinary shares of SCL (the "2004 Plan" and the "SCL Equity Plan," respectively), which are described below. The plans provide for the granting of equity awards pursuant to the applicable provisions of the Internal Revenue Code and regulations.

**Las Vegas Sands Corp. 2004 Equity Award Plan**

The 2004 Plan gives the Company a competitive edge in attracting, retaining and motivating employees, directors and consultants and to provide the Company with a stock plan providing incentives directly related to increases in its stockholder value. Any of the Company's subsidiaries' or affiliates' employees, directors or officers and many of its consultants are eligible for awards under the 2004 Plan. The 2004 Plan provided for an aggregate of 26,344,000 shares of the Company's common stock to be available for awards. The 2004 Plan originally had a term of ten years, but in June 2014, the Company's Board of Directors approved an amendment to the 2004 Plan, extending the term to December 2019. In May 2019, the Board of Directors and stockholders approved the adoption of the Las Vegas Sands Corp. Amended and Restated 2004 Equity Award Plan (the "Amended 2004 Plan"), which extended the term of the Amended 2004 Plan through December 2024, and increased the number of shares of common stock available for grants by 10,000,000 shares. The compensation committee may grant awards of nonqualified stock options, incentive (qualified) stock options, stock appreciation rights, restricted stock awards, restricted stock units, stock bonus awards, performance compensation awards or any combination of the foregoing. As of December 31, 2020, there were 8,998,486 shares available for grant under the Amended 2004 Plan.

Stock option awards are granted with an exercise price equal to the fair market value (as defined in the Amended 2004 Plan) of the Company's stock on the date of grant. The outstanding stock options generally vest over three to four years and have ten-year contractual terms. Compensation cost for all stock option grants, which all have graded vesting, is recognized on a straight-line basis over the awards' respective requisite service periods. The Company estimates the fair value of stock options using the Black-Scholes option-pricing model. Expected volatilities are based on the Company's historical volatility for a period equal to the expected life of the stock options. The expected option life is based on the contractual term of the option as well as historical exercise and forfeiture behavior. The risk-free interest rate for periods equal to the expected term of the stock option is based on the U.S. Treasury yield curve in effect at the time of grant. The expected dividend yield is based on the estimate of annual dividends expected to be paid at the time of the grant.

**Sands China Ltd. Equity Award Plan**

The SCL Equity Plan gives SCL a competitive edge in attracting, retaining and motivating employees, directors and consultants and to provide SCL with a stock plan providing incentives directly related to increases in its stockholder value. Subject to certain criteria as defined in the SCL Equity Plan, SCL's subsidiaries' or affiliates' employees, directors or officers and many of its consultants are eligible for awards under the SCL Equity Plan.

The SCL 2009 Equity Plan provided for an aggregate of 804,786,508 shares of SCL's common stock to be available for awards. The SCL 2009 Equity Plan had a term of ten years, which expired on November 30, 2019, and no further awards may be granted after the expiration of the term. All existing awards previously granted under the SCL 2009 Equity Plan, but which are unexercised or unvested, will remain valid and (where applicable) exercisable in accordance with their terms of grant despite the expiration of the SCL 2009 Equity Plan. SCL's remuneration committee may grant awards of stock options, stock appreciation rights, restricted stock awards, restricted stock units, stock bonus awards, performance compensation awards or any combination of the foregoing. Effective December 1, 2019, the SCL 2019 Equity Plan was approved by shareholders, with materially the same terms of the SCL 2009 Equity Plan. As of December 31, 2020, there were 808,619,139 shares available for grant under the SCL 2019 Equity Plan.

000849

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

Stock option awards are granted with an exercise price not less than (i) the closing price of SCL's stock on the date of grant or (ii) the average closing price of SCL's stock for the five business days immediately preceding the date of grant. The outstanding stock options generally vest over four years and have ten-year contractual terms. Compensation cost for all stock option grants, which all have graded vesting is recognized on a straight-line basis over the awards' respective requisite service periods. SCL estimates the fair value of stock options using the Black-Scholes option-pricing model. Expected volatilities are based on SCL's historical volatility for a period equal to the expected life of the stock options. The expected option life is based on the contractual term of the option as well as historical exercise and forfeiture behavior. The risk-free interest rate for periods equal to the expected term of the stock option is based on the Hong Kong Government Bond rate in effect at the time of the grant. The expected dividend yield is based on the estimate of annual dividends expected to be paid at the time of the grant.

Under the SCL 2009 Equity Plan and the SCL 2019 Equity Plan, SCL granted restricted share units to eligible employees. Such restricted share units vest over three to four years. Employees are entitled to a future cash payment that is equivalent to the fair value of the restricted share unit and any accumulated dividends in cash upon vesting.

**Stock-Based Employee Compensation Activity**

The fair value of each option grant was estimated on the grant date using the Black-Scholes option-pricing model with the following weighted average assumptions:

|  | Year Ended December 31, | | |
|  | 2020 | 2019 | 2018 |
| --- | --- | --- | --- |
| **LVSC Amended 2004 Plan:** | | | |
| Weighted average volatility | 23.8 % | 24.1 % | 25.8 % |
| Expected term (in years) | 5.5 | 5.5 | 6.7 |
| Risk-free rate | 1.3 % | 2.1 % | 2.9 % |
| Expected dividend yield | 4.6 % | 5.2 % | 5.7 % |
| **SCL Equity Plan:** | | | |
| Weighted average volatility | — % | 36.9 % | 36.0 % |
| Expected term (in years) | — | 4.8 | 4.7 |
| Risk-free rate | — % | 1.7 % | 1.7 % |
| Expected dividend yield | — % | 5.0 % | 5.8 % |

A summary of the stock option activity for the Company's equity award plans for the year ended December 31, 2020, is presented below:

|  | Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value (in millions) |
| --- | --- | --- | --- | --- |
| **LVSC Amended 2004 Plan:** | | | | |
| Outstanding as of January 1, 2020 | 8,515,855 | $ 56.33 | | |
| Granted | 875,474 | 64.82 | | |
| Exercised | (342,700) | 51.25 | | |
| Forfeited or expired | (111,363) | 72.44 | | |
| Outstanding as of December 31, 2020 | 8,937,266 | $ 57.16 | 6.61 | $ 38 |
| Exercisable as of December 31, 2020 | 4,597,701 | $ 58.52 | 5.14 | $ 14 |
| **SCL Equity Plan:** | | | | |
| Outstanding as of January 1, 2020 | 64,874,150 | $ 4.99 | | |
| Granted | — | — | | |
| Exercised | (1,766,550) | 3.41 | | |
| Forfeited or expired | (8,689,800) | 5.51 | | |
| Outstanding as of December 31, 2020 | 54,417,800 | $ 4.96 | 6.53 | $ 9 |
| Exercisable as of December 31, 2020 | 32,903,000 | $ 4.85 | 5.77 | $ 9 |

000850

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

A summary of the unvested restricted stock and restricted stock units under the Company's equity award plans for the year ended December 31, 2020, is presented below:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| **LVSC Amended 2004 Plan:** | | | |
| *Unvested Restricted Stock* | | | |
| Balance as of January 1, 2020 | 19,337 | $ | 60.00 |
| Granted | 17,512 | | 45.68 |
| Vested | (19,337) | | 60.00 |
| Forfeited | (2,189) | | 45.68 |
| Balance as of December 31, 2020 | 15,323 | $ | 45.68 |
| **SCL Equity Plan:** | | | |
| *Unvested Restricted Stock Units* | | | |
| Balance as of January 1, 2020 | 1,407,200 | $ | 4.99 |
| Granted | 2,337,200 | | 4.11 |
| Vested | (244,500) | | 4.09 |
| Forfeited | (137,200) | | 4.97 |
| Balance as of December 31, 2020 | 3,362,700 | $ | 4.44 |

The grant date fair value of SCL's restricted stock unit awards is the share price of SCL's ordinary shares at the respective grant date. The fair value of these awards is remeasured each reporting period until the vesting dates. Upon settlement, SCL will pay the grantees an amount in cash calculated based on the higher of (i) the closing price of SCL's shares on the vesting date, and (ii) the average closing price of SCL's shares for the five trading days immediately preceding the vesting date. The accrued liability associated with these cash-settled restricted stock units was $3 million as of December 31, 2020.

As of December 31, 2020, under the Amended 2004 Plan there was $18 million of unrecognized compensation cost related to unvested stock options. The stock option costs are expected to be recognized over a weighted average period of 2.4 years.

As of December 31, 2020, under the SCL Equity Plan there was $14 million and $9 million of unrecognized compensation cost related to unvested stock options and unvested restricted stock units, respectively. The stock option and restricted stock unit costs are expected to be recognized over a weighted average period of 1.9 years.

111

000851

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

The stock-based compensation activity for the Amended 2004 Plan and SCL Equity Plan is as follows for the three years ended December 31, 2020:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (Dollars in millions, except weighted average grant date fair values) | | |
| Compensation expense: | | | |
| Stock options | $ 21 | $ 34 | $ 29 |
| Restricted stock and stock units | 7 | 2 | 1 |
| | $ 28 | $ 36 | $ 30 |
| Income tax benefit recognized in the consolidated statements of operations | $ 2 | $ 4 | $ 4 |
| Compensation cost capitalized as part of property and equipment | $ 1 | $ 1 | $ 1 |
| **LVSC Amended 2004 Plan:** | | | |
| Stock options granted | 875,474 | 1,204,145 | 3,124,168 |
| Weighted average grant date fair value | $ 7.79 | $ 7.23 | $ 7.52 |
| Restricted stock granted | 17,512 | 11,039 | 10,296 |
| Weighted average grant date fair value | $ 45.68 | $ 63.40 | $ 77.68 |
| Stock options exercised: | | | |
| Intrinsic value | $ 5 | $ 11 | $ 16 |
| Cash received | $ 18 | $ 26 | $ 56 |
| **SCL 2019 Equity Plan:** | | | |
| Stock options granted | — | 19,409,600 | 18,872,800 |
| Weighted average grant date fair value | $ — | $ 1.03 | $ 1.01 |
| Restricted stock units granted | 2,337,200 | 1,412,400 | — |
| Weighted average grant date fair value | $ 4.11 | $ 4.99 | $ — |
| Stock options exercised: | | | |
| Intrinsic value | $ 2 | $ 12 | $ 12 |
| Cash received | $ 6 | $ 28 | $ 23 |

**Note 16 — Related Party Transactions**

During the years ended December 31, 2020, 2019 and 2018, the Principal Stockholder and his family purchased certain services from the Company including lodging, banquet services and other goods and services for $1 million, $2 million and $3 million, respectively. For the years ended December 31, 2020, 2019 and 2018, the Company incurred $2 million, $3 million and $3 million, respectively, for food and beverage services, newspaper subscriptions and security support from entities in which the Principal Stockholder has an ownership interest.

During the years ended December 31, 2020, 2019 and 2018, the Company incurred certain expenses of $5 million, $9 million and $6 million, respectively, related to the Company's use of its Principal Stockholder's personal aircraft and yacht and aircraft refurbishment and maintenance services for business purposes. During the years ended December 31, 2020, 2019 and 2018, the Company charged the Principal Stockholder $18 million, $25 million and $20 million, respectively, related to aviation costs incurred by the Company for the Principal Stockholder's use of Company aviation personnel and assets for personal purposes. In addition, the Principal Stockholder agreed to reimburse the Company for the installation of avionics and aircraft systems on his personal aircraft. During the years ended December 31, 2019 and 2018, the Company paid $9 million and $13 million, respectively, for such costs and was reimbursed in full by the Principal Stockholder.

Related party receivables were $6 million and $3 million as of December 31, 2020 and 2019, respectively. Related party payables were approximately $1 million and $2 million as of December 31, 2020 and 2019, respectively.

112

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Note 17 — Segment Information**

The Company's principal operating and developmental activities occur in three geographic areas: Macao, Singapore and the U.S. The Company reviews the results of operations for each of its operating segments: The Venetian Macao; The Londoner Macao; The Parisian Macao; The Plaza Macao and Four Seasons Hotel Macao; Sands Macao; Marina Bay Sands; Las Vegas Operating Properties; and, through May 30, 2019, Sands Bethlehem. The Company also reviews construction and development activities for each of its primary projects currently under development, in addition to its reportable segments noted above, which include the renovation, expansion and rebranding of Sands Cotai Central to The Londoner Macao, the MBS Expansion Project and the Las Vegas Condo Tower (for which construction currently is suspended) in the United States. The Company has included Ferry Operations and Other (comprised primarily of the Company's ferry operations and various other operations that are ancillary to its properties in Macao) to reconcile to consolidated results of operations and financial condition. The Company has included Corporate and Other (which includes the Las Vegas Condo Tower and corporate activities of the Company) to reconcile to the consolidated financial condition.

The Company's segment information as of and for the years ended December 31, 2020, 2019 and 2018, is as follows:

| | Casino | Rooms | Food and Beverage | Mall | Convention, Retail and Other | Net Revenues |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Year Ended December 31, 2020** | | | | | | |
| Macao: | | | | | | |
| The Venetian Macao | $ 531 | $ 46 | $ 14 | $ 126 | $ 21 | $ 738 |
| The Londoner Macao | 192 | 42 | 17 | 38 | 8 | 297 |
| The Parisian Macao | 180 | 33 | 14 | 27 | 5 | 259 |
| The Plaza Macao and Four Seasons Hotel Macao | 159 | 17 | 9 | 79 | 1 | 265 |
| Sands Macao | 107 | 6 | 5 | 1 | 1 | 120 |
| Ferry Operations and Other | — | — | — | — | 28 | 28 |
| | 1,169 | 144 | 59 | 271 | 64 | 1,707 |
| Marina Bay Sands | 872 | 136 | 97 | 112 | 44 | 1,261 |
| Las Vegas Operating Properties | 227 | 218 | 127 | — | 166 | 738 |
| Intercompany eliminations[1] | — | — | — | (2) | (92) | (94) |
| Total net revenues | $ 2,268 | $ 498 | $ 283 | $ 381 | $ 182 | $ 3,612 |
| **Year Ended December 31, 2019** | | | | | | |
| Macao: | | | | | | |
| The Venetian Macao | $ 2,875 | $ 222 | $ 73 | $ 254 | $ 86 | $ 3,510 |
| The Londoner Macao | 1,541 | 320 | 97 | 71 | 23 | 2,052 |
| The Parisian Macao | 1,376 | 130 | 70 | 53 | 21 | 1,650 |
| The Plaza Macao and Four Seasons Hotel Macao | 650 | 41 | 31 | 151 | 4 | 877 |
| Sands Macao | 576 | 18 | 27 | 3 | 4 | 628 |
| Ferry Operations and Other | — | — | — | — | 117 | 117 |
| | 7,018 | 731 | 298 | 532 | 255 | 8,834 |
| Marina Bay Sands | 2,167 | 404 | 241 | 185 | 104 | 3,101 |
| United States: | | | | | | |
| Las Vegas Operating Properties | 444 | 610 | 347 | — | 417 | 1,818 |
| Sands Bethlehem[2] | 199 | 7 | 11 | 1 | 9 | 227 |
| | 643 | 617 | 358 | 1 | 426 | 2,045 |
| Intercompany eliminations[1] | — | — | — | (2) | (239) | (241) |
| Total net revenues | $ 9,828 | $ 1,752 | $ 897 | $ 716 | $ 546 | $ 13,739 |

113

000853

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

| | Casino | Rooms | Food and Beverage | Mall | Convention, Retail and Other | Net Revenues |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **Year Ended December 31, 2018** | | | | | | |
| Macao: | | | | | | |
| The Venetian Macao | $ 2,829 | $ 223 | $ 81 | $ 234 | $ 107 | $ 3,474 |
| The Londoner Macao | 1,622 | 331 | 102 | 69 | 29 | 2,153 |
| The Parisian Macao | 1,265 | 124 | 65 | 57 | 22 | 1,533 |
| The Plaza Macao and Four Seasons Hotel Macao | 502 | 39 | 29 | 145 | 4 | 719 |
| Sands Macao | 598 | 17 | 27 | 3 | 5 | 650 |
| Ferry Operations and Other | — | — | — | — | 160 | 160 |
| | 6,816 | 734 | 304 | 508 | 327 | 8,689 |
| Marina Bay Sands | 2,178 | 393 | 211 | 179 | 108 | 3,069 |
| United States: | | | | | | |
| Las Vegas Operating Properties | 357 | 590 | 324 | — | 411 | 1,682 |
| Sands Bethlehem | 468 | 16 | 26 | 4 | 22 | 536 |
| | 825 | 606 | 350 | 4 | 433 | 2,218 |
| Intercompany eliminations[1] | — | — | — | (1) | (246) | (247) |
| Total net revenues | $ 9,819 | $ 1,733 | $ 865 | $ 690 | $ 622 | $ 13,729 |

_____

(1) Intercompany eliminations include royalties and other intercompany services.

(2) The Company completed the sale of Sands Bethlehem on May 31, 2019. Results of operations include Sands Bethlehem through May 30, 2019.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| **Intersegment Revenues** | | | |
| Macao: | | | |
| The Venetian Macao | $ 4 | $ 4 | $ 4 |
| The Londoner Macao | 1 | — | — |
| Ferry Operations and Other | 19 | 27 | 25 |
| | 24 | 31 | 29 |
| Marina Bay Sands | 4 | 4 | 9 |
| Las Vegas Operating Properties | 66 | 206 | 209 |
| Total intersegment revenues | $ 94 | $ 241 | $ 247 |

000854

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| **Adjusted Property EBITDA** | | | |
| Macao: | | | |
| The Venetian Macao | $ (53) | $ 1,407 | $ 1,378 |
| The Londoner Macao | (184) | 726 | 759 |
| The Parisian Macao | (131) | 544 | 484 |
| The Plaza Macao and Four Seasons Hotel Macao | 33 | 345 | 262 |
| Sands Macao | (76) | 175 | 178 |
| Ferry Operations and Other | (20) | (8) | 18 |
| | (431) | 3,189 | 3,079 |
| Marina Bay Sands | 383 | 1,661 | 1,690 |
| United States: | | | |
| Las Vegas Operating Properties | (124) | 487 | 394 |
| Sands Bethlehem[1] | — | 52 | 116 |
| | (124) | 539 | 510 |
| Consolidated adjusted property EBITDA[2] | (172) | 5,389 | 5,279 |
| **Other Operating Costs and Expenses** | | | |
| Stock-based compensation[3] | (16) | (14) | (12) |
| Corporate | (168) | (313) | (202) |
| Pre-opening | (19) | (34) | (6) |
| Development | (18) | (24) | (12) |
| Depreciation and amortization | (1,160) | (1,165) | (1,111) |
| Amortization of leasehold interests in land | (55) | (51) | (35) |
| Loss on disposal or impairment of assets | (80) | (90) | (150) |
| Operating income (loss) | (1,688) | 3,698 | 3,751 |
| **Other Non-Operating Costs and Expenses** | | | |
| Interest income | 21 | 74 | 59 |
| Interest expense, net of amounts capitalized | (536) | (555) | (446) |
| Other income | 22 | 23 | 26 |
| Gain on sale of Sands Bethlehem | — | 556 | — |
| Loss on modification or early retirement of debt | — | (24) | (64) |
| Income tax (expense) benefit | 38 | (468) | (375) |
| Net income (loss) | $ (2,143) | $ 3,304 | $ 2,951 |

_____

(1)  The Company completed the sale of Sands Bethlehem on May 31, 2019. Results of operations include Sands Bethlehem through May 30, 2019.

(2)  Consolidated adjusted property EBITDA, which is a non-GAAP financial measure, is net income before stock-based compensation expense, corporate expense, pre-opening expense, development expense, depreciation and amortization, amortization of leasehold interests in land, gain or loss on disposal or impairment of assets, interest, other income or expense, gain on sale of Sands Bethlehem, gain or loss on modification or early retirement of debt and income taxes. Consolidated adjusted property EBITDA is a supplemental non-GAAP financial measure used by management, as well as industry analysts, to evaluate operations and operating performance. In particular, management utilizes consolidated adjusted property EBITDA to compare the operating profitability of its operations with those of its competitors, as well as a basis for determining certain incentive compensation. Integrated Resort companies have historically reported adjusted property EBITDA as a supplemental performance measure to GAAP financial measures. In order to view the operations of their properties on a more stand-alone basis, Integrated Resort companies, including Las Vegas Sands Corp., have historically excluded certain expenses that do not relate to the management of

000855

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

specific properties, such as pre-opening expense, development expense and corporate expense, from their adjusted property EBITDA calculations. Consolidated adjusted property EBITDA should not be interpreted as an alternative to income from operations (as an indicator of operating performance) or to cash flows from operations (as a measure of liquidity), in each case, as determined in accordance with GAAP. The Company has significant uses of cash flow, including capital expenditures, dividend payments, interest payments, debt principal repayments and income taxes, which are not reflected in consolidated adjusted property EBITDA. Not all companies calculate adjusted property EBITDA in the same manner. As a result, consolidated adjusted property EBITDA as presented by the Company may not be directly comparable to similarly titled measures presented by other companies.

(3) During the years ended December 31, 2020, 2019 and 2018, the Company recorded stock-based compensation expense of $28 million, $36 million and $30 million, respectively, of which $12 million, $22 million and $18 million, respectively, was included in corporate expense in the accompanying consolidated statements of operations.

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| **Capital Expenditures** | | | |
| Corporate and Other | $ 5 | $ 59 | $ 81 |
| Macao: | | | |
| The Venetian Macao | 140 | 131 | 180 |
| The Londoner Macao | 739 | 282 | 131 |
| The Parisian Macao | 11 | 32 | 131 |
| The Plaza Macao and Four Seasons Hotel Macao | 157 | 298 | 63 |
| Sands Macao | 9 | 16 | 29 |
| Ferry Operations and Other | 2 | 3 | 1 |
| | 1,058 | 762 | 535 |
| Marina Bay Sands | 164 | 195 | 182 |
| United States: | | | |
| Las Vegas Operating Properties | 103 | 198 | 127 |
| Sands Bethlehem[1] | — | 2 | 24 |
| | 103 | 200 | 151 |
| Total capital expenditures | $ 1,330 | $ 1,216 | $ 949 |

(1) The Company completed the sale of Sands Bethlehem on May 31, 2019. Results of operations include Sands Bethlehem through May 30, 2019.

116

000856

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

|  | | December 31, | | | | |
|---|---|---|---|---|---|---|
|  | | 2020 | | 2019 | | 2018 |
|  | | (In millions) | | | | |
| **Total Assets** | | | | | | |
| Corporate and Other | $ | 839 | $ | 1,390 | $ | 1,296 |
| Macao: | | | | | | |
| The Venetian Macao | | 2,446 | | 3,243 | | 3,403 |
| The Londoner Macao | | 4,298 | | 4,504 | | 4,295 |
| The Parisian Macao | | 2,119 | | 2,351 | | 2,455 |
| The Plaza Macao and Four Seasons Hotel Macao | | 1,203 | | 1,239 | | 883 |
| Sands Macao | | 320 | | 324 | | 322 |
| Ferry Operations and Other | | 141 | | 156 | | 259 |
|  | | 10,527 | | 11,817 | | 11,617 |
| Marina Bay Sands | | 5,592 | | 5,880 | | 4,674 |
| United States: | | | | | | |
| Las Vegas Operating Properties | | 3,849 | | 4,112 | | 4,321 |
| Sands Bethlehem[1] | | — | | — | | 639 |
|  | | 3,849 | | 4,112 | | 4,960 |
| Total assets | $ | 20,807 | $ | 23,199 | $ | 22,547 |

(1)  The Company completed the sale of Sands Bethlehem on May 31, 2019.

|  | | December 31, | | | | |
|---|---|---|---|---|---|---|
|  | | 2020 | | 2019 | | 2018 |
|  | | (In millions) | | | | |
| **Total Long-Lived Assets[1]** | | | | | | |
| Corporate and Other | $ | 308 | $ | 311 | $ | 281 |
| Macao: | | | | | | |
| The Venetian Macao | | 1,705 | | 1,740 | | 1,750 |
| The Londoner Macao | | 4,162 | | 3,591 | | 3,414 |
| The Parisian Macao | | 2,067 | | 2,203 | | 2,317 |
| The Plaza Macao and Four Seasons Hotel Macao | | 1,135 | | 1,112 | | 772 |
| Sands Macao | | 218 | | 237 | | 229 |
| Ferry Operations and Other | | 73 | | 54 | | 130 |
|  | | 9,360 | | 8,937 | | 8,612 |
| Marina Bay Sands | | 4,989 | | 5,063 | | 4,148 |
| United States: | | | | | | |
| Las Vegas Operating Properties | | 2,708 | | 2,805 | | 2,762 |
| Sands Bethlehem[2] | | — | | — | | 549 |
|  | | 2,708 | | 2,805 | | 3,311 |
| Total long-lived assets | $ | 17,365 | $ | 17,116 | $ | 16,352 |

(1)  Long-lived assets include property and equipment, net of accumulated depreciation and amortization, and leasehold interests in land, net of accumulated amortization.

(2)  The Company completed the sale of Sands Bethlehem on May 31, 2019.

117

000857

**LAS VEGAS SANDS CORP. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (CONTINUED)**

**Note 18 — Selected Quarterly Financial Results (Unaudited)**

| | Quarter | | | | |
| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| | (In millions, except per share data) | | | | |
| **2020** | | | | | |
| Net revenues | $ 1,782 | $ 98 | $ 586 | $ 1,146 | $ 3,612 |
| Operating income (loss) | 55 | (922) | (610) | (211) | (1,688) |
| Net loss | (51) | (985) | (731) | (376) | (2,143) |
| Net loss attributable to Las Vegas Sands Corp. | (1) | (820) | (565) | (299) | (1,685) |
| Basic loss per share | — | (1.07) | (0.74) | (0.39) | (2.21) |
| Diluted loss per share | — | (1.07) | (0.74) | (0.39) | (2.21) |
| **2019** | | | | | |
| Net revenues | $ 3,646 | $ 3,334 | $ 3,250 | $ 3,509 | $ 13,739 |
| Operating income | 971 | 894 | 899 | 934 | 3,698 |
| Net income[1] | 744 | 1,108 | 669 | 783 | 3,304 |
| Net income attributable to Las Vegas Sands Corp.[1] | 582 | 954 | 533 | 629 | 2,698 |
| Basic earnings per share[1] | 0.75 | 1.24 | 0.69 | 0.82 | 3.50 |
| Diluted earnings per share[1] | 0.75 | 1.24 | 0.69 | 0.82 | 3.50 |

_____

(1)  During Q2 2019, the Company closed the sale of Sands Bethlehem and recorded a gain on the sale of $556 million.

Because earnings per share amounts are calculated using the weighted average number of common and dilutive common equivalent shares outstanding during each quarter, the sum of the per share amounts for the four quarters may not equal the total earnings per share amounts for the respective year.

118

000858

Table of Contents

### SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS

### LAS VEGAS SANDS CORP. AND SUBSIDIARIES

### For the Years Ended December 31, 2020, December 31, 2019 and December 31, 2018

| Description | Balance at Beginning of Year | | Provision for Credit Losses | Write-offs, Net of Recoveries | Balance at End of Year | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| Provision for credit losses: | | | | | | |
| 2018 | $ | 442 | 5 | (123) | $ | 324 |
| 2019 | $ | 324 | 30 | (72) | $ | 282 |
| 2020 | $ | 282 | 99 | (67) | $ | 314 |

| Description | Balance at Beginning of Year | | Additions | Deductions | Balance at End of Year | |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| Deferred income tax asset valuation allowance: | | | | | | |
| 2018 | $ | 4,690 | 105 | (26) | $ | 4,769 |
| 2019 | $ | 4,769 | 29 | (12) | $ | 4,786 |
| 2020 | $ | 4,786 | 138 | (2) | $ | 4,922 |

119

000859

Table of Contents

**ITEM 9. — *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE***

Not applicable.

**ITEM 9A. — *CONTROLS AND PROCEDURES***

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of December 31, 2020, and have concluded they are effective at the reasonable assurance level.

It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Company's internal control over financial reporting that occurred during the fourth quarter covered by this Annual Report on Form 10-K that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.

**Management's Annual Report on Internal Control Over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

(1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets;

(2) provide reasonable assurance transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and the Company's receipts and expenditures are being made only in accordance with authorizations of its management and directors; and

(3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2020. In making this assessment, the Company's management used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)."

000860

Table of Contents

Based on this assessment, management concluded, as of December 31, 2020, the Company's internal control over financial reporting is effective based on this framework.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2020, has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report, which appears herein.

**ITEM 9B. — *OTHER INFORMATION***

None.

**PART III**

**ITEM 10. — *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE***

We incorporate by reference the information responsive to this Item appearing in our definitive Proxy Statement for our 2021 Annual Meeting of Stockholders, which we expect to file with the Securities and Exchange Commission on or about March 31, 2021 (the "Proxy Statement"), including under the captions "Board of Directors," "Executive Officers," "Delinquent Section 16(a) Reports" and "Information Regarding the Board of Directors and Board and Other Committees."

We have adopted a Code of Business Conduct and Ethics, which is posted on our website at *www.sands.com*, along with any amendments or waivers to the Code. Copies of the Code of Business Conduct and Ethics are available without charge by sending a written request to Investor Relations at the following address: Las Vegas Sands Corp., 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

**ITEM 11. — *EXECUTIVE COMPENSATION***

We incorporate by reference the information responsive to this Item appearing in the Proxy Statement, including under the captions "Executive Compensation and Other Information," "Director Compensation," "Information Regarding the Board of Directors and Board and Other Committees" and "Compensation Committee Report" (which report is deemed to be furnished and is not deemed to be filed in any Company filing under the Securities Act of 1933 or the Securities Exchange Act of 1934).

**ITEM 12. — *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS***

We incorporate by reference the information responsive to this Item appearing in the Proxy Statement, including under the captions "Equity Compensation Plan Information" and "Security Ownership of Certain Beneficial Owners and Management."

**ITEM 13. — *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE***

We incorporate by reference the information responsive to this Item appearing in the Proxy Statement, including under the captions "Board of Directors," "Information Regarding the Board of Directors and Board and Other Committees" and "Certain Transactions."

**ITEM 14. — *PRINCIPAL ACCOUNTANT FEES AND SERVICES***

We incorporate by reference the information responsive to this Item appearing in the Proxy Statement, under the caption "Fees Paid to Independent Registered Public Accounting Firm."

000861

Table of Contents

## PART IV

**ITEM 15. — *EXHIBITS AND FINANCIAL STATEMENT SCHEDULES***

(a) Documents filed as part of the Annual Report on Form 10-K.

(1) List of Financial Statements

Reports of Independent Registered Public Accounting Firm

Consolidated Balance Sheets

Consolidated Statements of Operations

Consolidated Statements of Comprehensive Income

Consolidated Statements of Equity

Consolidated Statements of Cash Flows

Notes to Consolidated Financial Statements

(2) List of Financial Statement Schedule

Schedule II — Valuation and Qualifying Accounts

(3) List of Exhibits

| Exhibit No. | Description of Document |
| --- | --- |
| 3.1 | Certificate of Amended and Restated Articles of Incorporation of Las Vegas Sands Corp. (incorporated by reference from Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2018 and filed on July 25, 2018). |
| 3.2 | Second Amended and Restated By-Laws of Las Vegas Sands Corp., as further amended effective October 20, 2020 (incorporated by reference from Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended September 30, 2020 and filed on October 23, 2020). |
| 4.1 | Form of Specimen Common Stock Certificate of Las Vegas Sands Corp. (incorporated by reference from Exhibit 4.1 to the Company's Amendment No. 2 to Registration Statement on Form S-1 (File No. 333-118827) filed on November 22, 2004). |
| 4.2 | Indenture, dated as of August 9, 2018, between SCL and U.S. Bank National Association, as trustee (incorporated by reference from Exhibit 4.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on August 10, 2018). |
| 4.3 | Forms of 4.600% Senior Notes due 2023, 5.125% Senior Notes due 2025 and 5.400% Senior Notes due 2028 (incorporated by reference from Exhibit 4.2 (included in Exhibit 4.1) to the Company's Current Report on Form 8-K (File No. 001-32373) filed on August 10, 2018). |
| 4.4 | Indenture, dated as of June 4, 2020, between SCL and U.S. Bank National Association, as trustee (incorporated by reference from Exhibit 4.1 to the Company's current report on Form 8-K (File No. 001-32373) filed on June 5, 2020). |
| 4.5 | Forms of 3.800% Senior Notes due 2026 and 4.375% Senior Notes due 2030 (incorporated by reference from Exhibit 4.2 (included in Exhibit 4.1) to the Company's current report on Form 8-K (File No. 001-32373) filed on June 5, 2020). |
| 4.6 | Indenture, dated as of July 31, 2019, between Las Vegas Sands Corp. and U.S. Bank National Association, as trustee (incorporated by reference from Exhibit 4.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on July 31, 2019). |
| 4.7 | First Supplemental Indenture, dated as of July 31, 2019, between Las Vegas Sands Corp. and U.S. Bank National Association, as trustee, relating to the 3.200% Notes due 2024 (incorporated by reference from Exhibit 4.2 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on July 31, 2019). |
| 4.8 | Form of Las Vegas Sands Corp.'s 3.200% Notes due 2024 (included in Exhibit 4.5 hereto) (incorporated by reference from Exhibit 4.3 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on July 31, 2019). |

000862

| Exhibit No. | Description of Document |
|---|---|
| 4.9 | Second Supplemental Indenture, dated as of July 31, 2019, between Las Vegas Sands Corp. and U.S. Bank National Association, as trustee, relating to the 3.500% Notes due 2026 (incorporated by reference from Exhibit 4.4 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on July 31, 2019). |
| 4.10 | Form of Las Vegas Sands Corp.'s 3.500% Notes due 2026 (included in Exhibit 4.7 hereto) (incorporated by reference from Exhibit 4.5 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on July 31, 2019). |
| 4.11 | Third Supplemental Indenture, dated as of July 31, 2019, between Las Vegas Sands Corp. and U.S. Bank National Association, as trustee, relating to the 3.900% Notes due 2029 (incorporated by reference from Exhibit 4.6 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on July 31, 2019). |
| 4.12 | Form of Las Vegas Sands Corp.'s 3.900% Notes due 2029 (included in Exhibit 4.9 hereto) (incorporated by reference from Exhibit 4.7 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on July 31, 2019). |
| 4.13 | Fourth Supplemental Indenture, dated as of November 25, 2019, between Las Vegas Sands Corp. and U.S. Bank National Association, as trustee, relating to the 2.900% Notes due 2025 (incorporated by reference from Exhibit 4.2 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on November 25, 2019). |
| 4.14 | Form of Las Vegas Sands Corp.'s 2.900% Notes due 2025 (included in Exhibit 4.11 hereto). (incorporated by reference from Exhibit 4.3 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on November 25, 2019). |
| 4.15 | Description of Capital Stock (incorporated by reference from Exhibit 4.13 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2019 and filed on February 7, 2020). |
| 10.1 | Facility Agreement dated November 20, 2018, among Sands China Limited, Bank of China Limited, Macau Branch, as agent, the arrangers listed therein and the original lenders listed therein (incorporated by reference from Exhibit 10.9 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2018 and filed on February 22, 2019). |
| 10.2† | Waiver and Amendment Request Letter, dated March 27, 2020, with respect to the Facility Agreement, dated as of November 20, 2018, by and among Sands China, as borrower, Bank of China Limited, Macau Branch, as agent, and the arrangers and lenders party thereto (incorporated by reference from Exhibit 10.1 to the Company's current report on Form 8-K (File No. 001-32373) filed on March 27, 2020). |
| 10.3† | Waiver Extension and Amendment Request Letter, dated September 11, 2020, with respect to the Facility Agreement, dated as of November 20, 2018 by and among Sands China, as borrower, Bank of China Limited, Macau Branch, as agent, and the arrangers and lenders party thereto (incorporated by reference from Exhibit 10.1 to the Company's current report on Form 8-K (File No. 001-32373) filed on September 11, 2020). |
| 10.4 | Revolving Credit Agreement, dated as of August 9, 2019, by and among Las Vegas Sands Corp., the Lenders from time to time party thereto and The Bank of Nova Scotia, as Administrative Agent and Issuing Bank (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on August 12, 2019). |
| 10.5† | Amendment No. 1 to Revolving Credit Agreement, dated as of September 23, 2020, by and among Las Vegas Sands Corp., the Lenders from time to time party thereto and The Bank of Nova Scotia, as Administrative Agent (incorporated by reference from Exhibit 10.1 to the Company's current report on Form 8-K (File No. 001-32373) filed on September 23, 2020). |
| 10.6 | Facility Agreement, dated as of June 25, 2012, among Marina Bay Sands Pte. Ltd., as borrower, DBS Bank Ltd., Oversea-Chinese Banking Corporation Limited, United Overseas Bank Limited and Malayan Banking Berhad, Singapore Branch, as global coordinators, DBS Bank Ltd., as agent for the finance parties and security trustee for the secured parties and certain other lenders party thereto (incorporated by reference from Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2012 and filed on August 9, 2012). |

000863

Table of Contents

| Exhibit No. | Description of Document |
|---|---|
| 10.7 | Amendment and Restatement Agreement dated as of August 29, 2014, to the Facility Agreement, dated as of June 25, 2012 (as amended by an amendment agreement dated November 20, 2013), among Marina Bay Sands Pte. Ltd., as borrower, various lenders party thereto, DBS Bank Ltd. ("DBS"), Oversea-Chinese Banking Corporation Limited, United Overseas Bank Limited and Malayan Banking Berhad, Singapore Branch, as global coordinators, DBS, as agent and security trustee, and DBS, Oversea-Chinese Banking Corporation Limited, United Overseas Bank Limited, Malayan Banking Berhad, Singapore Branch, Standard Chartered Bank, Sumitomo Mitsui Banking Corporation and CIMB Bank Berhad, Singapore Branch, as mandated lead arrangers (including as Schedule 3 thereto, the Form of Amended and Restated Facility Agreement) (incorporated by reference from Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended September 30, 2014 and filed on November 5, 2014). |
| 10.8 | Second Amendment and Restatement Agreement dated as of March 19, 2018, to the Facility Agreement, dated as of June 25, 2012 (as amended by an amendment agreement dated November 20, 2013 and further amended and restated by an amendment and restatement agreement dated August 29, 2014), among Marina Bay Sands Pte. Ltd., as borrower, various lenders party thereto and DBS Bank Ltd. as agent and security trustee (incorporated by reference from Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.9 | Third Amendment and Restatement Agreement, dated as of August 30, 2019, among Marina Bay Sands Pte. Ltd., as borrower, the various lenders party thereto and DBS Bank Ltd., as agent and security trustee and the other parties thereto (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on September 4, 2019). |
| 10.10† | Amendment Letter, dated June 18, 2020, with respect to the facility agreement, originally dated as of June 25, 2012 (as amended, restated, amended and restated, supplemented and otherwise modified) among Marina Bay Sands Pte. Ltd., the lenders party thereto, DBS Bank Ltd., as the agent, and the other parties thereto (incorporated by reference from Exhibit 10.1 to the Company's current report on Form 8-K (File No. 001-32373) filed on June 19, 2020). |
| 10.11 | Sands Resort Hotel and Casino Agreement, dated as of February 18, 1997, by and between Clark County and Las Vegas Sands, Inc. (incorporated by reference from Exhibit 10.27 to Amendment No. 1 to Las Vegas Sands, Inc.'s Registration Statement on Form S-4 (File No. 333-42147) dated February 12, 1998). |
| 10.12 | Addendum to Sands Resort Hotel and Casino Agreement, dated as of September 16, 1997, by and between Clark County and Las Vegas Sands, Inc. (incorporated by reference from Exhibit 10.20 to the Company's Amendment No. 1 to Registration Statement on Form S-1 (File No. 333-118827) dated October 25, 2004). |
| 10.13 | Concession Contract for Operating Casino Games of Chance or Games of Other Forms in the Macao Special Administrative Region, June 26, 2002, among the Macao Special Administrative Region and Galaxy Casino Company Limited (incorporated by reference from Exhibit 10.40 to Las Vegas Sands, Inc.'s Form 10-K (File No. 333-42147) for the year ended December 31, 2002 and filed on March 31, 2003). |
| 10.14 | Amendment to Concession Contract for Operating Casino Games of Chance or Games of Other Forms in the Macau Special Administrative Region, dated as of December 19, 2002, among the Macao Special Administrative Region and Galaxy Casino Company, Limited (incorporated by reference from Exhibit 10.16 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2018 and filed on February 22, 2019). |
| 10.15 | Subconcession Contract for Operating Casino Games of Chance or Games of Other Forms in the Macau Special Administrative Region, dated December 19, 2002, between Galaxy Casino Company Limited, as concessionaire, and Venetian Macau S.A., as subconcessionaire (incorporated by reference from Exhibit 10.65 to the Company's Amendment No. 5 to Registration Statement on Form S-1 (File No. 333-118827) dated December 10, 2004). |
| 10.16 | Land Concession Agreement, dated as of December 10, 2003, relating to the Sands Macao between the Macao Special Administrative Region and Venetian Macau Limited (incorporated by reference from Exhibit 10.39 to the Company's Amendment No. 1 to Registration Statement on Form S-1 (File No. 333-118827) dated October 25, 2004). |

124

000864

Table of Contents

| Exhibit No. | Description of Document |
|---|---|
| 10.17 | Amendment, published on April 23, 2008, to Land Concession Agreement, dated as of December 10, 2003, relating to the Sands Macao between the Macau Special Administrative Region and Venetian Macau Limited (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2008 and filed on May 9, 2008). |
| 10.18 | Land Concession Agreement, dated as of April 10, 2007, relating to the Venetian Macao, Four Seasons Macao and Site 3 among the Macau Special Administrative Region, Venetian Cotai Limited and Venetian Macau Limited (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2007 and filed on May 10, 2007). |
| 10.19 | Amendment published on October 29, 2008, to Land Concession Agreement between Macau Special Administrative Region and Venetian Cotai Limited (incorporated by reference from Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended September 30, 2008 and filed on November 10, 2008). |
| 10.20 | Amendment, published on June 5, 2013, to Land Concession Agreement between Macau Special Administrative Region and Venetian Cotai Limited (incorporated by reference from Exhibit 10.22 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2018 and filed on February 22, 2019). |
| 10.21 | Amendment, published on October 22, 2014, to Land Concession Agreement between Macau Special Administrative Region and Venetian Cotai Limited (incorporated by reference from Exhibit 10.23 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2018 and filed on February 22, 2019). |
| 10.22 | Land Concession Agreement, dated as of May 5, 2010, relating to The Londoner Macao among the Macau Special Administrative Region, Venetian Orient Limited and Venetian Macau Limited (incorporated by reference from Exhibit 10.24 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2018 and filed on February 22, 2019). |
| 10.23 | Development Agreement, dated August 23, 2006, between the Singapore Tourism Board and Marina Bay Sands Pte. Ltd. (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended September 30, 2006 and filed on November 9, 2006). |
| 10.24 | Supplement to Development Agreement, dated December 11, 2009, by and between Singapore Tourism Board and Marina Bay Sands PTE. LTD (incorporated by reference from Exhibit 10.76 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2009 and filed on March 1, 2010). |
| 10.25† | Development Agreement, dated April 3, 2019, between the Singapore Tourism Board and Marina Bay Sands Pte. Ltd. (incorporated by reference from Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the three and six months ended June 30, 2019 and filed on July 24, 2019). |
| 10.26 | Energy Services Agreement, dated as of May 1, 1997, by and between Atlantic Pacific Las Vegas, LLC and Venetian Casino Resort, LLC (incorporated by reference from Exhibit 10.3 to Amendment No. 2 to Las Vegas Sands, Inc.'s Registration Statement on Form S-4 (File No. 333-42147) dated March 27, 1998). |
| 10.27 | Energy Services Agreement Amendment No. 1, dated as of July 1, 1999, by and between Atlantic Pacific Las Vegas, LLC and Venetian Casino Resort, LLC (incorporated by reference from Exhibit 10.8 to Las Vegas Sands, Inc.'s Annual Report on Form 10-K (File No. 333-42147) for the year ended December 31, 1999 and filed on March 30, 2000). |
| 10.28 | Energy Services Agreement Amendment No. 2, dated as of July 1, 2006, by and between Atlantic Pacific Las Vegas, LLC and Venetian Casino Resort, LLC (incorporated by reference from Exhibit 10.77 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2006 and filed on February 28, 2007). |
| 10.29 | Energy Services Agreement Amendment No. 3 dated as of February 10, 2009, by and between Trigen-Las Vegas Energy Company, LLC f/k/a Atlantic Pacific Las Vegas, LLC, Venetian Casino Resort, LLC Grand Canal Shops II, LLC and Interface Group-Nevada, Inc. (incorporated by reference from Exhibit 10.34 to the Company's Annual Report on Form 10-K (File No. 001-32373) for year ended December 31, 2010 and filed on March 1, 2011). |

000865

Table of Contents

| Exhibit No. | Description of Document |
|---|---|
| 10.30 | Energy Services Agreement, dated as of November 14, 1997, by and between Atlantic-Pacific Las Vegas, LLC and Interface Group-Nevada, Inc. (incorporated by reference from Exhibit 10.8 to Amendment No. 1 of the Company's Registration Statement on Form S-1 (File No. 333-118827) dated October 25, 2004). |
| 10.31 | Energy Services Agreement Amendment No. 1, dated as of July 1, 1999, by and between Atlantic-Pacific Las Vegas, LLC and Interface Group-Nevada, Inc. (incorporated by reference from Exhibit 10.9 to the Company's Amendment No. 1 to Registration Statement on Form S-1 (File No. 333-118827) dated October 25, 2004). |
| 10.32 | Amended and Restated Services Agreement, dated as of November 14, 1997, by and among Las Vegas Sands, Inc., Venetian Casino Resort, LLC, Interface Group Holding Company, Inc., Interface Group-Nevada, Inc., Lido Casino Resort MM, Inc., Grand Canal Shops Mall MM Subsidiary, Inc. and certain subsidiaries of Venetian Casino Resort, LLC named therein (incorporated by reference from Exhibit 10.15 to Amendment No. 1 to Las Vegas Sands, Inc.'s Registration Statement on Form S-4 (File No. 333-42147) dated February 12, 1998). |
| 10.33 | Assignment and Assumption Agreement, dated as of November 8, 2004, by and among Las Vegas Sands, Inc., Venetian Casino Resort, LLC, Interface Group Holding Company, Inc., Interface Group-Nevada, Inc., Interface Operations LLC, Lido Casino Resort MM, Inc., Grand Canal Shops Mall MM Subsidiary, Inc. and certain subsidiaries of Venetian Casino Resort, LLC named therein (incorporated by reference from Exhibit 10.52 to the Company's Amendment No. 2 to Registration Statement on Form S-1 (File No. 333-118827) dated November 22, 2004). |
| 10.34 | Fourth Amended and Restated Reciprocal Easement, Use and Operating Agreement, dated as of February 29, 2008, by and among Interface Group-Nevada, Inc., Grand Canal Shops II, LLC, Phase II Mall Subsidiary, LLC, Venetian Casino Resort, LLC, and Palazzo Condo Tower, LLC (incorporated by reference from Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2008 and filed on May 9, 2008). |
| 10.35+ | Las Vegas Sands Corp. 2004 Equity Award Plan (Amended and Restated) (incorporated by reference from Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2014 and filed on August 7, 2014). |
| 10.36+ | Las Vegas Sands Corp. Amended and Restated 2004 Equity Award Plan (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on May 20, 2019). |
| 10.37+ | Form of Director Restricted Stock Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2014 and filed on August 7, 2014). |
| 10.38+ | Form of Director Restricted Stock Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.39+ | Form of Restricted Stock Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.48 to the Company's Annual Report on Form 10-K (File No. 001-32373) for year ended December 31, 2010 and filed on March 1, 2011). |
| 10.40+ | Form of Restricted Stock Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.82 to the Company's Annual Report on Form 10-K (File No. 001-32373) for year ended December 31, 2010 and filed on March 1, 2011). |
| 10.41+ | Form of Restricted Stock Award agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.86 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2011 and filed on February 29, 2012). |
| 10.42+ | Form of Restricted Stock Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2014 and filed on August 7, 2014). |
| 10.43+ | Form of Restricted Stock Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.44+ | Form of Nonqualified Stock Option Agreement under the Company's 2004 Equity Award Plan (incorporated by reference from Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2009 and filed August 7, 2009). |

126

000866

| Exhibit No. | Description of Document |
|---|---|
| 10.45+ | Form of Nonqualified Stock Option Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.51 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2010 and filed on March 1, 2011). |
| 10.46+ | Form of Nonqualified Stock Option Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.47+ | Form of Director Nonqualified Stock Option Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.48+ | Form of Director Restricted Stock Units Award Agreement under the Company's 2004 Equity Award Plan (incorporated by reference from Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2014 and filed on August 7, 2014). |
| 10.49+ | Form of Director Restricted Stock Units Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.7 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.50+ | Form of Director Restricted Stock Units Award Agreement (with deferred settlement) under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2014 and filed on August 7, 2014). |
| 10.51+ | Form of Director Restricted Stock Units Award Agreement under the 2004 Equity Award Plan (with deferred settlement) (incorporated by reference from Exhibit 10.8 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.52+ | Form of Restricted Stock Units Award agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.87 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2011 and filed on February 29, 2012). |
| 10.53+ | Form of Restricted Stock Units Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2014 and filed on August 7, 2014). |
| 10.54+ | Form of Restricted Stock Units Award Agreement under the 2004 Equity Award Plan (incorporated by reference from Exhibit 10.9 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2018 and filed on April 27, 2018). |
| 10.55+ | Las Vegas Sands Corp. Amended and Restated Executive Cash Incentive Plan (incorporated by reference from Exhibit 10.9 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373 for the quarter ended June 30, 2018 and filed on July 25, 2018). |
| 10.56 | Settlement Agreement, date as of June 24, 2011, by and among Venetian Casino Resort, LLC, Phase II Mall Holding, LLC, GGP Limited Partnership, The Shoppes at the Palazzo, LLC (f/k/a Phase II Mall Subsidiary, LLC) and Grand Canal Shops II, LLC (incorporated by reference from Exhibit 10.63 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2011 and filed on February 29, 2012). |
| 10.57 | Purchase and Sale Agreement, dated April 12, 2004, by and among Grand Canal Shops Mall Subsidiary, LLC, Grand Canal Shops Mall MM Subsidiary, Inc. and GGP Limited Partnership (incorporated by reference from Exhibit 10.1 to Las Vegas Sands, Inc.'s Current Report on Form 8-K (File No. 333-42147) filed on April 16, 2004). |
| 10.58 | Agreement, made as of April 12, 2004, by and between Lido Casino Resort, LLC and GGP Limited Partnership (incorporated by reference from Exhibit 10.2 to Las Vegas Sands, Inc.'s Current Report on Form 8-K (File No. 333-42147) filed on April 16, 2004). |
| 10.59 | Assignment and Assumption of Agreement and First Amendment to Agreement, dated September 30, 2004, made by Lido Casino Resort, LLC, as assignor, to Phase II Mall Holding, LLC, as assignee, and to GGP Limited Partnership, as buyer (incorporated by reference from Exhibit 10.60 to the Company's Amendment No. 1 to Registration Statement on Form S-1 (File No. 333-118827) dated October 25, 2004). |

127

000867

Table of Contents

| Exhibit No. | Description of Document |
|---|---|
| 10.60 | Second Amendment, dated as of January 31, 2008, to Agreement dated as of April 12, 2004 and amended as of September 30, 2004, by and among Venetian Casino Resort, LLC, as successor-by-merger to Lido Casino Resort, LLC, Phase II Mall Holding, LLC, as successor-in-interest to Lido Casino Resort, LLC, and GGP Limited Partnership (incorporated by reference from Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2008 and filed on May 9, 2008). |
| 10.61 | Second Amended and Restated Registration Rights Agreement, dated as of November 14, 2008, by and among Las Vegas Sands Corp., Dr. Miriam Adelson and the other Adelson Holders (as defined therein) that are party to the agreement from time to time (incorporated by reference from Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on November 14, 2008). |
| 10.62 | Investor Rights Agreement, dated as of September 30, 2008, by and between Las Vegas Sands Corp. and the Investor named therein (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended September 30, 2008 and filed on November 10, 2008). |
| 10.63 | Agreement, dated as of July 8, 2004, by and between Sheldon G. Adelson and Las Vegas Sands, Inc. (incorporated by reference from Exhibit 10.47 to the Company's Registration Statement on Form S-1 (File No. 333-118827) dated September 3, 2004). |
| 10.64 | Venetian Hotel Service Agreement, dated as of June 28, 2001, by and between Venetian Casino Resort, LLC and Interface Group-Nevada, Inc. d/b/a Sands Expo and Convention Center (incorporated by reference from Exhibit 10.49 to the Company's Amendment No. 2 to Registration Statement on Form S-1 (File No. 333-118827) dated November 22, 2004). |
| 10.65 | First Amendment to Venetian Hotel Service Agreement, dated as of June 28, 2004, by and between Venetian Casino Resort, LLC and Interface Group-Nevada, Inc. d/b/a Sands Expo and Convention Center (incorporated by reference from Exhibit 10.50 to the Company's Registration Statement on Form S-1 (File No. 333-118827) dated September 3, 2004). |
| 10.66+ | Las Vegas Sands Corp. Non-Employee Director Deferred Compensation Plan (incorporated by reference from Exhibit 10.88 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2011 and filed on February 29, 2012). |
| 10.67+ | Amendment to Non-Employee Director Compensation Program — Increase to Annual Cash Retainer (incorporated by reference from Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the three and nine months ended September 30, 2019 and filed on October 25, 2019). |
| 10.68+ | Amended & Restated Employment Agreement among Las Vegas Sands Corp., Las Vegas Sands, LLC and Sheldon G. Adelson, effective as of January 1, 2017 (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on September 7, 2017). |
| 10.69+ | Terms of Continued Employment, dated December 9, 2014, among Las Vegas Sands Corp., Las Vegas Sands, LLC and Robert G. Goldstein (incorporated by reference from Exhibit 10.81 to the Company's Annual Report on Form 10-K (File No. 001-32373) for the year ended December 31, 2014 and filed on February 27, 2015). |
| 10.70+ | First Amendment to Letter Agreement, dated November 20, 2018 between Robert G. Goldstein and Las Vegas Sands Corp. and Las Vegas Sands, LLC (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on November 20, 2018). |
| 10.71+ | Terms of Continued Employment, dated March 28, 2016, among Las Vegas Sands Corp., Las Vegas Sands, LLC and Patrick Dumont (incorporated by reference from Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended March 31, 2016 and filed on May 6, 2016). |
| 10.72+ | Employment Agreement, dated August 23, 2016, among Las Vegas Sands Corp., Las Vegas Sands, LLC and Lawrence A. Jacobs (incorporated by reference from Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2017 and filed on August 4, 2017). |
| 10.73+ | First Amendment to Letter Agreement, dated October 9, 2018 between Lawrence A. Jacobs and Las Vegas Sands Corp. and Las Vegas Sands, LLC (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on October 10, 2018). |

000868

| Exhibit No. | Description of Document |
|---|---|
| 10.74+ | Second Amendment to Letter Agreement, dated June 21, 2019 between Lawrence A. Jacobs and Las Vegas Sands Corp. and Las Vegas Sands, LLC (incorporated by reference from Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-32373) filed on June 24, 2019). |
| 10.75+ | Employment Agreement, dated August 19, 2019, among Las Vegas Sands Corp., Las Vegas Sands, LLC and D. Zachary Hudson (incorporated by reference from Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-32373) for the quarter ended June 30, 2020 and filed on July 24, 2020). |
| 21.1* | Subsidiaries of Las Vegas Sands Corp. |
| 23.1* | Consent of Deloitte & Touche LLP. |
| 31.1* | Certification of the Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of the Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1++ | Certification of Chief Executive Officer of Las Vegas Sands Corp. pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2++ | Certification of Chief Financial Officer of Las Vegas Sands Corp. pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101* | The following financial information from the Company's Annual Report on Form 10-K for the year ended December 31, 2020, formatted in Inline Extensible Business Reporting Language ("iXBRL"): (i) Consolidated Balance Sheets as of December 31, 2020 and 2019, (ii) Consolidated Statements of Operations for the years ended December 31, 2020, 2019 and 2018, (iii) Consolidated Statements of Comprehensive Income for the years ended December 31, 2020, 2019 and 2018, (iv) Consolidated Statements of Equity for the years ended December 31, 2020, 2019 and 2018, (v) Consolidated Statements of Cash Flows for the years ended December 31, 2020, 2019 and 2018, and (vi) Notes to Consolidated Financial Statements. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

---

\*    Filed herewith.

†    Certain identified information has been excluded from the exhibit because such information is both (i) not material and (ii) would be competitively harmful if publicly disclosed.

+    Denotes a management contract or compensatory plan or arrangement.

++    This exhibit will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section. Such exhibit shall not be deemed incorporated into any filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.

**ITEM 16. — *FORM 10-K SUMMARY***

None.

000869

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned thereunto duly authorized.

LAS VEGAS SANDS CORP.

February 5, 2021                                                              /S/ ROBERT G. GOLDSTEIN

Robert G. Goldstein,
Chairman of the Board and
Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/ ROBERT G. GOLDSTEIN<br>Robert G. Goldstein | Chairman of the Board, Chief Executive Officer and Director<br>(Principal Executive Officer) | February 5, 2021 |
| /S/ PATRICK DUMONT<br>Patrick Dumont | President,<br>Chief Operating Officer and Director | February 5, 2021 |
| /S/ IRWIN CHAFETZ<br>Irwin Chafetz | Director | February 5, 2021 |
| /S/ MICHELINE CHAU<br>Micheline Chau | Director | February 5, 2021 |
| /S/ CHARLES D. FORMAN<br>Charles D. Forman | Director | February 5, 2021 |
| /S/ GEORGE JAMIESON<br>George Jamieson | Director | February 5, 2021 |
| /S/ NORA M. JORDAN<br>Nora M. Jordan | Director | February 5, 2021 |
| /S/ CHARLES A. KOPPELMAN<br>Charles A. Koppelman | Director | February 5, 2021 |
| /S/ LEWIS KRAMER<br>Lewis Kramer | Director | February 5, 2021 |
| /S/ DAVID F. LEVI<br>David F. Levi | Director | February 5, 2021 |
| /S/ RANDY HYZAK<br>Randy Hyzak | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer and Principal Accounting Officer) | February 5, 2021 |

130

000870

**Exhibit 21.1**

**Significant Subsidiaries of Las Vegas Sands Corp.**

The following is a list of significant subsidiaries of Las Vegas Sands Corp., omitting subsidiaries which, considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary as of December 31, 2020.

| Legal Name | State or Other Jurisdiction of Incorporation or Organization |
| --- | --- |
| Cotai Strip Lot 2 Apart Hotel (Macao) Limited | Macao |
| Las Vegas Sands, LLC | Nevada |
| LVS (Nevada) International Holdings, Inc. | Nevada |
| LVS Dutch Finance C.V. | Netherlands |
| LVS Dutch Holding B.V. | Netherlands |
| Marina Bay Sands Pte. Ltd. | Singapore |
| MBS Holdings Pte. Ltd. | Singapore |
| Sands China Ltd. | Cayman Islands |
| Sands IP Asset Management B.V. | Netherlands |
| Venetian Casino Resort, LLC | Nevada |
| Venetian Cotai Limited | Macao |
| Venetian Macau Limited | Macao |
| Venetian Orient Limited | Macao |
| Venetian Venture Development Intermediate II | Cayman Islands |
| Venetian Venture Development Intermediate Limited | Cayman Islands |

000871

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-249825 on Form S-3 and No. 333-232819 on Form S-8 of our reports dated February 5, 2021, relating to the consolidated financial statements and financial statement schedule of Las Vegas Sands Corp., and the effectiveness of Las Vegas Sands Corp.'s internal control over financial reporting appearing in this Annual Report on Form 10-K of Las Vegas Sands Corp. for the year ended December 31, 2020. We also consent to the reference to us under the heading "Experts" in such Registration Statement.

/s/ Deloitte & Touche LLP

Las Vegas, Nevada
February 5, 2021

000872

**Exhibit 31.1**

**LAS VEGAS SANDS CORP.**

**CERTIFICATIONS**

I, Robert G. Goldstein, certify that:

1. I have reviewed this annual report on Form 10-K of Las Vegas Sands Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 5, 2021                                    By:    /S/ ROBERT G. GOLDSTEIN

Robert G. Goldstein
Chief Executive Officer
(Principal Executive Officer)

000873

**Exhibit 31.2**

**LAS VEGAS SANDS CORP.**

**CERTIFICATIONS**

I, Randy Hyzak, certify that:

1. I have reviewed this annual report on Form 10-K of Las Vegas Sands Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:     February 5, 2021                                          By:     /S/ RANDY HYZAK

Randy Hyzak
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

000874

**Exhibit 32.1**

**CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K for the year ended December 31, 2020 as filed by Las Vegas Sands Corp. with the Securities and Exchange Commission on the date hereof (the "Report"), I certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Las Vegas Sands Corp.

Date:    February 5, 2021                          By:    /S/ ROBERT G. GOLDSTEIN

                                                          Robert G. Goldstein
                                                          Chief Executive Officer
                                                          (Principal Executive Officer)

000875

**Exhibit 32.2**

### CERTIFICATION UNDER SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-K for the year ended December 31, 2020 as filed by Las Vegas Sands Corp. with the Securities and Exchange Commission on the date hereof (the "Report"), I certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

     (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

     (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Las Vegas Sands Corp.

Date:     February 5, 2021               By:     /S/ RANDY HYZAK

                                           Randy Hyzak
                                           Executive Vice President and Chief Financial Officer
                                           (Principal Financial Officer)

000876