# EXHIBIT 24

Securities and Exchange Commission Order, filed in *In the Matter of Las Vegas Sands Corp.*, File No. 3-17204, dated 4/7/2016

# EXHIBIT 24

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 77555 / April 7, 2016**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-17204**

| | |
|---|---|
| **In the Matter of** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |
| **LAS VEGAS SANDS CORP.,** | |
| **Respondent.** | |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Las Vegas Sands Corp. ("LVSC," "the company," or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds that:

001083

**Respondent**

1.    **Las Vegas Sands Corp.**, based in Las Vegas, Nevada, was incorporated as a Nevada corporation in August 2004.  LVSC owns and operates integrated resorts and casinos in Asia and the United States through a network of subsidiaries.  The company's common stock is registered under Section 12(g) of the Exchange Act, and it is traded on the New York Stock Exchange (the "NYSE") under the symbol "LVS."

**OTHER RELEVANT ENTITIES**

2.    Sands China Ltd. ("SCL") is an LVSC subsidiary that was incorporated in the Cayman Islands in July 2009.  Since November 2009, shares of SCL have been traded on the Hong Kong Stock Exchange (Stock Code: 1928).  LVSC owns 70.1% of the shares.

3.    Venetian Macao Ltd. (VML) is an SCL subsidiary through which SCL operates in Macao.  Prior to the incorporation of SCL, VML was a wholly-owned subsidiary of LVSC.

4.    Venetian (Zhuhai Hengqin) Hotel Co. Ltd. ("VHQ"), is an LVSC subsidiary that is a wholly foreign-owned entity ("WFOE") established under Chinese law in February 2007.  The business scope of VHQ was the construction and development of hotel and ancillary facilities, hotel management, and related consulting services.

5.    Venetian (Zhuhai) Hotel Marketing Co. Ltd. ("VHM"), is an LVSC subsidiary that is a WFOE established under Chinese law in October 2007.  When formed, the business scope of VHM was hotel management, marketing, and consulting services for convention and exhibition. In March 2008, among other services, ferry services were added to the business scope of VHM.

6.    Beijing Asia Travel Alliance Business Consulting Co., Ltd. ("BATA"), is an LVSC subsidiary that is a WFOE established under Chinese law in July 2008.  When formed, the business scope of BATA was hotel management, corporate image planning, and information consulting.  In November 2008, its business scope was expanded to include advertising, sports agency business, investment management and consulting, financial planning, and property management.

**Summary**

7.    This matter concerns the failure of LVSC to devise and maintain a reasonable system of internal accounting controls over its operations in the People's Republic of China ("PRC" or "China") and the Macao Special Administrative Region of the People's Republic of China ("Macao") from 2006 through at least 2011.  As a result, funds totaling more than $62 million were transferred to a consultant[1] in China over a series of transactions under

---

[1]    The Consultant, LVSC President and Chief Operating Officer, LVSC President of Asian Development (formerly Vice-President of Asian Development), LVSC Senior Director of Finance, LVSC CFO, and members of the SCL Audit Services Group referred to herein are no longer employed or engaged by the company.

2

circumstances that frequently lacked supporting documentation or appropriate authorization. Moreover, most of the transfers occurred despite knowledge by senior LVSC management that they could not account for significant funds previously transferred to the consultant in an environment where significant bribery risks were present. This lack of controls impacted other transactions, such as gifts and entertainment for foreign officials, employee and vendor expense reimbursements, and customer comps. The company also kept inaccurate books and records.

8.    As a result of this conduct, LVSC violated the internal controls and books and records provisions of the Foreign Corrupt Practices Act ("FCPA").

## Background

9.    Macao was a Portuguese colony until December 20, 1999, when Portugal transferred control of Macao to China. While casino gambling is not legal in China, it is legal in Macao. In 2002, the Macao government granted gaming concessions to casino and hotel developers.

10.    LVSC conducted business in Macao through VML until November 2009, when it issued an initial public offering ("IPO") for SCL, a public company that is listed on the Hong Kong Stock Exchange. Through SCL, LVSC owns and operates casinos, hotels, convention facilities, retail space, and a 15,000-seat sports arena in Macao. Until March of 2009, LVSC's operations in Macao and China were overseen by its President and Chief Operating Officer ("President"), who worked in close concert with LVSC's President of Asian Development.

## LVSC's China Operations

11.    In addition to operating in Macao, LVSC also sought to establish operations in China. Certain LVSC executives, including its President, were particularly interested in development opportunities on Hengqin Island, which is part of Zhuhai in southern China and close to Macao.

12.    To facilitate business development activities in China, LVSC established VHQ, VHM and BATA. As WFOEs, these entities are permitted to conduct only business in China that fell within their prescribed business scope. LVSC used intercompany transfers to fund the WFOE operations but failed to implement a system of internal financial controls over their operations.

13.    While the WFOEs were governed according to general articles of association as required by Chinese law, the articles of association do not specify accounting policies and procedures and none were adopted by the WFOEs when established. In the absence of their own policies and procedures, accounting staff at the WFOEs inconsistently applied certain of VML's accounting policies with regard to their operations.

14.    As a gaming company, LVSC was subject to significant restrictions on its ability to advertise its casinos or to own assets in China.

15.    In 2006, the LVSC President of Asian Development (who was then Vice-President of Asian Development) identified a Chinese consultant ("Consultant") to assist the company with

3

its activities in China. The Consultant claimed to be a former Chinese government official and touted his political connections with Chinese government officials as his principle qualification to provide assistance to LVSC. With the approval of the LVSC President, the Consultant was hired to liaise with governmental bodies, provide advice and assistance with approval processes and to serve as an intermediary or "beard" to obscure LVSC's role in certain transactions.

16. The Consultant established numerous business entities in China, which he frequently used interchangeably for his interactions with LVSC. In 2007, after the Consultant had been engaged and several payments had been made to him, the company conducted due diligence on him and three of his business entities. The company did not, however, conduct due diligence on at least seven other businesses associated with the Consultant and to which LVSC transferred funds.

## A.    The Basketball Team

17. In early 2007, the LVSC President sought to purchase a professional basketball team in China, with the purported purpose being to improve LVSC's image in China and to bring customers to the casinos because the team could play in the Venetian Macao's sports arena. The team would wear jerseys with an image of a gold lion, which was the symbol of the Venetian Macao Casino. As the team could not put the name of a gaming company on the jerseys, the team was named "Wei Li Xin," which translates to "good fortune" and sounds like "Venetian" when pronounced in Chinese. No research or marketing analysis was ever done in connection with the basketball team.

18. The Chinese Basketball Association ("CBA"), which falls under the PRC State General Administration of Sports (which in turn is organized directly under the State Council of the PRC), would not permit a gaming company to own a league team, and thus neither LVSC nor its relevant subsidiaries could purchase a team. Instead, the Consultant was used as a "beard" to buy the team, and the company entered into what was ostensibly a sponsorship agreement for the team.

19. The Consultant established an entity called Shenzhen Wei Li Xin to purchase and own the team. In March 2007, an LVSC subsidiary entered into a promissory note agreement with a separate entity associated with the Consultant. Subsequently, approximately $6,072,400 was transferred from the VHQ WFOE to Shenzhen Wei Li Xin, though neither entity was a party to the promissory note agreement.

20. In September 2007, an LVSC Senior Director of Finance (who also served as a VML Director of Finance) raised concerns about the basketball transaction to the CFO of LVSC. Of particular concern was the repeated transfer of funds to the Consultant without any supporting documentation for the team's need for or use of the funds. The LVSC Senior Director of Finance had also learned from a former employee of the Consultant that the Consultant had used LVSC funds to make a payment to a senior CBA official in connection with the Wei Li Xin team.

21. While the CFO instructed the Senior Director of Finance to conduct financial due diligence on the team, including a review of the team's books and its players' contracts, the

001086

Consultant would not permit an on-site review.  Instead, the Consultant had another of his employees pretend that he worked for the team and present a handwritten list of the team's expenses, which the LVSC Senior Director of Finance found to be facially unreliable.  Within months, the President of  LVSC arranged to have the LVSC Senior Director of Finance placed on administrative leave and eventually terminated.  Meanwhile, the LVSC President approved the ongoing payments to the Consultant, which were made through the VHQ and VHM WFOEs.

22.    Referencing his concerns about the fact that the promissory agreement was with an entity that was different than the entity that received LVSC funds, the inability of LVSC to track the funds that it had transferred to the Consultant, and the lack of recourse should the Consultant fail to purchase the team, the CFO wrote in October 2007, "My . . . concern is how to deal with this from a Sarbanes-Oxley perspective.  The manner in which this has transpired is not indicative of a sound control environment.  This will be exacerbated by any write-off we would have to take as that will call into question our ability to safeguard assets."

23.    Due to lack of accountability of funds provided to the Consultant, in late 2007 the company engaged an international accounting firm ("the firm") to review the basketball transaction.  When the firm was instructed to cease its investigation in February 2008, it had already identified over $700,000 in unaccounted for funds that had been transferred to the Consultant.  Nonetheless, more than $5 million in additional payments were subsequently made to the Consultant ostensibly in connection with the basketball team.

24.    Within this lax control environment, payments to the Consultant were also falsely recorded in the company's books and records.  For example, in September 2008, approximately $1.5 million was transferred to one of the Consultant's entities upon the request of an employee who initially stated that the payment was for "bank charges and loan."  The employee subsequently said that the Consultant was actually using the funds to set up a network of state-owned enterprise ("SOE") travel agencies that would promote the Venetian Macao.  No invoice or supporting documentation was received in connection with this payment, and it was booked as a consultancy fee.

25.    In total, between March 2007 and January 2009, pursuant to a series of sponsorship and advertising contracts, approximately $14.8 million was paid to the Consultant in connection with the basketball team.  Over one-third of these funds were paid after the firm had identified significant unaccounted for funds, and approximately $6.9 million was transferred without appropriate authorization or supporting documentation.

**B.    The Adelson Center**

26.    Beginning in 2006, the LVSC President looked to develop a non-gaming resort on Hengqin Island, a new resort district in China.  Any such development would need the approval of various governmental entities, and the President believed that partnering with a Chinese company would improve LVSC's chances of receiving the needed approvals.

27.    As part of pursuing this strategy, only one Chinese company was considered as a partner – an SOE whose Chairman was believed to have particular influence in connection with

5

001087

Hengqin, and who was introduced to the company by the same Consultant used for the basketball team.

28.      The partnership was initially designed as a joint venture between the SOE and LVSC.  In December 2006, LVSC signed a letter of intent with the SOE to establish a joint venture and to buy portions of a building in Beijing ("real estate" or "property") from the SOE for approximately $42 million.  As part of the joint venture, SOE agreed to help LVSC develop Hengqin.  However, the SOE Chairman and/or Consultant stated that a "beard" would be needed as the SOE board would not approve a direct relationship with a gaming company.  LVSC initially tried to arrange for a U.S.-based entity to invest on its behalf as a "beard," but the joint-venture deal eventually collapsed.

29.      Instead of a joint venture, the LVSC President authorized using the Consultant as a "beard" to purchase the Beijing building from the SOE.  The real estate itself consisted of conference rooms, office space, 55 apartments, and a two-level basement, all of which were largely unfinished.  An initial independent appraisal valued the property more than 10% below the agreed-upon purchase price, but a second appraisal was obtained suggesting the value was slightly above the purchase price.

30.      Little or no thought appears to have been given by LVSC to a purchase of the building in advance, but ultimately the LVSC President determined that the property would be named after the company's founder and CEO, and that it would be developed as a business center to help U.S. companies seeking to do business in China.  He also planned to set up a high-end "men's club" in the basement.  The "Adelson Center" was scheduled to open in August 2008, during the Beijing Olympics, and in February 2008 the LVSC CEO sent a letter to the President of the United States, inviting him to attend the ribbon-cutting ceremony.

31.      No research or analysis was done to determine whether a need existed for such a business center, the amount of any profit or loss it was likely to generate, or whether it would do anything to improve LVSC's image in China.  Numerous employees were concerned that the purchase of the real estate was solely for political purposes.  Nevertheless, between July 2007 and February 2008, approximately $43 million was transferred to one of the Consultant's entities for the purchase of the real estate.  None of the payments was approved by an LVSC employee with sufficient authorization to approve the amounts paid.  In addition, LVSC spent approximately $14 million on renovation and miscellaneous expenses.  Of these payments, approximately $13.7 million lacked appropriate authorization.

32.      In August 2007, LVSC employees learned that, contrary to their understanding, the basement of the building was not part of the real estate purchased by the Consultant, as the SOE had never obtained a title for the basement.  The Consultant informed them that it would be very difficult and costly to obtain a title for the basement, but that he could obtain one if he was given approximately $1.4 million.  The Consultant proposed leasing the basement to the company if it would prepay the rent for a period of years.

33.      While significant concerns were raised that the Consultant intended to obtain the basement title by making improper payments to government officials, the company proceeded to

6

001088

lease the basement from the Consultant. No documentation was obtained demonstrating that the Consultant had obtained the title legally or that his entity had actually purchased the basement from the SOE. On April 9, 2008, approximately $3.6 million was wired to an entity affiliated with the Consultant as a prepayment for a five-year lease of the basement. The CFO of LVSC approved the payment, even though it exceeded his approval limit.

34.    For all relevant periods, the Beijing building was managed by a property manager affiliated with the SOE. Nonetheless, between November 2008 and July 2009, approximately $900,000 in purported property management fees were paid to an entity controlled by the Consultant. No property management services were provided by the Consultant's entity, but the payments were recorded in the company's books and records as property management fees.

35.    In April 2008, approximately $1.4 million was paid to an entity associated with the Consultant, which was recorded in the company's books and records as "arts and crafts." In February 2009, an LVSC accountant raised questions about the payment, because the entity had not obtained any artwork for the Adelson Center. The accountant was told by the LVSC President of Asian Development that the payment actually related to Hengqin Island. No adjustment was made to how the payment was recorded.

36.    In July 2008, pursuant to a series of contracts, the Consultant transferred control to LVSC of the shares of his entity that owned the real estate. In September 2008, the LVSC President of Asian Development signed contracts that cancelled the transfer of shares from the Consultant's entity and agreed to receive in exchange from the Consultant a promissory note for approximately $43 million. This transaction far exceeded his authority. At or around the same time, a decision was made to shutter the Adelson Center project. In total, the company transferred approximately $61 million in connection with the real estate transaction and ultimately received approximately $44 million in settlement from the Consultant.

### LVSC's Macao Operations

37.    In 2007, LVSC set up a high-speed ferry business to transport customers from China and Hong Kong to Macao. LVSC sought to contract with a ferry services provider to operate the ferries. Under pressure from the LVSC President, LVSC employees selected a recently-formed ferry company ("New Ferry") that was partially-owned by an older, Chinese state-owned ferry company ("Old Ferry"). The LVSC President stated in an email to an LVSC executive that the selection of New Ferry would be politically advantageous to LVSC.

38.    The shareholders of New Ferry included Old Ferry and a shipping company ("Shipping") that was indirectly owned by the Consultant and the SOE Chairman. Given the contract values, due diligence was required on the respective entities and principals under LVSC's policies. While it was known that Old Ferry and Shipping owned New Ferry, due diligence was only done on Old Ferry, and in July 2007, two Hong Kong subsidiaries of LVSC signed a contract with New Ferry as Operator and Guarantor, respectively.

39.    As part of its contract, each year New Ferry submitted a detailed budget which included a "Business Entertainment" line item that was divided into separate amounts for

7

business partners and for government officials.  In 2010, SCL's internal audit department, Audit Services Group ("ASG"), concluded that New Ferry was spending the majority of the entertainment expense on government officials.  In addition to providing meals to government officials, New Ferry gave them "red envelopes" containing cash around the Chinese New Year.  New Ferry personnel told an SCL auditor that it was necessary to provide meals and entertainment to government officials to secure routes for the ferries.  ASG failed to elevate this issue within the company.

40.     LVSC had policies and procedures in place at VML regarding purchasing, but they were not enforced.  Employees were able to use cash advances and expense reimbursements to circumvent those policies and procedures.  For example, in September 2006, the LVSC President of Asian Development used a cash advance of approximately $28,000 from VML to pay for a topographic map of Hengqin.  In another instance, in October 2006, he arranged a forum at the Great Hall of the People in Beijing.  Afterward, he submitted a personal expense report for which he was reimbursed approximately $86,000.

41.     In 2008, VML's professional service engagement controls did not require pre-hiring due diligence.  Furthermore, LVSC did not require engagement letters with specific controls on professional service providers.  For example, LVSC had no controls in place to ensure that legal engagements were consistent with the FCPA.

42.      Beginning in March 2009, LVSC's policy regarding payments to outside counsel explicitly required the submission of original backup documentation when seeking reimbursement for expenses in excess of $100.  This policy was not uniformly enforced.  For example, in September 2009, an outside counsel ("Attorney") submitted a bill to VML for "Expenses in Beijing," in the amount of approximately $25,000, but he provided no documentation to support the expenses and was nonetheless paid.  Later, Attorney stated that he actually requested the funds on behalf of a friend who was an unpaid consultant to LVSC.  This payment was recorded in the books and records as a reimbursement of legal expenses, despite the lack of documentation.

43.     In its Macao casinos and hotels, LVSC provides complimentary items and services ("comps") such as restaurant meals and hotel stays to actual and potential gaming customers and business contacts.  LVSC employees are allowed to give comps up to a certain amount, depending on their position in the company.  Non-gaming comps required the approval of an LVSC vice president, and LVSC used players' names to determine whether comps were provided to players who actually earned them due to the amount they played.

44.     During the relevant period, VML employees often failed to record the comp recipients' names, which resulted in an inability to track or audit comps.  In particular, this precluded the identification of comp recipients who were government officials or Politically Exposed Persons ("PEPs").

001090

**Legal Standards and FCPA Violations**

45.     Under Section 21C(a) of the Exchange Act, the Commission may impose a cease-and-desist order upon any person who is violating, has violated, or is about to violate any provision of the Exchange Act or any rule or regulation thereunder, and upon any other person that is, was, or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to such violation.

46.     Under Section 13(b)(2)(A) of the Exchange Act, issuers are required to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer. 15 U.S.C. § 78m(b)(2)(A).

47.     Under Section 13(b)(2)(B) of the Exchange Act, issuers are required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  15 U.S.C. § 78m(b)(2)(B).

48.     As a result of the conduct described above, LVSC violated Section 13(b)(2)(A) because its books and records did not, in reasonable detail, accurately and fairly reflect the purpose of the payments.  LVSC violated Section 13(b)(2)(B) because it did not devise and maintain a reasonable system of internal accounting controls over operations in Macao and China to ensure that access to assets was permitted and that transactions were executed in accordance with management's authorization; in addition, that transactions were recorded as necessary to maintain accountability for assets, particularly with regard to the accounts payable process, the purchasing process, due diligence, and controls surrounding contracts.

**LVSC's Cooperation and Remedial Efforts**

In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff ("the Staff").

49.     In connection with the investigation by the Staff, the LVSC Audit Committee retained outside counsel to conduct an internal investigation.  The LVSC Audit Committee provided significant cooperation with the Commission's investigation by sharing in real-time the facts discovered during the course of its internal investigation and provided information that may not have been otherwise available to the Staff; facilitating the interviews of certain key foreign witnesses; voluntarily producing translations of key documents; and producing large volumes of business, financial, and accounting documents in response to requests.

50.     LVSC undertook various remedial measures, including hiring a new general counsel and new heads of the internal audit and compliance functions.  In addition, the company

9

001091

established a new Board of Directors Compliance Committee and increased the compliance and accounting budgets.  LVSC updated the Code of Business Conduct, the Anti-Corruption Policy, the guidelines regarding comps for government officials, and the SOE and expense policy.  The company also developed and implemented enhanced anti-corruption training and an electronic procurement and contract management system.  Furthermore, LVSC enhanced its screening of both third parties and new hires and its contracting process.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent LVSC's Offer.

Accordingly, it is hereby ORDERED that:

A.      Pursuant to Section 21C of the Exchange Act, Respondent LVSC cease and desist from committing or causing any violations and any future violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rule 13b2-1 thereunder.

B.      Respondent shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $9,000,000 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.  Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying LVSC as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Charles E. Cain, Deputy Chief of FCPA Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St. NE, Washington, DC 20549.

10

001092

C.    Respondent shall comply with the following undertakings:

1.  Retain an independent consultant (the "Independent Consultant") not unacceptable to the Staff within sixty (60) days after the issuance of this Order. Within thirty (30) calendar days after the issuance of this Order, Respondent shall recommend to the Staff three qualified candidates to serve as the Independent Consultant.

2.  The Independent Consultant candidates shall have, at a minimum, the following qualifications: demonstrated expertise with respect to the FCPA, including experience counseling on FCPA issues; experience designing and/or reviewing corporate compliance policies, procedures, and internal controls, including FCPA-specific policies, procedures and internal controls; ability to access and deploy resources as necessary to discharge the Independent Consultant's duties as described herein; and independence from Respondent to ensure effective and impartial performance of the Independent Consultant's duties.

3.  The Independent Consultant should not have provided legal, auditing, or other services to, or have had any affiliation with, the Respondent during the prior two years.

4.  Respondent shall retain the Independent Consultant for a period of two (2) years from the date of engagement. Respondent shall exclusively bear all costs, including compensation and expenses, associated with the retention of the Independent Consultant.

5.  To ensure the independence of the Independent Consultant, Respondent shall not have the authority to terminate the Independent Consultant without the prior written approval of the Staff.

6.  The Independent Consultant's responsibility is to review and evaluate Respondent's internal controls, record-keeping and financial reporting policies and procedures ("Policies and Procedures") as they relate to its compliance with the books and records, internal accounting controls, and anti-bribery provisions of the FCPA ("the FCPA Policies") and to make recommendations. This review and evaluation shall include an assessment of the policies and procedures as actually implemented and how FCPA compliance fits within Respondent's ethics and compliance function. The Independent Consultant shall consider whether the ethics and compliance function has sufficient resources, authority, and independence, and provides sufficient training and guidance.

7.  Respondent and the Independent Consultant shall agree that the Independent Consultant is an independent third-party and not an employee or agent of

11

001093

the Respondent.  In addition, Respondent and the Independent Consultant agree that no attorney-client relationship shall be formed between them.

8.  Respondent shall require the Independent Consultant to enter into an agreement with Respondent providing that, for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such.  Any firm with which the Independent Consultant is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two (2) years after the engagement.

9.  Respondent shall require the Independent Consultant to prepare a written work plan and submit it to Respondent and the Staff for comment within thirty (30) days of commencing the engagement. The Respondent's comments shall be provided to the Independent Consultant no more than fifteen (15) calendar days after receipt of the written work plan.  In order to conduct an effective initial review and to understand fully any existing deficiencies in policies, procedures, and internal controls related to the FCPA, including how FCPA compliance fits within Respondent's ethics and compliance function, the Independent Consultant's initial work plan shall include such steps as are reasonably necessary to develop an understanding of the facts and circumstances surrounding any violations that may have occurred and to assess the effectiveness of Respondent's existing policies, procedures, and internal controls that were designed to detect, deter, and prevent violations of the FCPA and of Respondent's ethics and compliance program.  Any dispute between Respondent and the Independent Consultant with respect to the work plan shall be decided by the Staff.

10. Respondent shall cooperate fully with the Independent Consultant, and the Independent Consultant shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about Respondent's Policies and Procedures in accordance with the principles set forth herein and applicable law, including data protection, blocking statutes, and labor laws and regulations applicable to Respondent.  To that end Respondent shall provide the Independent Consultant with access to all information, documents, records, facilities and/or employees, as requested by the Independent Consultant, that fall within the scope of the Independent

12

Consultant's responsibility, except as provided in this paragraph; and provide guidance on applicable laws (such as relevant data protection, blocking statutes, and labor laws).

11. In the event that Respondent seeks to withhold from the Independent Consultant access to information, documents, records, facilities and/or employees of Respondent that may be subject to a claim of attorney-client privilege or to the attorney work product doctrine, or where Respondent reasonably believes production would otherwise be inconsistent with applicable law, Respondent shall work cooperatively with the Independent Consultant to resolve the matter to the satisfaction of the Independent Consultant. If the matter cannot be resolved, at the request of the Independent Consultant, Respondent shall promptly provide written notice to the Independent Consultant and the Staff. Such notice shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as the basis for the claim. To the extent Respondent has provided information to the Staff in the course of the investigation leading to this action pursuant to a non-waiver of privilege agreement, Respondent and the Independent Consultant may agree to production of such information to the Independent Consultant pursuant to a similar non-waiver agreement.

12. Respondent shall require the Independent Consultant to issue a written report ("Report"), within six (6) months after being retained to review Respondent's Policies and Procedures: (a) summarizing its review and evaluation, and (b) if necessary, making recommendations based on its review and evaluation that are reasonably designed to improve Respondent's Policies and Procedures. Respondent shall require that the Independent Consultant provide the Report to the Board of Directors of Respondent and simultaneously transmit a copy to the Staff at the following address: Charles E. Cain, Deputy Chief of FCPA Unit, Division of Enforcement, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

13. Respondent shall adopt all recommendations in the Report within sixty (60) days of the issuance of the Report; provided, however, that, as to any recommendations that Respondent considers to be unduly burdensome, impractical, or costly, Respondent need not adopt the recommendations at that time, but may submit in writing to the Staff, within thirty (30) days of receiving the Report, an alternative policy or procedure designed to achieve the same objective or purpose. Respondent and the Independent Consultant shall attempt in good faith to reach an agreement relating to each recommendation Respondent considers unduly burdensome, impractical, or costly. In the event that Respondent and the Independent Consultant are unable to agree on an alternative proposal within thirty (30) days, Respondent will abide by the determinations of the Staff.

001095

14. Within six (6) months of the issuance of the Report, Respondent shall implement all of Consultant's recommendations or agreed-upon alternatives.

15. Thirty (30) days after the Respondent completes the implementation, Respondent shall require the Independent Consultant to perform a follow-up review to confirm that Respondent has implemented the recommendations or agreed-upon alternatives and continued the application of the Policies and Procedures, and to deliver a supplemental report within thirty (30) days to the Board of Directors of Respondent and the Staff setting forth its conclusions and whether any further improvements should be implemented.

16. Respondent agrees that the Staff may extend any of the dates set forth above at its discretion.

17. Respondent shall certify, in writing, compliance with the undertaking(s) set forth above. The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. Respondent shall submit the certification and supporting material to Charles E. Cain, Deputy Chief of FCPA Unit, Division of Enforcement, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

18. Respondent agrees that these undertakings shall be binding upon any acquirer or successor in interest to Respondent or substantially all of Respondent's assets and liabilities or business.

D.      Respondent acknowledges that the Commission is not imposing a civil penalty in excess of $9,000,000 based upon its cooperation in a Commission investigation and related enforcement action. If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondent knowingly provided materially false or misleading information or materials to the Commission or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondent, petition the Commission to reopen this matter and seek an order directing that the Respondent pay an additional civil penalty. Respondent may contest by way of defense in any resulting administrative proceeding whether it

14

001096

knowingly provided materially false or misleading information, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

By the Commission.


Brent J. Fields
Secretary

15

001097