John P. Aldrich, Esq.
NV Bar No. 6877
**Aldrich Law Firm, Ltd.**
7866 West Sahara Ave.
Las Vegas, NV 89117
Tel: (702) 853-5490
jaldrich@johnaldrichlawfirm.com

Shannon L. Hopkins (*Pro Hac Vice*)
**Levi & Korsinsky, LLP**
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| THE DANIELS FAMILY 2001 REVOCABLE TRUST, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-01958-GMN-EJY |
| Plaintiff, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| LAS VEGAS SANDS CORP., DR. MIRIAM ADELSON, in her capacity as Special Administrator of the estate of SHELDON G. ADELSON, PATRICK DUMONT, and ROBERT G. GOLDSTEIN, | |
| Defendants. | |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................1

II.   STATEMENT OF FACTS ....................................................................................3

      A.    Marina Bay Sands Traditionally Drove Earnings for Las Vegas Sands until Additional Regulation and Scrutiny in 2012.........................................................................3

      B.    Las Vegas Sands Circumvents Heightened Regulation through Undisclosed, Unauthorized, and Illegal Transfers of Customer Funds. ...............................................5

      C.    Defendants Concealed Marina Bay Sands' Scheme until 2019 when the Truth Started to Emerge and Investors Began to Sustain Damages...........................................6

III.  LEGAL STANDARD........................................................................................9

IV.   ARGUMENT .................................................................................................9

      A.    Material Misrepresentations or Omissions ..................................................10

            1.    Defendants' SEC Filings and Public Statements Concealed LVS's Illegal "Premium Player" Scheme and Regulatory Risk.................................................10

            2.    Plaintiffs' Confidential Witnesses Are Reliable and Provide a Particularized Factual Basis for the "Premium Player" Scheme Allegations. ..........................14

            3.    The Internal Investigation Conducted by Hogan Lovells Provides Persuasive Support for Plaintiffs' Allegations about the "Premium Player" Scheme..........19

      B.    Scienter ......................................................................................22

            1.    LVS Knew the "Premium Player" Scheme Existed Because High-Level Compliance Officers Discussed It, Hogan Lovells Investigated It, and Regulatory Agencies Investigated It.................................................................23

            2.    CWs Confirm LVS's Unauthorized Transfer Practice Was Widespread and Well-Known Within the Company ...................................................27

            3.    Defendants Misconstrue the Scienter Standard and Applicable Case Law. .......30

            4.    Defendants Had Motive to Mislead Investors. .................................31

      C.    Loss Causation ...............................................................................33

V.    CONCLUSION................................................................................................37

## TABLE OF AUTHORITIES

**Cases**

*Abdo v. Fitzsimmons*,
No. 17-00851, 2018 WL 11220494 (N.D. Cal. May 22, 2018) ...................................................... 18

*Al-Kidd v. Ashcroft*,
580 F.3d 949 (9th Cir. 2009) .......................................................................................................... 9

*Alphabet Secs. Litig., R.I. v. Alphabet, Inc.*,
No. 20-15638, 2021 WL 2448223 (9th Cir. June 16, 2021) ........................................................ 18

*Anderson v. Peregrine Pharm. Inc.*,
No. 12-1647, 2013 WL 4780059 (C.D. Cal. Aug. 23, 2013) ........................................................ 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................................ 9

*Ballan v. Wilfred Am. Ed. Corp.*,
720 F. Supp. 241 (E.D.N.Y. 1989) ............................................................................................... 13

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................... 10, 23, 26

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ........................................................................................... 14

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ................................................................................... 16, 29

*Brody v. Transitional Hospitals. Corp.*,
280 F.3d 997 (9th Cir. 2002) ......................................................................................................... 12

*Buttonwood Tree Value Partners, LP v. Sweeney*,
2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) ............................................................................ 32

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010) ....................................................................................... 14

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
No. 17 CIV. 10014 (LGS), 2019 WL 719751 (S.D.N.Y. Feb. 19,
2019), *reconsideration denied*, No. 17 CIV. 10014 (LGS), 2019 WL 2136902
(S.D.N.Y. May 16, 2019) ............................................................................................................... 36

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ......................................................................................................... 30

*City of Miami Gen. Employees' & Sanitation Emps.' Ret. Trust v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ........................................................................................ 26

*City of Roseville Emples. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................................... 29

Case No. 2:20-cv-01958-GMN-EJY

*Communs. Workers of Am. Plan for Emples. Pension & Death Bens. v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) .................................................................................. 26

*Crago v. Charles Schwab & Co.*,
    No. 16-cv-03938-RS, 2017 WL 6550507 (N.D. Cal. Dec. 5, 2017) ................................... 33

*Curry v. Hansen Med., Inc.*,
    No. 09-5094, 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) ............................................. 23

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................................ 9

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ........................................................................................... 10

*Evanston Police Pens. Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. Oct. 30, 2019) .................................................................. 9

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ............................................................................................. 10

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
    501 F. Supp. 3d 735 (N.D. Cal. 2020) ................................................................... 28, 29, 30

*Ferreira v. Funko Inc.*,
    No. LACV2002319VAPPJWX, 2021 WL 880400 (C.D. Cal. Feb. 25, 2021) .................. 13

*Finisar Corp. Sec. Litig. v. Finisar Corp.*,
    646 F. App'x 506 (9th Cir. 2016) ...................................................................................... 19

*Fosbre v. Las Vegas Sands Corp.*,
    No. 10-00765, 2013 WL 5970250 (D. Nev. Nov. 7, 2013) ............................................... 23

*Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ........................................................................................... 34

*Greenfield v. Prof'l. Care, Inc.*,
    677 F. Supp. 110 (E.D.N.Y. 1987) .................................................................................... 13

*Halford v. AtriCure, Inc.*,
    No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ........................................ 21

*Hampton v. Aqua Metals, Inc.*,
    No. 17-cv-07142-HSG, 2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ....................... 16, 29

*Hollin v. Scholastic Corp.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................................ 16

*Hsu v. Puma Biotechnology, Inc.*,
    213 F. Supp. 3d 1275 (C.D. Cal. 2016) ............................................................................ 10

*IBEW Local 697 Pension Fund v. Int'l Game Tech.*,
    No. 09-419, 2011 WL 915115 (D. Nev. Mar. 15, 2011) ................................................... 35

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Allied Nev. Gold Corp.*,
   No. 3:14-CV-00175-LRH-WGC, 2016 WL 4191017 (D. Nev. Aug. 8, 2016) ............................ 27

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) .............................................................................. 21, 33

*In re Amgen Inc. Sec. Litig.*,
   No. 07-2536, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ........................................................ 23

*In re Apple Sec. Litig.*,
   No. 19-02033, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................ 23

*In re BofI Holding, Inc. Sec. Litig.*,
   No. 15-02324, 2017 WL 2257980 (S.D. Cal. May 23, 2017) ...................................................... 29

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
   No. 3:12-CV-1737 JM WMC, 2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ............................... 25

*In re Coinstar Inc. Sec. Litig.*,
   No. 11-133-MJP, 2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) ................................................ 31

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005) ....................................................................................... 15, 33

*In re El Paso Elec. Co. Sec. Litig.*,
   No. EP-03-CA-0004, 2004 WL 377555 (W.D. Tex. Feb. 23, 2004) ............................................ 21

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) .................................................................................. 19

*In re Extreme Networks, Inc.*,
   No. 15-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ............................................. 35

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ............................................................................................ 33

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) .............................................................................................. 12

*In re In re Qualcomm Inc. Sec. Litig.*,
   No. 17cv00121 JAH-WVG, 2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ................................... 25

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ................................................................................. 18

*In re LendingClub Sec. Litig.*,
   254 F. Supp. 3d 1107 (N.D. Cal. 2017) ................................................................................. 12

*In re Lihua Int'l Sec. Litig.*,
   No. 14-5037, 2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) ......................................................... 19

*In re Massey Energy Co. Sec. Litig.*,
   883 F. Supp. 2d 597 (S.D. W. Va. 2012) ................................................................................ 14

*In re Merck & Co., Inc. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005) ................................................................................................ 16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re MGM Mirage Sec. Litig.*,
  No. 2:09-CV-01558-GMN, 2013 WL 5435832 (D. Nev. Sept. 26, 2013) ............................... 12, 36

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)............................................................................. 14

*In re Network Assocs., Inc., Sec. Litig.*,
  No. 99-01729, 2000 WL 33376577 (N.D. Cal. Sep. 5, 2000) ........................................... 22

*In re Novastar Fin. Sec. Litig.*,
  No. 04-0330-CV-W-ODS, 2005 WL 1279033 (W.D. Mo. May 12, 2005)................................... 14

*In re Nuvelo, Inc. Sec. Litig.*,
  668 F. Supp. 2d 1217 (N.D. Cal. 2009) ........................................................................ 34

*In re Par Pharm., Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990) .............................................................................. 13

*In re Petrobras Securities Litigation*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................... 13, 14

*In re Providian Fin. Corp. Sec. Litig.*,
  152 F. Supp. 2d 814 (E.D. Pa. 2001) ......................................................................... 13

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .................................................................. 16, 28, 29, 30

*In re Questcor Sec. Litig.*,
  No. SA CV 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ................................... 12

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ................................................................................... 23

*In re Silver Wheaton Corp. Securities Litigation*,
  No. CV15-5146-CAS(JEMx), 2016 WL 3226004 (C.D. Cal. Jun. 6, 2016) ............................ 21, 28

*In re Sotheby's Holdings, Inc.*,
  No. 00 CIV. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ................................... 13

*In re SunPower Sec. Litig.*,
  No. 09-5473-RS, 2011 WL 7404238 (N.D. Cal. Dec. 19, 2011) ....................................... 31

*In re Toyota Motor Corp. Sec. Litig.*,
  No. CV 10-922 DSF AJWX, 2012 WL 3791716 (C.D. Cal. Mar. 12, 2012)................................ 16

*In re Verifone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ................................................................................... 22

*In re WageWorks, Inc., Sec. Litig.*,
  No. 18-CV-01523-JSW, 2020 WL 2896547 (N.D. Cal. June 1, 2020) ................................... 35

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
  No. 14-1997, 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ......................................... 29, 30

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003).......................................................................... 33

*In re Zoran Corp. Deriv. Litig.,*
511 F. Supp. 2d 986 (N.D. Cal. 2007) .......................................................................... 26

*In re Zynga Inc. Sec. Litig.,*
No. 12-04007, 2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) .................................... 31

*Institut'l Inv. Grp. v. Avaya, Inc.,*
564 F.3d 242 (3d Cir. 2009).......................................................................................... 25

*Khoja v. Orexigen Therapeutics, Inc.,*
899 F.3d 988 (9th Cir. 2018) .......................................................................................... 9

*Lapin v. Goldman Sachs Grp., Inc.,*
506 F. Supp. 2d 221 (S.D.N.Y. 2006)........................................................................... 14

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
416 F.3d 940 (9th Cir. 2005) ........................................................................................ 25

*Lloyd v. CVB Fin. Corp.,*
811 F.3d 1200 (9th Cir. 2016) ...................................................................................... 27

*Lomingkit v. Apollo Educ. Grp. Inc.,*
No. 16-00689, 2017 WL 633148 (D. Ariz. Feb. 16, 2017) .......................................... 29

*Lomingkit v. Apollow Educ. Grp. Inc.,*
No. CV-16-00689-PHX-JAT, 2017 WL 633148 (D. Ariz. Feb. 16, 2017) ................... 16

*Lopez v. Smith,*
203 F.3d 1122 (9th Cir. 2000) ...................................................................................... 37

*Luna v. Marvell Tech. Grp., Ltd.,*
No. 15-05447, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ....................................... 35

*M&M Hart Living Tr. v. Glob. Eagle Ent. Inc.,*
No. 17-1479, 2017 WL 5635425 (C.D. Cal. Oct. 30, 2017)........................................... 28

*Matrixx Initiatives, Inc. v. Siracusano,*
131 S. Ct. 1309 (2011)................................................................................................... 25

*Maverick Fund L.D.C. v. First Solar, Inc.,*
No. 15-1156, 2018 WL 6181241 (D. Ariz. Nov. 27, 2018)................................... 18, 29, 30

*McGovney v. Aerohive Networks, Inc.,*
367 F. Supp. 3d 1038 (N.D. Cal. 2019) ........................................................................ 28

*Menkes v. Stolt-Nielsen S.A.,*
No. 3:03CV409(DJS), 2005 WL 3050970 (D. Conn. Nov. 10, 2005) ........................... 13

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
540 F.3d 1049 (9th Cir. 2008) ...................................................................................... 30

*Mineworkers' Pension Scheme v. First Solar, Inc.,*
881 F.3d 750 (9th Cir. 2018) .................................................................................. 33, 34

*Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.,*
523 F.3d 75 (1st Cir. 2008).......................................................................................... 23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Murphy v. Precision Castparts Corp.*,
 No. 3:16-CV-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017), *report and recommendation adopted*, No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017) ........................................................................................................................... 15

*Nathanson v. Polycom, Inc.*,
 87 F. Supp. 3d 966 (N.D. Cal. Apr. 3, 2015) ................................................................... 36

*Nguyen v. Endologix, Inc.*,
 962 F.3d 405 (9th Cir. 2020) .......................................................................................... 29

*NL Indus., Inc. v. Kaplan*,
 792 F.2d 896 (9th Cir. 1986) .......................................................................................... 22

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
 730 F.3d 1111 (9th Cir. 2013) .................................................................................. 33, 34

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
 780 Fed. App'x 480 (9th Cir. 2019) ................................................................................ 27

*Patel v. Axesstel, Inc.*,
 No. 3:14–CV–1037–CAB–BGS, 2015 WL 631525 (S.D. Cal. Feb. 13, 2015) .............................. 25

*Patel v. Seattle Genetics, Inc.*,
 No. C17-41 RSM, 2018 WL 2359137 (W.D. Wash. May 24, 2018) ............................................. 20

*Petrie v. Elec. Game Card, Inc.*,
 761 F.3d 959 (9th Cir. 2014) .......................................................................................... 31

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
 631 F.3d 436 (7th Cir. 2011) .......................................................................................... 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014) ........................................................................................ 30

*Prodanova v. H.C. Wainwright & Co., LLC*,
 993 F.3d 1097 (9th Cir. 2021) ........................................................................................ 29

*Reese v. Malone*,
 747 F.3d 557 (9th Cir. 2014) .................................................................................... 26, 30

*Resh v. China Agritech, Inc.*,
 2019 WL 1055240 (C.D. Cal. Jan. 8, 2019) .................................................................... 32

*Richman v. Goldman Sachs Grp., Inc.*,
 868 F. Supp. 2d 261 (S.D.N.Y. 2012) ............................................................................ 14

*Robb v. Fitbit Inc.*,
 216 F. Supp. 3d 1017 (N.D. Cal. 2016) .......................................................................... 36

*Roberts v. Zuora, Inc.*,
 No. 19-cv-03422-SI, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ......................... 17, 31

*Ross v. Career Educ. Corp.*,
 No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ........................................... 14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Roth v. Aon Corp.*,
   No. 04-C-6835, 2008 WL 656069 (N.D. Ill. Mar. 7, 2008) ............................................. 33

*Rudolph v. UTStarcom,*
   No. C 07-04578 SI, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008)................................... 35

*S. Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .................................................................... 22, 23, 25

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................. 24

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) ............................................................................ 10

*Sharenow v. Impac Mortg. Holdings, Inc.*,
   385 F. App'x 714 (9th Cir. 2010) ........................................................................ 32

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................. 17

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), aff'd, 563 U.S. 27, 131 S. Ct. 1309, 179 L. Ed. 2d
   398 (2011) ....................................................................................................... 31

*South Ferry LP # 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................................... 25

*Special Situations Fund III v. Brar*,
   No. 14–cv–04717–SC, 2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ............................ 25

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*,
   690 F. Supp. 2d 959 (D. Ariz. 2010) ..................................................................... 28

*Tellabs Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S. 308 (2007)................................................................................ 22, 30, 31

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................ 22, 26

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)......................................................................................... 14

*Usher v. City of Los Angeles*,
   828 F.2d 556 (9th Cir. 1987) ................................................................................ 9

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
   No. 16-02942, 2017 WL 2378369 (C.D. Cal. May 31, 2017)..................................... 23, 26

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
   No. 10-02604, 2012 WL 3835078 (N.D. Cal. Sep. 4, 2012) ......................................... 30

*Webb v. SolarCity Corp.*,
   884 F.3d 844 (9th Cir. 2018) .............................................................................. 16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Westley v. Oclaro, Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2013) ............................................................................ 35

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ......................................................... 3, 34, 35, 36

*Xiang v. Inovalon Holdings, Inc.*,
   254 F. Supp. 3d 635 (S.D.N.Y. 2017)............................................................................ 35

*Zaghian v. Farrell*,
   675 F. App'x 718 (9th Cir. 2017)............................................................................ 12, 19

*Zola v. TD Ameritrade, Inc.*,
   172 F. Supp. 3d 1055 (D. Neb. 2016) .......................................................................... 33

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ......................................................................................... 28

## **Statutes**

15 U.S.C. §78u-4(b)(1)(B).................................................................................................. 10

## I.     PRELIMINARY STATEMENT[1]

Plaintiffs plead a strong case against Defendants for securities fraud under the Securities Exchange Act of 1934. In 2006, Las Vegas Sands ("LVS") opened its Marina Bay Sands ("MBS") casino in Singapore. The casino was wildly profitable. It generated between 28% and 44% of LVS's overall casino revenue. In 2012, things started to change. China's President, Xi Jinping, implemented broad anticorruption policies that prevented Chinese nationals from transferring money abroad. LVS's revenue from MBS started to decline in short order as Chinese "VIPs" and "high rollers" stopped gambling at the casino. To stop the bleeding and offset the looming losses, LVS began illegally providing credit to its patrons at MBS that under local law were ineligible for the credit they were receiving. This scheme, referred to as the "premium player" scheme, successfully concealed LVS's losses while it was in existence. Unfortunately for LVS's investors, the scheme was illegal and when it came to light, LVS's stock price declined as the weakness in LVS's overseas casino operations became known.

Defendants' motion to dismiss is meritless. They take the unsubstantiated position that the "premium player" scheme did not exist. Plaintiffs' well-pleaded allegations show otherwise. To compensate for the loss of its VIPs and high rollers, MBS started extending credit to "premium player" patrons in violation of eligibility requirements under local law. MBS circumvented these eligibility requirements by illegally transferring funds from other client accounts without authorization to show, at least on paper, that the "premium player" eligibility requirements had been satisfied. In 2014 and 2015, these illicit transfers were regularly discussed at meetings attended by high-level compliance officers, including LVS's Global Chief Compliance Officer, MBS's Chief Financial Officer, Deputy General Counsel, and MBS's Chief Compliance Officer. The problem LVS and MBS faced was that the credit being extended to these phony "premium players" was not being repaid and, consequently, adding to mounting losses.

The illegal "premium player" transfers grew so pervasive at MBS that LVS was forced to investigate the scheme internally. In 2017 and 2018, it hired the international law firm of Hogan Lovells.

---

[1] Plaintiffs filed an unopposed motion for leave to exceed the page limits on June 14, 2021 (ECF No. 64). The Court granted a similar motion filed by Defendants on May 5, 2021 (ECF No. 51).

Case No. 2:20-cv-01958-GMN-EJY

Hogan Lovells concluded that over 3,000 letters of authorization had been executed since 2013 totaling SGD$1.4 billion, and that more than 26% of them appeared to be part of the fraudulent "premium player" scheme. In April 2018, subsequent to Hogan Lovells' investigation, LVS notified Singapore's Casino Regulatory Authority ("CRA") that MBS was changing its compliance practices in an attempt to curb the illicit transfers, requiring "wet ink" signatures and verbal confirmations from its patrons before moving funds. It was not until 2019 and 2020 when the truth about LVS's "premium player" scheme at MBS finally started to emerge. *Bloomberg* published a series of articles detailing various lawsuits and regulatory investigations against LVS and MBS stemming from the "premium player" scheme. These lawsuits and investigations included, among other things, a grand jury subpoena from the U.S. Department of Justice.

Notwithstanding the internal discussions and investigations, LVS and its chief executives, including Sheldon Adelson and Robert Goldstein, represented to the public that it was abiding by local law and the strict regulatory rules it imposed on MBS's operations. They claimed that MBS only "extend[ed] credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit" and that it "extend[ed] credit to approved casino customers following background checks and investigations of creditworthiness." They even went so far as to say in direct response to analyst questioning that "I've not seen evidence of that. In fact, if anything, I say, today it's harder to move money than ever, especially in our hotels because we're very compliant and we're very proud of our compliance record. . . . In fact, I think we're more aggressive than the government in terms of monitoring that. We're a big believer that compliance is critical." These statements clearly contradicted the facts that existed and were in their possession at the time, namely that MBS was engaged in a widespread scheme whereby it was qualifying unqualified patrons as "premium players" using illegal transfers of cash in order to extend credit to them that should not have been extended. Accordingly, Plaintiffs adequately prove the key elements of falsity and scienter for the purposes of their securities fraud claims.

Defendants also use their motion to dismiss to take aim at Plaintiffs' damages, claiming that the disclosures at issue in the complaint did not cause investors any losses. Plaintiffs' allegations once again show otherwise. A series of disclosures from various news articles and regulatory investigations in 2019

Case No. 2:20-cv-01958-GMN-EJY

and 2020 revealed the existence of the "premium player" scheme which, as alleged, had been concealed from investors during the class period. LVS's stock price declined in response to these disclosures. While Defendants argue that the declines were too insignificant or short-lived to demonstrate loss causation, that is not what the law requires at the pleading stage. The Ninth Circuit has very clearly articulated that the loss causation element is "simply a variant of proximate cause" and the "ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021). Here, unlike in the cases cited by Defendants, the disclosures revealed new and adverse material information to the market and, accordingly, caused LVS's stock price to decline. The materiality of the information is evidenced by the fact that each disclosure about the "premium player" scheme resulted in an additional decline, ultimately resulting in a per share price for LVS stock that was $7.41 per share (13%) less at the end of the class period than when it started. At the pleading stage, nothing further is required to demonstrate Plaintiffs' ability to prove loss causation.

Plaintiffs meet the pleading requirements for their claims under the Exchange Act. Consequently, Defendants have no basis for dismissing this case on the face of the pleadings. Plaintiffs respectfully request that Defendants' motion to dismiss be denied in its entirety.

## II. STATEMENT OF FACTS

### A. Marina Bay Sands Traditionally Drove Earnings for Las Vegas Sands until Additional Regulation and Scrutiny in 2012.

LVS operates casinos worldwide. ¶38.[2] In 2006, LVS commenced operations in Singapore with the development of MBS. ¶¶48-51. MBS has traditionally been LVS's most important property in terms of revenue generation; since 2010, it has contributed between 28% and 43% of LVS's overall revenue. ¶67; *see generally* ¶¶63-68 (detailing MBS's revenue between 2010 and 2019). MBS's revenues and EBITDA contributed more to LVS's earnings than any other reporting segment. ¶67.

With these newfound revenues also came heightened regulatory requirements under Singapore law. Prior to 2010, Singapore had a ban on gambling that had been in place for nearly 40 years. ¶53.

---

[2] Citations to "¶__" refer to Plaintiffs' Amended Complaint dated March 8, 2021 (ECF No. 36).

Case No. 2:20-cv-01958-GMN-EJY

LVS operates MBS in Singapore pursuant to a strict regulatory scheme designed to prevent the growth of organized crime, loan sharking, and other vices that frequently accompany gaming. ¶¶49-57. The regulations require MBS to establish and implement strict internal controls designed to detect and prevent money laundering. ¶58. Importantly, Singapore's gaming regulatory framework prohibits MBS from lending money, extending credit, or allowing patrons to purchase chips with credit cards. ¶60. MBS may provide chips on credit to patrons who are not citizens or permanent residents of Singapore or to residents of Singapore deemed "premium players," or international marketing agents as part of their jobs. ¶59. The marketing agreements also are highly regulated and forbid any type of commission or rebate unless the international marketing agent is licensed. ¶60.

Monetary regulations and other rules in both China and Singapore erect significant hurdles for Chinese gamblers seeking to bet big at MBS. ¶72. For instance, the Chinese government restricts Chinses nationals from transferring out of China more than $50,000 USD in any given year and Chinses nationals may only exit the country with RMB$20,000 (or approximately $3,083 USD). ¶75. For its part, Singapore requires visitors to declare at customs any amount of money exceeding $15,000 USD and requires that any transfer into the country of more than SGD$5,000 (approximately $3,700 USD) be reported to the government as an anti-money laundering safeguard. ¶76.

In order to circumvent these restrictions, casinos in Macao turned to the use of junkets – unaffiliated middlemen who connect high value gamblers (often in mainland China) with casino operators. ¶77. The junket operates by collecting a set amount in China and providing the gambler with credit redeemable at their destination casino. *Id*. The junket's ledgers are then adjusted according to the gambler's performance at the casino and the accounts are settled upon the bettor's return home. *Id*. The junket also receives a "finder's fee" commission from the casinos for getting the valuable VIP gamblers into their casino. *Id*. Because junkets are often linked to organized crime and money laundering, however, Singapore only allows two junkets (called International Market Agents) to operate in its country. ¶¶78-80.

Then, beginning in 2012, there was a marked shift in high roller gambling when Chinese President Xi Jinping instituted broad anticorruption policies that resulted in several years of investigations, hundreds of thousands of corruption charges, including for accepting bribes laundered

Case No. 2:20-cv-01958-GMN-EJY

through the VIP tables throughout Macao and Singapore, and limited efforts of foreign casinos to lure in Chinese gamblers. ¶¶89-91. In 2015, the CCP deputy Bureau chief at the Ministry of Public Security emphasized that China had "investigated a series of cases" and was "crack[ing] down" on foreign casinos attempting to attract Chinese citizens to gamble abroad. ¶91.

**B.    Las Vegas Sands Circumvents Heightened Regulation through Undisclosed, Unauthorized, and Illegal Transfers of Customer Funds.**

Heightened regulation and scrutiny from Singapore and China led to a sharp decline in MBS's casino revenues. In the third quarter of 2014, MBS's casino revenues fell 8.7% as betting volume against "VIPs" or "high rollers" plunged almost 34%. ¶94. Revenues continued to decline into 2015, falling 10% year over year from 2014. ¶69. Casino revenue at MBS fell nearly $260 million from 2014 to 2015. ¶64. Analysts began to conclude that the increase in regulation and scrutiny would permanently change the industry, claiming that "[w]ith that slowdown [of Chinese VIP gamblers to Singapore] and with Asian governments . . . keen to set up the gaming industry, I believe the boom years that we saw previously are now over . . . ." ¶95 (commentary from CMC Markets). LVS might have fallen victim to this trend if it were not for the scheme it implemented to evade the new regulatory oversight.

To compensate for the loss of its "high rollers" from mainland China, MBS devised a way to maximize the wagers being made by its remaining clientele by illegally extending in-house lines of credit to gamblers that by law were ineligible to receive them. ¶¶98-99, 108. Singapore's Casino Control Act prohibited MBS from extending credit to casino patrons unless they were "premium players," which the Act defined as a person who opens a deposit account with the casino and deposits at least SGD$100,000 (approximately $75,000 USD). ¶¶100-02. Given that a number of its "premium players" were no longer gambling due to the tightening regulatory restrictions, MBS began anointing additional patrons as "premium players" even though they did not meet the initial qualifications. ¶¶104, 108. MBS transferred funds from existing "premium players" without their permission and placed them in accounts belonging to new "premium players" so they could qualify for the credit lines MBS was extending. ¶105. MBS then leveraged these new "premium players" to create even more "premium players" with access to additional lines of credit. ¶106; *see also* ¶¶144-46 (alleging that widespread practice of using unauthorized transfers to create "premium players" allowed MBS to extend credit beyond legal

Case No. 2:20-cv-01958-GMN-EJY

boundaries).

MBS's scheme violated local law and exposed LVS to significant amounts of uncollectible debt generated by their phony "premium players." ¶109. The scheme was easy for MBS to carry out. MBS employees simply photocopied signed, but blank forms, and used them to forge each transfer. ¶107. Members of MBS' International Marketing Department, known as "Relationship Managers", along with the Finance Department, worked together to get the money to high value Chinese gamblers. ¶¶115, 124. The money would come out of other member accounts, despite there being no nexus or relationship between the two players, and minimal paperwork was presented for the transfer. ¶116. The Relationship Managers, who had long-standing relationships with many of these gamblers, were paid commissions and bonuses based on the individuals they brought into the casino. ¶116. In exchange for pushing applications through, VIP gamblers handed the director of the International Marketing Department money on the casino floor as a "thank you." ¶125.

While Suspicious Transaction Reports could be filed with regulators for unauthorized transfers, no one at MBS cared, no action was taken to prevent such transfers, and MBS employees, including executive compliance, were told to stop filing so many reports or to back off. ¶¶117, 122. If they did not, those employees were fired. ¶122. While the high number of suspicious transactions was discussed at meetings with LVS' Chief Compliance Officer, MBS's chief financial officer, senior compliance personnel, and representatives from legal, the issue was never addressed and no solutions were proposed. ¶121. As a result, the unauthorized transfers occurred all the time without recourse. ¶117. Between 2013 and 2017, photocopied letters of authorization were used to endorse transfers amounting to SGD$365 million (or more than 26% of the amounts transferred during that period). ¶110.

**C.   Defendants Concealed Marina Bay Sands' Scheme until 2019 when the Truth Started to Emerge and Investors Began to Sustain Damages.**

While the unauthorized transfer practice may have artificially buoyed MBS's premium player segment for a short time, it had the concurrent effect of sending LVS's bad debt write-offs soaring. Between 2013 and 2020, LVS wrote off $1.61 billion in bad debt, with a former MBS executive telling *Bloomberg* that $717 million (or nearly 62%) of that amount was directly attributable to write-offs at MBS. ¶¶16, 149-50; *see also* ¶151 (allowance for doubtful accounts rose from 25.1% of gross

receivables in 2010 to 51.5% in 2017 and write-offs increased from $34.6 million in 2010 to $234 million in 2016). This was in part due to the fact that that the probability of collection of debt issued to patrons from mainland China was exceptionally low because gambling debts are legally unenforceable in Chinese courts. ¶147.

LVS stemmed its write-off problems in 2018 when it began limiting the practice of unauthorized third-party transfers. ¶152. This, in turn, reduced the amount of credit extended to the phone "premium players" and lowered the volume of wagers being made at MBS. ¶152. LVS's casino revenue also fell by more than 7% that year. ¶152. Indeed, between 2017 and 2019, MBS's casino revenues fell by $166 million. ¶¶64-69.

LVS curtailed its practice of unauthorized third-party transfers only after conducting an internal investigation with the help of an outside law firm, Hogan Lovells. Unbeknownst to the investing public, LVS hired Hogan Lovells in 2017 or 2018 to conduct an internal probe into the unauthorized transfers. ¶159. As a result of the investigation, Hogan Lovells uncovered instances of employees filling in payment details on pre-signed or photocopied authorization forms. ¶¶110, 159. Specifically, of the more than 3,000 letters of authorization executed between 2013 and 2017, which amounted to more than SGD$1.4 billion in customer-to-customer transfers, letters authorizing transfers for SGD$365 million (or more than 26%) bore signatures that appeared similar. ¶¶110, 159. In other words, nearly 26% of those transfers were unauthorized transfers. ¶¶110, 159. The investigation also concluded that one group of employees was responsible for carrying out more than half of the third party transfers themselves, in an amount totaling SGD$763 million. ¶111.

In a letter to the CRA, MBS claimed it conducted its own review and amended compliance procedures in April 2018 to end the unauthorized transfers, including by implementing basic compliance policies such as requiring transfer letters to include fresh "wet ink" signatures, that staff receive verbal confirmation from a patron before removing funds, and that there be a declaration of the relationship between the patrons and reason for making the third-party payment. ¶¶118-19, 160.

LVS managed to keep this information concealed from investors until September 26, 2019 when a Chinese national high-roller named Wang Xi alleged publicly that the casino had misappropriated approximately $6.1 million USD from his accounts through 22 separate transactions between October

Case No. 2:20-cv-01958-GMN-EJY

and December 2015. ¶¶153, 222. These transfers were carried out through letters of authorization that appeared to either be forged or photocopied. ¶154.

When Mr. Wang sued, he set off a chain reaction of investigations by the United States Department of Justice, Singapore police, and Singapore's Casino Regulatory Authority. In January 2020, *Bloomberg* reported that the DOJ issued a grand jury subpoena to a chief compliance officer at MBS "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls." ¶156.

Next, on May 12, 2020, *Bloomberg* reported that the Singapore police commenced a probe and were investigating the unauthorized transfer activity at MBS. ¶¶157, 224.

On June 4, 2020, *Bloomberg* published an article titled "*Adelson's Singapore Casino Probed Over Laundering Controls,*" not only affirming its previous reporting of the Singapore police investigation into MBS but announcing for the first time that LVS was being probed by the DOJ to determine "whether anti-money laundering regulations were breached in the way [LVS] handled the accounts of top gamblers." ¶¶158, 225. The article also revealed new information about the grand jury proceedings that occurred earlier in the year, including that prosecutors asked MBS's compliance head to produce records related to regulatory violations and the use of third-party lending. ¶226. The article also featured comments from an internal source at MBS confirming that the internal investigation found instances of employees violating accepted transfer procedures using phony or fake authorization forms and that these violations had continued until April 2018. ¶¶228-29.

On July 19, 2020, *Bloomberg* published an additional article entitled "*Sheldon Adelson's Singapore Casino Ends Suit with $6.5 Million Payment,*" announcing that MBS had agreed to a confidential settlement with Wang Xi in exchange for full payment of his demand – SGD$9.1 million. ¶233.

Finally, on September 16, 2020, *Bloomberg* published a new article entitled "*Adelson's Singapore Casino Hires Law Firm to Probe $1 Billion Transfers.*" In this article, *Bloomberg* revealed for the first time that LVS hired the well-known Singapore law firm of Davinder Singh Chambers LLC to conduct a new investigation into employee transfers of more than $1 billion in gamblers' money to

Case No. 2:20-cv-01958-GMN-EJY

third parties. ¶¶235-36. According to the article, LVS's previous investigation into the matter with the help of Hogan Lovells confirmed that illicit transfers had taken place in contravention of local law. ¶242.

LVS's stock price declined steadily over the course of these disclosures. From its closing price of $57.08 per share on September 25, 2019, LVS's stock fell $7.41 to close at $49.67 per share on September 16, 2020. ¶¶222, 243. Plaintiffs and other LVS investors sustained significant damages as a result of Defendants' conduct.

## III.   LEGAL STANDARD

On a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Evanston Police Pens. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 591 (N.D. Cal. Oct. 30, 2019) (*quoting Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)); *see also Al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009) (A court must "accept[] as true all facts alleged in the complaint, and draw[] all reasonable inferences in favor of the plaintiff" in ruling on a motion to dismiss). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (internal quotations and alterations omitted). Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV.   ARGUMENT

To state a Section 10(b) claim, a plaintiff must allege: (1) a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) reliance; (4) scienter; (5) economic loss; and (6) loss causation. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). Defendants challenge the first, fourth, and six elements only.

A.    **Material Misrepresentations or Omissions**

1.    **Defendants' SEC Filings and Public Statements Concealed LVS's Illegal "Premium Player" Scheme and Regulatory Risk.**

"'[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.'" *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). A complaint sufficiently pleads falsity where, as here, it "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). At the pleading stage, a plaintiff need not prove falsity, but instead only "allege[] why each of the[] statements . . . could be false or at least misleading." *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1286 (C.D. Cal. 2016). Further, Plaintiffs are entitled to a presumption that their allegations are true at the pleading stage. *See ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (taking Plaintiffs "allegations as true—as we must at the pleading stage").

Plaintiffs adequately allege falsity. Beginning in 2014, MBS started losing revenue from its high-roller clientele. ¶¶64, 69, 94-95. LVS hid these losses by offsetting them with revenue MBS was generating from new "premium players" with significant lines of credit. ¶¶98-99, 108. These "premium players," however, were not eligible for "premium player" status and the credit lines that came with it. Instead, MBS was generating phony "premium players" by making transfers between customer accounts to satisfy on paper the mandatory financial eligibility requirements. ¶¶104-08, 144-46. These transfers were unauthorized by the clients and illegal under Singapore law. ¶¶100-02. This scheme was widespread; indeed, LVS's internal investigation determined that upwards of SGD$365 million of MBS's customer transfers between 2013 and 2017 appeared to be part of the scheme, representing more than 26% of MBS's overall transfers during the same period. ¶¶110, 159.

Contrary to the state of affairs that existed at the time, LVS represented in its filings with the SEC that it adhered strictly with local law, extended credit only to those who qualified, and maintained compliance policies to avoid unnecessary regulatory risk. In particular, LVS claimed in its annual reports

Case No. 2:20-cv-01958-GMN-EJY

for 2015, 2016, 2017, 2018, and 2019 on Forms 10-K that it "extend[s] credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit" (¶170) and that it "extends credit to approved casino customers following background checks and investigations of creditworthiness" (¶178).[3] These statements were false and materially misleading because, as explained above, LVS was actively skirting the new regulatory regime by using illicit customer transfers to open credit lines at MBS for unqualified "premium players." ¶¶171, 179; *see also* ¶¶124-25 (describing practice of extending credit to unworthy patrons based on personal relationships with the gamblers). Moreover, LVS was aware of the scheme at the time of these statements based on the fact that it was discussed regularly throughout 2014 and 2015 at high-level meetings with LVS's Global Chief Compliance officer, MBS's Chief Compliance Officer, MBS's Chief Financial Officer, Deputy General Counsel, and other compliance personnel. ¶121. And, at least with respect to the statements in its 2017, 2018, and 2019 annual reports, LVS had ***already*** conducted an internal investigation into the "premium player" scheme and had evidence of its existence in hand when filing the reports with the SEC on February 23, 2018, February 22, 2019, and February 7, 2020, respectively. ¶¶110, 159, 163.[4]

Goldstein and Adelson similarly misled investors when discussing LVS's compliance and MBS's operating results. For example, on March 10, 2016, Goldstein told investors and analysts when discussing illegal credit extensions at MBS that "I've not seen evidence of that. In fact, if anything, I say, today it's harder to move money than ever, especially in our hotels because we're very compliant and we're very proud of our compliance record. . . . In fact, I think we're more aggressive than the government in terms of monitoring that. We're a big believer that compliance is critical." ¶180. This

---

[3] LVS made other statements in other SEC filings relating to the creditworthiness of its patrons and the collectability of its gaming receivables. *See* ¶172 ("Even where gaming debts are enforceable, they may not be collectible."); *see also* ¶¶174, 176 (". . . doubtful accounts in the future will depend upon . . . our credit standards . . . ."). Similar to the statements discussed above, these representations were materially misleading because they, too, concealed the existence of MBS's "premium player" scheme and the fact that its new phony "premium player" clientele were not eligible for the credit MBS had extended them in the first place. *See* ¶¶173, 175, 177.

[4] Similarly, when LVS denied the merits of Wang Xi's lawsuit during an investor presentation on June 10, 2020, it already had the results of its internal investigation and had dealt with the regulatory fallout caused by the lawsuit's allegations. *See* ¶¶215-16.

Case No. 2:20-cv-01958-GMN-EJY

statement clearly contradicted the truth of the matter, which was that MBS was engaged in a widespread scheme at the time whereby it was qualifying unqualified patrons as "premium players" using illegal transfers of cash in order to extend credit to them that should not have been extended. ¶181.[5] Likewise, when discussing MBS's impact on LVS's revenues in 2016 and 2017, Goldstein and Adelson consistently omitted the existence of "premium player" scheme and its effects on revenue. *See* ¶¶182, 184, 186, 190, 192. For example, LVS boasted that its earnings were "double" that of competitors and "74% of the market," stating "[t]here's got to be something we're doing right and our competitors are not doing." ¶185. Having touted the Company's strong performance, Defendants had a duty to disclose that LVS's market share and earnings were the result of unauthorized transfer practices and were at risk of declining if LVS's unauthorized practice was stopped. *See Zaghian v. Farrell*, 675 F. App'x 718, 721 (9th Cir. 2017) (reversing dismissal on the pleadings where defendants voluntarily "made statements reflecting confidence" in product sales but "fail[ed] to inform the market about the risk" related to product sales); *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) ("investors would also have been interested to know that millions of dollars of loans were not the result of organic matches in the marketplace reflecting participants' trust in LendingClub's purportedly neutral platform, but were inflated artificially through self-dealing disguised as real transactions").[6]

Plaintiffs' allegations easily establish falsity for the purposes of stating a claim. Courts have consistently recognized a duty to disclose any conduct where a failure to do so would be misleading, particularly where a corporation engages in conduct that is potentially illegal or subjects the corporation to risks associated with government investigation and/or prosecution. *See*, *e.g.*, *Menkes v. Stolt-Nielsen*

[5] For this reason, LVS's representations about the effectiveness and adequacy of its "disclosure controls and procedures" were also materially misleading. *See* ¶¶217-220.

[6] While these statements may be literally true, they remain misleading without full disclosure of LVS's unauthorized transfer practices. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1551 (9th Cir. 1994) (statement "even if literally true" can be misleading); *In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2013 WL 5435832, at *4 (D. Nev. Sept. 26, 2013) ("a statement that is technically true, may still be misleading and actionable under securities laws where it 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.'") (*citing Brody v. Transitional Hospitals. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG, 2013 WL 5486762, at *11 (C.D. Cal. Oct. 1, 2013) (holding misrepresentation occurred where statement disclosed only part of the truth).

Case No. 2:20-cv-01958-GMN-EJY

*S.A.*, No. 3:03CV409(DJS), 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005) (duty to disclose "uncharged anti-competitive activity"); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (duty to disclose "illegal or fraudulent business practices" where corporation put that conduct "in play"); *In re Sotheby's Holdings, Inc.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (duty to disclose anti-competitive agreement); *In re Par Pharm., Sec. Litig.*, 733 F. Supp. 668, 679 (S.D.N.Y. 1990) (duty to disclose bribery scheme); *Ballan v. Wilfred Am. Ed. Corp.*, 720 F. Supp. 241, 249 (E.D.N.Y. 1989) (duty to disclose conduct of management and employees); *Greenfield v. Prof'l. Care, Inc.*, 677 F. Supp. 110, 113 (E.D.N.Y. 1987) (duty to disclose scheme to defraud). "The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose." *Par Pharm.,* 733 F. Supp. at 675; *accord Ballan*, 720 F. Supp. at 248-49 ("The fact that a defendant's act may be a crime does not justify its concealment" because "[a] corporation has no privilege against self-incrimination"); *Menkes*, 2005 WL 3050970, at *7 (holding that "a corporation has a duty to disclose uncharged criminal conduct" where a failure to do so would be misleading).[7]

Moreover, courts routinely hold that statements affirming compliance with various regulations local laws, or internal policies can be actionable under the federal securities laws, contrary to Defendants' arguments otherwise. DB at 26.[8] For example, in *In re Petrobras Securities Litigation*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015), the court denied the defendants' motion to dismiss where the plaintiffs alleged that statements relating to the company's code of ethics were false and misleading. The statements at issue were substantially identical to the statements at issue here, including representations that the defendants "refuse any corrupt and bribery practices," "refuse support and contributions to political parties," and "neither Petrobras nor any of its officers had engaged in corruption, made any

---

[7] Defendants' attempt to escape liability by hiding behind risk disclosures (DB at 27) is unavailing considering the risks had already materialized and, therefore, do not insulate Defendants from liability. *See Ferreira v. Funko Inc.*, No. LACV2002319VAPPJWX, 2021 WL 880400, at *18 (C.D. Cal. Feb. 25, 2021) ("the disclosure is misleading and not meaningful because it sets forth various hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized, as alleged by Plaintiffs. This is exactly the circumstance under which the Ninth Circuit has found this type of statement to be misleading.").

[8] "DB" refers to Defendants' brief in support of their motion to dismiss (ECF No. 52).

Case No. 2:20-cv-01958-GMN-EJY

bribe or unlawful payment, or violated any provision of certain U.S., U.K. and Brazilian anti-corruption laws." *Id*. at 377. In denying the motion to dismiss, the court held that "[w]hile some of the alleged statements, viewed in isolation, may be mere puffery, nonetheless, when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company. Accordingly, the Court cannot find that all of Petrobras' alleged statements regarding its general integrity and ethical soundness were immaterial as a matter of law." *Id*. at 381 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976), for premise that issue of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").[9]

### 2.   Plaintiffs' Confidential Witnesses Are Reliable and Provide a Particularized Factual Basis for the "Premium Player" Scheme Allegations.

Defendants' motion is premised in part on the notion that Plaintiffs' confidential witness allegations are unreliable and, therefore, cannot show the existence of the "premium player" scheme. DB at 16-19. Their arguments on this point are unavailing. Courts credit CW allegations at the pleading

---

[9] *See also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 280 (S.D.N.Y. 2012) (misstatements of compliance with laws and regulations actionable); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 241 (S.D.N.Y. 2012) (statements regarding compliance with environmental laws actionable); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D. W. Va. 2012) (statements concerning the "risk factor created by the mine industry and the regulation of federal and state agencies" were actionable misstatements "inasmuch as Massey had already failed to comply with the regulations"); *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (statement that "'[w]e have carefully reviewed and modified our policies and practices for reporting job placement rates, admissions and advertising'" misled investors as defendants were still misrepresenting their placement rates); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010) (code of ethics statement that company complied with U.S. antitrust laws was actionable); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y. 2009) (ratings agency's statements regarding its purported "independence" and "ratings integrity" were materially misleading for failure to disclose that its ratings and methodologies were in fact compromised by conflicts of interest); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006) (statements touting policy of issuing "unbiased" research, especially where defendant stated that "such integrity 'was at the heart' of its business," was materially misleading in light of fact that analysts were beset by conflicts of interest which tainted their recommendations); *In re Novastar Fin. Sec. Litig.*, No. 04-0330-CV-W-ODS, 2005 WL 1279033, at *4 (W.D. Mo. May 12, 2005) (concealed regulatory noncompliance actionable where defendant made statements concerning importance of compliance to future success).

Case No. 2:20-cv-01958-GMN-EJY

stage when it appears from the face of the complaint that the CW was in a position to know the information being attributed to him. *See In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005). Plaintiffs establish the reliability of their CWs by alleging their titles, employment periods, and responsibilities. *See* ¶¶112-13, 123. *See In re Daou Sys.*, 411 F.3d at 1016 (holding that plaintiffs described confidential witnesses with sufficient detail by alleging title and job responsibility); *Murphy v. Precision Castparts Corp.*, No. 3:16-CV-00521-SB, 2017 WL 3084274, at *14 (D. Or. June 27, 2017), *report and recommendation adopted*, No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017) (finding CW allegations as providing "sufficient indicia of reliability" where CW title, employment period, and duties have been alleged).

Defendants argue CW1 lacks firsthand knowledge and provides conclusory and speculative accounts. DB at 17. But CW1 was an Anti-Money Laundering Specialist in MBS's compliance department who managed in-depth reviews of client accounts (and was the only employee doing so), and was responsible for reviewing customer transactions to flag suspicious activity. ¶¶112-15. CW1 processed "customer-to-customer transfers first-hand . . . to force through approval of transfers to high value Chinese gamblers at the casino." ¶115. Based on CW1's direct experience with the subject matter central to this litigation, participation in meetings with high level MBS executives where the high number of illegal transfers were discussed, observation of the newfound friendships (and perks of those friendships, such as private jet flights) and interactions among these individuals, as well as the evasive responses CW1 received when raising inquiries or flagging suspicious transactions and the response from higher-ups to back off and not be outspoken, CW1 knew that these transfers were not authorized. ¶¶116-17, 121. CW1 discussed these unauthorized transfers (referred to as "Suspicious Transaction Reports") at meetings with LVS's Global Chief Compliance Officer, MBS's Chief Compliance Officer, MBS's Chief Financial Officer, MBS's Deputy General Counsel, and other high-level compliance and legal personnel. ¶121. Coupled with the corroborating details in the Amended Complaint, CW1's accounts are credible.

Defendants also argue that CW1's accounts are irrelevant because they occurred prior to the start of the Class Period. DB at 15-16. To the contrary, pre-class period events are relevant to demonstrating the falsity of Defendants' statements during the Class Period. *See In re Quality Sys., Inc. Sec. Litig.*, 865

F.3d 1130, 1145 (9th Cir. 2017) (crediting allegations from CW who was not employed during the class period); *In re Toyota Motor Corp. Sec. Litig.*, No. CV 10-922 DSF AJWX, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012) ("facts predating the class period are relevant to establish that statements made during the class period were materially false. . . . In short, '[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'"); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("We shall follow the Second Circuit here and hold the pre-class data regarding Merck's market share relevant to showing Medco's statements to be misleading.").

The cases Defendants rely on do not support their assertion that pre-class-period recollections are irrelevant. Rather, their cases stand for the unremarkable proposition that CWs must provide first-hand accounts rather than rely on hearsay. DB at 16-17. *See Hampton v. Aqua Metals, Inc.*, No. 17-cv-07142-HSG, 2020 WL 6710096, at *15 (N.D. Cal. Nov. 16, 2020) (CW "admittedly premise[d] his statements solely on hearsay"); *Lomingkit v. Apollo Educ. Grp. Inc.,* No. CV-16-00689-PHX-JAT, 2017 WL 633148, at *13 (D. Ariz. Feb. 16, 2017) (CW was "lacking firsthand knowledge" where accounts were based on the fact "he kept in touch" with people after he left the company); *Brodsky v. Yahoo! Inc.,* 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) (observations that Yahoo! was "bursting at the seams" and "literally self-destructing" without objective indicators or specificity as to when this was not credible). Here, by contrast, while CW1 was employed before the Class Period, CW1 was employed while the wrongdoing occurred, witnessed first-hand the unauthorized credit, and CW1's account is corroborated by a plethora of other accounts, including from CWs, investigations, and other lawsuits. Given CW1's description of the pre-Class Period events, a strong inference exists that the "premium player" scheme continued afterwards into and through the Class Period. *See Webb v. SolarCity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) (pre-class period statements from confidential witnesses can confirm class period events); *see also Hollin v. Scholastic Corp.*, 252 F.3d 63, 73 (2d Cir. 2001) ("[P]ost-class period data may be relevant to determining what a defendant knew or should have known during the class period."). This is especially true when considering Plaintiff's other allegations demonstrating that the "premium player" scheme continued during the Class Period, namely Hogan Lovells' internal investigation and the various lawsuits and regulatory investigations prompted by the *Bloomberg* reporting. *See* ¶¶110,

Case No. 2:20-cv-01958-GMN-EJY

222-240.

CW2, a former credit officer on the gaming side tasked with conducting know-your-customer due diligence on MBS patrons in MBS's Finance Department from 2013 to 2016, also corroborated that the decision to extend credit was not based on credit worthiness. ¶¶123-24. According to CW2, the decision came from the VP-level or higher (¶124) and the amount of credit to be granted was based on the executive's personal relationship with the gambler. *Id*. *See also* ¶125. A prospective credit gamer's relationship with those at LVS played a larger role in determining eligibility than credit worthiness, as the unauthorized transactions were carried out for favored clients. The MGS Relationship Managers had long-standing relationships with these high-stakes gamblers, who were often shuttled between Macao and Singapore in LVS's private jets. ¶116.

Defendants mischaracterize CW2's statements in attempt to render CW2's allegations unreliable. DB at 18. While CW2 explained that this witness would check an applicant's creditworthiness, CW2 stated that higher-ups ultimately made the decisions whether to extend credit based on their relationship with the gambler, rather than credit worthiness. ¶¶124-25. CW2 witnessed first-hand interactions between MBS employees and gamblers where the MBS employee effectively received a kickback for approving credit requests, including one instance in particular where a VIP from China attempted to hand thousands of dollars directly to a director from the International Marketing Department at MBS. ¶125. Further, that CW2 explained that the letters of authorization were signed at the cage and without telling compliance (¶127) indicates the authorizations were signed without the actual third party gamblers present. ¶127. Relatedly, that CW2 was present during a portion of the Class Period, rather than its entirety, does not discount the fact that CW2 recounted reliable, first-hand knowledge of events that occurred during the Class Period. *Roberts v. Zuora, Inc*., No. 19-cv-03422-SI, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) ("The Court is not persuaded by defendants' assertion that the CW allegations are deficient because the CWs did not work at Zuora for the entire class period."); *Shenwick v. Twitter, Inc*., 282 F. Supp. 3d 1115, 1125 n.8 (N.D. Cal. 2017) ("the timeframe of CW[]'s employment has little bearing on whether he can provide relevant testimony . . . .").

Plaintiffs' CW allegations are also corroborated by additional sources. In addition to uncovering

Case No. 2:20-cv-01958-GMN-EJY

that a significant number of authorizations forms were pre-signed with empty information or had been photocopied (¶159), a former MBS Compliance executive noted during LVS's internal investigation that he raised the issue of unauthorized transfers internally at MBS but was urged by the operations and legal teams to back off. ¶122. This former executive's contract was not renewed at the end of its term, which is consistent with CW1's account that MBS fired anyone who raised the problem of suspicious transfers. ¶122; *see also* ¶117 (CW1 instructed to back off from filing STRs and to just accept the transactions).  This practice is further corroborated by the Wang Xi lawsuit, one of MBS's high-rollers who noticed approximately $6.1 million was missing from his account between October and December 2015 due to unauthorized transfers to other players. ¶153.

Despite Defendants' attempt to discredit this executive (DB at 19), confidential informants in reputable news sources, which are corroborated by other witnesses and allegations, are credible. *See In re Mattel Secs. Litig.*, No. 19-10860, 2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) (refusing to disregard former senior tax executive's claims of accounting deficiencies and finding scienter); *Abdo v. Fitzsimmons*, No. 17-00851, 2018 WL 11220494 (N.D. Cal. May 22, 2018) (scienter adequately pled where whistleblower disclosed details of a cover-up to hide the failure of a Super Bowl advertisement to company's auditors and Audit Committee and Board of Directors each concluded allegations were accurate); *In re LDK Solar Sec. Litig.,* 584 F. Supp. 2d 1230 (N.D. Cal. 2008) (where a whistleblower was central to a complaint alleging serious accounting errors, the court found falsity and scienter). The two cases relied on by Defendants are inapposite as they concern unreliable blog posts by anonymous short sellers (with no inside knowledge of the company) and are uncorroborated articles. DB at 19. Corroborating accounts from confidential witnesses, former executives, as well as lawsuits and investigations demonstrate the falsity of Defendants' statements. *See Maverick Fund L.D.C. v. First Solar, Inc.,* No. 15-1156, 2018 WL 6181241, at *11 (D. Ariz. Nov. 27, 2018) (CW corroborating accounts reliable where, "based on their position descriptions, [the CWs] were positioned to know"). Moreover, news reports are frequently and routinely accepted in support of falsity allegations at the pleading stage. *See Alphabet Secs. Litig., R.I. v. Alphabet, Inc.*, No. 20-15638, 2021 WL 2448223 (9th Cir. June 16, 2021) (finding a strong inference of scienter regarding security vulnerability coverup exposed through a WSJ article); *In re Lihua Int'l Sec. Litig.,* No. 14-5037, 2016 WL 1312104, at *4, 16-

Case No. 2:20-cv-01958-GMN-EJY

17 (S.D.N.Y. Mar. 31, 2016) (crediting Chinese news articles in support of decline in production where they relied on anonymous sources, sufficient to find material misrepresentation and scienter); *see also In re Equifax Inc. Sec. Litig.,* 357 F. Supp. 3d 1189, 1235-36 (N.D. Ga. 2019) ("Despite the fact that these news articles rely in part on anonymous sources, the Court declines to completely discount the allegations that rely upon them… News articles, which frequently rely upon unnamed sources, constitute reliable bases for allegations. Therefore, the Court does not discount the allegations based upon these two articles merely because they cite anonymous sources.").

### 3. The Internal Investigation Conducted by Hogan Lovells Provides Persuasive Support for Plaintiffs' Allegations about the "Premium Player" Scheme.

Hogan Lovells conducted an internal investigation at LVS in 2017 or 2018. ¶110. The focus of the investigation was on the alleged unauthorized transfers of client funds. *Id*. Hogan Lovells concluded that more than 3,000 letters of authorization for fund transfers were processed between 2013 and 2017, covering approximately SGD$1.4 billion. *Id*. Of this amount, Hogan Lovells determined that approximately 26%, or SGD$365 million, were effectuated through authorization letters bearing what appeared to be photocopied signatures. ¶¶110, 159, 242. Following Hogan Lovells' investigation, MBS self-reported to the Singapore CRA and advised that it had implemented significant compliance measures in response to the investigation findings. ¶118. These measures included requiring "wet ink" signatures and verbal confirmations for all transfers. ¶119.

Although Plaintiffs' allegations about the investigation are detailed, corroborated, and particularized, Defendants fault Plaintiffs for failing to identify precisely how many transfers occurred or how many transfers with similar signatures were used. DB at 20. This argument overlooks the detailed facts already alleged and ignores that discovery has not yet taken place in the action. *See Zaghian,* 675 F. App'x at 720 (reversing dismissal where plaintiff adequately alleged that defendants knew of market risk by describing report of "independent study" even though actual contents of report not pleaded); *Finisar Corp. Sec. Litig. v. Finisar Corp.,* 646 F. App'x 506, 507 (9th Cir. 2016) (holding that plaintiff adequately pleaded falsity where complaint "identifie[d] a specific statement in which Finisar's CEO denied having knowledge of an inventory buildup and down-played concerns of a looming inventory bubble" and "identifie[d] why that statement was misleading by alleging that inventory levels would

have been disclosed to defendants during the annual contract negotiations"); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (court at pleading stage must ensure that "the grounds for the plaintiff's suspicions . . . make the allegations plausible," while "remain[ing] sensitive to information asymmetries that may prevent [plaintiff] from offering more detail" before he has had the benefit of discovery). Any more details require Plaintiffs to essentially prove their case, which is not required at this stage. *Patel v. Seattle Genetics, Inc.,* No. C17-41 RSM, 2018 WL 2359137, at *7 n.13 (W.D. Wash. May 24, 2018) ("Plaintiff has not had an opportunity to conduct discovery and is not required to prove its case at this stage of the action.").

Relatedly, Defendants misplace reliance on the claim that MBS was not the subject of any public investigative findings by any regulatory agency. DB at 15. In doing so, Defendants ignore that the CRA concluded that there were "weaknesses in MBS' casino control measures pertaining to fund transfers" and directed MBS to strengthen its controls. ¶237. Further, Defendants' assertion that the SEC would have "taken action" if LVS was engaging in unauthorized transfers (DB at 21) is entirely speculative and belied by the fact that LVS paid $9 million to end the SEC's probe (¶281), had to hire new general counsel and new heads of internal audit and compliance functions as a result of the probe, had to establish a new Board of Directors Committee and increase its compliance and accounting budgets as a result of the probe (¶282), and, pursuant to the SEC's order, had to hire an independent consultant with certain enumerated qualifications (¶283) for a two-year engagement where the consultant was engaging in certain compliance related tasks (¶284). To this day, LVS remains the subject of ongoing investigations (such as the DOJ investigation) and, as a result, recently created a special committee in March of 2021 and hired counsel to "look into potential breaches of anti-money laundering procedures at its Singapore casino," according to *Bloomberg* reports. *See* Chanyaporn Chanjaroen, *Vegas Sands Probes Money-Laundering Safeguards at Singapore Unit* (Mar. 28, 2021).[10]

Whether or not LVS ultimately is fined or penalized by one of these regulatory agencies is beside the point. A number of cases have addressed this very issue and have held that the ultimate issue of whether a defendant in fact violated a law is secondary to whether or not a plaintiff has adequately stated

---

[10]  Available at: https://www.bloomberg.com/news/articles/2021-03-29/vegas-sands-probes-money-laundering-safeguards-at-singapore-unit (last accessed Jul. 2, 2021).

Case No. 2:20-cv-01958-GMN-EJY

a claim at the pleading stage. For example, in *In re Silver Wheaton Corp. Securities Litigation*, No. CV15-5146-CAS(JEMx), 2016 WL 3226004 (C.D. Cal. Jun. 6, 2016), the defendants allegedly misrepresented their compliance with certain Canadian tax regulations. *Id.* at *1. In support of their motion to dismiss, the defendants argued that they did not commit any violations under the applicable rules and that they would ultimately be vindicated. *Id.* at *7. The Court denied the motion to dismiss, holding that "this argument [was] misplaced." *Id.* "Whether defendants were required to record or disclose a tax liability depends, not on whether the Canadian tax courts will ultimately affirm the CRA's reassessment, but rather on whether it is *probable* that Silver Wheaton will eventually be required to pay unpaid income taxes and applicable penalties." *Id.* Similar to the defendants in *Silver Wheaton*, Defendants' argument about whether or not they actually violated the FCPA is secondary to the present issue of whether or not Plaintiff has adequately stated claims showing that Defendants' statements were materially misleading.

*Halford v. AtriCure, Inc.*, No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010), further supports Plaintiff's point. In that case, the plaintiffs alleged *inter alia* that the defendants engaged in marketing tactics that violated the Federal Food, Drug, and Cosmetic Act (the "FDCA"). *Id.* at *4-7. The court denied the defendants' motion to dismiss. In doing so, the court held that the "[p]laintiffs have identified specific statements it contends are fraudulent, identified the speaker, stated where and when the statements were made, and explain why the statements were allegedly fraudulent. . . . It is the falsity of Defendants' statements which is critical, not whether the underlying activity is found to be illegal by the DOJ." *Id.* at *9; *see also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008) (rejecting premise that securities fraud claim can proceed if and only if the FDA determines that defendants engaged in illegal marketing practices).

*In re El Paso Elec. Co. Sec. Litig.*, No. EP-03-CA-0004, 2004 WL 377555 (W.D. Tex. Feb. 23, 2004), also proves Defendants wrong. In that case, the court rejected the very same argument raised by Defendants here, holding that:

> Defendants stretch to deflect charges that the information it failed to provide to investors was not material, by claiming that [the company] did not violate any of the FERC's rules or regulations. That explanation misses the mark completely, irrespective of the FERC's rules or regulations because a reasonably prudent investor might refrain from investing

Case No. 2:20-cv-01958-GMN-EJY

their money in a company that is involved in a potentially illegal relationship.

*Id*. at *6.

The same is true here. Plaintiffs' claims are not dependent upon a finding of illegality or the results of ongoing investigations by the CRA, SEC, DOJ, or any other agency for that matter. Instead, liability in this case comes down to whether Defendants misled investors. As demonstrated above, Plaintiffs have sufficiently identified Defendants' materially false and misleading statements and omissions. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986) (accepting allegations as true at the pleading stage).[11]

### B. Scienter

A complaint will survive when "*all* of the facts alleged, *taken collectively,* give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 310 (2007) (emphasis in original). "The PSLRA calls for a 'strong inference,' not an outright confession or an airtight case." *In re Network Assocs., Inc., Sec. Litig.,* No. 99-01729, 2000 WL 33376577, *8 (N.D. Cal. Sep. 5, 2000). A court should "consider the totality of circumstances, rather than… develop separately rules of thumb for each type of scienter allegation." *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).[12] Accordingly, in assessing scienter, "the sum is greater than the parts." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012).

The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'" – only be equally plausible to any non-culpable inference. *Tellabs,*

---

[11] Defendants' speculation about whether LVS's clients would have noticed their money was missing is also unfounded and improper. DB at 15. Not only do Defendants lack a factual basis for the claim, but it is contradicted by Plaintiffs' well-pleaded allegations. As the Wang Xi lawsuit demonstrates, the withdrawals of funds can take years to notice (filing lawsuit in 2019 for unauthorized transfers that occurred in 2015). ¶¶16, 153-4.

[12] *Thomas v. Magnachip Semiconductor Corp.* is analogous. There, where the plaintiffs alleged "violations… w[ere] of such a fundamental nature that it can be inferred that most reasonable, non-reckless executives would have become aware… [and] many of the individual defendants served on a committee whose responsibility was to police for such violations[,]" the court held that, while the allegations alone may be insufficient, taken as a whole, the standard was met. 167 F. Supp. 3d 1029, 1045 (N.D. Cal. 2016).

Case No. 2:20-cv-01958-GMN-EJY

551 U.S. at 324; *Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) ("'we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'"). "In other words, the tie goes to the Plaintiff." *Fosbre v. Las Vegas Sands Corp.,* No. 10-00765, 2013 WL 5970250, *5 (D. Nev. Nov. 7, 2013). "The purpose of the PSLRA is 'to curb frivolous, lawyer-driven litigation,' not to exclude meritorious claims." *In re Apple Sec. Litig.*, No. 19-02033, 2020 WL 6482014, *13 n.13 (N.D. Cal. Nov. 4, 2020).[13] While *Tellabs* requires a court to "consider plausible, nonculpable explanations[,]" Defendants, within 41 pages of briefing, have failed to advance a single nonculpable explanation for the Xi lawsuit and the resulting settlement for the full amount of the claim, the Hogan Lovell's report, the totality of the *Bloomberg* reporting, or the accounts of the CWs. Defendants merely point to the fact that more has yet to be revealed. DB at 36.[14] As such, "Defendants urge the Court to go above and beyond these requirements, and to apply an even stricter" standard. *In re Amgen Inc. Sec. Litig.*, No. 07-2536, 2014 WL 12585809, *9 (C.D. Cal. Aug. 4, 2014).

### 1.    LVS Knew the "Premium Player" Scheme Existed Because High-Level Compliance Officers Discussed It, Hogan Lovells Investigated It, and Regulatory Agencies Investigated It.

This is a case where it truly "would be 'absurd' to suggest that management was without knowledge" that LVS was using the "premium player" scheme to offset losses caused by the regulatory attrition of its high-roller MBS clientele. *S. Ferry LP, # 2*, 542 F.3d at 786 (9th Cir. 2008) (quoting *Berson*, 527 F.3d at 988 (9th Cir. 2008)). Between January 2014 and March 2015, CW-1 discussed the illicit transfers regularly at meetings attended by high-level compliance officers, including LVS's Global

---

[13] Defendants' citation to *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir. 1999), to frame their argument against scienter is disingenuous as the holding has been narrowed considerably. *See Curry v. Hansen Med., Inc.,* No. 09-5094, 2012 WL 3242447, *7 (N.D. Cal. Aug. 10, 2012) ("*Silicon Graphics*… may have been 'too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright.'… [Those] are now properly considered as part of a holistic review….'") (internal citations omitted).

[14] The lack of a finding of regulatory violation by the Singapore casino regulatory authorities neither impacts the scienter nor the misrepresentation analysis. *See Vancouver Alumni Asset Holdings Inc. v. Daimler AG,* No. 16-02942, 2017 WL 2378369, *13 (C.D. Cal. May 31, 2017) ("the Court's findings do not depend on Defendants' technical compliance with a regulatory exception or violation of government regulations. The issue is whether Defendants made misleading statements as to any material fact.").

Case No. 2:20-cv-01958-GMN-EJY

Chief Compliance Officer, MBS's Chief Financial Officer, Deputy General Counsel, and MBS's Chief Compliance Officer. ¶¶112, 121. The scheme was of such a magnitude that MBS's Compliance Manager specifically instructed CW-1 to "back off from filing so many reports…." ¶117. Compliance executives "raised the issue internally at MBS" only to be "urged by the operations and legal teams to back off" and then fired. ¶122.

In 2017 and 2018, LVS retained Hogan Lovells to conduct an internal investigation into the scheme. ¶110. Hogan Lovells concluded that over 3,000 letters of authorization had been executed since 2013 totaling SGD$1.4 billion, and that more than 26% were effectuated through spurious letters (*e.g.*, forged or photocopied). ¶110. In April 2018, subsequent to Hogan Lovells' investigation, LVS notified the CRA that MBS was changing its compliance practices in an attempt to curb the illicit transfers, requiring "wet ink" signatures and verbal confirmations from its patrons before moving funds. ¶¶160-61.

In 2019 and 2020, LVS and MBS were subject to various lawsuits and regulatory investigations stemming from the "premium player" scheme. Wang Xi filed his lawsuit against MBS, which prompted a grand jury subpoena and probe from the DOJ, the CRA, and the Singapore police. ¶¶222-240, 323.

Notwithstanding the internal discussions and investigations, Defendants LVS, Goldstein and Adelson represented to the public that, for example, it "extend[ed] credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit" (¶170) and that it "extend[ed] credit to approved casino customers following background checks and investigations of creditworthiness" (¶178). Goldstein and Adelson similarly claimed strict adherence to compliance protocols, saying that "I've not seen evidence of that. In fact, if anything, I say, today it's harder to move money than ever, especially in our hotels because we're very compliant and we're very proud of our compliance record. . . . In fact, I think we're more aggressive than the government in terms of monitoring that. We're a big believer that compliance is critical." ¶180. These statements clearly contradict with the facts they had in their possession at the time, namely that MBS was engaged in a widespread scheme whereby it was qualifying unqualified patrons as "premium players" using illegal transfers of cash in order to extend credit to them that should not have been extended. ¶181. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016) (scienter pled where complaint

Case No. 2:20-cv-01958-GMN-EJY

alleged defendants knew of facts undermining their statements); *S. Ferry LP #2*, 542 F.3d at 784-86 (allegations of actual exposure to information/personal involvement sufficient); *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (reversing dismissal where defendants themselves were personally responsible for events giving rise to the fraud).[15]

*Livid Holdings* is particularly on point. There, the Ninth Circuit found that scienter had been sufficiently pleaded regarding defendants' false and misleading statements indicating a $25 million offering had been "completed", implying the money was received, when various contingencies meant much less had been received. The court noted that "[t]here [were] few ways to make the misrepresentation more explicit" than defendants' "stat[ing] as 'fact' that the initial stock offering 'ha[d] been completed . . . .'" *Id.* at 948. As in *Livid*, in response to analyst and investor questions, Adelson, Goldstein, and LVS doubled-down and confirmed their commitment to compliance with the new regulatory scheme in placed, despite knowing this was not true. *See Institut'l Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (officer's false statements in response to specific queries supported scienter); *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM WMC, 2013 WL 5206216, at *24 (S.D. Cal. Sept. 13, 2013) (same); *South Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (same).[16]

MBS's significance to LVS's overall operations underscores Plaintiffs' point on this issue. MBS

---

[15] *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1313 (2011), is analogous. There the defendants argued reports of adverse events "cannot be material absent a sufficient number of such reports to establish a statistically significant risk that the product is in fact causing the events." *Id.* at 1318-19. The Court held that while the "mere existence" of adverse reports will not satisfy the standard, "[s]omething more is needed, but that something more… can come from 'the source, content, and context of the reports.'" *Id.* at 1321. The high number of STRs and compliance reports are analogous to the existence of reports of adverse events and Plaintiffs have provided substantial evidence nudging the FAC across the line of "something more."

[16] *See also In re In re Qualcomm Inc. Sec. Litig.*, No. 17cv00121 JAH-WVG, 2019 WL 1239301, at *10-11 (S.D. Cal. Mar. 18, 2019) (finding scienter where defendants made misrepresentations about matters they were involved in, despite claims of good faith); *Patel v. Axesstel, Inc.*, No. 3:14–CV–1037–CAB–BGS, 2015 WL 631525, at *11-12 (S.D. Cal. Feb. 13, 2015) (scienter where CEO defendant allegedly involved in matters addressed by misrepresentations); *Special Situations Fund III v. Brar*, No. 14–cv–04717–SC, 2015 WL 1393539, at *5 (N.D. Cal. Mar. 26, 2015) (CEO's scienter pled given inference that important communication undermining his statements would "go straight to top management").

Case No. 2:20-cv-01958-GMN-EJY

was, on a margin basis, the best performer within LVS's portfolio, ranking as the top EBITDA margin property for LVS *every* year, from 2010 through 2019. ¶66. Total LVS bad debt write-offs from 2013 through March 2020 totaled $1.61 billion and nearly 62% of write-offs during the period stemmed from MBS. ¶150. Adelson reviewed MBS's quarterly financials. ¶¶184, 191 (off-the-cuff noting the strongest MBS quarterly rolling segment performance of the past decade). Thus, when casino revenues started to fall off in in the third quarter of 2014, increase back to average levels thereafter, and then decline again once the "premium player" scheme was ended (*see* ¶¶64-69, 94, 152), it would be "absurd" to suggest that LVS and its executive officers, including Adelson, did not know the cause behind it. *See Berson*, 527 F.3d at 988.

Further, throughout the Class Period, LVS maintained both a Board Compliance Committee and an Operational Compliance Committee. ¶290. Adelson was the LVS Board Compliance Committee Chairman and Goldstein was a Board member. ¶297. This provides a strong inference that they were privy to the compliance discussions about the "premium player" scheme. *See Magnachip,* 167 F. Supp. at 1044 (members of an audit committee should have noticed significant errors); *Vancouver Alumni*, 2017 WL 2378369, at *15. The Board Compliance Committee's charter places responsibility on the Board to, among others, "ensure that the Company's compliance program effectively prevents and/or detects violations" and "receive reports of relevant conduct, misconduct, and such other issues…." ¶293. *See In re Zoran Corp. Deriv. Litig.,* 511 F. Supp. 2d 986, 1015-16 (N.D. Cal. 2007) (duties to know based on committee membership sufficient to show the defendants knew wrongdoing was occurring or were negligent in not knowing); *Communs. Workers of Am. Plan for Emples. Pension & Death Bens. v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1125 (D. Ariz. 2007) (problems may have resulted from poor management but "equally plausible" that defendants "possessed the deliberate recklessness or fraudulent intent necessary for scienter"). As such, this Court may impute scienter to LVS's key officers "based on the inference that [they] have knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014); *City of Miami Gen. Employees' & Sanitation Emps.' Ret. Trust v. RH, Inc.,* 302 F. Supp. 3d 1028, 1043 (N.D. Cal. 2018). "The core operations doctrine applies… to transactions worth millions of dollars or that represent a significant portion of the company's revenue." *Anderson v. Peregrine Pharm. Inc.,* No. 12-1647, 2013 WL

4780059, at *12 (C.D. Cal. Aug. 23, 2013).

### 2.    CWs Confirm LVS's Unauthorized Transfer Practice Was Widespread and Well-Known Within the Company

MBS was beset with systemic internal control issues.  CW-1 "described a wholly ineffective compliance function that was bent to the will of the Finance and International Marketing Departments." ¶112.[17]  CW-2 confirmed that the decision whether or not to extend credit "came down from above," with VP-level or higher members of the International Marketing Department having the last say as to how much credit would actually be granted, often dependent on an executive's personal relationship with the gambler.  ¶124.  CW-2 personally witnessed a returning VIP gambler from China attempt to hand thousands of dollars directly to an International Marketing Department director and the two move to an auxiliary room to escape casino floor surveillance.  ¶125.  CW allegations are credible when they are "sufficiently reliable, plausible and coherent." *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.,* 780 Fed. App'x 480, 484 n.5 (9th Cir. 2019) (crediting a hearsay report for scienter); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (same).  The CWs' statements regarding their observations are "specific in time, context, and details" and relate to their specific role with the casino.  *Id.* at 1208. At the pleading stage, this is more than enough to credit the information the CWs obtained.  *LifeLock, Inc.,* 780 Fed. App'x at 484 n.5; *Lloyd*, 811 F.3d at 1208.[18]

---

[17] CW-1 also corroborated MBS upper management's knowledge of the operation of junkets within the casino and the lack of any action taken to curb their activity.  ¶141.  MBS's "tone at the top" prevented any personnel from raising concerns or investigating the operation of junkets, as there was fear doing so would place an employee at risk for termination.  *Id*.  LVS's "tone at the top" exhibited general disregard for regulations.  Three separate incidents are indicative: In 2013, LVS forfeited $47 million to the United States Government to avoid criminal prosecution regarding whether employees at its Venetian-Palazzo hotel in Las Vegas failed to alert authorities that a high stakes gambler linked to international drug trafficking was making large and suspicious deposits.  ¶280.  In April 2016, LVS paid $9 million to end a five-year SEC probe into whether it violated the Foreign Corrupt Practices Act when it transferred tens of millions of dollars to a "consultant" who served as a middleman to LVS's business interests in China and Macao.  ¶281.  Finally, in 2016, LVS settled a wrongful termination lawsuit brought by a former CEO of LVS China who claimed he was fired for refusing to carry out illegal demands made by Defendant Adelson.  ¶288.

[18] This is nothing like *In re Allied Nev. Gold Corp.*, No. 3:14-CV-00175-LRH-WGC, 2016 WL 4191017, at *6 (D. Nev. Aug. 8, 2016), where a witness's flat accusation that "everybody knew" was unreliable hearsay.

Case No. 2:20-cv-01958-GMN-EJY

CWs do not need to provide "'smoking gun evidence' that establishes a clear intent to deceive." *In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008).[19] Courts credit allegations attributed to unnamed sources if a complaint pleads facts sufficient to show the witnesses would "be in a position to infer" the facts. *Silver Wheaton*, 2016 WL 3226004, at *3 n. 3. A plaintiff's allegations need only establish the reliability and personal knowledge of the CW for their accounts to be credited. *Quality Sys.*, 865 F.3d at 1145. CW-1's primary job duties were related to compliance generally and **customer-to-customer** transfers specifically – the exact business functions put at issue within the FAC. ¶¶114-15. CW-2 *personally* witnessed improper dealings between VIP credit-gamers and MBS directors and his job duties placed him within the loop of credit gaming. ¶¶123, 125.

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), is distinguishable as this FAC provides, in conjunction with the confidential witness statements, what was lacking in that matter, "other factual information, such as documentary evidence…." *Id.* at 995. Even in the absence of additional evidence, Plaintiffs pass the *Zucco* requirements that CWs be "described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* at 995. The *Zucco* court found the connection between the proffered CWs and their observations too tenuous, *i.e.,* it was not clear that an employee with their specific job duties would gain knowledge to which they spoke.[20] Further, CW-1's statements are not "speculation." DB at 17. CW-1's statements establish concrete facts based on observation inherent to her specific role within MBS, in direct contrast to the CWs in *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1054 (N.D. Cal. 2019), where the court found the complaint lacked details about the CWs' "'job description and responsibilities,' or duties." *Id.* at 1053. The LVS FAC sufficiently pleads each CWs' *nexus* to the fraudulent transfer scheme – CW-1 speaks directly to actions of LVS upper-management

---

[19] If an argument involves a factual dispute, it is "not appropriately resolved on a motion to dismiss." *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 755 (N.D. Cal. 2020). "*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry plaintiff's burden." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 690 F. Supp. 2d 959, 980 (D. Ariz. 2010).

[20] *M&M Hart Living Tr. v. Glob. Eagle Ent. Inc.*, No. 17-1479, 2017 WL 5635425, *8-9 (C.D. Cal. Oct. 30, 2017), is also distinguishable as there the misstatements were in relation to actions taken by the accounting department when neither witness worked in that department.

Case No. 2:20-cv-01958-GMN-EJY

and compliance officials which *permitted* the unauthorized transfer scheme, while CW-2 speaks directly to the actions of employees which directly *affected* the scheme.

Defendants' proffered CW caselaw is distinguishable.[21]   Defendants' argument in reliance on *Aqua Metals,* 2020 WL 6710096, blurs the difference between a CW being employed while an alleged wrongdoing was taking place and leaving employ prior to the beginning of a Class Period.  DB at 16. The *Aqua Metals* court focused on whether the employee was present while the alleged fraud was occurring.  CW-1 may have left MBS employ prior to the beginning of the Class Period but she was there while the fraudulent transfer scheme was taking place and thus can adequately speak to its existence.  *In re BofI Holding, Inc. Sec. Litig.,* No. 15-02324, 2017 WL 2257980, at *11 (S.D. Cal. May 23, 2017) (CW's employment prior to Class Period did not diminish "probative value" of allegations related to conduct that began pre-Class Period and continued into it); *Quality Sys.*, 865 F.3d at 1135. During her tenure, CW-1 was the *sole* employee responsible for conducting AML review of MBS inter-account transactions.  ¶112.  *See, First Solar, Inc.*, 2018 WL 6181241, at *11 (CW corroborating accounts reliable where, "based on their position descriptions, [the CWs] were positioned to know.").[22]

Nor is *Prodanova v. H.C. Wainwright & Co., LLC,* 993 F.3d 1097, 1107 (9th Cir. 2021), controlling as the theory there was facially illogical and, when the totality of the FAC's allegations are considered, there is no corollary "error" explanation for MBS's conduct.  In *In re Weight Watchers Int'l, Inc. Sec. Litig.*, No. 14-1997, 2016 WL 2757760 (S.D.N.Y. May 11, 2016), each of the confidential

---

[21] In *Lomingkit v. Apollo Educ. Grp. Inc.*, No. 16-00689, 2017 WL 633148, *24 (D. Ariz. Feb. 16, 2017), the court did not even engage in a scienter analysis; in *City of Roseville Emples. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1135-37 (E.D. Wash. 2013), the complaint lacked a CW who worked in a relevant department whose employment spanned across and into the Class Period; in *Yahoo! Inc.*, 592 F. Supp. 2d at 1201, the complaint failed to establish the witnesses' direct, personal knowledge of the process at issue; in *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020), the CW's statements were "high on alarming adjectives…."'

[22] The *Ferraro* CWs were not actual former employees. *Ferraro*, 501 F. Supp. 3d at 756.  The court also found it determinative that the complaint contained zero allegations that "there was any coordinated effort to engage in a company-wide off-label marketing scheme."  *Id.*  In contrast, the FAC makes multiple allegations that directives from LVS upper management perpetuated the fraudulent transfer scheme.  *See* ¶¶122, 124.

Case No. 2:20-cv-01958-GMN-EJY

witnesses were found lacking by the court for reasons incongruous with the facts pled in the LVS FAC.[23] Finally, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014), does not disqualify the FAC's CWs. DB at 19. There only one CW was cited in support of scienter, a sales representative who was employed for three months, incomparable to employment lasting a year or three. *Id.* at 1063; ¶¶112, 123. Courts have also discredited the general notion that a CW must be a high-level employee. *See, Quality Sys.*, 865 F.3d at 1139, 1145.

### 3.    Defendants Misconstrue the Scienter Standard and Applicable Case Law.

Defendants have misapplied the scienter test. DB at 29. *See First Solar, Inc.,* 2018 WL 6181241, at *10 (in arguing that the confidential witnesses do not demonstrate scienter because they have no personal knowledge of the defendants' state of mind, "[d]efendants misapply the test").[24] *Ferraro,* 501 F. Supp. 3d 735 stands against the weight of Ninth Circuit precedent. *Compare, Ferraro*, at 766 ("witness statements cannot create a strong inference of scienter unless the confidential witness 'has reliable personal knowledge of the defendants' mental state."); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605, 620 (9th Cir. 2017) ("particularized allegations that defendants had 'actual access to the disputed information,'… raise a strong inference of scienter."); *Quality Sys.,* 865 F.3d at 1145 (same); *Reese*, 747 F.3d at 575 (same); *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.,* No. 10-02604, 2012 WL 3835078, *3 (N.D. Cal. Sep. 4, 2012) ("failure to recruit a confidential witness with personal knowledge of the Defendants' mental state does not mean the

---

[23] One of the *Weight Watchers* witnesses was never even employed with the defendant company. The court took issue with the generality of another witness's statement and the court concluded a former account manager was speaking a "hyperbolic" opinion when he stated management was "aware that the Portal 'was a complete disaster.'" *Id.* at *6-7. Each of the asserted CW-1 opinion statements, that an MBS Chief Compliance Officer was fired for raising concerns regarding the high number of STRs, as were three or four other individuals, are each testable through the discovery process. DB at 18. Further, these are the exact type of assertions that, even under the PSLRA, are required to be taken as true at the MTD stage. *Tellabs,* 551 U.S. 308, 322 (2007).

[24] Defendants' arguments also eschew the role CWs play in a *holistic* scienter evaluation, as a defendant cannot "de-contextualiz[e] every statement in a complaint that goes to scienter…." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008).

Case No. 2:20-cv-01958-GMN-EJY

allegations must be disregarded….").[25]  CW-1 confirmed that data existed which the Individual Defendants had access to which should have apprised them of the existence of an unauthorized transfer scheme.  ¶¶114, 121.  CW-2 confirmed that the transfer scheme was known, and orchestrated, by high-level management at MBS.  ¶124.

In sum, Defendants have failed to provide the Court with a competing, non-culpable explanation for their conduct. The best they can muster is ignorance. But this is based squarely on a single source stating, anonymously, that MBS management was "largely" unaware of the transfer problem in 2018. DB at 30. This is contradicted by Plaintiffs' well-pleaded allegations as well as reporting from *Bloomberg*. To the extent the anonymous executive's account is to be credited, there is insufficient detail within the article to determine the import of "largely" – a word of which the meaning could significantly alter any conclusion drawn.  Defendants cannot have it both ways; they argue that accounts from confidential sources are unreliable, yet urge the court to rely on a single sentence from a confidential source.

### 4.    Defendants Had Motive to Mislead Investors.

It is well established, both by the U.S. Supreme Court and the Ninth Circuit, that it is unnecessary to allege "motive" in order to establish scienter. *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal….[rather] allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the complaint's entirety"); *Siracusano v. Matrixx Initiatives, Inc.,* 585 F.3d 1167, 1182 (9th Cir. 2009), aff'd, 563 U.S. 27, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) (motive is "a relevant consideration" but "the absence of a motive allegation is not fatal"); *see also Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014) (same). Motive allegations are not required in a scienter analysis.  *See, e.g., In re Coinstar Inc. Sec. Litig.,* No. 11-133-MJP, 2011 WL 4712206, at *10 (W.D. Wash. Oct. 6, 2011); *In re SunPower Sec. Litig.*, No. 09-5473-RS, 2011 WL 7404238, at *5 n.4 (N.D. Cal. Dec. 19, 2011).  As such, the Ninth Circuit "do[es] not draw a negative inference from the absence of stock sales that benefitted the defendant [officers]."

---

[25] Despite Defendants' argument, DB at 30, CWs need not have direct contact with defendants for allegations to support scienter.  *Zuora, Inc.,* 2020 WL 2042244, *10-11 (rejecting argument that CW allegations should not be credited because they lacked direct contact with defendants); *In re Zynga Inc. Sec. Litig.,* No. 12-04007, 2015 WL 1382217, *7 (N.D. Cal. Mar. 25, 2015) (same).

Case No. 2:20-cv-01958-GMN-EJY

*Sharenow v. Impac Mortg. Holdings, Inc.,* 385 F. App'x 714, 717 n.2 (9th Cir. 2010). Although not required, LVS's corporate motive to enhance profits through ill-gotten gains further supports Plaintiffs' allegations of scienter. ¶¶304-06, 307-10.[26]

LVS permitted unauthorized transfers to achieve revenue growth and maintain its position as one of the two exclusive casinos in Singapore. Responsible for nearly half of LVS' revenue, MBS's performance and growth was imperative to the Company's success. ¶¶67, 304. This exclusive license, however, was expiring in 2017 and MBS could only be considered for this coveted position if it had, among other things, "suitable financial resources," and was a "suitable person to develop, maintain and promote the integrated resort (of which the casino is a part) as a compelling tourist destination which meets prevailing market demand and industry standards and contributes to the tourism industry in Singapore." ¶304. With revenues falling 8.7% in third quarter 2014 (¶94) and 10% in 2015 (¶69), and with industry experts identifying further downward trends due to strict regulatory changes (¶95), LVS lacked the financial resources to satisfy MBS' renewal. Coupled with VIP betting volume drastically down 34% in third quarter 2014, alone, LVS' ability to contribute to tourism in Singapore was also seriously called into question. ¶94. Exacerbating matters, LVS' agreement with Singapore to restrict the extension of credit to premium players was "discouraging local people to come into the casino." ¶308.[27]

With regulations hindering LVS' main revenue driver and ability to grow, LVS turned to unauthorized transfers and junkets to both maintain exclusivity in Singapore as well as generate growth.

---

[26] As a corollary to this, courts recognize that the mere fact that an insider does not engage in insider trading or even purchases additional shares during the Class Period does not undermine allegations of scienter. *See, e.g, Buttonwood Tree Value Partners, LP v. Sweeney*, No. 10-00537, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012) ("the Court again rejects the proposition that a strong inference of scienter is negated by the fact that the Individual Defendants purchased and/or retained FRB stock during the Class Period"); *Resh v. China Agritech, Inc.*, No. 14-05083, 2019 WL 1055240, at *6 (C.D. Cal. Jan. 8, 2019) (treating defendant's purchases during relevant period "only as a competing inference" that "neither support[ed] nor negate[d] scienter"). Accordingly, contrary to Defendants' assertion, the mere fact that Defendants are not alleged to have engaged in insider selling during the Class Period does not undermine the strong inference of scienter against them. The cases Defendants rely on (DB at 35-36) are inapposite as, unlike here, those complaints contained allegations of insider trading or personal benefits and the court was evaluating whether such trades or benefits were suspicious.

[27] Because MBS' hotel was already operating at maximum capacity, the casino was the only viable way to grow yet MBS was restricted from doing so due to the regulations. ¶¶308-09; ¶309 ("we'd love to have more sleeping rooms and more gaming capacity.").

Case No. 2:20-cv-01958-GMN-EJY

This goes beyond the generic motive attributed to every company and lends support to a strong inference of scienter. *See Crago v. Charles Schwab & Co.*, No. 16-cv-03938-RS, 2017 WL 6550507, at *5-6 (N.D. Cal. Dec. 5, 2017) (scienter where defendant engaged in scheme to increase company profits); *Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055, 1073 (D. Neb. 2016) (scienter of TD Ameritrade was based, in part, on motive as "reflected in its alleged generation of over one billion dollars in revenue" in connection with "order routing practices"); *Amgen Inc.*, 544 F. Supp. 2d at 1033 (considering "lucrative nature of ["off-label" marketing] scheme" in holding that plaintiffs had adequately pleaded scienter); *Roth v. Aon Corp.*, No. 04-C-6835, 2008 WL 656069, at *5- 6 (N.D. Ill. Mar. 7, 2008) (company scheme "crucial for the company's continued revenue growth" was sufficient motive to support inference of scienter); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 425 (S.D.N.Y. 2003) (fraud enabled underwriter to collect $107 million in fees during five-year period).

### C. Loss Causation

To adequately plead "loss causation" in the Ninth Circuit, a plaintiff must show a "'causal connection'" between the facts misrepresented and his or her alleged loss. *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013)). A plaintiff is not required to show "that a misrepresentation was the ***sole*** reason for the investment's decline in value in order to establish loss causation." *Daou Sys.*, 411 F.3d at 1025 (emphasis in original and internal quotations omitted). The "ultimate issue" is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *First Solar*, 881 F.3d at 754. Consequently, "loss causation is a context-dependent inquiry as there are an infinite variety of ways for a tort to cause a loss." *Id* at 753. (internal quotations omitted). Arguments over "loss causation" are therefore "normally inappropriate to rule on . . . at the pleading stage." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Plaintiffs easily meet the criteria for pleading loss causation. In the complaint, Plaintiffs allege that (i) false statements caused LVS's stock price to be artificially inflated (¶¶320, 333, 335) and (ii) that a series of partial disclosures revealing the truth behind the false statements removed the inflation in the stock price (¶¶221-43), thereby causing losses to Plaintiffs and members of the putative Class. These partial disclosures occurred on September 26, 2019; October 10, 2019; May 12, 2020; June 4,

Case No. 2:20-cv-01958-GMN-EJY

2020; July 19, 2020; and September 16, 2020. Each one revealed additional information relating to the "premium player" scheme and how it operated at MBS, which was the crux of the misrepresentations made during the Class Period. *See* ¶¶323-28 (detailing lawsuit that alleged unauthorized transfer of client funds and *Bloomberg* articles revealing Singapore police probe, DOJ investigation, and additional internal LVS investigations into "premium player" scheme).

Defendants overlook the revelatory nature of the partial disclosures, arguing instead that the disclosures were not followed immediately by significant or consistent declines in LVS's stock price. DB at 38-39. This is not true. Plaintiffs allege that the disclosure on September 26, 2019 resulted in an immediate decline of $1.20 per share; May 12, 2020 resulted in a decline of $2.54 per share; July 19, 2020 resulted in a decline of $1.41 per share; and September 16, 2020 resulted in a decline of $2.18 per share. ¶¶323, 325, 327, 328. Moreover, for the disclosure that occurred on June 4, 2020, Plaintiffs allege a decline of $0.56 per share after taking into account market conditions during that day. *See* ¶326. In any event, the amount of the stock price decline following a corrective disclosure is not determinative when pleading loss causation because, as the Ninth Circuit has held, "'[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'" *First Solar*, 881 F.3d at 753 (quoting *Nuveen*, 730 F.3d at 1120). Loss causation does not require an "immediate market reaction" to a corrective disclosure because "[t]he market is subject to distortions that prevent the ideal of a free and open public market from occurring." *Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1226 (N.D. Cal. 2009).

Defendants blur the distinction between a motion to dismiss and one for summary judgment with regard to loss causation. DB at 38. Citing *Wochos,* 985 F.3d 1180, Defendants ask the Court to dismiss Plaintiffs' claims based on partial recoveries in the price of LVS's stock that occurred days afterwards. First, *Wochos* did not establish a brightline test for a stock price decline to determine the sufficiency of a loss causation allegation. *Id*. at 1197. Such a test would be at odds with the law on this issue, given that loss causation typically presents a material issue of fact and is inappropriate for resolution at the pleading stage. *Gilead*, 536 F.3d at 1057 (district courts do not weigh competing loss causation theories at the pleading stage); *see also In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 931 (N.D. Cal. 2020)

Case No. 2:20-cv-01958-GMN-EJY

(defeating motion to dismiss with 2.5%, 2.6%, 5% and 9% drops); *In re WageWorks, Inc., Sec. Litig.*, No. 18-CV-01523-JSW, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) (holding that "plaintiffs me[]t the low bar of pleading proximate cause for purposes of loss causation."); *In re Extreme Networks, Inc.,* No. 15-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) (finding loss causation with stock drop of 4%); *IBEW Local 697 Pension Fund v. Int'l Game Tech.,* No. 09-419, 2011 WL 915115 (D. Nev. Mar. 15, 2011) (defeating motion to dismiss where stock declined 2%).

Second, in *Wochos*, Tesla's stock price not only "immediately rebounded," but it traded up over the next week. *Id.* at 1198. To the extent LVS's stock price increased after any one particular disclosure, the recovery was not sustained. For example, following the July 19, 2020 disclosure, LVS's stock overall traded down the next four days, closing down 10% from its close prior to the disclosure. Similarly, following the June 4, 2020 disclosure, it eventually closed down 5% in the following trading week. After September 16, 2020, the share price never recovered, closing 9.3% lower in the five trading days following the disclosure. Overall, between September 25, 2019 and September 16, 2020, LVS's stock price fell from $57.08 per share to $49.67 per share. ¶¶222, 243.

Third, and perhaps most important, *Wochos* involved just one singular corrective disclosure whereas the facts here involve upwards of a half dozen. *See Wochos*, 985 F.3d at 1198. Therefore, the analysis required to determine the market's reaction to the alleged fraud is not as straightforward and cannot be decided as a matter of law at the pleading stage. *See Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 645 (S.D.N.Y. 2017) ("whether the corrective disclosures actually caused the price… to drop is a question of fact that is not appropriate for resolution at this stage"); *Rudolph v. UTStarcom,* No. C 07-04578 SI, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008) ("[L]oss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage…."); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 931 (N.D. Cal. 2013) (skepticism "best reserved for later stages"); *see also Luna v. Marvell Tech. Grp., Ltd.*, No. 15-05447, 2017 WL 4865559, at *3 (N.D. Cal. Oct. 27, 2017) ("The mere fact that at the same time [defendants'] stock returned to its purchase price does not cure the alleged fraud.").

Indeed, as Defendants note, "the loss causation analysis is contextual" and therefore requires consideration of the facts surrounding the disclosures comprising the loss causation allegations. *See* DB

Case No. 2:20-cv-01958-GMN-EJY

at 38. The corrective disclosure at issue here revealed piecemeal information about the "premium player" scheme, its existence, and its impact on LVS going forward. The first disclosure on September 26, 2019, was a lawsuit filed by Wang Xi alleging that MBS had taken $6.6 million from his account without authorization. ¶323. That disclosure was compounded when, on October 10, 2019, *Bloomberg* reported on the lawsuit publicly. ¶324. On May 12, 2020, *Bloomberg* again reported on the Mr. Wang's claims, except this time noting that Singapore's police were investigating MBS over the accusations. ¶325. The severity of the accusations was revealed when, on June 4 and 5, 2020, *Bloomberg* reported that the U.S. Department of Justice was investigating MBS as well. ¶326. On July 20, 2020, *Bloomberg* reported on the allegations once again, confirming that LVS had in fact resolved Mr. Wang's lawsuit and agreed to pay him the entirety of what he claimed had been taken from him. ¶327. Finally, on September 16, 2020, *Bloomberg* issued an article revealing that LVS had hired Hogan Lovells to investigate the scheme and that the firm found millions of dollars in fraudulent transfers during the 2013 to 2017 time period. ¶328. These disclosures, collectively, revealed to investors the existence and seriousness of the "premium player" scheme. Unlike the disclosure in *Wochos*, determinations about Plaintiffs' loss causation allegations cannot be made on the face of the pleadings.

Finally, Defendants misstate the law in so far as they argue that Plaintiffs were required to rule out other causes for the alleged stock price declines. DB at 40-41. Courts widely hold that a plaintiff need not "disaggregate losses or rule out other causes" for the declines in order to "sufficiently plead loss causation." *See City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17 CIV. 10014 (LGS), 2019 WL 719751, at *8 (S.D.N.Y. Feb. 19, 2019), *reconsideration denied*, No. 17 CIV. 10014 (LGS), 2019 WL 2136902 (S.D.N.Y. May 16, 2019). "Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage." *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. Apr. 3, 2015) ("If [ ] there are alternative causes for the losses of which Plaintiff complains, that is an issue for resolution in the later stage of this case."). Thus, Defendants' reference to stock price movements of other companies or the market in general is irrelevant and outside the complaint. *See MGM Mirage*, 2013 WL 5435832, *4 ("The information… only tend[s] to support Defendants' competing inference… although [ ] relevant to proving a viable

Case No. 2:20-cv-01958-GMN-EJY

defense for Defendants, the presentation of such evidence is not proper on a Motion to Dismiss.").[28]

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.[29]

Dated: July 6, 2021                                    Respectfully submitted,


**ALDRICH LAW FIRM, LTD.**

/s/ John P. Aldrich
John P. Aldrich, Esq.
NV Bar No. 6877
7866 West Sahara Ave.
Las Vegas, NV 89117
Tel.  702.853.5490
Fax.  702.227.1975
Email:  jaldrich@johnaldrichlawfirm.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*Pro Hac Vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com

*Counsel for Plaintiffs*

---

[28] As Plaintiffs have adequately pled a primary violation of securities laws, and have stated a primary claim under Section 10(b), their Section 20(a) claim should also survive.

[29] If the Court finds any deficiencies in the CAC, Plaintiffs respectfully request leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) ("a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts").

Case No. 2:20-cv-01958-GMN-EJY

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2021, I electronically filed the foregoing document using the CM/ECF system which will send notifications of such filings to the email addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

**ALDRICH LAW FIRM, LTD.**

/s/ John P. Aldrich
John P. Aldrich, Esq.

*Counsel for Plaintiffs*

Case No. 2:20-cv-01958-GMN-EJY