Patrick G. Byrne (Nevada Bar #7636)
Morgan Petrelli (Nevada Bar #13221)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Tel.  702.784.5200
Fax.  702.784.5252
Email:  pbyrne@swlaw.com
          mpetrelli@swlaw.com

Walter C. Carlson (*Pro Hac Vice*)
Lawrence P. Fogel (*Pro Hac Vice*)
Martha C. Clarke (*Pro Hac Vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Tel.  312.853.7000
Fax.  312.853.7036
Email:  wcarlson@sidley.com
          lawrence.fogel@sidley.com
          mclarke@sidley.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| THE DANIELS FAMILY 2001 REVOCABLE TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>v.<br><br>LAS VEGAS SANDS CORP., DR. MIRIAM ADELSON, in her capacity as Special Administrator of the estate of SHELDON G. ADELSON, PATRICK DUMONT, and ROBERT G. GOLDSTEIN,<br><br>         Defendants. | Case No. 2:20-cv-01958-GMN-EJY<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** |

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

    I.   Plaintiffs Fail to Allege That Defendants Made Any False or Misleading Statement.........2

        A.    Plaintiffs' "Premium Player" Scheme Has No Logical Basis. ..............................3

        B.    Plaintiffs Plead No Particularized Allegations to Support Their Alleged "Premium Player" Scheme. ...................................................................................4

        C.    Plaintiffs Do Not Address Defendants' Additional Arguments on Falsity............11

    II.  Plaintiffs Do Not Plead a Strong Inference of Scienter. ...................................................12

    III. Plaintiffs Fail to Allege Loss Causation. ..........................................................................17

    IV. Dismissal With Prejudice Is Appropriate. ........................................................................20

CONCLUSION.................................................................................................................. 20

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*In re Am. Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012) ...................................................................13

*In re Anchor Gaming Sec. Litig.*,
   33 F. Supp. 2d 889 (D. Nev. 1999)...........................................................................7

*Ballan v. Wilfred Am. Educ. Corp.*,
   720 F. Supp. 241 (E.D.N.Y. 1989) .........................................................................11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Technology, Inc.*,
   856 F.3d 605 (9th Cir. 2017) ...................................................................................16

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
   963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................8

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)..................................................................................................19

*In re El Paso Elec. Co. Sec. Litig.*,
   2004 WL 377555 (W.D. Tex. Feb. 23, 2004).............................................................6

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
   501 F. Supp. 3d 735 (N.D. Cal. 2020) ..................................................................7, 16

*Ferreira v. Funko Inc., et al.*,
   2021 WL 880400 (C.D. Cal. Feb. 25, 2021).........................................................15, 16

*Ferris v. Wynn Resorts Ltd.*,
   462 F. Supp. 3d 1101 (D. Nev. 2020).......................................................................11

*Halford v. AtriCure, Inc.*,
   2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)...........................................................6

*Inchen Huang v. Higgins*,
   443 F. Supp. 3d 1031 (N.D. Cal. 2020) ..................................................................5, 7

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ..................................................................................20

*Livid Holdings v. Salomon Smith Barney*,
   416 F.3d 940 (9th Cir. 2005) ....................................................................................14

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ...................................................................................19

*McCasland v. FormFactor Inc.*,
2008 WL 2951275 (N.D. Cal. July 25, 2008).........................................................15

*Menkes v. Stolt-Nielsen S.A.*,
2005 WL 3050970 (D. Conn. Nov. 10, 2005) ...................................................10, 11

*In re Merck & Co. Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005).......................................................................................8

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...................................................................5, 6, 17, 18

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ...............................................................................4, 15

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .................................................................................14

*In re Par Pharm., Inc. Sec. Litig.*,
733 F. Supp. 668 (S.D.N.Y. 1990)...........................................................................10

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015).................................................................10, 12

*Prodanova v. H.C. Wainwright & Co*,
993 F.3d 1097 (9th Cir. 2021) ...........................................................................14, 15

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...................................................................................8

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010)............................................................15

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ...........................................................8

*In re Silver Wheaton Corp. Sec. Litig.*,
2016 WL 3226004 (C.D. Cal. June 6, 2016) .............................................................6

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) .......................................................................2

*Special Situations Fund III QP, L.P. v. Brar*,
2015 WL 1393539 (N.D. Cal. Mar. 26, 2015)..........................................................15

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

*Tellabs, Inc., v Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2007)................................................................................................17

*In re Toyota Motor Corp. Sec. Litig.*,
    2012 WL 3791716 (C.D. Cal. Mar. 12, 2012)..........................................................8

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019).............................................................12, 17

*In re Verisign, Inc., Derivative Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ...................................................................12

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) .............................................................................8, 12

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .........................................................................18, 19

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ...................................................................14

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................16

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

### INTRODUCTION[1]

Plaintiffs' Opposition ("Opp.") confirms that this lawsuit is nothing more than an attempt to invent a securities fraud claim. Confronted with actual facts relating to their theory of "illegal junkets," Plaintiffs abandon that theory altogether. What remains is an illogical and unsupported theory based on the assertions of a single casino patron. From these assertions, Plaintiffs attempt to plead a so-called "widespread scheme" of unauthorized transfers that Plaintiffs claim inflated Marina Bay Sands' ("MBS") gaming revenue. But this alleged scheme is utterly unsupported by particularized factual allegations, much less any showing of scienter or pleading of loss causation.

The undisputed fact is that only one MBS patron, Wang Xi, has claimed funds were transferred out of his account without his authorization. His claim was reviewed by Singapore's Casino Regulatory Authority (the "CRA") and found not to involve any regulatory breach by MBS. As reported in *Bloomberg*, MBS investigated the third-party transfers and determined that <u>no</u> funds were transferred without patron authorization. Moreover, the CRA twice during the Class Period renewed MBS's license to operate a casino in Singapore after reviewing MBS's record of compliance. Plaintiffs have not pled a "widespread scheme" of fraud.

Instead of addressing these deficiencies and the logical fallacies that permeate Plaintiffs' theory of fraud, the Opposition attempts to mask them with mischaracterizations, unfounded assertions, and citations to pages and pages of inapposite case law. Despite their efforts, Plaintiffs cannot overcome the numerous fatal and fundamental flaws to their Complaint, and fall far short of the strict pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").

*First,* Plaintiffs offer no particularized allegations to support their claims of falsity. The crux of Plaintiffs' claim is that approximately 70 statements were allegedly false and misleading because Defendants did not disclose the existence of the alleged scheme. But none of these statements can be false or misleading because there was no alleged scheme for Defendants to disclose. At most, Plaintiffs have alleged a process issue at MBS, where certain employees, with the patrons' consent, used pre-signed or photocopied forms to transfer funds, rather than obtaining

---

[1] Defendants filed an unopposed motion for leave to exceed the page limits on July 28, 2021. ECF No. 67. In the event this motion is not granted, Defendants request leave to modify the brief in accordance with the number of pages granted by the Court.

1

fresh signatures. But this is a far cry from the "widespread" scheme of fraud Plaintiffs attempt to plead based upon the allegations of a single patron.

*Second*, Plaintiffs' scienter arguments are equally without merit, and rest on distortions of the law and facts. For example, the Opposition's principal argument for scienter is that the Hogan Lovells investigation occurred in 2017 or 2018, and therefore Defendants must have known of the alleged scheme by this date. But this argument fails for two independent reasons: (1) the very news article Plaintiffs rely upon plainly states that the Hogan Lovells investigation did not commence until late 2019, and (2) there are no particularized allegations suggesting that Hogan Lovells found any evidence of unauthorized transfers. Plaintiffs' remaining scienter arguments are equally meritless. Stripped of Plaintiffs' rhetoric, the only logical inference to be drawn is a non-culpable one: Defendants did not fraudulently fail to disclose an unauthorized transfer scheme.

*Third*, Plaintiffs have no coherent response to their failure to plead loss causation. As explained in Defendants' Motion to Dismiss, ("Motion" or "Mtn."), Las Vegas Sands' ("LVS") stock price *increased* on several of the alleged corrective disclosure dates. On the disclosure dates where the price did decline, the decline was minimal and rapidly recovered, or was in line with the price performance of LVS's peers. The Opposition attempts to sidestep these defects by pointing to a decline in LVS's stock price over the period from September 25, 2019 to September 16, 2020. But this is precisely what long-standing Supreme Court and Ninth Circuit law forbids, as Plaintiffs fail to distinguish between price declines resulting from unrelated market events and their theory of fraud. Indeed, Plaintiffs ignore altogether the impact of the COVID-19 pandemic, which had a dramatic impact on LVS and its peer gaming companies over that period.

For all these reasons, as more fully set forth below, Plaintiffs have failed to meet their pleading burden and the Complaint must be dismissed.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO ALLEGE THAT DEFENDANTS MADE ANY FALSE OR MISLEADING STATEMENT.

Having abandoned their "illegal junkets" theory[2], Plaintiffs' Opposition relies solely on

_____

[2] These allegations, accordingly, are no longer at issue. *See In re Solarcity Corp. Sec. Litig.*, 274 F.

2

their "unauthorized transfers" theory, which they now label the "premium player" scheme and contend involved the "illegal" transfer of SGD$365 million between 2013-2017. Opp. 6-7, 10. Despite its new name and heated rhetoric, Plaintiffs' allegations remain completely baseless. The Complaint's theory of fraud is completely illogical, and Plaintiffs have pleaded no particularized facts demonstrating that any of the challenged statements were false or misleading.

## A.    Plaintiffs' "Premium Player" Scheme Has No Logical Basis.

The central thesis to Plaintiffs' "premium player" scheme is that MBS "illegally" extended credit to foreign patrons—*i.e.*, non-Singaporean patrons who gambled at MBS—in order to increase the amount of "VIP" gambling and thus revenue at MBS. Opp. 5-7. MBS allegedly did so by illegally transferring funds from existing "premium players," without their knowledge, into the accounts of Chinese nationals in order to qualify them as "premium players."[3] *Id.* 5. Once qualified as premium players, Plaintiffs theorize, these foreign patrons would be eligible for credit lines from MBS which they would then use to gamble at MBS. *Id.*

Plaintiffs' theory has no logical basis for several reasons. To begin, as Plaintiffs acknowledge in both their Complaint and the Opposition, Compl. ¶ 59; Opp. 4, under Singapore law, MBS is permitted to extend credit to a patron "*who is neither a citizen of Singapore nor a permanent resident of Singapore*." Ex. 52, CCA § 108(7)(a) at 1357 (emphasis added).[4] This is true whether or not the foreign player qualified as a "premium player." Moreover, under Singapore law, MBS is permitted to extend credit to foreign patrons to cover the initial SGD$100,000 deposit required to qualify the patron as a premium player. Mtn. 6 n.6 (citing Ex. 10, CCR (Credit) 2010 § 2A(1)(e) at 998). In other words, MBS had no need to engage in "illegal" transfers from "unsuspecting patrons" to extend credit to Chinese nationals. MBS could extend credit to them directly and without regard to whether there already were funds in their patron account. Plaintiffs have no answer for why MBS would engage in any such "illegal" scheme when it had no reason to

Supp. 3d 972, 991 (N.D. Cal. 2017) (where opposition brief "abandons Plaintiffs' claim" by omitting mention of it, claim is subject to dismissal with prejudice "on this ground alone").

[3] "Premium player" is defined as a player who has at least SGD$100,000 in a deposit account. Ex. 7, Casino Control Act ("CCA") at 897.

[4] Defendants submit with this brief Exhibits 52-57, which are the exhibits to the Declaration of Patrick G. Byrne in Support of Defendants' Reply in Support of Motion to Dismiss Amended Class Action Complaint.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

do so, especially in light of the very real risk any such scheme would pose to its highly successful Singapore license.

Plaintiffs' attempt to spin a widespread illegal scheme is equally illogical given the CRA's strict regulatory oversight of MBS. The Complaint concedes that MBS is subject to a strict regulatory regimen overseen by the CRA, yet does not point to any finding of material regulatory noncompliance. To the contrary, the CRA renewed MBS's license <u>twice</u> during the putative Class Period after considering, among other factors, whether MBS "has a consistent track record of compliance." Mtn. 9. And, in 2019, Singapore extended MBS's license exclusivity period to 2030. *Id.* 10. Indeed, Plaintiffs themselves allege that MBS's exclusivity period was extended after the CRA "presumably conduct[ed] its review of MBS in the intervening period [of 2017-2019]." Compl. ¶ 306. It defies logic that the CRA would be closely reviewing MBS, including during the very years Plaintiffs allege this implausible scheme occurred, yet somehow not uncover it.

In addition, Plaintiffs' invented theory of fraud is irreconcilable with the fact that Plaintiffs make no challenge to the accuracy of LVS's financial statements at any point during the Class Period. Plaintiffs argue, without support, that the alleged unauthorized transfers "artificially buoyed MBS's premium player segment" and sent LVS's "bad debt write-offs soaring." Opp. 6-7. But Plaintiffs make no challenge to LVS's revenues, the adequacy of LVS's reserves, or the timeliness of charge-offs at any point during the Class Period. Indeed, Plaintiffs themselves plead that MBS's EBITDA was robust before and throughout the Class Period. Compl. ¶¶ 66-67.

The Opposition has no answer to any of these gaping holes in Plaintiffs' theory. Plaintiffs' "premium player" scheme, thus, quickly falls apart and with it the entire basis of Plaintiffs' claims. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) ("[T]he PSLRA neither allows nor requires us to check our disbelief at the door.")

**B.      Plaintiffs Plead No Particularized Allegations to Support Their Alleged "Premium Player" Scheme.**

Notwithstanding the fatal logical fallacies underlying their theory, Plaintiffs insist in their Opposition that they have met their burden of pleading particularized facts supporting the existence of the "premium player" scheme. Plaintiffs, however, misrepresent or ignore the facts and come nowhere close to meeting the requirements of the PSLRA.

*First*, Plaintiffs' arguments regarding Wang Xi provide no support for the existence of a "widespread scheme" of unauthorized transfers. Opp. 18. Plaintiffs do not dispute that, for a putative Class Period stretching approximately five years, Wang Xi is *the only* patron at MBS who has claimed that transfers from his account were unauthorized. Nor do Plaintiffs dispute that the CRA investigated Wang Xi's allegations, concluded that MBS had not breached any regulatory requirements, and confirmed there are no ongoing reviews. Compl. ¶ 237; Mtn. 11. Thus, if anything, the Wang Xi allegation belies the existence of any widespread scheme.

Unable to rebut these facts, the Opposition responds in two ways, neither of which has merit. Plaintiffs first engage in wild conjecture, speculating that no other MBS patrons have come forward because it "can take years" for a patron to notice the unauthorized withdrawal of hundreds of thousands of dollars from their account. Opp. 22 n.11. This is nonsense. It has been over five years since the start of the Class Period and nearly two years since Wang Xi filed suit—a suit that was reported in *Bloomberg* on multiple occasions beginning in October 2019. Yet Plaintiffs put forth not one single other claim of an unauthorized transfer. An isolated allegation regarding a single patron provides no basis to infer that there was a massive scheme of "hundreds" of fraudulent transfers allegedly involving "hundreds of millions of dollars." And "the court…is not required to indulge unwarranted inferences in order to save a complaint from dismissal." *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., 540 F.3d 1049, 1064-65 (9th Cir. 2008). *See also Inchen Huang v. Higgins*, 443 F. Supp. 3d 1031, 1049 (N.D. Cal. 2020) (allegation of a single instance of off-label marketing "does not support the inference that this practice was systematic and widespread").

Next, Plaintiffs attempt to sidestep the CRA's finding of no regulatory breach, arguing that the CRA's finding of "weaknesses in MBS' casino control measures" somehow supports the existence of the scheme. Opp. 20. But Plaintiffs' claims are premised on an alleged "widespread scheme" of unauthorized and illegal transfers, not internal control improvements. Recognizing the weakness of their argument, Plaintiffs backpedal, arguing that "[w]hether or not LVS ultimately is fined or penalized by one of these regulatory agencies is beside the point." Opp. 20-21, 23 n.14. This, too, is nonsense. The undisputed fact is that the CRA investigated Wang Xi's allegations and concluded that there was no breach of regulatory requirements: this bears directly on whether

Plaintiffs have pleaded the existence of a scheme of unauthorized transfers. They have not.

Plaintiffs' cited case law, Opp. 20-22, is wholly inapposite. For instance, in *In re Silver Wheaton Corp. Sec. Litig.*, the defendants argued that alleged misstatements regarding the defendant company's tax liability were not misleading because it was currently contesting the issue in tax court. 2016 WL 3226004, at *5-7 (C.D. Cal. June 6, 2016). The court rejected this argument, finding that the plaintiff's claims depended not on a conclusive finding of wrongdoing, but "whether it is *probable* that Silver Wheaton will eventually be required to pay unpaid income taxes and applicable penalties." *Id.* at *7. Further, the plaintiffs had presented a "plausible claim" of wrongdoing, including because the Canadian tax authority had already proposed to reassess the company's tax liability. *Id.* at *2-5. In contrast, Plaintiffs' "premium player" scheme is devoid of any supporting allegations, much less any regulator's finding of a violation.

Similarly, in *Halford v. AtriCure, Inc.*, the alleged misstatements were "not dependent on the legality or illegality of Defendants' promotion and sales activities," but whether, for example, the company "educate[s] or train[s] doctors to use any of its products." 2010 WL 8973625, at *9 (S.D. Ohio Mar. 29, 2010). And in *In re El Paso Elec. Co. Sec. Litig.*, the plaintiffs alleged the defendants did not disclose "the full truth of the dealings between EPE and Enron," which was separate from whether EPE had violated any rules or regulations. 2004 WL 377555, at *5-6 (W.D. Tex. Feb. 23, 2004). Again, Plaintiffs here claim that Defendants' statements were false and misleading because they did not disclose the illegal "premium player" scheme, and Plaintiffs make no particularized allegations demonstrating that there was any scheme for Defendants to disclose.[5]

*Second,* Plaintiffs point to the Hogan Lovells investigation, arguing the investigation found that "nearly 26%" of the roughly 3,000 Letters of Authorization ("LOAs") examined by Hogan Lovells were "unauthorized transfers." Opp. 7, 10. But Plaintiffs have no support for this argument, and it is contradicted by the Complaint and the documents it relied upon. As the Complaint alleges,

---

[5] Plaintiffs' argument regarding an independent SEC consultant retained by LVS in 2016 pursuant to an unrelated settlement, Opp. 20, is also meritless and illogical. As Defendants explained, there is zero evidence that this consultant "uncovered" evidence of any alleged unauthorized transfers. Mtn. 21. Indeed, if the consultant had uncovered such evidence, the consultant surely would have reported this to the SEC, and the SEC would have taken action (which Plaintiffs do not allege). Plaintiffs' only response is to accuse Defendants of speculation, but, in fact it is Plaintiffs who are asking the Court to draw wholly unwarranted inferences. *See Metzler*, 540 F.3d at 1064-65.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Hogan Lovells found instances of employees "not complying with proper standards" and using LOAs "bearing signatures that appeared similar and were likely photocopied." Compl. ¶¶ 110, 159. Nowhere, however, does the Complaint allege that Hogan Lovells found evidence of unauthorized transfers. In fact, the Complaint cites and quotes a *Bloomberg* article that expressly states the Company's "review concluded that no patron funds were transferred in a manner that was contrary to a patron's intent." *Id.* ¶ 230; Ex. 18, June 4, 2020 *Bloomberg* Article at 1064. The Opposition elsewhere argues that *Bloomberg* reported that the investigation "confirmed that illicit transfers had taken place in contravention of local law." Opp. 9. Not true. The *Bloomberg* article states the opposite: Hogan Lovells "found instances of employees not complying with proper standards" but that MBS concluded that "*no patron funds were transferred in a manner that was contrary to the client's intent.*" Ex. 22, Sept. 16, 2020 *Bloomberg* Article at 1076 (emphasis added).

Ultimately, Plaintiffs fall back to their allegation that the use of photocopied signatures "support[s] the inference" that the LOAs were "unauthorized." Compl. ¶ 159; Opp. 7, 10-11. But there is no basis to credit this inference given that only one patron, Wang Xi, has ever claimed that transfers from his account were unauthorized, and the CRA investigated and found MBS did not breach any regulatory requirements. *See Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 758 (N.D. Cal. 2020) ("The Court accepts as true Plaintiffs' factual allegations, but it is not required to accept a chain of inferences that are unmoored from particularized allegations that demonstrate their basis."); *Inchen Huang*, 443 F. Supp.3d at 1053 ("[O]ne-off allegations do not support an inference of the sort of widespread practices necessary to support Plaintiffs' theory of falsity.").[6]

*Third,* Plaintiffs' allegations regarding two Confidential Witnesses and another former

---

[6] Plaintiffs argue that SGD$365 million in revenues over the period from 2013-2017 were "illegal." *See* Compl. ¶ 110; Opp. 6-7, 10. Not only is their argument without factual basis, this amount is immaterial. Stated in U.S. dollars, SGD$365 million is approximately US$270 million. This is 0.42% of LVS's total revenue of over $64 billion, or 1.79% of MBS's total revenue of over $15 billion, over this same period. *See* Ex. 1, 2015 10-K at 129 (LVS revenue of $13.8 billion in 2013, $14.6 billion in 2014, and $11.7 billion in 2015; MBS revenue of $2.97 billion in 2013, $3.2 billion in 2014, $2.95 billion in 2015); Ex. 3, 2017 10-K at 429 (LVS revenue of $11.4 billion in 2016, $12.9 billion in 2017; MBS revenue of $2.8 billion in 2016, $3.2 billion in 2017). The immateriality of this amount is also fatal to Plaintiffs' claim. *See, e.g.*, *In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d 889, 895 (D. Nev. 1999) (amount of vendor dispute, representing 2.5% of quarterly earnings per share, was immaterial).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

MBS employee do not support the existence of a "premium player" scheme. Beginning with the CWs, the Opposition concedes that they had little to no overlap with the Class Period: CW-1 left MBS nearly a year prior to the start of the Class Period, and CW-2 overlapped with the Class Period for only a matter of months. Opp. 15-17. As Defendants demonstrated in their Motion, courts routinely discount allegations premised on CWs who do not overlap with the class period. Mtn. 16-17. *See, e.g.*, *City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1135 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (CWs who left prior to the class period lacked personal knowledge about practices during the class period and "[a]ny inference that pre-Class Period practices continued during the Class Period amounts to unsubstantiated speculation").

The Opposition's case law is not to the contrary. Several of the cases Plaintiffs rely upon do not even concern confidential witnesses.[7] And the few cases that do are plainly distinguishable. In each of these cases the pre-class period statements of CWs were considered alongside statements from multiple other CWs who did overlap with the class period. Further, the pre-class period CW statements were credited only to the extent that the CW had personal knowledge that bore on the relevant conduct. *See, e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (cited at Opp. 15-16, 29) (concluding seven CWs, "taken collectively," gave rise to a strong inference of scienter, and crediting pre-class period CW who "had personal knowledge of executive-level management's real-time access to" relevant reports); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *2 (N.D. Cal. Apr. 28, 2020) (cited at Opp. 17) (considering statements from four CWs who worked for the defendant for a substantial portion of the 13 month class period).[8]

Here, in contrast, Plaintiffs have alleged only two CWs, only one of whom overlapped with the Class Period for a few months. Further, Plaintiffs make no particularized allegations demonstrating that either CW had personal knowledge of unauthorized transfers. Plaintiffs conclusorily argue that CW-1 "knew" that transfers were not authorized. Opp. 15. But this

---

[7] *See*, *e.g.*, Opp. 16 (citing *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012) (discussing whether discovery should be limited to the class period); *In re Merck & Co. Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (considering pre-class period market share data offered by plaintiff)).

[8] *See Webb v. Solarcity Corp.*, 884 F.3d 844, 851, 856 (9th Cir. 2018) (cited at Opp. 16) (affirming dismissal after considering statements from eleven CWs, several who left prior to the class period).

argument is without support. The Complaint merely alleges that CW-1 "believ[ed]" transfers were unauthorized. Compl. ¶ 116. Moreover, the Opposition does not dispute that CW-1 had no direct contact with any patrons whatsoever, let alone any contact with patrons who told her that they had not consented to a fund transfer. *Id*. And while the Opposition argues that CW-1 "managed in-depth reviews of client accounts" and reviewed customer transactions to "flag suspicious activity," Opp. 15, Plaintiffs do not explain what from these reviews purportedly indicated that certain transfers were unauthorized. To the contrary, the Complaint affirmatively pleads that CW-1 admits that the MBS Relationship Managers, who did have contact with the patrons, "always" provided her with details and paperwork supporting patron consent for the transfers. Compl. ¶ 116.

Instead of providing any actual basis for CW-1's statements, the Opposition flagrantly distorts them. Most notably, the Opposition claims that CW-1 participated in meetings where "the high number of illegal transfers" were discussed. Opp. 15. But CW-1 merely stated that she participated in several meetings in which the submission of Suspicious Transaction Reports ("STRs") was discussed, and the concern raised at these meetings was that "so many reports were required." Compl. ¶ 121. Moreover, any suggestion that these STRs are indicative of unauthorized transfers is belied by Plaintiffs' own allegations: the Complaint alleges that "thousands" of STRs were submitted to the CRA and the Suspicious Transaction Reporting Office ("STRO") of the Singapore Police Force, as required by Singapore gaming regulations. *Id.* ¶ 114. Yet Plaintiffs never allege that the CRA or the STRO has ever determined that any transfers were unauthorized.

The Opposition's arguments regarding CW-2 are similarly distorted. For example, Plaintiffs claim that CW-2 said that management at MBS decided whether to extend credit based on their relationship with the patron, rather than creditworthiness. Opp. 17. But all the Complaint actually says is that CW-2 said "the decision to extend or not extend credit to an individual came down from [his superiors]." Compl. ¶ 124. He does not state that his superiors excluded an applicant's financial condition from the process. Likewise, CW-2's statement that LOAs were signed "at the cage" and that he did not believe compliance was always informed adds no support to Plaintiffs' allegations regarding supposed unauthorized transfers. Opp. 17. Indeed, nowhere does CW-2 ever state that

any LOAs were completed without the patron's consent.[9]

Lastly, the Opposition points to a statement attributed to an unnamed executive in a *Bloomberg* article, who was purportedly told to "back off" when he raised "the issue of unauthorized transfers" in 2018. Opp. 6, 18. But the Opposition once again stretches the Complaint's allegations. The underlying *Bloomberg* article simply states that this individual raised an "issue" with regard to "transfers." Ex. 23, Dec. 21, 2020 *Bloomberg* Article. The source never stated that the "issue" was unauthorized transfers, as opposed to, for example, process issues like the use of photocopies instead of original, wet ink signatures. Moreover, the statement that the source was told to "back off" when he purportedly raised "the issue" in 2018 is inconsistent with Plaintiffs' own allegation that MBS management had addressed the issue by early 2018. Compl. ¶¶ 244-45. Thus, Plaintiffs have provided no corroborating allegations to provide context to or support the reliability of this anonymous source's ambiguous statement.

For all of the reasons discussed above, Plaintiffs' "premium player" scheme is devoid of logic and unsupported by particularized allegations. The out-of-circuit precedent Plaintiffs point to, Opp. 12-14, is readily distinguishable. In each these cases, the alleged wrongdoing was supported by particularized allegations. For example, in *In re Petrobras Securities Litigation*, Opp. 13, the court concluded that statements touting compliance and anti-corruption measures were false and misleading where the arrests of a number of high-level Petrobras executives (referred to by the court as the "Corrupt Executives") supported the allegations of widespread fraud and corruption at the defendant company. 116 F. Supp. 3d 368, 374-75 (S.D.N.Y. 2015). Here, Defendants made their statements about MBS's performance and LVS's compliance record in a starkly different context: one where there was a finding that no regulations were violated and where Plaintiffs have not alleged any regulatory non-compliance, much less a scheme of widespread fraud.[10]

---

[9] Plaintiffs make much of CW-2 allegedly once witnessing a Chinese patron handing money to an MBS International Marketing Department employee. Opp. 17. CW-2 admits that he merely "inferred" that the cash was in exchange for the employee approving the patron's credit application but provides no allegations in support of his rank speculation. Compl. ¶ 125.

[10] The other cases cited by Plaintiffs, Opp. 13-14, are similarly distinguishable. *See, e.g.*, *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *2 (D. Conn. Nov. 10, 2005) (plaintiffs' allegations were supported by, among other things, a criminal complaint and the affidavit of an FBI agent filed against the company's managing director); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668,

**C.      Plaintiffs Do Not Address Defendants' Additional Arguments on Falsity.**

While Plaintiffs' failure to allege facts supporting the existence of any "scheme" of unauthorized transfers disposes of all of Plaintiffs' allegations of falsity, they fail for additional reasons that Plaintiffs do not even address.

As Defendants explained in their Motion, the bulk of the allegedly false and misleading statements have nothing to do with the subject matter of the alleged fraud—issuance of credit and the collectability of receivables. *See* Mtn. 12, 24-25 (explaining that alleged misstatements concerned a wide variety of broad, unrelated topics such as general performance at MBS, gaming volumes at MBS, and the financial performance of LVS as a whole). Statements that do not even relate to the alleged wrongdoing cannot be false or misleading. Plaintiffs' own case law makes this point. For example, in *Menkes v. Stolt-Nielsen*, Opp. 12-13, the court held that certain statements were *not* materially misleading "because the 'subject matter of [each] statement is so attenuated from [the uncharged illegal conduct] that it could not reasonably be found to have created a false impression in a reasonable investor.'" 2005 WL 3050970, at \*8 (citation omitted). Like in *Menkes*, no reasonable investor would interpret general statements about MBS's or LVS's performance, or other statements on topics wholly unrelated to credit and receivables, as saying anything about third-party fund transfers at MBS whatsoever. *See also* Mtn. 25 (citing *Ferris v. Wynn Resorts Ltd.*, 462 F. Supp. 3d 1101, 1124 (D. Nev. 2020)).

Plaintiffs likewise do not address Defendants' other arguments. Defendants' Motion specifically addressed a number of Plaintiffs' alleged misstatements relating to the Company's performance and record of compliance, and explained why these statements are of the type that courts routinely dismiss as inactionable. Mtn. 26. Plaintiffs avoid these arguments entirely, and in fact barely address any actual statements.[11] The closest Plaintiffs get to addressing these issues at

674-75 (S.D.N.Y. 1990) (employees pleaded guilty to improper payments in connection with a grand jury investigation); *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 245 (E.D.N.Y. 1989) (indictments of over two dozen present and former employees).

[11] One of the few exceptions is Mr. Goldstein's March 2016 general statements regarding LVS's record of compliance, which he made in response to two questions at an analyst conference. Opp. 2, 11, 24. Plaintiffs argue that Mr. Goldstein made these statements while "discussing illegal credit extensions at MBS," Opp. 11, but this argument is baseless and mischaracterizes the context of his responses. The excerpted transcript included in the Complaint states the two questions are largely

all is their summary discussion of *Petrobras*, which they contend holds that "statements affirming compliance" can be actionable. 116 F. Supp. 3d at 374. But as noted above, *Petrobras* is clearly distinguishable. *Petrobras* included particularized allegations of widespread fraud and corruption at the defendant company, which stands in stark contrast to Plaintiffs' allegations here.[12]

## II.   PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER.

Under the PSLRA, it is Plaintiffs' heavy burden to plead facts giving rise to a "strong inference" of scienter. Indeed, "'[t]he bar set by *Tellabs* is not easy to satisfy' because it requires Plaintiffs to plead an inference of scienter that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 817-18 (N.D. Cal. 2019) (quoting *Webb*, 884 F.3d at 855). Plaintiffs do not come close to this requirement. There is not a single allegation as to what facts were known by the Individual Defendants at the time they made the challenged statements. In fact, the Opposition does not even mention one of the Individual Defendants, Patrick Dumont. Moreover, any inference that Defendants were aware of the alleged scheme is wholly belied by Plaintiffs' failure to plead particularized allegations demonstrating its existence.

Lacking in particularized allegations, the Opposition again misrepresents or downright ignores the facts and the numerous inferences cutting against fraud to be drawn from them.[13] The Opposition makes several arguments, all of which are without merit.

*First,* the Opposition primarily argues that scienter can be inferred from two allegations:

"indiscernible." Compl. ¶ 180. And Plaintiffs ignore that the actual transcript shows the conference host prefaced the first question by asking: "[A]re there any question[s] from the audience on *Macao*?" Ex. 41 at 1214 (emphasis added). Moreover, the statements regarding LVS's compliance record are indisputably true: Plaintiffs point to no material adverse regulatory or compliance action against MBS before or during the Class Period. *See* Mtn. 26 n.17.

[12] Plaintiffs also offer no response to Defendants' arguments regarding statements relating to LVS's reserves and general statements about LVS's disclosure controls and procedures. Mtn. 26-27. Plaintiffs have thus waived these claims. *See In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1189 n.11 (N.D. Cal. 2007) (plaintiffs conceded point raised in motion to dismiss where "they do not respond to this argument in their opposition to the motion").

[13] The Opposition fails to address Defendants' points regarding the Complaint's other deficient allegations of scienter, *see* Mtn. 33-34, including that scienter cannot be inferred from the fact that the Individual Defendants knew MBS operates under strict regulatory scrutiny in Singapore or from turnover in the MBS compliance department over the course of a decade. These allegations, accordingly, are abandoned. *See Verisign*, 531 F. Supp. 2d at 1189 n.11.

12

the Hogan Lovells investigation and meetings CW-1 attended with "high-level compliance officers" where the "illicit transfers" were allegedly discussed. Opp. 1, 6-7, 11, 23-24. Neither argument has merit.

With regard to Hogan Lovells, the Opposition argues that the investigation occurred in "2017 or 2018," and therefore the Individual Defendants must have known about the alleged "premium player" scheme when making statements in 2017, 2018, and 2019. *Id.* 11, 23-24. But not even the Complaint alleges that the Hogan Lovells investigation occurred in 2017 or 2018. Rather, as the September 16, 2020 *Bloomberg* Article relied upon in the Complaint states, Hogan Lovells "started its probe following the 2019 lawsuit from patron Wang Xi"—*i.e.*, in late 2019. Ex. 22, Sept. 16, 2020 *Bloomberg* Article at 1077. Moreover, and assuming the Individual Defendants became aware of the investigation's findings at some time after late 2019, there are no well-pled allegations that the investigation uncovered any evidence of unauthorized transfers. In fact, MBS's investigation "concluded that no patron funds were transferred in a manner that was contrary to a patron's intent." Compl. ¶ 230.

Plaintiffs' argument regarding CW-1's meetings with high-level compliance officers is similarly unsupported. As explained, CW-1 never stated that illicit or unauthorized transfers were discussed at these meetings. Rather, these meetings focused on the "high number of STRs" being submitted to the CRA and STRO, and "CW-1 and other attendees often raised why so many reports were required." *Supra* at 9. Further, there is not a single allegation that either the CRA or the STRO found that any of these STRs evidenced unauthorized transfers. If anything, these numerous filings support a non-culpable inference, to which Plaintiffs have no response.[14]

Plaintiffs' reliance on *Livid Holdings v. Salomon Smith Barney*, Opp. 25, is badly misplaced. In *Livid*, the plaintiffs alleged that a statement suggesting that an initial stock offering had been completed was false and misleading because the sale had not actually been completed.

---

[14] The mere existence of the Wang Xi lawsuit, Opp. 24, similarly does not support an inference of scienter, particularly where Plaintiffs concede that the CRA closed its investigation of the Wang Xi allegations after concluding that MBS did not breach regulatory requirements. Plaintiffs likewise make no allegations of any findings of wrongdoing with regard to the investigations by the DOJ or Singapore Police. *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1084 n.220 (C.D. Cal. 2012) (ongoing investigation did not support an inference of scienter).

13

416 F.3d 940, 948 (9th Cir. 2005). There was no dispute that the defendants knew the sale had not been completed. *Id.* at 945. *Livid* is nothing like this case, where Plaintiffs have alleged no particularized facts indicating that any Defendant was aware of any scheme.

*Second*, Plaintiffs argue that they can meet the "high burden of proof" required to plead scienter under a core operations theory. *Prodanova v. H.C. Wainwright & Co*, 993 F.3d 1097, 1111 (9th Cir. 2021). Plaintiffs first argue that the Individual Defendants must have been exposed to the alleged scheme because LVS maintained two Compliance Committees and "[Mr.] Adelson was the LVS Board Compliance Committee Chairman." Opp. 26. Plaintiffs simply made this up: Mr. Adelson wasn't the Compliance Committee Chairman; he wasn't even on the Committee. *See* Compl. ¶ 297 (alleging Mr. Adelson was Chairman *of the LVS Board*); *see also* Exs. 53-57 (excerpts from LVS's proxies for 2016-2020 setting forth the Compliance Committee membership and showing Mr. Adelson was not a member).[15] Moreover, Plaintiffs make no allegation that the alleged scheme was discussed by the Committees nor do they allege any facts about any reports made to the Board that would support an inference of scienter. Nor does MBS's prominence in LVS's portfolio or the amount of "bad debt write-offs" contribute to an inference of scienter. Opp. 26. Plaintiffs assert that "62% of write-offs [from 2013 to March 2020] stemmed from MBS," but Plaintiffs make no challenge to LVS's accounting, the amount of its receivables, the adequacy of its reserve for bad debts, or the timing of write-offs. Nor do they plead facts to suggest that any unauthorized transfers contributed to any uncollectible receivables.

Accordingly, Plaintiffs' speculative and conclusory allegations regarding the Individual Defendants' positions on the Board and MBS's profitability do not support a core operations theory of scienter. *See Prodanova*, 993 F.3d at 1112 (rejecting "conclusory" allegations that the defendants "would have" been involved in alleged wrongdoing given their positions); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (core operations theory did not give rise to strong inference of scienter where "Plaintiffs never plausibly allege that specific information" about the

---

[15] Plaintiffs' caselaw regarding committee membership is therefore inapposite and also is clearly distinguishable. For example, in *In re Zoran Corporation Derivative Litigation*, Opp. 26, the court noted that plaintiffs needed only demonstrate that defendants' conduct was negligent for purposes of the Section 14(a) claim, not knowing or reckless as would be required for a Section 10(b) claim. 511 F. Supp. 2d 986, 1015-16 (N.D. Cal. 2007).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

alleged wrongdoing was conveyed to the individual defendants).[16]

*Third,* Plaintiffs spend multiple pages rehashing their arguments with respect to why the CWs should be considered reliable, notwithstanding the fact that the CWs had little to no overlap with the putative Class Period. Opp. 27-30. But Plaintiffs cannot deny that courts routinely discount scienter allegations based on statements from CWs who were not employed when the alleged misstatements were made. *See Prodanova*, 993 F.3d at 1110; *Nguyen*, 962 F.3d at 416; *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010) (that CWs were not employed during the class period "makes it unlikely that they had personal knowledge of Defendants' relevant state of mind").[17]

In addition to the CWs' minimal temporal overlap, Plaintiffs fail to address the heart of the issue: whether the CWs put forth "specific facts showing a connection between the false statement and the mindset of the person who made it." *Prodanova*, 993 F.3d at 1110; *Ferreira v. Funko Inc., et al.*, 2021 WL 880400, at *27 (C.D. Cal. Feb. 25, 2021) (considering statements of pre-class period CWs "only to the extent they can confirm what the Defendants allegedly knew or should have known during the Class Period"). Plaintiffs do not dispute that the CWs are not alleged "to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period." *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) (observations of nine CWs did "not provide an adequate basis for believing that the defendants made false statements, and knowingly so"). The CW allegations fail to raise any inference of scienter, let alone a strong one.

---

[16] These cases stand in stark contrast to caselaw cited by Plaintiffs where the court concluded that the facts were so prominent that it would be "absurd to suggest that top management was unaware of them." *See, e.g.*, *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *5 (N.D. Cal. Mar. 26, 2015) (cited at Opp. 25 n.16) (letter from Department of Energy that defendant's participation in a key project "might be terminated absent immediate action," where company received "nearly all of its revenues from DOE," was "certain to go straight to top management").

[17] Plaintiffs attempt to distinguish *Nguyen* based on the fact the court noted the allegations sourced to the CW were "high on alarming adjectives," but Plaintiffs fail to address the court's key conclusion with respect to the CW: the fact that "[m]any of the statements that plaintiff alleges are false and misleading were made after CW1 left" gave the court "ample basis to question aspects of CW1's claimed knowledge and his effort to impute scienter to the defendants." 962 F.3d at 416.

15

Unable to meet their pleading burden, Plaintiffs attempt to lower the bar and accuse Defendants of "misconstruing" the case law. Opp. 30. Specifically, Plaintiffs argue that one of Defendants' cited cases, *Ferraro*, cited at Mtn. 29-30, "stands against the weight of Ninth Circuit precedent." Opp. at 30. This is nonsense. The standard articulated by *Ferraro* is drawn directly from controlling Ninth Circuit authority. *See Ferraro*, 501 F. Supp. 3d at 765 ("The Ninth Circuit has made clear that confidential witness statements cannot create a strong inference of scienter unless the confidential witness 'has reliable personal knowledge of the defendants' mental state.'") (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009)).

Indeed, the CWs do not support a strong inference of scienter under Plaintiffs' own caselaw. In *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Technology, Inc.*, Opp. 30, the court held that a CW's statements were insufficient to plead scienter where the CW stated that the wrongdoing would have been "readily apparent" from financial documents but did not allege that the defendants personally accessed those documents or that the CW personally disclosed the alleged misdeed to the individual defendants. 856 F.3d 605, 620 (9th Cir. 2017). And in *Ferreira,* Opp. 30 n.13, the court rejected scienter allegations based on statements from CWs who were not alleged to have "had direct contact with any of the Defendants, let alone that they could opine competently and with personal knowledge as to what any of the Defendants knew [about the alleged wrongdoing] during the Class Period." 2021 WL 880400, at *27. The same is true here.

*Fourth,* Plaintiffs bizarrely claim that Defendants committed fraud because they were motivated to maintain MBS's license, which purportedly would only be extended if MBS had "suitable financial resources." Opp. 32. This is utterly without foundation. Plaintiffs themselves plead that MBS was extremely financially successful from before the beginning of the Class Period. *See, e.g.*, Compl. ¶¶ 66-67 (setting forth MBS's EBITDA performance). Plaintiffs have pleaded no facts to suggest that MBS's performance or its casino license from the CRA were in jeopardy. Yet, Plaintiffs now hypothesize MBS embarked upon a scheme of theft from its own patrons, under the watchful eye of the CRA. This makes absolutely no sense. Why would MBS be "motivated" to break the law? It could extend credit directly to foreign patrons; it did not need to "illegally" transfer funds. Plaintiffs' hypothesis is also utterly inconsistent with the facts: as Plaintiffs acknowledge,

16

MBS's license was renewed in 2016 and 2019 and the exclusivity period was extended in April 2019, *after* third-party transfers were virtually eliminated by 2018. *Supra* at 4.

Conceding the weakness of their "motive" allegations, Plaintiffs claim it is "unnecessary to allege motive" in order to establish scienter. Opp. 31. "That may be so, but the Court may properly consider motive as a factor in its holistic analysis of scienter." *Veal*, 423 F. Supp. 3d at 818. This includes, contrary to Plaintiffs' assertion, Opp. 30-31, 31 n.26, the fact that the beneficial share ownership of each Individual Defendant increased over the Class Period. *See* Mtn. 35-36 (citing cases). Under the *Tellabs* analysis, Defendants plainly are allowed to raise this competing inference, and courts "must take into account plausible opposing inferences." *Tellabs, Inc., v Makor Issues & Rights Ltd.*,551 U.S. 308, 323 (2007).

In sum, as demonstrated above and in Defendants' Motion, Plaintiffs' allegations—both standing alone and considered holistically—do not evince any fraudulent intent or deliberate recklessness that make an inference of scienter cogent and at least as compelling as the opposing inference of nonfraudulent intent. There is simply no well-pled allegation supporting any inference of scienter. Plaintiffs have fallen far short of their pleading burden.

## III.    PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION.

Plaintiffs' Opposition presents no coherent answer to Defendants' showing that the Complaint does not plead loss causation. As required by the Ninth Circuit, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'" *Metzler*, 540 F.3d at 1062 (citation omitted). Plaintiffs have not, and cannot, make such allegations. To begin with, Plaintiffs backpedal in their Opposition, abandoning one-third of the nine corrective disclosures alleged in the Complaint. *Compare* Compl. ¶¶ 323-29 *with* Opp. 33-34. They now rely on six "partial disclosures." Opp. 33. However, as demonstrated in Defendants' Motion, Plaintiffs have failed to adequately plead any corrective disclosure because the stock price on each of these days either (a) increased, (b) declined minimally and rapidly recovered, or (c) moved in parallel with the price performance of LVS's peers.

**October 10, 2019 and June 4, 2020.** There is no dispute that LVS's stock price went up on two of Plaintiffs' alleged corrective disclosure dates: on both October 10, 2019, and June 4, 2020,

17

LVS's stock price *increased*, and continued to increase in the immediately following trading days. Mtn. 38; Ex. 33, LVS Stock Price Chart. Plaintiffs have no answer to how an increase in stock price pleads loss causation.[18] *See Metzler*, 540 F.3d at 1062.

**September 26, 2019, May 12, 2020, and July 19, 2020.** Plaintiffs do not dispute that the declines on three of their other disclosure dates—September 26, 2019, May 12, 2020, and July 19, 2020—were minimal, and quickly recovered either the very next trading day or within a few days thereafter. Mtn. 38-39; Ex. 33, LVS Stock Price Chart (showing that LVS's stock price declined slightly following the September 26, 2019, May 12, 2020, and July 19, 2020 disclosure dates, and recovered most if not all of its slight loss within the next few trading days). As the Ninth Circuit has explained, when "a 'modest' drop in the stock price coincides with the disclosure of certain news but then 'recover[s] very shortly after,' the allegation of loss causation may be insufficient." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021). *See also Metzler*, 540 F.3d at 1062.

**September 16, 2020.** As to Plaintiffs' last disclosure date, September 16, 2020, Plaintiffs do not dispute that LVS and its peers experienced similar declines that day. As Defendants demonstrated in their Motion, the stock price of LVS, Wynn, MGM, and the Dow Jones U.S. Gambling Index all declined on September 16 and in the days that immediately followed, thus demonstrating that market forces unrelated to any alleged fraud were responsible for LVS's stock price decline on September 16. Mtn. 39-40.

Plaintiffs do not and cannot rebut any of the above, so they attempt to distinguish *Wochos*. Each of their arguments is unavailing. Plaintiffs argue, with regard to the June 4, 2020 disclosure date, that *Wochos* is distinguishable because "[t]o the extent LVS's stock price increased … the recovery was not sustained." Opp. 35. But Plaintiffs cannot deny that LVS's stock price increased from $52.35 on June 4 to $52.97 on June 5, and to $55.64 on June 8 (the next trading day). Ex. 33, LVS Stock Price Chart at 1149. Plaintiffs attempt to point to LVS's stock "in the following trading week," Opp. 35, but this argument runs counter to Plaintiffs' allegations that LVS stock trades in an efficient market, and therefore any impact from the June 4 disclosure would have been promptly

[18] Plaintiffs argue that LVS's stock price "declined" $0.56 on June 4, 2020 when compared to its peers. *See* Opp. 34. But Plaintiffs provide no legal authority to support their argument. If LVS's stock did not decrease in price, there can be no "loss" and no loss causation.

18

incorporated into the stock price—*i.e.*, not the following trading week. Compl. ¶¶ 23, 320. Plaintiffs similarly argue, with regard to the July 19, 2020 disclosure, "[that] LVS's stock overall traded down the next four days," Opp. 35, but inexplicably ignore that LVS's stock price *increased* the very next trading day after the purported corrective disclosure. *See* Ex. 33, LVS Stock Price Chart at 1149 (LVS stock increasing from $47.29 on July 20 to $48.00 on July 21).

Next, Plaintiffs argue that *Wochos* is distinguishable because it involved a single corrective disclosure whereas Plaintiffs have alleged multiple partial disclosures. Opp. 35. But nowhere does *Wochos* suggest that its holding is so limited. Rather, as *Wochos* explains, the loss causation analysis examines whether the stock price falls promptly after the disclosure of the allegedly concealed facts, as this would suggest that the alleged fraud had artificially propped up the stock price. 985 F.3d at 1197. However, if the stock price falls modestly and promptly recovers, this suggests that other market forces, as opposed to the alleged misstatement, caused the decline in the stock price. *Id.* Here, Plaintiffs allege that the "truth behind the false statements" was revealed through each of these partial disclosures. Opp. 33. It is therefore appropriate, at the pleading stage, to examine the stock price movements accompanying each alleged partial disclosure, and that is precisely what Defendants have done.

Recognizing they have no answer when each alleged corrective disclosure is examined, Plaintiffs finally claim they have pleaded loss causation because "between September 25, 2019 and September 16, 2020, LVS's stock price fell from $57.08 per share to $49.67 per share." Opp. 3, 35. But this is the very approach that *Dura* disavowed, as Plaintiffs must "prove that the defendant's misrepresentation … proximately caused [their] economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Plaintiffs, thus, are required to allege facts that distinguish between losses relating to the alleged fraud, and those resulting from general market forces or other factors unrelated to the alleged fraud. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

Plaintiffs do not even attempt to do so. First, they ignore the performance of LVS and its peers over the same time period. As set forth in the following table, LVS declined far less than MGM or Wynn over Plaintiffs' chosen time period:

|  | **LVS** | **MGM** | **WYNN** |
|---|---|---|---|
| **September 25, 2019** | $57.08 | $28.27 | $111.00 |
| **September 16, 2020** | $49.67 | $23.01 | $79.66 |
| **% stock price decline** | 12.98% | 18.60% | 19.22% |

*See* Ex. 34, Comparative Stock Price Chart. Moreover, Plaintiffs also ignore that changes in LVS's stock price (and those of its peers) over this period reflect the COVID-19 pandemic and its dramatic impact on the global gaming industry. Plaintiffs fail to acknowledge the COVID-19 pandemic at all, even as many of the *Bloomberg* articles that Plaintiffs incorporate into their Complaint expressly reference the impact of these events on LVS and its stock price. *See* Ex. 19, June 5, 2020 *Bloomberg* Article at 1069; Ex. 21, July 19, 2020 *Bloomberg* Article at 1074. For all of these reasons, Plaintiffs have not pled loss causation.

## IV.    DISMISSAL WITH PREJUDICE IS APPROPRIATE.

For each of the foregoing reasons, the Complaint must be dismissed. Because Plaintiffs have already been provided an opportunity to amend the complaint, dismissal should be with prejudice. Although Plaintiffs request leave to amend in their Opposition, Opp. 37 n.29, they identify no allegations that they would seek to add. Indeed, there are no allegations they could plausibly add. Accordingly, under these circumstances, dismissal with prejudice is appropriate. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002) ("Because any amendment would be futile, there was no need to prolong the litigation by permitting further amendment.")

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice.[19]

Dated: August 5, 2021

SNELL & WILMER, L.L.P.

By: */s/ Patrick Byrne*
Patrick G. Byrne, Esq.
Morgan Petrelli, Esq.
3883 Howard Hughes Parkway,

---

[19] Claims under Section 20(a) are derivative of Section 10(b) claims and must be dismissed where, as here, the Complaint fails to allege an underlying violation of the securities laws. Mtn. 41.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Ste. 1100
Las Vegas, NV 89169
Tel.  702.784.5200
Fax: 702.784.5252
Email:  pbyrne@swlaw.com
          mpetrelli@swlaw.com

Walter C. Carlson (*Pro Hac Vice*)
Lawrence P. Fogel (*Pro Hac Vice*)
Martha C. Clarke (*Pro Hac Vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Tel.  312.853.7000
Fax. 312.853.7036
Email:  wcarlson@sidley.com
          lawrence.fogel@sidley.com
          mclarke@sidley.com
*Attorneys for Defendants*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

## CERTIFICATE OF SERVICE

On August 5, 2021, I served the foregoing document on all parties appearing in this case when filing said document through the court's PACER system with automatic e-service on all persons who have registered for e-service on PACER for this case.


                                                    */s/ Lyndsey Luxford*
                                                    An employee of SNELL & WILMER L.L.P.

4833-4995-5829

22