# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

THE DANIELS FAMILY 2001
REVOCABLE TRUST, individually and on
behalf of all others similarly situated,

           Plaintiff,

   vs.

LAS VEGAS SANDS CORP., PATRICK
DUMONT, ROBERT GLEN GOLDSTEIN,
and MIRIAM ADELSON as special
administrator of the estate on behalf of
SHELDON G. ADELSON,

           Defendants.

Case No.: 2:20-cv-01958-GMN-EJY

**ORDER**

      Pending before the Court is the Motion to Dismiss the Amended Complaint, (EF No. 52), filed by Defendant Las Vegas Sands, Corporation ("LVS" or "Company"); Dr. Miriam Adelson, in her capacity as Special Administrator of the estate of Sheldon Adelson; Patrick Dumont; and Robert Goldstein, (collectively, "Defendants"). Plaintiffs Carl S. Ciaccio and Donald M. DeSalvo (collectively "Plaintiffs")[1] filed a Response, (ECF No. 66), and Defendants filed a Reply, (ECF No. 68).

      Also pending before the Court is the Unopposed Motion for Leave to File Excess Pages, (ECF No. 64), filed by Plaintiffs, and the Unopposed Motion for Leave to File Excess Pages, (ECF No. 67), filed by Defendants.[2]

---

[1] On January 5, 2021, this Court appointed Carl S. Ciaccio and Donald M. DeSalvo as co-lead plaintiffs. (*See* Order Granting Mot. Appointment, ECF No. 19).

[2] Given that these Motions are unopposed, the Court accordingly grants Plaintiffs' Motion for Leave to File Excess Pages, (ECF No. 64) and Defendants' Motion for Leave to File Excess Pages, (ECF No. 67).

Also pending before the Court is the Motion for Leave to File Supplemental Authority, (ECF No. 71), filed by Plaintiffs.  Defendants filed a Response, (ECF No. 72), to which Plaintiffs filed a Reply, (ECF No. 73).[3]

For the reasons discussed herein, the Court **GRANTS** Defendants' Motion to Dismiss, Plaintiffs' Motion for Leave to File Excess Pages, Defendants' Motion for Leave to File Excess Pages, and Defendants' Motion for Leave to File Supplemental Authority.

## I.   BACKGROUND

Plaintiffs bring this putative securities class action against Las Vegas Sands, Corporation and some of its directors and executive officers, on behalf of all persons who purchased or otherwise acquired LVS's securities between February 27, 2016, and September 15, 2020 (the "Class Period"). (Am. Compl. 1:1–8, ECF No. 36).  Plaintiffs claim that during the Class Period, Defendants made several misleading statements and omissions concerning alleged fraudulent transfers, illegal use of junkets, and disclosure procedures by LVS, which was ultimately uncovered by an internal investigation prompted by LVS. (*See generally* Am. Compl.).  Despite uncovering these allegedly illegal schemes, Plaintiffs allege that LVS remained silent until a public lawsuit and subsequent reporting by *Bloomberg* revealed the unauthorized transfer process. (*Id.* ¶ 21).  LVS's securities, as a result, traded at declined price of $1.20 per share. (*Id.*).  Plaintiffs allege that news of LVS's undisclosed transfer process and use of junkets caused LVS's share prices to decline, resulting in a financial loss to class members. (*Id.*).

//

//

//

---

[3] Defendants, in their Response, indicates that they do not oppose Plaintiffs' Motion for Leave but disputes the applicability of the supplemental authority. (Resp. to Mot. Leave 2:2, ECF No. 72).  Because Defendants do not oppose the Motion, the Court accordingly grants Plaintiffs' Motion for Leave to File Supplemental Authority.

A.     THE PARTIES

Plaintiffs are persons who purchased the Company's securities at allegedly inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. (*Id*. ¶¶ 25–26).

LVS is a "global developer of destination properties that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants, and other amenities," known as "Integrated Resorts." (*Id*. ¶ 28).  Its securities trade on the New York Stock Exchange under the ticker symbol, "LVS." (*Id*.).

Sheldon Adelson was the founder, chairman of the board of directors, and chief executive officer of LVS during the Class Period. (*Id*. ¶ 29).  On January 11, 2021, Mr. Adelson passed away. (Pls.' Unopposed Mot. Substitute Party 2:4–5, ECF No. 40).  Dr. Miriam Adelson, in her capacity as special administrator of the estate of Sheldon G. Adelson, was substituted for Sheldon Adelson as a defendant in this action. (*See* Order Granting Unopposed Mot. Substitute Party, ECF No. 41).  Patrick Dumont served as LVS's Senior Vice President of Finance and Strategy from September 2013 to March 2016; served as Vice President of Corporate Strategy from June 2010 to August 2013; and has served as LVS's Executive Vice President and Chief Financial Officer since March 28, 2016. (*Id*. ¶ 30).  Robert G. Goldstein served as a member of the Board, President, and Chief Operating Officer of LVS from January 1, 2015, to January 26, 2021. (*Id*. ¶ 31).  Upon Sheldon Adelson's death in January 2021, Mr. Goldstein was named Chief Executive Officer. (*Id*.).  Plaintiffs allege that each individual defendant, by virtue of his high-level position with LVS, directly participated in the management and operations of the Company, and further was privy to confidential and proprietary information. (*Id*. ¶ 33).

//

### B.     OVERVIEW OF LVS'S OPERATIONS

LVS owns and operates properties in the United States, Singapore, and Macao. (*Id*. ¶ 28).   In the United States, LVS's properties include the Venetian Resort Las Vegas and the Sands Expo and Convention Center. (*Id*. ¶ 42).  In Macao, LVS operates four Integrated Resorts including The Venetian Macao Resort Hotel, The Londoner Macao, The Parisian Macao, The Plaza Macao and Four Seasons Hotel Macao, Cotai Strip, and The Sands Macao. (*Id*. ¶ 43).

In Singapore, LVS owns and operates Marina Bay Sands ("MBS"). (*Id*. ¶ 44).  On August 23, 2006, LVS entered into an agreement with the Singapore Tourism Board to design, develop, and construct MBS. (*Id*. ¶ 51).  Singapore selected another group, Genting, to build a second casino in Singapore called Sentosa. (*Id*. ¶ 52).  The concessions MBS and Sentosa received from Singapore effectively created a duopoly in Singapore's gaming industry. (*Id*.).  Prior to MBS and Sentosa, Singapore had no lawfully operating casinos due to a nearly 40-year ban on gambling. (*Id*. ¶ 53).

Gaming in Singapore attracts a spectrum of players.  At one end are weekend travelers who often wager with any cash they bring with them and depart having won or lost relatively small amounts. (*Id*. ¶ 46).  At the other end are "premium players," who are players enticed to spend large amounts of money at LVS properties through perks such as luxury amenities, luxury accommodations, restaurants, lounges, invitation-only clubs, and private gaming salons. (*Id*. ¶ 47).  Unlike the weekend gamers, premium players are typically extended lines of credit and provided "rolling chips," which are special non-negotiable and non-exchangeable chips that allows MBS to monitor the specific players gaming success. (*Id*.).  To become a premium player, a patron must open a deposit account with the casino and input at least SGD $100,000 (approximately $75,000 USD). (*Id*. ¶ 101).

//

MBS and Sentosa are subject to Singapore's Casino Control Regulations ("CCR"), which are enforced by the Casino Regulatory Authority ("CRA"), which licenses and regulates casinos in Singapore. (*Id*. ¶¶ 55–56). Pursuant to the Casino Control Act ("CCA"), MBS must "establish and implement a system of internal controls for the casino operations which satisfies the prescribed internal control requirements." (*Id*. ¶ 57). The CCA also requires MBS to perform due diligence to prevent money laundering and prohibits MBS from lending money or extending credit by any means other than money of chips. (*Id*. ¶ 59). MBS, however, may provide chips on credit to patrons who are not citizens or permanent residents of Singapore or Singapore residents who are "premium players." (*Id*.). MBS quickly became and remained LVS's most profitable property by a significant margin. (*Id*. ¶ 63).

## C.   ALLEGED SCHEMES TO INCREASE PROFIT AT MBS

In 2012, China imposed various anti-corruption policies relating to gaming, which directly reduced the number of Chinese players entering Singapore for gaming. (*Id*. ¶¶ 88–89, 92). Due to the decreased influx of Chinese premium players, MBS began directly competing with Sentosa, the only other casino in Singapore, for "premium players." (*Id*. ¶ 93). Rather than compete for the market share of premium players, Plaintiffs allege that MBS utilized two different strategies to increase profit.

### 1.   Unauthorized Transfer and Issuance of Credit

Plaintiffs allege that MBS illegally transferred money to subprime borrowers to create new "premium players" so that MBS could extend credit to more players. (*Id*. ¶ 99). Beginning in 2013, MBS allegedly began transferring money from its wealthy clientele accounts to other subprime accounts. (*Id*. ¶ 104). Plaintiffs allege that MBS employees convinced wealthy patrons to sign blank "Letters of Authorization" and then filled out the amount of the transfer and other details as necessary. (*Id*. ¶ 106). MBS allegedly photocopied the signed blank forms to repeatedly transfer money from wealthy accounts without needing recurring authorization.

(*Id*. ¶ 107).  By conducting these unauthorized transfers, MBS effectively created new "premium players" on paper, which allowed MBS to extend lines of credit to players who otherwise would not qualify for "premium" status. (*Id*. ¶ 109).  According to MBS' internal investigation conducted by retained law firm, Hogan Lovells, MBS endorsed more than 3,000 letters of authorization between 2013 to 2017, totaling approximately SGD $1.4 billion. (*Id*. ¶ 110).  Of this total amount, more than 26% were effectuated through the use of letters of authorization bearing signatures that appeared similar and were likely photocopied. (*Id*.).

Plaintiffs' two confidential witnesses also allege that this scheme existed at MBS. Confidential Witness #1 ("CW-1, a former Anti-Money Laundering Specialist in MBS' compliance department from January 2014 to March 2015, reported that these unauthorized transfers between customer accounts occurred "all the time." (*Id*. ¶ 117).  Despite her reporting suspicious activity, CW-1 claims that no one took action to stop the practice, with her manager even directing her to stop filing so many reports. (*Id*.).  Another confidential witness, Confidential Witness #2 ("CW-2"), was a former credit officer in MBS's Finance Department from 2013 to 2016. (*Id*. ¶ 123).  CW-2 reported that letters of authorization were often filled out and signed "at the cage," which was the portion of the Finance Department that directly released funds to players. (*Id*. ¶ 127).  According to CW-2, "the cage" often did not tell the Compliance Department about these unauthorized transfers. (*Id*.).

Plaintiffs allege that, pursuant to the unauthorized transfer scheme, MBS was forced to write-off a significant amount of bad debt expense. (*Id*. ¶ 149).  By writing off the bad debts, MBS was able to keep credit-based wagering artificially high from 2010 to 2017. (*Id*. ¶ 151). According to Plaintiffs, LVS's write-offs increased from $34.6 million in 2010 to $234 million in 2016. (*Id*.).  In 2018, the extraordinarily high write-offs prompted LVS to limit unauthorized transfers and reduce the amount of credit extended to casino patrons. (*Id*. ¶ 152).

//

### 2.  Use of Illegal Junkets

Plaintiffs allege that MBS employees directly engaged illegal junkets, who were operating at MBS without a license, in another effort to increase profits. (*Id*. ¶ 130).  Junkets are unaffiliated middlemen who connect high value gamblers, typically from China, with casino operators. (*Id*. ¶ 77).  These junkets often collect a set amount in China from the patron and provide the gambler with credit redeemable at their destination. (*Id*.).  Casinos typically pay junkets a commission as a type of "finder's fee" for enticing and connecting high value gamblers to the casino. (*Id*.).  Because junkets are often linked organized crime and money laundering, Singapore only licensed two junkets who are permitted to operate through Sentosa, but not MBS. (*Id*. ¶ 79).

According to Plaintiffs, MBS employees directly coordinated with illegal junkets to operate at MBS without a license. (*Id*. ¶ 130).  A former MBS marketing executive allegedly told *Bloomberg* that "MBS had no choice but to call on junkets when it first opened in order to attract VIPS because of a lack of local contacts." (*Id*. ¶ 132).  Several lawsuits initiated by MBS also allegedly revealed MBS's use of junkets. (*Id*. ¶¶ 133– 136).  CW-2 allegedly confirms that he learned about the role of junkets at MBS based on multiple conversations from his friends in the junket business in Macao, where junkets are legal. (*Id*. ¶¶ 137–140).

### D.    REVEALATIONS OF SCHEME

On September 26, 2019, a premium player at MBS, Wang Xi, filed a statement of claim in the High Court of Singapore ("Wang Xi Lawsuit"), alleging that the casino misappropriated SGD $9.1 million (approximately $6.1 million USD) from his account to other MBS patrons. (*Id*. ¶ 153).  Wang alleges that MBS transferred money from his account, without authorization, through 22 separate transactions between October and December 2015. (*Id*. ¶ 154).  MBS, he alleges, effectuated these transfers through letters of authorization that appeared to be either forged or photocopied. (*Id*.).

According to *Bloomberg News*, the Wang Xi Lawsuit grabbed the attention of law enforcement in Singapore and the United States. (*Id*. ¶ 155).  In January 2020, the United States Department of Justice ("DOJ") issued a grand jury subpoena to a chief compliance officer at MBS, "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls." (*Id*. ¶ 156).   In May 2020, *Bloomberg* reported that Singapore police began investigating Wang's claims and the unauthorized transfer activity at MBS. (*Id*. ¶ 157).  In June 2020, Singapore CRA also commenced its own investigation, according to Bloomberg. (*Id*. ¶ 158).

On September 16, 2020, Bloomberg published another article, revealing for the first time that LVS hired Davinder Singh Chambers, LLC—a well-known Singapore law firm, to conduct a new investigation into employee transfers of more than $1 billion in gambler's money to third parties. (*Id*. ¶ 235).  The same article revealed that LVS hired another law firm, Hogan Lovells, to conduct an internal investigation into the unauthorized transfer of money to third-party accounts. (*Id*. ¶ 241).  In that investigation, Hogan Lovells determined that, from 2013 to 2017, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in a total approximate amount of SGD $1.4 billion ($1.05 billion USD). (Id.).  Of those transactions, approximately SGD $365 million of those transfers were authorized by letters from multiple casino guests that bore signatures that appeared similar. (*Id*)  In response to this news, LVS's stock price dropped from a close of $51.85 on September 15, 2020 to $49.67 on September 16, 2020. (Id. ¶ 243).

## E.    ALLEGED FALSE AND MISLEADING STATEMENTS

In light of these schemes, Plaintiffs allege that Defendants made several materially misleading statements and omissions in SEC filings, annual reports, earnings calls, and press releases during the relevant Class Period.  These statements fall into the following four categories:

### 1.      LVS's Issuance of Credit

LVS submitted Annual Reports to the SEC, filed on Form 10-Ks, in 2015, 2016, 2017, 2018, and 2019. (*Id.* ¶¶ 163–164).  Plaintiffs allege that LVS made materially false and misleading statements in these reports as to: (1) LVS's credit policies and procedures; (2) the difficult of collecting debts in foreign jurisdictions; and (3) the manner in which it assessed risk. (*Id.* ¶¶ 166, 172, 174).   For example, as to LVS's credit policies and procedures, LVS told investors in the above Annual Reports that it extends "credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit." (*Id.* ¶¶ 167, 170).  Defendants' statements, however, were allegedly false and misleading because Defendants inaccurately represented that MBS extended credit based on financial status, when in fact, MBS extended credit to otherwise unqualified borrowers, who MBS gave "premium" status based on the unauthorized movement of hundreds of millions of dollars between accounts. (*Id.* ¶ 171).

Defendants also represented, in Form 10-Qs and Annual Reports, that LVS's recovery for doubtful accounts depended "upon the state of the economy, . . . credit standards, . . . [and] risk assessments." (*Id.* ¶ 176).  These statements were allegedly false by omission because Defendants failed to mention the accumulating debt at MBS due to the unauthorized transfer practice. (*Id.* ¶ 177).  In similar SEC filings from 2016 to 2020, Defendants described LVS's accounts receivables and credit risks. (*Id.* ¶ 178).  Specifically, Defendants stated:

> The Company extends credit to approved casino customers following background checks and investigations of creditworthiness.  The Company also extends credit to its junkets in Macao, which receivables can be offset against commissions payable to the respective junkets.

(*Id.*).  According to Plaintiff, Defendants failed to disclose that the ultimate drive for extending credit was not a background check or investigation of a patron's creditworthiness, but instead, a patron's relationship with MBS' International Marketing Department. (*Id.* ¶ 179).

Moreover, Defendants via Mr. Goldstein and Mr. Adelson allegedly misrepresented LVS's policies for extending credit at MBS and omitted MBS's efforts to maintain premium players during various earnings calls from 2016 to 2020. (*Id.* ¶¶ 180, 182, 184, 186, 188, 190, 196, 199, 201, 203, 205). For example, on March 10, 2016, then-President and Chief Operating Officer Robert Goldstein reiterated LVS's compliance record. (*Id.* ¶ 180). He specifically stated the following:

> We're very much asked the question where does it come from, who are you, how do you get credit, how do you – if a person wants a line of credit or wants to move money, we're probably the first line of defense. In fact, I think we're more aggressive than the government in terms of monitoring that. We're a big believer that compliance is critical. We've embraced it the last 4 years, 5 years, and we don't fear it. We embrace it, accept it. It's part of our world today.

(*Id.* ¶ 180). Plaintiffs allege that such statements were false and misleading because Mr. Goldstein failed to disclose MBS's unauthorized movement of money between accounts to falsely accredit subprime borrowers. (*Id.* ¶ 181). On April 26, 2017, Mr. Goldstein reiterated MBS's strong performance, stating "MBS, I got to take a minute just to recognize how strong I feel about the performance there. I think it's extraordinary that we did $388 million normalized without having a strong VIP business over there. . . . But no, it's not driven by VIP out of Mainland China. The diversification, geographic diversification of MBS is just compelling." (*Id.* ¶ 186). On April 25, 2018, Mr. Goldstein again addressed the decelerating rolling segment. (*Id.* ¶ 199). Plaintiffs claim that his statement was materially false and misleading because he failed to disclose that the decelerating rolling segment was caused by MBS's cessation of the unauthorized transfer practice. (*Id.* ¶ 200).

### 2.    Use of Junkets

In the 2015, 2016, 2017, 2018, and 2019 Annual Reports, LVS stated the following:

We are dependent upon gaming junket operators for a significant portion of our gaming revenues in Macao. […] Junket operators, which promote gaming and draw high-roller customers to casinos, are responsible for a significant portion of our gaming revenues in Macao.

(*Id*. ¶¶ 208–209).  LVS made similar statements in the Annual Reports related to its practice of extending credit to junket operators. (*Id*. ¶ 211).  According to Plaintiff, LVS's statements were false and misleading by omission because LVS neglected to disclose MBS's use of junkets in Singapore. (*Id*. ¶¶ 210, 212).

At the July 26, 2017, earning call, Mr. Goldstein confirmed an analyst's question that there were "obviously no junkets in the market." (*Id*. ¶ 213).  Mr. Goldstein's affirmation, Plaintiffs allege, was materially false and misleading because MBS had been working with illegal junkets in Singapore for years. (*Id*. ¶ 214).

### 3.    Wang Xi Lawsuit and Unauthorized Transfer Claim

Defendants generally refrained from speaking about the unauthorized transfers or the Wang Xi Lawsuit during the Class Period. (*Id*. ¶ 215).  Mr. Briggs, however, answered a question from an analyst concerning the lawsuit and governmental probes, on June 10, 2020, at a conference he attended on behalf of the Company. (*Id*.).  He stated:

> I don't want to get into the details of it, but this person has mistreated staff and had been very inappropriate, and we basically banned him from the building. And that customer didn't like being banned, wants to come back and play, has been fighting with us to try to figure out a way to come back and play. He's paid us all of the debt that he owed us, but we have continued to ban him because of his mistreatment of some of our employees. And then he has threatened, "Well, I'm going to get a lawyer and we're going to make as much trouble as possible." So that's what's happened. We'll see.

> We don't know of any investigation that's happening right now. We've heard that this guy is trying to illustrate some things that he believes were inappropriate in the past. We don't believe that we've done anything inappropriate with respect to this customer other than not letting him back in the building because he's mistreated folks.

(*Id*.).  Plaintiffs allege that Mr. Brigg's statements were materially false and misleading because the Company had already conducted an internal investigation with Hogan Lovells that revealed the unauthorized transfers and issuance of credit. (*Id*. ¶ 216).

### 4.      Disclosure Controls and Procedures

LVS's Annual Reports also highlighted the important of adequate disclosure controls and assured investors that LVS's disclosure procedures were effective. (*Id.* ¶¶ 217–220).  LVS stated, in relevant part:

> Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. The Company's Chief Executive Officer and its Principal Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of [], and have concluded that they are effective at the reasonable assurance level.

(*Id.* ¶ 217).  Similarly, LVS allegedly failed to timely disclose required information such as LVS's lack of effective internal controls in its Annual Reports. (*Id.* ¶¶ 218–219).  Plaintiffs allege that LVS's failed to timely disclose information that was required to be disclosed, such as LVS's lack of effective internal controls and the unauthorized transfer of money from wealthy accounts. (*Id.* ¶¶ 218, 220).

### F.      PROCEDURAL HISTORY

On October 22, 2020, Plaintiffs brought this securities class action against Defendants. (*See* Compl., ECF No. 1).  On January 5, 2021, Carl S. Ciaccio and Donald M. Desalvo were named lead plaintiffs. (Order on Mot. Lead Pls., ECF No. 19).  Plaintiffs subsequently filed an Amended Complaint, (ECF No. 36), which alleges two causes of action: (1) Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and (2) Violation of Section 20(a) of the Exchange Act against Defendants Adelson, Goldstein, and Dumont (collectively, "Individual Defendants").  Defendants now move to dismiss the Amended Complaint. (Defs.' Mot. Dismiss ("MTD"), ECF No. 52).

//

## II.  LEGAL STANDARD

### A.  RULE 12(B)(6) MOTION TO DISMISS

Dismissal is appropriate under Rule 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Twombly*, 550 U.S. at 555.  Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  "However, material which is properly submitted as part of the complaint may be considered." *Id.*  Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  On a motion to dismiss, a court may also take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if a court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. Fed. R. Civ. P. 12(d).

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc*., 957 F.2d 655, 658 (9th Cir. 1992).  Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## B.    RULE 9(B) AND THE PSLRA PLEADING STANDARD

Beyond meeting the demands of Rule 12(b)(6), a plaintiff asserting securities fraud claims must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), in order to survive a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007).

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b).  To comply with the rule, the complaint must state with particularity the circumstances constituting the fraud, including an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004). "[A]llegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Bly–Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal punctuation omitted).  Where several defendants are alleged to be part of the fraud, "Rule 9(b) 'does not allow a complaint to . . . lump multiple

defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant.'" *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).

The PSLRA requires that a complaint must "specify each statement alleged to have been false or misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(2).  Further, where recovery is dependent on a showing that defendant acted with a particular state of mind, "the complaint shall [. . .] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

## IV.   <u>DISCUSSION</u>

Defendants argue that Plaintiffs' Section 10(b) claim should be dismissed because Plaintiffs fail to adequately plead actionable false statements, scienter, and loss causation. (Defs.' Mot. Dismiss ("MTD") at 13–41).  Defendants further argue that because Plaintiffs fail to state a claim for a predicate primary violation of Section 10(b) against any Defendant, Plaintiffs' Section 20(a) claim necessarily fails. (*Id.* at 41).  The Court addresses each of Plaintiffs' claims in turn.

### A.   CLAIM 1 - SECTION 10(B) AND RULE 10B-5

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j.  Rule 10b–5 promulgated by the Securities and Exchange Commission (SEC) under the authority of Section 10(b), in turn makes it unlawful for any person,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.  To avoid dismissal of a claim for relief under § 10(b), a plaintiff must allege: (1) defendant made a material misrepresentation or omission, (2) with scienter or intent to defraud, (3) in connection with the purchase or sale of a security, (4) plaintiff relied on that misrepresentation, (5) plaintiff suffered economic loss, and (6) that loss was caused by the misrepresentation or omission. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

### 1.      False Statements and Omissions

To adequately plead a material misrepresentation or omission under § 10(b), the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041–42 (N.D. Cal. 2014).  "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). To be misleading, a statement must be "capable of objective verification." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

//

//

//

1

2

### a.   Statements Regarding LVS's Issuance of Credit and Unauthorized Transfers

3

4       Defendants argue that Plaintiffs fail to plausibly allege false and misleading statements

5   as to the unauthorized transfer of money[4] for two reasons: (1) Plaintiffs fail to allege the

6   existence of a false scheme; and (2) Plaintiffs fail to demonstrate how the alleged statements

7   are false. (MTD 13:21–28:14).  The Court addresses each argument in turn.

### i.   Existence of the Unauthorized Transfer Scheme

8       Defendants contend that Plaintiffs cannot allege false and misleading statements because

9   they fail to plausibly allege the existence of a scheme—namely, that MBS transferred money,

10  without permission, from wealthy clientele accounts to subprime borrowers. (MTD 15:4–10).

11  Defendants challenge the four sources of evidence that Plaintiffs allegedly rely on, specifically

12  (1) the Wang Xi lawsuit; (2) statements from two confidential witnesses; (3) a statement from

13  an unnamed executive in a Bloomberg article; and (4) the Hogan Lovells investigation. (*Id.*).

14      Here, Plaintiffs plausibly allege that the scheme existed.  The Hogan Lovells

15  investigation, as Plaintiffs allege, "uncovered instances of employees not complying with

16  proper standards by filling in payment details on pre-signed or photocopied authorization

17  forms." (*Id.* ¶ 159).  Plaintiffs additionally allege that "the Hogan Lovells probe determined

18  that, of the more than 3,000 letters of authorization accounting for more than SGD$1.4 billion

19

20

21

22

23

24

25

---

[4] Neither party clarifies whether their arguments relate to Plaintiff's first category of false and misleading statements: LVS's Issuance of Credit and the Collectability of Receivables and/or Plaintiff's third category of false and misleading statements: the Wang Xi lawsuit and Unauthorized Transfer. (Am. Compl. ¶¶ 166–206). Defendants move to dismiss Plaintiff's "unauthorized transfer" theory, which Plaintiffs rebut by claiming it plausibly alleges a "premium player" scheme. (MTD 15:4–11); (Resp. to MTD 10:2–3).  Plaintiffs seemingly reference unauthorized transfers and issuance of credit in two different categories in its Amended Complaint. (*See* Am. Compl. ¶¶ 166–206, 215–216).  Specifically, Plaintiffs allege a scheme—namely, MBS transferring money without authorization, which allowed MBS to extend credit to subprime players (the "scheme")—in both the first category: Issuance of Credit and the third category: Wang Xi Lawsuit and Unauthorized Transfer Claim. (*Id.*).  Given that neither party clarifies which category they are referencing, the Court considers both categories of false and misleading statements together.

in customer-to-customer transfers executed between 2013 and 2017, letters authorizing transfers for SGD $365 million (or more than 26%) bore signatures that appeared similar – supporting the inference that these were likely photocopied duplicates and unauthorized." (*Id*.). Though Plaintiffs do not explicitly state that the Hogan Lovell's investigation revealed unauthorized transfers, alleging that the investigation uncovered "photocopied duplicates" of the Letters of Authorization infers that unauthorized transfers occurred at MBS.

The existence of the Wang Xi lawsuit further infers that such scheme existed. Plaintiff alleges that Wang Xi, a wealthy patron at MBS, alleged that LVS improperly transferred $6.6 million USD from his account to other patrons at MBS without his permission between October and December 2015. (Am. Compl. ¶ 323). According to Wang, MBS took the money from his account through 22 separate transactions and were carried out through letters of authorization that appeared to be either forged or photocopied. (*Id*. ¶ 154). He further alleged that he was unable to verify the authenticity of the letters. (*Id*.). If the scheme was ongoing as Plaintiffs allege, Defendants assert that more than one patron would have sounded the alarm by filing a lawsuit or contacting authorities. (MTD 15:20–21). Because only one patron filed a lawsuit, Defendants thus contend that the alleged scheme did not exist. The fact that only one individual filed a lawsuit, however, does not discount Plaintiffs' allegations of a scheme. (Resp. to MTD at 22, n.11). Plaintiffs, at the motion to dismiss stage, must allege sufficient facts that Defendants' statements were misleading, such that "it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson*, 527 F.3d at 985 (quoting *Brody*, 280 F.3d at 1006). Taken together, the Wang Xi lawsuit and Hogan Lovells investigation give a "reasonable investor that the 'impression of a state of affairs . . . differs in a material way from the one that actually exists.'" *Id*. Thus, though Defendants urge the Court to refrain from "check[ing] its disbelief at the door" because it is implausible that MBS's wealthy clientele overlooked the hundreds of thousands of dollars

1   missing from their accounts, Plaintiffs' allegations of the Hogan Lovells investigation and the

2   Wang Xi lawsuit together support an inference that the scheme existed. (MTD 15:20–16:3). At

3   this stage, the Court takes Plaintiffs' allegations as true and finds that Plaintiffs sufficiently

4   allege that Defendants engaged in a scheme of unauthorized transfers.

5                              ii.      *Falsity of Defendants' Statements*

6            Defendants additionally argue that Plaintiffs fail to allege a plausible Section 10(b)

7   claim because Plaintiffs do not allege how Defendants' statements were false and misleading.

8   (*Id*. 24:23–28:11). Specifically, Defendants argue that: (1) the alleged statements are so broad

9   that no reasonable investor would believe that Defendants' statements concerned the

10  unauthorized transfer of money; (2) many statements are inactionable puffery; and (3) the

11  statements are not otherwise specific as to falsity. (*Id*.). Plaintiff, in response, broadly argues

12  that Defendants' statements were misleading because Defendants had a duty to disclose illegal

13  conduct and failed to do so. (Resp. to MTD 12:17–14:10).

14           A statement may be misleading under Rule 10(b) if it omits material information. *Khoja*

15  *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "Disclosure is required . . .

16  only when necessary 'to make . . . statements made, in the light of the circumstances under

17  which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27,

18  44, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). As such,

19  "companies can control what they have to disclose under these provisions by controlling what

20  they say to the market." *Id*. at 45. "But once defendants [choose] to tout positive information to

21  the market, they [are] bound to do so in a manner that wouldn't mislead investors, including

22  disclosing adverse information that cuts against the positive information." *Schueneman v.*

23  *Arena Pharms.*, Inc., 840 F.3d 698, 705-06 (9th Cir. 2016) (quotation marks and citation

24  omitted). Regardless of whether the statement is allegedly an omission or misstatement, "a

25  plaintiff must allege materiality." *Khoja*, 899 F.3d at 1008. "[A] misrepresentation or omission

is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

Plaintiffs, in the present case, fail to plausibly allege false and misleading statements by omission. "The person who omitted the material information must have had a duty to disclose it to the person supposedly harmed by the omission." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996). A duty to disclose may arise "from a relationship of trust and confidence between parties to a transaction." *Chiarella v. United States*, 445 U.S. 222, 230, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980). Plaintiffs, in their Amended Complaint, alleges that Defendants made false and misleading statements by failing to disclose their knowledge of the unauthorized transfer scheme in their Annual Reports, SEC filings, and earnings calls. (Am. Compl. ¶¶ 166–175) (alleging false statements in Defendants' Annual Reports); (Am. Compl. ¶¶ 176–179) (alleging false statements in SEC filings); (Am. Compl. ¶¶ 180–206) (alleging false statement in earnings calls from 2016 to 2020). Nowhere in the Complaint do Plaintiffs allege that Defendants had a duty to disclose the alleged scheme of unauthorized transfers.[5] *See, e.g., Ansell v. Laikin*, No. CV 10-9292 PA (AGRx), 2011 U.S. Dist. LEXIS 85695, at *7 (C.D. Cal. Aug. 1, 2011). For example, as to the earnings calls, Plaintiffs allege that Defendants via Mr. Goldstein and Mr. Adelson falsely mislead investors by confirming the strength of LVS's market share and earnings and sufficiently alleges that those statements were misleading because Mr. Goldstein and Mr. Adelson failed to mention LVS's practice of unauthorized transfers. (Am. Compl. ¶¶ 180, 182, 184, 186, 188, 190, 196, 199, 201, 203, 205).

---

[5] Plaintiffs, in their Response to the MTD, also do not point to any allegations in which Plaintiffs allege that Defendants had a duty to disclose material facts concerning the unauthorized transfer. (Resp. to MTD 11:16–12:16). Though Plaintiffs mention that "Defendants had a duty to disclose that LVS's market share and earnings were the result of unauthorized transfer practices and were at risk of declining if LVS's unauthorized practice was stopped," Plaintiffs do not point to any allegations in the Amended Complaint establishing Defendants' duty.

Plaintiff, however, fails to allege that Mr. Goldstein and Mr. Adelson had a duty to disclose such conduct.

For this reason, Plaintiffs fail to allege a plausible claim relating to LVS's issuance of credit and unauthorized transfer of money.  Because Plaintiffs fail to allege false and misleading statements by omission, the Court thus finds that Plaintiffs fail to plausibly alleges that Defendants made false and misleading statements as to MBS's unauthorized transfers and credit issuance.  Plaintiffs' claims concerning the issuance of credit, Wang Xi's lawsuit, and the unauthorized transfer scheme are dismissed with leave to amend.

### b.  Statements Regarding LVS's Use of Junkets

Here, Defendants argue that Plaintiffs fail to allege particularized facts regarding the operation of illegal junkets at MBS. (MTD 21:16–23:18).  Defendants attack Plaintiffs' bases for the allegedly false statements, specifically Plaintiffs' reiteration of findings in three lawsuits and statements made by CW-1 and CW-2. (*See id.*).  Plaintiffs did not respond to this argument and thus have consented to granting that portion of the Motion. *See* D. Nev. Local Rule 7-2(d); *Gayle v. Bank of Am., N.A.*, No. 2:18-cv-913-APG-NJK, 2019 WL 1410889, at *2 (D. Nev. Mar. 27, 2019); (*see also* Reply to MTD 2:26).  As Plaintiffs have effectively conceded its Complaint does not and cannot adequately allege an independent claim based on LVS's use of junkets, the Court dismisses the claim with prejudice. *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006).

### c.  Statements Regarding LVS's Disclosure Procedures

Here, Defendants argue that Plaintiffs fail to allege that MBS's disclosures were false and misleading because Plaintiffs fail to allege any scheme of unauthorized transfer or use of illegal junkets. (MTD 23:18–24:22).  Plaintiffs did not respond to this argument and thus have consented to granting that portion of the Motion. *See* D. Nev. Local Rule 7-2(d); *Gayle v. Bank of Am., N.A.*, No. 2:18-cv-913-APG-NJK, 2019 WL 1410889, at *2 (D. Nev. Mar. 27, 2019);

1  (*see also* Reply to MTD 12:23–25).  Similar to Plaintiffs' allegation of illegal junkets, the Court
2  dismisses Plaintiffs' allegation concerning LVS's disclosure procedures with prejudice. *Walsh*,
3  471 F.3d at 1037.

### 2.      Scienter and Loss Causation

4  Because the Court holds that Plaintiffs have not adequately pled any actionable false or
5  misleading statement under Section 10(b) or Rule 10b-5, the Court has no occasion to address
6  Defendants' alternative grounds for dismissal based on alleged deficiencies in Plaintiffs'
7  pleadings as to scienter and loss causation.

### 3.      CLAIM 2 - SECTION 20(A) OF THE EXCHANGE ACT

9   To adequately state a claim under § 20(a) of the Exchange Act, a plaintiff must plead
10  facts that show (1) a primary violation of the federal securities laws and (2) that the defendant
11  was a control person. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir.
12  2009).  A control person is a person or entity that has actual power or influence over the
13  primary violator. *See id.*  "Section 20(a) claims may be dismissed summarily . . . if a plaintiff
14  fails to adequately plead a primary violation of [S]ection 10(b)." *Id.*

15  Because Plaintiffs have not stated a claim for a primary violation of the Exchange Act
16  by any control person, Plaintiffs' claims against Adelson, Dumon, and Goldstein under § 20(a)
17  are also incapable of surviving Defendants' Motions to Dismiss. (*See* Am. Compl. ¶¶ 32, 360).

### 4.      LEAVE TO AMEND

19  Rule 15(a)(2) of the Federal Rules of Civil Procedure permits courts to "freely give
20  leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Ninth Circuit "ha[s]
21  held that in dismissing for failure to state a claim under Rule 12(b)(6), 'a district court should
22  grant leave to amend even if no request to amend the pleading was made, unless it determines
23  that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*,

203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

The Court finds that Plaintiffs may be able to plead additional facts to support their first cause of action.  Accordingly, the Court will grant Plaintiffs leave to file an amended complaint.  The Court, however, cautions that an amended complaint must plead facts, with particularity, as to why statements were false or misleading at the time they were made.  Additionally, any allegations of scienter must be specific to a Defendant's state of mind at the time he or she made the statements.  Plaintiffs shall file their amended complaint within twenty-one (21) days of the date of this Order if they can allege sufficient facts that plausibly establish Plaintiffs' first and second causes of action.  Failure to file an amended complaint by this date shall result in the Court dismissing these claims with prejudice.

///

## V.  CONCLUSION

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, (ECF No. 52), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Unopposed Motion for Leave to File Excess Pages, (ECF No. 64), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Unopposed Motion for Leave to File Excess Pages, (ECF No. 67), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Supplemental Authority, (ECF No. 71), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs are **GRANTED** leave to amend consistent with the foregoing.  Plaintiffs shall have twenty-one (21) days from the date of this Order to file an amended complaint.  Failure to file an amended complaint by this date shall result in the Court dismissing Plaintiffs' claims with prejudice.

**DATED** this __27__ day of March, 2022.

_____
Gloria M. Navarro, District Judge
United States District Court