Patrick G. Byrne (Nevada Bar #7636)
Morgan Petrelli (Nevada Bar #13221)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Tel.  702.784.5200
Fax.  702.784.5252
Email:  pbyrne@swlaw.com
        mpetrelli@swlaw.com

Walter C. Carlson (*Pro Hac Vice*)
Lawrence P. Fogel (*Pro Hac Vice*)
Martha C. Clarke (*Pro Hac Vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Tel.  312.853.7000
Fax.  312.853.7036
Email:  wcarlson@sidley.com
        lawrence.fogel@sidley.com
        mclarke@sidley.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

THE DANIELS FAMILY 2001
REVOCABLE TRUST, Individually and
On Behalf of All Others Similarly Situated,

       Plaintiff,

    v.

LAS VEGAS SANDS CORP., DR. MIRIAM
ADELSON, in her capacity as Special
Administrator of the estate of SHELDON
G. ADELSON, PATRICK DUMONT, and
ROBERT G. GOLDSTEIN,

       Defendants.

Case No. 2:20-cv-01958-CDS-EJY

**DEFENDANTS' MOTION TO
DISMISS SECOND AMENDED
CLASS ACTION COMPLAINT**

**ORAL ARGUMENT REQUESTED**

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

**TABLE OF CONTENTS**

INTRODUCTION................................................................................................................1

BACKGROUND.................................................................................................................3

    A.    The Parties..............................................................................................3

    B.    Marina Bay Sands and its Long Record of Material Compliance With Singapore's Strict Regulatory Requirements. ....................................4

    C.    Extensions of Credit and Third-Party Transfers at MBS. ..................6

RELEVANT PROCEDURAL HISTORY ...........................................................................8

    A.    The Amended Complaint and Judge Navarro's Order......................8

    B.    The Second Amended Complaint. ......................................................9

        1.   Plaintiffs' Alleged "Premium Player" Scheme. .......................9

        2.   Statements Challenged in the Second Amended Complaint. ...................11

ARGUMENT .....................................................................................................................11

I.   Plaintiffs' Second Amended Complaint is Subject to the Strict Pleading Requirements of FRCP 9(b) and the PSLRA. ....................................11

II.  The Section 10(b) Claim Should be Dismissed Because Plaintiffs Fail to Allege That Defendants Made Any False or Misleading Statement...........................13

    A.    Plaintiffs Have Failed to Adequately Allege That the Company's Risk Factor Disclosure Was False and Misleading. ...............................14

        1.   Plaintiffs' Allegations Ignore the Language and Purpose of the Risk Factor Disclosure. ...........................15

        2.   Plaintiffs Make No Particularized Allegations to Support the "Premium Player" Scheme. ...........................16

        3.   The "Premium Player" Scheme as Alleged is Immaterial. ...................22

        4.   Item 105 of Regulation S-K Cannot Form the Basis of Plaintiffs' Claim. ...............24

    B.    Plaintiffs Have Failed to Adequately Allege That Any Accounts Receivable and Credit Risk Statements Were False and Misleading. ....................25

    C.    Plaintiffs Have Failed to Adequately Allege That the SOX Certification Statements Were False and Misleading. ....................26

    D.    Plaintiffs Have Failed to Adequately Allege That the Goldstein March 2016 Investor Conference Statements Were False and Misleading. ....................27

III. The Section 10(b) Claim Should Also be Dismissed Because Plaintiffs Do Not Plead a Strong Inference of Scienter...........................28

    A.    Plaintiffs' Allegations Do Not Raise a Strong Inference of Scienter............29

        1.   The Purported Accounts of Former MBS Employees Do Not Support a Strong Inference of Scienter.......................29

        2.   MBS's "Importance to LVS" Does Not Support a Strong Inference of Scienter...........................30

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

i

3.   Allegations Regarding Various Related and Unrelated Investigations Do Not Support a Strong Inference of Scienter. ....................................................................31

4.   Plaintiffs' Remaining Allegations Do Not Support a Strong Inference of Scienter. ........................................................................................................32

B.   Plaintiffs' Motive Allegations Do Not Support a Strong Inference of Scienter. .............34

C.   The Inferences Pointing Against Scienter Are Far More Compelling. ...........................35

D.   The Second Amended Complaint Does Not Plead Scienter as to the Company. ............35

IV.   The Section 10(b) Claim Should Also be Dismissed For Failure to Allege Loss Causation. ...................................................................................................................36

A.   "Corrective Disclosures" That Coincide with Stock Price Increases or Temporary Declines Do Not Plead Loss Causation. ........................................................................37

B.   Plaintiffs Have Not Pled Loss Causation With Respect to September 16, 2020. ............38

C.   Plaintiffs Fail to Allege That Any Movement in the Stock Price Was Proximately Caused by the Revelations Rather Than by Other Factors. ...............................................38

V.   The Section 20(a) Control Person Claim Should Be Dismissed. ..............................................40

CONCLUSION ...............................................................................................................................40

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfasigma USA, Inc. v. First Databank, Inc.*,
525 F. Supp. 3d 1088 (N.D. Cal. 2021) .......................................................................................16

*In re Allied Nev. Gold Corp.*,
2016 WL 4191017 (D. Nev. Aug. 8, 2016)..................................................................................20

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012)........................................................................................32

*In re Anchor Gaming Sec. Litig.*,
33 F. Supp. 2d 889 (D. Nev. 1999) ..............................................................................................23

*Askins v. U.S. Dep't of Homeland Security*,
899 F.3d 1035 (9th Cir. 2018)......................................................................................................16

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) .......................................................................................21

*Cai v. Switch, Inc.*,
2020 WL 3893246 (D. Nev. July 10, 2020)..................................................................................37

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013) .......................................................................................16

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
47 F. Supp. 3d 1205 (E.D. Wash. 2014) ......................................................................................26

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ...................19

*Cunha v. Hansen Nat. Corp.*,
2010 WL 11469534 (C.D. Cal. July 12, 2010) .............................................................................24

*Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
2022 WL 901737 (D. Nev. Mar. 28, 2022)...................................................................................22

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017) .................................................................................37

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ...............................................................................30

*Dreiling v. Am. Express Co.*,
458 F.3d 942 (9th Cir. 2006)..........................................................................................................4

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

*In re Duke Energy Corp. Sec. Litig.*,
　282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004) ..........................23

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005) ...................................................................................... 13, 36, 37, 39

*El Dabe v. Calavo Growers, Inc.*,
　719 F. App'x 607 (9th Cir. 2018)............................................................................................34

*Fadia v. FireEye, Inc.*,
　2016 WL 6679806 (N.D. Cal. Nov. 14, 2016)........................................................................33

*Ferris v. Wynn Resorts Ltd.*,
　462 F. Supp. 3d 1101 (D. Nev. 2020) ........................................................................................4

*In re Hansen Nat. Corp. Sec. Litig.*,
　527 F. Supp. 2d 1142 (C.D. Cal. 2007).............................................................................24, 32

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
　554 F. Supp. 2d 1083 (C.D. Cal. 2008)...................................................................................26

*Inchen Huang v. Higgins*,
　443 F. Supp. 3d 1031 (N.D. Cal. 2020) .............................................................................17, 36

*Kelly v. Elec. Arts, Inc.*,
　2015 WL 1967233 (N.D. Cal. Apr. 30, 2015) .........................................................................18

*Khoja v. Orexigen Therapeutics, Inc.*,
　899 F.3d 988 (9th Cir. 2018)...................................................................................................18

*In re LeapFrog Enters., Inc. Sec. Litig.*,
　527 F. Supp. 2d 1033 (N.D. Cal. 2007) ..................................................................................16

*Lechner v. Infusystem Holdings, Inc.*,
　2017 WL 11593803 (C.D. Cal. Dec. 15, 2017) ......................................................................34

*In re Lions Gate Ent. Corp. Sec. Litig.*,
　165 F. Supp. 3d 1 (S.D.N.Y. 2016)..........................................................................................25

*Lipton v. Pathogenesis Corp.*,
　284 F.3d 1027 (9th Cir. 2002)..................................................................................................34

*Lloyd v. CVB Fin. Corp.*,
　2012 WL 12883522 (C.D. Cal. Jan. 12, 2012)........................................................................38

*Lloyd v. CVB Fin. Corp.*,
　2013 WL 12120506 (C.D. Cal. May 9, 2013), *aff'd in part, rev'd in part on other
　grounds and remanded*, 811 F.3d 1200 (9th Cir. 2016)............................................................19

iv

*Lomingkit v. Apollo Educ. Grp. Inc.*,
2017 WL 633148 (D. Ariz. Feb. 16, 2017) ................................................................ 27

*Lomingkit v. Apollo Educ. Grp. Inc.*,
275 F. Supp. 3d 1139 (D. Ariz. 2017) ...................................................................... 16

*Loos v. Immersion Corp.*,
762 F. 3d 880 (9th Cir. 2014) ........................................................................... 36, 40

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .......................................................................................... 12, 23

*McCasland v. FormFactor Inc.*,
2008 WL 2951275 (N.D. Cal. July 25, 2008) ............................................................ 30

*McGovney v. Aerohive Networks, Inc.*,
367 F. Supp. 3d 1038 (N.D. Cal. 2019) .................................................................. 20

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................................................................... *passim*

*Miller v. PCM, Inc.*,
2018 WL 5099722 (C.D. Cal. Jan. 3, 2018) ............................................................. 22

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ................................................................................. 36

*Nardy v. Chipotle Mexican Grill, Inc.*,
2019 WL 3297467 (D. Colo. Mar. 29, 2019) ............................................................ 25

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ......................................................... 13, 29, 33, 40

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ....................................................................... *passim*

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ................................................................................. 12

*Pettit v. Fed. Nat. Mortg. Ass'n*,
2014 WL 584876 (D. Nev. Feb. 11, 2014), *aff'd* 678 F. App'x 468 (9th Cir.
2017) ................................................................................................................... 9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ................................................................. 21, 25, 27

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) ................................................................. 29, 31, 34

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

v

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017)....................................................................................12

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)......................................................................................34

*Sakkal v. Anaplan Inc.*,
557 F. Supp. 3d 988 (N.D. Cal. 2021) ........................................................................31

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
782 F. Supp. 2d 1059 (E.D. Cal. 2011) ......................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .........................................................................................3, 12, 13, 28

*Union Cent. Life Ins. v. Ally Fin., Inc.*,
2013 WL 2154381 (S.D.N.Y. Mar. 29, 2013) ...........................................................32

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................................27

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021)............................................................................*passim*

*Zamir v. Bridgepoint Educ., Inc.*,
2016 WL 3971400 (S.D. Cal. July 25, 2016)..............................................................35

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)...............................................................................*passim*

**Statutes and Rules**

15 U.S.C. § 78j(b) .........................................................................................................11

15 U.S.C. § 78u-4 *et seq.*..................................................................................viii, 12, 13

15 U.S.C. § 7241 ...........................................................................................................26

17 C.F.R. § 229.105 ......................................................................................................24

17 C.F.R. § 240.10b-5 ...................................................................................................11

Federal Rule of Civil Procedure 9(b) ....................................................................viii, 12

Federal Rule of Civil Procedure 12(b)(6) .........................................................................viii

Fed. R. Evid. 201(b)(1) ...................................................................................................4

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

**Other Authorities**

FAST Act Modernization and Simplification of Regul. S-K, 2019 WL 1437180
(12688-89) (Apr. 2, 2019) ........................................................................................................25

Modernization of Regul. S-K Items 101, 103, & 105, 2020 WL 5076727, S.E.C.
Release No. 10825 (Aug. 26, 2020) ...........................................................................................24

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

**MOTION TO DISMISS**

Defendants Las Vegas Sands Corp. ("LVS" or the "Company"), Dr. Miriam Adelson, in her capacity as Special Administrator of the estate of Sheldon G. Adelson, Patrick Dumont, and Robert G. Goldstein (the "Individual Defendants"), hereby move to dismiss, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ("PSLRA"), the Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") filed against them by Co-Lead Plaintiffs Carl S. Ciaccio and Donald M. DeSalvo ("Plaintiffs").

This motion is supported by the attached Memorandum of Points and Authorities and its supporting Exhibits, as well as the other papers and pleadings on file herein. Given the number of issues addressed and the application of the PSLRA, Defendants believe oral argument would be helpful and are prepared to provide it should this Court find it beneficial.

DATED: May 18, 2022

SNELL & WILMER, L.L.P.

/s/ *Patrick Byrne*

Patrick G. Byrne, Esq.
Morgan Petrelli, Esq.
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169

Walter C. Carlson (*Pro Hac Vice*)
Lawrence P. Fogel (*Pro Hac Vice*)
Martha C. Clarke (*Pro Hac Vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603

*Attorneys for Defendants*

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

**INTRODUCTION**

Securities fraud claims, like the one Plaintiffs seek to bring here, are subject to heightened pleading requirements that a plaintiff must meet to survive a motion to dismiss. These include Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), which was passed by Congress as a check against the extraordinary costs and burdens of unfounded securities fraud class actions. The PSLRA requires plaintiffs to plead the elements of their claim with particularity, and to plead particularized facts that support a strong inference that defendants acted with fraudulent intent.

This is Plaintiffs' second attempt to meet these heightened pleading requirements. Judge Navarro dismissed Plaintiffs' prior complaint in its entirety in her March 28, 2022 Order. ECF No. 74 (the "Order"). Plaintiffs' latest attempt fares no better, and instead repackages many of the same unsupported allegations. The Second Amended Complaint (the "SAC") should be dismissed in its entirety, this time with prejudice.

The crux of Plaintiffs' claim is its so-called "premium player" scheme, which Plaintiffs allege was carried out by a "handful" of employees at Las Vegas Sands' Singapore property, Marina Bay Sands ("MBS"). The SAC alleges that these employees transferred money from the casino accounts of wealthy patrons at MBS, without those patrons' consent, to the accounts of "subprime" patrons, mainly foreign patrons from China. Plaintiffs further allege that the employees made these "unauthorized transfers" for the purpose of qualifying these foreign subprime patrons as "premium players," so the patrons could receive credit from MBS to gamble at the casino.

Plaintiffs' purported scheme is completely baseless and illogical. Under Singapore law, MBS is permitted to extend credit to any patron who is qualified as a "premium player." But it is also permitted to extend credit to Chinese and other foreign patrons, *regardless of whether they are qualified as "premium players."* In other words, there was no need for MBS employees to engage in "unauthorized transfers" between patron accounts to generate more premium players among foreign patrons; MBS could simply and legally have extended credit to these same patrons directly. Further, the alleged scheme becomes entirely implausible when considered in light of Singapore's

1

strict regulations around gaming. Despite alleging thousands of third-party transfers, Plaintiffs do not allege a single instance of any regulator finding that any transfers were unauthorized.

In fact, in the over six years since the beginning of the putative Class Period,[1] Plaintiffs identify just one patron, Wang Xi, who claims funds were transferred without his authorization. But even this single patron's claim—which relates to conduct prior to the Class Period—was reviewed by the Singaporean regulatory authorities and found not to involve any regulatory breach by MBS. Moreover, Plaintiffs do not allege any rational motive for Defendants to permit this alleged scheme. As noted, MBS did not need to make fraudulent transfers to extend credit to foreign patrons. And engaging in such a reckless practice would make no economic sense regardless. Plaintiffs allege that there was a total of approximately $275 million in unauthorized transfers over the entire five year period from 2013-2017—an extremely tiny percentage of LVS's and MBS's total revenue over that period. It simply makes no sense that Defendants would engage in such a scheme and risk LVS's highly profitable license to operate MBS in Singapore.

When measured against the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, the SAC should be dismissed for three reasons.

*First*, Plaintiffs fail to plead that Defendants made any false and misleading statements. Plaintiffs challenge approximately 20 statements made by Defendants between 2016 and 2020 concerning the extension of credit and collectability of receivables at LVS properties and LVS's record of compliance. Plaintiffs' allegations, however, ignore the context and purpose of the statements, and attempt to twist them into meaning something altogether different. Moreover, each of Plaintiffs' allegations is premised on the "premium player" scheme, but Plaintiffs fail to plead any particularized facts (much less logical ones) demonstrating its existence. In addition, the scheme as alleged by Plaintiffs—which concerned an extremely tiny percentage of LVS's and MBS's total revenue—is immaterial as a matter of law and therefore cannot form the basis of an alleged misstatement.

*Second*, Plaintiffs fail to plead the statutorily required "strong inference" that any Defendant

---

[1] The putative class period runs from February 27, 2016 to September 15, 2020 ("Class Period").

2

acted with an intent to defraud, or *scienter*. The Supreme Court has held that this "strong inference" must include facts demonstrating a "cogent" and "compelling" inference of fraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). The SAC pleads no particularized facts indicating that any Defendant was aware of the alleged "premium player" scheme. Instead, Plaintiffs ask the Court to infer scienter based on a number of generic arguments which—when considered both individually and holistically—do not come close to meeting the PSLRA's strict pleading requirements.

*Third*, Plaintiffs do not plead loss causation. Loss causation requires Plaintiffs to plead with particularity a causal connection between their financial loss and the alleged fraud. On many of Plaintiffs' alleged corrective disclosures dates, LVS's stock price increased, which precludes an allegation of loss causation. The declines on other alleged corrective dates were minimal and rapidly recovered, *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021), or were in line with the price performance of LVS's peers. Moreover, Plaintiffs fail to allege that their loss was caused by the alleged fraud, and not unrelated factors, including the persistent impact of the COVID-19 pandemic on LVS and other gaming companies over the last nine months of the Class Period.

Accordingly, Plaintiffs have not satisfied their high pleading burden with respect to each of these elements, and the Second Amended Complaint should be dismissed.

### BACKGROUND

A.    The Parties.

LVS and its subsidiaries develop and operate resorts and gaming properties. SAC ¶ 1. During the putative Class Period, LVS operated in three geographic areas: the United States, Macao, and Singapore. *Id*. Sheldon G. Adelson was the founder, Chairman of the Board, and Chief Executive Officer of LVS, *id.* ¶ 20,[2] and Patrick Dumont was the Executive Vice President and Chief Financial Officer of LVS beginning on March 28, 2016, *id.* ¶ 21. Robert G. Goldstein was President and Chief Operating Officer during the Class Period. *Id.* ¶ 22. Following Mr. Adelson's death, Mr. Goldstein

---

[2] Mr. Adelson passed away after the filing of this action. Plaintiffs substituted Dr. Miriam Adelson, in her capacity as Special Administrator of Mr. Adelson's estate, for Mr. Adelson. ECF No. 40.

3

was named Chief Executive Officer and Mr. Dumont was named President and Chief Operating Officer. Plaintiffs Carl S. Ciaccio and Donald M. DeSalvo allegedly acquired Company securities during the Class Period. *Id.* ¶¶ 15-17.

**B.    Marina Bay Sands and its Long Record of Material Compliance With Singapore's Strict Regulatory Requirements.**

The allegations in the SAC relate exclusively to LVS's property in Singapore, Marina Bay Sands. Plaintiffs make *no* allegations of any false statements concerning LVS's numerous other properties in Macao or in the U.S.

MBS opened in 2010 pursuant to LVS's development agreement with the Singapore Tourism Board. *Id.* ¶¶ 45, 57. The agreement included a concession that permitted MBS to become one of only two companies in Singapore to own and operate a casino for an initial ten-year period (the "Exclusivity Period"). *Id*. ¶¶ 43, 45-46. In connection with its opening, MBS was issued a three-year casino license by Singapore's casino regulatory body, the Casino Regulatory Authority (the "CRA"). Ex. 1, 2015 10-K at 14.[3] Like LVS's properties in Las Vegas and Macao, MBS has been a success since it first opened, and accounted for approximately 25% of LVS's casino revenues and roughly one-third of its EBITDA during the Class Period. SAC ¶¶ 59, 61.

As Plaintiffs emphasize repeatedly in the SAC, the gaming industry in Singapore, including MBS, is subject to a "strict regulatory scheme" overseen by the CRA. *See id.* ¶¶ 48, 288. MBS must apply for a license every three years and meet the CRA's renewal requirements. The CRA considers, among other factors, whether MBS "has a consistent track record of compliance with legal and regulatory requirements applicable to it, whether in relation to casino gaming or otherwise and whether in Singapore or elsewhere." Ex. 8, Casino Control Regulations ("CCR") (Casino Licence

---

[3] Citations to "Ex." are to the exhibits to the Declaration of Patrick G. Byrne. When ruling on a motion to dismiss, courts may take into account matters of public record and any documents referred to in the complaint. *See Dreiling v. Am. Express Co*., 458 F.3d 942, 946 n.2 (9th Cir. 2006) (in evaluating a motion to dismiss, a court "may consider documents referred to in the complaint or any matter subject to judicial notice, such as SEC filings"); *Ferris v. Wynn Resorts Ltd*., 462 F. Supp. 3d 1101, 1117 (D. Nev. 2020) (considering documents incorporated by reference into the complaint and taking judicial notice of "SEC filings, matters of public record, and news articles"). Therefore, Defendants request that the Court take judicial notice of the exhibits filed herewith, which are either incorporated by reference into the SAC or are matters of public record "not subject to reasonable dispute." Fed. R. Evid. 201(b)(1).

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

and Fees) 2009 § 3(b) at 958; Ex. 7, Casino Control Act ("CCA") § 45(2)(i) at 924. Moreover, MBS is required to establish and implement a system of internal controls for its casino operations, which may be subject to review and approval by the CRA. SAC ¶¶ 50-51. This includes internal controls and policies relating to third-party transfers and extensions of credit to patrons, discussed below. In addition to Singapore regulations, as a wholly-owned subsidiary of LVS, MBS is required to comply with U.S. regulations, which similarly require MBS to, among other things, implement internal controls, file suspicious activity reports, prevent money laundering, and follow generally accepted accounting principles. *Id.* ¶ 56.

LVS repeatedly disclosed before and throughout the Class Period the substantial regulatory requirements to which MBS and its other properties are subject. *See, e.g.*, Ex. 5, 2019 10-K at 628 ("MBS also must comply with comprehensive internal control standards or regulations concerning . . . casino operations including casino-related financial transactions and patron disputes, issuance of credit and collection of debt . . .; compliance functions and the prevention of money laundering; periodic standard and other reports to the CRA . . . ."); Ex. 1, 2015 10-K at 24. Not only do these statements recognize the importance of casino regulations in Singapore, they do not claim or guarantee perfect compliance. *See, e.g.*, Ex. 1, 2015 10-K at 34; Ex. 5, 2019 10-K at 644 ("We *believe* our organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of Macao and Singapore.") (emphasis added). LVS also disclosed before and throughout the Class Period the risk posed to its "gaming operations" by acts of fraud, including by patrons acting "in collusion with [MBS] employees." *See, e.g.*, Ex. 1, 2015 10-K at 28; Ex. 5, 2019 10-K at 639-40. As LVS further disclosed, if MBS were to violate regulatory requirements, it could be subject to disciplinary action. *See, e.g.*, Ex. 5, 2019 10-K at 634, 642. This included the possible termination or non-renewal of its license to operate MBS, which would have a material adverse effect on its business. *Id.* LVS thus is highly incented for MBS to comply with all applicable laws and regulations to maintain its unique and successful business.

The SAC alleges no disciplinary action taken by the CRA against MBS at any point since MBS opened in 2010. To the contrary, the CRA has renewed MBS's license every three years: first

in 2013, twice during the Class Period (April 2016 and April 2019), and most recently in April 2022. *See* Ex. 2, 2016 10-K at 180; Ex. 5, 2019 10-K at 698; Ex. 12, CRA April 2016 Press Release at 1007; Ex. 13, CRA April 2019 Press Release at 1009; Ex. 14, CRA April 2022 Press Release at 1011. Moreover, in April 2019, MBS and the Singapore Tourism Board entered into a second development agreement, permitting MBS to construct a second large-scale development adjacent to MBS and extending MBS's Exclusivity Period to 2030. Ex. 5, 2019 10-K at 628-29.

**C.    Extensions of Credit and Third-Party Transfers at MBS.**

The SAC's allegations focus on MBS's extension of credit to casino patrons and the use of third-party transfers between casino patrons. As discussed further below, and Plaintiffs do not dispute, both are common features of casino gaming and permitted by the CRA.

**Extensions of Credit.**  LVS repeatedly disclosed throughout the Class Period that it extends credit to "customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit." SAC ¶¶ 145, 167, 182, 197, 213. In Singapore, this includes extending credit to patrons who are "premium players"—*i.e.* a patron who has at least SGD$100,000 in an account with the casino. *Id.* ¶¶ 4, 53, 95. Significantly, MBS is also permitted to extend credit to any patron "who is neither a citizen of Singapore nor a permanent resident of Singapore," *regardless of whether the foreign player qualified as a premium player*. *Id.* ¶ 53; Ex. 7, CCA § 108(7)(a) at 942. MBS is thus permitted to extend credit to foreign patrons to cover the initial SGD$100,000 deposit required to qualify the patron as a premium player. Ex. 9, CCR (Credit) 2010 § 2A(1)(e) at 968. In other words, MBS could permissibly extend credit to any foreign patron, such as Chinese nationals, directly and without regard to whether they had SGD$100,000 in their account.

As LVS disclosed throughout the Class Period, credit was extended to patrons on an unsecured basis, and thus there was a possibility it may not be able to collect gaming receivables from its credit players. *See, e.g.*, SAC ¶ 145. Accordingly, as Plaintiffs acknowledge, LVS maintained, monitored, and regularly evaluated reserves for doubtful casino accounts for all its operating casino resorts, including MBS. *See id.* ¶¶ 274-75. These reserves represented LVS's best estimate of the amount of probable credit losses in its existing accounts receivable. *See, e.g.*, Ex. 5,

6

2019 10-K at 690. LVS charged off account balances against its reserves "when the Company believes it is probable the receivable will not be recovered." *Id*. LVS further repeatedly disclosed to investors that the "large receivables" associated with extension of credit "could have a significant impact on our results of operations if deemed uncollectible." SAC ¶ 145. Significantly, Plaintiffs make no challenge to the adequacy of LVS's reserves, the timeliness of charge-offs, or the accuracy of LVS's financial statements at any point during the Class Period.

**Third-Party Transfers Between Patrons.**  Authorized third-party transfers are another common and legal feature of gaming in Asia and are used to transfer funds between the accounts of casino patrons. To effectuate a third-party transfer at MBS, patrons completed letters of authorization that allowed MBS to transfer money from their accounts to those of other patrons. *Id.* ¶ 100. Such transfers are subject to regulatory requirements regarding internal controls, patron accounts, and the monitoring and reporting of transactions. Ex. 11, CCR (Prevention of Money Laundering and Terrorism Financing) 2009, §§ 2-3, 8-9, 13 at 991-99; Ex. 10, CCR (Internal Controls) 2013 §§ 7-8 at 982-83. Any "unusual or suspicious" fund transfers between patrons must be reported on a "Suspicious Transaction Report" ("STR") and filed with the CRA and the Suspicious Transaction Reporting Office ("STRO") of the Singapore Police Force. Ex. 11, CCR (Prevention of Money Laundering and Terrorism Financing) 2009 § 19 at 1004-05. As the SAC itself pleads, MBS complied with these requirements, submitting "thousands" of STRs every year. SAC ¶ 108. The SAC makes no allegations that the CRA or the STRO determined that any of these transfers were unauthorized.

In the over six years since the start of the Class Period, *only one* MBS patron has alleged that MBS transferred money from his patron account without authorization. On September 26, 2019, Wang Xi filed a lawsuit claiming that he had discovered several allegedly unauthorized withdrawals from his account between October and December of 2015 (*i.e.*, prior to the start of the Class Period). *Id.* ¶¶ 133-34. The CRA investigated the claims, and concluded that MBS "did not breach [regulatory] requirements related to Wang [Xi's] claims." *Id.* ¶ 260; *see also* Ex. 22, Sept. 16, 2020 Article at 1048. The CRA further stated that it "has completed its investigations, and there are no

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

7

ongoing reviews." Ex. 23, Dec. 21, 2020 Article at 1053.

In the nearly three years since Wang Xi filed his claim, no other patron has come forward with allegations of unauthorized transfers and no regulatory body has taken any action against MBS.

## RELEVANT PROCEDURAL HISTORY

### A.    The Amended Complaint and Judge Navarro's Order.

Plaintiffs' Amended Complaint purported to plead claims under Section 10(b) and Section 20(a) of the Securities Exchange Act based on approximately 70 allegedly false or misleading statements made by Defendants during the Class Period. Plaintiffs premised their allegations on two alleged "schemes" at MBS: (1) the "premium player" scheme, and (2) a second scheme involving the alleged use of unlicensed junkets to attract more VIP players. Defendants moved to dismiss for failure to adequately plead three elements: (1) that Defendants made any false and misleading statements, (2) that Defendants acted with intent to defraud, *i.e.*, scienter, and (3) that Plaintiffs' alleged loss was caused by the alleged false statements. ECF No. 52.

On March 28, 2022, Judge Navarro granted Defendants' Motion to Dismiss in its entirety. Although the Court found that Plaintiffs had plausibly alleged the existence of a scheme involving unauthorized transfers of SGD$365 million (approximately US$275 million), the Court determined that Plaintiffs had not plausibly alleged any false and misleading statements because Plaintiffs failed to allege Defendants had a duty to disclose the alleged unauthorized transfers. Order at 20-21. The Court dismissed with prejudice Plaintiffs' alleged "junket" scheme. *Id.* at 21. Because Judge Navarro found that Plaintiffs failed to allege a duty to disclose, the Court did not reach Defendants' additional arguments regarding Plaintiffs' failure to adequately plead falsity. Nor did the Court reach Defendants' additional independent grounds for dismissal based on Plaintiffs' failure to adequately plead scienter and loss causation. The Court granted Plaintiffs 21 days to file an amended complaint for those allegations it did not dismiss with prejudice.[4]

---

[4] Plaintiffs moved for reconsideration of certain parts of the Order. ECF No. 75. In their briefing, Plaintiffs argued that they should be granted leave to amend *a second time* following the Court's ruling on the motion for reconsideration, so they have "the benefit of the Court's full analysis of its claims to properly understand the deficiencies the Court perceives in the pleading." ECF No. 80 at

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

8

### B.    The Second Amended Complaint.

#### 1.    Plaintiffs' Alleged "Premium Player" Scheme.

On April 18, 2022, Plaintiffs filed their Second Amended Complaint. ECF No. 77. The SAC is premised solely on the alleged "premium player" scheme. Plaintiffs premise this scheme on the Chinese government's implementation of certain anticorruption policies in 2012 that, Plaintiffs allege, limited the ability of Chinese VIP patrons and thus "premium players" to gamble at MBS. SAC ¶¶ 3-5, 82-87. Faced with this decrease in premium players, MBS employees allegedly orchestrated unauthorized transfers between patron accounts to generate additional premium players mainly among Chinese patrons. *Id*. ¶¶ 5, 93. According to Plaintiffs, MBS employees allegedly transferred funds from the accounts of "unsuspecting whales" to the accounts of "subprime" borrowers—*i.e.*, patrons who did not have the requisite SGD$100,000 in their patron accounts—in order to qualify the "subprime" patrons as "premium players." *Id.* ¶¶ 4-5, 102. Once these "subprime" patrons were so qualified, Plaintiffs theorize, MBS could then extend credit to them which they would then gamble at MBS. *Id.* ¶ 102.

Plaintiffs premise their entire case on this theory, notwithstanding the fact that MBS had no need to engage in "unauthorized transfers" to extend credit to Chinese patrons. As set forth above, Singapore regulations permitted MBS to extend credit to Chinese and other foreign patrons directly and without regard to whether there already were funds in their patron account. This included the extension of credit to foreign patrons to provide them with the initial SGD$100,000 deposit required to qualify them as a "premium player."

As Plaintiffs acknowledge, MBS conducted an internal review of third-party transfers and subsequently hired an outside law firm, Hogan Lovells, to examine third-party transfers made by MBS patrons from 2013 to 2017 (a period that begins three years prior to the Class Period). *Id*

---

8. Plaintiffs are not entitled to an advisory opinion from the Court, and any request for additional time to file a second amended complaint was mooted when Plaintiffs filed their SAC. *See Pettit v. Fed. Nat. Mortg. Ass'n*, 2014 WL 584876, at *3 (D. Nev. Feb. 11, 2014), *aff'd Pettit v. Fed. Nat'l Mortg. Ass'n*, 678 F. App'x 468 (9th Cir. 2017) (declining to "advise [p]laintiff on [] legal questions" where plaintiff "is essentially seeking an advisory opinion").

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

SNELL & WILMER

L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

¶¶ 104, 139.[5] Hogan Lovells identified approximately 3,000 letters of authorization over these five years, totaling approximately SGD$1.4 billion. *Id.* ¶ 104. Plaintiffs do not allege that the vast majority of these transfers were unauthorized or even that Hogan Lovells found that *any* of these transfers were unauthorized.

Rather, Plaintiffs allege that with regard to 26% of these transfers—totaling approximately SGD$365 million—"a handful of staff" took a "low-tech approach," "by filling in payment details on pre-signed or photocopied authorization forms." *Id.* ¶¶ 31, 101, 104, 264. In other words, a small number of employees took a shortcut to effectuate transfers by using photocopied letters rather than securing a fresh signature for every new transfer. But this does not equate to failing to obtain patron consent for the transfer. As reported by articles incorporated into the SAC, the MBS investigation concluded that, while there may have been deficiencies in MBS's processes, "no patron funds were transferred in a manner that was contrary to a patron's intent." *See* Ex. 18, June 4, 2020 Article at 1036; Ex. 22, Sept. 16, 2020 Article at 1048 (similar).

Without any factual support, Plaintiffs conclusorily allege that the "premium player" scheme "continued" into 2019 and 2020. SAC ¶¶ 132, 205, 223, 230, 239. These allegations are squarely contradicted by other allegations in the SAC and the news reports Plaintiffs have incorporated into the SAC by reference. As reported by *Bloomberg*, the majority of third-party transfers occurred prior to the Class Period, peaking in 2014 at 1,011 transfers, with only six transfers in all of 2018. Ex. 23, Dec. 21, 2020 Article at 1052. In addition, "Marina Bay management was largely unaware" of this practice until 2018. *Id.* At that time, MBS took steps "to increase scrutiny over all transfers, including the new requirement that all transfer letters had fresh 'wet ink' signatures (as opposed to photocopies) and that staff received a verbal confirmation from the patron before moving any funds out of their account." SAC ¶ 114; *id.* ¶ 113 (alleging the practice was "curb[ed]" in early 2018).

Finally, Plaintiffs conclusorily allege that the "premium player" scheme contributed to

---

[5] Plaintiffs allege "[u]pon information and belief" that the Hogan Lovells investigation occurred "in late-2017 or early-2018." SAC ¶ 31. To the contrary, the September 16, 2020 *Bloomberg* Article relied upon in the SAC expressly states that Hogan Lovells "started its probe following the 2019 lawsuit from patron Wang Xi"—*i.e.*, in late 2019. Ex. 22, Sept. 16, 2020 Article at 1049.

10

LVS's bad debt write-offs. *Id.* ¶¶ 8, 124-32. But Plaintiffs make no allegations that LVS's reserves for doubtful casino accounts were inadequate or that any of its financial statements were inaccurate. Nor do Plaintiffs make any allegations connecting the alleged unauthorized fund transfers to bad debt. Indeed, Plaintiffs affirmatively plead that MBS was highly profitable and consistently had strong EBITDA margins throughout the Class Period. *Id.* ¶¶ 60-62, 272.

### 2.        Statements Challenged in the Second Amended Complaint.

The SAC alleges that the "premium player" scheme rendered approximately 20 Class Period statements false and misleading. These statements fall into the following four categories:

- A Risk Factor disclosure repeated in each of the Form 10-Ks issued during the Class Period about extensions of credit and collectability of receivables at LVS, *id.* ¶¶ 145, 167, 182, 197, 213.

- An "Accounts Receivable and Credit Risk" statement about LVS repeated in each of the Form 10-Ks and two 10-Qs issued during the Class Period, *id.* ¶¶ 151, 173, 188, 204, 220, 229, 238.

- Statements included in statutorily required SOX certifications in the Form 10-Ks and 10-Qs, *id.* ¶¶ 155, 177, 192, 208, 224, 233, 242.

- Statements made by Mr. Goldstein at an investor conference in March 2016 regarding LVS's general record of compliance, *id.* ¶ 160.[6]

Plaintiffs allege that the falsity of these statements was revealed by eight corrective disclosures between September 2019 and September 2020. These alleged corrective disclosures are Wang Xi's September 2019 lawsuit, *id.* ¶ 338, and seven *Bloomberg* articles published between October 2019 and September 2020, *id.* ¶¶ 339-43. On a number of Plaintiffs' alleged corrective disclosure dates, LVS's stock price increased. On the dates where the stock did decline, the declines were small and either quickly recovered or tracked the performance of LVS's peers.

### ARGUMENT

### I.        PLAINTIFFS' SECOND AMENDED COMPLAINT IS SUBJECT TO THE STRICT PLEADING REQUIREMENTS OF FRCP 9(B) AND THE PSLRA.

Plaintiffs bring a claim under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. To allege a viable

---

[6] For the Court's reference, Defendants have included as exhibits all of the documents Plaintiffs contend contain false statements. *See* Exs. 1-5, 32-34.

claim under Section 10(b) and Rule 10b-5, Plaintiffs must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citation and quotation marks omitted).

Securities fraud complaints are subject to heightened pleading requirements. One source of these heightened standards is Federal Rule of Civil Procedure 9(b) which requires Plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiffs' claim is also subject to the "formidable" pleading standards of the PSLRA. *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). The PSLRA was enacted in 1995 to "curb perceived abuses of the § 10(b) private action—nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers." *Tellabs*, 551 U.S. at 320 (citation and quotation marks omitted). These heightened pleading requirements apply to "all elements" of Plaintiffs' claims, including falsity, scienter, and loss causation. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

**Falsity.** The PSLRA has "exacting requirements for pleading falsity." *Metzler*, 540 F.3d at 1070. "[T]he complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs must explain, with particularity, the factual basis for the assertion that a statement was misleading or untrue. *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017). Moreover, plaintiffs must show that the statement was "*misleading as to a material* fact." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (emphasis in original) (citation omitted). A fact is material if there is "a substantial likelihood" that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (citation omitted). The PSLRA thus "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are

12

deceitful." *Metzler*, 540 F.3d at 1061 (emphasis in original).

**Scienter.** A complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.,* scienter. 15 U.S.C. § 78u-4(b)(2)(A). This "strong inference" requirement is an "exacting pleading obligation" that "reflects Congress's attempt to halt early on securities litigation that lacks merit or is even abusive." *Nguyen v. Endologix, Inc*., 962 F.3d 405, 414 (9th Cir. 2020) (citation omitted). As the Supreme Court has explained, "[t]he 'strong inference' standard unequivocally raise[d] the bar for pleading scienter." *Tellabs*, 551 U.S. at 321 (citation omitted). A complaint can survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

**Loss Causation.** Plaintiffs also bear the burden of pleading loss causation with particularity. Loss causation is the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citation omitted). A complaint must plausibly allege that the "share price fell *significantly* after the truth became known." *Id.* at 347 (emphasis added). Loss causation "is simply a variant of proximate cause, and the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Wochos*, 985 F.3d at 1197 (citation omitted).

The SAC does not meet the strict pleading requirements for any of these elements, and it must therefore be dismissed.

## II.   THE SECTION 10(B) CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE THAT DEFENDANTS MADE ANY FALSE OR MISLEADING STATEMENT.

Plaintiffs have not pled any particularized facts to demonstrate that any of Defendants' statements were false or misleading. When reviewed in their proper context, and stripped of Plaintiffs' baseless and conclusory assertions regarding unauthorized transfers, the statements are unquestionably true. At most, Plaintiffs have pled immaterial weaknesses in MBS internal controls that were brought to MBS management's attention in 2018 and addressed. Such immaterial weaknesses are insufficient to serve as a basis for Plaintiffs' claim.

13

**A.    Plaintiffs Have Failed to Adequately Allege That the Company's Risk Factor Disclosure Was False and Misleading.**

Plaintiffs first challenge the Company's Risk Factor disclosure relating to extension of credit and collectability of receivables, repeated in every Form 10-K issued during the Class Period. Plaintiffs excerpt the Risk Factor in their SAC. However, the Risk Factor in the 2015 Form 10-K, for example, stated in full:

> **We extend credit to a large portion of our customers and we may not be able to collect gaming receivables from our credit players.**
>
> We conduct our gaming activities on a credit and cash basis. Any such credit we extend is unsecured. Table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than players who tend to wager lower amounts. High-end gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a significant positive or negative impact on cash flow and earnings in a particular quarter.
>
> During the year ended December 31, 2015, approximately 23.1%, 33.1%, and 67.4% of our table games drop at our Macao properties, Marina Bays Sands and our Las Vegas properties, respectively, was from credit-based wagering, while table games play at our Pennsylvania property was primarily conducted on a cash basis. *We extend credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit.* These large receivables could have a significant impact on our results of operations if deemed uncollectible.
>
> While gaming debts evidenced by a credit instrument, including what is commonly referred to as a "marker," and judgments on gaming debts are enforceable under the current laws of Nevada, and Nevada judgments on gaming debts are enforceable in all states under the Full Faith and Credit Clause of the U.S. Constitution, other jurisdictions around the world, including jurisdictions our gaming customers may come from, may determine that enforcement of gaming debts is against public policy. Although courts of some foreign nations will enforce gaming debts directly and the assets in the U.S. of foreign debtors may be reached to satisfy a judgment, judgments on gaming debts from courts in the U.S. and elsewhere are not binding on the courts of many foreign nations.
>
> In particular, we expect that our Macao operations will be able to enforce gaming debts only in a limited number of jurisdictions, including Macao. To the extent our Macao gaming customers and junket operators are from other jurisdictions, our Macao operations may not have access to a forum in which it will be possible to collect all gaming receivables because, among other reasons, courts of many jurisdictions do not enforce gaming debts and our Macao operations may encounter forums that will refuse to enforce such debts. Moreover, under applicable law, our Macao operations remains obligated to pay taxes on uncollectible winnings from

14

customers.

It is also possible that our Singapore operations may not be able to collect gaming debts in certain jurisdictions. To the extent our Singapore gaming customers' assets are situated in such jurisdictions, our Singapore operations may not be able [to] collect all gaming receivables because, among other reasons, courts of certain jurisdictions do not enforce gaming debts.

Even where gaming debts are enforceable, they may not be collectible. Our inability to collect gaming debts could have a significant adverse effect on our operating results.

Ex. 1, 2015 10-K at 27-28. *See also* SAC ¶¶ 145, 167, 182, 197, 213.

Plaintiffs allege that the italicized language as it appeared in a single sentence in the second paragraph in each Form 10-K was false and misleading because, as a result of the alleged "premium player" scheme at MBS, LVS "extended credit to customers whose level of play and financial resources did *not* warrant an extension of credit." *Id.* ¶¶ 146, 168, 183, 198, 214. This argument fails for multiple reasons.

### 1.    Plaintiffs' Allegations Ignore the Language and Purpose of the Risk Factor Disclosure.

To begin, Plaintiffs' argument ignores the actual language of the Risk Factor. This Risk Factor concerns LVS's properties worldwide, not just Singapore. In fact, the sentence immediately preceding the challenged statement mentions *all* LVS properties. *See, e.g.*, *id.* ¶ 145. Plaintiffs make no challenge to any practices that occurred in Macao, Las Vegas, or Pennsylvania. Rather, Plaintiffs' allegations are limited to only one of these properties—Singapore—and even then relate to only a small number of third-party transfers made between 2013 and 2017. In addition, Plaintiffs ignore that the Risk Factor primarily concerns the collectability of receivables at these properties. The SAC makes no challenges to the amount of LVS's receivables, the adequacy of its reserve for bad debts, or the timing of write-offs.

Moreover, Plaintiffs' argument distorts the intended purpose of the Risk Factor. Risk Factor disclosures like the one alleged here are forward-looking statements previewing potential risks; not guarantees of the *absence* of risk. Indeed, the title of this Risk Factor expressly warns investors of the risks associated with extension of credit and collectability of receivables: "We extend credit to

15

a large portion of our customers and we may not be able to collect gaming receivables from our credit players." *See, e.g.*, Ex. 1, 2015 10-K at 27. No reasonable investor would read this Risk Factor disclosure as ensuring the absence of any issues at MBS, particularly the absence of the immaterial issues in the transfer process that were addressed in 2018. "To require Defendants to disclose" these immaterial issues "is no different than an all-encompassing duty to complete," which is not what the law requires. *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1162 (D. Ariz. 2017) (rejecting allegation that defendant's risk factors were false and misleading where there was no duty to disclose). *See also Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1141 (N.D. Cal. 2013) (dismissing risk factor allegations where "risk factor statements were not false, nor did they create a duty to disclose [] alleged violations of the code of ethics"); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (holding that Risk Factor disclosures in defendant's annual filings were "cautionary statements and are not actionable").

      **2.**      **Plaintiffs Make No Particularized Allegations to Support the "Premium Player" Scheme.**

Plaintiffs' allegations regarding the Risk Factor disclosure also fail because Plaintiffs have not adequately alleged the existence of a "premium player" scheme.

As an initial matter, Judge Navarro's prior determination that the FAC plausibly alleged a scheme involving approximately $275 million in unauthorized transfers at MBS over the five year period from 2013-2017 does not bind this Court in considering this motion to dismiss the new SAC. As the Ninth Circuit has explained, a district court is not "precluded" by the law of the case doctrine from revisiting a finding in its prior order; "[t]he district court may decide the second motion to dismiss in the same way it decided the first, but permitting the filing of an amended complaint requires a new determination." *Askins v. U.S. Dep't of Homeland Security*, 899 F.3d 1035, 1043 (9th Cir. 2018). *See also Alfasigma USA, Inc. v. First Databank, Inc.*, 525 F. Supp. 3d 1088, 1095 (N.D. Cal. 2021) (court revisiting prior order denying defendant's motion to strike following amended complaint and granting motion).

The plausibility of Plaintiffs' alleged scheme should be revisited in light of the specific

16

allegations of the SAC. As discussed below, the SAC includes several allegations—which Judge Navarro's Order did not address—that Defendants respectfully submit preclude finding the alleged scheme to have plausibly been pleaded. Indeed, the SAC was filed more than a year after the FAC. During this period, *no* other patron has come forward alleging unauthorized transfers, and *no* regulator has commenced any proceeding, much less found any transfer to have been unauthorized. The SAC is demonstrably founded on unsupported inferences, which have become even more incredulous with the substantial passage of time. "[T]he court…is not required to indulge unwarranted inferences in order to save a complaint from dismissal." *Metzler*, 540 F.3d at 1064-65.

*First*, there is no logical basis for Plaintiffs' alleged scheme. Plaintiffs theorize that MBS employees engaged in fraudulent transfers from unsuspecting wealthy patrons to skirt regulations and extend credit to Chinese nationals in order to qualify them as "premium players." SAC ¶¶ 3-5. But as explained above and as Plaintiffs themselves acknowledge, *id.* ¶ 53, MBS is permitted to extend credit to foreign patrons, including Chinese nationals, without regard to whether the patron was a premium player. *Supra* at 6. There was therefore no reason for MBS to engage in alleged "illegal" transfers to Chinese nationals when it could clearly extend credit to them directly under Singapore law. Judge Navarro's Order finding that Plaintiffs had adequately alleged the existence of the scheme did not address this point.

*Second*, the Wang Xi lawsuit provides no support to Plaintiffs' allegations. Among the third-party transfers Plaintiffs allege occurred between 2013 and 2017, Wang Xi is the *only patron* alleged by Plaintiffs to have claimed that money was transferred from his account without authorization. SAC ¶ 29. Indeed, it has been over six years since the start of the Class Period and nearly three years since Wang Xi filed suit—a suit that was reported in *Bloomberg* on multiple occasions beginning in October 2019. Yet Plaintiffs put forth not one single other claim of an unauthorized transfer. If the alleged scheme was "pervasive and unchecked," as Plaintiffs conclusorily allege, *id.* ¶ 106, one would expect numerous lawsuits or claims of unauthorized transfers, not just one. *See Inchen Huang v. Higgins*, 443 F. Supp. 3d 1031, 1053 (N.D. Cal. 2020) ("one-off allegations" of off-label marketing do not support the inference that this practice was "widespread"). Further, as Plaintiffs

concede, the CRA specifically investigated Wang Xi's allegations of unauthorized transfers and concluded that MBS did not breach any regulatory requirements. SAC ¶¶ 260, 286. Judge Navarro's Order did not address the CRA's finding with respect to Wang Xi.

*Third*, Plaintiffs allege that 26% of the transfers between 2013 and 2017 examined by Hogan Lovells bore "signatures that appeared similar and were likely photocopied," which "support[s] the inference that" those transfers were unauthorized. *Id.* ¶¶ 104, 139. But once again, there is no basis to indulge this "unwarranted inference." The SAC nowhere alleges that Hogan Lovells found any of the transfers to be unauthorized. To the contrary, the SAC merely alleges that a small number of employees took a "low-tech" approach of filling in payment details as a shortcut to effectuate transfers between patrons. *Supra* at 10. Moreover, the very *Bloomberg* articles upon which Plaintiffs rely expressly contradict Plaintiffs' assertion. Two articles reported that MBS concluded after its review of third-party transfers that "no patron funds were transferred in a manner that was contrary to a patron's intent." *See* Ex. 18, June 4, 2020 Article at 1036; Ex. 22, Sept. 16, 2020 Article at 1048. This finding was similarly not addressed by Judge Navarro in her Order. Moreover, another *Bloomberg* article reported that the majority of third-party transfers occurred prior to the start of the Class Period, dropping to only six transfers in all of 2018. Ex. 23, Dec. 21, 2020 Article at 1052. This directly contradicts Plaintiffs' baseless allegations that the alleged scheme "continued" into 2019 and 2020. SAC ¶¶ 132, 205, 223, 230, 239. *See also Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *8 (N.D. Cal. Apr. 30, 2015) (dismissing complaint where, *inter alia*, articles cited by plaintiffs contradicted plaintiffs' assertions).

Notably, Plaintiffs now omit each of these *Bloomberg* excerpts from their SAC—even though they were affirmatively alleged by Plaintiffs in their prior complaint. Plaintiffs cannot cherry-pick information when it suits them and ignore it elsewhere. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("[Incorporation by reference] prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."). Moreover, even where plaintiffs alter allegations in an amended complaint, "the court may properly consider the

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

plausibility of the [operative complaint] in light of the prior allegations." *Lloyd v. CVB Fin. Corp.*, 2013 WL 12120506, at \*22 (C.D. Cal. May 9, 2013), *aff'd in part, rev'd in part on other grounds and remanded*, 811 F.3d 1200 (9th Cir. 2016) (citation omitted); *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) ("The Court does not ignore the prior allegations in determining the plausibility of the current pleadings").

*Fourth*, Plaintiffs' allegations based on purported statements from three former employees do not support the existence of the "premium player" scheme. Plaintiffs primarily rely on two low-level Confidential Witnesses, "CW-1" and "CW-2." A complaint relying on statements from confidential witnesses must describe the witnesses with "sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Plaintiffs have not and cannot do so. CW-1 was employed in MBS's compliance department from January 2014 to March 2015, leaving MBS nearly a year before the beginning of the Class Period. SAC ¶ 106. CW-2 worked in MBS's finance department for at most a small fraction of the Class Period, leaving at some point in 2016. *Id.* ¶ 117.[7] As courts have held, when a CW leaves prior to the relevant time period, they necessarily lack personal knowledge about practices during that period, thus undercutting their reliability. *See, e.g.*, *Zucco*, 552 F.3d at 996 (disregarding statements by CWs who "were not employed by Digimarc during the time period in question and have only secondhand information about accounting practices at the corporation during that year."); *City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127-28, 1135 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (CWs who left prior to the class period lacked personal knowledge about practices during the class period and "[a]ny inference that pre-Class Period practices continued during the Class Period amounts to unsubstantiated speculation").

The CWs lack of temporal overlap with the Class Period is reason alone to significantly discount these allegations. To the extent the observations of the CWs can be credited at all, the SAC

---

[7] Although Plaintiffs fail to provide the date CW-2 left MBS, even assuming he was employed at MBS for all of 2016, he was employed for at most ten months or roughly 15% of the Class Period.

19

fails to allege any specific facts attributed to them to support Plaintiffs' conclusory allegations regarding purported unauthorized transfers.

**CW-1.** Plaintiffs allege CW-1's conclusory "belie[f]" that certain transfers were not authorized. SAC ¶ 110. But CW-1 admits that she had no direct contact with any patrons whatsoever, let alone any contact with patrons who communicated to her that they had not consented to a fund transfer. *Id*. The only individuals CW-1 is alleged to have interacted with were the MBS Relationship Managers, who she acknowledges "always" provided her with details and paperwork supporting patron consent for the transfers. *Id*. CW-1's speculation that the paperwork "*could* have been forged," *id.* (emphasis added), and "second-guessing of management decisions . . . does not provide a basis for securities fraud." *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1054 (N.D. Cal. 2019) (dismissing complaint where CW allegations deemed insufficient to support § 10(b) claim); *In re Allied Nev. Gold Corp.*, 2016 WL 4191017, at *11 (D. Nev. Aug. 8, 2016) (CW statements are "disregarded if lacking in specificity or based on hearsay, rumor, or speculation").

CW-1's assertions that "thousands" of STRs were submitted by MBS, and that suspicious transfers were discussed during several "high-level" meetings with senior compliance personnel, similarly provide no support for the alleged scheme. SAC ¶¶ 108, 115, 147. She provides no details on what was said about the transfers and admits the main issue raised was that "so many reports were required." *Id.* ¶ 115.[8] This undercuts any suggestion that MBS concealed reports in order to continue a scheme of unauthorized transfers. Further, despite the fact that "thousands" of STRs were submitted to the CRA and STRO, Plaintiffs do not allege that the CRA or STRO have ever determined that any transfers were unauthorized or taken any action against MBS.[9]

---

[8] Plaintiffs suggest that CW-2 also attended "high-level meetings" where third party transfers were discussed. SAC ¶¶ 147, 169, 184, 199, 215. But nowhere does CW-2 state that he attended any such meetings, let alone that unauthorized transfers were ever discussed.

[9] CW-1's assertion that not every patron "would receive the full line of credit they originally sought" similarly undermines Plaintiffs' allegations. SAC ¶ 122. It does not follow that MBS would allegedly violate its own credit policy by deciding to extend credit to unqualified patrons, but then not actually provide the requested credit to the patron.

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

The remaining statements attributed to CW-1 boil down to her personal view that MBS's compliance department was "barely functional" and was "not taken seriously." *Id.* ¶¶ 107, 113. But her personal opinions say nothing about MBS's alleged practices relating to extensions of credit or unauthorized transfers. Similarly, her statements about the departure of a Chief Compliance Officer and "three to four" other individuals well before the Class Period are irrelevant, particularly where she had no personal knowledge of the circumstances of the departures beyond hearing rumors. *Id.* ¶ 116. *See Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1202 (N.D. Cal. 2008) (CW statements based on "gossip and innuendo" should be rejected) (citation omitted).

**CW-2.**   Plaintiffs' allegations based on statements from CW-2 are equally lacking in substance. Plaintiffs first distort CW-2's statements, alleging that CW-2 "observed [illegal] transfers routinely." SAC ¶¶ 147, 169, 184, 199, 215. But that is not what CW-2 actually is alleged to have witnessed. Rather, CW-2 simply allegedly stated that letters of authorization were signed "at the cage" and that he did not believe compliance was always informed about such transactions. *Id.* ¶ 121. Moreover, CW-2 lacks the personal knowledge to draw any conclusions about what compliance did or did not know: he did not work in compliance, and is not alleged to have spoken with anyone in compliance, much less about these transactions. CW-2's additional statement, "that the decision to extend or not extend credit to an individual came down from [his superiors]," *id.* ¶ 118, does not aid Plaintiffs. Most importantly, CW-2 never actually states that an applicant's financial condition was excluded from the decision-making process. CW-2's speculation or impressions of what may have happened do not suffice, as "[t]he impression of a low-level employee is just that—an unsubstantiated statement without substance or context." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).[10]

Finally, Plaintiffs also point to a statement in a *Bloomberg* article attributed to an unnamed MBS compliance executive, who was purportedly told to "back off" when in 2018 he raised "issues"

---

[10] CW-2 also claims that seven out of ten customers who applied for credit during his tenure were from mainland China. SAC ¶ 120. This adds nothing to Plaintiffs' claims. As explained above, MBS is entitled to extend credit to foreign patrons, so there was no need for MBS to engage in unauthorized transfers to these patrons. *Supra* at 6.

with respect to fund transfers. SAC ¶¶ 116, 293. Just as with the CWs, this does not aid Plaintiffs because Plaintiffs plead no allegations regarding what purported "issues" were raised, including whether they involved unauthorized transfers. *See Miller v. PCM, Inc.*, 2018 WL 5099722, at *9 n.6 (C.D. Cal. Jan. 3, 2018) (applying *Zucco* standard to anonymous sources). Moreover, while this unnamed individual was purportedly told to "back off," this is flatly contradicted by Plaintiffs' allegation that MBS addressed the "issues" in 2018 by instituting a "series of compliance measures." SAC ¶¶ 31, 113.

Not only do these allegations fail to plead the existence of a scheme, the SAC contains numerous allegations that undercut Plaintiffs' supposed scheme. Plaintiffs allege the following: (1) the CRA specifically looked into Wang Xi's allegations of unauthorized transfers and concluded that MBS did not breach any regulatory requirements; (2) MBS submitted "thousands" of STRs to the CRA and STRO, and Plaintiffs do not identify a single instance of either the CRA or the STRO identifying any unauthorized transfers or otherwise taking action against MBS for non-compliance; (3) MBS's exclusivity period was extended by the Singapore Tourism Board, following a review by the CRA; and (4) LVS retained an independent consultant in April 2016 pursuant to its settlement of an unrelated matter with the SEC, who was required to report to the SEC on LVS's compliance function. *Id.* ¶¶ 108, 260, 299-302, 322; Ex. 24, SEC Order at 1067. In each of these examples, Plaintiffs do not and cannot point to any instance of regulatory action—which fundamentally belies their conclusory allegation that MBS was engaged in a "pervasive and unchecked" scheme.

### 3. The "Premium Player" Scheme as Alleged is Immaterial.

Plaintiffs' allegations regarding the Risk Factor fail for an additional reason: the challenged statements could not be false or misleading because, even assuming it was plausibly alleged, the alleged "premium player" scheme was immaterial. To adequately plead a false or misleading statement, a plaintiff must plead "falsity with respect to a 'material fact.'" *Wochos*, 985 F.3d at 1188-89. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 2022 WL

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

901737, at *11 (D. Nev. Mar. 28, 2022) (citation omitted). The Supreme Court has been "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." *Matrixx*, 563 U.S. at 38 (citation omitted).

Here, Plaintiffs cannot show that the allegedly unauthorized transfers were material. Plaintiffs' alleged scheme involved letters authorizing transfers for SGD$365 million (or approximately US$275 million) that bore signatures that appeared similar. SAC ¶ 31. These letters were issued over a five year period from 2013 through 2017. *Id.* The amount allegedly improperly transferred is only 0.43% of LVS's total revenue of over $64 billion over the same period, or just 1.81% of MBS's total revenue of over $15 billion over the period.[11] Moreover, the foregoing percentages assume that the entire amount transferred was gambled by patrons and lost. An apples-to-apples comparison would compare the $275 million allegedly transferred (and presumably wagered) to the total volume of VIP wagering over the same five year period. When compared to the total amount that was actually wagered by VIPs, the $275 million represents only 0.037% of the total volume wagered by VIPs at all LVS properties in Asia over the period, and only 0.13% of the total volume wagered by VIPs at MBS over this same period.[12]

No reasonable investor would have viewed the omission of such immaterial amounts as "having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38. *See also In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d 889, 895 (D. Nev. 1999) (amount of vendor dispute, representing 2.5% of quarterly earnings per share, was immaterial); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160–61 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004) (alleged omission was immaterial as a matter of law because "[s]tripped of rhetorical

---

[11] *See* Ex. 1, 2015 10-K at 129 (LVS revenue of $13.8 billion in 2013, $14.6 billion in 2014, and $11.7 billion in 2015; MBS revenue of $2.97 billion in 2013, $3.2 billion in 2014, $2.95 billion in 2015); Ex. 3, 2017 10-K at 445 (LVS revenue of $11.4 billion in 2016, $12.9 billion in 2017; MBS revenue of $2.8 billion in 2016, $3.2 billion in 2017).

[12] *See* Ex. 1, 2015 10-K at 48, 55 (Macao operations rolling chip volume of $178.02 billion in 2013, $139.45 billion in 2014, and $73.71 billion in 2015; MBS rolling chip volume of $60.10 billion in 2013, $42.56 billion in 2014, and $41.15 billion in 2015); Ex. 3, 2017 10-K at 371-72 (Macao operations rolling chip volume of $61.26 billion in 2016, $69.48 billion in 2017; MBS rolling chip volume of $31.89 billion in 2016, $34.99 billion in 2017).

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

hyperbole, the Complaint alleges that Duke Energy undertook, at most, $217 million in round-trip trades over the course of two years" which "amounts to about 0.3% of Duke Energy's total revenues for that period—an immaterial percentage as a matter of law").

Moreover, Plaintiffs make no allegations that LVS's financial statements, the amount of its receivables, the adequacy of its reserve for bad debts, or the timing of write-offs were in any way improper or inaccurate. The absence of any such allegations further confirms that any alleged improper transfers were immaterial. *See Cunha v. Hansen Nat. Corp.*, 2010 WL 11469534, at *19 (C.D. Cal. July 12, 2010) ("[A]bsent some context for what (if any) effect such a 'withholding' had on [the company's] financials, it is impossible to say that such a maneuver would be sufficiently material . . . . If the 'withholding' had a negligible or no effect on the financials . . . a reasonable investor would have no reason to care whether a decision was intentionally made that had absolutely no effect."); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007) ("When the financial import of alleged misstatements is de minimis, those alleged misstatements are immaterial as a matter of law.").

### 4. Item 105 of Regulation S-K Cannot Form the Basis of Plaintiffs' Claim.

Finally, the SAC makes reference to Item 105 of Regulation S-K. SAC ¶¶ 150, 172, 187, 203, 219. During the Class Period, Item 105 required disclosure of "the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.[13] Plaintiffs' argument is of no help to their claims. First, their argument is premised on the existence of the alleged "premium player" scheme, and thus fails for the reasons discussed above. Moreover, and contrary to Plaintiffs' allegations, LVS *did* disclose "the most significant factors" that made investing in LVS "risky." The Company's 10-Ks contain approximately 17 single-spaced pages of Risk Factors, *see, e.g.*, Ex. 1, 2015 10-K at 23-39, including specific warnings about regulatory compliance, extension of credit, collectability of receivables, and LVS's operations in Singapore, *id.* at 24, 27-28. An alleged failure to disclose the allegedly unauthorized transfers, which were

---

[13] After the end of the Class Period, the language of Item 105 was amended to replace "the most significant factors" with "the material factors." *See* Modernization of Regul. S-K Items 101, 103, & 105, 2020 WL 5076727, at *30-31, S.E.C. Release No. 10825 (Aug. 26, 2020).

immaterial for the reasons explained above, *see supra* § II.A.3, cannot form the basis of a violation of Item 105. *See, e.g.*, *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (finding no violation of Item 503, the predecessor to Item 105,[14] because the allegedly omitted information was immaterial).[15]

**B.      Plaintiffs Have Failed to Adequately Allege That Any Accounts Receivable and Credit Risk Statements Were False and Misleading.**

In addition to challenging the Company's Risk Factor regarding extension of credit and collectability of receivables, Plaintiffs challenge a substantially similar statement in the Company's Accounts Receivable and Credit Risk disclosure repeated in every Form 10-K issued during the Class Period and in two 2020 10-Qs. SAC ¶¶ 151, 173, 188, 204, 220, 229, 238. Plaintiffs allege that this statement was false and misleading for the same reason as the Risk Factor disclosure: "because LVS in fact extended credit to customers whose backgrounds and creditworthiness did *not* warrant an extension of credit through the illicit, unauthorized transfer scheme alleged herein." *See, e.g.*, *id.* ¶ 152. Like the Risk Factor disclosure, Plaintiffs' allegation ignores the actual language and context of this statement. The Accounts Receivable and Credit Risk disclosure appears in a section of the Form 10-K that sets forth the Company's Significant Accounting Policies, and broadly discusses the collectability of receivables at LVS as a whole. The challenged statement does not even mention MBS. Moreover, Plaintiffs' allegations are similarly premised on the alleged "premium player" scheme, and thus fail for the reasons discussed above, including because Plaintiffs have not adequately alleged the existence of the scheme or that the scheme was material.

Plaintiffs also cannot state a claim based on an alleged violation of U.S. GAAP. *Id.* ¶¶ 153,

---

[14] In 2019, the SEC adopted amendments to certain disclosure requirements in Regulation S-K, moving what was previously Item 503 to Item 105. FAST Act Modernization and Simplification of Regul. S-K, 2019 WL 1437180, at *1 (12688-89) (Apr. 2, 2019).

[15] Further, as the Ninth Circuit has held, an alleged failure to comply with other items of Regulation S-K does not independently constitute a Section 10(b) claim. *See NVIDIA*, 768 F.3d at 1056 (holding that "Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5. Such a duty to disclose must be separately shown according to the principles set forth by the Supreme Court in *Basic* and *Matrixx Initiatives*."); *Intuitive Surgical, Inc.*, 759 F.3d at 1061 n.4 (similar). Other courts have specifically held that Item 105 of Regulation S-K does "not create an independent duty to disclose that may give rise to liability under Rule 10b-5." *See Nardy v. Chipotle Mexican Grill, Inc.*, 2019 WL 3297467, at *9 (D. Colo. Mar. 29, 2019) (so holding with respect to Item 503, the predecessor to Item 105).

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

175, 190, 206, 222, 231, 240. In assessing the magnitude of an alleged GAAP violation, "the Court must discern whether the alleged violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue. The plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 47 F. Supp. 3d 1205, 1221 (E.D. Wash. 2014) (citation omitted). Plaintiffs make no allegations whatsoever that LVS's financial statements were inaccurate in any respect and therefore have not pleaded any violation of GAAP.

### C.   Plaintiffs Have Failed to Adequately Allege That the SOX Certification Statements Were False and Misleading.

Plaintiffs next challenge the statutorily required statements of certification attached to the 10-Ks and 10-Qs. SAC ¶¶ 155, 177, 192, 208, 224, 233, 242. The Sarbanes-Oxley Act of 2002 requires the CEO and CFO of publicly traded companies to issue a statement certifying that the accompanying financial statements and disclosures fairly present, in all material respects, the operations and financial condition of the company. 15 U.S.C. § 7241. Plaintiffs do not support their claim of falsity with particularized allegations.

As an initial matter, Plaintiffs' SOX certification claims must fail because they are predicated on Plaintiffs' ability to show that the other alleged misstatements in the Forms 10-K and 10-Q were false or misleading. As discussed above, Plaintiffs have not pled with particularity the falsity of any of these statements, thus dooming Plaintiffs' SOX certification claims. *See In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1091 (C.D. Cal. 2008) (because SOX certifications were alleged to be false only to the extent that other alleged statements in the 10-Ks were false, "the Court need not consider the SOX certifications separately").

In addition, Plaintiffs have not pled with particularity any untrue statement of fact within the SOX certifications. Plaintiffs allege that the SOX certifications signed by Messrs. Adelson and Dumont were false because "LVS did not have sufficient internal controls in place to ensure accurate reporting of LVS's financial results." *See, e.g.*, SAC ¶ 156. But Plaintiffs nowhere allege that any of LVS's financial statements were inaccurate. An immaterial weakness in *MBS's* casino operations,

*id.*, does not suggest otherwise; the SOX certifications concern *LVS*'s disclosure controls and procedures and internal control over financial reporting, which are entirely different.[16]

### D. Plaintiffs Have Failed to Adequately Allege That the Goldstein March 2016 Investor Conference Statements Were False and Misleading.

Finally, Plaintiffs challenge statements made by Mr. Goldstein at an investor conference in March 2016 that LVS is "very compliant," "very proud of [its] compliance record," "a big believer that compliance is critical" and "embrace[s]" and "accept[s]" compliance. *Id.* ¶ 160. As an initial matter, Mr. Goldstein's statements are indisputably true. Plaintiffs do not and cannot plead any material non-compliance by MBS before or during the Class Period. To the contrary, the SAC pleads MBS's strong record of compliance, including the CRA's finding that there was no regulatory breach by MBS with respect to Wang Xi, MBS's filing of thousands of STRs with no indicia of non-compliance, and the extension of MBS's exclusivity period. *Supra* at 22.

Moreover, Mr. Goldstein's statements are of the type that courts routinely dismiss as inactionable puffery and immaterial as a matter of law. As the Ninth Circuit has explained, "[s]tatements of mere corporate puffery, 'vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers,' are not actionable because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *Intuitive Surgical, Inc.*, 759 F.3d at 1060 (citation omitted). Courts have routinely held that statements regarding general legal compliance, such as the one made by Mr. Goldstein, "are too vague to be actionable misrepresentations or omissions." *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *23 (D. Ariz. Feb. 16, 2017); *see also, e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (holding statements touting "relentless focus on" and "commitment to" compliance inactionable puffery).

*       *       *

For all these reasons, the SAC does not meet the PSLRA's strict requirements for pleading

---

[16] Similarly, Defendants did not fail to disclose "[a]ny fraud" involving "management or other employees who have a significant role [in LVS's] internal control over financial reporting." SAC ¶ 155. Plaintiffs concede that the alleged scheme involved "just a handful of staff" at MBS. *Id.* ¶ 264.

a false or misleading statement.

## III.   THE SECTION 10(B) CLAIM SHOULD ALSO BE DISMISSED BECAUSE PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER.

Plaintiffs' Second Amended Complaint must also be dismissed for the additional, independent reason that it does not plead a "strong inference" of scienter with respect to any defendant. *Tellabs*, *Inc.*, 551 U.S. at 321. Section 10(b) and Rule 10b-5 only proscribe the making of a false statement by a person who possesses the necessary intent to defraud. Thus, to state a claim, Plaintiffs must both identify a false statement, as discussed above, and establish that the person who made (or had direct authority for) that statement possessed the requisite state of mind, *i.e.*, *scienter*, when the statement was made. Moreover, a strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

Plaintiffs come nowhere close to pleading the necessary "strong inference" of scienter with respect to any Defendant. Plaintiffs allege no particularized facts indicating that any Defendant was aware of the alleged "premium player" scheme. Further, the SAC is silent as to what facts were known by the Individual Defendants at the time they made the challenged statements. Instead, Plaintiffs resort to the types of generic allegations that repeatedly have been rejected by courts as failing to give rise to a strong inference of scienter. When considered separately and holistically, Plaintiffs' allegations fall far short of pleading a strong inference of scienter.

Indeed, there is no plausible inference of scienter, as Plaintiffs' theory is entirely illogical. Plaintiffs allege that MBS employees engaged in fraudulent transfers in order to maintain its exclusive license to operate in Singapore. SAC ¶¶ 320-22. But engaging in such transfers would put MBS's license in jeopardy: the CRA explicitly considers MBS's record of compliance when deciding whether to renew a casino license. And Plaintiffs acknowledge that MBS was at all times a highly productive and successful property, with strong EBITDA margins. *Id.* ¶¶ 60-62, 272. It would be utterly irrational for Defendants to place LVS's highly profitable MBS business in jeopardy by engaging in a scheme that would transfer an additional 0.13% of all funds wagered by

VIP patrons at MBS over a five year period.

### A. Plaintiffs' Allegations Do Not Raise a Strong Inference of Scienter.

Plaintiffs ask the Court to infer the Individual Defendants' alleged scienter based on a hodge-podge of disparate allegations: allegations from former employees, *id.* ¶¶ 269-71; allegations regarding MBS's "importance" to LVS, *id.* ¶¶ 272-77; the existence of related and unrelated investigations and settlements, *id.* ¶¶ 278-87, 295-305; allegations about "willful and pervasive" violations of local law, *id.* ¶¶ 288-90; personnel changes in the MBS compliance department, *id.* ¶¶ 291-94; and the existence of Board and Operational Compliance Committees, *id.* ¶¶ 306-19. These allegations, when considered separately and holistically, fall far short of the PSLRA's strict pleading requirements.

### 1. The Purported Accounts of Former MBS Employees Do Not Support a Strong Inference of Scienter.

Plaintiffs argue that the two CWs and one former compliance executive anonymously quoted in a *Bloomberg* article confirm that "the unauthorized transfer practice was widespread and well-known at MBS." *Id.* ¶¶ 269-70. However, confidential witness statements cannot create a strong inference of scienter unless the CW "has reliable personal knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998. Plaintiffs do not come close to meeting this requirement.

To begin, that almost all of the alleged false statements were made after the CWs left MBS provides "ample basis to question aspects of [the CWs] claimed knowledge and [their] effort[s] to impute scienter to the defendants." *Nguyen*, 962 F.3d at 416 (CW's allegations did not support scienter where many of the alleged misstatements were made after CW left the company); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1110 (9th Cir. 2021) (rejecting scienter assertions where CW "left his employment at HCW before any of the events at issue took place").[17]

In addition, Plaintiffs have made no allegations of "specific facts showing a connection between the false statement and the mindset of the person who made it." *Prodanova*, 993 F.3d at

---

[17] As discussed *supra* at 21-22, a statement by an unnamed compliance executive that he was told to "back off" lacks the requisite reliability to support a strong inference of scienter where Plaintiffs plead no allegations regarding what purported "issues" the executive raised.

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

1110. None of the former employees assert that any of the Individual Defendants had knowledge of the alleged wrongdoing. This is not surprising, considering the SAC does not and cannot allege that any of the CWs or the former compliance executive had any interaction or communication with any of the Individual Defendants. In fact, Plaintiffs' own allegations suggest that information regarding the transfer process issues was *not shared* with the Individual Defendants: according to the former executive referenced in the *Bloomberg* article, not even MBS management was aware of the alleged MBS process issues until early 2018. Ex. 23, Dec. 21, 2020 Article at 1052. Further, while Plaintiffs allege that CW-1 attended "high-level" meetings with senior compliance executives where STRs were discussed, SAC ¶¶ 115, 147, 317, there are no allegations that any Individual Defendants attended these meetings nor are there any particularized allegations that unauthorized transfers were even discussed at such meetings. Such vague allegations do not support a strong inference of scienter. *See In re Downey Sec. Litig.*, 2009 WL 736802, at *9 (C.D. Cal. Mar. 18, 2009).

Where a CW is not alleged "to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period," that CW cannot support any inference of scienter, let alone a strong one. *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008). Plaintiffs are thus left with purely conclusory allegations that the alleged wrongdoing was "well-known." These are the very type of "generalized claims about corporate knowledge" that do not create a strong inference of scienter, "since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998.

**2.     MBS's "Importance to LVS" Does Not Support a Strong Inference of Scienter.**

Plaintiffs' conclusory allegations that MBS's performance "was an important revenue center" that the Individual Defendants "paid close attention to" also come nowhere close to pleading scienter. SAC ¶¶ 272-73. Plaintiffs allege that given the "role MBS played in LVS's portfolio," and the alleged magnitude of write-offs at MBS for doubtful casino accounts, the Individual Defendants must have known of the unauthorized transfers scheme. *Id.* ¶¶ 274-77. Plaintiffs appear to be

advancing a "core operations theory" of scienter, which presumes that "corporate officers have knowledge of the critical core operation of their companies," *Prodanova*, 993 F.3d at 1111 (citation omitted), and "comes into play only in an exceedingly rare category of cases." *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) (citation omitted).

Plaintiffs also provide no support for their conclusory assertion that any alleged unauthorized transfer contributed to write-offs from doubtful accounts. SAC ¶ 275. Plaintiffs assert that "62% of LVS's total write-offs between 2013 and 2020" stemmed from MBS, *id.*, but Plaintiffs make no challenge to LVS's accounting, the amount of its receivables, the adequacy of its reserve for bad debts, or the timing of write-offs. Nor do they plead facts to suggest that any alleged unauthorized transfer contributed to any uncollectible receivables. Plaintiffs rely instead on the Individual Defendants' management positions to suggest that they would have been aware of the alleged wrongdoing of a few employees at MBS. But it is well-settled law in the Ninth Circuit that "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. Plaintiffs' conclusory allegations, therefore, fall far short of meeting the "high burden of proof" required to plead scienter under a "core operations theory." *Prodanova*, 993 F.3d at 1111-12 (rejecting "conclusory" allegations that the defendants "would have" been involved in alleged wrongdoing given their positions); *NVIDIA*, 768 F.3d at 1064 (core operations theory did not give rise to strong inference of scienter where "Plaintiffs never plausibly allege that specific information" about the alleged wrongdoing was conveyed to the individual defendants).

### 3. Allegations Regarding Various Related and Unrelated Investigations Do Not Support a Strong Inference of Scienter.

Plaintiffs next allege that the existence of internal and external investigations relating to the alleged "unauthorized transfer practice" supports an inference of scienter. SAC ¶¶ 278-87. The investigations support the opposite inference. As discussed *supra* at 9-10, 18, Plaintiffs do not—and cannot—allege that the investigation undertaken by MBS and Hogan Lovells uncovered any evidence of transfers occurring without patron consent. Nor do Plaintiffs allege that the investigation

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

linked any of the Individual Defendants to the immaterial issues identified. Plaintiffs also make no allegations of any findings of regulatory non-compliance by the DOJ, CRA or Singapore Police investigations, *id.* ¶¶ 283-87, and in fact, concede that the CRA concluded to the contrary in its investigation of Wang Xi's allegations, *id.* ¶ 260. Plaintiffs thus allege no more than "the mere existence of [an] investigation," which, standing alone, "cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management." *Hansen*, 527 F. Supp. 2d at 1162 (citation omitted); *see also In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1084 n.220 (C.D. Cal. 2012) (ongoing investigation did not support scienter).

Plaintiffs' allegations regarding wholly unrelated "past regulatory and employee issues" are even further afield. Plaintiffs point to a 2013 settlement involving a gambler in Las Vegas, SAC ¶ 296; a 2016 settlement of a SEC probe into internal accounting controls in China and Macao that involved events between 2006 and 2011, *id.* ¶ 297; Ex. 24, SEC Order at 1056; a 2017 non-prosecution agreement with the DOJ with respect to the same matters addressed in the 2016 SEC settlement, SAC ¶ 303; and a 2016 settlement of an employment lawsuit involving a former CEO of Sands China Ltd., *id.* ¶ 304. None of these involved MBS and all of them address conduct that long predates the Class Period. Such irrelevant allegations contribute nothing to Plaintiffs' allegations of scienter. *See NVIDIA*, 768 F.3d at 1062 ("[T]he existence of this additional lawsuit does not add to an inference of scienter"); *Union Cent. Life Ins. v. Ally Fin., Inc.*, 2013 WL 2154381, at *1 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations involving [the company] provides no evidence of scienter").

### 4. Plaintiffs' Remaining Allegations Do Not Support a Strong Inference of Scienter.

Plaintiffs' remaining arguments do not support an inference of Defendants' fraudulent intent. *First*, Plaintiffs allege that scienter can be inferred from their conclusory allegation that LVS engaged in "willful and pervasive violations" of local law and regulation. SAC ¶¶ 288-90. But as discussed above, Plaintiffs have not plausibly alleged *any* violation of local law or regulations, let alone "willful and pervasive" violations. Furthermore, the fact that the "CRA pays close attention

32

to MBS," *id.* ¶ 288, points squarely against the existence of any wrongdoing at MBS and belies any inference of scienter. The far more compelling inference is that the CRA has closely scrutinized MBS and found it to be in compliance with CRA regulations, as it did in its investigation of Wang Xi's claims.[18]

*Second*, Plaintiffs' generic allegations of turnover in MBS's compliance department between June 2010 and June 2020, a period starting long before the Class Period, do not support an inference of scienter. *Id.* ¶¶ 116, 291-94. Plaintiffs make no allegations about the circumstances of the departures of the compliance employees, let alone allegations that any of these departures were suspicious, uncharacteristic, or connected to any of the alleged wrongdoing. Absent such allegations, the inference that employees left because of alleged wrongdoing "will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Zucco*, 552 F.3d at 1002. *See also Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *17 (N.D. Cal. Nov. 14, 2016) (where replacement of executive "is unaccompanied by any additional evidence of wrongdoing on the part of the Defendants, an inference of scienter is unlikely").

*Third*, Plaintiffs ask the Court to infer scienter from the fact that LVS maintains a Board Compliance Committee and an Operational Compliance Committee. SAC ¶¶ 306-19. Plaintiffs offer no details to bridge the gap between the existence of these Committees and the Individual Defendants' knowledge of any alleged wrongdoing. Instead, Plaintiffs speculate that information about the "high numbers of STR[s] coming from MBS" prior to the start of the Class Period might have "made its way" to the Committees, and eventually to the Individual Defendants. *Id.* ¶¶ 317-18. Even assuming this pre-Class Period information "made its way" to the Individual Defendants— and Plaintiffs have pled no particularized allegations to support this—Plaintiffs have failed to "plead any details about these reports that would demonstrate a strong inference of scienter." *Nguyen*, 962

---

[18] Plaintiffs also suggest that the Individual Defendants' certifications in the quarterly reports around the maintenance of adequate internal controls support an inference of scienter. SAC ¶ 290. The Ninth Circuit has held that "[b]oilerplate language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003–04.

F.3d at 417. Indeed, Plaintiffs allege that MBS submitted "thousands" of STRs to the CRA and to the STRO, yet do not and cannot allege that the CRA or STRO identified any unauthorized transfers or took any action against MBS. At bottom, Plaintiffs have alleged no more than the Committees report to the Board on certain important issues. But the Ninth Circuit has long held that it will "not infer [scienter] from the general allegation that management was informed about important issues in the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008).

**B.      Plaintiffs' Motive Allegations Do Not Support a Strong Inference of Scienter.**

As discussed above, *supra* at 28, the suggestion that LVS had a motive to commit fraud—amounting to a de minimis percentage of its total revenue—in order to keep its highly profitable license to operate in Singapore is nonsensical. A theory of motive cannot support scienter where the Defendants "would stand to lose more from [their] allegedly fraudulent actions than [they] would gain." *Prodanova*, 993 F.3d at 1107. Plaintiffs' other motive allegations are similarly without merit. Plaintiffs argue that Defendants were motivated to drive growth and profitability by boosting the VIP segment. SAC ¶¶ 323-26. But allegations that the Defendants were motivated to maintain LVS's profitability and success do not meet the rigorous standard for pleading scienter. As the Ninth Circuit has recognized, "[i]f scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (citation omitted); *El Dabe v. Calavo Growers, Inc.*, 719 F. App'x 607, 609 (9th Cir. 2018) ("[G]eneralized assertions of motive, without more, are inadequate" to give rise to a strong inference of scienter).

Moreover, notably absent from the SAC are any particularized allegations of financial gain, which cuts against an inference of scienter. In fact, the beneficial share ownership of each Individual Defendant increased during the Class Period. *See* Exs. 25-29, Schedules 14A, 2016-2020. It defies logic to suggest that a person who purportedly engaged in a fraud to artificially inflate the price of a company's stock and to maximize his profits from the fraud would increase his holdings of stock over the same period. This also undermines any inference of scienter. *See Lechner v. Infusystem*

34

*Holdings, Inc.*, 2017 WL 11593803, at *7 (C.D. Cal. Dec. 15, 2017) (increase in stock holdings during relevant time period "detracts from a holistic finding of scienter"); *Zamir v. Bridgepoint Educ., Inc.*, 2016 WL 3971400, at *10 (S.D. Cal. July 25, 2016) (that certain defendants "increased their holdings 'giv[es] rise to an inference of good faith,' not scienter.") (citation omitted).

**C.    The Inferences Pointing Against Scienter Are Far More Compelling.**

Plaintiffs' allegations of scienter in this case are myriad but "even together they are not as cogent or compelling as a plausible alternative inference." *Zucco*, 552 F.3d at 1007. Plaintiffs' theory that MBS committed "pervasive" regulatory violations, under the watchful eye of the CRA, in order to maintain its exclusive license makes no sense. It similarly makes no sense that Defendants would conceal this information, remedy the issues in 2018, and continue to mislead the market for another two years. Plaintiffs' theory is neither cogent nor compelling. Instead, the far more plausible inference is that there was no "pervasive and unchecked" scheme of unauthorized transfers at MBS, which is corroborated by, *inter alia*, that Wang Xi is the only patron alleged to have claimed unauthorized transfers, the CRA's findings that MBS did not breach any requirements related to Wang Xi's claims, MBS's conclusion that no transfers were made without a patron's consent, and the CRA's repeated renewals of MBS's license before, during, and after the Class Period.

**D.    The Second Amended Complaint Does Not Plead Scienter as to the Company.**

Failing to plead a strong inference of scienter as to any Individual Defendant, Plaintiffs make a half-hearted attempt to argue that their allegations give rise to an inference of scienter against LVS under the corporate scienter doctrine. SAC ¶¶ 327-34. Corporate scienter is alleged where a company's public statements are "so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *NVIDIA*, 768 F.3d at 1063. Plaintiffs come nowhere close to doing so here. They merely repeat the same insufficient and unsupported allegations of a "pervasive scheme" of unauthorized transfers in an attempt to plead scienter on behalf of the Company. Just as these allegations do not plead scienter as to any of the Individual Defendants, they do not allege corporate scienter.

35

## IV.   THE SECTION 10(B) CLAIM SHOULD ALSO BE DISMISSED FOR FAILURE TO ALLEGE LOSS CAUSATION.

Plaintiffs also fail to plead loss causation. Loss causation requires the showing of a "causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citation and quotation marks omitted). This requirement exists because the purpose of private securities fraud actions is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 345. Plaintiffs must therefore plead facts to distinguish between losses allegedly relating to the alleged corrective disclosures, and those resulting from general market forces or other factors unrelated to the alleged fraud. *Loos v. Immersion Corp.*, 762 F. 3d 880, 887 (9th Cir. 2014).

According to the SAC, the purported fraud was revealed to the market through eight partial corrective disclosures between September 26, 2019 and September 16, 2020: (1) the September 26, 2019 filing of the Wang Xi lawsuit, SAC ¶ 338, Ex. 15; (2) an October 10, 2019 article reporting this lawsuit, SAC ¶ 339, Ex. 16; (3) a May 12, 2020 article reporting that Wang Xi had lodged a complaint with the Singapore police, SAC ¶ 340, Ex. 17; (4) a June 4, 2020 article reporting the DOJ and CRA investigations, SAC ¶ 341, Ex. 18; (5) an update to that same article on June 5, 2020, SAC ¶ 341, Ex. 19; (6) a June 7, 2020 article reporting certain regulatory changes the CRA was considering, SAC ¶ 341, Ex. 20; (7) a July 19, 2020 article reporting the settlement with Wang Xi, SAC ¶ 342, Ex. 21; and (8) the September 16, 2020 article regarding the Hogan Lovells investigation and noting that the CRA had concluded its investigation relating to Wang Xi and found no regulatory breach by MBS, SAC ¶ 343, Ex. 22.[19] Plaintiffs have failed to adequately plead a single corrective disclosure because the stock price on each of these days either (a) increased, (b) declined minimally and rapidly recovered, or (c) moved in parallel with the performance of LVS's peers.

---

[19] Plaintiffs also make reference to a *Bloomberg* article issued on December 21, 2020. SAC ¶¶ 344-47. But this article post-dates the close of the Class Period by over three months and therefore cannot qualify as a corrective disclosure. *See Inchen Huang*, 443 F. Supp. 3d at 1058. Moreover, there is no loss causation for this date for the reasons discussed below.

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

### A.    "Corrective Disclosures" That Coincide with Stock Price Increases or Temporary Declines Do Not Plead Loss Causation.

Plaintiffs do not even allege LVS's stock price declined on four of their alleged corrective disclosure dates. After the October 10, 2019 *Bloomberg* article was published prior to market open, LVS's stock price *increased*, from $54.17 to $54.79, and increased further the next day to $57.58. *See* Ex. 30, LVS Stock Price Chart at 1096.[20] LVS's stock likewise increased after the June 4, June 5 and June 7, 2020 articles were published (rising from $51.79 per share on June 3 to $52.35 on June 4, to $52.97 on June 5, and to $55.64 on June 8). *Id.* at 1100. Plainly, when the stock price increases, there can be no loss causation. *See Metzler*, 540 F.3d at 1062 (loss causation requires complaint to allege that the defendant's "share price fell significantly after the truth became known.") (quoting *Dura*, 544 U.S. at 347); *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *19 (D. Ariz. Aug. 1, 2017) (plaintiffs failed to plead loss causation as to certain disclosure where the "stock experienced no actual loss"; "[w]ith no loss, there can be no loss causation").

Plaintiffs' allegations of stock price declines with respect to other disclosures similarly cannot support loss causation. As the Ninth Circuit has explained, "[t]he [loss causation] analysis is contextual, and where, for example, a 'modest' drop in the stock price coincides with the disclosure of certain news but then recovers very shortly after, the allegation of loss causation may be insufficient." *Wochos*, 985 F.3d at 1197 (citation omitted).

Placing Plaintiffs' remaining alleged corrective disclosure dates in context, Plaintiffs' loss causation allegations are plainly insufficient. For three of the dates where Plaintiffs have actually alleged a price decline, the declines were small. And for each of these days, LVS's stock price recovered either the very next trading day or within a few days thereafter. Specifically, LVS's stock price declined on September 26, 2019, the date Wang Xi filed suit (from $57.08 to $55.88), but the very next day it closed higher than the pre-filing price (at $57.11). Ex. 30, LVS Stock Price Chart at 1096. Similarly, while LVS's stock price declined the day the May 12, 2020 article was published (from $48.50 to $45.96), it closed at $48.39 four days later, and soon closed in excess of the pre-

---

[20] Courts may take judicial notice of historical stock price information because it is public information and not subject to reasonable dispute. *See Cai v. Switch, Inc.*, 2020 WL 3893246, at *2 (D. Nev. July 10, 2020) ("A public company's historical stock prices are judicially noticeable").

37

article price. *Id.* at 1099. The same is true for the July 19, 2020 article, issued on a Sunday. After trading slightly downward on July 20, 2020 (from $48.69 to $47.28), LVS recovered most of this slight loss by the next trading day ($48.00). *Id.* at 1100.[21] The "quick and sustained price recovery" after each of these drops precludes Plaintiffs' reliance upon them to plead loss causation. *Wochos*, 985 F.3d at 1198; *see also Metzler*, 540 F.3d at 1065 (no loss causation where, three days later, "stock quickly recovered from the 10% drop").

**B.      Plaintiffs Have Not Pled Loss Causation With Respect to September 16, 2020.**

On Plaintiffs' sole remaining "corrective disclosure" date, September 16, 2020, LVS's stock price declined from $51.85 to close at $49.67. Ex. 30, LVS Stock Price Chart at 1101. Plaintiffs' allegations, however, attempt to hide the fact that LVS's peers experienced similar declines that same day. By pleading at numerous places in the SAC that LVS had underperformed compared to its peers, SAC ¶¶ 337, 339, 341, Plaintiffs have put the stock price performance of LVS's peers at issue, *see Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *13 (C.D. Cal. Jan. 12, 2012), and that performance is telling. Just as LVS's stock price declined on September 16, Wynn's stock price declined from $82.28 to $79.66, MGM's stock price went down from $23.74 to $23.01, and the Dow Jones U.S. Gambling Index dropped from $726.99 to $704.64. Ex. 31, Comparative Stock Price Chart at 1109.[22] And the stock price performance of all three companies and the Index followed the same path in the following days. *Id*.

**C.      Plaintiffs Fail to Allege That Any Movement in the Stock Price Was Proximately Caused by the Revelations Rather Than by Other Factors.**

Additionally, Plaintiffs have failed to plead with particularity that the alleged stock price declines were caused by the alleged false statements, rather than market forces or other unrelated

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

---

[21] As for the post-Class Period date, while LVS stock traded down an insignificant amount on December 22, 2020 (from $56.88 to $56.25), the next day it closed higher than the pre-article price ($57.19). *See* Ex. 30, LVS Stock Price Chart at 1103.

[22] The Comparative Stock Price Chart includes stock price information for MGM, Wynn Resorts, and the Dow Jones U.S. Gambling Index. LVS's public filings compare the Company's performance to the Index. *See, e.g.*, Ex. 1, 2015 10-K at 43; Ex. 5, 2019 10-K at 652. MGM and Wynn are two of LVS's peers and key competitors. Plaintiffs plead that MGM is LVS's "next largest competitor." SAC ¶ 32. In addition, Wynn, like LVS and MGM, has properties in the United States and in Macao. *See* Ex. 5, 2019 10-K at 621 (noting Wynn as a competitor in Macao).

38

factors. A price decline "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . "—none of which suffice for loss causation. *Dura*, 544 U.S. at 343.

The fluctuation in LVS's stock price following the alleged corrective disclosures indicates that movements in the stock price were not responses to disclosures of any alleged fraud, but were simply responses to market forces. Indeed, Plaintiffs ignore that changes in LVS's stock price occurred in the context of the COVID-19 pandemic, even as many of the articles that Plaintiffs incorporate into the SAC expressly reference the impact of the pandemic on LVS and its stock price. *See* Ex. 19, June 5, 2020 Article at 1041; Ex. 21, July 19, 2020 Article at 1046. The Company's peers experienced the same adverse global changes, as illustrated in the following chart.[23]



Rather than plead facts distinguishing between declines related to market forces and those allegedly relating to the alleged fraud, Plaintiffs offer only conclusory allegations about the "[t]he timing and magnitude of the price movements in LVS stock." SAC ¶ 348. This is insufficient under

[23] Data in the chart is obtained from https://finance.yahoo.com and marketwatch.com/investing. The stock prices are set forth in Exhibit 31.

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

long-standing Ninth Circuit law. *See Loos*, 762 F.3d at 887; *see also Metzler*, 540 F.3d at 1064 ("So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud . . . . Loss causation requires more.").

## V.    THE SECTION 20(A) CONTROL PERSON CLAIM SHOULD BE DISMISSED.

A claim for control person liability under Section 20(a) of the Exchange Act is predicated on a primary violation of securities laws. *Nguyen*, 962 F.3d at 419. Because Plaintiffs have not stated a primary claim under Section 10(b), their Section 20(a) claim should also be dismissed.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Second Amended Complaint with prejudice.

Dated: May 18, 2022

SNELL & WILMER, L.L.P.

By: */s/ Patrick Byrne*
    Patrick G. Byrne, Esq.
    Morgan Petrelli, Esq.
    3883 Howard Hughes Parkway, Ste. 1100
    Las Vegas, NV 89169
    Tel.  702.784.5200
    Fax: 702.784.5252
    Email:  pbyrne@swlaw.com
              mpetrelli@swlaw.com

    Walter C. Carlson (*Pro Hac Vice*)
    Lawrence P. Fogel (*Pro Hac Vice*)
    Martha C. Clarke (*Pro Hac Vice*)
    SIDLEY AUSTIN LLP
    One South Dearborn Street
    Chicago, Illinois 60603
    Tel.  312.853.7000
    Fax. 312.853.7036
    Email:  wcarlson@sidley.com
              lawrence.fogel@sidley.com
              mclarke@sidley.com
    *Attorneys for Defendants*

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

40

## CERTIFICATE OF SERVICE

On May 18, 2022, I served the foregoing document on all parties appearing in this case when filing said document through the court's PACER system with automatic e-service on all persons who have registered for e-service on PACER for this case.

/s/ Lyndsey Luxford
An employee of SNELL & WILMER L.L.P.

4859-3979-6000.1

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY
SUITE 1100
LAS VEGAS, NEVADA 89169

41