John P. Aldrich, Esq.
NV Bar No. 6877
**Aldrich Law Firm, Ltd.**
7866 West Sahara Ave.
Las Vegas, NV 89117
Tel: (702) 853-5490
jaldrich@johnaldrichlawfirm.com

Shannon L. Hopkins (*Pro Hac Vice*)
**Levi & Korsinsky, LLP**
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| THE DANIELS FAMILY 2001 REVOCABLE TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LAS VEGAS SANDS CORP., DR. MIRIAM ADELSON, in her capacity as Special Administrator of the estate of SHELDON G. ADELSON, PATRICK DUMONT, and ROBERT G. GOLDSTEIN,<br><br>Defendants. | Case No. 2:20-cv-01958-CDS-EJY<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ............................................................................................. 1

II.   PROCEDURAL HISTORY.............................................................................................. 4

III.  STATEMENT OF FACTS ................................................................................................ 4

      A.   LVS Opens Marina Bay Sands as One of Only Two Casinos Allowed to Operate in Singapore. ................................................................................................ 4

      B.   Strict Regulatory Requirements on Money Transfers Hindered MBS's Growth. .............. 5

      C.   To Increase MBS Casino Revenues, Defendants Implemented the Unauthorized Transfer Scheme .......................................................................... 7

      D.   The Unauthorized Transfer Scheme Results in Internal Investigations and a Sharp Increase in Bad Debt Expense When Non-Creditworthy Borrowers Defaulted on Their Loans.............................................................................. 9

      E.   The Truth About LVS's Unauthorized Transfer Scheme is Revealed Over Several Partial Corrective Disclosures Starting with a Lawsuit Filed by One of MBS's Wealthy Patrons, Wang Xi ................................................................................ 10

IV.   LEGAL STANDARD.................................................................................................... 11

V.    ARGUMENT.............................................................................................................. 11

      A.   The Court's Previous Conclusion that Plaintiffs Adequately Alleged the Unauthorized Transfer Scheme is the Law of the Case and Cannot Be Revisited.................................. 11

      B.   Plaintiffs' SAC Cures the Pleading Deficiencies the Court Identified in its Order and Adequately Alleges Defendants Made Materially  False and Misleading Statements During the Class Period ...................................................................... 16

            1.   Plaintiffs Adequately Alleged the Credit Misstatements Were Affirmatively False and Misleading When Made .......................................................... 16

            2.   Plaintiffs Adequately Alleged the SOX Certifications Were Affirmatively False and Misleading. ........................................................................ 23

            3.   Defendants Violated Item 105 of Regulation S-K. .............................................. 25

      C.   Plaintiffs Adequately Alleged Scienter............................................................................. 25

            1.   CWs Confirm the Unauthorized Transfer Scheme Was Discussed at Compliance Meetings Attended by the Global Chief Compliance Officer Who Was Required to Report the Unauthorized Transfers to Defendants ......................................... 26

            2.   LVS's Own Internal Investigations into the Unauthorized Transfers and Related Patron Lawsuits Support Scienter................................................................ 29

            3.   Plaintiffs' Other Allegations Support the Holistic Scienter Analysis................... 30

            4.   Defendants Had Motive to Mislead Investors ...................................................... 32

5.    Plaintiffs Have Alleged a Strong Inference of Scienter at Least as Compelling as Any Non-Culpable Inference Asserted by Defendants ......................................... 34

D.    Plaintiffs Adequately Allege A "Causal Connection" Between the Alleged Misstatements and the Corrective Disclosures that Caused Plaintiffs' Losses ......................................... 34

E.    Plaintiffs Adequately Allege Control Person Liability ....................................................... 39

VI.    CONCLUSION .................................................................................................................... 39

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF AUTHORITIES

**Cases**

*Abdo v. Fitzsimmons*,
2017 U.S. Dist. LEXIS 228340 (N.D. Cal. Nov. 3, 2017)................................................................ 28

*Alfasigma USA, Inc. v. First Databank, Inc.*,
525 F. Supp. 3d 1088 (N.D. Cal. 2021) ....................................................................................... 16

*Al-Kidd v. Ashcroft*,
580 F.3d 949 (9th Cir. 2009) ........................................................................................................ 22

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ........................................................................................... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................................... 11

*Asis Internet Servs. v. Optin Glob., Inc.*,
2006 U.S. Dist. LEXIS 73669 (N.D. Cal. Sep. 27, 2006) ............................................................. 15

*Askins v. United States Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ...................................................................................................... 16

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................... 16, 17, 19

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. June 12, 2012) .................................................................... 31, 32

*Buttonwood Tree Value Partners, LP v. Sweeney*,
2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) ............................................................................ 32

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
No. 17 CIV. 10014 (LGS), 2019 WL 719751 (S.D.N.Y. Feb. 19,
2019), *reconsideration denied*, No. 17 CIV. 10014 (LGS), 2019 WL 2136902
(S.D.N.Y. May 16, 2019)................................................................................................................. 38

*Crago v. Charles Schwab & Co.*,
No. 16-cv-03938-RS, 2017 WL 6550507 (N.D. Cal. Dec. 5, 2017) ............................................. 33

*Craigslist, Inc. v. Dealercmo, Inc.*,
2017 U.S. Dist. LEXIS 222957 (N.D. Cal. Apr. 11, 2017) ........................................................... 22

*Di Donato v. Insys Therapeutics, Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017).................................................................................... 39

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................................................... 11

*Evanston Police Pens. Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ..................................................................................... 4, 11

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ........................................................................................................ 16

Case No. 2:20-cv-01958-CDS-EJY

*Ferraro Family Foundation, Inc., et. al. v. Corcept Therapeutics, Inc., et. al.*,
    2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ............................................................................... 17, 20

*Ferreira v. Funko Inc.*,
    2021 WL 880400 (C.D. Cal. Feb. 25, 2021)............................................................................... 19

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015)...................................................................................... 26

*Hessefort v. Super Micro Comput., Inc.*,
    2021 U.S. Dist. LEXIS 63629 (N.D. Cal. Mar. 29, 2021)............................................................ 32

*Hsu v. Puma Biotechnology, Inc.*,
    213 F. Supp. 3d 1275 (C.D. Cal. 2016) .................................................................................... 16

*IBEW Local 697 Pension Fund v. Int'l Game Tech.*,
    No. 09-419, 2011 WL 915115 (D. Nev. Mar. 15, 2011) .............................................................. 37

*In re Acadia Pharm. Inc. Sec. Litig.*,
    2020 U.S. Dist. LEXIS 95464 (S.D. Cal. Jun. 1, 2020) .............................................................. 28

*In re Allied Nev. Gold Corp.*,
    2016 WL 4191017 (D. Nev. Aug. 8, 2016) ............................................................................... 20

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal. 2012) ............................................................................... 30, 31

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. 2014) ...................................................................................... 26

*In re Anchor Gaming Sec. Litig.*,
    33 F. Supp. 2d 889 (D. Nev. 1999)......................................................................................... 23

*In re BofI Holding, Inc. Sec. Litig.*,
    No. 15-02324, 2017 WL 2257980 (S.D. Cal. May 23, 2017) ....................................................... 20

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................................... 21

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................................... 23

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ............................................................................................... 35

*In re GlenFed Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) ................................................................................................. 17

*In re MGM Mirage Sec. Litig.*,
    2013 WL 5435832 (D. Nev. Sept. 26, 2013)............................................................................. 38

*In re Nuvelo, Inc.*,
    668 F. Supp. 2d 1217 (N.D. Cal. 2009).................................................................................... 25

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)...................................................................................... 19

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Portal Software, Inc. Sec. Litig.*,
 2005 U.S. Dist. LEXIS 20214 (N.D. Cal. Aug. 10, 2005)..................................................................25

*In re Providian Fin. Corp. Sec. Litig.*,
 152 F. Supp. 2d 814 (E.D. Pa. 2001) ..................................................................24

*In re Quality Sys., Inc. Sec. Litig.*,
 865 F.3d 1130 (9th Cir. 2017) .......................................................................... 20, 21

*In re QuantumScape Sec. Class Action Litig.*,
 2022 U.S. Dist. LEXIS 7782 (N.D. Cal. Jan. 14, 2022) ..................................................21

*In re Silver Wheaton Corp. Sec. Litig.*,
 2016 WL 3226004 (C.D. Cal. June 6, 2016) .................................................................21

*In re Tesla Sec. Litig.*,
 477 F. Supp. 3d 903 (N.D. Cal. Apr. 15, 2020)..................................................................28

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012) .................................................................26

*In re WageWorks, Inc., Sec. Litig.*,
 No. 18-CV-01523-JSW, 2020 WL 2896547 (N.D. Cal. June 1, 2020)............................................35

*In re Wash. Mut., Inc. Sec.*,
 694 F. Supp. 2d 1192 (W.D. Wash. 2009)..................................................................23

*Inchen Huang v. Higgins*,
 443 F. Supp. 3d 1031 (N.D. Cal. 2020) .................................................................13

*Indep. Towers of Wash. v. Washington*,
 350 F.3d 925 (9th Cir. 2003) .................................................................14

*Johnson v. CBD Energy, Ltd.*,
 2016 U.S. Dist. LEXIS 87174 (S.D. Tex. July 6, 2016)..................................................................29

*Kelly v. Elec. Arts, Inc.*,
 2015 WL 1967233 (N.D. Cal. Apr. 30, 2015) .................................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) .......................................................................... 4, 11, 13

*Kipling v. Flex Ltd.*,
 2020 WL 7261314 (N.D. Cal. Dec. 10, 2020)..................................................................12

*Lloyd v. CVB Fin. Corp.*,
 811 F.3d 1200 (9th Cir. 2016) .................................................................26

*Lloyd v. CVB Fin. Corp.*,
 2013 WL 12120506 (C.D. Cal. May 9, 2013) .................................................................16

*Loos v. Immersion Corp.*,
 762 F. 3d 880 (9th Cir. 2014) .................................................................39

*Lopez v. Smith*,
 203 F.3d 1122 (9th Cir. 2000) .................................................................39

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Luna v. Marvell Tech. Grp., Ltd.*,
   No. 15-05447, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ........................................................ 38

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27, 131 S. Ct. 1309 (2011) .......................................................................................... 23

*McCasland v. Formfactor Inc., et al.*,
   2008 WL 2951275 (N.D. Cal. July 25, 2008) ............................................................................ 20

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ...................................................................................... 20

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .................................................................................................... 39

*Miller v. PCM, Inc.*,
   2018 WL 5099722 (C.D. Cal. Jan. 3, 2018) ............................................................................... 20

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
   881 F.3d 750 (9th Cir. 2018) ...................................................................................................... 34

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) .................................................................................................... 32

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) .......................................................................................... 38

*Nguyen v. Endologix, Inc., et. al.*,
   962 F.3d 405 (9th Cir. 2020) ...................................................................................................... 20

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) .................................................................................................... 34

*Oaktree Principal  Fund V, LP v. Warburg Pincus LLC*,
   2017 U.S. Dist. LEXIS 122725 (C.D. Cal. Jan. 17, 2017) ......................................................... 19

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 Fed. App'x 480 (9th Cir. 2019) ........................................................................................... 21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .................................................................................................... 20

*Prodanova v. H.C. Wainwright & Co.*, LLC,
   993 F.3d 1097 (9th Cir. 2021) .................................................................................................... 20

*Rabkin v. Lion Biotechnologies, Inc.*,
   2018 U.S. Dist. LEXIS 25326 (N.D. Cal. Feb. 15, 2018) .......................................................... 25

*Resh v. China Agritech, Inc.*,
   2019 WL 1055240 (C.D. Cal. Jan. 8, 2019) ............................................................................... 32

*RG Abrams Ins. v. L. Off. of CR Abrams*,
   2021 WL 6752000 (C.D. Cal. Oct. 13, 2021) ............................................................................. 14

*Robb v. Fitbit Inc.*,
   216 F. Supp. 3d 1017 (N.D. Cal. 2016) ...................................................................................... 38

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Roth v. Aon Corp.*,
No. 04-C-6835, 2008 WL 656069 (N.D. Ill. Mar. 7, 2008) ......................................................... 33

*Rudolph v. UTStarcom*,
No. C 07-04578 SI, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) ............................................. 35

*S. Ferry LP, #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ...................................................................................................... 26

*SEC v. Todd*,
642 F.3d 1207 (9th Cir. 2011) .................................................................................................... 16

*Sharenow v. Impac Mortg. Holdings, Inc.*,
385 F. App'x 714 (9th Cir. 2010) ............................................................................................... 32

*Smajlaj v. Brocade Communs. Sys.*,
2007 U.S. Dist. LEXIS 64968 (N.D. Cal. Aug. 27, 2007).......................................................... 27

*Smith v. NetApp, Inc.*,
2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) .............................................................................. 19

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
782 F. Supp. 2d 1059 (E.D. Cal. 2011)....................................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................................................... 25, 26, 32

*United States v. Cuddy*,
147 F.3d 1111 (9th Cir. 1998) .................................................................................................... 12

*Usher v. City of Los Angeles*,
828 F.2d 556 (9th Cir. 1987) ...................................................................................................... 11

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
No. 16-02942, 2017 WL 2378369 (C.D. Cal. May 31, 2017) ...................................................... 30

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
2013 WL 2247394 (C.D. Cal. May 9, 2013) ................................................................... 12, 13, 15

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................................................ 19

*Venice PI, LLC v. Doe 1*,
2019 WL 7493522 (D. Haw. Oct. 30, 2019) ............................................................................... 14

*Xiang v. Inovalon Holdings, Inc.*,
254 F. Supp. 3d 635 (S.D.N.Y. 2017).......................................................................................... 38

*Zaghian v. Farrell*,
675 F. App'x 718 (9th Cir. 2017).................................................................................................. 24

*Zola v. TD Ameritrade, Inc.*,
172 F. Supp. 3d 1055 (D. Neb. 2016)........................................................................................... 33

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................................................ 20, 31

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**<u>Statutes</u>**

15 U.S.C. §78u-4(b)(1)(B)....................................................................................................... 16

Case No. 2:20-cv-01958-CDS-EJY

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.   PRELIMINARY STATEMENT

Defendant Las Vegas Sands ("LVS") opened its Marina Bay Sands ("MBS") casino in 2010 as one of only two casinos licensed to operate in Singapore. MBS generates most of its revenue by extending credit to "high roller" or "VIP" patrons in Singapore and China, with Chinese patrons accounting for one half of LVS's sales. Under LVS's internal credit policies, it could only extend credit to creditworthy patrons "whose level of play and financial resources warrant." Thus, patrons typically had to deposit "front money" to evidence they had sufficient financial resources to obtain credit.

MBS was wildly profitable, generating 32% of LVS's overall casino revenue, until 2015 when increased governmental regulations began to interfere with LVS's reliable stream of revenue from high-roller clientele. New regulations from China imposed strict limitations on the amount of money Chinese patrons could take out of China ($50,000 USD) and Singapore law prevented MBS from extending credit to residents who did not qualify as "premium players" (those who deposited at least SGD $100,000 into an MBS account). These regulatory restrictions had a devastating impact on MBS's revenue as fewer Chinese VIPs gambled at MBS because they could not bring sufficient funds out of China to serve as the "front money" needed to obtain credit. Likewise, patrons in Singapore who did not qualify as "premium players" could not obtain credit.

To increase gambling revenues by qualifying more players for credit, Defendants orchestrated the "Unauthorized Transfer Scheme," which involved transferring money from an in-house wealthy "premium player" account, without their knowledge, to a new patron account that did not have sufficient financial resources to qualify them for credit. MBS executed this scheme by obtaining the premium player's signature on a blank Letter of Authorization and then photocopying the form and filling in the remaining details such as dollar amount and transferee account, instantly qualifying these new, otherwise non-qualifying accounts, for credit.

Confidential witnesses ("CW") who were employed in MBS's compliance and finance departments confirmed that the unauthorized transfers happened "all the time." CWs further stated that MBS employees disregarded internal policies and, instead, extended credit to non-creditworthy patrons based on their personal relationships. One witness observed a Chinese VIP attempting to reward an MBS executive with thousands of dollars for helping push the VIP's credit application through to approval.

Confidential witnesses further confirmed that they attended compliance meetings at MBS attended by LVS's Global Chief Compliance Officer and other high-level executives, where concerns about unauthorized transfers and the high number of suspicious transfer reports ("STRs") being submitted (around 1,000 per year), were discussed. These witnesses' concerns were rebuffed by management who told them to "learn to behave" and "not be so outspoken" about the suspicious transfers.

The Global Chief Compliance Officer who attended these compliance meetings was required to report the unauthorized transfers and STRs to the Compliance Committee to the LVS Board of Directors ("Board"), upon which Defendants Adelson and Goldstein sat. Thus, Defendants were keenly aware of the scheme. The Unauthorized Transfer Scheme grew so pervasive that Defendants had to hire the law firm of Hogan Lovells to investigate. Hogan Lovells concluded that a least SGD $365 million of the suspicious transfers examined appeared to be photocopied duplicates, confirming the existence of the scheme. An investigation by the Singapore's Casino Regulatory Authority ("CRA") determined that MBS lacked the proper internal controls to prevent the unauthorized fund transfers and required LVS to implement better internal controls.

Despite Defendants' knowledge that MBS was engaging in the Unauthorized Transfer Scheme, in violation of LVS's policies for extending credit, Defendants falsely represented to investors throughout the Class Period that LVS "extend[s] credit to approved casino customers following background checks and investigations of creditworthiness" and "whose level of play and financial resources warrant" and that LVS disclosed "all" internal control "deficiencies and material weaknesses" and "[a]ny fraud, whether or not material, that involves management."

The truth of the Unauthorized Transfer Scheme began to emerge when on September 26, 2019, a former MBS patron and Chinese national, Wang Xi, accused MBS of transferring millions of his funds to unknown patrons without his authorization, triggering investigations by the Singapore CRA and Police, and the U.S. Department of Justice. Shortly after the Wang lawsuit was filed, LVS resolved the dispute for ***full damages***, evidencing the lawsuit's merit. The truth was revealed through a series of partially corrective disclosures that occurred between September 2019 and September 16, 2020, resulting in an overall stock drop of $7.41 per share, or 13% over the Class Period, causing significant harm to investors.

Case No. 2:20-cv-01958-CDS-EJY

On March 27, 2022, the Court issued its order (the "Order") on Defendants' first motion to dismiss concluding "[a]t this stage, the Court takes Plaintiffs' allegations as true and finds that Plaintiffs ***sufficiently allege that Defendants engaged in a scheme of unauthorized transfers***." Order at 19. The Court's conclusions in its Order are the law of the case and cannot be revisited.

Recognizing the Court's Order is fatal to their motion, Defendants seek to refocus the Court's attention to the fact that the CRA has not yet found LVS violated any regulations, as a basis for dismissal. But this case is not about whether Defendants violated anti-money laundering laws. It is about whether Defendants violated the *federal securities laws* by making false and misleading statements to investors. Here, Plaintiffs allege that, contrary to Defendants' Class Period statements that LVS only extended credit to creditworthy patrons with sufficient "financial resources," Defendants used the Unauthorized Transfer Scheme to circumvent regulations and transfer funds to non-creditworthy patrons in order to qualify them for credit. Plaintiffs further allege that LVS falsely represented it maintained adequate internal controls. Having adequately pled the existence of the Unauthorized Transfer Scheme, Plaintiffs have alleged Defendants' misstatements were false when made.

Defendants also argue that Plaintiffs failed to allege they acted with scienter because none of the CWs with knowledge of the Unauthorized Transfer Scheme had direct contact with any defendant. But direct contact is not required. Rather, Plaintiffs need only allege Defendants had direct *access* to facts contradicting their false public statements (*e.g.*, facts concerning the scheme). Plaintiffs have sufficiently alleged Defendants' access to information about the scheme from the Global Chief Compliance Officer with whom the CWs *did* have direct contact at compliance meetings. The Global Chief Compliance Officer was required to inform the Board (including Defendants) about the suspicious transfers discussed at these meetings. While these allegations are, alone, sufficient to plead scienter, Plaintiffs allege numerous other facts, such as LVS's internal investigation confirming MBS used photocopied forms to facilitate the unauthorized transfers and the terminations of employees who raised concerns about the scheme. These allegations, when taken holistically, create a strong inference of scienter.

The rest of Defendants' motion rehashes arguments the Court has already rejected and improperly seeks to insert new facts from documents and materials not cited or relied on in the SAC to create factual disputes, such as alternative causes for LVS's stock price decline. Defendants then ask the

Court to rule on those issues in their favor. But at the pleading stage, the Court must accept Plaintiffs' well-pled allegations as true, draw all reasonable inferences in Plaintiffs' favor and refrain from deciding factual disputes. *Evanston Police Pens. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 591 (N.D. Cal. 2019); *Khoja v. Orexigen Therapeutics*, Inc., 899 F.3d 988, 1003 (9th Cir. 2018). In any event, as discussed below, Defendants' unfounded and speculative arguments lack merit.

For these reasons, discussed further below, Defendants' Motion should be denied in its entirety.

## II.   PROCEDURAL HISTORY

The Court appointed Carl S. Ciaccio and Donald M. Desalvo as Co-Lead Plaintiffs on January 5, 2021. ECF No. 19. On March 8, 2021, Plaintiffs filed the First Amended Complaint ("FAC") (ECF No. 36) and on May 7, 2021, Defendants filed a Motion to Dismiss the FAC (ECF No. 52). On March 27, 2022, the Court issued an order on Defendants' motion, finding "Plaintiffs plausibly allege that the [Unauthorized Transfer] scheme existed" (Order at 17), but dismissed the FAC on the grounds that Plaintiffs failed to adequately allege falsity and granted leave to amend. ECF No. 74. Plaintiffs filed a Motion for Reconsideration on April 8, 2022, which is pending. ECF No. 75.

After fully remedying the deficiencies the Court found in the FAC, Plaintiffs filed a Second Amended Complaint ("SAC") on April 18, 2022. ECF No. 77. On May 18, 2022, Defendants moved to dismiss the SAC (the "MTD"). ECF No. 84. Defendants' MTD brief ("DB") is littered with arguments the Court previously rejected and, in some instances, even argues in direct contradiction of positions taken in the first motion to dismiss. Defendants support their MTD with 34 exhibits, including exhibits having no connection to the pleadings, in a brazen attempt to rewrite the pleadings more favorably to Defendants. ECF No. 84-93. Plaintiffs now oppose Defendants' MTD and request for judicial notice.

## III.   STATEMENT OF FACTS

### A.   LVS Opens Marina Bay Sands as One of Only Two Casinos Allowed to Operate in Singapore.

LVS operates casinos in the United States, Singapore, and China. ¶¶1, 38. It's Singaporean casino, Marina Bay Sands (MBS), is one of only two casinos licensed to operate in Singapore. ¶¶2, 38. After commencing operations in late 2010, MBS's casino operations have generated approximately $2.5 billion in annual revenues, accounting for approximately 25% of LVS's total casino revenues. ¶¶2, 38,

58-59. Throughout the Class Period, MBS's contribution to LVS's annual earnings was more than 33% of total EBITDA, making MBS one of the most profitable properties in LVS's portfolio. ¶¶61-62.

At all times during the Class Period, Sheldon G. Adelson was CEO of LVS, Defendant Dumont was the Executive Vice President of LVS (and beginning March 28, 2016, CFO of LVS), and Defendant Goldstein was COO of LVS. ¶¶20-22. Mr. Adelson passed during the pendency of this action and Defendant Dr. Miriam Adelson, the Special Administrator of the Estate of Sheldon G. Adelson, was substituted for Mr. Adelson as a defendant. ¶20.

**B.    Strict Regulatory Requirements on Money Transfers Hindered MBS's Growth.**

MBS generates revenues primarily through two gaming segments: "mass market" and "VIP and premium players." ¶39. The VIP and premium player segment accounted for the largest portion of MBS casino revenues because the amounts wagered by VIPs and premium players were magnitudes larger than the wagers placed by mass market players.[1] ¶¶40, 41. Chinese players historically accounted for approximately one half of MBS's VIP and premium player segment revenues and, thus, were an important part of LVS's business. ¶82.

MBS extends credit to VIPs and premium players to facilitate wagers of larger amounts of money by more patrons. ¶75. CW-2 recalled that during CW-2's employment, seven out of ten players who applied for credit were from mainland China. ¶120. Thus, the extension of credit to VIP and premium players, particularly from China, was essential to MBS's business and growth. ¶76.

MBS's ability to increase the volume of credit-based wagers, however, was limited by LVS's internal credit lending policies and strict governmental regulations on money transfers. LVS's internal lending policy during the Class Period only allowed MBS to extend credit to patrons who were approved after "background checks and investigations of creditworthiness" and to those "whose level of play and financial resources warrant" an extension of credit. ¶¶145, 182, 188. A patron's creditworthiness considered both their financial resources and payment history. As part of LVS's lending policy, Defendants also required patrons to deposit "front money" before they could receive and draw upon lines of credit. ¶¶95-96, 102. Although the front money did not secure the debt, it was evidence that a

---

[1] For example, in 2019, VIP and premium players wagered approximately $29.5 billion USD at MBS, while mass market players wagered only $5.2 billion. *Las Vegas Sands Form 10-K for the year ended December 31, 2019* at 47.

player's financial resources warranted the extension of credit. ¶145. Patrons who did not have sufficient financial resources did not qualify for credit under LVS's internal policies. ¶97.

In violation of LVS's credit policies, throughout the Class Period, Defendants extended credit to non-qualifying casino patrons who lacked the requisite financial resources. CW-2, a credit officer in MBS's Finance Department from 2013 to 2016, performed know-your-customer due diligence procedures on players who wished to obtain credit. ¶118. This diligence included evaluating the prospective borrower's creditworthiness using a database called CentralCredit, a tool utilized within the gaming industry to track a player's credit history at other casinos. *Id.* But, according to CW-2, the ultimate decision of whether to extend credit came from above, with VP-level or higher members of the International Marketing Department often having the last say as to how much credit would be granted. ¶¶117-18. CW-2 recalled that MBS disregarded patron's creditworthiness and patrons received credit regardless of the results of the background or credit checks because the International Marketing Department simply pushed credit applications through to approval for those patrons with whom they had a personal relationship. ¶¶118, 127. CW-2 recalled observing a Chinese VIP player attempt to reward a director in the International Marketing Department with thousands of dollars for helping push the VIP's credit application through to approval. ¶119. CW-2 reported feeling powerless to stop the unethical behavior and ultimately left MBS to get away from such "shady" activities. ¶119.

Singapore and Chinese governmental regulations place further limitations on extending credit. The Singapore Casino Regulatory Authority (CRA) only allows MBS to extend credit to citizens or permanent residents of Singapore who qualify as a "premium player" by depositing at least SGD $100,000 (approximately $75,000 USD) into an MBS account. ¶95. Singapore regulations also require foreign patrons arriving in country to declare amounts exceeding SGD $20,000 (approximately $15,000 USD), and any transfer into the country of more than SGD $5,000 (approximately $3,700 USD) as an anti-money laundering safeguard. ¶70. Moreover, in response to a regulatory crackdown on corrupt money laundering practices among casinos, in 2012, China implemented stricter anti-money laundering regulations prohibiting Chinese nationals from transferring out of the country more than $50,000 USD annually and from physically carrying out of the country more than RMB $20,000 (approximately $3,083 USD). ¶69. Singapore's "premium player" limitation further requires MBS to conduct diligence

on foreign patrons to ensure the absence of money laundering and illegal activities. ¶¶52-53.

As Chinese regulatory restrictions severely limited the amount of money foreign players could bring to MBS, Chinese players were unable to qualify for large lines of credit under MBS's internal policies because, without large amounts of cash to deposit as "front money," Chinese players would be unable to demonstrate they had the financial resources that warranted a line of credit as required by LVS's internal policies. Thus, contrary to Defendants' contention that they had "no need" to engage in the Unauthorized Transfer Scheme because the Singapore CRA does not impose the "premium player" restrictions on foreign patrons (DB at 9), Chinese regulatory limitations on the amount of money that could leave China coupled with LVS's internal credit policies requiring sufficient financial resources still prevented LVS from extending credit to Chinese nationals.

As a result of strict regulations on money transfers, fewer Chinese nationals came to Singapore to gamble, resulting in a decline in MBS revenues prior to the Class Period as both revenues and credit-based wagers fell. ¶¶81-87. Accordingly, to increase casino revenues, Defendants engaged in the Unauthorized Transfer Scheme, which allowed them to circumvent governmental money transfer regulations by disregarding LVS's internal lending policies and extending credit to Singapore residents who did not qualify as "premium players," Chinese patrons who did not have sufficient "front money," and/or all patrons who did not meet the Company's creditworthiness standards. ¶¶5, 92-93, 98, 102.

## C. To Increase MBS Casino Revenues, Defendants Implemented the Unauthorized Transfer Scheme

Prior to and throughout the Class Period, Defendants engaged in the Unauthorized Transfer Scheme to increase gambling wagers by qualifying more players for credit. The Unauthorized Transfer Scheme involved transferring money from an in-house wealthy "premium player" account, without their knowledge, to a new patron account that did not otherwise qualify for credit, thereby manufacturing new "premium player" accounts on paper. MBS executed this scheme by obtaining the premium player's signature on a blank Letter of Authorization and then using this form repeatedly to conduct unauthorized transfers by simply photocopying the form and filling in the remaining details such as dollar amount and transferee account, instantly qualifying these new accounts for credit. ¶¶100-02.

CWs confirm that the Unauthorized Transfer Scheme went unchecked prior to and throughout

the Class Period. According to CW-1, a former Anti-Money Laundering Specialist in MBS's Compliance Department from January 2014 to March 2015 responsible for reviewing new client account openings, deposits and transfers and reporting suspicious transfers, confirmed MBS was transferring money from premium player accounts without their authorization to new accounts to circumvent regulatory restrictions. ¶¶107-10. CW-1 confirmed that the purpose of the unauthorized transfers was so that high-value players could secure credit when Chinese and Singaporean money transfer restrictions would have otherwise prevented such players from bringing sufficient money to MBS to qualify for credit. ¶¶106, 109. CW-1 recalled that the unauthorized transfers occurred "all the time." ¶112. When CW-1 raised this witness's concerns, CW-1 was told by senior members of the Compliance Department to "learn to behave" and "not be so outspoken" about suspicious transfers. *Id.*

An MBS Compliance executive corroborated CW-1's account and reportedly told *Bloomberg* that he, too, raised the Unauthorized Transfer Scheme to management at MBS in 2018 but was told by operations and legal to back off. ¶116. CW-2, likewise, corroborated CW-1's account stating that MBS routinely extended credit to patrons not based on creditworthiness or financial resources but, rather on personal relationships. ¶¶118-19. CW-2 recalled that the Letters of Authorization were often filled out "at the cage," *e.g.*, by the Finance Department responsible for releasing the funds to players. ¶121. CW-1 recalled that MBS did no due diligence before extending credit and thousands of "suspicious transfers" occurred with no oversight. ¶¶106-112; 117-121.

CW-1 stated that the Unauthorized Transfer Scheme was known throughout the Company and regularly discussed at high-level compliance meetings at MBS that CW-1 attended. ¶¶6, 115. During CW-1's tenure, CW-1 attended six to eight compliance committee meetings (once every one to three months) **with LVS's Global Chief Compliance Officer** during which the suspicious transfers between patron accounts and the high volume of STRs were discussed. ¶115. CW-1 recalled the compliance meetings were also attended by the Global Chief Compliance Officer, MBS's chief financial officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, as well as Daphne Hearn, who took over the role of MBS Chief Compliance Officer in September 2014. ¶115. The Global Chief Compliance Officer was required under a corporate charter to report to the Compliance Committee of the LVS Board of Directors ("Board") about "potential criminal acts and

serious violations of the Policies committed by the Company's team members, officers, directors, and other agents…as soon as practicable after the Global Chief Compliance Officer becomes aware of them and no later than the next scheduled meeting of the [Compliance] Committee." ¶309. Defendants Adelson and Goldstein, who sat on the Board were, thus, aware of the Unauthorized Transfer Scheme throughout the Class Period because the Global Chief Compliance Officer would have reported the policy violations and suspicious transfers to the Board. ¶¶307-08.

Even though Defendants were aware of the Unauthorized Transfer Scheme, throughout the Class Period they falsely old investors that LVS "extends credit to approved casino customers following background checks and investigations of creditworthiness" and to patrons "whose level of play and financial resources warrant" an extension of credit." ¶¶145, 182, 188. Contrary to these statements (and others), LVS was disregarding internal policies for extending credit and governmental regulations by transferring money to patrons who lacked the financial resources and/or creditworthiness to receive credit to increase the volume and amount of wagers at MBS. Defendants also falsely claimed that LVS closely monitored money transfers and compliance with internal MBS policies for extending credit:

> [T]oday it's harder to move money than ever [] because we're very compliant and we're very proud of our compliance record.
>
> *       *       *
>
> [I]f a person wants a line of credit or wants to move money, we're probably the first line of defense. In fact, I think we're more aggressive than the government in terms of monitoring that. We're a big believer that compliance is critical. We've embraced it the last 4 years, 5 years, and we don't fear it. We embrace it, accept it.

¶160. Contrary to Defendants' statements that it was "harder to move money than ever," they allowed funds to be freely transferred between patron accounts throughout the Class Period; and rather than being "more aggressive than the government" when a patron sought a line of credit, Defendants were circumventing government regulations to ensure that VIPs received large lines of credit, regardless of creditworthiness, background checks, and financial resources. ¶¶161-62. In fact, when CW-1 attempted to report the illicit transfers, "no one cared" and management took no action to curb the practice. ¶163.

**D.    The Unauthorized Transfer Scheme Results in Internal Investigations and a Sharp Increase in Bad Debt Expense When Non-Creditworthy Borrowers Defaulted on Their Loans**

In late-2017 or early-2018, LVS hired the international law firm of Hogans Lovell to investigate the transactions underlying the Unauthorized Transfer Scheme. ¶¶10, 31, 104-05. Hogan Lovells

concluded that during the period under investigation (2013-2017), of the more than 3,000 letters of authorization examined, SGD $365 million (or more than 26%) were effectuated using Letters of Authorization bearing signatures that appeared similar and to be unauthorized, photocopied duplicates where MBS employees filled in the transfer amounts and other details without the permission of the transfer or patron. *Id.* Defendants admitted as much in a 2018 letter to the CRA wherein they informed the CRA that LVS agreed to implement new control procedures, such as requiring wet ink signatures and verbal authorizations for fund transfers, to prevent the unauthorized transfer of money between players' accounts. ¶114.

The Unauthorized Transfer Scheme also resulted in a tremendous amount of bad debt expense for MBS when patrons ultimately could not repay their loans. ¶129. According to *Bloomberg*, "from 2013 through March 2020 the casino wrote off $717 million from 928 accounts," representing a sharp increase in bad debt of 62%. A former MBS executive told *Bloomberg* that typical losses for a casino that size are $20 million to $30 million a year. The peak write-offs were in 2015 to 2017, the years immediately following the biggest transfers, while 67% of the dollar value was tied to Chinese clients []." ¶¶8, 103, 129-130. The explosion in write-offs during the Class Period coinciding with the largest transfers is strong evidence that credit was being extended to casino patrons whose creditworthiness and financial resources did not justify the extension of credit and that the Unauthorized Transfer Scheme was used to extend credit to patrons who would not have otherwise been eligible to receive credit.

E.      **The Truth About LVS's Unauthorized Transfer Scheme is Revealed Over Several Partial Corrective Disclosures Starting with a Lawsuit Filed by One of MBS's Wealthy Patrons, Wang Xi**

The truth about MBS's scheme to extend credit to players who did not meet LVS's internal standards began to emerge on September 16, 2019 when Wang Xi sued MBS for misappropriating SGD $9.1 million (more than $6 million USD) of his funds by transferring the money from Wang's account to that of other patrons without Xi's authorization. ¶¶9, 29, 133-134. Wang's lawsuit led to further investigations by the U.S. DOJ, Singapore police, and Singapore CRA. ¶¶9, 135-138.

Reports of the lawsuit and other governmental investigations appeared in *Bloomberg* on October 10, 2019 and May 12, June 4, June 7, July 19, and September 16, 2020, with each article revealing more about MBS's Unauthorized Transfer Scheme. ¶¶247-65. The reporting by *Bloomberg* showed that

increased regulatory pressure led LVS to ultimately conduct an internal investigation in 2018 carried out by Hogan Lovells. ¶¶10, 31, 141. According to *Bloomberg*, Hogan Lovells uncovered more than 3,000 authorization letters covering transfers amounting to more than SGD $1.4 billion. Approximately 26% (SGD $365 million) appeared to be phony. ¶¶10, 104-05.

Each new revelation caused the price of LVS stock to fall, falling from $57.08 prior to the revelation of the Wang Xi lawsuit on September 26, 2019 to $49.67 on September 16, 2020 after Bloomberg reported that a second law firm, Davinder Singh Chambers LLC, had been retained to investigate the illicit transactions. ¶¶258-59, 263, 265.

## IV.   LEGAL STANDARD

On a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *McKesson Corp.*, 411 F. Supp. 3d at 591 (*quoting Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable." *Khoja.*, 899 F.3d at 1008 (internal quotations and alterations omitted). Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## V.   ARGUMENT

To state a Section 10(b) claim, a plaintiff must allege: (1) a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) reliance; (4) scienter; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants challenge the first, fourth, and six elements only.

### A.   The Court's Previous Conclusion that Plaintiffs Adequately Alleged the Unauthorized Transfer Scheme is the Law of the Case and Cannot Be Revisited

The Court has already concluded "Plaintiffs plausibly allege that the [Unauthorized Transfer] scheme existed." Order at 17. The Court found persuasive that SGD $365 million (or more than 26%) of the suspicious transfers Hogan Lovells examined during its investigation, bore signatures that

appeared similar, which supported "the inference that these were likely photocopied duplicates and unauthorized." *Id.* at 18. Thus, even though Plaintiffs did not "explicitly" allege the investigation revealed unauthorized transfers, the Court found the "'photocopied duplicates' of the Letters of Authorization *infers that unauthorized transfers occurred at MBS*." *Id.* The Court also found that the Wang Xi lawsuit alleging 22 unauthorized transfers bearing forged or photocopied signatures worth nearly $7 million further supported the existence of the scheme at the pleading stage. *Id.* Thus, the Court concluded "[t]aken together, the Wang Xi lawsuit and Hogan Lovells investigation give a 'reasonable investor that the impression of a state of affairs . . . differs in a material way from the one that actually exists.'" Order at 18 (internal quotations omitted). The Court's conclusions are the law of the case and may not be revisited. *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2013 WL 2247394, at *7 (C.D. Cal. May 9, 2013); *Kipling v. Flex Ltd.*, 2020 WL 7261314, at *9 (N.D. Cal. Dec. 10, 2020) (issues decided in the previous MTD Order were law of the case).

Under the law of the case doctrine, "the decision on a legal issue by the same or a superior court must be followed in all subsequent proceedings in the same case" unless one of the following narrow exceptions apply: "(1) the first decision was clearly erroneous; (2) there has been an intervening change in law; (3) the evidence before the court when reconsidering the issue is substantially different; (4) there are other changed circumstances; or (5) a manifest injustice would result from applying the doctrine." *Vanleeuwen*, 2013 WL 2247394, at *7, at *7 (citing *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998)). "Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* (citation omitted).

Defendants do not argue that the Court's prior Order was clearly erroneous, that there has been an intervening change in law or that manifest injustice would result (exceptions 1, 2 or 5). Rather, despite that the Unauthorized Transfer Scheme alleged in the SAC is based on *the same* facts as those alleged in the FAC, Defendants contend there are purported new facts and/or changed circumstances (exceptions 3 and 4) that warrant the Court revisiting its prior Order. DB at 17. But Defendants do not actually argue *new* facts. Instead, they argue the *absence* of new facts (*e.g.*, additional patron lawsuits or regulatory findings) supports a finding that no Unauthorized Transfer Scheme existed:

[T]he SAC was filed more than a year after the FAC. During this period, *no* other patron

has come forward alleging unauthorized transfers, and *no* regulator has commenced any proceeding, much less found any transfer to have been unauthorized. The SAC is demonstrably founded on unsupported inferences, which have become even more incredulous with the substantial passage of time.

DB at 17. An absence of new facts, however, is not a new fact, and the mere passage of time is not a change in circumstance. Were it otherwise, the law of the case could never prohibit a court from revisiting earlier legal conclusions and the doctrine would be meaningless. Defendants' arguments should be rejected because they are not based on new facts or circumstances and merely repeat the same arguments the Court has already rejected.

*First*, Defendants argue that because only one patron, Wang Xi, brought suit, there can be no scheme. DB at 17-18. But the Court already rejected this argument. Order at 18 ("The fact that only one individual filed a lawsuit, however, does not discount Plaintiffs' allegations of a scheme."). The Court also implicitly rejected Defendants' argument that the passage of more than one year since the FAC was filed without any other lawsuits being filed undermines the scheme. The Court issued its Order on March 27, 2022, well aware that the FAC was filed more than a year before and with full knowledge that only one patron had filed suit at the time of its March 2022 Order. Very little time has elapsed since the Court's March 27, 2022 Order and now—hardly a "substantial passage of time," as Defendants suggest. DB at 17. And none of the relevant facts or law have changed. Further, Defendants' own exhibit suggests there **are** other lawsuits that were brought and would come to light in discovery. Ex. 23 at 1051 (Dec. 21, 2020 *Bloomberg* article referring to "Wang's suit **and similar ones**"). At the pleading stage, Defendants may not interject new facts outside the SAC to create factual disputes and support their erroneous argument that the Court should revisit its prior Order. *Khoja*, 899 F.3d at 998-99. Even if the Court considers Defendants' argument (it should not), the law requires "substantially different" facts, not just *any* new fact, to qualify for an exception to the law of the case doctrine. *Vanleeuwen* at *7 (C.D. Cal. 2013). No such facts are present here.[2]

*Second*, Defendants contend that the law of the case does not apply because the Court's Order

---

[2] Defendants cite *Inchen Huang v. Higgins*, 443 F. Supp. 3d 1031, 1053 (N.D. Cal. 2020) for the proposition that "one-off allegations" of wrongdoing are insufficient to support an inference of widespread wrongdoing. DB at 17. However, in Higgins, unlike here, plaintiff had only alleged "**one** instance of actual off-label marketing." *Higgins* at *1050 (emphasis added). Plaintiffs here, on the other hand, have pleaded a years-long scheme that involved more than 3,000 transfers, totaling SGD $1.4 billion, 26% of which appeared fraudulent by Defendants' own investigation. Even the Wang Xi lawsuit alone, which Defendants settled for the full amount demanded, alleged 22 unauthorized transfers totaling SGD $9.1 million.

Case No. 2:20-cv-01958-CDS-EJY

did not address three of Defendants' arguments. DB at 17-19. But Defendants point to no evidence in the record that the Court overlooked any facts or arguments before it. In fact, the Court's Order makes clear that it *did* consider the FAC and motion to dismiss briefing. Order at 1 (citing Defendants' motion to dismiss briefing and docket numbers). Moreover, Defendants in their opposition to Plaintiffs' Motion for Reconsideration, conceded that the Court "carefully considered" all the facts before it. *See* ECF No. 78 at 6 ("Judge Navarro engaged in a careful review of Plaintiffs' allegations"); *id*. ("following this careful review, the Court appropriately found…Plaintiff had not… adequately plead any false and misleading statements."). If Defendants truly believed the Court overlooked any arguments, the appropriate vehicle to raise those issues was a motion for reconsideration. Defendants did not file such a motion. Regardless, Defendants' arguments were rejected by the Court and/or lack merit.

Specifically, Defendants contend that the Court failed to consider the argument that MBS had no reason to engage in the "premium player[s]" scheme because it could extend credit to Chinese Nationals, regardless of whether they qualified as premium players. DB at 17. But Defendants never made that argument in their first motion to dismiss (ECF No. 52) and, thus, it was never before the Court. Yet, Defendants now fault the Court for not considering it. Courts are expected to "review only issues which are argued specifically and distinctly." *RG Abrams Ins. v. L. Off. of CR Abrams*, 2021 WL 6752000, at *2 (C.D. Cal. Oct. 13, 2021) (quoting *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)). It is not the Court's job to make arguments for Defendants or to scour their briefing for arguments not clearly made. *See Venice PI, LLC v. Doe 1*, 2019 WL 7493522, at *3 (D. Haw. Oct. 30, 2019) ("[T]he burden of representation lies upon [the parties], and not upon the Court.").

In fact, in their first motion to dismiss that was the subject of the Court's Order, Defendants argued the opposite—the CRA required MBS to implement a "credit policy" for ***all*** patrons, including Chinese nationals, "that provides detailed procedures for assessing the creditworthiness of patrons, establishing credit limits and credit accounts, and recovery of debts." ECF No. 52 at 6-7 (citations omitted). It cannot, thus, also be true, as Defendants now argue, that MBS had no reason to engage in the Unauthorized Transfer Scheme because it could still lend to Chinese nationals regardless of premium player status. Rather, as Plaintiffs allege (and Defendants previously conceded), Chinese patrons still had to meet LVS's credit standards before they could obtain credit. Thus, MBS did have reason to

engage in the scheme because it allowed MBS to transfer money to Chinese nationals who otherwise would not have sufficient "front money" to qualify for credit under MBS's internal policy due to regulatory limitations on funds that could be taken out of China. The Unauthorized Transfer Scheme involved transferring money to Singaporean gamblers to achieve premium player status, as well as transferring funds to Chinese nationals so they could have sufficient "front money" to qualify for credit under MBS's internal credit policies. Defendants cannot rewrite the SAC and do not get a do-over to make new arguments after the first one failed. *Vanleeuwen* at *10 (rejecting individual defendants' request to revisit conclusions from prior order that address corporation's arguments finding the court already made "legal conclusions about the sufficiency of the Plaintiffs' allegations").

Moreover, that the CRA did not find Wang Xi's allegations of unauthorized transfers breached any "regulatory requirements" (DB at 18) misses the mark. Plaintiffs allege the Unauthorized Transfer Scheme violated LVS's *internal credit lending policies* and was implemented to circumvent government regulations. ¶¶68, 124-26. The CRA would not have uncovered the scheme without insider information because the transfers were executed using photocopied forms bearing the signature of the patron from whose account the transfer was made. The CRA did, however, conclude that MBS lacked sufficient controls relating to the transfers, just as Plaintiffs allege.

Finally, the Court *already* considered and rejected Defendants' last argument that because Hogan Lovells's investigation did not expressly find any unauthorized transfers, no scheme existed (DB at 18), finding "[t]hough Plaintiffs do not explicitly state that the Hogan Lovell's investigation revealed unauthorized transfers, alleging that the investigation uncovered 'photocopied duplicates' of the Letters of Authorization infers that unauthorized transfers occurred at MBS." Order at 18. Defendants' reliance at the pleading stage on MBS's self-serving statements in a couple of *Bloomberg* articles that MBS, itself, found no evidence of wrongdoing during its own investigation into Wang's allegations cannot overcome the numerous well-pled allegations and corroborating facts to the contrary. Indeed, such factual disputes cannot be resolved at the pleading stage. *Asis Internet Servs. v. Optin Glob., Inc.*, 2006 U.S. Dist. LEXIS 73669, at *21 (N.D. Cal. Sep. 27, 2006) (When plaintiff attaches an exhibit to the complaint, and the exhibit is not a written instrument at issue in the litigation, "the [defendants'] self-

serving statements included therein do not bind Plaintiff.").[3]

Because Defendants have provided no basis for the Court to revisit its Order, the law of the case applies that Plaintiffs have adequately alleged the Unauthorized Transfer Scheme.

> **B.    Plaintiffs' SAC Cures the Pleading Deficiencies the Court Identified in its Order and Adequately Alleges Defendants Made Materially False and Misleading Statements During the Class Period**

A complaint sufficiently pleads falsity where, as here, it "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). At the pleading stage, a plaintiff need not prove falsity, but instead only "allege[] why each of the[] statements . . . could be false or at least misleading." *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1286 (C.D. Cal. 2016). "'[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.'" *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

> **1.    Plaintiffs Adequately Alleged the Credit Misstatements Were *Affirmatively* False and Misleading When Made**

In each of LVS's Form 10-Ks filed during the Class Period, Defendants falsely represented that LVS extended credit to only those who have sufficient financial resources and meet LVS's creditworthiness standards as follows:[4]

---

[3] Defendants' cases are distinguishable (DB at 16) because in those case, the plaintiffs asserted new facts that were different from those alleged in the complaint. *See Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) (law of the case inapplicable where plaintiff asserted "***facts and claims that were different*** from those in the initial complaint"); *Alfasigma USA, Inc. v. First Databank, Inc.*, 525 F. Supp. 3d 1088, 1095 (N.D. Cal. 2021) (same); *Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *7 (N.D. Cal. Apr. 30, 2015) (new facts insufficient to overcome prior dismissal); *Lloyd v. CVB Fin. Corp.*, 2013 WL 12120506, at *22 (C.D. Cal. May 9, 2013) (where core of plaintiff's case was that CVB misrepresented the quality of its loan portfolio, the court may consider a chart derived from SEC filings showing CVB increased loan reserves pled in the first, but omitted from the second complaint); *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) (new facts insufficient to overcome prior dismissal). Here, unlike Defendants' cases, Plaintiffs assert in the SAC, the exact ***same facts*** as alleged in the FAC to support the existence of an Unauthorized Transfer Scheme and the details from *Bloomberg* articles omitted from the SAC relating to compliance with regulations are, unlike in *Lloyd*, not germane to Plaintiffs' securities fraud claim for false statements regarding compliance with LVS credit policies.

[4] Plaintiffs also seek relief from the Court's dismissal of the false statements through a Motion to Reconsider, which motion is currently pending before the Court. ECF No. 75.

- LVS "extend[s] credit to those customers whose level of play and financial resources warrant [] an extension of credit." ¶¶145-149.
- LVS "extend[s] credit to approved casino customers following background checks and investigations of creditworthiness." ¶¶151-152.[5]

On March 10, 2016, Defendant Goldstein made similar false statements at a J.P. Morgan conference where he told investors that LVS closely monitored money transfers and compliance with internal MBS policies for extending credit (¶160):

> [T]oday it's harder to move money than ever [] because we're very compliant and we're very proud of our compliance record.

> \*       \*       \*

> [I]f a person wants a line of credit or wants to move money, we're probably the first line of defense. In fact, I think we're more aggressive than the government in terms of monitoring that. We're a big believer that compliance is critical. We've embraced it the last 4 years, 5 years, and we don't fear it. We embrace it, accept it.

Defendants' statements were false and misleading when made because Defendants did not "monitor" compliance with, or adhere to, MBS's internal credit policies when extending credit. Instead, pursuant to the Unauthorized Transfer Scheme, Defendants ignored those policies and transferred money from qualifying third-party, "premium player" accounts into the accounts of customers who lacked the financial resources and creditworthiness to receive credit, in violation of LVS's internal policies. Having adequately alleged an Unauthorized Transfer Scheme and that the scheme created the impression of a state of affairs that differed from those that existed (Order at 18), Plaintiffs have adequately alleged the above misstatements were affirmatively false and misleading when made. *Ferraro Family Foundation, Inc., et. al. v. Corcept Therapeutics, Inc., et. al.*, 2021 WL 3748325 at \*18-19 (N.D. Cal. Aug. 24, 2021) (finding statements that company promoted drug on-label and complied with FDA regulations affirmatively false and misleading where plaintiff adequately alleged the existence of an off-label marketing scheme); *Berson*, 527 F.3d at 985; *In re GlenFed Inc. Sec. Litig.*, 42 F.3d 1541 at 1548 (9th Cir. 1994) (falsity pled where contemporaneous facts contradict public statements).

In addition to the Wang Xi lawsuit and Hogan Lovells investigation the Court already found

---

[5] This statement was also included in LVS's Form 10-Qs filed on April 24, 2020 and July 24, 2020. ¶¶229, 238.

sufficient (Order at 17-19), falsity is further supported by the accounts of Plaintiffs' CWs who all confirmed that MBS disregarded the Company's credit policies in extending credit. For example, CW-1 reviewed as part of CW-1's job duties, thousands of customer-to-customer transfers that were suspicious and that this witness believed were not authorized by the transferor patron. ¶¶108-12. CW-1 discussed these unauthorized transfers at compliance meetings with the Global Chief Compliance Officer. *Id.* CW-2 corroborated CW-1's account, stating that CW-2 reviewed as part of CW-2's job, new customer credit applications in the CentralCredit database and saw that players were extended credit based on who they knew, not their actual financial condition. ¶¶117-18. Likewise, a former MBS *compliance* executive confirmed he raised the unauthorized transfer issue during MBS's internal investigation in early 2018 but was told by operations and legal to back off with his employment contract not being renewed. ¶116.

In support of dismissal, Defendants make the following arguments, all of which lack merit and are contradicted by Defendants' own motion. *First*, Defendants argue that since Plaintiffs only allege the Unauthorized Transfer Scheme occurred at MBS and no other part of LVS, the alleged misstatements cannot be false because they do not specifically name MBS. Nonsense. A reasonable investor would understand statements about the Company, as a whole, also applied to each 100%-owned subsidiary (*e.g.*, MBS). This is especially so when immediately after the alleged false statement, Defendants' disclosure referenced credit-based wagering at LVS in Macao, Singapore, and the United States. In fact, Defendants argued as much in their initial motion to dismiss, stating "LVS repeatedly disclosed throughout the Class Period that it extends credit to 'customers whose level of play and financial resources warrant….' This **includes certain casino patrons at MBS**." ECF 52 at 6.

*Second*, Defendants contend that the alleged misstatement included within a risk disclosure—that LVS "extend[s] credit to those customers whose level of play and financial resources warrant"—was only a warning and not actionable because Defendants made no "guarantees of the absence of risk." DB at 15-16. But the challenged statement is not couched as a warning about something that *might* or *could* happen. Rather, it is an affirmative statement of present fact providing context to the risk disclosure about the Company's lending policies. Accordingly, no reasonable investor would have understood this statement as merely a warning that LVS might not comply with internal policies and

lend to patrons who lacked the financial resources. Even if the Court considered the statement a risk warning (it is not), it would still be actionable because the purported risk warned about had materialized as MBS was extending credit to non-creditworthy patrons who lacked the required financial resources. *Smith v. NetApp, Inc.*, 2021 WL 1233354, at *7 (N.D. Cal. Feb. 1, 2021) (disclosing "as-yet-unrealized risks and contingencies" is misleading when the risks had already materialized) (quoting *Berson*, 527 F.3d at 986). Nor is Defendants' statement forward-looking (DB at 15) for the same reasons. *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2017 U.S. Dist. LEXIS 122725, at *27 (C.D. Cal. Jan. 17, 2017) ("Forward-looking language includes statements that a company 'expects,' 'believes,' or 'is confident' that certain projections will be realized in the future" and is only protected if identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.")

*Third*, Defendant Goldstein's March 10, 2016 statement was not mere puffery. DB at 27. Puffery is vague or merely optimistic language that is "not capable of objective verification" *Ferreira v. Funko Inc.*, 2021 WL 880400, at *12 (C.D. Cal. Feb. 25, 2021). "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 805 (N.D. Cal. 2019) (citing *In re Petrobras Sec. Litig.* 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) and explaining that statements of compliance that would constitute puffery are actionable when executives are simultaneously engaged in fraud that prompts investigations by government authorities). Here, Defendant Goldstein used specific and concrete language to explain that LVS's monitoring of compliance with governmental regulations and the Company's credit policies went far beyond what was required while simultaneously engaging in the Unauthorized Transfer Scheme that led to regulatory investigations by the DOJ, CRA, and the Singapore Police. Moreover, when questioned by analysts about whether LVS moved money around to enable Chinese high rollers gambling in Singapore, Goldstein affirmatively stated, *inter alia*: "No, the answer is, I've not seen evidence of that." ¶160. Thus, Goldstein's statements were not puffery, but affirmative false statements of material fact.

*Fourth*, Defendants' challenges to Plaintiffs' CWs fail for several reasons. Defendants incorrectly claim that because the CWs were not employed at MBS during or for the entire Class Period, their accounts cannot be considered. Not so. Courts have found where, as here, the witness was

employed *during the period the alleged fraud was occurring*, their accounts should be credited. *Corcept*, 2021 WL 3748325 at *12 (finding off-label marketing scheme adequately alleged, relying, in part, on CW employed prior to the class period but while the alleged scheme was happening); *In re BofI Holding, Inc. Sec. Litig.,* 2017 WL 2257980, at *11 (S.D. Cal. May 23, 2017) (CW's employment prior to Class Period did not diminish "probative value" of allegations related to conduct that began pre-Class Period and continued into it); *In re Quality Sys., Inc. Sec. Litig.,.*, 865 F.3d 1130, 1135 (9th Cir. 2017) (finding statement actionable based on account of CW who left company prior to class period).[6] Each of the CWs was indisputably employed at MBS while the Unauthorized Transfer Scheme was occurring and CW-2 and the Compliance executive were both employed at MBS during the Class Period. Thus, their accounts should be credited. *Corcept*, 2021 WL 3748325 at *11-12.

Defendants also claim CW-1's account is not credible because CW-1 is not alleged to have had interactions with any MBS patrons. DB at 20. But that is irrelevant. CW-1's job was to review documentation of customer transactions, such as money transfers in and out of accounts, and to flag suspicious activity for inclusion in STRs. ¶108. Thus, CW-1 had direct personal knowledge of the scheme, despite not interacting with patrons, because it was CW-1's job to critically review the paperwork evidencing unauthorized transfers. *Id.* CW-1 also interacted directly with "Relationship Managers" who worked with the Finance Department to force through approval of non-compliant

---

[6] Defendants' cases (DB at 20-21) are distinguishable because in those cases, the court found the CW allegations lacked specific detail and/or the CW was not employed when the alleged misconduct was happening. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996-96 (9th Cir. 2009) (CW allegations insufficient where CWs "not positioned to know the information alleged, many report only unreliable hearsay, and others allege conclusory assertions of scienter"); *Nguyen v. Endologix, Inc., et. al.*, 962 F.3d 405, 417 (9th Cir. 2020) (finding CW account insufficient because it "lacks any detail about the supposed device migration problems that Nellix encountered in the European channel"); *Prodanova v. H.C. Wainwright & Co.*, LLC, 993 F.3d 1097, 1110 (9th Cir. 2021) (CW allegations insufficient because they failed to "link a member of the compliance department with the Report or knowledge of the Offering" at issue); *McCasland v. Formfactor Inc., et al*., 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) (CW allegations that on unspecified dates, unspecified defendants directed unspecified employees to conceal the fraud with no corroborating details, insufficient); *In re Downey Sec. Litig.*, 2009 WL 736802, at *9 (C.D. Cal. Mar. 18, 2009) (general allegations that defendants sat on committees "without describing the duties of the committee or how these defendants participated in it," insufficient); *In re Allied Nev. Gold Corp.*, 2016 WL 4191017, at *6 (D. Nev. Aug. 8, 2016) (CW statement "everybody knew" too general and unreliable hearsay); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (allegations of CW employed for three months were "without substance or context" and "vague and incomplete."); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019) (complaint failed to describe CW's job responsibilities); *Miller v. PCM, Inc.*, 2018 WL 5099722, at *9 (C.D. Cal. Jan. 3, 2018) (finding anonymous blog post lacked reliability where the author provided no details to support his personal knowledge of the facts alleged and expressly disclaimed their accuracy stating "such information and sources cannot be guaranteed as to their accuracy or completeness.")). Unlike Defendants' cases, Plaintiffs allege the CWs were employed at the time the Unauthorized Transfer Scheme was occurring and provided specific details about the scheme, how it was implemented, when it occurred, the magnitude and who knew about it as corroborated by other evidence.

Case No. 2:20-cv-01958-CDS-EJY

transfers to high value Chinese gamblers. ¶109. Defendants erroneously claim that CW-1 stated this witness was "always" provided details and paperwork supporting patron consent for transfers. DB at 20. Quite the opposite. CW-1 alleges the Relationship Managers provided "minimal paperwork" to support the transfers and, when questioned by CW-1, gave only "vague details" and a "weak backstory" about the purported relationship between the patrons transferring funds (¶110), further evidencing the scheme.

Likewise, Defendants' criticism that CW-2 cannot speak to the alleged scheme because CW-2 did not work in Compliance (DB at 21) is a red herring. CW-2 worked in Finance, the very department that physically executed the unauthorized transfers. Moreover, contrary to Defendants' argument that CW-2 does not allege MBS excluded the patron's financial condition from its analysis (DB at 21), that is exactly what CW-2 alleges—that MBS routinely extended credit to patrons not based on creditworthiness or financial resources but, rather on personal relationships. ¶¶118-19. Similarly, the Compliance executive cited in the *Bloomberg* article is described as an MBS compliance executive employed during the Class Period through at least 2018. This is sufficient.

Plaintiffs' CW accounts are, thus, not the sort of conclusory allegations Defendants claim. DB at 19. The CWs' statements regarding their observations of the Unauthorized Transfer Scheme are "specific in time, context, and details" and relate to their specific role with the casino. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016). Indeed, courts routinely credit allegations attributed to unnamed sources where, as here, the complaint pleads facts sufficient to show the witnesses would "be in a position to infer" the facts. *Silver Wheaton Corp.*, 2016 WL 3226004, at *3 n. 3; *Quality Sys.*, 865 F.3d at 1145 (plaintiff's allegations need only establish the reliability and personal knowledge of the CW); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.,* 780 Fed. App'x 480, 484 n.5 (9th Cir. 2019) (crediting a hearsay report for scienter and finding CW allegations are credible when they are "sufficiently reliable, plausible and coherent."); *Lloyd*, 811 F.3d at 1208 (same); *In re QuantumScape Sec. Class Action Litig.*, 2022 U.S. Dist. LEXIS 7782, at **19-20 (N.D. Cal. Jan. 14, 2022) (crediting anonymous former employee allegations in short seller report). The CWs independent corroboration of one another's accounts further supports their credibility. *See, e.g., In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1145 (C.D. Cal. 2008) (finding that "[confidential witnesses] from different levels and involved in different aspects of the company corroborate" the allegations supported witness

reliability).

Defendants also rehash arguments already rejected by the Court, either explicitly or implicitly, that they contend undermines Plaintiffs' CW allegations. DB at 22. Each argument is irrelevant to the claims in the SAC and amounts to nothing more than an attempt to distract the Court from Plaintiffs' well-pled allegations. For example, the fact that the CRA continued to renew MBS's license in Singapore and did not find that Wang Xi's allegations or any STRs violated any regulations does not undermine Plaintiffs' case. Plaintiffs' case is about whether Defendants' statements about LVS's credit policies and internal controls were false when made, not about whether LVS violated governmental regulations. Moreover, absent inside information, it is unlikely the CRA would uncover that the transfers were not authorized. The fact that MBS introduced new internal controls in 2018 does not mean those controls were implemented or followed. To the contrary, the fact that LVS employed Singh to conduct a second internal investigation in 2020 and that the DOJ and Singapore police are currently investigating the scheme shows the new control procedures were not followed and that nobody was monitoring LVS's compliance with them. These, and other factual issues Defendants raise, are not appropriately decided on this motion. *Craigslist, Inc. v. Dealercmo, Inc.*, 2017 U.S. Dist. LEXIS 222957, at *4 (N.D. Cal. Apr. 11, 2017). Rather, at the pleading stage, the Court must take Plaintiffs' well-pled allegations as true. *Al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009)

*Finally*, the Unauthorized Transfer Scheme was hardly immaterial (DB at 22-23). Indeed, the total amount of the fraudulent transfers at issue of at least SGD $365 million, exceeded ten percent of yearly revenue. ¶¶104-105. The scheme also resulted in a significant 62% spike in bad debt expense during the Class Period and millions of dollars spent on costly internal investigations and responding to numerous regulatory investigations and the Wang Xi lawsuit. LVS's own risk disclosure, itself, warned that non-compliance with LVS's credit policies would have a "significant" impact on earnings. Thus, Plaintiffs have alleged the Unauthorized Transfer Scheme was highly material. *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 224 (E.D. Pa. 2021) (misrepresentations about "compliance with the code of conduct" were material due to the risk of "government or regulatory investigations and/ or litigation [] depreciating the [defendant's] unit

value.").[7] In any event, materiality determinations are inappropriate at the pleading stage.

### 2. Plaintiffs Adequately Alleged the SOX Certifications Were Affirmatively False and Misleading.

Each of the Company's Form 10-Ks and Form 10-Qs filed with the SEC during the Class Period contained SOX certifications signed by Defendants Adelson and Dumont that falsely represented "this *report* does not contain any untrue statement of material fact" and "the financial statements, *and other financial information* in this report, fairly present in all material respects the financial condition, results of operations and cash flows" of the Company. ¶¶155, 177, 192, 208, 224, 233, 242. The SOX certifications were affirmatively false and misleading when made because Defendants falsely stated they complied with LVS's internal credit and lending practices when they did not. *See* Sections V.A and V.B.1., *supra*. Having adequately alleged the Unauthorized Transfer Scheme (Order at 17-19), Plaintiffs have alleged Defendants' SOX certifications were false when made.

In fact, Defendants admitted as much in a 2018 letter to the CRA wherein they informed the CRA that LVS agreed to implement new control procedures, such as requiring wet ink signatures and verbal authorizations for fund transfers, to prevent the unauthorized transfer of money between players' accounts. ¶¶113-14, 140. Two years later, when investigating the allegations in the Wang Xi lawsuit in or around September 2020, the CRA concluded that "there were weaknesses in MBS's casino control measures pertaining to fund transfers" and directed MBS to strengthen its control measures. ¶30. A plaintiff sufficiently alleges SOX certifications are false where, as here, a regulatory investigation concludes the company lacks internal controls. *In re Wash. Mut., Inc. Sec.*, 694 F. Supp. 2d 1192, 1212-13 (W.D. Wash. 2009) (misstatement that internal controls were effective adequately pled as false when internal document highlighted gaps in the company's internal controls related to its drive to increase loan volume).

---

[7] Defendants' cases (DB at 23) are easily distinguishable as none of Defendants' cases involved allegations of an illicit scheme that triggered governmental investigations with potentially catastrophic consequences. *In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d 889, 894 (D. Nev. 1999) (finding plaintiff failed to allege the single vendor dispute at issue existed at the time of the alleged misstatement); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160-61 (S.D.N.Y. 2003) (the undisclosed trades had no impact beyond the 0.3% difference in revenues and did not include an illicit scheme that triggered regulatory investigations). Moreover, the *Matrixx* case Defendants cite **supports** materiality. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28, 131 S. Ct. 1309, 1312 (2011) (materiality adequately pled even without statistical significance because "[c]onsumers likely would have viewed [the undisclosed risk] as substantially outweighing its benefit").

Defendants' certifications also affirmatively declared that LVS had disclosed all internal control weaknesses and deficiencies and "any fraud" whether or not material involving employees with roles in the registrant company's internal controls (¶¶155, 177, 192, 208, 224, 233, 242):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Again, having adequately alleged the scheme, Plaintiffs have also alleged the above statements were false and misleading when made because LVS did not disclose the fraudulent Unauthorized Transfer Scheme or that LVS lacked sufficient internal controls over compliance and the fund transfer process. Having spoken about and, thus, put at issue, "any fraud" and internal control "deficiencies" in the SOX certifications, Defendants had a duty to disclose the Unauthorized Transfer Scheme. *See Zaghian v. Farrell*, 675 F. App'x 718, 721 (9th Cir. 2017) (reversing dismissal on the pleadings where defendants voluntarily "made statements reflecting confidence" in product sales but "fail[ed] to inform the market about the risk" related to product sales); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (duty to disclose "illegal or fraudulent business practices" where corporation put that conduct "in play").

Defendants contend that their SOX certifications only apply to LVS's internal controls over *financial reporting*, which is "different," they say, from what Plaintiffs allege concerning LVS's *operational* controls. DB at 26-27. Defendants' argument misstates the scope and application of their SOX disclosures. The SOX certifications concern LVS's internal controls over **all** disclosures made in the Form-10K "report," not just the numbers reported in its financial statements. *See, e.g.*, ¶192 ("this **report** does not contain any untrue statement of a material fact…."). Moreover, the financial statements include more than just the numbers reported in the financial statements, themselves. They also include the footnotes to the financial statements. Plaintiffs allege the "Accounts Receivable and Credit Risk" policy disclosed in "Note 2 — Summary of Significant Accounting Policies" is false and misleading because LVS did not comply with its stated accounting policy. *See* Section V.B., *supra*. Thus,

Defendants' arguments fail.

### 3.   Defendants Violated Item 105 of Regulation S-K.

Failure to disclose material risks that make an investment speculative or risky, such as the Unauthorized Transfer Scheme, constitute a violation of Item 105 of Regulation S-K, and are actionable under Rule 10b-5. *See In re Nuvelo, Inc.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) ("the SAC need merely allege that defendants misled investors by omitting to disclose a material *risk*") (emphasis in original). Having adequately alleged the Unauthorized Transfer Scheme (Order at 17-19), which indisputably was not disclosed, Plaintiffs have adequately alleged an Item 105 claim. *Id. See also, e.g.*, *Rabkin v. Lion Biotechnologies, Inc.*, 2018 U.S. Dist. LEXIS 25326, at *28 (N.D. Cal. Feb. 15, 2018) (risk disclosure of reasons why stock might fluctuate actionable where defendant failed to disclose it was actively engaged in a promotion scheme intended to manipulate the price of its common stock).

Defendants' only arguments in response are that (i) the Unauthorized Transfer Scheme is immaterial; and (ii) they sufficiently disclosed warnings about the collectability of receivables. DB at 24-25. Both fail. First, while materiality determinations are highly fact-intensive and, thus, generally inappropriate for resolution on a motion to dismiss, Plaintiffs have nonetheless adequately alleged the scheme was material. Section V.A, *supra*.

Moreover, even though the alleged misstatement is contained within a risk factor, it was not couched as a warning. Section V.B.1., *supra*. There is simply no specific warning anywhere in this risk factor that LVS might disregard its own internal credit policies, which made investing in LVS speculative in terms of high bad debt expense, costly investigations and patron lawsuits and reputational harm. LVS's generic warnings about receivable collectability are insufficient because they do not warn of the specific risk at issue. *In re Portal Software, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 20214, at *38 (N.D. Cal. Aug. 10, 2005) (mere boilerplate warnings insufficient because "[t]he cautionary warning ought to be precise and relate directly to the forward-looking statements at issue.").

### C.   Plaintiffs Adequately Alleged Scienter

Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). Plaintiff need not allege Defendants "*actually knew*" their statements were false. *In re VeriFone*

*Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 708 (9th Cir. 2012) (emphasis in original). Recklessness is sufficient. *Lloyd*, 811 F.3d at 1208. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Hatamian v. Advanced Micro Devices, Inc.,* 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015). Scienter is adequately alleged where "*all* of the facts alleged, *taken collectively,* give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 310 (emphasis in original); *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (courts must "consider the totality of circumstances, rather than… develop separately rules of thumb for each type of scienter allegation."). A scienter inference is "strong" if it is "at least as likely as any plausible opposing inference." *Tellabs*, 551 U.S. at 311, 328-329. The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'" – it need only be as plausible as any non-culpable inference. *Tellabs,* 551 U.S. at 324. Thus, a "tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.,* 2014 WL 12585809, *8 (C.D. Cal. Aug. 4, 2014).

Plaintiffs' scienter inference is at least as plausible as Defendants' non-culpable explanation.

> **1.    CWs Confirm the Unauthorized Transfer Scheme Was Discussed at Compliance Meetings Attended by the Global Chief Compliance Officer Who Was Required to Report the Unauthorized Transfers to Defendants**

Throughout the Class Period, LVS maintained both a Board Compliance Committee and an Operational Compliance Committee. ¶¶306-09. The Board Compliance Committee met four times per year and reported directly to the Board, upon which Defendant Adelson (Chairman) and Goldstein sat. ¶¶20, 22. The Board Compliance Committee charter tasked the committee with "assist[ing] the Board in overseeing the Company's compliance program," including: (i) *meeting with the Global Chief Compliance Officer* about violations of LVS policies "as soon as practicable after the Global Chief Compliance Officer becomes aware of them and no later than the next scheduled meeting of the Committee;" (ii) reviewing and *discussing with the Global Chief Compliance Officer* the quarterly reports of the Company's internal Operational Compliance Committee meetings; and (iii) reviewing periodic reports on "anticorruption, anti-money laundering and other compliance matters." ¶¶307-09. The Operational Compliance Committee charter tasked the committee with monitoring LVS's

compliance with business practices and procedures and regulations and was required to provide the Board Compliance Committee with quarterly updates. ¶315.

CW-1 stated that, during CW-1's tenure at MBS, CW-1 personally attended six to eight compliance meetings (once every one to three months) with **LVS's Global Chief Compliance Officer**, MBS's chief financial officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, as well as Daphne Hearn, during which concerns about the suspicious transfers between patron accounts and high number of STRs (suspicious transfer reports) were discussed. ¶¶115, 317. CW-1 stated that the number of STRs coming from MBS were so unusually high that CW-1 and other attendees questioned executives at the compliance meetings about why MBS never implemented a solution. *Id.* CW-1's concerns were rebuffed by executives who told CW-1 to stop filing so many STRs. ¶ 112. Thus, contrary to Defendants' erroneous contention that Plaintiffs do not allege the unauthorized transfers were discussed at these meetings (DB at 30, 34), Plaintiffs allege numerous facts demonstrating the scheme and glaring red flags (high STRs) were discussed at the meetings.

Under the Compliance charters, the Global Chief Compliance Officer was required to report the unauthorized transfers and suspicious activity to the Board upon which Defendants Adelson and Goldstein both sat, and management on no less than a quarterly basis. ¶¶307-09, 318. These facts, combined with CW1's account that the Global Chief Compliance Officer was informed of the Unauthorized Transfer Scheme, is sufficient to raise a strong inference of scienter as to the Individual Defendants. *Smajlaj v. Brocade Communs. Sys.*, 2007 U.S. Dist. LEXIS 64968, at *6 (N.D. Cal. Aug. 27, 2007) (finding scienter adequately pled where, as a result of defendants' committee duties and responsibilities, they "either knew, or were reckless in not knowing" of the fraud). Like in *Smajlaj*, Plaintiffs here have described with particularity the duties and responsibilities of the Board Compliance Committee and the Global Chief Compliance Officer and demonstrated that Defendants would have been informed of the fraud after the Global Chief Compliance Officer learned of the of the unauthorized transfers in meetings with CW-1 and reported them to the Board Compliance Committee. Accordingly, Individual Defendants Adelson, Dumont, and Goldstein knew, or were reckless in not knowing, of the unauthorized transfers and red flags being reported to them prior to and during the Class Period.

Defendants contend that these allegations are insufficient to support a strong inference of scienter for two unavailing reasons. *First*, Defendants contend that because none of the CWs are alleged to have had direct contact with the Individual Defendants, Plaintiffs cannot show Defendants knew of the Unauthorized Transfer Scheme at the time of their misstatements. DB at 29-30. But Plaintiffs need only show Defendants had access to the relevant information. *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 U.S. Dist. LEXIS 95464, at *23 (S.D. Cal. Jun. 1, 2020) (***defendants' access to data*** showing large payments to physicians raised an inference of scienter). Moreover, CW-1 had direct contact and interactions with Global Chief Compliance Officer about the Unauthorized Transfer Scheme and high number of STRs at frequently held compliance meetings. ¶115. The Global Chief Compliance Officer presumably adhered to the Compliance charters and performed his job responsibilities and reported the scheme to Defendants, thereby linking their knowledge of, or access to, facts evidencing the scheme. ¶¶306-19.

Defendants, in support of their argument they were unaware of the scheme, rely on a December 2020 *Bloomberg* article reporting that "Marina Bay management was largely unaware of the transfer problem until 2018." DB at 30. While Plaintiffs cite the December 2020 Bloomberg article in the SAC as further evidence of the scheme, they did not include this statement regarding *MBS*'s management's knowledge because that is irrelevant. It is not MBS's management's scienter that is at issue. It is the scienter of the Individual Defendants who are LVS's most senior executive officers that matters. Moreover, as discussed in Plaintiffs' accompanying Opposition to Judicial Notice, the Court may not consider this statement for the truth of the matter because it is not alleged in the SAC (JN at 8-10) and would contradict facts alleged by the CWs and confirmed by LVS's own internal investigations that Defendants knew of or recklessly disregarded the scheme. *In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 919 (N.D. Cal. Apr. 15, 2020) ("a court may not take judicial notice of a fact that is 'subject to reasonable dispute'"). Moreover, the Court may not resolve factual disputes at the pleading stage. *Abdo v. Fitzsimmons*, 2017 U.S. Dist. LEXIS 228340, at *74 (N.D. Cal. Nov. 3, 2017).

*Second*, that the CWs were not employed during the entire Class Period does not, as Defendants erroneously contend (DB at 29) undermine their credibility. As discussed above in Section V.B.1., *supra*, where, as here, the witness was employed *during the period the alleged fraud was occurring*, their accounts should be credited. *Corcept*, 2021 WL 3748325 at *11-12.

**2.    LVS's Own Internal Investigations into the Unauthorized Transfers and Related Patron Lawsuits Support Scienter**

Defendants' scienter is further supported by the meritorious Wang lawsuit, which settled for *full damages*, and multiple internal Company investigations during the Class Period into LVS's Unauthorized Transfer Scheme. First, the Wang lawsuit is a perfect example of how the alleged Unauthorized Transfer Scheme was perpetrated and harmed patrons. Wang alleged 22 unauthorized transfers worth $6.1 million USD were made out of his account into other patrons' accounts over a three-month period without his knowledge. ¶9. LVS ultimately paid Mr. Wang the *full amount* of the money transferred out of his account to resolve his lawsuit, indicating the suit had merit. Defendants certainly were aware of the substance of a lawsuit filed against them and payment of a settlement to resolve it. *Johnson v. CBD Energy, Ltd.*, 2016 U.S. Dist. LEXIS 87174, at *29 (S.D. Tex. July 6, 2016) (reasonable to assume CFO was aware that the company had been sued). That no other patrons filed suit does not, as Defendants suggest (DB at 17), negate scienter, as this Court already found. Order at 18. Moreover, Defendants' exhibit suggests MBS *did* receive patron complaints. Ex. 23 at 1051 (December 2020 *Bloomberg* article referring to "Wang's suit *and similar ones*.").

In addition, in early 2018, Defendants hired Hogan Lovells to conduct an internal investigation into suspicious unauthorized transfers that occurred during 2013 to 2017. ¶139. The Hogan Lovells probe concluded that, of the SGD $1.4 billion in transfers examined, SGD $365 million (26%) were effectuated using unauthorized photocopied duplicates where MBS employees filled in the transfer amounts and other details, supporting Defendants' knowledge of the Unauthorized Transfer Scheme. *Id.*

Recognizing LVS's internal investigations are fatal, Defendants resort to erroneously arguing that the investigations support the inference of no wrongdoing because they purportedly did not uncover any evidence of unauthorized transfers or regulatory non-compliance. DB at 31-32. Not so. The Court already found the Hogan Lovells investigation findings evidenced the existence of the Unauthorized Transfer Scheme (Order at 18), which uncovered evidence that a material amount of transfers (26%) appeared to be photocopied with similar signatures.

Moreover, the gravamen of Plaintiffs' SAC is that LVS's Unauthorized Transfer Scheme violated the Company's internal lending practices and was perpetuated by LVS's lack of internal controls. Defendants' persistent efforts to distract the Court with arguments related to LVS's regulatory

compliance, rather than the falsity of their misstatements about LVS's credit policies and internal control, is a red herring that should be disregarded. *See Vancouver Alumni Asset Holdings Inc. v. Daimler AG,* 2017 WL 2378369, \*13 (C.D. Cal. May 31, 2017) ("the Court's findings do not depend on Defendants' technical compliance with a regulatory exception or violation of government regulations. The issue is whether Defendants made misleading statements as to any material fact.").

Finally, Defendants' contention that scienter is negated by the fact the CRA purportedly found no "regulatory violations" from the thousands of STRs MBS filed or the Wang Xi lawsuit (DB at 34) fails for similar reasons. There is no evidence that Singapore regulators were reviewing the STRs for compliance with LVS's internal lending policies or to ensure the signatures and paperwork were valid. Rather, regulators were likely reviewing the transfers to ensure that, for example, money transfers from China did not exceed allowable amounts. Since there is no financial limit on transfers from accounts in Singapore, the Unauthorized Transfer Scheme would not be uncovered by regulators. Moreover, LVS could be engaging in unauthorized transfers below the regulatory limit, which would also not be flagged by the CRA. Accordingly, a lack of any regulatory violation by the CRA in no way undermines the Unauthorized Transfer Scheme and the Wang lawsuit and CW accounts confirming the scheme. Moreover, at the pleading stage, the Court must take Plaintiffs' allegations as true and draw all reasonable inferences in Plaintiffs favor. Thus, it cannot, as Defendants request here, make improper factual findings based on Defendants' unsupported inferences.[8]

Finally, Defendants' argument that it makes no sense for LVS to implement controls in 2018 only to keep engaging in the unauthorized scheme ignores that LVS had to conduct a second investigation for this very reason—the scheme was still occurring. Defendants' purported new internal control procedures does not mean they were adhered to and Defendants are, at best, reckless for being aware of the unauthorized transfers but not ensuring such controls were implemented and followed before making their false public statements.

### 3. Plaintiffs' Other Allegations Support the Holistic Scienter Analysis

The following additional scienter allegations, while alone are insufficient to support a strong

---

[8] Unlike *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1084 n.220 (C.D. Cal. 2012) relied on by Defendants (DB at 32), the Hogan Lovells investigation was completed and its findings support the unauthorized transfer scheme.

inference of scienter, when considered in totality as the Court must do, support a strong inference.

*First*, the significant turnover in the Compliance Department of employees who objected to and reported the unauthorized transfer practice (¶¶116) supports scienter. According to CW-1, during this witnesses' employment, three to four individuals in compliance were terminated in retaliation for raising the suspicious transfers. ¶116. A June 4, 2020 *Bloomberg* article corroborated CW-1's account, reporting that MBS had gone through at least six chief compliance officers over the last decade. ¶¶292-93.[9] The Bloomberg article also cited a former MBS compliance executive who was told to back off when he raised concerns about the unauthorized transfers and his employment contract was not renewed thereafter. *Id.* Thus, contrary to Defendants' contention that Plaintiffs fail to show how the employee terminations were for anything other than general business reasons (DB at 33), Plaintiffs allege specific facts and witness accounts of individuals employed in the "Compliance" Department at issue who were fired for raising concerns about unauthorized transfers. Such turnover in retaliation supports scienter. *Zucco Partners*, 552 F.3d at 1002 ("resignations, terminations, and other allegations of corporate reshuffling may…be indicative of scienter").[10]

*Second*, the significant 62% increase in uncollectible account reserves further supports that the unauthorized transfers were being made to non-creditworthy patrons who lacked the financial resources to repay the loan during 2013 to March 2020. Defendants, as LVS officers who signed its SEC filings, either knew of the sharp 62% increase in bad debt reserve, or recklessly disregarded it and failed to investigate the reasons for the increase. *See, e.g. Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1122-24 (C.D. Cal. June 12, 2012) (allegations that a significant portion of the company's reported sales were based on alleged misconduct supported scienter). Defendants' argument that, because Plaintiffs do not challenge the accuracy of the reserves, their allegations are insufficient (DB at 30-31), ignores Plaintiffs' argument. It is the *increase* in bad debt reserves, not the accuracy of the

[9] *See, e.g.*, *Am. Apparel*, 855 F. Supp. 2d at 1084 n.220 ("the fact that American Apparel had three chief financial officers during the class period … **is relevant in conducting a holistic review of plaintiffs' allegation**. ").

[10] *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *17 (N.D. Cal. Nov. 14, 2016), upon which Defendants rely (DB at 33), is distinguishable because, unlike here, the departure of the head of sales was not accompanied by any other evidence of scienter. Here, LVS terminated employees in retaliation for their raising concerns about the scheme. Defendants' reliance upon *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1202 (N.D. Cal. 2008) (DB at 33) is also misplaced. In *Brodsky*, the court declined to credit a CW because the plaintiffs could not show how the CW would have knowledge of the conduct at issue. Here, Plaintiffs have clearly demonstrated that CW-1 worked in compliance, had first-hand knowledge of the scheme, and even raised the issue of the illicit conduct during meetings with the Global Chief Compliance Officer.

Case No. 2:20-cv-01958-CDS-EJY

amounts, that alerted Defendants that LVS was violating its underwriting policies. Such red flags support scienter. *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1102 (9th Cir. 2011) ("red flags [] support a strong inference of scienter").

*Third*, Plaintiffs sufficiently allege corporate scienter through: (i) the findings of multiple Company investigations that Defendants initiated; (ii) the Compliance Committee meetings attended by the Global Chief Compliance Officer where the unauthorized transfers and abnormally high STRs were discussed; and (iii) CW-2's account confirming that the decision whether or not to extend credit "came down from above," and credit was granted based on executive's personal relationships (¶118). *Brown*, 875 F. Supp. 2d at 1122-24.

Finally, that MBS was an important business segment accounting for 25% of LVS's revenue and nearly half of its EBITDA, when taken holistically, supports the overall scienter analysis. *Hessefort v. Super Micro Comput., Inc.*, 2021 U.S. Dist. LEXIS 63629, at *37-8 (N.D. Cal. Mar. 29, 2021).

### 4.   Defendants Had Motive to Mislead Investors

A plaintiff need not allege motive to plead scienter. *See Tellabs*, 551 U.S. at 325 (absence of motive not fatal, rather, "allegations must be considered collectively"). The Ninth Circuit "do[es] not draw a negative inference from the absence of stock sales that benefitted the defendant [officers]." *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010).[11]

Although not required, Plaintiffs allege Defendants were motivated to engage in the undisclosed, Unauthorized Transfer Scheme to obtain renewal of LVS's Singapore license. ¶¶304-06, 307-10. MBS's exclusive license was expiring in 2017 and MBS could only be considered for this coveted position if it had, among other things, "suitable financial resources," and was a "suitable person to develop, maintain and promote the integrated resort (of which the casino is a part) as a compelling tourist destination which

---

[11] As a corollary to this, courts recognize that the mere fact that an insider does not engage in insider trading or even purchases additional shares during the Class Period does not undermine allegations of scienter. *See, e.g, Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012) ("the Court again rejects the proposition that a strong inference of scienter is negated by the fact that the Individual Defendants purchased and/or retained FRB stock during the class period"); *Resh v. China Agritech, Inc*., 2019 WL 1055240, at *6 (C.D. Cal. Jan. 8, 2019) (treating defendant's purchases during relevant period "only as a competing inference" that "neither support[ed] nor negate[ed] scienter"). Accordingly, contrary to Defendants' assertion (DB at 34-35), the mere fact that Defendants are not alleged to have engaged in insider selling during the Class Period does not undermine the strong inference of scienter against them. The cases Defendants rely on (DB at 35-36) are inapposite as, unlike here, those complaints contained allegations of insider trading or personal benefits and the court was evaluating whether such trades or benefits were suspicious.

meets prevailing market demand and industry standards and contributes to the tourism industry in Singapore." ¶320. With revenues falling (¶¶63, 88) and industry experts identifying further downward trends due to strict regulatory changes (¶89), LVS lacked the financial resources to satisfy MBS's renewal. Coupled with VIP betting volume drastically down 34% in third quarter 2014, alone, LVS's ability to contribute to tourism in Singapore was also seriously called into question. ¶88.

As regulations hindered LVS's main revenue driver, LVS turned to unauthorized transfers to both maintain exclusivity in Singapore as well as generate growth. This goes beyond the generic motive attributed to every company and lends support to a strong inference of scienter. *See Crago v. Charles Schwab & Co.*, 2017 WL 6550507, at *5-6 (N.D. Cal. Dec. 5, 2017) (scienter where defendant engaged in scheme to increase company profits); *Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055, 1073-4 (D. Neb. 2016) (scienter of TD Ameritrade was based, in part, on motive as "reflected in its alleged generation of over one billion dollars in revenue" in connection with "order routing practices"); *Roth v. Aon Corp.*, 2008 WL 656069, at *5- 6 (N.D. Ill. Mar. 7, 2008) (scheme "crucial for the company's continued revenue growth" was sufficient motive to support inference of scienter).

The Unauthorized Transfer Scheme also provided significant tax savings for the Company's Singapore operations. In their MTD brief, Defendants seek judicial notice of the Casino Control Act (CCA), but suspiciously omit the section of the code relating to the taxation of Defendants' casino operations in Singapore. Specifically, that omitted section of the code states, in relevant part:

> A casino operator shall pay to the Comptroller a casino tax every month during which the casino operator holds a casino licence [sic]. The amount of casino tax payable under subsection (1) shall be (a) 5% of the gross gaming revenue for the month from premium players; and (b) 15% of the gross gaming revenue for the month from any other player.

Casino Control Act (Chapter 33A), Part IX, Casino Tax, paragraph 146.[12]

Thus, not only did the Unauthorized Transfer Scheme increase the Company's revenues, it also allowed LVS to avoid paying a 15% tax on gaming revenues from non-premium players by converting them to "premium players" at a 5% tax rate for total potential annual tax savings in excess of $100 million USD. Thus, Defendants' argument—that the risk of getting caught outweighed the benefits of

---

[12] In March 2022, the Casino Control Act was amended, changing the taxation rate to 12% and 22% of gaming revenues from premium players and from any other player, respectively. *See* Casino Control Act 2006, Singapore Statutes Online, accessed June 17, 2022 at 9:15 am, https://sso.agc.gov.sg/Act/CCA2006.

Case No. 2:20-cv-01958-CDS-EJY

the Unauthorized Transfer Scheme (DB at 28)—does not survive scrutiny.

### 5. Plaintiffs Have Alleged a Strong Inference of Scienter at Least as Compelling as Any Non-Culpable Inference Asserted by Defendants

Defendants fail to advance a single nonculpable explanation for the alleged pervasive Unauthorized Transfer Scheme, as supported by the accounts of CWs directly involved in the oversight, monitoring and execution of the transfers, the Wang Xi lawsuit that settled for full claimed damages and the Hogan Lovell's investigatory findings confirming the Unauthorized Transfer Scheme. Instead, Defendants merely point to the absence of any regulatory violations found by the CRA and its renewal of MBS's license and that purportedly no other patrons besides Wang filed suit. DB at 35.

As the Court has already rejected Defendants' argument that the absence of other patron lawsuits negates the existence of a scheme (Order at 18), and the CRA was not investigating the specific misconduct at issue here and was likely misled by the forged transfer forms, the more plausible inference is that Defendants were aware of the Unauthorized Transfer Scheme through the Compliance Committee reporting, the Wang Xi lawsuit, their internal investigations and the DOJ and Singapore Police investigations and used it as a means to boost revenue to obtain renewal of MBS's Singapore license.

### D. Plaintiffs Adequately Allege A "Causal Connection" Between the Alleged Misstatements and the Corrective Disclosures that Caused Plaintiffs' Losses

To adequately plead "loss causation" a plaintiff must show a "'causal connection'" between the facts misrepresented and his or her alleged loss. *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013)). The "ultimate issue" is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *First Solar*, 881 F.3d at 753. A plaintiff is not required to show "that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (emphasis in original and internal quotations omitted). Consequently, "loss causation is a context-dependent inquiry as there are an infinite variety of ways for a tort to cause a loss." *First Solar*, 881 F.3d at 753 (internal quotations omitted). Because arguments over "loss causation" are highly fact intensive, they are "normally inappropriate to rule on . . . at the pleading stage." *In re Gilead Scis. Sec.*

*Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *Rudolph v. UTStarcom,* 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008) ("[L]oss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage….").

Defendants do not dispute that Plaintiffs allege a direct "causal connection" between Defendants' misstatements that LVS purportedly complied with internal lending standards and maintained "effective" internal controls and the corrective disclosures that revealed MBS ignored internal lending standards by engaging in the Unauthorized Transfer Scheme and, thus, lacked effective controls. Thus, "plaintiffs meet the low bar of pleading proximate cause for purposes of loss causation." *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Plaintiffs also allege that LVS's stock price declined in response to the alleged corrective disclosures, each revealing new details about the falsity of Defendants' misstatements, thereby causing losses to Plaintiffs and members of the putative Class. Nothing more is required at the pleading stage.

In particular, Plaintiffs allege the following corrective disclosures:

**September 26, 2019**: Wang Xi filed a complaint in the High Court of Singapore alleging MBS improperly transferred approximately $6.6 million USD from his account to other patrons' accounts without his permission. Upon this news, LVS's stock price declined by $1.20 per share, or 2.1%, from $57.08 per share on September 25, 2019 to $55.88 per share on September 26, 2019.

**May 12, 2020**; *Bloomberg* reported that the Singapore Police began an investigation into Mr. Wang's claims against MBS, causing LVS's stock price to drop $2.54 per share, or 5.2%, from $48.50 per share on May 11, 2020 to $45.96 per share on May 12, 2020.

**June 4-7, 2020**: *Bloomberg* revealed the severity of MBS's unauthorized transfer practices in an article published mid-day on June 4 announcing that the Department of Justice was now investigating MBS's unauthorized transfers. *Bloomberg* updated this article hours later on June 5, 2020 to provide additional details about Singapore's anti-money laundering weaknesses that likely led to MBS's unauthorized transfer practices alleged by Wang. Then, on Sunday, June 7, 2020, *Bloomberg* published a follow-on article calling for LVS to conduct greater due diligence on customers in light of the Wang lawsuit. Upon the news, LVS's stock price declined $.56, $.42 and $.15 per share on June 4, June 5 and

June 8, respectively, for an aggregate stock drop of $1.13 per share over the three days.[13]

**July 19, 2020**: *Bloomberg* reported that MBS settled the Wang Xi lawsuit for the *full* amount of the alleged unauthorized transfers, indicating to the market that MBS had, in fact, engaged in the unauthorized transfers alleged in Wang Xi's complaint. Upon the news, LVS's stock price declined by $1.41 per share, or 3%, from $48.69 per share on July 17, 2020 to $47.28 per share on July 20, 2020.

**September 16, 2020**: *Bloomberg* published an article disclosing for the first time that LVS had retained Davinder Sing to conduct an internal investigation of the unauthorized transfers at MBS and that LVS had previously retained the law firm of Hogan Lovells in 2018 to conduct a similar investigation. The article further disclosed that the Hogan Lovells investigation focused on the period of 2013 to 2017 and examined 3,000 suspicious transfers during that period worth $1 billion USD, of which SGD $365 million (26%) involved transactions that raised red flags about unauthorized transfers. In response to the news, LVS's stock price declined $2.18 per share, or 4.2%, from $51.85 per share on September 15, 2020 to $49.67 per share on September 16, 2020. The stock continued its decline the following week to close at $45.04 per share on September 23, 2020, for a total decline of 13%. ¶343; Byrne Decl., Ex. 30 (stock price chart).

Defendants' sole arguments in support of dismissal are that (i) LVS's stock price purportedly increased in response to corrective disclosures on October 10, 2019 and June 4, 5 and 8, 2020; and, that (ii) even when LVS's stock price declined, there is no loss causation because the stock price rebounded in the following days. DB at 37. These improper factual arguments involving competing interpretations of disclosures and data are inappropriate for determination on a motion to dismiss, prior to discovery. *Gilead*, 536 F.3d at 1057 (district courts do not weigh competing loss causation theories at the pleading stage). Each argument also lacks merit.

*First*, in arguing that LVS's stock price increased on June 4, 5 and 8, 2020 in response to the alleged corrective disclosures,[14] Defendants improperly include the effects on LVS's stock price from factors unrelated to the fraud. However, after removing the non-fraud related effects on LVS's stock

---

[13] Plaintiffs' expert calculated the decrease in LVS's stock price relating to the alleged misstatements on June 4, 5 and 8, 2020 by removing the effects of unrelated market factors from LVS' stock price movement. *See* ¶ 342.

[14] Plaintiffs allege the October 10, 2019 disclosure did not disclose new information. ¶339 ("the article was largely publicizing the previously filed suit"). Thus, it is not alleged to be corrective and is alleged for context.

price, as Plaintiffs did here, LVS's stock price actually *declined* on each of June 4, 5 and 8, 2020 by $.56, $.42 and $.15 per share, respectively, for an aggregate drop of $1.13 per share. ¶341. Defendants do not dispute the accuracy of Plaintiffs' residual stock price declines. Defendants also agree for purposes of analyzing the September 16, 2020 disclosure that Plaintiffs should remove the effects of unrelated factors from LVS's stock price reaction. DB at 38-39 (Plaintiffs must "distinguish[] between declines related to market forces and those allegedly relating to the alleged fraud"). Yet, for purposes of arguing LVS's stock price increased upon the June 2020 disclosures, Defendants include the effects of non-fraud factors. Defendants cannot have it both ways. At the pleading stage, the Court must accept Plaintiffs' reasonably pled allegations as true and not engage in a fact-finding exercise prior to merits and expert discovery. Accordingly, Defendants' argument lacks merit and should be rejected.[15]

*Second*, relying on *Wochos v. Tesla, Inc.,* 985 F.3d 1180 (9th Cir. 2021), Defendants argue that Plaintiffs have not alleged loss causation because LVS's stock price rebounded after the corrective disclosures on September 26, 2019, May 12, 2020 and July 19, 2020. DB at 37-38. This speculative argument is premature and not supported by any actual evidence. In fact, LVS's stock price did not rebound. Following the September 26, 2019 disclosure, LVS's stock price declined from $57.08 to $55.88 per share. While it modestly increased the next two business days on September 27 and September 30 to close at $57.11 and $57.75 per share, respectively, it then began a steady decline for the next week, eventually closing at $53.47 per share on October 8, 2019 (Byrne Decl., Ex. 30)—hardly a "rebound" as Defendants would like the Court to believe. Similarly, after LVS's stock price declined on May 12, 2020 to $45.96 per share, it traded below the May 11 price of $48.50 for the entire following week to close at $48.25 per share on May 19, 2020. Likewise, following the July 19, 2020 disclosure, LVS's stock overall traded down the next six days, closing down 10% from its close prior to the corrective disclosure. In aggregate, between September 25, 2019 and September 16, 2020, LVS's stock price fell from $57.08 per share to $49.67 per share, or 13%. ¶¶247-65. In any event, that the stock price may have modestly rebounded for a day does not defeat loss causation. *See Luna v. Marvell Tech. Grp.,*

---

[15] Each of the corrective disclosures was followed by more than a $1.00 per share decline equating to a 2% to 5% stock drop. While there is no bright line rule, courts routinely find stock price declines in this range sufficient to demonstrate loss causation at the pleading stage. *See, e.g.*, *IBEW Local 697 Pension Fund v. Int'l Game Tech.,* 2011 WL 915115 (D. Nev. Mar. 15, 2011) (defeating motion to dismiss where stock declined 2%).

*Ltd.*, 2017 WL 4865559, at \*3 (N.D. Cal. Oct. 27, 2017) ("The mere fact that at some later time [defendants'] stock returned to its purchase price does not cure the alleged fraud."); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 984 (N.D. Cal. 2015) (subsequent price recovery does not negate the inference that the plaintiff has suffered economic loss "because the price rebound could be explained by external events").

*Third*, for the September 16, 2020 corrective disclosure, Defendants fault Plaintiffs for not disaggregating potential market factors that may have affected LVS's stock price. DB at 39. Defendants then speculatively claim that because LVS's stock price movement purportedly mirrored that of two of Defendants' cherrypicked competitors, LVS's stock decline must have been caused by unrelated market factors, rather than the corrective disclosures. But Plaintiffs are not required to rule out all other possible causes of the stock drop at the pleading stage, prior to expert or merits discovery. *Daou Sys.*, 411 F.3d at 1025; *see also, e.g., Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 645 (S.D.N.Y. 2017) ("whether the corrective disclosures actually caused the price… to drop is a question of fact that is not appropriate for resolution at this stage"). Plaintiffs need only, as they do here, allege a plausible "causal connection" to "sufficiently plead loss causation." *See City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, 2019 WL 719751, at \*8 (S.D.N.Y. Feb. 19, 2019). Indeed, "[w]hether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage." *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016); *Polycom, Inc.*, 87 F. Supp. 3d at 985 ("If [ ] there are alternative causes for the losses of which Plaintiffs complain, that is an issue for resolution in the later stages of this case."). Thus, Defendants' reference to stock price movements of other random companies outside of the SAC, with no evidence or analysis for why these companies' stock prices reacted, may not be considered at the pleading stage. *See In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at \*4 (D. Nev. Sept. 26, 2013) ("The information… only tend[s] to support Defendants' competing inference… although [ ] relevant to proving a viable defense for Defendants, the presentation of such evidence is not proper on a Motion to

Dismiss.").[16]

**E.    Plaintiffs Adequately Allege Control Person Liability**

As Plaintiffs have adequately pled a primary violation of Section 10(b), they have adequately pled a violation of Section 20(a).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.[17]

Dated: June 17, 2022

Respectfully submitted,

**ALDRICH LAW FIRM, LTD.**
*/s/ John P. Aldrich*
John P. Aldrich, Esq.
NV Bar No. 6877
7866 West Sahara Ave.
Las Vegas, NV 89117
Tel.  702.853.5490
Fax.  702.227.1975
Email:  jaldrich@johnaldrichlawfirm.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*Pro Hac Vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com

*Counsel for Plaintiffs*

---

[16] Defendants' cases are distinguishable. In *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, the court found that the plaintiff failed to allege the requisite causal connection between the alleged misrepresentations and the corrective disclosures, because "[n]either the June 24 *Financial Times* story nor the August 2 press release regarding earnings can be reasonably read to reveal widespread financial aid manipulation by Corinthian." 540 F.3d 1049, 1063 (9th Cir. 2008). The court declined to accept plaintiff's inference that a *Financial Times* article revealed a companywide financial aid fraud where the DOJ was investigating only one of 88 campuses and that, coupled with the stock price rebound following the disclosure, was insufficient to allege causation. In *Loos v. Immersion Corp.*, the court found an earnings announcement about poor financial results, without more, was insufficient to reveal fraudulent accounting practices. 762 F. 3d 880, 887 (9th Cir. 2014). In *Di Donato v. Insys Therapeutics, Inc.*, the court found an executive resignation, without more, coupled with a stock price rebound to increase *above* the original price ($1.01) by more than the price dropped ($.95) was insufficient. 2017 WL 3268797, at *18-19 (D. Ariz. Aug. 1, 2017). Here, unlike these cases, Plaintiffs indisputably allege the causal connection between the alleged false statements and corrective disclosures and LVS's stock price declined and/or did not rebound.

[17] If the Court finds any deficiencies in the SAC, Plaintiffs respectfully request leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) ("a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts").

Case No. 2:20-cv-01958-CDS-EJY

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2022, I electronically filed the foregoing document using the CM/ECF system which will send notifications of such filings to the email addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

**ALDRICH LAW FIRM, LTD.**

*/s/ John P.  Aldrich*_____
John P. Aldrich, Esq.

*Counsel for Plaintiffs*