Patrick G. Byrne (Nevada Bar #7636)
Morgan Petrelli (Nevada Bar #13221)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Tel.  702.784.5200
Fax.  702.784.5252
Email:  pbyrne@swlaw.com
         mpetrelli@swlaw.com

Walter C. Carlson (*Pro Hac Vice*)
Lawrence P. Fogel (*Pro Hac Vice*)
Martha C. Clarke (*Pro Hac Vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel.  312.853.7000
Fax.  312.853.7036
Email:  wcarlson@sidley.com
         lawrence.fogel@sidley.com
         mclarke@sidley.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| THE DANIELS FAMILY 2001 REVOCABLE TRUST, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> LAS VEGAS SANDS CORP., DR. MIRIAM ADELSON, in her capacity as Special Administrator of the estate of SHELDON G. ADELSON, PATRICK DUMONT, and ROBERT G. GOLDSTEIN, <br><br> Defendants. | Case No. 2:20-cv-01958-CDS-EJY <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

ARGUMENT .....................................................................................................................3

   I.   Plaintiffs Fail to Allege That Defendants Made Any False And Misleading Statement. ...........3

      A.    Plaintiffs Do Not Plausibly Allege a Scheme of Unauthorized Transfers. .......................3

      B.    Law of the Case Does Not Apply to Judge Navarro's Prior Determination. ....................8

      C.    Plaintiffs Have Not Adequately Alleged That Any of the Statements are False and Misleading. .........................................................................................................9

          1.   The Risk Factor Disclosures Are Not False and Misleading. ...................................9

          2.   The SOX Certification Statements Are Not False and Misleading..............................9

          3.   Mr. Goldstein's March 2016 Investor Conference Statements Are Not False and Misleading. ..........................................................................................10

   II.  The Alleged Scheme Was Immaterial and Does Not Render Any of the Challenged Statements False And Misleading. .......................................................................11

   III. Plaintiffs Do Not Plead a Strong Inference of Scienter.............................................12

      A.    Alleged Reporting by the Global Chief Compliance Officer Does Not Support a Strong Inference of Scienter.................................................................................13

      B.    Plaintiffs' Other Arguments Do Not Support a Strong Inference of Scienter..................16

   IV. Plaintiffs Fail to Allege Loss Causation................................................................18

   V.  Dismissal With Prejudice is Appropriate. ..............................................................20

CONCLUSION ................................................................................................................20

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Acadia Pharms. Inc. Sec. Litig.*,
2020 WL 2838686 (S.D. Cal. June 1, 2020) .............................................................................. 16

*Alaska Elec. Pension Fund v. Adecco S.A.*,
371 F. Supp. 2d 1203 (S.D. Cal. 2005) ..................................................................................... 15

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189, (E.D. Pa. 2021) ....................................................................................... 12

*In re Anchor Gaming Sec. Litig.*,
33 F. Supp. 2d 889 (D. Nev. 1999) ........................................................................................... 11

*Askins v. U.S. Dep't of Homeland Security*,
899 F.3d 1035 (9th Cir. 2018) ..................................................................................................... 8

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017) .............................................................................. 6

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ...................................................................... 6, 15

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ..................................................................................................... 16

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................................... 7

*In re Countrywide Fin. Corp. Sec. Litig.*,
2:07-cv-05295 (C.D. Cal. Apr. 11, 2008) .................................................................................... 7

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017) .............................................................................. 18

*In re Duke Energy Corp. Sec. Litig.*,
282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004) ....................... 11

*Eshelman v. Orthoclear Holdings, Inc.*,
2009 WL 506864 (N.D. Cal. Feb. 27, 2009) ............................................................................. 16

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ............................................................................ 6

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

*Fialkov v. Microsoft Corp.*,
72 F. Supp. 3d 1220 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017)................ 12

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007)..................................................................... 12

*IBEW Local 697 Pension Fund v. Int'l Game Tech.*,
2011 WL 915115 (D. Nev. Mar. 15, 2011)................................................................ 19

*Kelly v. Elec. Arts, Inc.*,
2015 WL 1967233 (N.D. Cal. Apr. 30, 2015) ........................................................... 14

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018).......................................................................... 8, 14

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016)........................................................................ 12

*Lipton v. PathoGenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002)............................................................................ 15

*Lomingkit v. Apollo Educ. Grp. Inc.*,
275 F. Supp. 3d 1139 (D. Ariz. 2017)..................................................................... 9

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)............................................................................. 19

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...................................................................................... 11

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)............................................................................. 3

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015) ..................................................................... 19

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022).............................................................................. 3

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020)........................................................................... 3, 20

*In re Nuvelo, Inc.*,
668 F. Supp. 2d 1217 (N.D. Cal. 2009) ................................................................... 12

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) .......................................................................... 7

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- iii -

Case 2:20-cv-01958-CDS-EJY   Document 99   Filed 07/08/22   Page 5 of 26

*Patel v. Seattle Genetics, Inc.*,
  2018 WL 2359137 (W.D. Wash. May 24, 2018)..................................................................15

*Petrie v. Elec. Game Card Inc.*,
  2011 WL 13131246 (C.D. Cal. May 26, 2011)....................................................................17

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014)..................................................................................6, 15, 17

*In re Portal Software, Inc. Sec. Litig.*,
  2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)....................................................................12

*Prodanova v. H.C. Wainwright & Co.*,
  993 F.3d 1097 (9th Cir. 2021)........................................................................... 13, 17, 18

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)....................................................................................6

*In re QuantumScape Sec. Class Action Litig.*,
  2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ....................................................................7

*Rabkin v. Lion Biotechnologies, Inc.*,
  2018 WL 905862 (N.D. Cal. Feb. 15, 2018)......................................................................12

*Smajlaj v. Brocade Commc'ns Sys. Inc.*,
  2007 WL 2457534 (N.D. Cal. Aug. 27, 2007)..................................................................16

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................................................................... 10, 13

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) ..........................................................................10

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007)..................................................................................16

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021)..........................................................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)..........................................................................5, 14, 17, 18, 20

**Other Authorities**

17 C.F.R. § 240.12b-2 ........................................................................................................9

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- iv -

**INTRODUCTION**

Defendants demonstrated in their opening memorandum ("Mtn.") that Plaintiffs' Second Amended Complaint (the "SAC") must be dismissed because it falls far short of satisfying the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs' Opposition (the "Opp.") fails to rebut any of these arguments. Instead, it represents Plaintiffs' latest effort in their searching attempt to manufacture a securities fraud claim where there simply isn't one.

Plaintiffs originally alleged in their Amended Complaint that Defendants' statements were materially misleading because they failed to disclose the existence of the alleged unauthorized transfer scheme, which Plaintiffs alleged was unlawful and posed regulatory risk to Las Vegas Sands Corp. ("LVS"). Judge Navarro dismissed these claims in their entirety, holding that Plaintiffs failed to allege a duty to disclose the alleged scheme. Plaintiffs' second bite at the apple, the SAC, morphed their omissions-based theory into an affirmative misrepresentation one, but still premised their claim on the alleged "widespread" and "illicit" transfer scheme and its regulatory risk to LVS. As Defendants demonstrated in their Motion, however, this purported scheme and its "regulatory risk" are simply not well-pled. In the over six years since the beginning of the Class Period, only *a single* patron has alleged unauthorized transfers. And this very claim was investigated by Singapore's regulator and found not to involve a regulatory breach. Moreover, MBS's casino license was renewed before, during, and after the Class Period following regulatory reviews.

Unable to address these facts, Plaintiffs' Opposition pivots once again, arguing that their claim is premised not on alleged illegal activity or regulatory risk, but simply on alleged breaches of LVS's internal lending standards. This is nonsense and belied by the SAC's repeated allegations; the entire crux of Plaintiffs' claim is the alleged "illicit" scheme. However, even under the Opposition's new theory, Plaintiffs still have no basis to allege that investors were misled by any alleged violation of LVS's internal policies. Plaintiffs repeatedly point to a "significant spike" in bad debt expense at MBS during the alleged scheme. But an investor could have been misled only if LVS was at the same time concealing this information. Plaintiffs never challenge the accuracy or adequacy of LVS's reserves for bad debt; and moreover, Plaintiffs themselves plead that MBS was at all times highly

1

profitable. These facts doom the theory of liability the Opposition now advances.

Accordingly, Plaintiffs' allegations—under any of their theories—do not plead with particularity the existence of an alleged scheme or any basis for fraud. This is reason alone to dismiss the SAC in its entirety. The SAC must also be dismissed for multiple additional reasons.

*First*, the statements Plaintiffs challenge are not false and misleading. For example, Plaintiffs mischaracterize the Company's Risk Factor statements as guarantees that the Company's credit-lending practices were free from risk. But this argument ignores the actual language and purpose of these statements; as their title suggests, these are ***Risk Factors*** advising investors of risks, and are not guarantees of perfection.

*Second*, Plaintiffs cannot show that any alleged false and misleading statement was misleading as to a ***material*** fact. Even if Plaintiffs' insufficient allegations of an alleged scheme were accepted, it involved just 0.43% of LVS's total revenue over the five years from 2013-2017, and just 1.81% of MBS's total revenue. No reasonable investor would have viewed such amounts as material, and they cannot form the basis of a securities fraud claim under controlling law.

*Third*, the SAC utterly fails to allege scienter. To plead scienter, Plaintiffs must plead with particularity facts giving rise to a ***strong inference*** that Defendants acted with fraudulent intent. By Plaintiffs' own admission, they cannot allege any of the Individual Defendants knew or were told about the alleged scheme. The best Plaintiffs can do is merely claim that someone else in the Company knew or was told about lax documentation of transfers, and that that person should have (not ***did***, but simply ***should have***) told the Individual Defendants about it. That is not enough.

*Fourth*, Plaintiffs have not pled loss causation. LVS's stock price ***increased*** on several of the alleged corrective disclosure dates; if LVS's stock did not decrease in price, there can be no "loss" and no loss causation. And Plaintiffs have no answer to the fact that the minimal stock price declines on the other alleged corrective disclosure dates are not actionable under Ninth Circuit law.

For all the reasons discussed below and in Defendants' Motion, the SAC must be dismissed, this time with prejudice.

/ / /

/ / /

## ARGUMENT

**I.    PLAINTIFFS FAIL TO ALLEGE THAT DEFENDANTS MADE ANY FALSE AND MISLEADING STATEMENT.**

### A.    Plaintiffs Do Not Plausibly Allege a Scheme of Unauthorized Transfers.

The SAC's well-pled allegations are as follows:

- In the over six years since the beginning of the Class Period, only one MBS patron, Wang Xi, has alleged funds were transferred without his authorization. SAC ¶¶ 133-34.

- The Casino Regulatory Authority ("CRA") investigated Wang Xi's claim of unauthorized transfers and found that MBS had not violated any regulatory requirements. *Id.* ¶¶ 260, 268.

- MBS was permitted under Singapore regulations to lend money directly to foreign patrons, without having to transfer money from third-parties. *Id.* ¶ 53.

- MBS's license exclusivity period was extended during the Class Period, *id.* ¶¶ 46, 322, and MBS's casino license was renewed before, during, and after the Class Period, following the CRA's review of MBS's "track record of compliance with legal and regulatory requirements," Mtn. 4.

- The amount of money Plaintiffs allege was improperly transferred is only 0.43% and 1.81% of LVS and MBS's respective total revenue over the same period. SAC ¶¶ 58-59.

From these allegations, Plaintiffs conclusorily allege a "widespread" and "illicit" scheme of unauthorized transfers undertaken for the supposed purpose of inflating MBS's gaming revenue so as to secure the renewal of MBS's license. But, as the Ninth Circuit has advised, "conclusory adjectives" do not meet the PSLRA's heightened pleading requirements. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022). Nor is the Court "required to indulge unwarranted inferences" in evaluating the plausibility of Plaintiffs' alleged scheme. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Indeed, "plausibility is no less relevant in the context of the heightened pleading standards of Rule 9(b) or the PSLRA." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).

Applying these principles to Plaintiffs' alleged scheme, it comes nowhere close to meeting the PSLRA's heightened pleading requirements. Simply put, the "theory does not make a whole lot of sense," and "encounter[s] an immediate first-level problem." *Id*. If the alleged scheme was "widespread" and "illicit," as Plaintiffs allege, why has only a single patron come forward with claims of unauthorized transfers—a single claim that was subsequently determined by the CRA not to have violated any regulatory requirements? And, similarly, why would the CRA repeatedly renew MBS's casino license, following its review of MBS's regulatory compliance?

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

3

Moreover, if MBS was permitted to extend credit directly to foreign patrons—who Plaintiffs concede were the supposed beneficiaries of the alleged scheme—why would MBS engage in "illicit" unauthorized transfers between patron accounts? There was simply no need to; MBS could extend credit to the foreign patrons without having to perform a third-party transfer. And finally, why would Defendants knowingly risk their incredibly valuable MBS gaming license for a scheme that represented less than one-half of one percent of LVS's total revenue over the period?

The Opposition provides no credible answer to any of these questions. Instead, the Opposition rests on conclusory adjectives and unwarranted inferences, responding to the above questions with distortions of their allegations and the law.

*First*, Plaintiffs do not dispute that authorized third-party transfers are a common and legal feature of gaming in Asia used to transfer funds between the accounts of casino patrons. *See* Ex. 18, June 4, 2020 Article at 1035; Ex. 22, Sept. 16, 2020 Article at 1049; Ex. 23, Dec. 21, 2020 Article at 1051. Nor do Plaintiffs dispute that they have alleged only a single instance of a patron alleging unauthorized transfers,[1] that the CRA investigated this claim and concluded there was no regulatory breach, and the CRA repeatedly renewed MBS's license before, during and after the Class Period. Rather, Plaintiffs insist that the Court should *ignore* these facts because the SAC purportedly alleges only a violation of LVS's internal lending policies, not a violation of Singapore law. Opp. 3, 15, 22.

Plaintiffs mischaracterize their own complaint. The crux of the SAC is an alleged "illicit" scheme that Plaintiffs allege involved "willful and pervasive violations of local law." SAC IX.A.5; *id.* ¶ 5 ("Defendants orchestrated a scheme whereby MBS by *illegally* extending in-house lines of credit to gamblers that, *by law*, were otherwise ineligible to receive credit.") (emphasis added). Moreover, Plaintiffs repeatedly link the alleged falsity of Defendants' statements to the underlying illegality of the alleged scheme. *See, e.g.*, *id.* ¶ 142 (alleging credit and compliance statements were false because MBS was "extending credit to patrons who did not have the requisite credit or financial resources necessary *by law* to permit the extensions"); *id.* ¶ 161 (alleging compliance statement was

---

[1] Plaintiffs, without support, assert that MBS received other patron complaints, seizing on a single clause from a *Bloomberg* article that refers to "Wang's suit and similar ones." Opp. 29. But these "similar" suits are lawsuits regarding the alleged use of "so-called junket operators" at MBS, not unauthorized transfers. Ex. 23, Dec. 21, 2020 Article at 1051. Judge Navarro dismissed with prejudice all allegations about these suits and the use of junkets. ECF No. 74 at 21.

4

false because LVS "did not adhere to *local law* in terms of extending credit") *id.* ¶¶ 164, 169, 184, 199, 215 (similar) (emphases added).

In other words, the CRA's findings with regard to Wang Xi and the CRA's repeated renewal of MBS's license bear directly on whether Plaintiffs have pled with particularity the existence of the alleged "illegal" scheme and, in turn, any false and misleading statements. Further, even if, as the Opposition now argues, Plaintiffs have alleged only a violation of MBS's or LVS's internal policies, that is not sufficient for pleading a Section 10(b) claim. As set forth in Sections I.C.1 and II below, Defendants' challenged statements did not purport to guarantee perfect compliance with all internal policies, and the alleged violation of these policies at MBS was immaterial given the small percentage of revenue involved.

*Second*, Plaintiffs have no coherent response to the fact that MBS was permitted to lend money directly to Chinese patrons and thus MBS did not need to engage in alleged illicit transfers. Instead, the Opposition invents a new argument, claiming for the first time that MBS made these transfers because Chinese patrons were supposedly required to deposit "front money" before they could receive lines of credit from MBS. Opp. at 5, 7, 14. This, again, is not true. The SAC itself makes clear that this "front money" requirement is from Singapore's Casino Control Act and applies only to *Singapore residents*. Opp. 5 (citing SAC ¶¶ 95-96, 102); SAC ¶ 53. Plaintiffs, accordingly, still have no explanation for why MBS would engage in these alleged illicit third-party transfers.

*Third*, in an attempt to buttress their allegations that the "scheme" was "widespread," Plaintiffs repeatedly distort and exaggerate what their two Confidential Witnesses ("CWs") are alleged to have said. For instance, the Opposition repeatedly asserts that the CWs "confirm" that the alleged unauthorized transfer scheme occurred "all the time" and "throughout the Class Period." Opp. 1, 6-8. But that is not what the CWs said, nor could they: CW-1 left MBS nearly a year before the Class Period even started, and CW-2 worked at MBS for, at most, a handful of months at the very beginning of the Class Period. SAC ¶¶ 106, 117. Courts routinely discount allegations premised on CWs who do not overlap with the Class Period and thus lack the requisite personal knowledge and reliability. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009); *see also*

Mtn. at 19.[2]

As just a few of the many other examples in which the Opposition misrepresents the CWs alleged statements:

The Opposition argues that CW-1 "***confirmed*** MBS was transferring money from premium player accounts without their authorization to new accounts to circumvent regulatory restrictions." Opp. 8 (emphasis added). CW-1 confirmed no such thing. The SAC merely alleges that "CW-1 did not ***believe*** these transfers were authorized by the client." SAC ¶ 110 (emphasis added). But the SAC "does not say what the basis for CW's belief is and therefore lacks the necessary specificity." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *16 (N.D. Cal. Mar. 24, 2014) (rejecting CW allegations and dismissing Section 10(b) claim).[3]

The Opposition also claims CW-2 stated that "MBS disregarded patron's creditworthiness" and instead extended credit based on "personal relationship[s]." Opp. 6, 8, 18. Again, CW-2 never said this, and in fact concedes he was not part of the decision-making process. CW-2 is merely alleged to have said that the decision to extend credit "came down from above" with management "often having the last say as to how much credit would be granted." SAC ¶ 118. "The impression" of CW-2 of what *may have happened* "is just that—an unsubstantiated statement without substance or context." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).[4] Accordingly, neither CW contributes particularized allegations.

[2] Plaintiffs' cited case law, Opp. 20, is readily distinguishable. In each of these cases the pre-class period statements of CWs were supported by statements from multiple other CWs who did overlap with the class period. Further, the pre-class period CW statements were credited only to the extent that the CW had personal knowledge that bore on the relevant conduct. *See, e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (concluding seven CWs, "taken collectively," gave rise to a strong inference of scienter, and crediting pre-class period CW who "had personal knowledge of executive-level management's real-time access to" relevant reports); *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at *12 (N.D. Cal. Aug. 24, 2021) (considering 14 CWs, two of whom worked at the Company prior to class period); *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *8 n.6 (S.D. Cal. May 23, 2017) (considering allegations from one pre-class period CW along with allegations from nine other CWs).

[3] The Opposition further argues that "CW-1 recalled that MBS did no due diligence before extending credit." Opp. 8. This, too, misrepresents CW-1's alleged statement, which acknowledges she "always" was provided with details and paperwork supporting patron consent for the transfers, even if such details were, in her opinion, thin. SAC ¶ 110. Again, CW-1's opinion or belief is insufficient to plead a Section 10(b) claim with particularity.

[4] Plaintiffs' case law, Opp. 21, is not to the contrary, as each contained far more particularized

6

*Finally*, throughout their Opposition, Plaintiffs selectively excerpt documents and ignore other portions of the same documents that belie their claims. For example, the Opposition repeatedly relies upon one *Bloomberg* article for the proposition that "the CRA concluded that 'there were weaknesses in MBS's casino control measurers pertaining to fund transfers,'" and therefore MBS "lack[ed] internal controls." Opp. 23. *See also id*. 2, 15. But Plaintiffs attempt to hide the context. The full excerpt from the article states:

> Singapore's Casino Regulatory Authority said it has completed investigations into allegations that Marina Bay Sands carried out unauthorized transfers from accounts of former Chinese patron Wang Xi. In a response to a Bloomberg News inquiry, the CRA said it concluded the casino didn't breach requirements in that case—including those relating to anti-money laundering—though "there were weaknesses in MBS' casino control measures pertaining to fund transfers," it said in a statement, referring to the complaint by Wang.

Ex. 22, Sept. 16, 2020 Article at 1048.

Not only do Plaintiffs omit the relevant context, but they also distort the CRA's findings. Contrary to Plaintiffs' argument, nowhere did the CRA conclude that MBS or LVS "lack[ed] internal controls." Opp. 23. Rather, as the excerpt above plainly states, the CRA merely noted "weaknesses in ***MBS's casino control measures***." As discussed further below, Plaintiffs' distortion of the article provides no basis to plead with particularity the falsity of Defendants' SOX Certification Statements, which address LVS's internal control over financial reporting. *See infra* at 9-10.

As another example of Plaintiffs' selective excerpting of documents, Plaintiffs conclusorily allege without any basis that the scheme continued "throughout the Class Period." Opp. 6-7, 9, 22. To the contrary, as set forth in another *Bloomberg* excerpt that Plaintiffs omit from the SAC (but included in the prior complaint), third-party transfers were phased out almost entirely ***by 2018***. Ex. 23, Dec. 21, 2020 Article at 1052; ECF No. 36 ¶ 198 (prior complaint alleging third-party transfers were "entirely curbed in early 2018"). In fact, the SAC itself alleges the steps taken by MBS in 2018

allegations establishing the reliability of the CWs in those cases. *See Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (CW sufficiently reliable to support inference of scienter where CW attested to personal knowledge that the individual defendants were informed of wrongdoing); *In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *9 (N.D. Cal. Jan. 14, 2022) (crediting anonymous account in short seller report supported by accounts from nine former employees, four experts, and public information); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1145 (C.D. Cal. 2008); 2:07-cv-05295, ECF No. 186 (Apr. 11, 2008) (14 CWs at various levels across the organization corroborated each other).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

to "increase scrutiny over all transfers" including requiring "wet ink" signatures and verbal confirmation from the patron before moving any funds. SAC ¶ 114. Plaintiffs' conclusory assertion that the scheme continued throughout the Class Period is further undermined by the undisputed fact that only one patron has claimed unauthorized transfers—a claim that concerned alleged transfers pre-dating the Class Period, *id.* ¶ 9, and was found by the CRA to not involve a regulatory violation.

As the Ninth Circuit has instructed, a plaintiff cannot rely "only on portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). *See also* Defs.' Reply in Support of Judicial Notice at 2-6. Plaintiffs have done precisely that here, and the SAC does not allege the existence of any "scheme" under the PSLRA's strict pleading requirements.

**B.    Law of the Case Does Not Apply to Judge Navarro's Prior Determination.**

Unable to meaningfully grapple with these defects in their own SAC, Plaintiffs seek to sidestep them. The Opposition argues that Judge Navarro's conclusion that the Amended Complaint had plausibly alleged the existence of a scheme is the "law of the case and may not be revisited." Opp. 11-12. Plaintiffs' argument misstates the law and ignores the Ninth Circuit's controlling decision in *Askins v. U.S. Dep't of Homeland Security*.[5] As *Askins* explains, "permitting the filing of an amended complaint requires a new determination," and thus a district court is not "precluded" by the law of the case doctrine from revisiting a prior order. 899 F.3d 1035, 1043 (9th Cir. 2018). Therefore, law of the case does not apply here, and the plausibility of the alleged scheme should be carefully considered in light of the specific allegations of the current SAC, including several critical allegations that Judge Navarro did not address in her opinion. *See* Mtn. 16-18.[6]

---

[5] The Opposition's sole response to *Askins*—buried in a footnote, Opp. 16 n.3—falls flat. Contrary to Plaintiffs' argument, the SAC does not allege "the exact *same facts* as alleged in the FAC." *Id.* Indeed, Plaintiffs cannot argue in one breath that they have sufficiently amended the SAC to cure the fatal defects previously identified by the Court and then elsewhere argue that the SAC is entirely unchanged. Further, neither of Plaintiffs' two cited cases, *Vanleeuwen v. Keyuan Petrochemicals, Inc.* and *Kipling v. Flex Ltd.*, address *Askins* at all. *Id.* 12.

[6] Plaintiffs argue that Defendants did not set forth in their prior motion to dismiss that MBS could permissibly extend credit to Chinese patrons. Opp. 14. Not true. Defendants set this forth clearly multiple times in the prior briefing. ECF No. 52 at 6 n.6; 19 n.14; ECF No. 68 at 3-4.

8

**C.      Plaintiffs Have Not Adequately Alleged That Any of the Statements are False and Misleading.**

The Opposition does not dispute that all of Plaintiffs' alleged misstatements are premised on the existence of the alleged scheme. Plaintiffs' failure to plead the existence of the scheme is thus fatal to the SAC's falsity claims.

Each of the alleged misstatements also fails for the following additional reasons.

**1.      The Risk Factor Disclosures Are Not False and Misleading.**

The Opposition continues to ignore the actual language of the Risk Factor disclosure, attempting to distort it into a guarantee of compliance. Opp. 18-19. Nowhere does the Risk Factor guarantee complete compliance or the absence of risk with regard to the extension of credit. To the contrary, the Risk Factor expressly warns investors of the risks associated with the extension of credit; indeed, the very title of the Risk Factor prominently advises investors that LVS "may not be able to collect gaming receivables from our credit players." Mtn. 14. This is in addition to other warnings throughout LVS's Risk Factors that disclosed the risk of potential non-compliance with casino regulations. *Id.* at 5. No reasonable investor would read this Risk Factor disclosure, or any of the Risk Factors, as ensuring the absence of any issues at MBS, particularly the absence of immaterial issues in the transfer process that were addressed in 2018. The law does not require Defendants to disclose immaterial issues. *See, e.g.*, *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1162 (D. Ariz. 2017) ("To require Defendants to disclose" immaterial issues "is no different than an all-encompassing duty to complete," which is not what the law requires).

**2.      The SOX Certification Statements Are Not False and Misleading.**

The Opposition likewise fails to support Plaintiffs' claim of falsity with respect to the SOX Certification Statements. Plaintiffs concede that SOX certifications attest that the "financial statements, and other financial information in this report, fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company. Opp. 23.[7] This is fatal to

---

[7] Plaintiffs argue that LVS represented that it disclosed "all" internal control "deficiencies and material weaknesses." Opp. 2. This is not true. The SOX certification addresses only *"significant* deficiencies and material weaknesses," which are defined by regulation. *See* 17 C.F.R. § 240.12b-2. Plaintiffs also argue that the SOX certifications falsely stated that the report does not "contain any untrue statement of a material fact," Opp. 24, but this, too, misstates the scope of the certifications.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Plaintiffs' claims, as Plaintiffs nowhere challenge the adequacy of LVS's reserves, the timeliness of charge-offs, or the accuracy of LVS's financial statements.

The Opposition instead points to "weaknesses in MBS's casino control[s]" relating to fund transfers, *id.*, but this does not support Plaintiffs' claim. A weakness in **MBS's casino controls** is far different from a material weakness or significant deficiency in **LVS's internal control over financial reporting**, and it is the latter that is required to plead falsity with regard to SOX certifications. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 808 (N.D. Cal. 2019) (rejecting falsity allegations for SOX certifications where the "complaint does not adequately allege a nexus between the alleged [wrongful act] and [the company's] financial condition or results of operations, or that the Company's financial reports contained inaccuracies.") (citation omitted).[8]

### 3. Mr. Goldstein's March 2016 Investor Conference Statements Are Not False and Misleading.

Finally, in a single paragraph, the Opposition half-heartedly attempts to defend the SAC's allegations regarding Mr. Goldstein's statements of general compliance. Opp. 19. However, the Opposition still cannot point to any material non-compliance by MBS before or during the Class Period. Mr. Goldstein's statements, accordingly, remain true. Moreover, Plaintiffs do not rebut Defendants' case law demonstrating that courts routinely dismiss such statements of general compliance as inactionable puffery. Mtn. 27.

Rather than address these points, the Opposition misconstrues Mr. Goldstein's statements, which he made in response to two questions from the audience. The Opposition fabricates the assertion that Mr. Goldstein made these statements in response to a question about "whether LVS moved money around to enable Chinese high rollers gambling in Singapore." Opp. 19. Plaintiffs have no basis for this assertion; the SAC itself alleges that the two questions are largely "indiscernible." SAC ¶ 160. And the actual transcript, Exhibit 34, shows the conference host prefaced the first question by asking: "[A]re there any question[s] from the audience on *Macao*?"

Further, as discussed below, the report does not contain any untrue statement of *material* fact.

[8] Plaintiffs' cited case is distinguishable. In *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, the plaintiffs alleged that the defendant's financial statements were false, including net income, allowance, and earnings per share. 694 F. Supp. 2d 1192, 1212 (W.D. Wash. 2009).

10

Ex. 34, Transcript at 1133 (emphasis added). Plaintiffs cannot plead a claim by distorting the record.

## II. THE ALLEGED SCHEME WAS IMMATERIAL AND DOES NOT RENDER ANY OF THE CHALLENGED STATEMENTS FALSE AND MISLEADING.

As demonstrated above, Plaintiffs have failed to plead the existence of a scheme or that Defendants' statements were false and misleading. But even assuming the "scheme" was plausibly alleged, the scheme is plainly immaterial as a matter of law, and cannot state a claim. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (statements must be "misleading as to a *material* fact.") (citation omitted).

Plaintiffs do not dispute that their alleged scheme involved transfers amounting to SGD $365 million over the five-year period from 2013-2017, or that this represents only 0.43% of LVS's total revenue of over $64 billion over the same period, or just 1.81% of MBS's total revenue of over $15 billion over the period. *See* Mtn. 23. Nor does the Opposition dispute that, when compared to the total amount that was actually wagered by VIPs, the alleged transfers represent only 0.037% of the total volume wagered by VIPs at all LVS properties in Asia over the period, and only 0.13% of the total volume wagered by VIPs at MBS over this same period. *Id.*[9] No reasonable investor would have viewed the omission of such immaterial amounts as "having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38 (citation omitted). *See also In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d 889, 895 (D. Nev. 1999) (vendor dispute, representing 2.5% of quarterly earnings per share, was immaterial); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160–61 (S.D.N.Y. 2003), *aff'd*, 113 F. App'x 427 (2d Cir. 2004) ($217 million in round-trip trades over two years amounting to about 0.3% of total revenues was "an immaterial percentage as a matter of law").

Unable to dispute these facts, Plaintiffs engage in misdirection, arguing that a "62% spike" in bad debt expense at MBS is indicative of materiality. Opp. 22. But Plaintiffs' argument is unavailing for many reasons. First, as noted above, Plaintiffs do not contend that LVS failed to properly account for its accounts receivables and bad debt, nor do they allege any error in the

---

[9] Plaintiffs rely on the same data Defendants rely on to calculate these percentages, acknowledging that these numbers are both accurate and meaningful. *See* Opp. 5 n.1 (citing the 2019 10-K). This financial data is cited extensively in the SAC. SAC ¶¶ 58-63, 81, 90, 130-32.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

financial statements. In other words, by Plaintiffs' own admission, any bad debt at MBS was appropriately reserved for and was disclosed in LVS's financials. This is simply inconsistent with Plaintiffs' claim of fraud. Second, Plaintiffs do not link the gaming enabled by the supposed transfers to any bad debt expense. Indeed, Plaintiffs acknowledge that "it's not clear how much money the unauthorized transfers and unpaid debts cost Marina Bay Sands." SAC ¶ 129. Finally, the amount of the transfers—even assuming all the funds transferred contributed to bad debt—is immaterial when Plaintiffs themselves affirmatively plead that MBS consistently was "one of the most profitable properties in LVS's portfolio." Opp. at 5; SAC ¶ 60. "When the financial import of alleged misstatements is *de minimis*, those alleged misstatements are immaterial as a matter of law." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007) (citation omitted).[10]

The immateriality of the alleged scheme is likewise fatal to Plaintiffs' argument that Defendants violated Item 105. Opp. 25. Any failure to disclose the allegedly unauthorized transfers, which are indisputably immaterial, cannot form the basis of a violation of Item 105. *See, e.g.*, *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (finding no violation of Item 503, the predecessor to Item 105, because the allegedly omitted information was immaterial).[11]

### III.    PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER.

The SAC utterly fails to plead a strong inference of scienter and should also be dismissed on this independent ground. Plaintiffs begin by misstating their pleading burden, claiming that a court is to "draw all reasonable inferences in Plaintiffs['] favor" when assessing scienter. Opp. 30. This misstates the standard. Under the PSLRA, a court "must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Fialkov v. Microsoft*

[10] The sole out-of-circuit case Plaintiffs cite, Opp. 22-23, is wholly inapposite. In *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, the court determined that statements regarding compliance with the "sensitive payments policy" within the code of conduct were material where the District Attorney had opened an investigation, six people were charged with bribery, and the defendant company had been fined over $45 million. 532 F. Supp. 3d 189, 224, 233 (E.D. Pa. 2021).

[11] Plaintiffs' cited cases provide no support. Opp. 25. In two of the cases, the court held that there was a duty to disclose *material* risks. *In re Nuvelo, Inc.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (omission of material risk that trial of occluded catheters would fail); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *8 (N.D. Cal. Feb. 15, 2018) (stock promotion scheme where company "paid writers to publish bullish articles and blog entries" to inflate stock price was material). In the third, the court dismissed the complaint for failure to plead falsity and scienter. *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *16 (N.D. Cal. Aug. 10, 2005).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

12

*Corp.*, 72 F. Supp. 3d 1220, 1228 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017) (quoting *Gompper v. VISX*, 298 F.3d 893, 897 (9th Cir. 2002)). Indeed, "'[t]he bar set by *Tellabs* is not easy to satisfy' because it requires Plaintiffs to plead an inference of scienter that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Veal*, 423 F. Supp. at 817-18 (citation omitted).

Plaintiffs do not come close to meeting this requirement. There is not a single allegation regarding what facts were known by the Individual Defendants at the time the challenged statements were made. Nor are there any allegations from anyone who interacted with the Individual Defendants. The Opposition instead treats the Individual Defendants as an undifferentiated mass, roundly asserting that they "must have known" of the alleged scheme by virtue of their positions within the Company. This utter lack of "specific facts showing a connection between the false statement and the mindset of the person who made it" is fatal to Plaintiffs' claim. *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1110 (9th Cir. 2021).

### A. Alleged Reporting by the Global Chief Compliance Officer Does Not Support a Strong Inference of Scienter.

The Opposition's primary argument for scienter is based on a highly attenuated chain of unwarranted inferences. First, relying solely on the allegations of CW-1,[12] Plaintiffs argue that the alleged unauthorized transfers were discussed at pre-Class Period MBS meetings involving MBS management and "senior compliance personnel," but none of the Individual Defendants. Opp. 26-27. Next, Plaintiffs assume that one of the supposed attendees at these meetings, the Global Chief Compliance Officer, reported unspecified information about the alleged transfers to the LVS Board Compliance Committee, which also did not include any of the Individual Defendants. Then, Plaintiffs further assume, someone from the Compliance Committee reported unspecified information about the alleged transfers to LVS's Board, on which two of the Individual Defendants sat.[13] These allegations do not plead a strong inference of scienter.

---

[12] The Opposition repeatedly claims that *both* CWs attended these meetings. *See* Opp. 26 ("CWs Confirm the Unauthorized Transfer Scheme was Discussed at Compliance Meetings . . . ."); *see also id.* 2-3. This is a blatant distortion of the SAC's allegations. Nowhere does CW-2 state that he attended any such meetings.

[13] Plaintiffs do not allege that Patrick Dumont sat on the Board. Indeed, Plaintiffs make no arguments whatsoever connecting Patrick Dumont to any alleged misconduct.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

To begin, Plaintiffs substantially overstate CW-1's assertions. CW-1 left MBS long before the start of the Class Period. She thus has no personal knowledge of what was or was not discussed at any MBS internal meetings during the Class Period. *Zucco*, 552 F.3d at 998. In addition, CW-1's assertions are seriously undermined by a *Bloomberg* article that Plaintiffs incorporate by reference into the SAC. This article states that "Marina Bay management was largely unaware of the transfer problem until 2018," long after CW-1 left MBS in March 2015. Ex. 23, Dec. 21, 2020 Article at 1052. In other words, if MBS management was not aware of the alleged transfers until 2018, this suggests they were *not* discussed at the meetings CW-1 allegedly attended, leaving Plaintiffs with zero basis for the alleged reporting to the Individual Defendants.[14]

Plaintiffs ask this Court to disregard this statement from the article, arguing that it is "irrelevant" and, in any case, cannot be considered on a motion to dismiss because it is not alleged in the SAC. Opp. 28. Plaintiffs' relevance argument is meritless for the reasons explained above, and particularly so considering Plaintiffs included *this very statement*—set out in a block quote, no less— in their prior complaint. ECF No. 36 ¶ 244; *see Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *9 (N.D. Cal. Apr. 30, 2015) (where plaintiffs removed allegations from amended complaint, "[w]hile the Court must ordinarily take the plaintiffs' allegations as true . . . a court is not required to accept as true allegations that contradict exhibits.") (cleaned up and internal citation omitted). Moreover, Plaintiffs' repeated attempts to cherry-pick from documents incorporated by reference should be rejected. *Khoja*, 899 F.3d at 1002.

Even if CW-1's allegations were to be credited—and they should not—Plaintiffs' argument still falls far short of pleading a strong inference of scienter because it alleges no more than the Individual Defendants might have "had access" to some unspecified information about the alleged scheme. Plaintiffs argue that they "need only show Defendants had access to the relevant information," Opp. 28, but Ninth Circuit case law is clear. Mere allegations of "access" to

---

[14] CW-1's account of what was actually discussed at those pre-Class Period meetings is vague. The meetings focused on the "high number of STRs" and the main issue was that "so many reports were required." SAC ¶ 115. There is no allegation in the SAC that either the CRA or the Suspicious Transaction Reporting Office found that any of these STRs evidenced unauthorized transfers. If anything, MBS's numerous STR filings support a non-culpable inference, to which Plaintiffs have no response.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

information is insufficient to support a strong inference of scienter. *Intuitive Surgical, Inc.*, 759 F.3d at 1063 ("Missing are allegations linking specific reports and their contents to the executives, not to mention the link between the witnesses and the executives. . . . Mere access to reports containing undisclosed sales data is insufficient to establish a strong inference of scienter"); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (allegations of access to reports insufficient to establish scienter because allegations lacked details about the contents of the reports).

The decision in *Browning v. Amyris, Inc.* is instructive. The plaintiff in *Browning* alleged that the defendant CEO made false and misleading statements regarding the company's production volume, when he allegedly had "access" to information showing that the company could not meet these volumes. 2014 WL 1285175, at *16. In particular, the plaintiff alleged that the defendant company's Vice President of Engineering, who had access to the company's scientific database, "was responsible for reporting scientific findings to the board, including [the] CEO." *Id.* Citing to Ninth Circuit precedent, the district court rejected this allegation, concluding that "[g]eneral allegations of [a] defendant['s] . . . interaction with other officers and employees' are insufficient to create a strong inference of scienter." *Id.* (quoting *In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005)).

The same is true for Plaintiffs' allegations. At most, Plaintiffs have alleged that the Global Chief Compliance Officer, who purportedly prior to the Class Period had access to unspecified information about the alleged transfers, may have reported this information to the Board Compliance Committee. There are no particularized allegations indicating that any information was actually reported to the Individual Defendants, much less any allegations indicating when it was reported or what was discussed. This does not suffice. *See also Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1218 (S.D. Cal. 2005) (allegations that former CFO, who was allegedly aware of relevant information and who "regularly communicated with" the Treasurer, who in turn "reported directly" to one of the individual defendants, were "too vague and conclusory to give rise to a strong inference of scienter"); *Patel v. Seattle Genetics, Inc.*, 2018 WL 2359137, at *5 (W.D. Wash. May 24, 2018) (CW's allegations that he approached senior-level officials "about his concerns," including the General Counsel, "are not sufficiently particularized . . . and do not demonstrate that [the CW's] concerns were ever directly communicated to anyone, much less the Individual Defendants").

15

Plaintiffs' cases, Opp. 27-28, are clearly distinguishable. In *In re Acadia Pharms. Inc. Sec. Litig.*, the plaintiffs alleged, and the defendants did not dispute, that the individual defendants directly reviewed data which contradicted certain public statements made by the individual defendants. 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020). And in *Smajlaj v. Brocade Commc'ns Sys. Inc.*, the court found a strong inference of scienter as to the company's practice of issuing backdated stock options where plaintiffs alleged that the individual defendants had "nearly exclusive authority" over the stock options program and that one defendant was connected "to myriad other companies where stock options practices of an apparently similar nature have surfaced." 2007 WL 2457534, at *1 (N.D. Cal. Aug. 27, 2007). This is a far cry from Plaintiffs' allegations in this case.

## B.   Plaintiffs' Other Arguments Do Not Support a Strong Inference of Scienter.

The Opposition's remaining scienter arguments are similarly unsupported and without merit.

*First*, the Opposition points to the Wang Xi lawsuit and its settlement "for full damages," which Plaintiffs argue indicates "the suit had merit." Opp. 29. This is pure rhetoric: "settlements can be made for many reasons without any indication of the relative merit of the allegations." *Eshelman v. Orthoclear Holdings, Inc.*, 2009 WL 506864, at *8 (N.D. Cal. Feb. 27, 2009).[15] To the contrary, any inference of scienter is refuted by the fact that the CRA closed its investigation of the Wang Xi allegations and concluded that MBS did not breach regulatory requirements. *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248-49 (8th Cir. 2008) (that SEC investigation uncovered no evidence of fraud undermined an inference of scienter).[16]

*Second*, the Hogan Lovells investigation, Opp. 29-30, does not contribute to any inference of scienter. There is not a single allegation that the investigation linked any of the Individual Defendants to any alleged wrongdoing. *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 949 (D. Ariz. 2007) (no scienter where complaint "has no factual allegations linking" finding of internal investigation to any individual defendants).[17]

---

[15] Plaintiffs admit that the settlement included a statement of non-admission of liability. SAC ¶ 257.

[16] Plaintiffs argue that Judge Navarro "already found" that the lack of other suits does not "negate scienter." Opp. 29. Not true. Judge Navarro did not reach Defendants' scienter arguments as she dismissed the prior complaint in full on falsity grounds. ECF No. 74 at 22.

[17] Moreover, Plaintiffs' allegations are refuted by two of the *Bloomberg* articles that Plaintiffs have incorporated by reference, which state that MBS's investigation concluded that "no patron funds

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

*Third*, Plaintiffs' allegations of turnover in personnel at MBS over the course of a decade, Opp. 31, do not support any inference of scienter. CW-1's speculation that one compliance executive was "definitely fired" two years prior to the Class Period and that "three to four" other (presumably low-level) individuals were fired, SAC ¶ 116, cannot support an inference of scienter, where CW-1 had no personal knowledge of the circumstances of these departures, let alone any knowledge that the departure was connected to any of the alleged wrongdoing. *See Intuitive Surgical, Inc.*, 759 F.3d at 1063. Nor can an MBS executive supposedly being told at MBS to "back off" when he raised "issues" be credited where Plaintiffs fail to allege any facts to support the reliability or probative value of this statement, including what purported "issues" the executive raised. Mtn. 21-22. Absent such plausible allegations, the inference that employees left because of alleged wrongdoing "will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Zucco*, 552 F.3d at 1002.

*Fourth*, Plaintiffs argue that the Individual Defendants must have known about the increase in bad debt reserve and, therefore, of the alleged scheme, because of their roles "as LVS officers who signed its SEC filings." Opp. 31-32. But there is no allegation that LVS, or MBS for that matter, ever misstated its bad debt reserves. Indeed, MBS was always highly profitable. Moreover, "[t]he Ninth Circuit has rejected these kinds of 'he-must-have-known' allegations [when] offered to demonstrate scienter under the PSLRA." *Petrie v. Elec. Game Card Inc.*, 2011 WL 13131246, at *4 (C.D. Cal. May 26, 2011). *See also Prodanova*, 993 F.3d at 1112 (rejecting "conclusory" allegations that the defendants "would have" been involved in alleged wrongdoing given their positions).

*Finally*, the Opposition wildly argues that Defendants committed fraud because they were motivated to maintain MBS's license and LVS "lacked the financial resources to satisfy MBS's renewal." Opp. 32-34. This is a complete fabrication. The SAC makes no allegations that LVS was ever in danger of losing its MBS license because gaming revenues at MBS were not high enough. To the contrary, Plaintiffs repeatedly highlight the success and profitability of MBS. SAC ¶¶ 60-62, 272. Plaintiffs also argue in the Opposition that Defendants were motivated to commit fraud because

were transferred in a manner that was contrary to a patron's intent." *See* Ex. 18, June 4, 2020 Article at 1036; Ex. 22, Sept. 16, 2020 Article at 1048.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

the alleged unauthorized transfer scheme allowed MBS to pay a lower casino tax. Opp. 33. But this makes no sense: engaging in fraudulent transfers to facilitate greater gaming and therefore a lower tax rate merely would increase the likelihood that the CRA would find MBS to be violating the law, which could lead to MBS losing its license to operate entirely.[18] Plaintiffs' theory of motive cannot support scienter where the Defendants "would stand to lose more from [their] allegedly fraudulent actions than [they] would gain." *Prodanova*, 993 F.3d at 1107.

Conceding the weakness of their "motive" allegations, Plaintiffs claim that a plaintiff "need not allege motive" in order to establish scienter. Opp. 32. But as the Ninth Circuit has explained, "the lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter." *Prodanova*, 993 F.3d at 1108.

*       *       *

In sum, there is simply no well-pled allegation supporting any inference of scienter. When all reasonable inferences are considered, both individually and holistically, Plaintiffs' allegations are "not as cogent or compelling as a plausible alternative inference"—that the Individual Defendants did not know of the alleged scheme. *Zucco*, 552 F.3d at 1007.

## IV.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION.

Plaintiffs' Opposition presents no coherent answer to Defendants' showing that the SAC does not plead loss causation.

*First*, there is no dispute that LVS's stock price went up on three of Plaintiffs' alleged corrective disclosure dates: June 4, 2020, June 5, 2020, and June 7, 2020.[19] *See* Mtn. 37; Ex. 30, LVS Stock Price Chart at 1100. If LVS's stock did not decrease in price, there can be no "loss" and no loss causation. *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *19 (D. Ariz. Aug. 1, 2017). The Opposition attempts to paper over this fatal deficiency by pointing to LVS's "residual stock price declines," after comparing LVS to its peers. Opp. 36 n.13, 36-37. But Plaintiffs provide

---

[18] Plaintiffs accuse Defendants' counsel of "suspiciously omit[ting]" the section of the Casino Control Act ("CCA") regarding casino taxes. Opp. 33. This is nonsense. The SAC makes no allegations regarding casino taxes or this section of the CCA, so there was no reason for Defendants' counsel to include it as an exhibit.

[19] Plaintiffs no longer allege October 10, 2019 as a corrective disclosure. *See* Opp. 36 n.14.

no legal authority to support this novel approach to pleading a "loss" for loss causation.[20]

*Second*, Plaintiffs do not dispute that the stock price declines on three of the other disclosure dates—September 26, 2019, May 12, 2020, and July 19, 2020—were modest and the price quickly recovered. Mtn. 37-38. The Ninth Circuit has squarely held that "[t]he [loss causation] analysis is contextual, and where, for example, a 'modest' drop in the stock price coincides with the disclosure of certain news but then recovers very shortly after, the allegation of loss causation may be insufficient." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021) (citation omitted).[21]

*Finally*, for the last corrective disclosure date, September 16, 2020, Plaintiffs do not dispute that LVS's stock price moved in tandem with the stock price of its peers. As Defendants demonstrated in their Motion, the stock price of LVS, Wynn, MGM, and the Dow Jones U.S. Gambling Index all declined on September 16 and in the days that immediately followed, thus demonstrating that market forces unrelated to any alleged fraud were responsible for LVS's stock price decline on September 16. Mtn. 38; Ex. 31, Comparative Stock Price Chart at 1109.[22]

Unable to refute these points, Plaintiffs resort to arguing they have pled loss causation because "between September 25, 2019 and September 16, 2020, LVS's stock price fell from $57.08 per share to $49.67 per share." Opp. 3, 37. But Plaintiffs are required to allege facts that distinguish between losses relating to the alleged fraud, and those resulting from general market forces or other factors unrelated to the alleged fraud. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). Plaintiffs do not even attempt to do so, as they entirely ignore the COVID-19 pandemic and the impact that it had on LVS and the gaming industry as a whole over this period. Plaintiffs have not

---

[20] *IBEW Local 697 Pension Fund v. Int'l Game Tech*. does not stand for the proposition that a 2% stock price decline is actionable. Opp. 37. In *IBEW*, the common stock declined by "nearly 8 percent" after the earnings per share forecast was adjusted, and then declined "more than two percent" in subsequent days. 2011 WL 915115, at *2-3 (D. Nev. Mar. 15, 2011). The plaintiffs also alleged two additional stock drops of six percent and five percent. *Id.*

[21] Plaintiffs' cited authority both predates *Wochos* and is clearly distinguishable. Opp. 37-38. In *Nathanson v. Polycom, Inc.*, for example, the defendants argued there was no loss causation because the stock price recovered within *two months*. 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) (emphasis added). That is a far cry from the stock price movement here, which happened within a few days.

[22] Plaintiffs' argument that Defendants "cherrypicked" these peer competitors is meritless. Plaintiffs affirmatively plead in multiple places that LVS had underperformed compared to its peers. SAC ¶¶ 337, 339, 341. Plaintiffs do not dispute that MGM and Wynn are two of LVS's key competitors. *Id.* ¶ 32 (MGM is LVS's "next largest competitor").

19

pled loss causation.

## V.    DISMISSAL WITH PREJUDICE IS APPROPRIATE.

For each of the foregoing reasons, the SAC must be dismissed, this time with prejudice. *See Nguyen*, 962 F.3d at 420 ("Where the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad.") (quoting *Zucco*, 552 F.3d at 1007). Although Plaintiffs request leave to amend, Opp. 39, they identify no allegations they would seek to add. Indeed, there are no allegations they could plausibly add. Accordingly, dismissal with prejudice is appropriate.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Second Amended Complaint with prejudice. [23]

Dated: July 8, 2022

SNELL & WILMER, L.L.P.

By: */s/ Patrick Byrne*
    Patrick G. Byrne, Esq.
    Morgan Petrelli, Esq.
    3883 Howard Hughes Parkway,
    Ste. 1100
    Las Vegas, NV 89169
    Tel.  702.784.5200
    Fax: 702.784.5252
    Email:  pbyrne@swlaw.com
            mpetrelli@swlaw.com

    Walter C. Carlson (*Pro Hac Vice*)
    Lawrence P. Fogel (*Pro Hac Vice*)
    Martha C. Clarke (*Pro Hac Vice*)
    SIDLEY AUSTIN LLP
    One South Dearborn Street
    Chicago, IL 60603
    Tel.  312.853.7000
    Fax.  312.853.7036
    Email:  wcarlson@sidley.com
            lawrence.fogel@sidley.com
            mclarke@sidley.com

    *Attorneys for Defendants*

---

[23] Claims under Section 20(a) are derivative of Section 10(b) claims and must be dismissed where, as here, the SAC fails to allege an underlying violation of the securities laws. Mtn. 40.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

20

## CERTIFICATE OF SERVICE

On July 8, 2022, I served the foregoing document on all parties appearing in this case when filing said document through the court's PACER system with automatic e-service on all persons who have registered for e-service on PACER for this case.

/s/  Lyndsey Luxford
An employee of SNELL & WILMER L.L.P.

4889-0342-2760.1

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

21