Patrick G. Byrne (Nevada Bar #7636)
Morgan Petrelli (Nevada Bar #13221)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone:  702.784.5200
Facsimile:  702.784.5252
Email:  pbyrne@swlaw.com
          mpetrelli@swlaw.com

Walter C. Carlson (*Pro Hac Vice*)
Lawrence P. Fogel (*Pro Hac Vice*)
Caroline A. Wong (*Pro Hac Vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  312.853.6892
Facsimile:  312.853.7036
Email:  wcarlson@sidley.com
          lawrence.fogel@sidley.com
          caroline.wong@sidley.com

*Attorneys for Defendants*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| THE DANIELS FAMILY 2001 REVOCABLE TRUST, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-01958-CDS-EJY |
| Plaintiff, | |
| v. | **DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| LAS VEGAS SANDS CORP., DR. MIRIAM ADELSON, in her capacity as Special Administrator of the estate of SHELDON G. ADELSON, PATRICK DUMONT, and ROBERT G. GOLDSTEIN, | |
| Defendants. | |

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

In accordance with the Federal Rules of Civil Procedure, Defendants Las Vegas Sands Corp. ("LVS"), Dr. Miriam Adelson, in her capacity as Special Administrator of the Estate of Sheldon G. Adelson, Patrick Dumont, and Robert G. Goldstein (collectively, "Defendants") answer Plaintiffs' Second Amended Class Action Complaint (ECF No. 77, the "Second Amended Complaint").[1]

The Court's Order entered on March 28, 2022 ("2022 Order") dismissed all claims relating to junkets with prejudice. In addition, the Court's Order entered on August 8, 2023 ("2023 Order") dismissed the Second Amended Complaint with respect to all statements that were made in 2016, 2017, and 2018. Allegations relating to these previously dismissed claims therefore are not relevant and do not require an answer. To the extent Defendants answer an allegation, Defendants do not concede that the allegation survived a motion to dismiss, or that the allegation continues to be relevant to the claims the Court permitted to proceed. Furthermore, Defendants deny any allegation in the Second Amended Complaint that suggests they made any false or misleading statement or acted with scienter at any time, or that suggests they in any way committed wrongdoing, misconduct, or a violation of the federal securities laws.

1.    LVS owns and operates destination properties ("Integrated Resorts") featuring premium accommodations with world-class gaming facilities, retail malls and other amenities. The Company's Integrated Resorts are located in the United States, Singapore, and Macao.

**ANSWER:**    Defendants admit the allegations in paragraph 1, except that Defendants deny that LVS currently operates integrated resorts in the United States.

2.    LVS opened the Marina Bay Sands ("MBS") resort in Singapore in 2010. MBS is one of only two casinos allowed to operate in all of Singapore. MBS generates approximately $2.5 billion annually in casino revenue, accounting for approximately 25% of LVS's overall revenue.

**ANSWER:**    Defendants admit the allegations in the first and second sentences of paragraph 2. Defendants state that MBS has generated casino revenues since it opened in 2010, and that those revenues have varied from year-to-year and varied as a percentage of LVS's overall revenue. Defendants deny the remaining allegations in paragraph 2.

---

[1] The headings contained within the Second Amended Complaint are not substantive allegations to which an answer is required, and thus have been omitted from this Answer. To the extent those items are intended as substantive allegations, Defendants deny the allegations.

3.    In 2012, shortly after LVS opened the MBS casino, Chinese President Xi Jinping instituted broad anticorruption policies that resulted in several years of investigations, hundreds of thousands of corruption charges, including for accepting bribes laundered through the VIP tables throughout Macao and Singapore, and limited efforts of foreign casinos to lure in Chinese gamblers. President Jinping's stance against corruption and money laundering continued into and through 2015 with a general "crack down" on foreign casinos attempting to attract Chinese citizens to gamble abroad.

**ANSWER:**    Defendants admit that Xi Jinping made statements in 2012 in favor of anti-corruption policies. Defendants lack knowledge or information sufficient to determine the truth or falsity of the remaining allegations in paragraph 3, including the allegations regarding the intent of the Chinese government, and therefore deny those allegations.

4.    As part of the regulatory "crack down," Singapore enacted the Casino Control Act, which prohibited MBS from, among other things, extending credit to casino patrons unless they were "premium players," defined as a person who opens a deposit account with the casino and deposits at least SGD$100,000 (approximately USD$75,000). LVS also maintained internal lending guidelines that prevented lending to subprime borrowers. As a result of increased regulations, MBS's casino revenues sharply declined with betting volume from "VIPs" or "high rollers" plunging almost 34% and MBS revenue dropping nearly $260 million from 2014 to 2015.

**ANSWER:**    Defendants admit that the Casino Control Act ("CCA") contains regulations relating to the extension of credit, and that the CCA permits a casino operator to extend credit to persons who qualify as a "premium player," as defined by the CCA. Defendants state that those regulations speak for themselves, and should be read as a whole. Defendants further state that the allegations in the first sentence of paragraph 4 assert legal conclusions and characterizations to which no further response is required. Defendants further admit that LVS had policies and procedures for assessing the creditworthiness of patrons before extending credit. Defendants deny the remaining allegations in paragraph 4.

5.    To evade regulatory scrutiny and compensate for lost revenue from "high rollers," Defendants orchestrated a scheme whereby MBS by illegally extending in-house lines of credit to gamblers that, by law, were otherwise ineligible to receive credit. Given that several of its "premium players" were no longer gambling due to the tightening regulatory restrictions, MBS began anointing additional patrons as "premium players" even though they did not meet the initial qualifications. MBS transferred funds from existing, legitimate "premium player" accounts without their permission and placed them in accounts belonging to new purported "premium players" so they could qualify for the credit lines MBS was extending.

**ANSWER:**    Defendants deny the allegations in paragraph 5.

6.    The "premium player" scheme was widely known throughout MBS and LVS. According to former MBS employees, the illicit transfers between patron accounts were often flagged as "suspicious" and brought to the attention of MBS's compliance department. The transfers were also repeatedly discussed at high-level internal meetings attended by, among others,

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

2

LVS's Chief Compliance Officer and MBS's Chief Financial Officer. Those that complained too much or reported too many suspicious transfers were fired. According to one former employee, "no one cared."

**ANSWER:**    Defendants deny the allegations in paragraph 6.

7.    The "premium player scheme" allowed LVS to successfully report record-breaking revenue and profitability at its famed MBS casino during the Class Period. Contrary to the undisclosed "premium player" scheme, however, Defendants told investors that LVS strictly adhered to local law and implemented robust compliance procedures. LVS routinely stated in its public filings that LVS only "extend[ed] credit to those customers whose level of play and financial resources warrant[ed] . . . an extension of credit" and only "extend[ed] credit to approved casino customers following background checks and investigations of creditworthiness." This was not true because LVS was extending credit to MBS patrons that did not meet the necessary financial criteria to qualify as a "premium player" or otherwise receive credit under Singapore law. Notwithstanding, LVS publicly told analysts and investors that it was "very compliant," "very proud of our compliance record," and "more aggressive than the government in terms of monitoring [who receives credit]."

**ANSWER:**    Defendants admit that the third sentence of paragraph 7 purports to quote statements in certain of LVS's SEC filings, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements. Defendants further state that LVS's SEC filings speak for themselves, and that each is a unitary document that should be read as a whole. By way of further answer, Defendants state that the Court's 2023 Order dismissed the Second Amended Complaint with respect to all statements that were made in 2016, 2017, and 2018. (2023 Order at 16–19.) Accordingly, no response to the last sentence of paragraph 7 is required. Defendants deny the remaining allegations in paragraph 7.

8.    LVS's "premium player" scheme would eventually cost the Company hundreds of millions of dollars in bad debt write-offs when these so called "premium players" lacked the financial wherewithal to repay their credit lines and defaulted on their loans. Write-offs from uncollectible accounts stemming from MBS accounted for $717 million of the $1.16 billion written off by LVS from 2013 to 2020, or ***nearly 62%.***

**ANSWER:**    Defendants deny the allegations in paragraph 8.

9.    The truth concerning the "premium player" scheme at MBS and LVS's credit risk finally began to emerge starting in September 2019 when a former MBS patron and Chinese national named Wang Xi accused MBS of misappropriating approximately USD$6.1 million from his accounts through 22 separate transactions between October and December 2015. These transfers were carried out through letters of authorization that appeared to either be forged or photocopied. Mr. Wang eventually sued in September 2019 to recover his millions, setting off a chain reaction of investigations by the United States Department of Justice, Singapore Police, and Singapore's Casino Regulatory Authority before MBS determined to settle with Wang in exchange for *full* payment of the claimed amount.

**ANSWER:**    Defendants deny the allegations in paragraph 9.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

3

10. Under intense regulatory pressure, LVS was forced to conduct an internal investigation with the assistance of the international law firm, Hogan Lovells. Hogan Lovells determined that between 2013 and 2017 (the period under investigation), more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in an amount totaling approximately SGD$1.4 billion. Of this total amount, transfers accounting for SGD$365 million (more than 26%) were effectuated using bogus letters of authorization bearing signatures that appeared similar and were likely photocopied.

**ANSWER:** Defendants admit that Hogan Lovells is a law firm that was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 10.

11. Defendants lied about LVS's credit extension practices and compliance policies. While they told investors that they extended credit to only those patrons who qualified, in reality, LVS was extending credit to subprime borrowers whose credit worthiness and financial background made them ineligible for the credit they received. Despite being aware of this unauthorized transfer process, LVS remained silent until the filing of Mr. Wang's suit, the publication of which caused a $1.20 per share decline in the Company's common stock. Thereafter, the truth about MBS's compliance failures and the breadth of the unauthorized transfer process dripped into the market over the course of several partial disclosures, sending LVS's stock price down and harming Plaintiffs and the Class.

**ANSWER:** Defendants deny the allegations in paragraph 11.

12. The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

**ANSWER:** Defendants admit that Plaintiffs purport to bring this action pursuant to the statutes and rule cited in paragraph 12. Defendants deny the remaining allegations in paragraph 12.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. §78aa. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of a national securities exchange. LVS's common stock trades in an efficient market on the New York Stock Exchange ("NYSE").

**ANSWER:** Defendants admit that this Court has jurisdiction over the subject matter of this action. Defendants further admit that LVS's common stock trades on the New York Stock Exchange ("NYSE"). Defendants deny the remaining allegations in paragraph 13.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

this District. Additionally, Defendant LVS maintains executive offices in this District at 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

**ANSWER:**    Defendants admit that venue is proper in this District. Defendants deny the remaining allegations in paragraph 14.

15.    Plaintiff Carl S. Ciaccio and Plaintiff Donald M. DeSalvo were appointed as Co-Lead Plaintiffs by the Court pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3), on January 5, 2021. (ECF No. 19).

**ANSWER:**    Defendants admit the allegations in paragraph 15.

16.    Plaintiff Carl S. Ciaccio, as previously set forth in his certification supporting the Motion for Appointment as Co-Lead Plaintiffs and Approval of Selection of Counsel (ECF No. 11-1), incorporated by reference herein, purchased LVS securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**ANSWER:**    Defendants admit that Plaintiff Carl S. Ciaccio filed a certification with the Court in connection with the Motion for Appointment as Co-Lead Plaintiff and Approval of Selection of Counsel (ECF No. 11-1) purporting to show that he purchased LVS's common stock during the putative class period. Defendants lack knowledge or information sufficient to form a belief about the truth of that certification. Defendants deny the remaining allegations in paragraph 16.

17.    Plaintiff Donald M. DeSalvo, as previously set forth in his certification supporting the Motion for Appointment as Co-Lead Plaintiffs and Approval of Selection of Counsel (ECF No. 11-1), incorporated by reference herein, purchased LVS securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**ANSWER:**    Defendants admit that Plaintiff Donald M. DeSalvo filed a certification with the Court in connection with the Motion for Appointment as Co-Lead Plaintiff and Approval of Selection of Counsel (ECF No. 11-1) purporting to show that he purchased LVS's common stock during the putative class period. Defendants lack knowledge or information sufficient to form a belief about the truth of that certification. Defendants deny the remaining allegations in paragraph 17.

18.    Defendant LVS was founded in 1988, is incorporated in Nevada, and maintains its principal offices at 3355 Las Vegas Boulevard South, Las Vegas, Nevada, 89109. LVS's common stock trades on the New York Stock Exchange under the ticker symbol "LVS." LVS describes itself as a "global developer of destination properties ('Integrated Resorts') that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants and other amenities." LVS operates integrated resorts in the United States, Singapore, and Macao.

5

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:**   Defendants admit the allegations in paragraph 18, except that Defendants deny that Las Vegas Sands Corp. ("LVS") was founded in 1988, deny that LVS maintains its principal offices at 3355 Las Vegas Boulevard South, Las Vegas, Nevada, 89109, and further deny that LVS currently operates integrated resorts in the United States.

19.   LVS owns and operates Marina Bay Sands or MBS, one of only two casinos licensed to operate in Singapore. Historically, MBS generated approximately $2.5 billion annually in casino revenue and accounted for approximately 25% of LVS's overall revenue. MBS is a core component of LVS's business operations.

**ANSWER:**   Defendants admit the allegations in the first sentence of paragraph 19. Defendants state that MBS has generated casino revenues since it opened in 2010, and that those revenues have varied from year-to-year and varied as a percentage of LVS's overall revenue, and admit that MBS is important to LVS's business operations. Defendants deny the remaining allegations in paragraph 19.

20.   Defendant Dr. Miriam Adelson is the Special Administrator of the Estate of Sheldon G. Adelson ("Adelson").[2] Adelson was the founder, chairman of the board of directors (the "Board"), and chief executive officer of LVS at all times relevant to this Action. Adelson, his family members and trusts and other entities established for the benefit of Adelson and/or his family members (collectively, the "Principal Stockholder and His Family") beneficially owned approximately 57% of LVS's outstanding common stock as of December 31, 2019. As the majority shareholder, the Principal Stockholder and His Family exercised significant influence over the LVS business policies and affairs, including the composition of LVS's Board and any action requiring approval of LVS stockholders.

**ANSWER:**   Defendants admit the allegations in paragraph 20, including the allegations in footnote 2.

21.   Defendant Patrick Dumont ("Dumont") has been LVS's Executive Vice President and Chief Financial Officer from March 28, 2016 through the time this Action was filed. Dumont was previously LVS's Vice President of Corporate Strategy from June 2010 to August 2013, Senior Vice President of Finance and Strategy from September 2013 to March 2016. Dumont has also served as LVS's principal financial officer since February 23, 2016.

**ANSWER:**   Defendants admit the allegations in the first and second sentences of paragraph 21. Defendants deny the remaining allegations in paragraph 21.

22.   Defendant Robert Glen Goldstein ("Goldstein") was previously LVS's President and Chief Operating Officer and a member of the Board, of LVS from January 1, 2015 until January 26, 2021. On January 26, 2021, Goldstein was named Chief Executive Officer of LVS following Adelson's death.

---

[2] Adelson passed away during the pendency of this Action. Dkt. No. 35. On March 22, 2021, Magistrate Judge Elayna J. Youchah granted Plaintiffs' Motion for Substitution and appointed Dr. Miriam Adelson as Adelson's representative in the Action. Dkt. No. 41.

**ANSWER:**    Defendants admit the allegations in paragraph 22. Defendants further state that Mr. Goldstein continues to be a member of LVS's Board.

23.    Defendants Adelson, Dumont, and Goldstein are collectively referred to herein as the "Individual Defendants" and, together with LVS, as the "Defendants."

**ANSWER:**    Because no allegations are set forth in paragraph 23, no response is required.

24.    Each Individual Defendant, by virtue of his high-level position with LVS, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his respective tenure with the Company, as alleged herein. As alleged below in Sections VII and X, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants. Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

**ANSWER:**    Defendants admit that by virtue of their positions, Messrs. Adelson, Dumont, and Goldstein participated in the management of the Company, were involved in the operations of the Company, and received and had access to certain confidential Company information. Defendants deny the remaining allegations in paragraph 24.

25.    As executive officers of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

**ANSWER:**    The allegations in the first sentence of paragraph 25 assert legal conclusions and characterizations to which no response is required. Defendants deny the remaining allegations in paragraph 25.

26.    Each of the Individual Defendants, because of his position of control and authority as an executive officer of LVS, was able to and did control the content of the SEC filings, press releases, and other public statements that LVS issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants state that the phrases "control the content" and "other public statements" are vague and undefined, and therefore deny the allegations relating thereto. Defendants deny the remaining allegations in paragraph 26.

27. Each of the Individual Defendants, because of his position of control and authority as an executive officer of LVS, had access to the adverse undisclosed information about LVS's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other LVS officers and employees, attendance at LVS's management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about LVS materially false or misleading.

**ANSWER:** Defendants deny the allegations in paragraph 27.

28. Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of LVS securities by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding LVS's products, business, operations, and management, and the intrinsic value of LVS securities; and (ii) caused Plaintiffs and members of the Class to acquire LVS common stock at artificially inflated prices.

**ANSWER:** Defendants deny the allegations in paragraph 28.

29. Wang Xi is a Chinese national and former VIP gambler at MBS. On September 26, 2019, Xi filed a statement of claim in the High Court of Singapore against MBS, claiming that the casino misappropriated SGD$9.1 million (approximately $6.1 million USD) from his account through unauthorized transfers to other MBS patrons. According to Xi, the amount was pilfered from his account through 22 separate transactions made between October and December 2015 and carried out through letters of authorization that appeared to either be forged or photocopied. When Xi attempted to verify the authenticity of the letters, he was provided only copies and told that the originals had been destroyed through the casino's Macao affiliate for "reasons of confidentiality." LVS ultimately resolved Xi's lawsuit in full by paying him the entire amount of the claimed misappropriated funds.

**ANSWER:** Defendants admit that Wang Xi was a Chinese national who was a former VIP customer at MBS, and that Xi filed a statement of claim on September 26, 2019 in the High Court of Singapore against MBS. Defendants further admit that paragraph 29 purports to quote and characterize statements in the Xi statement of claim, and admit that MBS settled Xi's lawsuit. Defendants deny the remaining allegations in paragraph 29.

30. The Singaporean CRA or CRA is a regulatory agency operating in Singapore that is tasked with the licensing and regulation the operation of casinos, including in particular MBS. The CRA commenced an investigation into MBS's unauthorized transfer practice in response to news of Xi's lawsuit. The CRA concluded in or around September 2020 that "there were weaknesses in MBS's casino control measures pertaining to fund transfers." Further, in a statement to *Bloomberg*, the CRA stated that it "takes a serious view of such matters and had directed MBS to strengthen its control measures, which MBS has since undertaken. CRA will continue to exercise close oversight to ensure that MBS's measures are effective." MBS implemented additional control measures in response to the CRA's investigation, including additional training for employees to spot and report

suspicious behavior and requiring that all transfer requests would have to be approved by the casino's compliance department.

**ANSWER:** Defendants admit that the CRA is an agency that regulates the operation of casinos in Singapore. Defendants further admit that paragraph 30 purports to quote and characterize statements in documents written by non-parties, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements and deny the remaining allegations in paragraph 30.

31. Hogan Lovells is a prominent, international law firm. LVS retained Hogan Lovells to conduct an internal investigation into the unauthorized transfer practices occurring at MBS. Hogan Lovells concluded that MBS employees had not been complying with proper standards by filling in payment details on pre-signed or photocopied authorization forms. Further, Hogan Lovells determined that from 2013 to 2017 (the period under review), more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in an amount totaling approximately SGD$1.4 billion (or approximately $1.05 billion USD). Of these transactions, letters authorizing transfers for SGD$365 million (approximately $275 million USD) from multiple casino guests bore signatures that appeared similar – thus, corroborating the earlier allegations that MBS employees were employing a system of copying signatures to conduct unauthorized transfers. Upon information and belief, LVS retained Hogan Lovells in late-2017 or early-2018 which prompted MBS's to report a series of compliance measures it had purportedly instituted in 2018 to curb the unauthorized transfers.

**ANSWER:** Defendants admit that Hogan Lovells is a law firm that was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 31.

32. Over the past several decades, the "Las Vegas Sands" name has become synonymous with gaming, not just in Las Vegas, but globally, as it has become the largest casino company worldwide, with annual revenues of $13.74 billion in 2019 according to Statista – nearly one billion dollars more than its next largest competitor, MGM Resorts.

**ANSWER:** Defendants admit that LVS had net revenues of approximately $13.74 billion in 2019, and that MGM Resorts International reported net revenues of approximately $12.9 billion in 2019. Defendants state that the phrases "synonymous with gaming" and "largest casino company" are vague and undefined, and therefore deny the allegations relating thereto.

33. LVS attributes its success to its casinos, as well as the development and maintenance of "destination properties" (referred to by LVS as "Integrated Resorts") "that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants and other amenities."

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants admit that LVS is a developer of destination properties that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibition facilities, celebrity chef restaurants, and other amenities. Defendants further admit that LVS has referred to these properties as "Integrated Resorts." Defendants deny the remaining allegations in paragraph 33.

34. LVS seeks to differentiate its Integrated Resorts from other standalone casinos by employing a convention-based marketing strategy that targets business travelers during lower-mid-week periods, while catering to leisure or vacation travelers on the weekends.

**ANSWER:** Defendants admit that LVS has a convention-based marketing strategy that allows it to attract business travelers during mid-week periods while leisure travelers principally occupy LVS properties during the weekends. Defendants deny the remaining allegations in paragraph 34.

35. While the Integrated Resorts may provide additional amenities, like malls and restaurants, making them attractive destinations for meetings, incentives, conventions, and exhibits (or "MICE" in LVS parlance), at its core remains LVS's casino portfolio, with gaming facilities in the United States, Macao, and Singapore.

**ANSWER:** Defendants admit that LVS's Integrated Resorts feature gaming and also non-gaming attractions and amenities, including entertainment, retail offerings, and meetings, incentives, conventions, and exhibitions ("MICE") facilities. Defendants further admit that LVS currently has Integrated Resorts in Macao and Singapore. Defendants deny the remaining allegations in paragraph 35.

36. In the United States, LVS properties include the Venetian Resort Las Vegas and the Sands Expo and Convention Center (the "Las Vegas Operating Properties"). On March 3, 2021, the Company announced that it had reached an agreement to sell its Las Vegas Operating Properties for $6.25 billion, with defendant Goldstein stating, "Asia remains the backbone of this company and our developments in Macao and Singapore are the center of our attention." LVS also previously owned and operated the Sands Casino Resort Bethlehem in Pennsylvania before selling the property in 2019.

**ANSWER:** Defendants admit that, until February 23, 2022, LVS's properties in the United States included The Venetian Resort Las Vegas and the Sands Expo and Convention Center (together with The Venetian Resort Las Vegas, the "Las Vegas Operating Properties"). Defendants further admit that, on March 3, 2021, LVS announced that it had entered into agreements to sell the Las Vegas Operating Properties for an aggregate purchase price of approximately $6.25 billion.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

Defendants admit that this announcement contained the quoted statement attributed to Robert Goldstein in the second sentence of paragraph 36. Defendants further admit that LVS previously owned and operated the Sands Casino Resort Bethlehem in Pennsylvania and that the Sands Casino Resort Bethlehem was sold in 2019. Defendants deny the remaining allegations in paragraph 36.

37.    In Macao, LVS operates a collection of Integrated Resorts, including: The Venetian Macao Resort Hotel; The Londoner Macao; The Parisian Macao; The Plaza Macao and Four Seasons Hotel Macao, Cotai Strip; and the Sands Macao.

**ANSWER:**    Defendants admit the allegations in paragraph 37.

38.    In Singapore, LVS owns and operates the Marina Bay Sands – one of only two casino properties licensed to operate in Singapore.

**ANSWER:**    Defendants admit the allegations in paragraph 38.

39.    The customer focus of each of these casinos can be roughly split in half between "mass market" gamers and "VIP and premium players."

**ANSWER:**    Defendants admit that LVS's customers include "mass market" gamers and "VIP and premium players." Defendants deny the remaining allegations in paragraph 39.

40.    The "mass market" segment of gamers includes those weekend travelers who visit LVS's (or any) gaming property for a vacation and typically wager whatever cash they have brought with them and depart having won or lost relatively small amounts. The mass market focus is particularly true in LVS's Macao properties, where LVS properties had a market share of approximately 30% while largely catering to mass market gamers, typically from mainland China.

**ANSWER:**    With regard to the first sentence of paragraph 40, Defendants admit that the "mass market" includes weekend travelers who wager relatively small amounts. With regard to the second sentence of paragraph 40, Defendants admit that the mass market segment is one component of the business of LVS's Macao properties; that, among Macao operators, LVS's combined properties in Macao had an average market share of approximately 30% for gaming win from mass tables and slots during the five years prior to 2023; and that a significant number of gaming customers come to LVS's Macao casinos from mainland China. Defendants deny the remaining allegations in paragraph 40.

41.    On the other end of the spectrum sit LVS's VIP and premium players – high rollers enticed to spend large amounts of money at LVS properties that provide players with luxury amenities and premium service levels, including luxury accommodations, restaurants, lounges, invitation-only clubs and private gaming salons. Unlike the mass market gamers who generally wager with "non-rolling chips" purchased from the casino with cash, these VIPs are typically extended lines of credits and bankrolled through the use of "rolling chips" – special non-negotiable

11

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

chips not directly exchangeable for cash that allow a casino to monitor a specific VIP's gaming success or lack thereof. MBS was specifically designed to cater to these high-end players.

**ANSWER:** Defendants admit that LVS's customers include "VIP and premium players" and that LVS properties provide luxury amenities and premium service levels, including luxury accommodations, restaurants, lounges, invitation-only clubs, and private gaming salons. Defendants further admit that Macao and Singapore table games are divided into two categories: Rolling Chip play (composed of VIP players) and Non-Rolling Chip play (mostly non-VIP players). Defendants further admit that LVS extends credit to certain of its customers. Defendants deny the remaining allegations in paragraph 41.

42. In or about 2006, the government of Singapore solicited proposals from several gaming companies for the development of two integrated resorts that would be permitted to operate casinos in the small city-state.

**ANSWER:** Defendants admit that, in or about 2006, the government of Singapore solicited proposals for two Integrated Resorts that would be permitted to operate casinos. Defendants lack knowledge or information sufficient to determine the truth or falsity of the remaining allegations in paragraph 42 and therefore deny those allegations.

43. An exclusivity period contained within Singapore's original request for proposal provided that only two licensees would be granted the right to operate a casino in Singapore during an initial ten-year period, expiring February 28, 2017. This exclusivity period is codified in Section 41 of Singapore's Casino Control Act ("CCA").

**ANSWER:** Defendants admit that, under the Singapore government's request for proposals to develop Integrated Resorts, only two licensees were granted the right to operate a casino in Singapore during an initial exclusivity period, which expired on February 28, 2017 and which has since been extended. Defendants further admit that the extended exclusivity period is codified in Section 41 of Singapore's Casino Control Act ("CCA"). Defendants state that this provision speaks for itself, and that the CCA should be read as a whole.

44. In May 2006, Singapore selected Las Vegas Sands to build and operate the first of these two planned resorts.

**ANSWER:** Defendants admit the allegations in paragraph 44.

45. On August 23, 2006, Las Vegas Sands' wholly owned subsidiary, Marina Bay Sands Pte. Ltd., entered into an agreement (the "Development Agreement") with the Singapore Tourism Board ("STB") to design, develop, construct, and operate an integrated resort in Singapore. Pursuant to the Development Agreement, MBS received concessions that permitted MBS to own

and operate a casino within the integrated resort – a first in the country, as gambling had been outlawed decades prior.

**ANSWER:**   Defendants admit that, on August 23, 2006, Marina Bay Sands Pte. Ltd., a wholly owned subsidiary of LVS, entered into a development agreement, as amended by a supplementary agreement on December 11, 2009 (the "Development Agreement"), with the Singapore Tourism Board to design, develop, construct, and operate an Integrated Resort in Singapore. Defendants further admit that LVS operates this gaming area within its Singapore property pursuant to a concession provided under the Development Agreement, and that casinos had previously been prohibited in Singapore. Defendants lack knowledge or information sufficient to determine the truth or falsity of the remaining allegations in paragraph 45 and therefore deny those allegations.

46.   Singapore later selected Malaysian gambling and leisure group, Genting, to build the second planned integrated resort. Genting was awarded similar concessions, allowing Genting to operate a casino within its planned resort, Sentosa. The concessions MBS and Sentosa received from Singapore, along with the exclusivity period, created an effective duopoly in Singapore's gaming industry. In 2019, Singapore officials announced the exclusivity period would be extended to the end of 2030.

**ANSWER:**   Defendants admit that Genting International was selected by the Singapore government to build an Integrated Resort that includes gaming. Defendants further admit that, in 2019, the Singapore government announced an extension of the exclusivity period for the two licensees to operate their respective casinos to the end of 2030. Defendants deny the remaining allegations in paragraph 46.

47.   Prior to the development of MBS and Sentosa, Singapore had no lawfully operating casinos due to a nearly 40-year ban on gambling.

**ANSWER:**   Defendants admit that prior to the development of MBS and Sentosa, Singapore had not allowed casino gaming for a number of years. Defendants lack knowledge or information sufficient to determine the truth or falsity of the remaining allegations in paragraph 47 and therefore deny those allegations.

48.   Singapore's decision to permit the development of casinos was premised on a strict regulatory scheme intended to prevent the growth of organized crime, loan sharking, and other vices that frequently accompany the gaming industry.

13

**ANSWER:**   Defendants admit that Singapore's decision to license two casino operators was based upon a strict regulatory scheme that was to be developed. Defendants lack knowledge or information sufficient to determine the truth or falsity of the remaining allegations in paragraph 48 and therefore deny those allegations.

49.   Prior to awarding gaming concessions to MBS and Sentosa, Singapore promulgated the Casino Control Regulations ("CCR") pursuant to the CCA.

**ANSWER:**   Defendants admit that Singapore promulgated casino regulations pursuant to the Casino Control Act ("CCA"). Defendants deny the remaining allegations and state, upon information and belief, that these casino regulations were promulgated after casino concessions were awarded to MBS and Sentosa.

50.   Singapore also created and empowered a regulatory body, the Casino Regulatory Authority or CRA to, *inter alia*, license and regulate the operation of casinos, approve any system of controls and administrative accounting procedures of casinos, and supervise the operation of casinos, including the persons responsible for operations and the conduct of gaming within casinos.

**ANSWER:**   The allegations in paragraph 50 assert legal conclusions and characterizations to which no response is required. To the extent a response is required, Defendants admit that the Casino Regulatory Authority[3] exercises licensing and regulatory functions with respect to casinos in Singapore, but deny the allegations in paragraph 50 to the extent they mischaracterize the powers of this legal authority.

51.   The CCA requires MBS to "establish and implement a system of internal controls for the casino operations which satisfies the prescribed internal control requirements." CCA § 138. The CCR specifies that the CRA will issue the Internal Controls Code for Casino Operators and the Internal Controls Code for International Market Agents.

**ANSWER:**   Defendants admit that the first sentence of paragraph 51 purports to quote § 138 of the CCA, but deny that Plaintiffs have accurately quoted the statement. Defendants further state that this provision speaks for itself, and that the CCA should be read as a whole. The remaining allegations in paragraph 51 assert legal conclusions and characterizations to which no further response is required.

52.   The CCA requires MBS to perform due diligence to detect or prevent money laundering and the financing of terrorism. Under this provision of the CCA, MBS must conduct due diligence whenever a patron opens an account, completes a transaction involving $10,000 or

---

[3] The Casino Regulatory Authority was reconstituted as the Gambling Regulatory Authority in 2022.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

more, receives a sum of $5,000 or more in a single transaction, has reasonable suspicion that a patron is engaged in any money laundering or terrorism financing activity, has doubts about the veracity or adequacy of any information previously obtained about a patron, or as otherwise prescribed under the regulations.

**ANSWER:** Defendants admit that the CCA contains a provision entitled "Customer due diligence measures to combat money laundering and terrorism financing." Defendants state that this provision speaks for itself, and that the CCA should be read as a whole. Defendants further state that the allegations in paragraph 52 assert legal conclusions and characterizations to which no further response is required.

53. With only a few exceptions, the CCA prohibits MBS from lending money, extending credit, providing money or chips as part of a transaction involving a credit card, or accepting a wager made by any means other than money or chips. MBS may provide chips on credit to patrons who are not citizens or permanent residents of Singapore, Singapore residents who are "premium players," or to international marketing agents as part of their job. LVS acknowledged in its annual filings with the SEC on Forms 10-K that MBS was "permitted to extend casino credit to persons who are not Singapore citizens or permanent residents but is not permitted to extend casino credit to Singapore citizens or permanent residents except to premium players."

**ANSWER:** Defendants admit that the first two sentences of paragraph 53 purport to reference a CCA provision regarding credit. Defendants state that this provision speaks for itself, and that the CCA should be read as a whole. Defendants further state that the allegations in the first two sentences of paragraph 53 assert legal conclusions and characterizations to which no further response is required. Defendants admit that the third sentence of paragraph 53 purports to quote certain of LVS's Form 10-K filings with the SEC, but deny that Plaintiffs have accurately quoted the statement. Defendants further state that LVS's Form 10-K filings speak for themselves, and that a Form 10-K is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 53.

54. The CCA also limits marketing arrangements at MBS. No person can engage in a casino marketing arrangement wherein any type of commission or rebate is paid for the gaming activities of a casino patron unless that person is licensed as an international marketing agent. Additionally, no person can extend chips on credit to a patron as part of a marketing arrangement unless that person is licensed as an international marketing agent.

**ANSWER:** Defendants admit that paragraph 54 purports to reference CCA provisions regarding casino marketing arrangements. Defendants state that these provisions speak for themselves, and that the CCA should be read as a whole. Defendants further state that the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

allegations in paragraph 54 assert legal conclusions and characterizations to which no further response is required.

55.    The CCA requires that all employees of MBS whose functions are related to the conduct or supervision of gaming activities must be licensed with the CRA. In seeking a license for an employee, MBS is required to certify to the CRA that the employee seeking to be licensed is competent to exercise the functions specific to the employee's position.

**ANSWER:**    Defendants admit that paragraph 55 purports to reference CCA provisions regarding the licensing of employees. Defendants state that these provisions speak for themselves, and that the CCA should be read as a whole. Defendants further state that the allegations in paragraph 55 assert legal conclusions and characterizations to which no further response is required.

56.    Marina Bay Sands, as a wholly owned subsidiary of Las Vegas Sands, is also required to comply with U.S. regulations that require MBS to implement internal controls over financial reporting and business operations, file suspicious activity reports, prevent money laundering, follow generally accepted accounting principles, and comply with other regulations.

**ANSWER:**    Defendants admit that Marina Bay Sands Pte. Ltd. is a wholly owned subsidiary of LVS. The remaining allegations in paragraph 56 assert legal conclusions and characterizations to which no response is required.

57.    From the outset, Marina Bay Sands became and remained LVS's most profitable property and reporting segment by a significant margin. In its first four months of operation, between the time MBS opened its doors in August 2010 and the end of that year, MBS generated over $1 billion in revenue with an EBITDA margin of 51%.

**ANSWER:**    Defendants admit that in 2010, MBS had more than $1 billion in net revenue and an adjusted EBITDA margin of approximately 51%. Defendants deny the remaining allegations in paragraph 57.

58.    MBS has generated an average of $3 billion in revenue in every year of operation since 2010. And since opening in 2010, more than 70% of MBS's total revenues were derived from casino operations.

| | MBS' Casino Revenue as Percentage of Total Revenue | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| MBS Casino Revenues | 1,062 | 2,365 | 2,272 | 2,363 | 2,574 | 2,315 | 2,164 | 2,333 | 2,178 | 2,167 |
| MBS Total Revenues | 1,263 | 2,922 | 2,886 | 2,968 | 3,214 | 2,952 | 2,791 | 3,134 | 3,069 | 3,101 |
| Casino as % of Total Revenue | 84% | 81% | 79% | 80% | 80% | 78% | 78% | 74% | 71% | 70% |

*For 2020, MBS casino revenues were $872; MBS total revenue was $813; and Casino as % total revenue was 62.7%.

16

**ANSWER:**   Defendants admit that since 2010 more than 70% of MBS's net revenues were from casino revenues. Defendants further admit that the table in paragraph 58 states MBS's approximate annual casino revenue and annual net revenue (in millions), and annual casino revenue as an approximate percentage of net revenue, for each year from 2010 through 2019. Defendants deny the remaining allegations in paragraph 58.

59.   Although MBS's parent had at least six other casinos operating over the last ten years, MBS's casino revenues frequently accounted for as much as a quarter of LVS's total casino revenues.

| | MBS and LVS Casino Revenues | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| MBS Casino Revenues | 1,062 | 2,365 | 2,272 | 2,363 | 2,574 | 2,315 | 2,164 | 2,333 | 2,178 | 2,167 |
| LVS Casino Revenues | 5,533 | 7,437 | 9,008 | 11,387 | 12,004 | 9,083 | 8,771 | 9,086 | 9,819 | 9,828 |
| MBS Casino / LVS Casino Revenues | 19% | 32% | 25% | 21% | 21% | 25% | 25% | 26% | 22% | 22% |

\* For 2020, MBS casino revenues were $872; LVS casino revenue was $2,268; and Casino as % total revenue was 38%.

**ANSWER:**   Defendants admit that LVS operated casinos in addition to MBS during the ten-year period from 2010 through 2019. Defendants further admit that the table and the sentence under the table in paragraph 59 state MBS's approximate annual casino revenue and LVS's approximate annual casino revenue (in millions), and MBS's annual casino revenue as an approximate percentage of LVS's annual casino revenue, for each year from 2010 through 2020. Defendants deny the remaining allegations in paragraph 59.

60.   In addition to providing an outsized amount of revenue to its parent, MBS was the most efficient reporting segment, with EBITDA margins exceeding 50% in eight of the last ten years. In comparison, LVS's second most profitable reporting segment, The Venetian Macao, achieved a 40% EBITDA margin only once during its entire history of operation.

| | EBITDA Margins for LVS Reporting Segments | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| **Singapore - Marina Bay Sands** | 50.8% | 52.4% | 47.3% | 46.6% | 53.6% | 51.1% | 50.0% | 56.0% | 55.1% | 53.6% |
| Macao - The Venetian Macao | 33.6% | 36.2% | 37.6% | 38.9% | 38.3% | 36.1% | 38.5% | 38.7% | 39.7% | 40.1% |
| Macao - The Londoner Macao | - | - | 20.3% | 27.4% | 31.9% | 29.8% | 32.0% | 33.0% | 35.3% | 35.4% |
| Macao - The Parisian Macao | - | - | - | - | - | - | 28.7% | 29.6% | 31.6% | 33.0% |
| Macao - The Plaza and Four Seasons | 22.8% | 32.1% | 26.5% | 28.6% | 33.8% | 35.2% | 37.8% | 39.7% | 36.4% | 39.3% |
| Macao - Sands Macao | 26.7% | 27.4% | 28.0% | 29.3% | 28.9% | 25.7% | 25.7% | 27.8% | 27.4% | 27.9% |
| Macao - Ferry Operations and Other | (22.1%) | (10.3%) | (10.8%) | (2.8%) | 2.6% | 14.4% | 20.3% | 13.0% | 11.3% | (6.8%) |
| US - Las Vegas Operating Properties | 25.6% | 25.2% | 23.9% | 23.2% | 21.2% | 20.2% | 22.7% | 23.6% | 23.4% | 26.8% |
| US - Sands Bethlehem | 19.5% | 22.7% | 24.2% | 24.8% | 23.8% | 24.8% | 25.8% | 26.1% | 21.6% | 22.9% |

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

17

**ANSWER:**   Defendants admit that the table in paragraph 60 states approximate EBITDA margins for LVS's operating segments for each year from 2010 to 2019. Defendants deny the remaining allegations in paragraph 60.

61.   Marina Bay Sands' exceptional revenue generation and EBITDA margins resulted in MBS contributing more to LVS's earnings than any other reporting segment in eight of the last ten years.

| | **Reporting Segments' Contribution to LVS' EBITDA** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Singapore - Marina Bay Sands | 28.8% | 43.3% | 36.0% | 29.1% | 31.8% | 36.1% | 33.7% | 35.8% | 32.0% | 30.8% |
| Macao - The Venetian Macao | 36.3% | 29.0% | 30.2% | 31.5% | 28.5% | 25.9% | 26.3% | 23.1% | 26.1% | 26.1% |
| Macao - The Londoner Macao | - | - | 5.6% | 15.5% | 18.5% | 15.6% | 14.9% | 12.9% | 14.4% | 13.5% |
| Macao - The Parisian Macao | - | - | - | - | - | - | 2.8% | 8.4% | 9.2% | 10.1% |
| Macao - The Plaza and Four Seasons | 5.1% | 6.2% | 7.6% | 6.4% | 6.9% | 5.8% | 5.3% | 4.8% | 5.0% | 6.4% |
| Macao - Sands Macao | 14.3% | 10.0% | 9.2% | 7.6% | 6.3% | 5.4% | 4.2% | 3.6% | 3.4% | 3.2% |
| Macao - Ferry Operations and Other | (1.1%) | (0.4%) | (0.4%) | (0.1%) | 0.1% | 0.6% | 0.8% | 0.4% | 0.3% | (0.1%) |
| US - Las Vegas Operating Properties | 13.9% | 9.4% | 8.7% | 7.4% | 5.8% | 7.3% | 8.6% | 8.0% | 7.5% | 9.0% |
| US - Sands Bethlehem | 2.6% | 2.6% | 3.0% | 2.6% | 2.2% | 3.3% | 3.5% | 3.0% | 2.2% | 1.0% |
| **Total EBITDA** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**ANSWER:**   Defendants admit that the table in paragraph 61 states LVS's operating segments' approximate contributions to LVS's annual EBITDA for each year from 2010 through 2019. Defendants deny the remaining allegations in paragraph 61.

62.   MBS's extraordinary profitability, driven primarily by the casino's performance, made MBS one of the most important properties in LVS's portfolio. Accordingly, MBS was one of LVS's core operations.

**ANSWER:**   Defendants admit that MBS has been profitable and is an important property in LVS's portfolio and operations. Defendants deny the remaining allegations in paragraph 62.

63.   Beginning with fiscal year 2015, however, MBS began to experience declining casino revenues due to decreased demand in the VIP market. Casino revenues declined 10%, 7%, 7%, and 1% in 2015, 2016, 2018, and 2019, respectively. While MBS's casino generated $2.57 billion of revenue in 2014, that amount dropped to $2.17 billion in 2019, or over 15%.

| | **MBS' Casino Revenues, % Change Year-On-Year** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Casino Revenues | 1,062 | 2,365 | 2,272 | 2,363 | 2,574 | 2,315 | 2,164 | 2,333 | 2,178 | 2,167 |
| % Change, Year-On-Year | | 123% | -4% | 4% | 9% | -10% | -7% | 8% | -7% | -1% |

* For 2020, MBS casino revenues were $872 which represented a 59.8% decline from the previous year.

**ANSWER:**   Defendants admit that the table and the sentence under the table in paragraph 63 state MBS's approximate annual casino revenue (in millions) and year-over-year percentage

18

change in annual casino revenue for each year from 2010 through 2020. Defendants deny the remaining allegations in paragraph 63.

64.     After entering the Singapore market with gusto upon the opening of MBS in 2010, LVS's casino revenues in that country plateaued and then began declining within a few years of opening, as MBS competed for market share not only with Sentosa in Singapore (the only other licensed casino in the country), but also with Macao, as the primary player pools for both Singapore and Macao are drawn from mainland China.

**ANSWER:**     Defendants admit that MBS opened in 2010, and that Sentosa is the only other licensed casino in Singapore. Defendants further admit that a significant number of gaming customers come to LVS's Singapore and Macao casinos from mainland China. Defendants deny the remaining allegations in paragraph 64.

65.     According to the Singapore Tourism Board, mainland China is the largest country of origin of tourists visiting Singapore, accounting for 3.4 million of the 18.5 million visitors to Singapore in 2018.

**ANSWER:**     On information and belief, Defendants state that the Singapore Tourism Board released information with respect to international visitor arrivals to Singapore in 2018, and that data indicated that China, Indonesia, India, Malaysia, and Australia accounted for approximately 3,418,000; 3,021,000; 1,442,000; 1,254,000; and 1,107,000 of the approximately 18.5 million international visitor arrivals to Singapore in 2018, respectively.

66.     However, monetary regulations and other rules in both China and Singapore erected significant hurdles for Chinese gamblers seeking to bet big at MBS.

**ANSWER:**     Defendants admit that various regulations in China and Singapore subject gaming to regulatory review. Defendants deny the remaining allegations in paragraph 66.

67.     Throughout all its properties, LVS has always courted high rollers, even creating its VIP-only Paiza membership program that grants these gamblers access to exclusive gaming suites and showers them with special amenities.

**ANSWER:**     Defendants admit that customers at LVS properties include high-end players, and that LVS caters to them by providing them with luxury amenities and premium service levels, including through the Paiza brand, which is associated with certain exclusive facilities. Defendants deny the remaining allegations in paragraph 67.

68.     However, to finance their actual gambling in Singapore, these VIP gamers are often dependent on lines of credit to circumvent tourist currency restrictions.

**ANSWER:** Defendants admit that MBS extends credit to some VIP customers. Defendants deny the remaining allegations in paragraph 68.

69.     The Chinese government has instituted a strict cap, restricting Chinese nationals from transferring out of the country more than $50,000 USD in any given year. Additionally, individuals from China are limited to the amount of money they can physically take on their person upon exiting the country to RMB$20,000 (or approximately $3,083 USD).

**ANSWER:** Defendants admit that there have been Chinese laws or regulations relating to money transfers. Defendants state that those laws or regulations speak for themselves, and should be read as a whole. Defendants further state that the allegations in paragraph 69 assert legal conclusions and characterizations to which no further response is required.

70.     Singapore requires individuals arriving in country to declare at customs any amount exceeding SGD$20,000 (approximately $15,000 USD). Further, Singapore's foreign currency reporting laws require any transfer into the country of more than SGD$5,000 (approximately $3,700 USD) be reported to the government as an anti-money laundering safeguard.

**ANSWER:** Defendants admit that there have been Singapore laws or regulations relating to money transfers. Defendants state that those laws or regulations speak for themselves, and should be read as a whole. Defendants further state that the allegations in paragraph 70 assert legal conclusions and characterizations to which no further response is required.

71.     In seeking to circumvent similar restrictions, casinos in Macao turned to the use of junkets – unaffiliated middlemen who connect high value gamblers (often in mainland China) with casino operators. These junkets will collect a set amount in China and provide the gambler with credit redeemable at their destination to be used at the casino. The junket's ledgers are then adjusted according to the gambler's performance at the casino (i.e., whether they have won or lost) and accounts settled upon the bettor's return home. For their part, these junkets are paid a commission by the casinos – a "finder's fee" for getting these valuable whales (and their money) into a position to bet big.

**ANSWER:** Defendants state that the Court's 2022 Order dismissed the claims relating to junkets with prejudice. (2022 Order at 21.) Accordingly, no response is required.

72.     However, these junkets are also often linked to the less desirable aspects of the casino industry, including organized crime and money laundering.

**ANSWER:** Defendants state that the Court's 2022 Order dismissed the claims relating to junkets with prejudice. (2022 Order at 21.) Accordingly, no response is required.

73.     For this reason, Singapore has sought to marginalize such practices in that country, licensing just two junkets (known in country as "International Market Agents") in 2012 who are permitted only to operate through Sentosa, but not MBS.

20

**ANSWER:** Defendants state that the Court's 2022 Order dismissed the claims relating to junkets with prejudice. (2022 Order at 21.) Accordingly, no response is required.

74.    Publicly, MBS has stated that it prohibits any association with any junket or junket-like operation, with former LVS CEO Sheldon Adelson stating in 2012 that "[t]here's no reason for us to go after that kind of junket," and likening the licensed junkets in Singapore to the Company's own internal salespeople.

**ANSWER:** Defendants state that the Court's 2022 Order dismissed the claims relating to junkets with prejudice. (2022 Order at 21.) Accordingly, no response is required.

75.    Instead of relying on junkets, MBS purports to use the extension of credit to its high value VIP customers to get them in the door.

**ANSWER:** Defendants admit that LVS extends credit to a portion of its customers, including at MBS. Defendants deny the remaining allegations in paragraph 75.

76.    The extension of credit to VIPs was an essential part of MBS's business, with LVS acknowledging in its annual report for 2010 on Form 10-K filed with the SEC on March 1, 2011, that the "percentage [of table games play conducted on a credit basis] is expected to increase as we increase the credit extended to our premium players and as our operations ramp up at Marina Bay Sands."

**ANSWER:** Defendants admit that LVS extends credit to a portion of its customers, including at MBS, and that LVS's 2010 Form 10-K was filed with the SEC on March 1, 2011 and contained the quoted statement. Defendants further state that LVS's 2010 Form 10-K speaks for itself, and that it is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 76.

77.    This credit, often signified by the extension of an instrument known as a "marker," is unsecured, with table games players typically extended more credit than slot players, and high-stakes players receiving more credit than those who wager less. As a result, and as the Company has acknowledged in various of its annual reports, "[h]igh-end gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a significant positive or negative impact on cash flow and earnings in a particular quarter."

**ANSWER:** Defendants admit that extensions of credit can be evidenced by a credit instrument, including what is commonly referred to as a "marker," and that credit LVS extends for gaming activities is unsecured. Defendants admit that table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than players who tend to wager lesser amounts. Defendants further admit that certain of LVS's Form 10-K filings contain the statement quoted in the second sentence of paragraph 77. Defendants state

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

21

LVS's Form 10-K filings speak for themselves, and that a Form 10-K is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 77.

78.    After getting these high rollers through the door and onto one of MBS's exclusive high-stakes tables, MBS then morphed into an informal bank – facilitating transfers between these customers' in-house accounts, allowing these individuals to stash away winnings from the watchful eye of their home country.

**ANSWER:**    Defendants deny the allegations in paragraph 78.

79.    Additionally, MBS allowed for the transfer of funds from customer-to-customer through their MBS house account, creating a private ledger whereby debts could be settled in Singapore among purportedly cooperating parties without triggering any regulatory currency restrictions.

**ANSWER:**    Defendants deny the allegations in paragraph 79.

80.    The need for such a system that encouraged private ordering and repayment of the extraordinary credit lines extended to these Chinese whales was paramount to MBS, as LVS recognized in its SEC filings that MBS "may not be able to collect gaming debts because, among other reasons, courts of certain jurisdictions do not enforce gaming debts. To the extent [MBS'] gaming customers' assets are situated in such jurisdictions, [MBS] may not be able to take enforcement action against such assets to facilitate collection of gaming receivables." In actuality, the real issue laid in the inability to enforce any Singapore judgment in China (except in Hong Kong). Even still, a judgment in Singapore for casino debt remains a civil offense not punishable by any jail time and it is all but impossible for MBS to collect on assets located in mainland China.

**ANSWER:**    Defendants admit that the first and second sentences of paragraph 80 purport to quote statements in LVS's SEC filings, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements. Defendants further state that the quoted SEC filings speak for themselves, and are each a unitary document that should be read as a whole. The allegations in the third and fourth sentences of paragraph 80 assert legal conclusions and characterizations to which no response is required. Defendants deny the remaining allegations in paragraph 80.

81.    Despite LVS's previous assertion that credit-based gaming was expected to increase as MBS's operations ramped up, the percentage of table games conducted on a credit basis actually fell in MBS's first four years, from 35.20% to 29.30%, largely coinciding with total casino revenue at the facility stagnating:

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

| | MBS Revenues Stagnate as Credit-Based Wagers Fall | | | |
|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 |
| Total Casino Revenue at MBS | 1,062 | 2,365 | 2,272 | 2,363 |
| Revenue, Percent Change, Year-on-Year | | 122.6% | -3.9% | 4.0% |
| % of Table Games Played on Credit Basis | 35.2% | 34.5% | 33.2% | 29.3% |

**ANSWER:** Defendants admit that LVS's 2010 Form 10-K stated that the "percentage [of table games play conducted on a credit basis] is expected to increase as we increase the credit extended to our premium players and as our operations ramp up at Marina Bay Sands." Defendants state that LVS's 2010 Form 10-K speaks for itself, and is a unitary document that should be read as a whole. Defendants further admit that the amounts and percentages set forth in the table in paragraph 81 state MBS's approximate annual total casino revenue (in millions), year-over-year percentage change in annual casino revenue, and percentage of table games play conducted on a credit basis for each year from 2010 through 2013. Defendants deny the remaining allegations in paragraph 81.

82.     Since opening in 2010, MBS (and Singapore's gaming sector in general) has been largely dependent on Chinese players, especially high rollers, visiting the country. CMC Markets analyst Demond Chua noted in November 2014 that "Chinese high rollers contribute to about half of MBS's premium segment revenue."[4]

**ANSWER:** Defendants admit that a significant number of gaming customers come to MBS from mainland China. Defendants admit that the source cited in the footnote in paragraph 82 contains the statement quoted in the second sentence of paragraph 82 and attributes those statements to CMC Markets analyst Desmond Chua, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements or the cited source. Defendants deny the remaining allegations in paragraph 82.

83.     While the flow of funds from these whales helped spur MBS's entry into the new market, there was a marked shift beginning in 2012 when Chinese President Xi Jinping instituted broad anti-corruption policies that directly impacted gambling by members of the Chinese Communist Party.

---

[4] https://www.todayonline.com/business/mbs-lashes-out-casinos-face-dwindling-vip-pie

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants admit that Xi Jinping made statements in 2012 in favor of anti-corruption policies. Defendants deny the remaining allegations in paragraph 83.

84. Following several years of investigation, hundreds of thousands of CCP members were charged with corruption, including accepting bribes that they laundered through the VIP tables at casinos throughout Macao and Singapore.

**ANSWER:** Defendants lack knowledge or information sufficient to determine the truth or falsity of the allegations in paragraph 84 and therefore deny those allegations.

85. The CCP under President Xi also made clear that it would be limiting efforts of foreign casinos to lure Chinese gamblers, with CCP deputy bureau chief at the Ministry of Public Security Hua Jingfeng stating in 2015:

> Some foreign countries see our nation as an enormous market, and we have investigated a series of cases. A fair number of neighboring countries have casinos, and they have set up offices in China to attract and drum up interest from Chinese citizens to go abroad and gamble. This will also be an area that we will crack down on.[5]

**ANSWER:** Defendants admit that the source cited in the footnote in paragraph 85 contains the statements quoted in paragraph 85 and attributes those statements to Hua Jingfeng, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements or the cited source. Defendants further state that they lack knowledge or information sufficient to determine the truth or falsity of the allegations in paragraph 85 regarding the intent of the CCP and therefore deny those allegations. Defendants deny the remaining allegations in paragraph 85.

86. The end result was a plateau in MBS and Singapore's casino revenues, with LVS publicly espousing a focus on the mass market segment while scrambling behind the scenes to continue catering to China's high stakes players.

**ANSWER:** Defendants deny the allegations in paragraph 86.

87. With a dwindling number of VIP gamers entering Singapore following President Xi's anti-corruption crackdown, MBS soon found itself competing with Sentosa – the only other casino operator in Singapore – for market share among these premium players.

**ANSWER:** Defendants admit that Sentosa is the only other licensed casino in Singapore. Defendants deny the remaining allegations in paragraph 87.

88. For example, in the third quarter of 2014, Genting (the owner of Sentosa) announced a 42% decline in net profit and a 17% decline in overall revenue, noting that premium player-business specifically underperformed during the period. These results came on the heels of LVS's

---

[5] https://www.businessinsider.com.au/xi-declares-war-on-global-gambling-firms-2015-2

24

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

own reported results for the quarter, wherein it was announced that MBS casino revenues fell 8.7% as VIP betting volume plunged almost 34%.

**ANSWER:** Defendants admit that Genting's quarterly report for the third quarter of 2014 stated that Genting's Leisure & Hospitality revenue in Singapore declined 17% year-over-year, and attributed Sentosa's lower revenue in part to underperformance of Sentosa's premium players business due to a low win percentage. Defendants further admit that LVS's Form 10-Q for the third quarter of 2014 reported a year-over-year decrease in MBS's casino revenues of 8.7% and a year-over-year decrease in Rolling Chip volume of 33.8%. Defendants deny the remaining allegations in paragraph 88.

89. CMC Markets Analyst Desmond Chua stated that the results were the new normal, noting, "[w]ith that slowdown [of Chinese VIP gamblers to Singapore] and with Asian governments, such as Japan, Korea and the Philippines, also keen to set up the gaming industry, I believe the boom years that we saw previously are now over — even though the casinos will remain profitable in the long term."[6]

**ANSWER:** Defendants admit that the source cited in the footnote in paragraph 89 contains the statements quoted in paragraph 89 and attributes those statements to CMC Markets analyst Desmond Chua, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements or the cited source. Defendants deny the remaining allegations in paragraph 89.

90. While LVS does not specifically disclose the amount of credit it extends each year, it does report net account receivables for its casino segment – a rough indicator of loans extended. An analysis of these figures shows that the Company's extension of credit exploded with the opening of MBS in 2011, with LVS accounts receivable increasing more than 93% in 2011 (the first full year of operation for MBS) and continuing to rise into 2012 before beginning to taper off and actually decline beginning in 2014 – as the CCP's anti-corruption crackdown ramped up and the party began issuing warnings to the gaming industry that illicit activities involving Chinese nationals would not be tolerated:

| | Accounts Receivable, Net (in millions) | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | All LVS Casinos | | | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Casino Accounts Receivable | 318 | 439 | 715 | 1,381 | 2,061 | 2,111 | 1,958 | 1,721 | 1,186 | 837 | 763 | 858 |
| Percent Change, Year-on-Year | | 38% | 63% | 93% | 49% | 2% | -7% | -12% | -31% | -29% | -9% | 12% |

\* For 2020, casino accounts receivables were $527 which represented a decline of 38% from the previous year.

---

[6] https://www.todayonline.com/business/mbs-lashes-out-casinos-face-dwindling-vip-pie

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants admit that LVS reports accounts receivable for its casino operations, and that these accounts receivable include credit extended to casino patrons and gaming promoters. Defendants admit that the table and the sentence under the table in paragraph 90 state LVS's approximate accounts receivable for its casino operations (in millions), and approximate percentage change in those accounts receivable, for each year from 2008 through 2020. Defendants deny the remaining allegations in paragraph 90.

91. Genting's response to the slowing flow of high stakes players from China was to make credit more easily available to these VIP players to increase market share. Adelson scoffed at such a move, stating on an analyst call on October 15, 2014, that "[m]aybe one day, [Genting will] get used to competing on the basis of a quality product, if they ever build one, and they won't have to buy the business," indicating that LVS would not engage in a race-to-the-bottom with respect to credit extensions.

**ANSWER:** Defendants lack knowledge or information sufficient to determine the truth or falsity of the allegations in the first sentence of paragraph 91 and therefore deny those allegations. Defendants admit that, subject to the existence of errors in transcription, the statements quoted in paragraph 91 represent a partial quotation of statements made by Sheldon Adelson during an earnings call on October 15, 2014. Defendants deny the remaining allegations in paragraph 91.

92. But in actuality, and in response to its failure to capture the critical mass of VIP gamers originally envisioned at MBS (as directly correlated with the percentage of table games conducted on a credit basis), MBS embraced a secret scheme of unauthorized internal transfers between customer accounts, all in an effort to falsely accredit subprime gamblers so they would be eligible to participate the extension of credit lines to facilitate high-stakes gambling.

**ANSWER:** Defendants deny the allegations in paragraph 92.

93. With the flow of high rollers from China declining and MBS's competition in Singapore offering more attractive travel and credit packages to entice gamers, MBS embarked on a different strategy. Rather than compete for market share among the limited number of high rollers still visiting Singapore to play, MBS simply moved the goalposts and extended credit to otherwise subprime borrowers, thereby manufacturing new "premium players" on paper.

**ANSWER:** Defendants deny the allegations in paragraph 93.

94. Under Singapore's Casino Control Act, MBS is prohibited from extending credit to casino patrons, with only a few exceptions. Under one such exception, MBS is permitted to extend casino credit to persons who qualify as "Premium Players."

**ANSWER:** Defendants admit that the CCA contains regulations relating to the extension of credit, and that the CCA permits a casino operator to extend credit to persons who qualify as a "premium player," as defined by the CCA. Defendants state that the CCA regulations further allow

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

for the extension of credit to a person who is neither a citizen of Singapore nor a permanent resident of Singapore, and who is not a "premium player." Defendants further state that those regulations speak for themselves, and that the CCA should be read as a whole. Defendants further state that the allegations in paragraph 94 assert legal conclusions and characterizations to which no further response is required.

95.    A patron qualifies as a "premium player" when he opens a deposit account with the casino and deposits at least SGD$100,000 (approximately $75,000 USD) – known as the "front money deposit."

**ANSWER:**    Defendants admit that the CCA contains a provision defining "premium player." Defendants state that this provision speaks for itself, and that the CCA should be read as a whole. Defendants further state that the allegations in paragraph 95 assert legal conclusions and characterizations to which no further response is required.

96.    Once qualified as a "premium player" at MBS, a gambler may draw down on large lines of credit, unlock the associated amenities of being a member of the Paiza club, and obtain access to VIP private gaming salons.

**ANSWER:**    Defendants admit that MBS provides luxury amenities and premium service levels, including through the Paiza brand and private gaming salons. Defendants further admit that high-stakes players typically are extended more credit than players who tend to wager lesser amounts. Defendants deny the remaining allegations in paragraph 96.

97.    The process for acquiring such loans is simple, with one former premium player at MBS telling a newspaper that acquiring lines of credit in the VIP room is "easy to get and happens often, as long as you are a premium player, and you qualify for the loans."[7]

**ANSWER:**    Defendants admit that the source cited in the footnote in paragraph 97 contains the statements quoted in paragraph 97, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements or the cited source. Defendants deny the remaining allegations in paragraph 97.

98.    However, unbeknownst to LVS investors, beginning in 2013, MBS began operating a financial shell game between customer accounts, seeking to accredit as many individuals as "premium players" as possible. Once afforded premium player status, these gamblers had access to increased credit lines which facilitated high stakes bets (and the associated larger potential return for MBS).

**ANSWER:**    Defendants deny the allegations in paragraph 98.

---

[7] https://www.asiaone.com/singapore/nicest-money-lenders-singapore

27

99.    The process seemed simple enough, but partially depended on MBS's wealthy clientele overlooking the missing money from their accounts. While transfers of hundreds of thousands of dollars might raise the antennae of a typical gamer, MBS's high net worth clients are anything but typical, often wagering at least SGD$10,000 per hand, and sometimes up to SGD$1.5 million at a time on baccarat in the VIP rooms.[8]

**ANSWER:**    Defendants admit that MBS's high net worth customers may wager larger amounts than other customers. Defendants deny the remaining allegations in paragraph 99.

100.    MBS employees leveraged these millions of dollars in captive accounts between 2013 and 2018, getting patrons to sign blank "Letters of Authorization" (the approval document necessary to transfer money between customer accounts), then filling in the amount of the transfer and other details as necessary.

**ANSWER:**    Defendants admit that MBS patrons completed letters of authorization to effectuate third-party transfers at MBS, including the transfer of funds between the accounts of casino patrons. Defendants state that authorized third-party transfers are permissible in Singapore. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 100.

101.    MBS employees took a low-tech approach to the shell game, simply photocopying the signed, but blank form, and using it repeatedly to conduct the unauthorized transfers.

**ANSWER:**    Defendants deny the allegations in paragraph 101.

102.    MBS employed this scheme to solve its declining number of high roller and VIP gamers by transferring money from unsuspecting whales to patrons that could not independently qualify for "premium player" status because they did not have the necessary funds in their deposit accounts (i.e., subprime gamers), thereby instantly qualifying them as premium players on paper. These subprime gamers could not afford the front money deposit themselves, could not otherwise qualify for casino credit, or were seeking to avoid the watchful eye of their home government.

**ANSWER:**    Defendants deny the allegations in paragraph 102.

103.    Creating this new crop of otherwise unjustified premium players with access to massive lines of credit presented MBS with problems beyond violating local gambling rules. Specifically, MBS had exposed itself and its parent, LVS, to increasing amounts of bad debt it would suffer at the hands of these new subprime borrowers who could not repay their debts.

**ANSWER:**    Defendants deny the allegations in paragraph 103.

104.    Based on MBS's own internal investigation for the period 2013 through 2017 conducted by the law firm of Hogan Lovells, during that period more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in an amount totaling approximately SGD$1.4 billion. Of this total amount, transfers accounting for SGD$365

---

[8]https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

million (**or more than 26%**) were effectuated using letters of authorization bearing signatures that appeared similar and were likely photocopied.

**ANSWER:** Defendants admit that MBS patrons completed letters of authorization to transfer funds between the accounts of casino patrons, and that Hogan Lovells is a law firm that was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 104.

105. Additionally, Hogan Lovells concluded that one group of employees carried out more than half of the third party transfers themselves in an amount totaling SGD$763 million.

**ANSWER:** Defendants admit that Hogan Lovells is a law firm that was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 105.

106. Plaintiffs' confidential witnesses corroborate the pervasive and unchecked scheme prior to and throughout the Class Period. CW-1, a former Anti-Money Laundering Specialist in MBS's compliance department from January 2014 to March 2015, described a wholly ineffective compliance function that was bent to the will of the Finance and International Marketing Departments – the very same groups who could open MBS's coffers to gamers.

**ANSWER:** Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 106.

107. In CW-1's role at MBS, CW-1 was tasked with managing an in-depth review of client account openings, deposits, and transfers. Surprisingly, CW-1 was the only MBS employee doing so, reporting to a Compliance Manager (who had no previous experience in compliance), who then reported up to MBS's Chief Compliance Officer. In fact, CW-1 recalls that when this witness began working at MBS, the compliance function was barely functional as there were no appropriate guidelines or procedures in place.

**ANSWER:** Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 107.

108.    In looking at customer transactions, CW-1's job was ostensibly to flag any suspicious activity for inclusion in Suspicious Transaction Reports filed with the Singapore financial authorities when, for example, Singapore's statutory foreign currency reporting threshold was exceeded by any transfer at the casino. According to this witness MBS, alone, submitted thousands of these Suspicious Transaction Reports per year.

**ANSWER:**    Defendants admit that MBS submitted Suspicious Transaction Reports in accordance with Singapore regulations. Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 108.

109.    CW-1 also dealt with customer-to-customer transfers first-hand, as members of MBS's International Marketing Department known as "Relationship Managers," along with those in the Finance Department, worked together to force through approval of transfers to high value Chinese gamblers at the casino. According to CW-1, these individuals were hamstrung by China's and Singapore's currency restrictions and it was up to MBS's Relationship Managers to get money into these individuals' hands by any means. To do so, MBS Relationship Managers worked with the Finance Department and transfer money to the player in need from the account of a different high roller at the casino.

**ANSWER:**    Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 109.

110.    CW-1 stated that CW-1 did not believe these transfers were authorized by the client from whose account money was being transferred, but CW-1 was always given a weak backstory by the MBS Relationship Manager of some sort of nexus between the two players, including vague details of supposed newfound friendships or a claim that the recipient of the funds was otherwise owed a private debt from the other gambler. CW-1 tried its best to probe behind these stories to determine their veracity, but CW-1 recalls being reliant on the representations of the Relationship Managers who presented minimal paperwork that could have been forged and who were the only available source of information, as CW-1 was not allowed to contact the casino patrons for follow up. Instead, it was the Relationship Managers who were tasked with the Know-Your-Customer (KYC) procedures. The Relationship Managers, however, had no incentive to turn away any big money player because they received commissions and bonuses based on the number of individuals brought into casino.

**ANSWER:** Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 110.

111.    CW-1 recalled that many of these Relationship Managers previously worked in Macao and seemed to have long-standing relationships with high-stakes gamblers who were often shuttled between Macao and Singapore in LVS's private fleet of jets.

**ANSWER:** Defendants admit that some of MBS's personnel previously worked in Macao and had relationships with certain gaming customers, some of whom have flown between Macao and Singapore on airplanes privately owned by LVS. Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants deny the remaining allegations in paragraph 111.

112.    CW-1 stated that these unauthorized transfers between customer accounts occurred "all the time" and CW-1 had no recourse but to note the transaction for the Finance Department to file a Suspicious Transaction Report with the regulator. But at MBS, CW-1 stated, "no one cared," and management took no action to curb the practice, with CW-1's manager (the Compliance Manager who reported directly to the Chief Compliance Officer) telling CW-1 to back off from filing so many reports and asking why CW-1 would not accept the reasoning the Relationship Managers provided. CW-1 also recalled having lunch with a senior member of the Compliance department who told CW-1 that CW-1 needed to "learn to behave" herself and to "not be so outspoken" when it came to suspicious transactions at MBS. It was CW-1's view that no actions were taken about these transactions "because a lot of people knew and those who knew had a hand in it."

**ANSWER:** Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 112.

113.    Instead, the entire compliance function at MBS was "not taken seriously" according to CW-1, and internal reporting at the casino regarding compliance issues was described as "very poor." CW-1's account is corroborated by MBS's own admissions to the Singapore CRA, when the casino wrote the regulator to explain the steps it had purportedly instituted in 2018 to curb the unauthorized transfer process that had impacted hundreds of millions of dollars over the previous eight years.

**ANSWER:** Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants admit that Marina Bay Sands submitted a letter to Singapore's Casino Regulatory Authority in 2020, and that the letter provided information regarding changes that MBS implemented in 2018 relating to the third-party transfer process. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 113.

114.   In this letter, MBS touted the steps it took to increase scrutiny over all transfers, including the new requirement that all transfer letters had fresh "wet ink" signatures (as opposed to photocopies) and that staff received a verbal confirmation from the patron before moving any funds out of their account. Additionally, MBS touted that these transfers would now be "subject to enhanced due diligence checks which will include . . . [a] declaration of the relationship between the patrons and the reasons for the patron making the third-party payment." MBS further told the CRA that employees would be receiving training to spot and report suspicious behavior and that all transfer requests would have to be approved by the casino's compliance department.[9]

**ANSWER:** Defendants admit that Marina Bay Sands submitted a letter to Singapore's Casino Regulatory Authority in 2020, and that the letter provided information regarding changes that MBS implemented in 2018 relating to the third-party transfer process. Defendants further admit that the source cited in the footnote in paragraph 114 contains the phrases quoted in the first and second sentences of paragraph 114 and attributes those statements to MBS's letter, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the cited source or the letter. Defendants deny the remaining allegations in paragraph 114.

115.   CW-1 recalled participating in several meetings with LVS's Global Chief Compliance Officer during CW-1's tenure at which the suspicious transfers between patron accounts and the related number of STRs were discussed. According to this witness, these meetings occurred every one to three months throughout CW-1's tenure (and six to eight times total) and were attended by the Global Chief Compliance Officer, MBS's chief financial officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, as well as Daphne Hearn, who took over the role of MBS Chief Compliance Officer in September 2014. According to CW-1, the issue of the unusually high number of STRs coming from MBS was discussed and CW-1 and other attendees often questioned why so many reports were required, only to never have a solution presented or addressed.

**ANSWER:** Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and

---

[9]https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 115.

116.   CW-1 was hardly alone in recognizing the utter compliance failure at MBS, as a former MBS Compliance executive noted during the casino's internal investigation into the transfers that he raised the issue internally at MBS in an effort to address it, but was urged by the operations and legal teams to back off, with the executive then leaving MBS when his contract was not renewed by the casino.[10] Such retaliatory action comports with what CW-1 witnessed during CW-1's time at MBS, as this witness saw Robert Clifford, the Chief Compliance Officer who hired CW-1, fired from his role just a month-and-a-half after the witness' employment commenced. According to CW-1, while MBS claimed the departure was voluntary, everyone knew that Clifford was "definitely fired" because security and legal personnel were at the meeting where his sudden departure was announced. In CW-1's time at MBS, CW-1 recalls three to four individuals being fired in retaliation for raising the problem of the suspicious transfers, always under the guise of supposed "performance issues."

**ANSWER:**   Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants lack knowledge or information regarding the identity of or purported statements alleged to have been made by the individual referred to in the third-party source, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by those individuals and deny the remaining allegations in paragraph 116.

117.   Compliance stood in stark contrast to MBS's Finance Department which held "a lot of power" according to CW-1. CW-2, a former credit officer on the gaming side in MBS's Finance Department from 2013 to 2016, corroborated CW-1's account. As part of CW-2's job, CW-2 was tasked with conducting know-your-customer due diligence on MBS patrons who wished to use credit to gamble. Notably, none of CW-2's training involved how to report unethical activity or behavior observed at MBS.

**ANSWER:**   Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants admit that MBS had policies and procedures for assessing the creditworthiness of patrons before extending credit. Defendants further deny the substance of the remaining statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 117.

---

[10]   https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

33

118.    When an MBS customer wished to draw a line of credit from the house, they filled out a new customer application and provided any required documentation. CW-2 then evaluated the prospective borrower's creditworthiness through a database called CentralCredit – a database purportedly employed throughout the gaming world to track a player's gambling history at other casinos. However, CW-2 made clear that the decision to extend or not extend credit to an individual came down from above, with VP-level or higher members of the International Marketing Department often having the last say as to how much credit would be granted based on the executive's personal relationship with the gambler.

**ANSWER:**    Defendants admit that MBS had policies and procedures for assessing the creditworthiness of patrons before extending credit. Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 118.

119.    As a player's casino credit was determined not by his actual financial condition, but by who he knew, MBS employees (and especially those in the International Marketing Department) were particularly vulnerable to unethical behavior. CW-2 recalled witnessing examples of that during CW-2's time at MBS. For instance, CW-2 witnessed a returning VIP gambler from China attempt to hand thousands of dollars directly to a director from the International Marketing Department at MBS, which CW-2 inferred was a "thank you" for helping push through the gambler's credit application. Rather than decline the cash, the International Marketing director suggested that the two take their business to the returning player's room to escape any surveillance on the casino floor. Yet, because MBS had no internal system to report such unethical conduct, CW-2 was left powerless until ultimately decided to depart the casino on CW-2's own to move away from such "shady" activities.

**ANSWER:**    Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 119.

120.    CW-2 stated that, during CW-2's tenure, seven out of every ten customers who applied for credit at MBS were from mainland China.

**ANSWER:**    Defendants admit that during the period from 2013 to early 2016 (the purported period of CW-2's employment), many of the customers at MBS who applied for credit were from mainland China. Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants deny the remaining allegations in paragraph 120.

34

121.    In discussing the unauthorized transfer activity at MBS, CW-2 stated that letters of authorization were often filled out and signed "at the cage" – the portion of the Finance Department that directly released funds to players. According to CW-2, oftentimes the cage "did not even tell compliance" about these transactions.

**ANSWER:**    Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 121.

122.    From a compliance perspective, CW-1 stated that, not every high-stakes gambler would receive the full line of credit they originally sought. As such, it was CW-1's belief that the patron-to-patron transfers could have been used to fill the gap for these individuals, or transfers were made into accounts from a third party to cover debt already incurred. The witness recalls inquiring about what the casino does about debt it was unable to collect and was told "we just write it off."

**ANSWER:**    Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 122.

123.    Further, CW-1 stated that during CW-1's time at MBS, issues with Chinese politically exposed persons (PEPs) arose as a result of the Chinese government's anti-corruption crackdown. According to this witness, many of the Chinese high rollers were lower-level PEPs, such as members of the legislative assembly or a district member of the CCP. CW-1 recalled that, after some internal discussion and determination that these players were not "high level," they would be allowed to gamble at MBS. However, they were not extended formal credit and their accounts were often funded through suspicious transfers from other patrons.

**ANSWER:**    Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 123.

124.    MBS's widespread practice of using unauthorized transfers to create premium players allowed MBS to extend credit to many patrons who would not have otherwise qualified for credit.

**ANSWER:**    Defendants deny the allegations in paragraph 124.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

35

125.    While the unauthorized fund transfers allowed MBS to technically comply with the credit limitation provisions of the CCA and CCR, casino patrons' use of credit to place wagers was still subject to the firm's internal underwriting standards, at least in theory.

**ANSWER:**    Defendants admit that MBS complied with the credit provisions of the CCA and applicable casino regulations, and that MBS had internal underwriting standards. Defendants deny the remaining allegations in paragraph 125.

126.    In practice, however, casino patrons frequently obtained more credit from MBS than MBS's own internal underwriting standards supported.

**ANSWER:**    Defendants deny the allegations in paragraph 126.

127.    For MBS, the probability of collection of debt issued to patrons from mainland China is exceptionally low because gambling debts are legally unenforceable in Chinese courts. Thus, when CW- 2 and CW-2's coworkers were instructed to approve credit for patrons from mainland China whose financial statements and background checks did not satisfy MBS's internal underwriting standards, the likelihood of a bad debt write-off increased.

**ANSWER:**    The allegations in the first sentence of paragraph 127 assert legal conclusions and characterizations to which no response is required. Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 127.

128.    Further, by engaging in a system of internal and unauthorized customer-to-customer transfers involving the funds of unwitting casino patrons, MBS was able to funnel money to illegal junkets operating within the casino without detection from any regulatory body. These payments could then be written-off as uncollectable bad debt.

**ANSWER:**    Defendants state that the Court's 2022 Order dismissed the claims relating to junkets with prejudice. (2022 Order at 21.) Accordingly, no response is required.

129.    MBS's scheme of using unauthorized third-party transfers to technically comply with legal limitations on extending credit to certain patrons, coupled with the willingness of management to ignore internal underwriting standards, resulted in a tremendous amount of bad debt expense for MBS. A *Bloomberg* article described it thusly:

> While it's not clear how much money the unauthorized transfers and unpaid debts cost Marina Bay Sands, from 2013 through March 2020 the casino wrote off $717 million from 928 accounts, according to an internal document seen by *Bloomberg*. A former Sands executive says typical losses for a casino that size are $20 million to $30 million a year. The peak write-offs were in 2015 to 2017, the years

36

immediately following the biggest transfers, while 67% of the dollar value was tied to Chinese clients, the document shows.[11]

**ANSWER:**   Defendants admit that MBS complied with legal and regulatory requirements relating to the extension of credit, and further admit that the extensions of credit can result in accounts receivable, provisions for doubtful accounts, and write-offs of uncollectable debts. Defendants further admit that the source cited in the footnote in paragraph 129 contains the statements block-quoted in paragraph 129. Defendants deny the remaining allegations in paragraph 129.

130.   These write-off figures for MBS alone are even more jarring in context, as all account receivable write-offs taken by LVS across all properties over the same period, as reported in the Company's SEC filings, totaled $1.61 billion – meaning ***nearly 62%*** of write-offs during the period stemmed from MBS:

| | Provision for Doubtful Accounts and Write-Offs (in millions) | | | | | | | | | | | | |
| | All LVS Casinos | | | | | | | | | | | | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Balance at Beginning of Year | 33 | 61 | 119 | 182 | 275 | 492 | 630 | 673 | 637 | 576 | 442 | 324 | 282 |
| Provision for Doubtful Accounts | 42 | 104 | 98 | 151 | 239 | 238 | 187 | 156 | 173 | 96 | 5 | 30 | 99 |
| Write-Offs, Net of Receoveries | (14) | (46) | (35) | (57) | (23) | (100) | (143) | (192) | (234) | (230) | (123) | (72) | (67) |
| Balance at End of Year | 61 | 119 | 182 | 275 | 492 | 630 | 673 | 637 | 576 | 442 | 324 | 282 | 314 |

**ANSWER:**   Defendants admit that the table in paragraph 130 states the approximate allowance for doubtful accounts (in millions) for all LVS casinos, for each year from 2008 through 2020. Defendants deny the remaining allegations in paragraph 130.

131.   MBS's scheme to circumvent legal restrictions on credit wagers helped to keep credit- based wagering as a percentage of table drop volume artificially high from 2010 through 2017. Because these credit-wagers were made by patrons who should not have been extended credit under MBS's internal underwriting criteria, LVS's allowance for doubtful accounts rose from 25.1% of gross receivables in 2010 to 51.5% in 2017. Accordingly, LVS's write-offs skyrocketed from $34.6 million in 2010 to approximately $230 million in 2016 and 2017:

| | Credit-Based Wagering at MBS, LVS' Allowance for Doubtful Accounts & Writeoffs | | | | | | | | | |
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| MBS, Credit Wagers as % of Volume | 35.2% | 34.5% | 33.2% | 29.3% | 31.0% | 33.1% | 28.6% | 34.1% | 16.0% | 23.9% |
| LVS ADA, % of Gross Receivables | 25.1% | 22.2% | 27.7% | 36.2% | 33.8% | 36.4% | 47.7% | 51.5% | 41.1% | 32.3% |
| Writeoffs (in millions) | (34.6) | (57.2) | (22.7) | (99.7) | (143.2) | (192.3) | (234.0) | (230.0) | (123.0) | (72.0) |

* For 2020, MBS credit wagers as % of volume was 14.6%; LVS ADA % of gross receivables was 58.3%; and write-offs were ($67).

---

[11]   https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-roller

37

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants admit that the table and the sentence under the table in paragraph 131 state the approximate percentage of table game drops from credit-based wagering at MBS, the approximate allowance for doubtful accounts as a percentage of gross casino revenues for LVS, and the approximate write-offs, net of recoveries (in millions), for LVS for each year from 2010 through 2020. Defendants deny the remaining allegations in paragraph 131.

132. While the allowance as a percentage of gross receivables began to decline in 2018 through 2020 as LVS began to limit the practice of unauthorized third-party transfers and cut credit-based wagers from 34.1% of table drop volume in 2017 to only 16% of table drop volume in 2018 in response to the Hogan Lovells investigation, the allowance still remained excessively high as LVS's overall internal controls remained insufficient to prevent the unauthorized transfers by Relationship Managers whose compensation was directly tied to the illegal practice. This continued into 2020 and 2021, as the bad debts incurred in earlier years resulted in greater allowances and provisions for bad debt, as reflected in the following table:

| Credit-Based Wagering at MBS, LVS' Allowance for Doubtful Accounts & Write-offs | | |
|---|---|---|
| | 2020 | 2021 |
| MBS, Credit Wagers as % of Volume | 14.60% | 7.90% |
| LVS ADA, % of Gross Receivables | 58.30% | 72.50% |
| Write-offs (in millions) | -67 | -26 |

**ANSWER:** Defendants admit that the table in paragraph 132 states the approximate percentage of table game drop from credit-based wagering at MBS, the approximate allowance for doubtful accounts as a percentage of gross casino revenues at LVS, and the approximate write-offs, net of recoveries (in millions), for LVS for 2020 and 2021. Defendants deny the remaining allegations in paragraph 132.

133. On September 26, 2019, Chinese national and VIP gambler Wang Xi filed a statement of claim in the High Court of Singapore against MBS, claiming that the casino misappropriated SGD$9.1 million (approximately $6.1 million USD) from his account through unauthorized transfers to other MBS patrons.

**ANSWER:** Defendants admit that Wang Xi was a Chinese national who was a former VIP customer at MBS, and that Xi filed a statement of claim on September 26, 2019 in the High Court of Singapore against MBS. Defendants further admit that paragraph 133 purports to describe Xi's claim against MBS. Defendants deny the remaining allegations in paragraph 133.

134. According to Xi, the amount was pilfered from his account through 22 separate transactions made between October and December 2015 and carried out through letters of authorization that appeared to either be forged or photocopied. However, when Xi attempted to verify the authenticity of the letters, he was provided only copies and told that the originals had been destroyed through the casino's Macao affiliate for "reasons of confidentiality."

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants admit that paragraph 134 purports to quote and characterize statements in the Xi statement of claim. Defendants deny the remaining allegations in paragraph 134.

135. The high-profile lawsuit quickly grabbed the attention of both the news media and the government in both Singapore and the United States.

**ANSWER:** Defendants admit that Wang Xi's lawsuit was reported in the news media in Singapore and the United States in October 2019. Defendants further admit that Wang Xi's claims were the subject of attention by the Casino Regulatory Authority and the Singapore police. Defendants lack knowledge or information sufficient to determine the truth or falsity of the remaining allegations in paragraph 135 and therefore deny those allegations.

136. It was later reported by *Bloomberg* that, in January 2020, the United States Department of Justice issued a grand jury subpoena to a chief compliance officer at MBS, "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls."

**ANSWER:** Defendants admit that paragraph 136 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 136.

137. Additionally, in May 2020, *Bloomberg* broke the news that the Singapore police were investigating Wang's claims and the unauthorized transfer activity at MBS.

**ANSWER:** Defendants admit that paragraph 137 purports to characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 137.

138. Finally, in June 2020, *Bloomberg* noted that the Singapore CRA had commenced its own investigation, with the regulator commenting to the media source that it was "committed to ensuring that the casinos in Singapore, including Marina Bay Sands, remain free from criminal influence or exploitation, and takes a serious view of any allegations of unauthorized money transfers."

**ANSWER:** Defendants admit that paragraph 138 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 138.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

39

139.    Further, and unbeknownst to the investing public, LVS had hired international law firm Hogan Lovells to conduct an internal probe into the transfer allegations for the period 2013 through 2017. The Hogan Lovells probe uncovered instances of employees not complying with proper standards by filling in payment details on pre-signed or photocopied authorization forms. Additionally, the Hogan Lovells probe determined that, of the more than 3,000 letters of authorization accounting for more than SGD$1.4 billion in customer-to-customer transfers executed between 2013 and 2017, letters authorizing transfers for SGD$365 million (or more than 26%) bore signatures that appeared similar – supporting the inference that these were likely photocopied duplicates and unauthorized.

**ANSWER:**    Defendants admit that Hogan Lovells is a law firm that was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 139.

140.    In a letter to the CRA, MBS claimed to have conducted its own review and amended its compliance procedures in April 2018, effectively ending the unauthorized transfer practice. To do so, according to MBS, it instituted basic and fundamental compliance policies previously missing at the casino, including a requirement that transfer letters have fresh "wet ink" signatures and that the staff receive verbal confirmation from a patron before moving any funds.

**ANSWER:**    Defendants admit that Marina Bay Sands submitted a letter to Singapore's Casino Regulatory Authority in 2020, and that the letter provided information regarding changes that MBS implemented in April 2018 relating to the third-party transfer process. Defendants further admit that the letter contains the two words quoted in paragraph 140, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the letter. Defendants deny the remaining allegations in paragraph 140.

141.    Given that MBS instituted these compliance changes in April 2018, it is reasonable to infer that it carried out its internal investigation at some point prior to that, identifying the material weakness in its compliance controls and the significant number of impacted party-to-party transfers between 2013 and 2017 that served as the impetus for such change. However, at no point did MBS or LVS ever publicly disclose these findings or confirm that it complied with purported new procedures, leaving shareholders in the dark about this practice and the fundamental flaws in MBS's controls.

**ANSWER:**    Defendants deny the allegations in paragraph 141.

142.    Defendants made false and/or materially misleading statements during the Class Period concerning LVS's credit extension practices and compliance policies and procedures (the "Credit and Compliance Misstatements") and related internal controls. While LVS represented to investors that MBS extended credit to only those patrons whose creditworthiness and financial circumstances supported it, that was untrue because MBS was in fact extending credit to patrons who did not have the requisite credit or financial resources necessary by law to permit the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

extensions. This practice occurred because LVS admittedly lacked the requisite internal controls to prevent such practices throughout the Class Period.

**ANSWER:**    Defendants deny the allegations in paragraph 142.

143.    LVS affirmatively misrepresented its credit extension practices and compliance policies by creating an impression of a state of affairs at MBS that differed materially from what actually existed.

**ANSWER:**    Defendants deny the allegations in paragraph 143.

144.–195.

**ANSWER:**    Defendants state that the Court's 2023 Order dismissed the Second Amended Complaint with respect to all statements that were made in 2016, 2017, and 2018. (2023 Order at 16–19.) Accordingly, no response to paragraphs 144 through 195 is required.

196.    LVS filed its 2018 Annual Report on Form 10-K with the SEC on February 22, 2019 (the "2018 Annual Report"). Defendants Adelson, Goldstein, and Dumont signed the 2018 Annual Report.

**ANSWER:**    Defendants admit the allegations in paragraph 196.

197.    The 2018 Annual Report provided investors with a description of LVS's material "risk factors." In pertinent part, the 2018 Annual Report stated:

We conduct our gaming activities on a credit and cash basis. Any such credit we extend is unsecured. Table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than players who tend to wager lesser amounts. High-end gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a significant positive or negative impact on cash flow and earnings in a particular quarter.

During the year ended December 31, 2019, approximately 14.7%, 23.9% and 66.8% of our table games drop at our Macao properties, Marina Bay Sands and our Las Vegas properties, respectively, was from credit-based wagering. **We extend credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit.** These large receivables could have a significant impact on our results of operations if deemed uncollectible.

**ANSWER:**    Defendants deny the allegations in paragraph 197 because the statements quoted in paragraph 197 are contained in LVS's 2019 Form 10-K, not its 2018 Form 10-K. Defendants further state that LVS's Form 10-K filings speak for themselves, and that a Form 10-K is a unitary document that should be read as a whole.

198.    The statement identified in the immediately preceding paragraph was affirmatively false and materially misleading because LVS extended credit to customers whose level of play and financial resources did ***not*** warrant an extension of credit.

41

**ANSWER:**    Defendants deny the allegations in paragraph 198.

199.    As described above in Section V.C., *supra*, LVS extended credit to subprime gamblers at MBS whose credit worthiness and financial resources made them ineligible to receive credit under local law. MBS accomplished this by illegally transferring funds from various client accounts without authorization to their subprime gambler clientele to qualify them for the credit being extended. CW-1 and CW-2 observed these transfers routinely during their employment at MBS between 2013 and 2016 and discussed them at various high-level meetings with LVS's Global Chief Compliance Officer, MBS's Chief Financial Officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, and Daphne Hearn who served as MBS's Chief Compliance Officer. Instead of approving patrons for credit based on their creditworthiness according to CentralCredit, for example, credit was extended to patrons based upon personal relationships with MBS staff and in spite of the fact that these patrons were ineligible for the credit being extended.

**ANSWER:**    Defendants deny the allegations in paragraph 199.

200.    In addition, when Hogan Lovells conducted its internal investigation, it identified more than 3,000 letters of authorization used to transfer SGD$1.4 billion between client accounts from 2013 to 2017. More than 26% of these transfers, or SGD$365 million, involved transfers with suspicious authorization forms that appeared to be photocopied signatures. Wang Xi's claim against MBS further evidences the existence of the unauthorized transfer scheme at MBS, which Hogan Lovells discovered during the course of its investigation.

**ANSWER:**    Defendants admit that Hogan Lovells was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 200.

201.    Despite Hogan Lovells' investigation and Wang Xi's lawsuit, LVS continued to mislead investors by misrepresenting MBS's credit extension and compliance practices. MBS's continuation of the "premium player" scheme prompted the U.S. Department of Justice, Singapore police, and CRA to commence investigations into MBS's controls. Specifically, in January 2020, the Department of Justice subpoenaed MBS's Chief Compliance Officer (who attended the high-level meetings at which suspicious transfers were discussed), in May 2020, the Singapore police began investigation Mr. Wang's claims and the unauthorized transfer activity at MBS, and in June 2020, the CRA commenced its own investigation "to ensur[e] that the casinos in Singapore, including Marina Bay Sands, remain free from criminal influence or exploitation."

**ANSWER:**    Defendants admit that the U.S. Department of Justice, Singapore police, and CRA made inquiries following the filing of Wang Xi's lawsuit. Defendants further state that the CRA investigated Wang Xi's claims relating to alleged unauthorized transfers and concluded that MBS did not breach any regulatory requirements. Defendants further state that MBS has not been charged with any violations of law or regulation in connection with any of the above-stated inquiries. Defendants deny the remaining allegations in paragraph 201.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

42

202.    Based on the foregoing, LVS misrepresented its credit extension and compliance practices when stating that it "extend[ed] credit to those customers whose level of play and financial resources warrant[ed] it." Contrary to this representation, MBS extended credit to patrons whose credit worthiness and financial resources did not warrant it. LVS therefore created an impression of a state of affairs concerning its credit extension and compliance practices that differed materially from the one that actually existed and, as such, violated SEC Rule 10b-5(b).

**ANSWER:**    Defendants deny the allegations in paragraph 202.

203.    In addition to SEC Rule 10b-5(b), LVS also violated Item 105 of Regulation S-K (17 C.F.R. §229.105), which required LVS to provide investors with "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and to "[c]oncisely explain how each risk affects the registrant or the securities being offered." The above statement concerning LVS's credit extension and compliance practices appeared within LVS's "risk factor" section and, therefore, required LVS to comply with Item 105 of Regulation S-K by giving investors an accurate description and explanation of the factors that made investing in LVS "risky." Contrary to this requirement, LVS misrepresented the nature of the risks pertaining to its credit extension and compliance practices, as previously explained.

**ANSWER:**    Certain allegations in paragraph 203 assert legal conclusions and characterizations to which no response is required. To the extent a response is required, Defendants admit that they are obligated to comply with the federal securities laws. Defendants state that LVS's Form 10-K filings include a "Risk Factor" relating to extension of credit and collectability of receivables. Defendants further state that LVS's Form 10-K filings speak for themselves, and that a Form 10-K is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 203.

204.    The 2018 Annual Report also provided investors with a summary of LVS's "Significant Accounting Policies." In pertinent part, the 2018 Annual Report stated the following when describing LVS's "Accounts Receivable and Credit Risk":

Accounts receivable are comprised of casino, hotel and other receivables, which do not bear interest and are recorded at cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness**. The Company also extends credit to gaming promoters in Macao, which receivables can be offset against commissions payable to the respective gaming promoters. Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries.

**ANSWER:**    Defendants admit the allegations in the first sentence of paragraph 204. As to the remaining allegations, Defendants deny that the statements quoted in paragraph 204 contain the emphasis that has been added to them, but otherwise admit that LVS's 2018 Form 10-K contains those quoted statements. Defendants state that LVS's 2018 Form 10-K speaks for itself, and is a

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 204.

205. The statement identified in the immediately preceding paragraph was false and materially misleading because LVS in fact extended credit to customers whose backgrounds and creditworthiness did *not* warrant an extension of credit. As described above in connection with the false statements about credit extension and compliance practices that appeared within LVS's "risk factor" discussion, MBS extended credit to patrons based upon personal relationships with MBS employees even when those patrons failed background checks and did not appear to be creditworthy, as evidenced when performing CentralCredit searches. This illicit practice continued through 2018 and beyond, as evidenced by the investigations commenced by the U.S. Department of Justice in January 2020, Singapore police in May 2020, and CRA in June 2020. Consequently, LVS materially misrepresented that it extended credit to patrons based upon "background checks and investigations of creditworthiness" and, as such, violated SEC Rule 10b-5(b).

**ANSWER:** Defendants deny the allegations in paragraph 205.

206. In addition, U.S. Generally Accepted Accounting Policies required LVS to provide investors with a summary of their critical accounting policies, pursuant to ASC 235-10-50-1. However, instead of providing investors with an accurate description of its "Accounts Receivable and Credit Risk" accounting policies, it told investors that it "extend[ed] credit to approved casino customers following background checks and investigations of creditworthiness," which was not true. Contrary to the requirements of U.S. GAAP, LVS misrepresented its significant accounting policies pertaining to its credit extension and compliance practices, as previously explained.

**ANSWER:** Defendants deny the allegations in paragraph 206.

207. LVS's misrepresentations in the 2018 Annual Report were material. The credit extended to MBS's subprime clientele created heightened risks of collectability and write-offs. Further, the information concerning LVS's credit extension and compliance policies was also required under Regulation S-K and U.S. GAAP. Consequently, the truth concerning LVS's credit extension and compliance policies would have altered the total mix of information available to investors. Had LVS truthfully and accurately disclosed LVS's credit extension and compliance practices, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:** Defendants admit that they are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 207.

208. Defendants Sheldon and Dumont certified the 2018 Annual Report pursuant to the Sarbanes-Oxley Act of 2002. In pertinent part, Sheldon and Dumont stated:

1. I have reviewed this annual report on Form 10-K of Las Vegas Sands Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b)      **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

**ANSWER:**      Defendants admit that Sheldon Adelson and Patrick Dumont signed certifications with respect to LVS's 2018 Form 10-K. Defendants deny that the statements quoted in paragraph 208 contain the emphasis that has been added to them, but otherwise admit that LVS's 2018 Form 10-K contains those quoted statements. Defendants state that LVS's 2018 Form 10-K speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 208.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

45

209. Defendants Sheldon and Dumont's certifications were affirmatively false and materially misleading when made because, contrary to their statements, LVS did not have sufficient internal controls in place to ensure accurate reporting of LVS's financial results. Indeed, as the CRA concluded in the course of its investigation, "there were weaknesses in MBS's casino control measures related to fund transfers." The U.S. Department of Justice's subpoena to MBS seeking information on the breaching of internal controls through illicit credit extension further demonstrates the falsity of the above statements.

**ANSWER:** Defendants deny the allegations in paragraph 209.

210. Moreover, contrary to Defendant Sheldon and Dumont's statements that they had disclosed "[a]ny fraud, whether or not material, that involves management," the 2018 Annual Report did not disclose that MBS was engaging in the scheme described above in Section V.C., *supra*, whereby employees were facilitating the extension of credit to subprime players through illicit transfers of money between casino patrons without authorization. These transfers were discussed during high-level meetings attended by, among others, LVS's Global Chief Compliance Officer. Consequently, the certifications misrepresented that fraudulent conduct was not occurring within LVS's operations when, in fact, it was.

**ANSWER:** Defendants deny the allegations in paragraph 210.

211. Sheldon's and Dumont's misrepresentations in their certifications were material. Internal controls are critical to the successful operation and financial reporting at LVS. Thus, certification as to their implementation and successful maintenance are essential, as required by the Sarbanes-Oxley Act of 2002. Consequently, the truth concerning Sheldon's and Dumont's certifications would have altered the total mix of information available to investors. Had Sheldon and Dumont truthfully and accurately disclosed the fraud occurring within LVS's operations, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:** Defendants admit that internal controls are important at LVS, and that Defendants are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 211.

212. LVS filed its 2019 Annual Report on Form 10-K with the SEC on February 7, 2020 (the "2019 Annual Report"). Defendants Adelson, Goldstein, and Dumont signed the 2019 Annual Report.

**ANSWER:** Defendants admit the allegations in paragraph 212.

213. The 2019 Annual Report provided investors with a description of LVS's material "risk factors," as required by Item 105 of Regulation S-K (17 C.F.R. §229.105). In pertinent part, the 2019 Annual Report stated:

> We conduct our gaming activities on a credit and cash basis. Any such credit we extend is unsecured. Table games players typically are extended more credit than slot players, and high-stakes players typically are extended more credit than players who tend to wager lesser amounts. High-end gaming is more volatile than other forms of gaming, and variances in win-loss results attributable to high-end gaming may have a significant positive or negative impact on cash flow and earnings in a particular quarter.

> During the year ended December 31, 2019, approximately 14.7%, 23.9% and 66.8% of our table games drop at our Macao properties, Marina Bay Sands and our Las

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

46

Vegas properties, respectively, was from credit-based wagering. **We extend credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit**. These large receivables could have a significant impact on our results of operations if deemed uncollectible.

**ANSWER:** The allegations in the first sentence of paragraph 213 assert legal conclusions and characterizations to which no response is required. As to the remaining allegations, Defendants deny that the statements quoted in paragraph 213 contain the emphasis that has been added to them, but otherwise admit that LVS's 2019 Form 10-K contains those quoted statements. Defendants state that LVS's 2019 Form 10-K speaks for itself, and is a unitary document that should be read as a whole.

214. The statement identified in the immediately preceding paragraph was affirmatively false and materially misleading when made because LVS extended credit to customers whose level of play and financial resources did *not* warrant an extension of credit.

**ANSWER:** Defendants deny the allegations in paragraph 214.

215. As described above in Section V.C., *supra*, LVS extended credit to subprime gamblers at MBS whose credit worthiness and financial resources made them ineligible to receive credit under local law. MBS accomplished this by illegally transferring funds from various client accounts without authorization to their subprime gambler clientele to qualify them for the credit being extended. CW-1 and CW-2 observed these transfers routinely during their employment at MBS between 2013 and 2016 and discussed them at various high-level meetings with LVS's Global Chief Compliance Officer, MBS's Chief Financial Officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, and Daphne Hearn who served as MBS's Chief Compliance Officer. Instead of approving patrons for credit based on their creditworthiness according to CentralCredit, for example, credit was extended to patrons based upon personal relationships with MBS staff and in spite of the fact that these patrons were ineligible for the credit being extended.

**ANSWER:** Defendants deny the allegations in paragraph 215.

216. In addition, when Hogan Lovells conducted its internal investigation, it identified more than 3,000 letters of authorization used to transfer SGD$1.4 billion between client accounts from 2013 to 2017. More than 26% of these transfers, or SGD$365 million, involved transfers with suspicious authorization forms that appeared to be photocopied signatures. Wang Xi's claim against MBS further evidences the existence of the unauthorized transfer scheme at MBS, which Hogan Lovells discovered during the course of its investigation.

**ANSWER:** Defendants admit that Hogan Lovells was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 216.

47

217.    Despite Hogan Lovells' investigation and Wang Xi's lawsuit, LVS continued to mislead investors by misrepresenting MBS's credit extension and compliance practices. MBS's continuation of the "premium player" scheme prompted the U.S. Department of Justice, Singapore police, and CRA to commence investigations into MBS's controls. Specifically, in January 2020, the Department of Justice subpoenaed MBS's Chief Compliance Officer (who attended the high-level meetings at which suspicious transfers were discussed), in May 2020, the Singapore police began investigation Mr. Wang's claims and the unauthorized transfer activity at MBS, and in June 2020, the CRA commenced its own investigation "to ensur[e] that the casinos in Singapore, including Marina Bay Sands, remain free from criminal influence or exploitation."

**ANSWER:**    Defendants admit that the U.S. Department of Justice, Singapore police, and CRA made inquiries following the filing of Wang Xi's lawsuit. Defendants deny the remaining allegations in paragraph 217.

218.    Based on the foregoing, LVS misrepresented its credit extension and compliance practices when stating that it "extend[ed] credit to those customers whose level of play and financial resources warrant[ed] it." Contrary to this representation, MBS extended credit to patrons whose credit worthiness and financial resources did not warrant it. LVS therefore created an impression of a state of affairs concerning its credit extension and compliance practices that differed materially from the one that actually existed and, as such, violated SEC Rule 10b-5(b).

**ANSWER:**    Defendants deny the allegations in paragraph 218.

219.    In addition to SEC Rule 10b-5(b), LVS also violated Item 105 of Regulation S-K (17 C.F.R. §229.105), which required LVS to provide investors with "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and to "[c]oncisely explain how each risk affects the registrant or the securities being offered." The above statement concerning LVS's credit extension and compliance practices appeared within LVS's "risk factor" section and, therefore, required LVS to comply with Item 105 of Regulation S-K by giving investors an accurate description and explanation of the factors that made investing in LVS "risky." Contrary to this requirement, LVS misrepresented the nature of the risks pertaining to its credit extension and compliance practices, as previously explained.

**ANSWER:**    Certain allegations in paragraph 219 assert legal conclusions and characterizations to which no response is required. To the extent a response is required, Defendants admit that they are obligated to comply with the federal securities laws. Defendants state that LVS's Form 10-K filings include a "Risk Factor" relating to extension of credit and collectability of receivables. Defendants further state that LVS's Form 10-K filings speak for themselves, and that a Form 10-K is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 219.

220.    The 2019 Annual Report also provided investors with a summary of LVS's "Significant Accounting Policies." In pertinent part, the 2019 Annual Report stated the following when describing LVS's "Accounts Receivable and Credit Risk":

Accounts receivable are comprised of casino, hotel and other receivables, which do not bear interest and are recorded at cost. **The Company extends credit to**

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

48

**approved casino customers following background checks and investigations of creditworthiness**. The Company also extends credit to gaming promoters in Macao, which receivables can be offset against commissions payable to the respective gaming promoters. Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries.

**ANSWER:**   Defendants admit the allegations in the first sentence of paragraph 220. As to the remaining allegations, Defendants deny that the statements quoted in paragraph 220 contain the emphasis that has been added to them, but otherwise admit that LVS's 2019 Form 10-K contains those quoted statements. Defendants state that LVS's 2019 Form 10-K speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 204.

221.   The statement identified in the immediately preceding paragraph was affirmatively false and materially misleading because LVS in fact extended credit to customers whose backgrounds and creditworthiness did ***not*** warrant an extension of credit. As described above in connection with the false statements about credit extension and compliance practices that appeared within LVS's "risk factor" discussion, MBS extended credit to patrons based upon personal relationships with MBS employees even when those patrons failed background checks and did not appear to be creditworthy, as evidenced when performing CentralCredit searches. Consequently, LVS materially misrepresented that it extended credit to patrons based upon "background checks and investigations of creditworthiness" and, as such, violated SEC Rule 10b-5(b).

**ANSWER:**   Defendants deny the allegations in paragraph 221.

222.   In addition, U.S. Generally Accepted Accounting Policies required LVS to provide investors with a summary of their critical accounting policies, pursuant to ASC 235-10-50-1. However, instead of providing investors with an accurate description of its "Accounts Receivable and Credit Risk" accounting policies, it told investors that it "extend[ed] credit to approved casino customers following background checks and investigations of creditworthiness," which was not true. Contrary to the requirements of U.S. GAAP, LVS misrepresented its significant accounting policies pertaining to its credit extension and compliance practices, as previously explained.

**ANSWER:**   Defendants deny the allegations in paragraph 222.

223.   LVS's misrepresentations in the 2019 Annual Report were material. The credit extended to MBS's subprime clientele created heightened risks of collectability and write-offs. Further, the information concerning LVS's credit extension and compliance policies was also required under Regulation S-K and U.S. GAAP. This illicit practice continued through 2018 and beyond, as evidenced by the investigations commenced by the U.S. Department of Justice in January 2020, Singapore police in May 2020, and CRA in June 2020. Consequently, the truth concerning LVS's credit extension and compliance policies would have altered the total mix of information available to investors. Had LVS truthfully and accurately disclosed LVS's credit extension and compliance practices, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:** Defendants admit that they are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 223.

224. Defendants Sheldon and Dumont certified the 2019 Annual Report pursuant to the Sarbanes-Oxley Act of 2002. In pertinent part, Sheldon and Dumont stated:

1. I have reviewed this annual report on Form 10-K of Las Vegas Sands Corp.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are**

**reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b)   **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

**ANSWER:**   The allegations in the first sentence of paragraph 224 assert legal conclusions and characterizations to which no response is required. As to the remaining allegations, Defendants admit that Sheldon Adelson and Patrick Dumont signed certifications with respect to LVS's 2019 Form 10-K. Defendants deny that the statements quoted in paragraph 224 contain the emphasis that has been added to them, but otherwise admit that LVS's 2019 Form 10-K contains those quoted statements. Defendants state that LVS's 2019 Form 10-K speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 224.

225.   Defendants Sheldon and Dumont's certifications were affirmatively, materially false and misleading when made because, contrary to their statements, LVS did not have sufficient internal controls in place to ensure accurate reporting of LVS's financial results. Indeed, as the CRA concluded in the course of its investigation, "there were weaknesses in MBS's casino control measures related to fund transfers." The U.S. Department of Justice's subpoena to MBS seeking information on the breaching of internal controls through illicit credit extension further demonstrates the falsity of the above statements.

**ANSWER:**   Defendants deny the allegations in paragraph 225.

226.   Moreover, contrary to Defendant Sheldon and Dumont's misstatement that they had disclosed "[a]ny fraud, whether or not material, that involves management," the 2019 Annual Report did not disclose that MBS was engaging in the scheme described above in Section V.C., *supra*, whereby employees were facilitating the extension of credit to subprime players through illicit transfers of money between casino patrons without authorization. These transfers were discussed during high-level meetings attended by, among others, LVS's Global Chief Compliance Officer. Consequently, the certifications misrepresented that fraudulent conduct was not occurring within LVS's operations when, in fact, it was.

**ANSWER:**   Defendants deny the allegations in paragraph 226.

227.   Sheldon's and Dumont's misrepresentations in their certifications were material. Internal controls are critical to the successful operation and financial reporting at LVS. Thus, certification as to their implementation and successful maintenance are essential, as required by the Sarbanes-Oxley Act of 2002. Consequently, the truth concerning Sheldon's and Dumont's certifications would have altered the total mix of information available to investors. Had Sheldon and Dumont truthfully and accurately disclosed the fraud occurring within LVS's operations, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:** Defendants admit that internal controls are important at LVS, and that Defendants are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 227.

228. LVS filed its Quarterly Report for the first quarter of fiscal 2020 on Form 10-Q with the SEC on April 24, 2020 (the "1Q20 Quarterly Report"). Defendants Adelson and Dumont signed the 1Q20 Quarterly Report.

**ANSWER:** Defendants admit the allegations in paragraph 228.

229. The 1Q20 Quarterly Report provided investors with financial statements and notes to the financial statements. In pertinent part, the 1Q20 Quarterly Report stated the following when describing LVS's "Accounts Receivable and Provision for Credit Losses":

> Accounts receivable are comprised of casino, hotel, mall and other receivables, which do not bear interest and are recorded at amortized cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness**. The Company also extends credit to gaming promoters in Macao. These receivables can be offset against commissions payable to the respective gaming promoters. Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries.

**ANSWER:** Defendants admit the allegations in the first sentence of paragraph 229. As to the remaining allegations, Defendants deny that the statements quoted in paragraph 229 contain the emphasis that has been added to them, but otherwise admit that LVS's 1Q20 Form 10-Q contains those quoted statements. Defendants state that LVS's 1Q20 Form 10-Q speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 229.

230. The statement identified in the immediately preceding paragraph was affirmatively false and materially misleading when made because LVS in fact extended credit to customers whose backgrounds and creditworthiness did not warrant an extension of credit. As described above in Section V.C., *supra*, MBS extended credit to patrons based upon personal relationships with MBS employees even when those patrons failed background checks and did not appear to be creditworthy, as evidenced when performing CentralCredit searches. This illicit practice continued through 2018 and beyond, as evidenced by the investigations commenced by the U.S. Department of Justice in January 2020, Singapore police in May 2020, and CRA in June 2020. Consequently, LVS materially misrepresented that it extended credit to patrons based upon "background checks and investigations of creditworthiness" and, as such, violated SEC Rule 10b-5(b).

**ANSWER:** Defendants deny the allegations in paragraph 230.

231. In addition, U.S. Generally Accepted Accounting Policies required LVS to provide investors with notes to the financial statements to facilitate an understanding of the financial statements and the accounting policies that LVS followed, pursuant to ASC 235-10-5. However, instead of providing investors with an accurate description of its "Accounts Receivable and

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

52

Provision for Credit Losses," LVS told investors that it "extend[ed] credit to approved casino customers following background checks and investigations of creditworthiness," which was not true. Contrary to the requirements of U.S. GAAP, LVS misrepresented its accounting practices pertaining to its "Accounts Receivable and Provision for Credit Losses."

**ANSWER:**   Defendants deny the allegations in paragraph 231.

232.   LVS's misrepresentations in the 1Q20 Quarterly Report were material. The credit extended to MBS's subprime clientele created heightened risks of collectability and write-offs, which was supposedly tempered by LVS's "credit evaluation process, credit policies," among other things. Further, the information concerning LVS's credit extension and compliance policies was also required under U.S. GAAP. Consequently, the truth concerning LVS's credit extension and compliance policies would have altered the total mix of information available to investors. Had LVS truthfully and accurately disclosed LVS's credit extension and compliance practices, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:**   Defendants admit that they are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 232.

233.   Defendants Sheldon and Dumont certified the 1Q20 Quarterly Report pursuant to the Sarbanes-Oxley Act of 2002. In pertinent part, Sheldon and Dumont stated:

1.   I have reviewed this annual report on Form 10-Q of Las Vegas Sands Corp.;

2.   **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.   **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

53

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b)     **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

**ANSWER:**     The allegations in the first sentence of paragraph 233 assert legal conclusions and characterizations to which no response is required. As to the remaining allegations, Defendants admit that Sheldon Adelson and Patrick Dumont signed certifications with respect to LVS's 1Q20 Form 10-Q. Defendants deny that the statements quoted in paragraph 233 contain the emphasis that has been added to them, but otherwise admit that LVS's 1Q20 Form 10-Q contains those quoted statements. Defendants state that LVS's 1Q20 Form 10-Q speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 233.

234.     Defendants Sheldon and Dumont's certifications were affirmatively, materially false and misleading when made because, contrary to their statements, LVS did not have sufficient internal controls in place to ensure accurate reporting of LVS's financial results. Indeed, as the CRA concluded in the course of its investigation, "there were weaknesses in MBS's casino control measures related to fund transfers." The U.S. Department of Justice's subpoena to MBS seeking information on the breaching of internal controls through illicit credit extension further demonstrates the falsity of the above statements.

**ANSWER:**     Defendants deny the allegations in paragraph 234.

235.     Moreover, contrary to Defendants Sheldon and Dumont's misstatement that they had disclosed "[a]ny fraud, whether or not material, that involves management," the 1Q20 Quarterly Report did not disclose that MBS was engaging in the scheme described above in Section V.C., *supra*, whereby employees were facilitating the extension of credit to subprime players through illicit transfers of money between casino patrons without authorization. These transfers were discussed during high-level meetings attended by, among others, LVS's Global Chief

Compliance Officer. Consequently, the certifications misrepresented that fraudulent conduct was not occurring within LVS's operations when, in fact, it was.

**ANSWER:**    Defendants deny the allegations in paragraph 235.

236.    Sheldon's and Dumont's misrepresentations in their certifications were material. Internal controls are critical to the successful operation and financial reporting at LVS. Thus, certification as to their implementation and successful maintenance are essential, as required by the Sarbanes-Oxley Act of 2002. Consequently, the truth concerning Sheldon's and Dumont's certifications would have altered the total mix of information available to investors. Had Sheldon and Dumont truthfully and accurately disclosed the fraud occurring within LVS's operations, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:**    Defendants admit that internal controls are important at LVS, and that Defendants are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 236.

237.    LVS filed its Quarterly Report for the second quarter of fiscal 2020 on Form 10-Q with the SEC on July 24, 2020 (the "2Q20 Quarterly Report"). Defendants Adelson and Dumont signed the 2Q20 Quarterly Report.

**ANSWER:**    Defendants admit the allegations in paragraph 237.

238.    The 2Q20 Quarterly Report provided investors with financial statements and notes to the financial statements. In pertinent part, the 2Q20 Quarterly Report stated the following when describing LVS's "Accounts Receivable and Provision for Credit Losses":

Accounts receivable is comprised of casino, hotel, mall and other receivables, which do not bear interest and are recorded at amortized cost. **The Company extends credit to approved casino customers following background checks and investigations of creditworthiness**. The Company also extends credit to gaming promoters in Macao. These receivables can be offset against commissions payable to the respective gaming promoters. Business or economic conditions, the legal enforceability of gaming debts, foreign currency control measures or other significant events in foreign countries could affect the collectability of receivables from customers and gaming promoters residing in these countries.

**ANSWER:**    Defendants admit the allegations in the first sentence of paragraph 238. As to the remaining allegations, Defendants deny that the statements quoted in paragraph 238 contain the emphasis that has been added to them, but otherwise admit that LVS's 2Q20 Form 10-Q contains those quoted statements. Defendants state that LVS's 2Q20 Form 10-Q speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 238.

239.    The statement identified in the immediately preceding paragraph was affirmatively false and materially misleading when made because LVS in fact extended credit to customers whose backgrounds and creditworthiness did ***not*** warrant an extension of credit. As described above

in Section V.C., *supra*, MBS extended credit to patrons based upon personal relationships with MBS employees even when those patrons failed background checks and did not appear to be creditworthy, as evidenced when performing CentralCredit searches. This illicit practice continued through 2018 and beyond, as evidenced by the investigations commenced by the U.S. Department of Justice in January 2020, Singapore police in May 2020, and CRA in June 2020. Consequently, LVS materially misrepresented that it extended credit to patrons based upon "background checks and investigations of creditworthiness" and, as such, violated SEC Rule 10b-5(b).

**ANSWER:**    Defendants deny the allegations in paragraph 239.

240.    In addition, U.S. Generally Accepted Accounting Policies required LVS to provide investors with notes to the financial statements to facilitate an understanding of the financial statements and the accounting policies that LVS followed, pursuant to ASC 235-10-5. However, instead of providing investors with an accurate description of its "Accounts Receivable and Provision for Credit Losses," LVS told investors that it "extend[ed] credit to approved casino customers following background checks and investigations of creditworthiness," which was not true. Contrary to the requirements of U.S. GAAP, LVS misrepresented its accounting practices pertaining to its "Accounts Receivable and Provision for Credit Losses."

**ANSWER:**    Defendants deny the allegations in paragraph 240.

241.    LVS's misrepresentations in the 2Q20 Quarterly Report were material. The credit extended to MBS's subprime clientele created heightened risks of collectability and write-offs, which was supposedly tempered by LVS's "credit evaluation process, credit policies," among other things. Further, the information concerning LVS's credit extension and compliance policies was also required under U.S. GAAP. Consequently, the truth concerning LVS's credit extension and compliance policies would have altered the total mix of information available to investors. Had LVS truthfully and accurately disclosed LVS's credit extension and compliance practices, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:**    Defendants admit that they are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 241.

242.    Defendants Sheldon and Dumont certified the 2Q20 Quarterly Report pursuant to the Sarbanes-Oxley Act of 2002. In pertinent part, Sheldon and Dumont stated:

1.    I have reviewed this annual report on Form 10-Q of Las Vegas Sands Corp.;

2.    **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.    **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

56

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b)   **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

**ANSWER:**   The allegations in the first sentence of paragraph 242 assert legal conclusions and characterizations to which no response is required. As to the remaining allegations, Defendants admit that Sheldon Adelson and Patrick Dumont signed certifications with respect to LVS's 2Q20 Form 10-Q. Defendants deny that the statements quoted in paragraph 242 contain the emphasis that has been added to them, but otherwise admit that LVS's 2Q20 Form 10-Q contains those quoted statements. Defendants state that LVS's 2Q20 Form 10-Q speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 242.

243.    Defendants Sheldon and Dumont's certifications were affirmatively, materially false and misleading when made because, contrary to their statements, LVS did not have sufficient internal controls in place to ensure accurate reporting of LVS's financial results. Indeed, as the CRA concluded in the course of its investigation, "there were weaknesses in MBS's casino control measures related to fund transfers." The U.S. Department of Justice's subpoena to MBS seeking information on the breaching of internal controls through illicit credit extension further demonstrates the falsity of the above statements.

**ANSWER:**    Defendants deny the allegations in paragraph 243.

244.    Moreover, contrary to Defendants Sheldon and Dumont's misstatements that they had disclosed "[a]ny fraud, whether or not material, that involves management," the 2Q20 Quarterly Report did not disclose that MBS was engaging in the scheme described above in Section V.C., *supra*, whereby employees were facilitating the extension of credit to subprime players through illicit transfers of money between casino patrons without authorization. These transfers were discussed during high-level meetings attended by, among others, LVS's Global Chief Compliance Officer. Consequently, the certifications misrepresented that fraudulent conduct was not occurring within LVS's operations when, in fact, it was.

**ANSWER:**    Defendants deny the allegations in paragraph 244.

245.    Sheldon's and Dumont's misrepresentations in their certifications were material. Internal controls are critical to the successful operation and financial reporting at LVS. Thus, certification as to their implementation and successful maintenance are essential, as required by the Sarbanes-Oxley Act of 2002. Consequently, the truth concerning Sheldon's and Dumont's certifications would have altered the total mix of information available to investors. Had Sheldon and Dumont truthfully and accurately disclosed the fraud occurring within LVS's operations, investors would not have purchased LVS securities at artificially inflated prices.

**ANSWER:**    Defendants admit that internal controls are important at LVS, and that Defendants are obligated to comply with the federal securities laws. Defendants deny the remaining allegations in paragraph 245.

246.    The truth about MBS's activities related to the unauthorized transfers between customer accounts and lack of adequate internal controls leaked into the market over the course of several partial disclosures.

**ANSWER:**    Defendants deny the allegations in paragraph 246.

247.    On September 26, 2019, Wang Xi filed his statement of claim in the High Court of Singapore, seeking to recover SGD$9.1 million (or approximately $6.6 million USD) that he claimed MBS transferred to other unknown casino patrons without his authorization through 22 transfers made between October and December 2015. On the same day, LVS's stock price declined, closing at $55.88 per share – a $1.20 decline over the prior day's close.

**ANSWER:**    Defendants admit that Wang Xi filed a statement of claim on September 26, 2019 in the High Court of Singapore against MBS. Defendants further admit that paragraph 247 purports to describe Wang Xi's claim against MBS. Defendants state that the prices at which LVS's

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 247.

248.   Reports of Wang's lawsuit began circulating on October 10, 2019 when *Bloomberg* author Chanyaporn Chanjaroen published an article titled "Singapore Sands Sued by Chinese Ex-Client Claiming $6.6 Million."[12] The October 10, 2019 article provided additional material information concerning the allegations of Wang's complaint. According to this article, MBS had told Wang that it had received signed authorization letters from him in Macao for the disputed transactions – a fact that Wang denied, asserting the letters were forgeries, as his signature had been copied and pasted onto the document. When Wang insisted on seeing the original documents, MBS stated that they had been destroyed by the casino's Macao affiliate for "reasons of confidentiality."

**ANSWER:**   Defendants state that Plaintiffs' June 17, 2022 Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint (ECF No. 95, "Opposition") stated that Plaintiffs are not alleging October 10, 2019 as a corrective disclosure. (Opposition at 36 n.14.) Accordingly, no response is required. To the extent a response is required, Defendants admit that paragraph 248 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 248.

249.   On May 12, 2020, *Bloomberg* broke the news that, in response to Wang's lawsuit, the Singapore police commenced a probe and were investigating the unauthorized transfer activity at MBS. On this news, LVS's stock price dropped from a close of $48.50 on May 11, 2020 to $45.96 on May 12, 2020.

**ANSWER:**   Defendants admit that the first sentence of paragraph 249 purports to characterize statements in a document written by a non-party, but deny the allegations that mischaracterize the statements. Defendants state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 249.

250.   Then, on June 4, 2020, Chanyaporn Chanjaroen and Tom Schoenberg of *Bloomberg* published an article titled "Adelson's Singapore Casino Probed Over Laundering Controls,"[13] not only affirming its previous reporting of the Singapore police investigation into MBS, but announcing for the first time that LVS was being probed by the United States Department of Justice to determine "whether anti-money laundering regulations were breached in the way [LVS] handled the accounts of top gamblers."

**ANSWER:**   Defendants admit that paragraph 250 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

---

[12]   https://www.bloomberg.com/news/articles/2019-10-10/singapore-sands-sued-by-chinese-ex-client-claiming-6-6-million

[13]   https://www.bloomberg.com/news/articles/2020-06-04/adelson-s-singapore-casino-probed-over-money-laundering-controls

inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 250.

251.    According to this article, the United States Department of Justice issued a grand jury subpoena to a former compliance chief of MBS in January 2020 (i.e., three months after Wang initiated his suit against the casino) "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls." In the context of this grand jury process, prosecutors asked this former compliance head to produce records related to any such regulatory violations, including the use of gambling junkets and third-party lending using casino credit.

**ANSWER:**    Defendants admit that paragraph 251 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 251.

252.    The June 4 *Bloomberg* article further reported that Wang's allegations and the possible practice of unauthorized transfers at MBS had drawn the attention of the CRA who, in response to a *Bloomberg* inquiry, stated it was "committed to ensuring that the casinos in Singapore, including Marina Bay Sands, remain free from criminal influence or exploitation, and takes a serious view of any allegations of unauthorized money transfers."

**ANSWER:**    Defendants admit that paragraph 252 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 252.

253.    The June 4 article also cites an individual with knowledge of the internal investigation carried out at MBS related to these transfers, stating:

Marina Bay's internal probe found instances of its group employees violating accepted transfer procedures by filling in payment details on pre-signed or photo-copied authorization forms, according to a person familiar with the matter. It also uncovered cases in which original documents were destroyed, the person said.

**ANSWER:**    Defendants admit that paragraph 253 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 253.

254.    The June 4 article was later updated at 2:08 am EDT on June 5, 2020, adding reference to the November 2019 report of the Financial Action Task Force (FATF) - a global anti-money laundering watchdog who urged Singapore to tighten its controls, particularly with respect to its casinos and real estate agents in its report:

In its 4th round [mutual evaluation report], Singapore was rated [Partially Compliant] with R.22, based on deficiencies with regard to the inadequate customer due diligence (CDD) requirements applicable to casinos, real estate agents, [Precious Stone and Metal Dealers] and accountants, and the fact that the record-keeping obligations for real estate agents and accountants were not provided by law.

* * *

Pursuant the legislation of Precious Stones and Precious Metals (Prevention of Money Laundering and Terrorism Financing) Act (PSPM (PMLTF) Act), the amendments to its Accounting Act and relevant subsidiary legislation and amendments, Singapore has addressed most of the deficiencies related to public accountants and PSMDs. *Singapore has indicated that they will be taking further steps, but as of now, deficiencies related to real estate agents and casinos remain unaddressed. Given the inherently higher risk of casinos, as recognised in the country's national risk assessment (NRA) and MER, moderate shortcomings are still affecting the [Designated Nonfinancial Businesses and Professions] sectors.*

*Singapore has not addressed all of the identified deficiencies and moderate shortcomings still exist. Singapore therefore remains rated Partially Compliant with R.22.*

**ANSWER:**    Defendants deny that the statements quoted in paragraph 254 contain the emphasis that has been added to them, but otherwise admit that the document written by a non-party that is referenced in paragraph 254 contains those quoted statements. Defendants deny the remaining allegations in paragraph 254.

255.    The findings of the FATF were amplified, and their impact on the CRA disclosed for the first time, on June 7, 2020 when *Bloomberg* author Chanyaporn Chanjaroen published an article titled "Singapore Mulls Tighter Anti-Money Laundering Rules for Casinos." According to this article, the CRA was "considering tighter regulations at its casinos in an effort to prevent money laundering and financing terrorism," and the regulator had already requested (but not required) that casino operators lower the threshold for cash transactions triggering due diligence review from the legislatively mandated SGD$10,000 to SGD$5,000. While the CRA denied that the review of the legislative threshold for due diligence was triggered by the investigation into Wang's allegations against MBS, *Bloomberg* noted that the timing conspicuously coincided with its own report of a week earlier regarding the United States Department of Justice investigation into MBS related to its anti-money laundering controls and the handling of its player accounts and its publicizing of the claims of the Wang lawsuit.

**ANSWER:**    Defendants admit that paragraph 255 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants further deny the remaining allegations in paragraph 255.

256.    Then, after the close of market on July 19, 2020, *Bloomberg* published a new article authored by Chanyaporn Chanjaroen titled "Sheldon Adelson's Singapore Casino Ends Suit with $6.5 Million Payment," announcing that MBS had agreed to a confidential settlement with Wang Xi in exchange for full payment of his demand – SGD$9.1 million, according to a source familiar

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

with the matter. LVS's stock price responded to the news by dropping from $48.69 on July 17, 2020 (the last trading day before the news) to a close of $47.28 on July 20, 2020.

**ANSWER:** Defendants admit that the first sentence of paragraph 256 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 256.

257.   While the Wang settlement included a "non-admission" of liability from both sides according to *Bloomberg*'s source, it was the filing of the suit, as well as *Bloomberg*'s reporting thereof, that appears to have spurred investigations in both Singapore and the United States into MBS's practices.

**ANSWER:** Defendants admit that paragraph 257 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants further admit that inquiries were made in Singapore and the United States following the filing of Wang Xi's lawsuit. Defendants lack knowledge or information sufficient to determine the truth or falsity of the remaining allegations in paragraph 257 and therefore deny those allegations.

258.   On September 16, 2020, *Bloomberg* published a new article from Chanyaporn Chanjaroen and Andrea Tan titled "Adelson's Singapore Casino Hires Law Firm to Probe $1 Billion Transfers."[14] In this article, *Bloomberg* revealed for the first time that LVS had hired the well-known Singapore law firm of Davinder Singh Chambers LLC to conduct a new investigation into employee transfers of more than $1 billion in gamblers' money to third parties, citing sources familiar with the matter.

**ANSWER:** Defendants admit that paragraph 258 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny that Davinder Singh was hired to conduct an investigation of MBS and deny the remaining allegations in paragraph 258.

259.   According to the September 16 article:

The review by one of Singapore's best-known law firms adds to scrutiny of the casino by the U.S. Department of Justice and Singapore authorities after a patron sued the firm last year alleging that S$9.1 million ($6.7 million) of his money was transferred to other gamblers without his knowledge. The lawsuit was settled out of

---

[14]   https://www.bloomberg.com/news/articles/2020-09-16/adelson-s-casino-hires-law-firm-to-probe-1-billion-in-transfers

court in June, with the casino agreeing to reimburse the full amount. There was a "non-admission" of liability from both sides.

**ANSWER:** Defendants admit that paragraph 259 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny that Davinder Singh was hired to conduct an investigation of MBS and deny the remaining allegations in paragraph 259.

260. The September 16 article also disclosed that, while the CRA had completed its investigation into MBS and concluded that it did not breach requirements related to Wang's claims, "there were weaknesses in MBS's casino control measures pertaining to fund transfers."

**ANSWER:** Defendants admit paragraph 260 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants further admit that the document stated that the CRA had completed its investigation into MBS and found that MBS did not breach regulatory requirements. Defendants deny the remaining allegations in paragraph 260.

261. Further, in a statement to *Bloomberg*, the CRA stated that it "takes a serious view of such matters and had directed MBS to strengthen its control measures, which MBS has since undertaken. CRA will continue to exercise close oversight to ensure that MBS's measures are effective."

**ANSWER:** Defendants admit that paragraph 261 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that selectively quote the statements.

262. While the CRA had concluded its review, the Singapore police declined to comment for the article, stating that it does not comment on ongoing investigations.

**ANSWER:** Defendants admit that paragraph 262 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 262.

263. Further, the September 16 article noted that Davinder Singh was actually the second major law firm retained by LVS to conduct an internal investigation into the unauthorized transfer practice. While *Bloomberg* earlier published articles referencing an "internal probe" conducted at MBS, the September 16 article disclosed for the first time that an additional probe was conducted by Hogan Lovells.

**ANSWER:** Defendants admit that paragraph 263 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny that Davinder Singh was hired to conduct an investigation of MBS and deny the remaining allegations in paragraph 263.

264. According to the September 16 article, the earlier Hogan Lovells probe uncovered instances of employees not complying with proper standards by filling in payment details on pre-signed or photocopied authorization forms. Additionally, and for the first time, the magnitude of the malfeasance was disclosed, as Hogan Lovells determined that, from 2013 to 2017, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties in an amount totaling approximately SGD$1.4 billion (or approximately $1.05 billion USD). Of these transactions, letters authorizing transfers for SGD$365 million (approximately $275 million USD) from multiple casino guests bore signatures that appeared similar – thus, corroborating the earlier allegations of Wang that MBS employees were employing a system of copying signatures to conduct unauthorized transfers. Further troubling was the fact that, according to the September 16 article and the Hogan Lovells review, "[o]ne group of employees was involved in S$763 million in transfers" – meaning just a "handful of staff" were able to carry out the activities.

**ANSWER:** Defendants admit that paragraph 264 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants admit that Hogan Lovells was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 264.

265. LVS's stock price responded negatively to learning this news, dropping from a close of $51.85 on September 15, 2020 to $49.67 on September 16, 2020.

**ANSWER:** Defendants state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 265.

266. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

**ANSWER:** Defendants deny the allegations in paragraph 266.

267. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer of LVS and, thus, controlled the information disseminated to the investing public in the Company's press releases

64

and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

**ANSWER:**    Defendants admit that Sheldon Adelson, Robert Goldstein, and Patrick Dumont were senior executive officers of LVS. Defendants further state that Mr. Goldstein and Mr. Dumont continue to be senior executive officers of LVS. Defendants deny the remaining allegations in paragraph 267.

268.    Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's unauthorized transfer scheme. Such actions allowed LVS to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to LVS as the Individual Defendants were among LVS's most senior management and were acting within the scope of their employment.

**ANSWER:**    Defendants deny the allegations in paragraph 268.

269.    As alleged herein, several former employees of MBS have confirmed that the unauthorized transfer practice was widespread and well-known at MBS.

**ANSWER:**    Defendants deny the allegations in paragraph 269.

270.    Specifically, two of Plaintiffs' CWs corroborate the accounts of additional former employees cited by *Bloomberg* beginning in 2019, including a former compliance executive who brought up the issue and tried to tackle it while still working for MBS, only to be urged by senior level management of the operations and legal teams to back down, then resulting in his contract not being renewed with the casino.

**ANSWER:**    Defendants deny the allegations in paragraph 270.

271.    Further, the magnitude of the unauthorized transfer process, as uncovered by MBS's own internal investigations and that of its retained counsel, Hogan Lovells, lends to the inference of scienter where more than 26% of these transactions were being effectuated pursuant to improperly obtained or suspicious letters of authorization and implicated hundreds of millions of dollars.

**ANSWER:**    Defendants deny the allegations in paragraph 271.

272.    At all times relevant to this Action, MBS's casino performance was an important revenue center and EBITDA contributor to LVS, with approximately 25% of revenue and 50% of EBITDA coming from this single casino.

**ANSWER:**    Defendants admit that MBS is important to LVS's business operations. Defendants further state that paragraph 272 is vague and undefined, including as to time period, and therefore deny the remaining allegations in paragraph 272.

273.    Because of its importance to LVS, the Individual Defendants paid close attention to MBS's performance, specifically reporting and answering questions about Singapore and MBS on every analyst call.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

65

**ANSWER:** Defendants admit that MBS is important to LVS's business operations, and that Sheldon Adelson, Patrick Dumont, and Robert Goldstein have made statements relating to Singapore and MBS during LVS's earnings calls. Defendants deny the remaining allegations in paragraph 273.

274. Further, in every annual report filed on Form 10-K issued by the Company during the Class Period, LVS stated:

> We maintain an allowance, or reserve, for doubtful casino accounts at our operating casino resorts in Macao, *Singapore* and the U.S., *which we regularly evaluate. We specifically analyze the collectability of each account with a balance over a specified dollar amount*, based upon the age of the account, the customer's financial condition, collection history and any other known information, and we apply standard reserve percentages to aged account balances under the specified dollar amount. We also monitor regional and global economic conditions and forecasts in our evaluation of the adequacy of the recorded reserves.

**ANSWER:** Defendants deny that the statements quoted in paragraph 274 contain the emphasis that has been added to them. By way of further answer with regard to the 2019-2020 period that was not dismissed by the Court's 2023 Order, Defendants admit that LVS's 2019 Form 10-K contains those quoted statements. Defendants further state that LVS's 2020 Form 10-K contains a similar statement which, *inter alia*, referenced the impact of the COVID-19 Pandemic on LVS's evaluation of the adequacy of the recorded reserve. Defendants state that LVS's Form 10-K filings speak for themselves, and that a Form 10-K is a unitary document that should be read as a whole. Defendants further state that the Second Amended Complaint does not challenge the adequacy of LVS's reserves or the accuracy of LVS's financial statements.

275. Since the Company in its SEC filings stated that it "regularly evaluate[d]" the allowance for doubtful casino accounts, and because the write-offs related to bad debt incurred at MBS as a result of the unauthorized transfer practice were exponentially higher than the expected amounts for a casino of that size, accounting for nearly 62% of LVS's total write-offs between 2013 and 2020, it is reasonable to infer the unauthorized transfer activities were either known or recklessly disregarded by the Individual Defendants, supporting an inference of their scienter.

**ANSWER:** Defendants deny the allegations in paragraph 275.

276. Furthermore, throughout its SEC filings, LVS recognized the impact extending credit to players has on its financials, including in its provision for doubtful accounts and associated write-offs. According to a former executive interviewed by *Bloomberg*, write-offs from doubtful accounts stemming from MBS accounted for $717 million of the $1.16 billion written off by LVS from 2013 to 2020, or *nearly 62%*. The shear fact that write-offs were so heavily concentrated in a single LVS property and were multiple times higher than the $20 to $30 million per year expected for a casino of MBS's size supports an inference of the Individual Defendants' scienter.

66

**ANSWER:** Defendants admit that the extension of credit, existence of accounts receivable, reserve for bad debts, and collectability of receivables are important to LVS's business, and are discussed in LVS's SEC filings. Defendants state that LVS's SEC filings speak for themselves, and that each of LVS's SEC filings is a unitary document that should be read as a whole. Defendants admit that paragraph 276 purports to characterize statements contained in a document written by a non-party. Defendants deny the remaining allegations in paragraph 276.

277. Given the outsized role MBS played in LVS's portfolio, and the magnitude of the unauthorized transfers in the context of total internal transfers carried out at MBS, the Individual Defendants either knew or recklessly disregarded the unauthorized transfer scheme occurring at MBS.

**ANSWER:** Defendants deny the allegations in paragraph 277.

278. As would only be disclosed through various *Bloomberg* articles, there were several probes conducted internally at LVS that each confirmed the pervasive unauthorized transfer practice.

**ANSWER:** Defendants deny the allegations in paragraph 278.

279. Specifically, MBS claimed to have conducted its own probe that ultimately led it to purportedly amend its compliance procedures and protocols in 2018, instituting for the first time basic due diligence and employee education requirements designed to identify suspicious activity and close avenues to abuse that led to the unauthorized transfer scheme.

**ANSWER:** Defendants admit that MBS implemented changes in 2018 relating to the third-party transfer process. Defendants deny the remaining allegations in paragraph 279.

280. Then, LVS retained Hogan Lovells to conduct an independent probe. The Hogan Lovells probe uncovered instances of employees not complying with proper standards by filling in payment details on pre-signed or photocopied authorization forms. Additionally, the Hogan Lovells probe determined that, of the more than 3,000 letters of authorization accounting for more than SGD$1.4 billion in customer-to-customer transfers executed between 2013 and 2017, letters authorizing transfers for SGD$365 million (or more than 26%) bore signatures that appeared similar – supporting the inference that these were likely photocopied duplicates and unauthorized transfers.

**ANSWER:** Defendants admit that Hogan Lovells was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants deny the remaining allegations in paragraph 280.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

281.    Finally, in 2020, LVS retained a second law firm, Davinder Singh, to conduct a second investigation of the unauthorized transfers at MBS, having already paid Hogan Lovells to conduct a similar investigation.

**ANSWER:**    Defendants admit that Davinder Singh is a law firm in Singapore, but deny that Davinder Singh was hired to conduct an investigation at MBS. Defendants deny the remaining allegations in paragraph 281.

282.    The presence of multiple internal probes all centered on the same facts during the same period evidences the Individual Defendants' recklessness in not uncovering such activity earlier and actual knowledge following the completion of the internal undisclosed probes, and supports an inference of the Individual Defendants' scienter.

**ANSWER:**    Defendants deny the allegations in paragraph 282.

283.    As a result of the unauthorized transfer practice, investigations into MBS were commenced by the United States Department of Justice, Singapore Police, and Singapore CRA.

**ANSWER:**    Defendants admit that the U.S. Department of Justice, Singapore police, and CRA made inquiries following the filing of Wang Xi's lawsuit. Defendants deny the remaining allegations in paragraph 283.

284.    In January 2020, the United States Department of Justice issued a grand jury subpoena to a former compliance chief of MBS "seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls." In the context of this grand jury process, prosecutors also asked this former compliance head to produce records related to any such regulatory violations, including the use of gambling junkets and third-party lending using casino credit. The pendency of the grand jury process and DOJ investigation into MBS was first reported by *Bloomberg* in June 2020,[15] with individuals familiar with the process indicating to *Bloomberg* reporters (who also saw the confidential subpoena) that the investigation was "likely in its early stage."

**ANSWER:**    Defendants admit that the U.S. Department of Justice made inquiries following the filing of Wang Xi's lawsuit. Defendants admit that paragraph 284 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 284.

285.    *Bloomberg* further announced in May 2020 that the Singapore police had commenced a probe in response to the Wang lawsuit regarding the unauthorized transfer of funds between accounts. The Singapore police declined comment in a September 16, 2020 *Bloomberg* article, indicating that it did not comment on ongoing investigations.

---

[15]    https://www.bloomberg.com/news/articles/2020-06-04/adelson-s-singapore-casino-probed-over-money-laundering-controls

**ANSWER:** Defendants admit that paragraph 285 purports to characterize statements in a document written by a non-party, but deny the allegations to the extent they mischaracterize or selectively describe the statements. Defendants deny the remaining allegations in paragraph 285.

286. Additionally, allegations of authorized transfers at MBS triggered an investigation by the CRA, which concluded in or around September 2020 that, while MBS did not breach requirements related to Wang's claims, "there were weaknesses in MBS's casino control measures pertaining to fund transfers." Further, in a statement to *Bloomberg*, the CRA stated that it "takes a serious view of such matters and had directed MBS to strengthen its control measures, which MBS has since undertaken. CRA will continue to exercise close oversight to ensure that MBS's measures are effective."

**ANSWER:** Defendants admit that paragraph 286 purports to quote and characterize statements in documents written by non-parties, but deny the allegations that selectively quote the statements.

287. The fact that the activity alleged herein triggered external investigations by several disparate organizations, and that two of those three investigations appear to have been ongoing at the end of the Class Period, supports an inference of the Individual Defendants' scienter.

**ANSWER:** Defendants deny the allegations in paragraph 287.

288. As alleged herein, MBS operates under significant regulatory scrutiny in Singapore, particularly with respect to its money lending practices. Further, as one of only two licensed casino operators in the country, the CRA pays close attention to MBS.

**ANSWER:** Defendants admit that Singapore's Casino Regulatory Agency is an agency that regulates the operation of casinos in Singapore, including MBS. Defendants further admit that MBS is one of only two casino properties licensed to operate in Singapore and that the CRA pays close attention to MBS. Defendants deny any remaining allegations in paragraph 288.

289. However, what has become clear is that during the Class Period, several MBS functions, including its compliance arm, failed to prevent the unauthorized transfers uncovered by the casino and its outside counsel's probes. Where MBS's compliance function was wholly deficient and incapable of meeting the requirements of the regulatory environment in which it operated, and the Individual Defendants were both aware of those regulatory restrictions and knew or recklessly disregarded the internal control shortcomings, the Individual Defendants' scienter can be inferred.

**ANSWER:** Defendants deny the allegations in paragraph 289.

290. Moreover, the Individual Defendants certified every quarter that LVS maintained adequate internal controls. Thus, Defendants' violations of local laws and regulations, as well as the Company's internal credit lending policies and procedures, supports an inference of scienter.

**ANSWER:** Defendants admit that Sheldon Adelson, Patrick Dumont, and Robert Goldstein have made certifications in certain of LVS's quarterly SEC filings regarding LVS's

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

internal controls. Defendants state that LVS's SEC filings speak for themselves, and that each of LVS's SEC filings is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 290.

291.    Frequent turnover within MBS's compliance department, including at its highest level with the chief compliance officer, supports an inference of scienter.

**ANSWER:**    Defendants deny the allegations in paragraph 291.

292.    In its June 4, 2020 article, *Bloomberg* noted that MBS had at least six chief compliance officers in the prior decade.[16]

**ANSWER:**    Defendants admit that paragraph 292 purports to characterize statements in a document written by a non-party, but deny the allegations to the extent they mischaracterize or selectively describe the statements.

293.    Additionally, a former compliance executive interviewed as part of the internal investigation at MBS stated he had attempted to bring up and rectify the issues surrounding the unauthorized transfers, only to be told to back off by the operations and legal teams.[17] Later, his contract with MBS went unrenewed and he was out of a job.

**ANSWER:**    Defendants admit that paragraph 293 purports to characterize statements in the document written by a non-party cited in the footnote in paragraph 293, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements or the document. Defendants deny the remaining allegations in paragraph 293.

294.    These warnings from above were not limited only to compliance executives, however, as CW-1 recalled being told by a manager in the Compliance department to avoid submitting so many suspicious transaction reports, effectively limiting the scope of the compliance function. Likewise, CW- 2 recalled the significant power wielded by the International Marketing Department and the absence of any internal reporting system to address unethical or improper behavior among MBS employees.

**ANSWER:**    Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 294.

---

[16]    https://www.bloomberg.com/news/articles/2020-06-04/adelson-s-singapore-casino-probed-over-money-laundering-controls

[17] https://www.bloomberg.com/news/articles/2020-12-21/sheldon-adelson-s-singapore-casino-paid-price-for-courting-china-s-high-rollers

295.    LVS and the Individual Defendants also cultivated a "tone at the top" that showed a willingness to sacrifice regulatory compliance (and possible fines) in exchange for casino growth.

**ANSWER:**    Defendants deny the allegations in paragraph 295.

296.    For example, in 2013, LVS agreed to return over $47 million to the United States Government to avoid criminal prosecution and conclude an investigation into whether employees at LVS's Venetian-Palazzo hotel in Las Vegas failed to alert authorities that a high stakes gambler later linked to international drug trafficking was making numerous large and suspicious deposits.[18]

**ANSWER:**    Defendants admit that in 2013 LVS settled an investigation related to events from 2005-2007 at its Venetian hotel in Las Vegas. Defendants deny the remaining allegations in paragraph 296.

297.    In April 2016, LVS agreed to pay $9 million to end a five-year SEC probe into whether LVS violated the Foreign Corrupt Practices Act ("FCPA") when it transferred tens of millions of dollars to a "consultant" who served as a middleman to LVS's business interests in China and Macao.[19] As set forth in the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Finds, and Imposing a Cease-and-Desist Order filed April 7, 2016 in the Administrative Proceeding captioned *In the Matter of Las Vegas Sands Corp.*, File No. 3-17204, LVS "did not devise and maintain a reasonable system of internal accounting controls over operations in Macao and China to ensure that access to assets was permitted and that transactions were executed in accordance with management's authorization; in addition, that transactions were recorded as necessary to maintain accountability for assets, particularly with regard to the accounts payable process, the purchasing process, due diligence, and controls surrounding contracts."

**ANSWER:**    Defendants admit that in 2016, without admitting or denying the SEC's allegations, LVS settled an investigation by the SEC with respect to certain of LVS's operations in China during 2006–2011. Defendants admit that the second sentence of paragraph 297 purports to quote and characterize statements in the SEC order dated April 7, 2016 (the "2016 SEC Order"), but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements. Defendants further state that the SEC's 2016 Order speaks for itself, and that it is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 297.

298.    In response to the SEC's probe, LVS purportedly hired a new general counsel and new heads of internal audit and compliance functions and established "a new Board of Directors Compliance Committee and increased the compliance and accounting budgets."

---

[18] https://www.justice.gov/usao-cdca/pr/operator-venetian-resort-las-vegas-agrees-return-over-47-million-after-receiving-money
[19] https://www.sec.gov/news/pressrelease/2016-64.html

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants admit that paragraph 298 purports to quote and characterize statements in the 2016 SEC Order, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements. Defendants state that the SEC's 2016 Order speaks for itself, and that it is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 298.

299. In addition to payment of the fine, LVS was also required to retain an independent consultant within sixty days of the SEC's order (i.e., by June 2016) for a period of two years. This consultant was required to have the following minimum qualifications: demonstrated expertise with respect to the FCPA, including experience counseling on FCPA issues; experience designing and/or reviewing corporate compliance policies, procedures, and internal controls, including FCPA-specific policies, procedures and internal controls.

**ANSWER:** Defendants admit that paragraph 299 purports to characterize statements in the 2016 SEC Order, but deny the allegations to the extent they mischaracterize the statements. Defendants state that the SEC's 2016 Order speaks for itself, and that it is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 299.

300. Further, the consultant's responsibility for the two-year engagement period was to "review and evaluate [LVS'] internal controls, record-keeping and financial reporting policies and procedures ('Policies and Procedures') as they relate to its compliance with the books and records, internal accounting controls, and anti-bribery provisions of the FCPA ('the FCPA Policies') and to make recommendations." The consultant was also tasked with "consider[ing] whether the ethics and compliance function has sufficient resources, authority, and independence, and provides sufficient training and guidance."

**ANSWER:** Defendants admit that paragraph 300 purports to quote and characterize statements in the 2016 SEC Order, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements. Defendants state that the SEC's 2016 Order speaks for itself, and that it is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 300.

301. According to the SEC's order, this consultant would be required to issue a written report within six months of retention and review of LVS's policies and procedures: "(a) summarizing its review and evaluation, and (b) if necessary, making recommendations based on its review and evaluation that are reasonably designed to improve [LVS'] Policies and Procedures." This report was required to be provided to LVS's Board of Directors and LVS was required to adopt any recommendations from the compliance consultant, or agreed-upon alternatives, within six months.

**ANSWER:** Defendants admit that paragraph 301 purports to quote and characterize statements in the 2016 SEC Order, but deny the allegations to the extent they mischaracterize or

inaccurately or selectively quote the statements. Defendants state that the SEC's 2016 Order speaks for itself, and that it is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 301.

302.   As this consultant was required to be retained, and would have been at LVS for much of the Class Period and was required to report on LVS's compliance function and its shortcomings within six months of engagement, it is reasonable to infer that the consultant likely uncovered and raised to LVS management the ongoing compliance deficiencies at MBS that resulted in the unauthorized transfers and which likely contributed to later compliance protocol adjustments in April 2018.

**ANSWER:**   Defendants deny the allegations in paragraph 302.

303.   Relatedly, in 2017, LVS agreed to pay nearly $7 million to resolve the FCPA investigation into the Company by the United States Department of Justice, entering into a non-prosecution agreement.

**ANSWER:**   Defendants admit the allegations in paragraph 303. Defendants further state that the non-prosecution agreement referenced in paragraph 303 speaks for itself, and that it is a unitary document that should be read as a whole.

304.   Additionally, in 2016, LVS settled a six-year-old wrongful termination lawsuit instituted by Steve Jacobs, the former CEO of Las Vegas Sands China. In his suit, Jacobs claimed he was fired for refusing to carry out illegal demands made by Defendant Adelson, including an order that Jacobs conduct secret investigations into the affairs of Macao's government officials so the information could be used as leverage in future dealings.[20] The confidential settlement was reported to have been in excess of $75 million.[21]

**ANSWER:**   Defendants admit that in 2016, LVS settled an action instituted by Steve Jacobs. Defendants admit that paragraph 304 purports to characterize statements in documents written by non-parties, but deny the allegations to the extent they mischaracterize the statements. Defendants deny the remaining allegations in paragraph 304.

305.   Each of these facts illustrates a culture at the highest levels of LVS exhibiting disregard for regulatory restrictions, supporting an inference of the Individual Defendants' scienter.

**ANSWER:**   Defendants deny the allegations in paragraph 305.

306.   According to its SEC filings, throughout the Class Period LVS maintained both a Board Compliance Committee and an Operational Compliance Committee, each of which was tasked with overseeing and monitoring the compliance operations at LVS's portfolio casinos, including MBS.

---

[20]   https://www.forbes.com/sites/robertolsen/2011/03/02/las-vegas-sands-reveals-sec-probe-into-macau-business/?sh=f32bbe93defa

[21]   https://www.wsj.com/articles/las-vegas-sands-to-pay-more-than-75-million-to-settle-suit-filed-by-former-macau-ceo-1464752315

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**ANSWER:** Defendants admit that throughout the putative class period, LVS's Board of Directors had a Compliance Committee and LVS had an Operational Compliance Committee. Defendants further admit that each of these committees oversaw and monitored certain compliance matters, including certain compliance matters relating to MBS and LVS's other operations. Defendants deny the remaining allegations in paragraph 306.

307. According to the LVS Proxy Statement filed on Form DEF 14A with the SEC on April 22, 2016, the Board Compliance Committee:

> operates under a written charter and **assists the Board in overseeing [LVS'] compliance program** with respect to: (a) **compliance with the laws and regulations applicable to the Company's business, including gaming laws**; and (b) compliance with the Company's Code of Business Conduct and Ethics, its Anti-Corruption Policy Including Guidelines on Travel and Entertainment Expenses and Customer Complimentaries for Government Officials, its Statement on Reporting Ethical Violations, its anti-money laundering policies and related policies and procedures applicable to the Company's team members, officers, directors and other agents.

**ANSWER:** Defendants deny that the statements quoted in paragraph 307 contain the emphasis that has been added to them, but otherwise admit that LVS's proxy statement filed on Form DEF 14A with the SEC on April 22, 2016 (the "2016 Proxy Statement") contains those quoted statements. Defendants state that LVS's 2016 Proxy Statement speaks for itself, and is a unitary document that should be read as a whole.

308. The charter for the compliance committee was subsequently amended several times throughout the Class Period. Based on the charter adopted for the Board Compliance Committee on July 25, 2017,[22] the Compliance Committee's purpose was:

> The Compliance Committee (the "Committee") **shall assist the Board in overseeing the Company's compliance program** with respect to: (a) compliance with the laws and regulations applicable to the Company's business, including gaming laws; and (b) compliance with the Company's Code of Business Conduct and Ethics, its Anti-Corruption Policy, its Statement on Reporting Ethical Violations, its anti-money laundering policies and related policies and procedures (collectively, the "Policies") applicable to the Company's team members, officers, directors, and other agents.

**ANSWER:** Defendants admit that the Compliance Committee charter was amended at times between 2016 and 2020. Defendants deny that the statements quoted in paragraph 308 contain the emphasis that has been added to them, but otherwise admit that the Compliance Committee

---

[22] https://s21.q4cdn.com/635845646/files/doc_downloads/committee-charters/new/Compliance-Committee-Charter-July-2017.pdf

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

charter adopted July 25, 2017 contains those quoted statements. Defendants state that the Compliance Committee charter speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 308.

309.    Further, the committee was granted the following authority and responsibilities:

1.      Provide oversight as needed to **ensure that the Company's compliance program effectively prevents and/or detects violations by the Company's team members, officers, directors, and other agents of law, regulation, the Policies, and any special conditions imposed on the Company by any governmental or regulatory authority**.

2.      **Oversee the compliance review process** to ensure that the vendors (including consultants) and customers with which the Company does business are entities/individuals: (a) that will cooperate with appropriate regulatory authorities; (b) that are "suitable" or "qualified" as those terms are used by applicable gaming and other authorities; and (c) whose role with the Company is not likely to result, in the judgment of the Committee, in the Company's failure to obtain, maintain, renew or qualify for a license, concession, contract, franchise or other governmental or regulatory approval with respect to the operation or conduct of the Company's business.

3.      **Review resources assigned to the Company's compliance program to assess their adequacy relative to the program's effectiveness**.

4.      Periodically meet separately with the Company's Global Chief Compliance Officer and **receive reports of relevant conduct, misconduct, and such other issues as the Global Chief Compliance Officer deems appropriate**. The Global Chief Compliance Officer **shall report to the Committee** potential criminal acts and serious violations of the Policies committed by the Company's team members, officers, directors, and other agents, including vendors and customers, and all disciplinary actions and remedial measures involving compliance infractions as soon as practicable after the Global Chief Compliance Officer becomes aware of them and no later than the next scheduled meeting of the Committee.

5.      Review annually the list of charitable donations, political contributions and lobbying expenditures.

6.      Receive in its discretion **reports from management on internal messaging to team members regarding the Company's commitment to behavior and practices that comply with law, as well as the Company's efforts to promote a culture of compliance**.

7.      Review and discuss with the Global Chief Compliance Officer the quarterly reports in connection with the Company's team member confidential hotline.

8.      **Review and discuss with the Global Chief Compliance Officer the quarterly reports of the Company's internal Operational Compliance Committee meetings**.

9.      Review periodic reports on matters of which the **Company has sought advice from external legal counsel or professional consultants in the areas of anticorruption, anti-money laundering and other compliance matters** and

75

review briefings from the Company regarding recent legal or regulatory changes in these areas.

10. Review with the Global Chief Compliance Officer any **correspondence with regulatory or government agencies** that raise material issues regarding the Company's compliance program.

11. **Review and assess the adequacy of the Policies at least annually** and recommend to the Board any changes deemed appropriate by the Committee.

12. Review and assess the adequacy of this Charter annually and recommend to the Board any changes deemed appropriate by the Committee.

13. Review its own performance annually.

14. Perform any other activities consistent with this Charter, the Company's bylaws and governing law, as the Committee or the Board deems appropriate.

**ANSWER:** Defendants deny that the statements quoted in paragraph 309 contain the emphasis that has been added to them, but otherwise admit that the Compliance Committee charter adopted July 25, 2017 contains those quoted statements. Defendants state that the Compliance Committee charter speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 309.

310. The Compliance Committee charter also provided that the committee would report periodically to the whole Board "(a) following meetings of the Committee, (b) with respect to such other matters as are relevant to the discharge of the Committee's duties and responsibilities, and (c) with respect to such recommendations as the Committee may deem appropriate from time to time."

**ANSWER:** Defendants admit that the Compliance Committee charter adopted July 25, 2017 contains the statements quoted in paragraph 310. Defendants state that the Compliance Committee charter speaks for itself, and is a unitary document that should be read as a whole.

311. On July 24, 2018, a similar version of charter was adopted[23] with one telling amendment – the purpose of the committee was amended to include reference to the Company's Reporting and Non- Retaliation Policy, an important inclusion as, prior to the amendment, a former LVS compliance executive informed the Company of the unauthorized transfer issues only be told by the operations and legal departments to back off, then have his contract not renewed:

The Compliance Committee (the "Committee") shall assist the Board in overseeing the Company's compliance program with respect to: (a) compliance with the laws and regulations applicable to the Company's business, including gaming laws; and (b) compliance with the Company's Code of Business Conduct and Ethics, its Anti-Corruption Policy, its Anti-Money Laundering Policy, **and its Reporting and Non-**

---

[23] https://s21.q4cdn.com/635845646/files/doc_downloads/committee-charters/2018/Compliance-Committee-charter-July-24-2018.pdf

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**Retaliation Policy** (collectively, the "Policies") applicable to the Company's directors, officers, team members, contractors and agents.

**ANSWER:** Defendants admit that a version of the Compliance Committee charter was adopted on July 24, 2018. Defendants admit that paragraph 311 purports to quote and characterize statements in the Compliance Committee charter adopted July 24, 2018, but deny the allegations that mischaracterize the statements. Defendants deny the remaining allegations in paragraph 311.

312. Then, on July 23, 2019, a new charter was adopted,[24] substantively amending the authority and responsibilities to mandate that the committee meet on a quarterly basis (as opposed to previous language which used the nebulous term "periodically"). Further, new provisions were added to the committee's responsibilities, providing that it must:

10. Receive summary reports from management or the Global Chief Compliance Officer that directors, officers, employees in high-risk and control functions, and, where appropriate, agents and business partners, have completed periodic compliance training and confirmed compliance with Company policies and procedures.

\* \* \*

13. Review, based upon the recommendation of the Global Chief Compliance Officer, the scope and plan of the work to be done by the compliance group and the responsibilities, budget and staffing needs of the compliance group.

14. Review on an annual basis the performance of the compliance group and the Global Chief Compliance Officer.

**ANSWER:** Defendants admit that a version of the Compliance Committee charter was adopted on July 23, 2019. Defendants admit that paragraph 312 purports to quote and characterize statements in the Compliance Committee charter adopted July 23, 2019, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants deny the remaining allegations in paragraph 312.

313. As the purpose of the Board Compliance Committee was to oversee and report on compliance issues across LVS's portfolio to the Board, and Defendant Adelson sat atop the Board as its Chairman and Defendant Goldstein a Board member, it is reasonable to infer that the Board Compliance Committee both learned of and reported the unauthorized transfer process, supporting an inference of defendants Adelson's and Goldstein's scienter.

**ANSWER:** Defendants admit that the Compliance Committee oversaw and reported to LVS's Board on certain compliance matters, that Mr. Adelson was the chairman of LVS's Board,

---

[24] https://s21.q4cdn.com/635845646/files/doc_downloads/committee-charters/2019/Compliance-Committee-Charter-Final-July-23-2019.pdf

77

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

and that Mr. Goldstein was and continues to be a member of LVS's Board. Defendants deny the remaining allegations in paragraph 313.

314.    Additionally, LVS maintained a Non-Board Operational Compliance Committee, described in its SEC filings as follows:

The Company has an operational compliance committee (the "Operational Compliance Committee") that operates under a written regulatory Compliance Program approved by the Nevada Gaming Control Board. The Company created the Operational Compliance Committee to **exercise its best efforts to identify and evaluate situations arising in the course of the Company's businesses, wherever conducted, which may have an adverse effect upon its objectives or those of gaming control and thereby cause concern to any gaming authority**. The Operational Compliance Committee **monitors the Company's activities so as to assist the Company's senior management** with regard to the Company's **(a) business associations**, that is, to protect the Company from associations with persons denied licensing or other related approvals, or who may be deemed unsuitable to be associated with the Company; **(b) business practices and procedures; (c) compliance with any special conditions imposed upon the Company's license(s)**; (d) reports submitted to gaming authorities; and **(e) compliance with the laws, regulations and orders of governmental agencies having jurisdiction over the Company's gaming or business activities**. The Company's Senior Vice President and Chief Compliance Officer is the Chair of the Operational Compliance Committee. The Operational Compliance Committee also has an independent member who is not otherwise employed by the Company and who possesses a background in and extensive experience with gaming control in Nevada. The remaining members of the Operational Compliance Committee are employees of the Company.

**ANSWER:**    Defendants admit that LVS had an Operational Compliance Committee. Defendants deny that the statements quoted in paragraph 314 contain the emphasis that has been added to them, but otherwise admit that LVS's 2016 Proxy Statement contains those quoted statements. Defendants state that LVS's 2016 Proxy Statement speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 314.

315.    This description of the Operational Compliance Committee in the Company's proxy statement was amended in 2017 to indicate that the chair of the Operational Compliance Committee "provides quarterly updates to the Compliance Committee."

**ANSWER:**    Defendants admit that paragraph 315 purports to quote and characterize statements in LVS's proxy statement filed on Form DEF 14A with the SEC on April 21, 2017 (the "2017 Proxy Statement"), but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements. Defendants state that LVS's 2017 Proxy Statement speaks for

itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 315.

316.    The 2020 Proxy Statement filed with the SEC on April 1, 2020 amended this description, making clear that "[t]he Company has operational compliance committees (the 'Operational Compliance Committees') **for each of its gaming operations** in Las Vegas, Macao, and **Singapore**."

**ANSWER:**    Defendants admit that paragraph 316 purports to quote and characterize statements in LVS's proxy statement filed on Form DEF 14A with the SEC on April 1, 2020 (the "2020 Proxy Statement"), but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, or add emphasis to the statements. Defendants state that LVS's 2020 Proxy Statement speaks for itself, and is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 316.

317.    Further, CW-1 stated that, during CW-1's tenure at MBS, CW-1 attended six to eight meetings (approximately every one to three months) with LVS's Global Chief Compliance Officer, MBS's chief financial officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, as well as Daphne Hearn, who took over the role of MBS Chief Compliance Officer in September 2014. According to CW-1, the issue of the unusually high number of STRs coming from MBS was discussed and CW-1 and other attendees often raised why so many reports were required, only to never have a solution presented or addressed.

**ANSWER:**    Defendants lack knowledge or information regarding the confidential witnesses' identities and the purported statements they are alleged to have made to Plaintiffs, and therefore deny those allegations. Defendants further deny the substance of the statements purportedly made by the confidential witnesses and deny the remaining allegations in paragraph 317.

318.    At the time of these meetings, LVS maintained its operational compliance committee, atop which the Global Chief Compliance Officer sat, with the stated goal of "assist[ing] the Company's senior management." As such, it is reasonable to infer that knowledge of the suspicious transfer practice that ultimately spurred these six to eight meetings attended by CW-1 ultimately made its way to defendants Adelson, Dumont, and Goldstein – the very members of senior management the operational compliance committee was designed to assist.

**ANSWER:**    Defendants admit that LVS had an Operational Compliance Committee and that paragraph 318 purports to quote and characterize statements in certain of LVS's proxy statements, but deny the allegations to the extent they mischaracterize or inaccurately or selectively quote the statements. Defendants state that LVS's proxy statements speak for themselves, and that

each of LVS's proxy statements is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 318.

319.    As, at all relevant times, LVS maintained an operational compliance committee designated to oversee the compliance function at MBS and to monitor ongoing casino activities for the benefit of LVS's senior management (including defendant Adelson as CEO, defendant Dumont as CFO, and defendant Goldstein as COO), the scienter of the Individual Defendants can be inferred with respect to the unauthorized transfer process in Singapore.

**ANSWER:**    Defendants admit that LVS had an Operational Compliance Committee and that LVS's Operational Compliance Committee oversaw and monitored certain compliance matters, including certain compliance matters relating to MBS and LVS's other operations. Defendants deny the remaining allegations in paragraph 319.

320.    LVS's exclusive license to operate as one of only two casinos in Singapore was set to expire in 2017. As part of the casino license review process, Section 45 of the Casino Control Act states:

Matters to be considered in determining applications

**45.**—(1) The Authority shall not grant an application for a casino licence unless the Authority is satisfied that ***the applicant, and each associate of the applicant***, is a suitable person to be concerned in or associated with the management and operation of a casino.

(2) In particular, the Authority shall consider whether —

(a)    each such person is of good repute, having regard to character, honesty and integrity;

(b)    each such person is of sound and stable financial background;

(c)    in the case of an applicant that is not a natural person, the applicant has, or has arranged, a satisfactory ownership, trust or corporate structure;

(d)    the applicant has or is able to obtain financial resources that are adequate to ensure the financial viability of the proposed casino and the services of persons who have sufficient experience in the management and operation of a casino;

(e)    the applicant has sufficient business ability to establish and maintain a successful casino;

(f)    ***any of those persons has any business association with any person, body or association who or which, in the opinion of the Authority, is not of good repute having regard to character, honesty and integrity or has undesirable or unsatisfactory financial resources***;

(g)    each director, partner, trustee, executive officer and secretary and any other officer or person determined by the Authority to be associated or connected

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

with the ownership, administration or management of the operations or business of the applicant is a suitable person to act in that capacity;

(h) any person proposed to be engaged or appointed to manage or operate the casino is a suitable person to act in that capacity;

(ha) *the applicant is a suitable person to develop, maintain and promote the integrated resort (of which the casino is a part) as a compelling tourist destination which meets prevailing market demand and industry standards and contributes to the tourism industry in Singapore; and*

(i) any other matter that may be prescribed.

**ANSWER:** Defendants admit that MBS is one of only two casino properties licensed to operate in Singapore, and that its license was in effect during an initial exclusivity period that expired on February 28, 2017 and was extended in 2019. Defendants admit that the allegations in paragraph 320 purport to quote and characterize § 45 of Singapore's Casino Control Act, but deny the allegations to the extent they mischaracterize, inaccurately or selectively quote, or add emphasis to the statements. The remaining allegations in paragraph 320 assert legal conclusions and characterizations to which no further response is required.

321. Given the nature of MBS's position in Singapore as one of just two licensed casinos, the Individual Defendants were uniquely motivated to perpetrate the fraud alleged herein to maintain MBS as a "compelling tourist destination" for the purposes of its license renewal, and to then continue to hide the true nature of the unauthorized transfer activity by MBS employees to avoid any licensure backlash.

**ANSWER:** Defendants deny the allegations in paragraph 321.

322. Notably, while exclusivity for MBS in Singapore ended in 2017, the period was not extended until 2019, with the CRA presumably conducting its review of MBS in the intervening period.

**ANSWER:** Defendants admit that MBS was granted the right to operate a casino in Singapore during an initial exclusivity period that expired on February 28, 2017, which was extended in 2019. Defendants further state that the CRA has repeatedly renewed MBS's casino license, including in April 2019, following the CRA's consideration of, among other factors, MBS's record of compliance with applicable legal and regulatory requirements. Defendants deny the remaining allegations in paragraph 322.

323. As part of its original deal with the Singaporean government to secure the licensing to operate in the country, LVS agreed that it would limit its interactions with Singaporean citizens or permanent residents by enforcing a casino entry levy (currently SGD$150 for a 24-hour period

81

and SGD$3,000 for a year) and restricted the extension of credit to those citizens or permanent residents who qualified as "premium players."

**ANSWER:** Defendants admit that Singapore's Casino Control Act has provisions regarding an entry levy for citizens and permanent residents of Singapore and provisions regarding credit, and that LVS is obligated to comply with those provisions. Defendants state that these provisions speak for themselves, and that the CCA should be read as a whole. Defendants deny the remaining allegations in paragraph 323.

324. This meant that MBS was predominantly focused on attracting tourists, who necessarily need a place to sleep when visiting the casino. This presented a bottleneck for LVS in Singapore, as MBS was already running near full capacity. As described by LVS Senior Vice President of Investor Relations Daniel Briggs at J.P. Morgan's Gaming, Lodging, Restaurant & Leisure Management Access Forum on March 8, 2018:

*Joseph Richard Greff*
Great. Next question? So let's talk a little bit about Marina Bay Sands in Singapore. How – can that property grow cash flows without having any increase in revenue-generating inputs like traditional hotel rooms?

*Daniel J. Briggs*
So Marina Bay Sands has been another huge success for us. It is generating, I think, $1.6 billion, $1.7 billion last year. We held a little heavy but it just makes a tremendous amount of money. We did invest $5.5 billion in the building, so it's been a very, very big investment. Its retail business is growing very nicely. Year-over-year our tenant sales per square foot is up actually 15%. So it's rare that you have a mall and – a mall that's actually growing at 15%, but we've got great customers at Marina Bay Sands and it's a beautiful place to be, a trophy asset. **The gaming business is not going to grow from Singaporeans. So Singapore has designed the market so that, effectively, it's – they're discouraging local people to come into the casino. So that avenue of growth is not available to us and we're happy that it's not. And this was the agreement when we went into Singapore. We knew that it was built for foreigners, for tourists. So growing in the mass business is going to be very difficult. If we had more hotel rooms, we could absolutely grow more because weekends and holidays during peak periods, with more hotel inventory, you will get benefit throughout the property**. We don't have anything to announce yet with respect to that. We would love to add more hotel, more retail, more entertainment, more convention and exhibition there, but we don't have anything to announce today other than our interest in doing that, which the government is aware of. Can it grow from here? I think VIP is seeing a nice resurgence globally. Obviously, we talked about the Macao VIP market going from $30 billion to $12 billion during the contraction and now growing back to $16 billion – $15 billion, $16 billion in Macao. **In Singapore, that VIP market between the 2 operators there, it's a duopoly, probably peaked at about $3 billion and then contracted to maybe $1.5 billion. Today, it's probably growing, going more toward, say, $2 billion. So it can grow. I think the one thing that happened in Singapore that really increased our profitability over the last year or so is it that we've been very disciplined and prudent about our reinvestment rate in VIP**, and our competitor there has also been very disciplined and prudent. So I think the EBITDA production in that market has increased for both of the operators in VIP. That's something we'd like to see continue. And if the VIP

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

82

business does grow, naturally, that's a place where we could continue to benefit. But I would just warn everyone that VIP is going to be more cyclical than a basic mass business and rich people tend to spend little less money when their property values go down or there's a contraction in the economic cycle, and so you will see, I think, a little more volatility in the earnings power that comes from the VIP segment.

**ANSWER:**    Defendants admit that the allegations in paragraph 324 purport to quote and characterize statements made by Daniel J. Briggs at J.P. Morgan's Gaming, Lodging, Restaurant & Leisure Management Access Forum on March 8, 2018, but deny the allegations that mischaracterize, inaccurately or selectively quote, or add emphasis to the statements. Defendants deny the remaining allegations in paragraph 324.

325.    Defendant Goldstein echoed the sentiment on a July 25, 2018 analyst call, stating in response to an analyst's question regarding the competitive landscape in Singapore that the "[h]otel is sold out. If anything, we lack in that market, Stephen, it's more capacity. What's frustrating is we just need more – we'd love to have more sleeping rooms and more gaming capacity."

**ANSWER:**    Defendants admit that, subject to the existence of errors in transcription, the statements quoted in paragraph 325 represent a partial quotation of statements made by Robert Goldstein during an earnings call on July 25, 2018. Defendants deny the remaining allegations in paragraph 325.

326.    Without the means to derive organic growth through additional mass gaming (e.g., more hotel rooms), the Individual Defendants and Company management were motivated to engage in the scheme alleged herein, and issue the false and misleading statements, to artificially bolster MBS's VIP gaming segment.

**ANSWER:**    Defendants deny the allegations in paragraph 326.

327.    In addition to the inference of LVS's scienter stemming from the above-alleged scienter of Individual Defendants Adelson, Dumont, and Goldstein, LVS's corporate scienter is further evidenced by the actions of its employees.

**ANSWER:**    Defendants deny the allegations in paragraph 327.

328.    As set forth herein, MBS employees oversaw a pervasive scheme of unauthorized transfers totaling hundreds of millions of dollars and spanning several years.

**ANSWER:**    Defendants deny the allegations in paragraph 328.

329.    Further, members of MBS's Finance and International Marketing departments were allowed to operate unchecked by MBS's ineffective Compliance department.

**ANSWER:**    Defendants deny the allegations in paragraph 329.

330.    When employees sought to put a halt to the unauthorized transfer practice, they were told to back down and pushed out of their positions, as described by the former MBS compliance executive in his interview in connection with LVS's internal probe.

**ANSWER:**    Defendants deny the allegations in paragraph 330.

331.    Further, given the outsized role MBS played in LVS's portfolio, and the magnitude of the unauthorized transfers in the context of total internal transfers carried out at MBS, LVS employees either knew or recklessly disregarded the unauthorized transfer scheme occurring at MBS.

**ANSWER:**    Defendants deny the allegations in paragraph 331.

332.    Additionally, the Company maintained both a Board Compliance Committee and Operational Compliance Committee responsible for overseeing compliance at LVS's portfolio casinos, including at MBS. Members of these committees either knew or recklessly disregarded the ongoing unauthorized transfer practice, as evidenced by both their required responsibilities and the fact that a former compliance executive specifically reported the issue, only to be told to back off and later have his contract not renewed.

**ANSWER:**    With regard to the first sentence in paragraph 332, Defendants admit that LVS's Board of Directors had a Compliance Committee and LVS had an Operational Compliance Committee, and that each of these committees oversaw and monitored certain compliance matters, including certain compliance matters relating to MBS and LVS's other operations. Defendants deny the remaining allegations in paragraph 332.

333.    Further, the requirements agreed to by the Company as part of its April 7, 2016 settlement with the SEC in the Administrative Proceeding captioned *In the Matter of Las Vegas Sands Corp.*, File No. 3-17204, necessarily required the Company to adopt a strengthened system of compliance oversight, resulting in several high-ranking members of LVS either knowing or recklessly disregarding the ongoing unauthorized transfer practice at MBS.

**ANSWER:**    Defendants admit that LVS agreed to requirements set forth in the 2016 SEC Order that is referenced in paragraph 333. Defendants further state that the 2016 SEC Order speaks for itself, and that it is a unitary document that should be read as a whole. Defendants deny the remaining allegations in paragraph 333.

334.    As MBS was an essential part of LVS's business and operated within its core operation of casinos, the scienter of LVS can be inferred from the action of its employees.

**ANSWER:**    Defendants admit that MBS is important to LVS's business operations. Defendants deny the remaining allegations in paragraph 334.

335.    At all relevant times, the market for LVS securities was open, well-developed, and efficient. During the Class Period, Defendants named in this Action materially misled the investing public by publicly issuing false and/or misleading statements and/or omitting material facts necessary to make their statements, as set forth herein, not false and/or misleading, thereby inflating

the price of LVS securities. These material misstatements concerned the regulatory compliance and risks associated with one of the Company's primary profit centers, MBS. Defendants' materially false or misleading statements and omissions of material fact, as alleged above in Section VII, caused the price of LVS's securities to be artificially inflated and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiffs and other Class Period purchasers of LVS's securities.

**ANSWER:**   Defendants deny the allegations in paragraph 335.

336.    Plaintiffs and other members of the Class purchased or otherwise acquired LVS securities relying upon the integrity of the market for LVS stock and market information related to the Company and have been damaged thereby.

**ANSWER:**   Defendants deny the allegations in paragraph 336.

337.    As Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of LVS's securities was removed, and the price of LVS's shares fell or traded lower than the market and LVS's peers on the same day.

**ANSWER:**   Defendants deny the allegations in paragraph 337.

338.    The first partial corrective disclosure occurred on September 26, 2019, when Wang Xi filed his statement of claim in the High Court of Singapore, alleging that MBS had improperly transferred approximately $6.6 million USD from his account to other patrons at MBS without his permission between October and December 2015. On the same day, LVS's stock price declined, closing at $55.88 per share – a $1.20 decline over the prior day's close.

**ANSWER:**   Defendants state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 338.

339.    News of Wang's lawsuit was amplified by news media on October 10, 2019, when Bloomberg published its article titled "Singapore Sands Sued by Chinese Ex-Client Claiming $6.6 Million" before market open. As the article was largely publicizing the previously filed suit, the impact to the Company's stock price laid in comparison to its peer index, as LVS stock underperformed on the date compared to its peers.

**ANSWER:**   Defendants state that Plaintiffs' Opposition stated that Plaintiffs are not alleging October 10, 2019 as a corrective disclosure. (Opposition at 36 n.14.) Accordingly, no response is required. To the extent a response is required, Defendants admit that paragraph 339 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants further state that the prices at which LVS's stock and its peers' stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 339.

340.    Then, on May 12, 2020, *Bloomberg's* pre-market announcement that Singapore's police force was probing Mr. Wang's claims against MBS sent LVS's stock tumbling – from a close of $48.50 on May 11, 2020 to $45.96 on May 12, 2020.

**ANSWER:** Defendants admit that paragraph 340 purports to characterize statements in a document written by a non-party, but deny the allegations that mischaracterize the statements. Defendants state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 340.

341. The truth regarding MBS's unauthorized transfer practice, and the investigations stemming therefrom, continued to make their way into the market on June 4, 2020 when *Bloomberg* published its article mid-day, breaking the news that the Department of Justice was investigating MBS, in addition to the Singapore police and CRA. This article was then updated on June 5, 2020 before market open to include additional information about Singapore's anti-money laundering weaknesses. The June 7, 2020 *Bloomberg* article similarly highlighted the reaction of the CRA to Wang's allegations against MBS, as the regulator was requesting its two casino operators to voluntarily conduct greater due diligence on its customers. The result on each of these days was LVS stock underperforming as compared to its peers, as signified by a lower log return for LVS stock on each of these dates compared to the return of its peer index and adjusting for the market index, resulting in residual loss to Plaintiffs and the Class:[25]

| Date | LVS Price | LVS Log Return | Market Index Log Return | Peer Index Log Return | Explained Return | Residual Return | Residual $ Return |
|------|-----------|----------------|-------------------------|-----------------------|------------------|-----------------|-------------------|
| 6/4/2020 | $ 52.35 | 1.08% | -0.32% | 2.40% | 2.17% | -1.10% | $ (0.56) |
| 6/5/2020 | $ 52.97 | 1.18% | 2.60% | 2.19% | 1.98% | -0.81% | $ (0.42) |
| 6/8/2020 | $ 55.64 | 4.92% | 1.35% | 5.85% | 5.21% | -0.29% | $ (0.15) |

**ANSWER:** Defendants admit that paragraph 341 purports to characterize statements in documents written by non-parties, but deny the allegations that mischaracterize the statements. Defendants state that the prices at which LVS's stock and its peers' stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 341, including the allegations in footnote 25.

342. After the market closed on July 19, 2020, *Bloomberg* broke the news that MBS had settled with Mr. Wang, agreeing to pay him the entirety of the amount allegedly transferred out of his account without authorization. LVS's stock responded to this news, and the fact that the Company paid in full to settle a claim it had previously denied as having merit, negatively, dropping from $48.69 on July 17, 2020 (the last trading day before the news) to a close of $47.28 on July 20, 2020.

**ANSWER:** Defendants admit that paragraph 342 purports to characterize statements in a document written by a non-party, but deny the allegations that mischaracterize the statements. Defendants state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 342.

---

[25] Plaintiffs' loss causation analysis based on these dates is derived from a preliminary event study analysis and regression modeling and is subject to modification.

343.    During the trading day on September 16, 2020, *Bloomberg* issued an article publicizing that LVS retained Davinder Singh to conduct a second investigation of the unauthorized transfers at MBS and had already previously retained Hogan Lovells to conduct a similar investigation. Further, this article informed the investing public of the outcome of that Hogan Lovells investigation, disclosing that more than 3,000 transfers between 2013 to 2017 accounting for more than $1.05 billion USD were at issue, with more than $275 million USD worth of these transactions raising red flags during the probe. LVS's stock price responded negatively to learning this news, dropping from a close of $51.85 on September 15, 2020 to $49.67 on September 16, 2020.

**ANSWER:**    Defendants admit that paragraph 343 purports to quote and characterize statements in a document written by a non-party, but deny the allegations that mischaracterize or inaccurately or selectively quote the statements. Defendants admit that Hogan Lovells was retained in 2019 to conduct an internal investigation in response to allegations made by Wang Xi. Defendants further state that Plaintiffs have purported to base certain of their allegations on articles written by a non-party, but that Plaintiffs have selectively quoted and mischaracterized those articles. Defendants further state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 343.

344.    Finally, after the close of market on December 21, 2020, *Bloomberg* issued a new article recounting the facts of the Wang lawsuit and providing new insight into the outcome of the Company's internal investigation into the matter, including the recollection of a former MBS compliance executive who was urged by the operations and legal teams to "back off" after he sought to address the issue of the unauthorized transfers.

**ANSWER:**    Defendants admit that paragraph 344 purports to quote and characterize statements in a document written by a non-party and issued on December 21, 2020. Defendants state that this date post-dates the close of the putative class period, and therefore cannot qualify as a corrective disclosure. Accordingly, no response is required. To the extent a response is required, Defendants deny the allegations that mischaracterize or inaccurately or selectively quote the statements in the document, and deny the remaining allegations in paragraph 344.

345.    Additionally, the December 21 article highlighted how lacking MBS's internal compliance procedures were prior to the casino's 2018 changes, showing that MBS employees were failing to carry out even the most basic of due diligence on their customers because internal procedures did not require it.

**ANSWER:**    Defendants deny the allegations in paragraph 345.

346.    Further, the December 21 article contextualized the impact of the unauthorized transfer activities and extensions of credit, citing internal MBS documents that showed MBS wrote off $717 million in bad debt from 2013 through March 2020 – multiple times higher than the $20 to $30 million per year expected for a casino of its size.

**ANSWER:** Defendants deny the allegations in paragraph 346.

347. LVS's stock price responded negatively to the news, dropping from a closing price of $56.88 per share on December 21, 2020 (prior to the news' release after hours) to $56.26 on December 22, 2020.

**ANSWER:** Defendants admit that paragraph 347 purports to reference statements in a document written by a non-party and issued on December 21, 2020. Defendants state that this date post-dates the close of the putative class period, and therefore cannot qualify as a corrective disclosure. Accordingly, no response is required. To the extent a response is required, Defendants state that the prices at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 347.

348. As a result of their purchases of LVS stock during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price movements in LVS stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

**ANSWER:** Defendants deny the allegations in paragraph 348.

349. At all relevant times, the market for LVS securities was efficient for the following reasons:

(a) LVS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b) As a regular issuer, LVS filed periodic reports with the SEC and NYSE;

(c) LVS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) LVS was followed by more than six securities analysts employed by major brokerage firms during the Class Period (including Deutsche Bank AG, Barclays Bank PLC, JPMorgan Chase & Co, UBS Investment Bank, BofA Securities, and Goldman Sachs Group, Inc.) who participated in the Company's Class Period earnings calls and wrote reports which were distributed to those brokerage firms' sales force and certain customers and each of these reports was publicly available and entered the public marketplace;

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

88

(e)    According to the Company's SEC filings, LVS had approximately 794 million and 763 million shares outstanding as of February 22, 2016 and October 21, 2020, respectively, with an average of 4.4 million shares trading daily on the NYSE and a public float in excess of 320 million shares;

(f)    During the Class Period, LVS common stock averaged a weekly trading volume of 22 million shares, translating to an average weekly turnover of approximately 3% of the outstanding shares;

(g)    During the Class Period, the Company was eligible to register and sell its common stock pursuant to a Form S-3 shelf registration statement and, in fact, filed automatic shelf registrations for "well-known seasoned issuers" on November 3, 2014; November 3, 2017; and November 3, 2020;

(h)    During the Class Period, the Company's stock price reacted to new information; and

(i)    LVS had a market capitalization exceeding $45 billion during the Class Period.

**ANSWER:**    Defendants state that the prices and volumes at which LVS's stock traded are a matter of public record. Defendants deny the remaining allegations in paragraph 349.

350.    As a result of the foregoing, the market for LVS securities promptly digested current material information regarding LVS from all publicly available sources and reflected such information in LVS's stock price. Under these circumstances, all purchasers of LVS securities during the Class Period suffered similar injury through their purchase of LVS securities at artificially inflated prices, and a presumption of reliance applies.

**ANSWER:**    Defendants deny the allegations in paragraph 350.

351.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

**ANSWER:**    Defendants deny the allegations in paragraph 351.

352.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

**ANSWER:**    Defendants deny the allegations in paragraph 352.

353.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

**ANSWER:**    Defendants deny the allegations in paragraph 353.

89

354.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements regarding, inter alia, (i) MBS's compliance functions and the use of a pervasive system of unauthorized customer- to-customer transfers; and (ii) the impact of the foregoing on MBS's rising bad debt issues. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by LVS were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

**ANSWER:**    Defendants deny the allegations in paragraph 354.

355.    To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

**ANSWER:**    Defendants deny the allegations in paragraph 355.

356.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired LVS common stock during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

**ANSWER:**    Defendants admit that Plaintiffs purport to bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired LVS common stock during that portion of the putative class period that was not dismissed by the Court's 2023 Order. Defendants deny that a class may be properly certified, deny that they engaged in any wrongdoing, deny that they are liable to Plaintiffs or the putative class, and deny the remaining allegations in paragraph 356.

357.    Excluded from the Class are LVS and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

**ANSWER:**    Defendants admit that Plaintiffs purport to exclude from the putative class LVS and its subsidiaries and affiliates, their respective officers and directors, any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest. Defendants deny that a class may be properly certified and deny the remaining allegations in paragraph 357.

358.    Because LVS had more than 700 million shares of common stock outstanding during the Class Period, and because its securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs

90

believe that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by LVS or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

**ANSWER:** Defendants admit that LVS's stock was actively traded on the NYSE during the putative class period. Defendants state that the number of outstanding shares of LVS common stock during that portion of the putative class period that was not dismissed by the Court's 2023 Order is a matter of public record. Defendants further state that the remaining allegations in the first sentence of paragraph 358 assert legal conclusions to which no response is required. Defendants lack knowledge or information sufficient to determine the truth or falsity of the allegations in the second and third sentences of paragraph 358, and therefore deny those allegations. Defendants further deny that a class may be properly certified.

359. Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

**ANSWER:** Defendants deny the allegations in paragraph 359. Defendants further deny that a class may be properly certified.

360. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

**ANSWER:** Defendants deny the allegations in paragraph 360. Defendants further deny that a class may be properly certified.

361. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

(a) Whether Defendants violated the federal securities laws, as alleged herein;

(b) Whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about LVS's business and operations;

(c) Whether the price of LVS's securities was artificially inflated during the Class Period; and

(d) The extent to which members of the Class have sustained damages and the proper measure of damages.

**ANSWER:** The allegations in paragraph 361 assert legal conclusions and characterizations to which no response is required. By way of further answer, Defendants deny that

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

91

a class may be properly certified, deny that they engaged in any wrongdoing, deny that they are liable to Plaintiffs or the putative class, and deny the remaining allegations in paragraph 361.

362.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:**    The allegations in paragraph 362 assert legal conclusions and characterizations to which no response is required. By way of further answer, Defendants deny that a class may be properly certified, deny that they engaged in any wrongdoing, deny that they are liable to Plaintiffs or the putative class, and deny the remaining allegations in paragraph 362.

## <u>COUNT I</u>

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### Against LVS and the Individual Defendants

363.    Plaintiffs reallege each allegation as if fully set forth herein.

**ANSWER:**    Defendants incorporate and restate each and every answer above as if fully set forth herein.

364.    This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against LVS and the Individual Defendants (the "Count I Defendants").

**ANSWER:**    Defendants admit that Plaintiffs purport to bring Count I under the statute and rule cited in paragraph 364. Defendants deny the remaining allegations in paragraph 364.

365.    The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:**    Defendants deny the allegations in paragraph 365.

366.    The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

**ANSWER:**    Defendants deny the allegations in paragraph 366.

367.    The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

**ANSWER:**    Defendants deny the allegations in paragraph 367.

368.    As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

**ANSWER:**    Defendants deny the allegations in paragraph 368.

369.    LVS is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of LVS in taking the actions alleged herein.

**ANSWER:**    Defendants deny the allegations in paragraph 369.

370.    Plaintiffs and the Class purchased LVS securities, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Plaintiffs and the Class were damaged as a result of their reliance on the Count I Defendants' false statements, misrepresentations and omissions of material facts.

**ANSWER:**    Defendants deny the allegations in paragraph 370.

371.    At the time of the Count I Defendants' false statements, misrepresentations and omissions, Plaintiffs and the Class were unaware of their falsity and believed them to be true. Plaintiffs and the Class would not otherwise have purchased LVS securities had they known the truth about the matters discussed above.

**ANSWER:**    Defendants deny the allegations in paragraph 371.

372.    By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:**    Defendants deny the allegations in paragraph 372.

373.    As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of LVS securities.

**ANSWER:**    Defendants deny the allegations in paragraph 373.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

374.    Plaintiffs reallege each allegation as if fully set forth herein.

**ANSWER:**    Defendants incorporate and restate each and every answer above as if fully set forth herein.

375.    This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against each of the Individual Defendants (the "Count II Defendants").

**ANSWER:**    Defendants admit that Plaintiffs purport to bring Count II under the statute cited in paragraph 375. Defendants deny the remaining allegations in paragraph 375.

376.    Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of LVS, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act. The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class's investments in LVS securities within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

**ANSWER:**    Defendants deny the allegations in paragraph 376.

377.    The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

**ANSWER:**    Defendants state that the phrases "controlled" and "control the content" are vague and undefined, and therefore deny the allegations relating thereto. Defendants deny the remaining allegations in paragraph 377.

378.    The Count II Defendants knew or recklessly disregarded the fact that LVS's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

**ANSWER:**    Defendants deny the allegations in paragraph 378.

379.    By virtue of their high-level positions and their participation in and awareness of LVS's operations and public statements, the Count II Defendants were able to and did influence and control LVS's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

**ANSWER:**    Defendants deny the allegations in paragraph 379.

380.    The Count II Defendants had the power to control or influence the statements made giving rise to the securities laws violations alleged herein, and as set forth more fully above.

**ANSWER:**    Defendants deny the allegations in paragraph 380.

381.    As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their

94

positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

**ANSWER:**   Defendants deny the allegations in paragraph 381.

382.   As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of LVS securities.

**ANSWER:**   Defendants deny the allegations in paragraph 382.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative and other defenses, without assuming the burden of proof on any such defenses or portions thereof which would otherwise rest with Plaintiffs. Defendants expressly reserve the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

### First Affirmative Defense

The Second Amended Complaint fails to plead claims with particularity and fails to state claims against Defendants upon which relief can be granted.

### Second Affirmative Defense

Defendants are not liable because Plaintiffs lack standing to assert any claims against them.

### Third Affirmative Defense

Defendants are not liable because the statements quoted did not contain any untrue statement of material fact, nor did they omit to state any material fact required to be stated or necessary to make the statements made not misleading.

### Fourth Affirmative Defense

Defendants are not liable because they did not participate in any device, scheme, or artifice to defraud in connection with the purchase or sale of any security.

### Fifth Affirmative Defense

Defendants are not liable, to the extent Plaintiffs' claims are based on Defendants' omission(s) of purported material information, because Defendants had no duty to disclose or update the information.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

95

**Sixth Affirmative Defense**

Pursuant to 15 U.S.C. § 78u-5(c), Defendants are not liable for any forward-looking statements because any such forward-looking statements were (i) accompanied by meaningful cautionary language, (ii) immaterial, and/ or (iii) made without actual knowledge that the statements were false or misleading.

**Seventh Affirmative Defense**

Defendants are not liable because any alleged statements of material fact, alleged omissions of material fact, or other challenged statements were contained or were made in the context of sufficient cautionary language or risk disclosure and thus are nonactionable under the "bespeaks caution" doctrine.

**Eighth Affirmative Defense**

Defendants are not liable because Plaintiffs and the market were informed in the SEC filings and other public information releases of the risks associated with their investments.

**Ninth Affirmative Defense**

Defendants are not liable because some or all of the matters now claimed by the Second Amended Complaint to be the subject of the alleged misstatements or omissions were publicly disclosed or were in the public domain and, as such, were available to Plaintiffs and were at all times reflected in the market price of LVS's stock.

**Tenth Affirmative Defense**

Defendants are not liable because at all times, and with respect to all matters contained herein, they acted in good faith, exercised reasonable care, and did not know, and in the exercise of reasonable care could not have known, of the purported untruths, misstatements, and/or omissions alleged in the Second Amended Complaint.

**Eleventh Affirmative Defense**

Defendants are not liable because any alleged misstatements or omissions made or caused to be made by Defendants were based in good faith and in reasonable reliance upon the work, opinions, information, representations, and advice of others upon whom they were entitled to rely.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

### Twelfth Affirmative Defense

Defendants are entitled to judgment on the Section 20(a) control person liability claim against them because they acted in good faith and did not directly or indirectly induce the act or acts constituting the alleged violation or cause of action.

### Thirteenth Affirmative Defense

Defendants are not liable with respect to the Section 20(a) control person claim because Defendants are not controlling persons, which is a predicate for establishing any liability for a control person claim.

### Fourteenth Affirmative Defense

Defendants are not liable because Plaintiffs' alleged damages, if any, were the result of one or more intervening or superseding causes, and were not the result of any act or omission on the part of Defendants.

### Fifteenth Affirmative Defense

Defendants are not liable because Plaintiffs did not rely, or could not have reasonably or justifiably relied, upon the alleged misstatements or omissions alleged in the Second Amended Complaint.

### Sixteenth Affirmative Defense

Defendants are not liable because Plaintiffs' losses, if any, were not caused by Defendants.

### Seventeenth Affirmative Defense

Plaintiffs' claims are barred in whole or in part because the alleged misstatements and omissions alleged in the Second Amended Complaint did not affect the market price of LVS's stock.

### Eighteenth Affirmative Defense

Defendants are not liable because Plaintiffs' claims are barred, in whole or in part, because Plaintiffs voluntarily assumed the risk of losses alleged in the Second Amended Complaint.

### Nineteenth Affirmative Defense

Defendants deny that Plaintiffs were injured in the nature and to the extent claimed and contest damages.

97

**Twentieth Affirmative Defense**

The damages sought by Plaintiffs exceed those permitted under the Securities Exchange Act of 1934, the PSLRA, common law, or any other applicable statute, rule, or regulation.

**Twenty-First Affirmative Defense**

This action may not be properly maintained as a class action.

**PRAYER FOR RELIEF**

**WHEREFORE,** Defendants pray that the Court enter judgment as follows:

1.    That judgment be entered in favor of Defendants;

2.    That Plaintiffs and the putative class take nothing from Defendants by the Second Amended Complaint, and that this action be dismissed with prejudice;

3.    For costs, attorneys' fees, expert witness fees, and court hearing costs incurred herein; and

4.    For such other relief as the Court deems just and proper.

Dated: November 20, 2023

**SNELL & WILMER, L.L.P.**

By: */s/ Patrick G. Byrne*

Patrick G. Byrne, Esq.
Morgan Petrelli, Esq.
3883 Howard Hughes Parkway, Ste. 1100
Las Vegas, NV 89169

Walter C. Carlson (*Pro Hac Vice*)
Lawrence P. Fogel (*Pro Hac Vice*)
Caroline A. Wong (*Pro Hac Vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603

*Attorneys for Defendants*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**CERTIFICATE OF SERVICE**

On November 20, 2023, I served the foregoing document on all parties appearing in this case when filing said document through the court's PACER system with automatic e-service on all persons who have registered for e-service on PACER for this case.


*/s/ Lyndsey Luxford*
An employee of Snell & Wilmer LLP