**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| The Daniels Family 2001 Revocable Trust, individually and on behalf of all others similarly situated,<br><br>             Plaintiff<br><br>    v.<br><br>Las Vegas Sands Corp., Patrick Dumont, Robert Glen Goldstein, Miriam Adelson as special administrator of the estate on behalf of Sheldon G. Adelson,<br><br>             Defendants | Case No. 2:20-cv-01958-CDS-EJY<br><br>**Amended Order Regarding Plaintiffs' Motion for Reconsideration, Defendants' Motion to Dismiss the Second-Amended Complaint, and the Parties' Leave to File Supplemental Authority**[1]<br><br>[ECF Nos. 75, 84, 103, 105] |

This is a putative securities class-action lawsuit filed against the Las Vegas Sands Corporation ("LVS"), some of its directors and executive officers, and on behalf of individuals who purchased or otherwise acquired LVS securities between February 27, 2016, and September 15, 2020. Last year, United States District Judge Gloria M. Navarro[2] dismissed plaintiff's first-amended complaint in its entirety, finding plaintiff failed to meet the heightened pleading requirement under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") because it failed to plausibly allege false and misleading statements by omission and further failed to state claim for a § 20(a) violation of the Exchange Act by any control person. After that, plaintiff filed a motion for consideration of the dismissal order. Defendants oppose the motion. Plaintiff filed a second-amended complaint (SAC) on April 18, 2022. Defendants move to dismiss the SAC, which plaintiff opposes. Both parties also move for leave to file supplemental authority. ECF No. 103 (plaintiff); ECF No. 105 (defendants). Because the supplemental authorities provided by

---

[1] In light of the December 19, 2023 hearing where I granted defendants' motion for reconsideration (ECF No. 146), this order amends the court's prior decision regarding loss causation in Section II(e), and as a result amends the court's prior decision granting defendants' motion to dismiss the SAC in part. The other findings of fact and conclusions of law remain undisturbed.

[2] This matter was administratively reassigned to me on April 13, 2022. ECF No. 76.

both parties discuss relevant case law, and considering that the motion to dismiss has been pending for more than a year, I grant both motions and consider the case law in resolving the motion to dismiss. For the reasons below, I deny plaintiff's motion for reconsideration and I grant defendants' motion to dismiss. Because amendment would not be futile, I also grant plaintiffs leave to amend.

## I.    Plaintiff's motion for reconsideration

Plaintiff ("the Trust") seeks reconsideration of two specific findings in Judge Navarro's order dismissing the first-amended complaint (ECF No. 74), arguing that she committed clear error when she "applied the wrong legal standard to the Plaintiff's affirmative Credit and Compliance Misstatements" and "overlooked Plaintiff[']s argument in opposition to Defendants' challenges to the internal control misstatements." ECF No. 75 at 9. Plaintiff asks that I grant reconsideration, find the "Credit and Compliance Statements" to be affirmative misstatements, and allow it to re-plead dismissed internal control statements. *Id.* at 6.[3]

Defendants oppose the reconsideration motion, asserting that Judge Navarro did not commit error in finding that plaintiff failed to plead false statements, arguing that those allegations sounded in false omissions, not affirmative misrepresentations. *See generally* ECF No. 78 at 5–6, 10–15. Defendants also argue that Judge Navarro did not commit clear error in dismissing, with prejudice, alleged misstatements regarding LVS's disclosure controls and procedures. *Id.* at 4, 10.

### A.  Legal framework

Federal Rule of Civil Procedure 59(e) governs motions for reconsideration, which are "an extraordinary remedy." *Feltzs v. Cox Commc'ns Cal., LLC*, 562 F. Supp. 3d 535, 539 (C.D. Cal. 2021) (quoting *Am. Unites for Kids v. Lyon*, 2015 WL 5822578, at *3 (C.D. Cal. Sept. 30, 2015))."[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless

---

[3] Plaintiff also seeks permission to file an SAC. One was already filed on April 18, 2022 (ECF No. 77), rendering this requested relief moot.

the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) (citing *Sch. Dist. No. 1J, Multnomah Cnty., Or., v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)); *see also* LR 59-1(a) ("A party seeking reconsideration under this rule must state with particularity the points of law or fact that the court has overlooked or misunderstood."). A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation. *Kona Enterprises, Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

### B. Discussion

In her dismissal order, Judge Navarro found that plaintiff failed to plausibly allege false and misleading statements by omission in the "Credit and Compliance Misstatements" section of the first-amended complaint (FAC) because there were no allegations that the defendants had a duty to disclose the alleged unauthorized transfers. ECF No. 74 at 20–21.[4] Plaintiff seeks reconsideration of the order, arguing the "Credit and Compliance Misstatements" allegations were incorrectly analyzed under an omission-based theory of liability, instead of an affirmative-misrepresentations theory. *See generally* ECF No. 75. It also asks to re-plead the "internal control statements" regarding LVS's use of junkets, which were dismissed after Judge Navarro determined that plaintiff failed to respond to defendants' argument. ECF No. 74 at 21.

Plaintiff's motion regarding the "Credit and Compliance Misstatements" is seemingly moot as a SAC has already been filed. In the interest of clarity, I nonetheless address and deny plaintiff's requested relief. Plaintiff cannot meet its burden showing that Judge Navarro committed clear error, nor can it demonstrate that she overlooked plaintiff's theory of liability. A review of plaintiff's opposition to defendants' motion to dismiss, together with a review of the FAC, shows it was unclear what theory of liability plaintiff was pursuing. Plaintiff's "Argument"

---

[4] Because Judge Navarro found that the plaintiff failed to properly allege a duty to disclose, she made no findings as to the remaining elements. ECF No. 74 at 21.

section is subtitled "Material Misrepresentations *or* Omissions." ECF No. 66 at 20 (emphasis added). Thereafter, plaintiff argued misrepresentations and omissions interchangeably. *See*, e.g., ECF No. 66 at 21 ("Goldstein and Adelson similarly *misled* investors when discussing LVS's compliance and [Marina Bay Sands (MBS)'s] operating results); *id.* at 22 ("Goldstein and Adelson consistently *omitted* the existence of "premium player" scheme and its effects on revenue"); *id.* at n.5 ("For this reason, LVS's representations about the effectiveness and adequacy of its 'disclosure controls and procedures' were also materially *misleading*"); *id.* ("Courts have consistently recognized a duty to disclose any conduct where a failure to do so would be *misleading*"); *id.* at n.6 ("While these statements may be literally true, they remain *misleading* without full disclosure [(*omission*)] of LVS's unauthorized transfer practices").

The FAC similarly alleges both theories of liability interchangeably. For example, in ¶¶ 322, 351, 352, 355, and 356, the Trust alleges "misrepresentations," but the allegations set forth in ¶¶ 177, 179, 183, 204, and 320 are deemed "misleading by omission" and "false and misleading by omission." *See generally* ECF No. 1. Consequently—and understandably—Judge Navarro analyzed and resolved the motion to dismiss by applying the "omissions" liability standard because that was consistently alleged in the FAC. The Trust's response to the motion to dismiss neither clarified nor specified what theory of liability it was pursuing. It was not until its motion for reconsideration was filed that plaintiff clarified that it was alleging an affirmative-misrepresentations theory. ECF No. 75 at 6–9. A motion for reconsideration may not be used to raise arguments or present, for the first time, evidence that reasonably could have been raised earlier in the litigation. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008). Plaintiff reasonably could have clarified its theory of liability in its opposition to defendants' motion to dismiss but failed to do so. I therefore decline to grant the Trust's request for reconsideration.

Further, the Trust fails to meet its burden demonstrating that it is entitled to reconsideration of the court's dismissal, with prejudice, of the FAC's allegations that MBS's disclosures were false and misleading. ECF No. 75 at 21–22. In its reconsideration motion, the

Trust contends that the court erred in finding that it did not respond to defendants' arguments, claiming that it did, in fact, respond, in footnote 5 of its opposition. *Id.* at 14. In its entirety, that footnote read "For this reason, LVS's representations about the effectiveness and adequacy of its 'disclosure controls and procedures' were also materially misleading." *Id.* at 22 (citing FAC at ¶¶ 217–20). But that footnote is pure argument and fails to cite any supporting case law or binding authority. Local Rule 7-2 requires that "the deadline to file and serve any points and authorities in response to the motion is 14 days after service of the motion." LR 7-2(b). Failing to do so "constitutes a consent to the granting of the motion." LR 7-2(d). Here, as noted by Judge Navarro, the Trust failed to provide points and authorities in support of its allegations; thus, the Trust consented to the granting of defendants' motion. Judge Navarro neither overlooked the Trust's argument nor erred in dismissing those allegations with prejudice. Consequently, the Trust's motion for reconsideration and request to replead the dismissed allegations in an amended complaint are denied.

## II.  The motion to dismiss the second-amended complaint (ECF No. 84)

Defendants filed a second motion to dismiss the SAC, renewing their assertion that the Trust fails to meet the heightened pleading requirement set forth in Federal Rule of Civil Procedure 9(b), and the SAC fails to: (1) plead any false and misleading statements; (2) establish scienter; and (3) plead loss causation. *See generally* ECF No. 84.[5]

---

[5] As part of their motion, defendants submit a number of exhibits and request that I take judicial notice of them. ECF No. 94 at n.4.  The Trust opposes this request. ECF No. 94. With limited exceptions, when ruling on a 12(b)(6) motion, a court cannot consider evidence outside the pleadings without converting the motion to dismiss into one for summary judgment and giving the opposing party an opportunity to respond. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). The exceptions to the aforementioned are: (1) documents attached to the complaint; (2) documents incorporated by reference in the complaint; and (3) matters that are judicially noticeable under Federal Rule of Evidence 201. *See Ritchie*, 342 F.3d at 907–08. With the exception of a few, the defendants' exhibits meet the second exception and I therefore considered them in resolving defendants' motion to dismiss the SAC. *See* Defs.' Exs. at ECF Nos. 85–93. But exhibits 6, 12–14, 24, 26–29, and 30–31 did not qualify under any exception and therefore were not considered in issuing this decision. Accordingly, defendants' request that I take judicial notice of their exhibits is granted in part and denied in part.

In opposition, the Trust argues that the SAC cures the pleading deficiencies identified by Judge Navarro's dismissal order. ECF No. 95 at 16. The Trust argues that the SAC adequately alleges that LVS's credit statements and SOX certifications contained "affirmatively false and misleading" statements, that defendants violated Item 105 of Regulation S-K, that it adequately alleges scienter, and adequately pleads loss causation. *See generally id.* at 16–38.

Defendants contend that the Trust's opposition to the motion are contrary to its allegations in the SAC. They assert that the SAC alleges an "illicit scheme," while the Trust's opposition to the motion suggests that its claims are based on alleged breaches of LVS's own internal lending standards. ECF No. 99 at 6. Defendants therefore contend that the SAC advances no scheme or fraud that meets the heightened pleading requirements for the stated claims. *Id.*

### A.   Legal framework

The Federal Rules of Civil Procedure (FRCP) require a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal is proper if the complaint lacks a "cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A pleading must give fair notice of a legally cognizable claim, and a plaintiff must proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of [FRCP] 9(b) and the [Private Securities Litigation Reform Act (PSLRA)]." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Rule 9(b) requires fraud claims to be pled with particularity,

"but a pleading is sufficient under Rule 9(b) if it identifies 'the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'" *Gottreich v. San Francisco Inv. Corp.*, 552 F.2d 866 (9th Cir. 1977) (quoting *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973)). For its claims grounded in fraud, the SAC must allege the "who, what, where, when, and how" of the fraudulent conduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Further, when asserting a claim under the PSLRA of 1995, a plaintiff must plead the element of falsity with particularity. *Zucco Partners, LLC*, 552 F.3d at 990–91; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("The PSLRA has exacting requirements for pleading 'falsity.'"). The Ninth Circuit sets forth three ways for a plaintiff to establish falsity: (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'" *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2021 WL 1091891, at *14 (N.D. Cal. 2021) (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017)). A plaintiff must plead specific facts to show how the statements at issue were false. *Metzler Inv. GMBH*, 540 F.3d at 1070; *see also Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false); *In re Arrowhead Pharm., Inc. Sec. Litig.*, 782 F. App'x 572, 574 (9th Cir. 2019). Moreover, to be actionable, a statement must be false at the time it was made. *Ronconi*, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

At the dismissal stage, the court only considers the well-pled allegations in the plaintiff's complaint. *Twombly*, 550 U.S. at 555. Typically, when a party submits evidence outside the pleadings in a motion to dismiss, the court converts the motion to a motion for summary judgment and imposes Rule 56's standard. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Finally, if the court grants a motion to dismiss for failure to state a claim, leave to

amend should be granted unless the deficiencies of the complaint cannot be cured by amendment, rendering amendment futile. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

### B. The allegations in the SAC

The SAC contains many of the same allegations that were set forth in the FAC, the majority of which are drawn from the LVS's Annual Reports and proxy statements filed with the SEC. For example, plaintiffs allege that the following statements contained in the LVS Annual Reports for calendar years 2015–2020, signed by defendants Adelson, Goldstein, and Dumont, were affirmatively false and misleading:

1. "We extend credit to those customers whose level of play and financial resources warrant, in the opinion of management, an extension of credit."; and
2. "The Company extends credit to approved casino customers following background checks and investigations of creditworthiness."

ECF No. 77 at ¶ 151 (2015); ¶ 173 (2016); ¶ 188 (2017); ¶ 204 (2018); ¶ 220 (2019); ¶ 229 (1st 2020 quarterly report); ¶ 238 (2nd 2020 quarterly report). The SAC also alleges that the following certifications set forth in Form 10-K of the LVS Annual Reports by defendants Sheldon and Dumont were materially false and misleading:

1. "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and
2. "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;" and
3. "The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting . . . ;"[6]
4. "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;" and

---

[6] The SAC does not allege "The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting…" was a misleading statement for the 2019 Annual Report, the 1st quarter of 2020 (1Q20), and 2nd quarter of 2020 (2Q20).

5.  "Any fraud, whether or not material, that involves management or other
    employees who have a significant role in the registrant's internal control over
    financial reporting."

*Id.* at ¶ 155 (2015); ¶ 177 (2016); ¶ 192 (2017); ¶ 208 (2018); ¶ 224 (2019); ¶ 233 (1st 2020 quarterly report); ¶ 242 (2nd 2020 quarterly report).

The Trust alleges that these were material misrepresentations because MBS's practice of extending credit to "subprime clientele created heightened risks of collectability and write-offs" and that "the truth concerning LVS's credit extension and compliance policies would have altered the total mix of information available to investors." *Id.* at ¶ 154 (2015); ¶ 176 (2016); ¶ 191 (2017); ¶ 207 (2018); ¶ 223 (2019); ¶ 232 (1st 2020 quarterly report); ¶ 241 (2nd 2020 quarterly report).

The SAC further alleges that defendant Goldstein's 2016 responses to questions about LVS's compliance practices were materially false and misleading. *See id.* at ¶¶ 159–65. For example, in March 2016, when Goldstein responded "no" to questions about whether there were compliance vulnerabilities (*see id.* at ¶ 160), the Trust alleges that rendered the following statement materially false and misleading:

We're very much asked the question where does it come from, who are you, how
do you get credit, how do you – if a person wants a line of credit or wants to move
money, we're probably the first line of defense. In fact, I think we're more
aggressive than the government in terms of monitoring that. We're a big believer
that compliance is critical. We've embraced it the last 4 years, 5 years, and we
don't fear it. We embrace it, accept it. It's part of our world today[.]

*Id.* at ¶ 216.

The remaining allegations in the SAC discuss the revelations regarding the money transferring scheme which surfaced through various news reports and articles (*see generally id.* at ¶¶ 246–65), the Wang Xi lawsuit and unauthorized transfer claims (*id.* at ¶¶ 269–82), and LVS's compliance board and assertions of scienter. ECF No. 95 at 34–35.

### C.  The parties' arguments

#### 1.  *Defendants' argument in support of their motion to dismiss the SAC*

Defendants argue that the Trust fails to plausibly allege a scheme of unauthorized transfers and that the allegations of "premium player scheme" are neither "widespread" nor "illicit." ECF No. 84 at 18; ECF No. 99 at 8. They contend that gambling regulations in Singapore permitted MBS to extend credit to foreign patrons directly, whether or not there were funds in their patron accounts. ECF No. 84 at 18. Thus, while an internal investigation revealed that there were around 3,000 letters of authorization between 2013 and 2017, the defendants argue that the Trust fails to allege that the transfers were unauthorized. *Id.* Instead, the Trust alleges that 26% of the aforementioned transfers were conducted using pre-filled or pre-signed authorization forms, which it contends stemmed from employees taking shortcuts to complete the transfers. *Id.* at 19. The defendants also characterize as conclusory the allegations that the alleged "scheme" continued through calendar years 2019 and 2020, arguing that such allegations are contradicted by others in the SAC. *Id.*  Finally, defendants contend that the alleged "scheme" contributed to "bad debt" write offs, but the Trust fails to allege any financial impact or consequences based on the alleged scheme. *Id.*

#### 2.  *The Trust's opposition to the motion*

In opposition to the motion to dismiss, the Trust alleges that the defendants engaged in the unauthorized transfer scheme to increase gambling wagers by qualifying more players for credit. *See generally* ECF No. 77. It contends that the scheme—together with false and misleading statements made to investors—caused LVS's stock to decrease, ultimately harming the Trust and the class. *See generally id.* The Trust contends that the SAC sets forth how the scheme worked. *Id.* at ¶¶ 100–02. It contends that the scheme was designed to circumvent money-transfer regulations in both Singapore and China, as well as Chinese anti-money-laundering regulations, to encourage Chinese patrons to visit Singapore and gamble. ECF No. 77 at ¶¶ 52–53; 69–70; 92–93; 98; 102; *see also* ECF No. at 95 at 15–16. In support of its "scheme" argument, the

Trust presents allegations about the scheme from two confidential witnesses (CW-1 and CW-2) (*see generally* ECF No. 77 at ¶¶ 106–12; ¶¶ 116–21) and alleges that an MBS patron—Wang Xi—brought a lawsuit for misappropriating his money through the scheme. ECF No. 95 at 18–19; *see also* ECF No. 77 at 9, 29, 133–34.

The Trust also alleges that LVS's own investigation into MBS's money transferring practices was widespread. ECF No. 95 at 18–19. The investigation revealed that "of the **more than 3,000 letters of authorization accounting for more than SGD $1.4 billion in customer-to-customer transfers** executed between 2013 and 2017, letters authorizing transfers for SGD $365 million (or more than 26%) bore signatures that appeared similar—supporting the inference that these were likely photocopied duplicates and unauthorized transfers." ECF No. 77 at ¶ 280 (emphasis added). This allegation suggests that the incidences of unauthorized transfers went beyond the sole example of the Xi lawsuit. The Trust alleges that the revelation of the scheme, the internal investigations into it, and the Xi lawsuit caused the LVS stock to fall almost $10.00 per share. *Id.* at 258–59, 263, 265.

The Trust contends that LVS's statements in its Form 10-Ks filed during the class period[7] were affirmatively false and misleading. Those statements include but are not limited to: "LVS 'extend[s] credit to those customers whose level of play and financial resources warrant [] an extension of credit" (*id.* at ¶¶ 145–49), that LVS "extend[s] credit to approved casino customers following background checks and investigations of creditworthiness (*id.* at ¶¶ 151–52), and other statements made by LVS executives—including Goldstein—and others. *See generally id.* The Trust alleges that these statements are false and misleading because MBS did not monitor or adhere to its own internal credit policies, which resulted in the unauthorized transfer scheme. ECF No. 95 at 26. The Trust then addresses the specific arguments from the defendants' motion, addressing

---

[7] The alleged class period is between February 27, 2016, and September 15, 2020. ECF No. 77 at ¶¶ 151–52.

first the credit-misstatements arguments, then the SOX certifications, and finally scienter and loss causation.

        *a.   Credit misstatements*

      First, the Trust contends that the defendants' argument that scheme allegations (from the SAC) occurred only at MBS and no other part of LVS fails because MBS is not specifically named. The Trust contends that this is "nonsense," and urges that the allegations related to the credit-based wagering at LVS were related to business in Macao, Singapore, and the United States. ECF No. 95 at 27. The Trust further maintains that defendants' argument—that the statement (that LVS "extend[s] credit to those customers whose level of play and financial resources warrant [] an extension of credit") was not false or misleading because defendants made no "guarantees of the absence of risk"—is unconvincing because the statement was not a warning but an "affirmative statement of fact" regarding the company's lending policies. *Id.* Next, the Trust argues that defendant Goldstein's March 10, 2016, statement (*see* ECF No. 77 at ¶¶ 159–65) was not "puffery," as argued by defendants, because he "used specific and concrete language to explain LVS's monitoring of compliance with governmental regulations" and made statements about the strength of LVS's credit policies. ECF No. 95 at 28. The Trust argues that affirmative statements do not meet the definition of "puffery." *Id.* (citing *Ferreira v. Funko Inc.*, 2021 WL 880400, at *12 (C.D. Cal. Feb. 25, 2021) (defining puffery as "vague or merely optimistic language that is 'not capable of objective verification'")). Fourth, the Trust argues that the defendants' challenges to the CWs' allegations fail because defendants incorrectly argue, without supplying authority, that because the CWs were not employed at MBS during or for the entire class period, their allegations cannot be considered by this court. *Id.* at 29. The Trust further proffers that defendants' attempts to attack the credibility of the CWs are irrelevant and are based on a misunderstanding of what information the CWs are providing in support of the SAC. *Id.* at 29–30. It also defends that the information supplied by the CWs is not conclusory. *Id.* Last, the Trust contends that the unauthorized transfer scheme was not immaterial, as the

amount of the fraudulent transfers was at least SGD $365 million. ¶¶ 104–05.

        *b.*  *SOX certifications*

      The Trust contends that LVS's Form 10-Ks and Form 10-Qs were false and misleading because they contained the following statements:

> "this report does not contain any untrue statement of material fact" and "the financial statements, and other financial information in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company."

ECF No. 77 at ¶¶ 155, 177, 192, 208, 224, 233, 242. The Trust contends that these certifications were affirmatively false and misleading when made because they falsely represented compliance with LVS's internal credit and lending practices. It also argues that LVS's own actions demonstrate the falsity of the certifications because, by 2018, it was agreeing to implement new control procedures, and then after the Xi lawsuit, it acknowledged "weaknesses" in its control measures. ECF No. 95 at 32. The Trust also argues that defendants' representations that they had disclosed all internal control weaknesses, deficiencies, and any "fraud" was affirmatively false and misleading because they failed to disclose the unauthorized transfer scheme. *Id.* at 33. The Trust's position is that defendants had an affirmative duty to disclose the information about the scheme. *Id.* The Trust argues that defendants misstate the "scope and application" and their SOX disclosures by claiming they only apply to LVS's internal controls over financial reporting. The Trust alleges that the SOX certifications about the LVS's internal controls apply to *all* disclosures made in the Form-10K, not just financial statements, and their failure to disclose the scheme—which it contends was a material risk—constitutes violations of Item 105 of Regulation S-K. *Id.* at 33–34.

    **D.  Analysis**

      Taking the Trust's allegations in the SAC as true, I find that it sufficiently alleges a scheme of unauthorized transfers. I make this as an independent determination. The Trust contends that a scheme was already found by Judge Navarro and therefore under the "law-of-

the-case" doctrine, this determination cannot be disturbed. ECF No. 95 at 21–22. The Trust misapprehends application of that doctrine to motions to dismiss. The law-of-the-case doctrine states that the decision on a legal issue by the same or a superior court must be followed in all subsequent proceedings in the same case. *Planned Parenthood of Cent. & N. Arizona v. State of Ariz.*, 718 F.2d 938, 949 (9th Cir. 1983). Once a plaintiff elects to file an amended complaint, the new complaint is the only operative complaint before the district court. *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992), *as amended* (May 22, 1992) ("[A]fter amendment the original pleading no longer performs any function and is treated thereafter as non-existent[.]" (internal quotation marks omitted)). Thus, when an original complaint is dismissed, the filing of an amended complaint does not seek the court's reconsideration of its analysis of the initial complaint (*Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018)), but it does raise a new set of legal issues within the amended pleading for the court's consideration. The amended complaint is a new complaint, entitling the plaintiff to judgment on that complaint's merits. *Id.* LVS's internal investigation revealing the scope and duration of the transfers alone supports this finding. That said, the SAC goes beyond the investigation and sets forth additional allegations in support of the scheme—including, but not limited to—the Xi lawsuit and information provided by two confidential witnesses. I thus evaluate whether the SAC sets forth violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 of the Exchange Act.

In order to establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)[8], the Trust must allege that a defendant, in connection with the purchase or sale of a security: (1) made a material misrepresentation or omission; (2) with scienter; (3) in interstate commerce. *See* 17 C.F.R. § 240.10b-5(b); *see also SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). This offense is also subject to the heightened pleading requirement—regarding fraud—of

---

[8] Rule 10b-5 prohibits the use of "any device, scheme, or artifice to defraud" in the offer or sale of securities. 15 U.S.C. § 77q(a)(1); 17 CFR § 240.10b-5(a).

FRCP 9(b).  Thus, in order to satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc) (requiring that the complaint state "what is false or misleading about a statement, and why it is false"), superseded by statute on other grounds, PSLRA of 1995, 15 U.S.C. § 78u–4(b)(1), as recognized in *Ronconi*, 253 F.3d 429 n.6.

A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information." *Khoja*, 899 F.3d 1008–09. In determining whether a statement is misleading, the court applies the objective standard of a "reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). A fact is material if there is a "substantial likelihood" that a reasonable investor would consider it important in his or her decision making. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Thus, to meet the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32 (citation omitted). Stated otherwise, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* at 240; *see also United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (materiality depends on the significance a reasonable investor would have placed on the withheld or misrepresented information).

The stated class period runs from 2016 to 2020. ECF No. 77 at ¶¶ 151–52. Evaluating the SAC within that timeframe, an immediate issue arises regarding the alleged false or misleading statements for the years 2016 to 2018. According to the SAC, it was not until late 2017—at the earliest—that Hogan Lovells was retained to conduct an internal investigation into the unauthorized transfer scheme. ECF No. 77 at ¶ 31. And, per the SAC, the results of that

investigation were not made known until an unknown date in 2018. *Id.* The Trust does not address how, without more, this court should find that the credit or SOX statements from 2016, 2017, and 2018 were either false or misleading, if it is unclear when the defendants discovered the scheme that could have potentially rendered the statements false or misleading at all.

Based on a plain reading of the SAC for the years 2016 to 2018, there is no information about precisely *when* or *which* defendants learned about the scheme to render statements false and misleading. "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" § 78u–4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007); *In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1214 (W.D. Wash. 2009) (citing Rule 10b–5. 15 U.S.C. § 78u–4(b)(2)'s requirement to plead "**with particularity** facts giving rise to a strong inference that the defendant acted with the required state of mind," and must do so for "each act or omission alleged to violate.") (emphasis added)). The SAC makes one general allegation of knowledge of the scheme by other persons employed at MSB, not by the defendants. This is not enough. *See Vess*, 317 F.3d at 1107 ("[T]he circumstances constituting the alleged fraud [must] be specific enough to give the defendants notice of the particular misconduct . . . Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." (cleaned up)). The Xi lawsuit and the CWs offer no additional allegations that would address the knowledge issue. The Xi lawsuit addresses transfers that happened before the alleged class period. ECF No. 77 at ¶ 134 ("According to Xi, the amount was pilfered from his account through 22 separate transactions made between October and December 2015[.]"). And the SAC's only allegation that upper management at MSB was aware of the scheme is set forth at paragraph 147, which states that CWs 1 and 2 "observed [the] transfers routinely during their employment at

MBS between 2013 and 2016 and discussed them at various high-level meetings with LVS's Global Chief Compliance Officer, MBS's Chief Financial Officer, senior compliance personnel, and representatives from legal, including Deputy General Counsel Penny Lo, and Daphne Hearn who served as MBS's Chief Compliance Officer." *Id.* at ¶ 147. But the allegation does not sufficiently address the "what . . . when, and how" the transfers were discussed to meet the PSLRA pleading requirement for the relevant class period.

But the allegations pertaining to 2019 and 2020 are different. The SAC alleges that by then, defendants, in fact, knew about the scheme; their knowledge is evidenced by their own internal investigation and subsequent report and the Xi lawsuit. By 2019, LVS was aware of the Xi lawsuit and its disclosure accompanied a decline in LVS's stock price. *Id.* at ¶ 247. And by 2020, there were news reports regarding the Xi lawsuit and the transfer scheme, which resulted in another drop in the LVS stock price. *See generally id.* at ¶¶ 249–65. As a result, I find that the Trust satisfies the first prong of establishing a violation of Section 10(b) of the Exchange Act and of Rule 10b-5(b). That is, the Trust sufficiently alleges that defendants made a material misrepresentation or omission when they certified that material aspects of the company's financial conditions and any significant deficiencies and material weaknesses with internal controls had been disclosed. *See generally id.* at ¶¶ 212–45. Taking the allegations and inferences into account, the SAC sufficiently alleges that defendants' 2019 and 2020 credit-and-internal-controls statements were material and that there was "'substantial likelihood'" that a reasonable investor would consider that information important in his or her decision making. *Basic Inc.*, 485 U.S. at 231.

I also find that the SAC establishes scienter for years 2019 and 2020. In a securities-fraud case, scienter can be established if a defendant had "a mental state embracing intent to deceive, manipulate, or defraud." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1568 (9th Cir. 1990) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). The Ninth Circuit has held that "recklessness" is sufficient to satisfy the scienter requirement. *Id.* at 1568–69; *SEC v. Glob. Express*

*Cap. Real Est. Inv. Fund, I, LLC*, 289 F. App'x 183, 187 (9th Cir. 2008); *see also Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978) (knowledge or recklessness is required for a finding of scienter under § 10(b)). Reckless conduct has also been described as conduct that demonstrates "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger*, 914 F.2d at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied*, 434 U.S. 875 (1977)).

When reviewing a complaint for scienter, the court considers "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Metzler Inv. GMBH*, 540 F.3d at 1061. Further, to plead a strong inference of scienter, the complaint must set forth particularized facts revealing that the individual defendants knew the supposedly false statements challenged by the plaintiffs were false or misleading when made or had access to information establishing that the individual defendants were deliberately reckless in allowing the false statements to be made. *See id.* at 1068. For 2019 and 2020, the SAC sufficiently alleges that defendants knew of the transfer scheme and the deficiencies in its internal controls. And by 2020, the SAC alleges that they knew that those issues emerged when the stock price dropped. These allegations are enough to establish falsity and scienter.

### E.   Loss causation

On August 7, 2023, in resolving defendants' motion to dismiss (ECF No. 84), the court found that plaintiffs' allegations of loss causation[9] were adequate to survive the pleading stage. ECF No. 108 at 18. The court relied in part on decisions in the Ninth Circuit which highlighted that proofs of loss causation are best left to discovery. *See, e.g., City of Miami Gen. Employees' &*

---

[9] Loss causation is "a variant of proximate cause," and turns on "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (loss causation sufficiently pled when share price fell 22% and never recovered). The central inquiry is whether a plaintiff's loss was caused by "the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per curiam) (citation omitted).

*Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018) ("Defendants' argument that the respective stock declines were due to other macroeconomic factors does not persuade. 'Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.'") (quoting *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D Cal. 2016)).

On December 4, 2023, the Ninth Circuit issued an opinion in *In re Facebook*, which provided greater clarity surrounding the heightened pleading standard applicable to loss causation. 2023 WL 8365362, at *13 (9th Cir. Dec. 4, 2023) (confirming that "Rule 9(b) applies to all elements of a securities fraud action, including loss causation.") (quoting *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014)). *In re Facebook* confirmed that "[p]leading loss causation requires a showing that the 'share price fell *significantly* after the truth became known" and that the shareholders must show that the "misstatement, *as opposed to some other fact*, foreseeably caused the plaintiff's loss." *Id.* at *12 (emphasis added) (quotation marks and citations omitted). Following further argument from the parties on December 19, 2023, the court decided to take judicial notice of LVS's stock (Exhibit 30) and its peers' stocks (Exhibit 31),[10] a request the court had previously denied when resolving defendants' motion to dismiss. ECF No. 146. The court now amends its holding regarding loss causation in light of the intervening *In re Facebook* decision and considerations following judicial notice of Exhibits 30 and 31.

Plaintiffs allege five instances of loss causation following particular corrective disclosure dates: (1) September 26, 2019, where LVS's stock dropped from $51.85 to $49.67 (ECF No. 77 at ¶338); (2) May 12, 2020, where LVS's stock dropped from $48.50 to $45.96 (*id.* at ¶340); (3) July 19, 2020, where LVS's stock dropped from $48.69 to $47.28 (*id.* at ¶342); (4) June 4, 2020–June

---

[10] At the December 19, 2023 hearing, plaintiffs objected to the court's taking judicial notice of the peer stocks (Exhibit 31) but given that plaintiffs put such peers' stocks at issue in the complaint (ECF No. 77 at ¶¶337, 339, 341), the court determined that judicial notice was appropriate. ECF No. 146; *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *13 (C.D. Cal. Jan. 12, 2012). Plaintiffs did not object to judicial notice of LVS's stock (Exhibit 30) at the hearing.

7, 2020, where plaintiffs allege that "LVS stock [was] underperforming as compared to its peers" during those days (in response to articles published on June 4, June 5, and June 7) (*id.* at ¶341); and (5) September 16, 2020, where LVS's stock dropped from $51.85 to $49.67 (*id.* at ¶342).

As set forth in *In re Facebook*, while plaintiffs are not required to prove loss causation at the motion to dismiss stage, they must (1) allege a "significant" drop in price, and (2) allege with particularity facts plausibly suggesting that the fraud caused the stock drop, as opposed to some other fact. 2023 WL 8365362, at *12.

Plaintiffs' June 4, 2020–June 7, 2020 loss causation allegations are unavailing because the complaint does not allege a drop in stock price during these dates, let alone a significant drop. While LVS's stock may or may not have underperformed as a result of the corrective disclosures compared to its peers on those days, such losses are not those intended to be covered by the law. *See Bajjuri v. Raytheon Techs. Corp.*, 2023 U.S. Dist. LEXIS 92114, *61–62 (D. Ariz. May 25, 2023) (finding allegations that stock "lagged" the applicable industry index and "significantly underperformed its peers" for five days following disclosure not actionable because law creates a cause of action based on "an absolute decline in a stock's price, not a relative decline.") (citing cases). Indeed, as *In re Facebook* confirmed, disclosures that are "unaccompanied by a stock price drop" are "not actionable." 2023 WL 8365362, at *13 ("[T]he June 2018 whitelisting revelation, which was unaccompanied by a stock price drop, is not actionable.") (citing *Lloyd,* 811 F.3d at 1210). Thus, plaintiffs' allegations surrounding the June 4, 5, and 7 disclosures are dismissed without prejudice. Plaintiffs are warned that if they choose to amend concerning these disclosures, such allegations must be based on a price *drop* to survive a future motion to dismiss.

Plaintiffs' remaining loss causation allegations do allege a drop in stock price following corrective disclosures, though these drops are, at least facially, modest. There is no hard cutoff for what percentage drop constitutes a "significant" drop for a stock price; instead, such determinations will "vary depending on the average trading range for the particular stock." *Eng v. Edison Int'l,* 2017 WL 1857243, at *4 (S.D. Cal. May 5, 2017) (citing *Greenberg v. Crossroads Sys., Inc.,*

364 F.3d 657, 665 n. 9 (5th Cir. 2004)). For example, "[a] drop of 10% for a volatile stock may not be statistically significant whereas the same drop for a stock with little average movement may be significant." *Id*. LVS's stock dropped less than 3% following the September 26 and July 20 disclosures and around 5% following the May 12 and September 16 disclosures. While not a hard and fast rule, "securities complaints tend to be predicated on double digit declines." Eng, 2017 WL 1857243, at *4 (collecting cases); *see Camp v. Qualcomm Inc.*, 2020 U.S. Dist. LEXIS 42079, *19–20 (C.D. Cal. Mar. 10, 2020) (calling 4% drop "minimal"). Having now taken judicial notice of LVS's public stock information, the court notes that LVS's stock appears relatively variable during the relevant time period with regular price fluctuations constituting drops often in line with or even exceeding the drops that plaintiffs allege were caused by fraud following the corrective disclosures. For example, the court notes that between March 26, 2020 to March 27, 2020, LVS's stock dropped from $48.36 to $42.10, almost a 14% decrease in stock price.[11] Ex. 30 at 4.

The question of whether plaintiffs have pled stock drops "significant" enough to pass the motion to dismiss stage in their second amended complaint is a close one here. While these 3% and 5% drops appear modest, the court is cognizant that expert analysis may shed much clearer light on whether the alleged instances of loss causation are statistically significant for LVS's average trading range. *See RH, Inc.*, 302 F. Supp. 3d at 1046. The court is also aware that the drops in price solely from the next day following the corrective disclosures may not be the full picture here. Indeed, plaintiffs made argument for the first time in briefing subsequent to the court's opinion on defendants' motion to dismiss and at the December 19, 2023 hearing that LVS's stock actually dropped higher percentages in the days following particular disclosures allegedly as a result of the market's delayed reaction in fully appreciating the fraud. ECF No. 135 at 3–4 ("After

---

[11] The court does not mean to ascribe any particular importance to these dates or this drop. It is merely cited as an example of LVS's stock price fluctuation during the relevant time period to contextualize why the 3% and 5% percent drops that plaintiffs allege are a result of fraud following the corrective disclosure dates do not *appear* to be a stark deviation from the stock's normal ebb and flow of price fluctuations.

the September 16, 2020 revelation, LVS's stock price dropped 4.3% that day and, as in Facebook, continued declining for the following week for a total drop of $6.81 per share, or 13% and did not recover until November 5, 2020, over seven weeks later. Likewise, LVS's stock price declined 3% on the first trading day after the July 19, 2020 disclosure and continued to decline over the next five trading days to close at $43.48 per share on July 27, 2020, or 10.7%, and did not recover for another 16 trading days."); *see Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936 at, *13 (N.D. Cal. Mar. 16, 2020) (finding sufficient loss causation where partial disclosure resulted in a 4.9% stock drop and later 28%). Plaintiffs did not plead this delayed theory in their SAC. The court makes no finding on the "significance" of the stock drops pled at this time nor opine on any potential amendments plaintiffs may make on that front.

The court does, however, find that the September 26, July 20, May 12, and September 16 loss causation allegations are deficient as pled because they fail to allege that the stock drops are plausibly (at least partially) the result of the disclosed fraud, "as opposed to some other fact[.]" *In re Facebook*, 2023 WL 8365362, at *12. Now that the court has taken judicial notice of LVS's stock and that of its peers, plaintiffs must allege facts supporting how the May 12 and September 26 drops are plausibly a result of fraud when each stock drop was modest, and then quickly rebounded. Ex. 30 at 1, 4; *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (finding quick, sustained price recovery after modest drop "refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price."); *see also Metzler Inv. GMBH*, 540 F.3d at 1064–65 ("[W]hile the court assumes that the facts in a complaint are true, it is not required to indulge unwarranted inferences in order to save a complaint from dismissal . . . [the] stock quickly recovered from the 10% drop that followed the [June 24] Financial Times story . . . . thus [the complaint] fails to allege loss causation based on the June 24 [disclosure.]"). And plaintiffs must provide allegations which plausibly allege that the drops following the September 16 and July 19 disclosures were occasioned (at least in part) from fraud rather than industry-wide turmoil, given that the peer stocks and industry index appear to

22

move in tandem with LVS's decline (and eventual recovery) during these time periods. Ex. 31 at 5–7. Though not alleged in the SAC, plaintiffs represented at the December 19 hearing that LVS's stock declined *further* in percentage than its peers following the September 16 disclosure. To the extent this is true, plaintiffs should allege such facts in any subsequent amended complaint to ensure that, while not needing to make any proofs of causation at this point, their allegations at least "allege with particularity facts plausibly suggesting that such showings can be made." *In re BofI Holding, Inc., Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020). For those reasons, the allegations regarding the September 26, 2019, May 12, 2020, July 19, 2020, and September 16, 2020 corrective disclosures are insufficient to plausibly allege loss causation at this stage. Accordingly, defendants' motion to dismiss the second amended complaint is granted.

### F. Leave to Amend

When dismissing a complaint for failure to state a claim, a court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). Although the court has determined that the Trust fails to state a claim for years 2016–2018 of the alleged class period, there is a possibility that the Trust can cure its allegations, and further may be able to cure the deficient allegations related to loss causation for years 2019–2020. Accordingly, because the Trust may salvage its claims related to those years, I find that amendment would not be futile. The Trust's claims are therefore dismissed in part, but with leave to amend. The Trust is advised that this will be its final opportunity to amend its pleading.

## III. Conclusion

IT IS HEREBY ORDERED that plaintiff's motion for reconsideration **[ECF No. 75] is DENIED.**

IT IS FURTHER ORDERED that plaintiff's and defendants' motions to file supplemental authority **[ECF Nos. 103; 105] are GRANTED.**

IT IS FURTHER ORDERED that defendants' motion to dismiss the second-amended complaint **[ECF No. 84] is GRANTED** for the reasons set forth in this amended order. Should the Trust choose to file an amended complaint, it must do so within 30 days of December 19, 2023. The Trust may not add new claims or parties without leave of the court or joint stipulation by the parties under Fed. R. Civ. P. 15.

DATED: January 2, 2024

_____
Cristina D. Silva
United States District Judge