———2:20-cv-01958-CDS-EJY———

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

THE DANIELS FAMILY 2001 )
REVOCABLE TRUST, ) Case No. 2:20-cv-01958-CDS-EJY
Individually, and On )
Behalf of All Others ) Las Vegas, Nevada
Similarly Situated, ) Tuesday, December 19, 2023
) 2:05 p.m. - 3:36 p.m.
Plaintiff, ) Courtroom 6B
)
vs. ) Motion Hearing
)
LAS VEGAS SANDS CORP., ) **C E R T I F I E D   C O P Y**
SHELDON G. ADELSON, and )
PATRICK DUMONT, )
)
Defendants. )
)
_____ )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CRISTINA D. SILVA,
UNITED STATES DISTRICT JUDGE

APPEARANCES:       See next page

COURT REPORTER:    Samantha N. McNett, RMR, CRR, CCR
                   United States District Court
                   333 Las Vegas Boulevard South, Room 1334
                   Las Vegas, Nevada  89101
                   Samantha_McNett@nvd.uscourts.gov

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

2

2:20-cv-01958-CDS-EJY

**APPEARANCES**

For the Plaintiff:

**SHANNON HOPKINS, ESQ.**
**DAVID C. JAYNES, ESQ.**
LEVI & KORSINSKY, LLP
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
203-992-4523

For the Defendants:

**CAROLINE WONG, ESQ.**
**WALTER CARLSON, ESQ.**
**LAWRENCE FOGEL, ESQ.**
SIDLEY AUSTIN, LLP
1 South Dearborn Street
Chicago, Illinois 60603
312-853-7146

-AND-

**BRADLEY T. AUSTIN, ESQ.**
SNELL & WILMER, LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702-784-5200

* * *

2:20-cv-01958-CDS-EJY

LAS VEGAS, NEVADA; TUESDAY, DECEMBER 19, 2023; 2:05 P.M.

--oOo--

P R O C E E D I N G S

THE COURTROOM ADMINISTRATOR:  This is the time set for hearing on motions, The Daniels Family 2001 Revocable Trust vs. Las Vegas Sands Corporation, case number 2:20-cv-01958-CDS-EJY.

Counsel, please note your appearance beginning with plaintiff.

MS. HOPKINS:  Good afternoon, your Honor.  This is Shannon Hopkins with Levi and Korsinsky for the plaintiffs.

THE COURT:  Good afternoon.

MR. JAYNES:  Good afternoon, your Honor.  David Jaynes with the plaintiffs.

THE COURT:  Good afternoon to you.

MR. AUSTIN:  Good afternoon, your Honor.  Brad Austin from Snell & Wilmer.  Also on behalf of defendants from Sidley Austin admitted pro hac vice to this court are Walter Carlson to my left.

MR. CARLSON:  Good afternoon, your Honor.

MR. AUSTIN:  Lawrence Fogel to my right.

MR. FOGEL:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. AUSTIN:  And Caroline Wong to my right.

MS. WONG:  Good afternoon.

THE COURT:  All right.  And good afternoon to you, as

well.

So we are here on a motion for reconsideration or a motion to stay pending decision on reconsideration.  I apologize for having to move things around.  I was in trial.  But I certainly appreciate everyone working together to make this hearing happen.  I wanted to get it taken care of sooner than later.

Before I resolve the motion for reconsideration, I'll note that I did grant both sides motion for leave to file supplemental authority last week via minute order and considered those filings in preparation for today's hearing.

In sum, defendants seek reconsideration of my order denying their motion to dismiss the second amended complaint.  I had found that lost causation was sufficiently pled.  Defendants ask that I reconsider my decision and argue that not taking judicial notice of the stock prices was erroneous for the reasons set forth in their motion.

Plaintiffs oppose the motion for reconsideration and argue that it did not err, for lack of a better summary, and ask that I do not reconsider my decision.

I had read the motions.  And then the requests for supplemental authority was filed first by plaintiff and then by defendants, which was helpful in the Court's view in terms of resolving the motion for reconsideration.  And so I thank the parties for providing that to the Court.

—————2:20-cv-01958-CDS-EJY—————

So I think first things first, I want us to be on the same page regarding the proper pleadings standard.  You know, I discussed that in my order denying the motion to dismiss, but I am going to, first, turn to plaintiffs.

Can we agree that the proper pleading standard would be pursuant to Rule 9(b)?

MS. HOPKINS:  Shannon Hopkins, your Honor.

It does -- the Ninth Circuit initially had said it was related to late notice pleading and subsequently said that Rule 9 be applied, but I would say, your Honor, that under 9(b), the plaintiff only need to plausibly allege loss causation.

THE COURT:  Understood.  And we'll dive more into that shortly.  So I'm going to assume that defendants don't disagree that 9(b) applies?

MS. WONG:  Your Honor, Caroline Wong for defendants.

We, of course, agree that Rule 9(b) applies under Facebook and the other Ninth Circuit cases applying Rule 9(b) to loss causation.

THE COURT:  So I want to just kind of get the groundwork laid and then move to the -- next would be the publicly available stock price information.

When I initially read the motion to dismiss the second amended complaint, the request for taking judicial notice of the stock prices was included, but the way I interpreted the

briefings, essentially, because they were -- there was a disagreement regarding the interpretation of the stock prices, how they rose, how they fell, or if they did at all was at issue, I didn't find it appropriate.

I want to turn to plaintiffs -- and your argument remains that I shouldn't.

Plaintiff cited a number of cases that suggest that I should.  Why should I not take judicial notice of the stocks?

MS. HOPKINS:  Your Honor, I think the Court can take judicial notice of Exhibit 30, which is Las Vegas Sands' historical stock price, but the Court cannot take judicial notice of the stock prices for the purposes of which defendants offer them which is to refute plaintiff's arguments at the pleadings stage.  Exhibit --

THE COURT:  So Exhibit 30 being the comparative stock?

MS. HOPKINS:  The Las Vegas Sands only historical stock prices.

So I would agree the Court could take judicial notice of the stock prices in Exhibit 30, which is the historical stock prices for Las Vegas Sands, but not for the truth or the purpose of the arguments the defendants are making against the plaintiffs at the pleadings stage.  That would be improper.

With respect to Exhibit 31, your Honor, I would still maintain plaintiff's position that that is not -- it should not be judicially noticed because it's not included in the

2:20-cv-01958-CDS-EJY

complaint.

However, I will note, your Honor, that courts are mixed on that. And a decision here in this court, In re MGM Mirage Securities Litigation, 2013 U.S. District LEXIS 139356, Judge Navarro did take judicial notice of stock prices of other companies in a nearly identical situation. However, Judge Navarro said that she was -- the Court would take judicial notice. However, it was premature for the Court to consider those for their truth and such evidence is not proper on a motion to dismiss. That's at star 13 to 14.

So while plaintiff's position is that the Court should not take judicial notice, I will note that another Court -- another district -- Judge Navarro did take judicial notice of -- of identical -- of stock prices of other companies in nearly an identical situation. And in MGM, the defendants introduced stock prices from a peer index and from another company to show that the stock price declined because of an industry -- an industry-wide disclosure and not the specific fraud at issue.

And Judge Navarro said she's going to take judicial notice but, quote, nevertheless, although the Court has taken judicial notice of the documents, the Court agrees with plaintiffs that the defendant's arguments based on these documents are premature and that the evidence was not proper on a motion to dismiss.

THE COURT: All right. Well, your argument, in part,

is based on not placing the company's or the competitor's or the peer's, whatever you want to call them, stock at issue. But if I look at the second amended complaint, specifically paragraphs 337, 339, and 341, it does appear that you put the competitor's stock at issue.

MS. HOPKINS:  Your Honor, the complaint in a couple of places does -- for pleading purposes, plaintiffs have to plausibly allege loss causation.  That doesn't mean that this is the only evidence or that this is -- plaintiff does not need to prove loss causation at this stage.  The defendants are using this index to make factual arguments to rebutt loss causation on an incomplete record.

The peer index that defendants are proposing to use, your Honor, has only four participants in it at the time of the September 20th corrective disclosure.  One of those participants, your Honor, is Las Vegas Sands.  Las Vegas Sands is weighted 55% of that peer index.  So is it any surprise that the peer index is somewhat correlated?  You can't look at the peer index.  That's not -- solely at the peer index.  That's not a proper comparator.

In addition, your Honor, to properly determine the movement of a stock price, as we've seen in the Facebook decision, the Ninth Circuit said there is "no bright-line rule requiring an immediate reaction -- market reaction after a revelation because the market is subject to distortions that

-2:20-cv-01958-CDS-EJY-

prevent the ideal of a free and open public market from occurring."

Here, defendants -- there are at least seven other publicly traded casinos that could be considered as comparators for Las Vegas Sands.

Defendant put forth a peer index that is weighted 55% based on Las Vegas Sands' stock prices, only one of four participants, when there are multiple other companies out there. So to take -- to take the peer index and find, as a matter of law, that plaintiffs have not alleged loss causation when that index is inappropriate to use is improper at this stage, your Honor.

The defendants also include the Wynn's -- the Wynn's casino as a comparator. They cherry-picked the one that's most advantageous to the story they want to tell.

But, again -- and your Honor, I have a demonstrative for your Honor that I thought would be helpful to show that there are seven casinos that could be considered comparators. It is not appropriate for the Court to decide, on a motion to dismiss, these factual issues.

The fact that plaintiffs used it in a complaint for -- to plausibly allege at a time when they are not required to prove loss causation does not mean that defendants get to come in here and tell the Court to only consider the pleading -- the peer index, only consider Wynn's, and the don't look at the

─2:20-cv-01958-CDS-EJY─

other public companies and find, as a matter of law, that loss causation has not been alleged is not proper at this stage.

THE COURT:  Understood.  I don't need the demonstrative aide yet.  And in fact, I think that might take us too far in terms of the scope of this hearing.  So hold on to that for now.

I do want to hear from defendants regarding the argument that the Exhibit 31 is, I'm going to call it, self-serving for purposes of the motion and the arguments contained therein.  And specifically, I want you to address the fact that the comparative stock price chart is weighted heavily in Sands' favor.

MS. WONG:  Thank you, your Honor.  Happy to address those questions.

So first, your Honor, I want to begin with the second amended complaint.  Plaintiffs, as has been discussed somewhat already, have put the peers, whose stock price information is reflected in Exhibit 31, into issue in their own allegations. Of course, paragraphs 337 to 341 are important in that regard.

I also want to call out paragraph 32 of the second amended complaint.  That's the first paragraph under the heading titled "Las Vegas Sands Operations and Its Position Within the Global Gaming Industry."  And that paragraph refers to the company's "next largest competitor, MGM Resorts."  So there, there's always an expressed identification of one of the

2:20-cv-01958-CDS-EJY

specific peer companies whose stock price information is in Exhibit 31.

I also want to be clear, your Honor, that paragraph 341 as well as 339 doesn't just refer to peers generally. They refer specifically to a peer index. So for example, 341 -- paragraph 341 of the second amended complaint says that Las Vegas Sands' stock was allegedly underperforming as compared to peers and then later in the sentence refers to the return of its peer index. And then there's a table right underneath right after the allegations in paragraph 341 with a column that, again, refers to a peer index log return.

Now, defendants have argued and made the point multiple times throughout the briefing in this case, your Honor, that the stock price information in Exhibit 31 is appropriate to consider. And Exhibit 31, since it was filed in the original motion to dismiss briefing, has been very clear that the peer index used there is the Dow Jones U.S. Gambling Index. And in turn, plaintiffs have had multiple opportunities now to come forward and say, no, no, no, defendants, your Honor, we actually meant to refer to a different peer index when we refer to a peer index multiple times in our complaint. They haven't done so. They still haven't done that today.

And your Honor, I don't know of any other peer index that would be appropriate to use in a company like this against a U.S. public company in the gaming industry like Las Vegas

Sands.

The other two peers are -- whose stock price information is in Exhibit 31 are MGM and Wynn Resorts. Again, MGM is referenced in plaintiff's own allegations. Wynn and MGM are the two other major U.S. public companies in the gaming industry that also have international gaming operations. And so they were selected for Exhibit 31 partly because of, again, paragraph 32 of plaintiff's own allegations but then also because of that characteristic that they have in common. Those with the peer index, again, which plaintiffs have put into issue, we think fairly represent the peers that the Court can take into account at this stage.

And again, your Honor, plaintiffs have had multiple opportunities to come forward and explain that they -- or clarify that they meant to refer to a different peer index or that they think a different peer group would be appropriate. They have not done so.

The reference today to a demonstrative exhibit with seven comparators that plaintiffs have offered to the Court is the first time in the motion to dismiss briefing or the briefing on the motion for reconsideration that they have ever come forward with any such alternatives.

THE COURT: All right.

MS. WONG: Your Honor, I also want to address the case law relevant to judicial notice because that's something that

Ms. Hopkins touched on, as well.

The stock price information in Exhibit 31 is properly subject to judicial notice and properly considered at this stage for two reasons.

So, first, all of the stock prices in there are publicly available and are not subject to reasonable dispute. Those are also reasons why the stock price information in Exhibit 30 is appropriately subject to judicial notice and considered at this stage. That reasoning applies equally to the information in Exhibit 31.

And to be very clear, your Honor, there is no factual dispute about any of the peer's stock prices on any given day or about the Dow Jones U.S. Gambling Index share price on any given day. Plaintiffs, of course, dispute the legal consequences that that stock price information has on their ability to plead loss causation, but there's no factual dispute about what the numbers are.

The second reason, your, Honor, why those stock prices in Exhibit 31 are judicially noticeable, are, again, because plaintiffs have put them at issue in their own allegations. And for this point, your Honor, I think the Lloyd vs. CVB District Court case that we cite in our briefing is especially instructive. In that case, the issue of judicial notice of peer companies' stock prices was disputed and the Court held that it was going to take judicial notice of that peer company

stock price information exactly because of the same reason that applies here.  The plaintiffs had put peers into issue in their own allegations.  The Court then used that peer company stock price information in granting a motion to dismiss in a Section 10(b) case.

I would also like to refer the Court to the body of District Court cases cited within Lloyd vs. CVB which show a uniform approach to judicial notice of company stock prices, again, in Section 10(b) case.

So, for example, Lloyd vs. CVB cites the In re Avista Securities litigation case from the Eastern District of Washington.  That case took judicial notice of the Dow Jones Utility Average Index.  It also -- Lloyd vs. CVB also cited In re Keithley from the Northern District of Ohio.  That took judicial notice of the stock prices of the defendant company's primary competitor as well as the Dow Jones Semiconductors Index.

There's also the In re Acterna Corporation Securities litigation case.  That's at 415 F. Supp -- excuse me.  That number was not right.  That's at 378 F. Supp. 2d 561 from the District of Maryland in 2005.  In that case, as well, a court took judicial notice of peer company stock prices and used them as a basis for dismissing a Section 10(b) complaint for failure to plead loss caution given that those peer company stock prices fell in tandem with the defendant company's stock

2:20-cv-01958-CDS-EJY

prices.

THE COURT:  In those cases -- and I don't know if you'll know the answer to this as you stand here today -- was there a weight issue in terms of the stock at issue in comparison or in tandem, if you will, with the comparative peer stocks?  I think that's an important consideration for this Court in how much Sands is weighted in the index compared to, let's say, the Avista Corp.

Do you know?

MS. WONG:  Your Honor, I do believe that that issue is not discussed in any of the District Court opinions that I just cited for the Court.

But, again, those -- those opinions use and take judicial notice of Dow Jones industry indices, various kinds. This is going to be an issue anytime that a court takes judicial notice of a Dow Jones industry index if the company that's at issue in the case is going to be part of that index. That's why the index is being used because it's the applicable industry index to look at.

And, again, that issue was not a bar -- none of the courts that I just -- that I just referenced in those decisions considered that a bar for judicial notice or any -- any other -- or otherwise a reason to decline to grant a motion to dismiss.

Your Honor, on the flip side of that, plaintiffs also

have not cited any cases that address that issue and found that that was a bar for dismissal or, you know, something that prevented a court from taking that kind of information into account and granting a motion to dismiss.  And I think the absence of case law to support plaintiffs on this point is telling, as well.

THE COURT:  All right.  Let me turn back to plaintiffs.

Anything you would like to add in reply to defendant's arguments?

MS. HOPKINS:  Well, your Honor, first of all, I just gave your Honor a citation of a case in this court by Judge Navarro that addressed this exact issue, which is the MGM case, and said it was premature to consider the peer index and the other competitor companies at the motion to dismiss stage.  So I just gave your Honor a citation to a case on nearly identical facts.  And the Court, while taking judicial notice, said specifically that the documents -- consideration of the documents was premature at the motion to dismiss and the presentation of such evidence is not proper on a motion to dismiss.  So there is support for plaintiff's argument.

And I think it's important to remember, your Honor, that at the pleadings stage, it's -- it's plausibility.  It is well-known, and defendants know this too, that loss causation is a fact intensive issue that requires expert discovery.  You

can't just take a peer index of four companies and find, as a matter of law, that plaintiffs have not alleged loss causation. Defendants have not done the event study to determine the price movements of each company's stock in that index.  For example, your Honor, one of the participants is Churchill Downs and that stock price increased .3% on September 15, 2020 when Las Vegas Sands went down.

So the -- you have to look -- you can't just take a peer index and find, as a matter of law, that there's no loss causation especially here when the index is weighted so heavily in favor of Las Vegas Sands.  It requires expert discovery and event study of each company's stock or aggression analysis to parse out the movement of the stock price.  And that's why loss causation is universally an issue for expert discovery.  And the fact that we're discussing this now is really not an appropriate time on an incomplete record based on cherry-picked companies that the defendants selected to make their argument.

THE COURT:  Well, I want to kind of hone in on an argument you just made and that is that, universally, loss causation is something that's left to expert discovery.  That seems to be putting the cart before the proverbial horse in terms of pleading.  Though, I understand -- and I assume your argument is based on the guidance that loss causation pleading stage is a little bit looser than some of the other requirements.

2:20-cv-01958-CDS-EJY

MS. HOPKINS:  Yes, your Honor.

In fact, the Facebook court in the Ninth Circuit in finding loss causation was alleged specifically said that "this case is at the very early motion to dismiss stage and that discovery in further proceedings are necessary to illuminate the issues surrounding loss causation."

THE COURT:  Right.

MS. HOPKINS:  If you look -- I'm sorry, your Honor.

THE COURT:  No.  No.  Go ahead.

MS. HOPKINS:  I was going to say if you look at the stock price movement on September 15th, which is one of the dates your Honor mentioned in your order, the stock price -- even defendants don't dispute the stock price significantly declined and stayed down for two months.  Plaintiffs plausibly allege a disclosure on that day causing the stock price to decline and stay down for months.  The peer index is not an appropriate comparator.

But, your Honor, in my presentation, if you do look at the peer index and the companies within it, you will see that Las Vegas Sands underperformed the others in the peer index. So, no, Las Vegas Sands does not follow its peers.  And now is certainly not the time to find, as a matter of law, that plaintiffs have not alleged loss causation.

THE COURT:  Hold on.  I want to take a step back.

MS. HOPKINS:  Sure.

THE COURT: You talked about September 15th.

MS. HOPKINS: I'm sorry. 16th, your Honor. The drop was on the 16th. Sorry, your Honor. And on that day, Las Vegas Sands lost $1.67 billion in market cap lost and the stocks stay depressed until -- for a couple of months. There was no prompt increase or anything like that.

THE COURT: Was that pled in the second amended complaint?

MS. HOPKINS: The stock price decline was pled, yes.

THE COURT: I know that the stock decline was pled.

MS. HOPKINS: Oh.

THE COURT: But was the continuity of the drop pled? I don't remember that. In fairness, I was in trial all last week and it's been a minute since I reviewed that.

MS. HOPKINS: Well, you know, I think at the pleadings stage, your Honor, to plausibly allege loss causation, as the Ninth Circuit held, the plaintiffs need to allege a disclosure correcting the prior misstatements that caused the stock drop in investor losses, which the plaintiffs have plausibly alleged here, your Honor. I don't think the plaintiffs need to allege an ongoing stock price drop to meet their burden.

THE COURT: I agree. But if we're going to be arguing this motion as it relates to the motion to dismiss the second amended complaint, I want to stick to what was pled and stick to what was argued.

2:20-cv-01958-CDS-EJY

All right.  So --

MS. HOPKINS:  Well, your Honor, if that's the case, then defendants, you know, should not be able to interject facts that are not in the complaint like the Wynn stock price movement or the peer index as a matter of --

THE COURT:  I mean, I think that's a little bit of a different inquiry because the matter is whether it was placed at issue.  And I haven't made a determination as to whether or not it was placed at issue.  But arguably, based on the questions I've asked you, you can see where I'm going with the fact that I could find it was placed at issue.  But I do want to talk about loss causation more generally in terms of loss since we're talking about that.

Certainly, I don't think there would be any dispute that the second amended complaint pleads a stock price decline.  You know, it's really -- if you look at the amount, in a matter of sense, it is by appearance modest but by result not modest based on the number of stocks alleged.  But it also appears that for almost every instance where a loss is pled, it is argued by defendants that there was a prompt rebound.

Is that sufficient to constitute loss causation under Ninth Circuit precedent?

MS. HOPKINS:  Your Honor, first of all, that's -- that's just not true.  There was not a prompt rebound on all of the corrective disclosures.

THE COURT: Well, I didn't say all. I said in almost all.

MS. HOPKINS: Well, not even almost all, your Honor.

Defendants keep talking about the October 29th disclosure. That's not alleged to be a corrective disclosure.

And the other ones they talk about are the ones that -- that plaintiff -- plaintiff alleges June 4, 2020 was the corrective disclosure and then elaborates that there was news repeating that the next couple of days. The stock price -- I mean, I have it in my presentation. The stock price on September 16th, nobody disputes there was a decline and a sustained declined that continued on.

In addition, your Honor, the May 20th corrective disclosure, there was a prompt -- there's five corrective disclosures. The September 16th corrective disclosure nobody disputes was a prompt sustained decline.

The May 12, 2020 disclosure similarly dropped and stayed down. That's the May 2021. And stayed declined.

The July 2020 disclosure declined, came up a little bit the following day, but never fully recovered. And then your Honor, if you would -- had seen my chart, it continued down and stayed down for -- for several weeks after that. So the stock generally stayed depressed after the July 19th and never fully recovered to the prior -- to the original stock price.

The June 4th -- the June 4, 2020 stock price in the morning -- that day, there was an announcement the casinos were opening after COVID.  So the stock price went up.  However, if you look at the intraday trading at 12:26 p.m. when this announcement came out, you would see a drop from the disclosure showing loss causation.  This is exact -- a perfect example of why it's inappropriate to make a finding of no loss causation, as a matter of law, at the pleadings stage.  There's so many things, we can all agree, and the Ninth Circuit just said in the Facebook decision, so many reasons a stock price can move up and down which is company specific news, market factors, all kinds of things which is why you typically need an expert for that.

The September 26, 2019 disclosure dropped and recovered quickly.

And your Honor, I would argue for the September 2019 disclosure, plaintiff has met their pleading burden to show a plausible loss causation.  And that as in Facebook where the Court said if there's no bright-line rule to have an immediate stock price decline, in Facebook -- I mean, here, the Wang lawsuit was announced in September 2019.  At that point, it was a single lawsuit with allegations.  And as in Facebook, the market needed additional information to fully appreciate the magnitude and the -- and the severity of the allegations in the Wang complaint and so subsequent declines support loss

causation for the Wang lawsuit as in the Facebook case.

THE COURT:  Well, let's -- let's stay on the Facebook page.  And I'm going to give the defendants an opportunity to respond shortly.

In the Facebook page -- the Facebook case, there, there was a continuing decline the following week for a total drop of $6.81 per share which was about 13% which didn't recover for almost two months.

Here, based on the allegations in the complaint, I don't see such a significant decline.  And so how do I -- in applying Facebook, how do I resolve that issue, because, again, I recognize the number can seem little but can have huge impact.  The same is true with Facebook.  And there's just a significant difference in terms of the decline.  So how do I reconcile that?

MS. HOPKINS:  Well, your Honor, again, the Ninth Circuit has said there's no bright-line rule for when a drop has to occur and how much it has to be and when.  The plaintiffs have pled on September 16th that the stock price dropped over 4% in one day and over a billion dollars in market cap loss, for an example.

THE COURT:  So are -- do you have authority that you're relying on to say that a -- let's focus on an immediate rebound, that that is sufficient to show loss causation?  What would you rely on?

MS. HOPKINS:  Your Honor, we don't have to -- well, your Honor, for pleading purposes, but the stock did not rebound.  Defendants aren't saying it rebounded either on September 16th.  Nobody is saying the stock price rebounded.  It did not.  Defendants can't say that and so they resort to saying, well, your Honor, look at the peer index, this peer index that's weighted 55% in favor of Las Vegas Sands.  Look at the Wynn's case.  Nobody disputes that the September 16th decline did -- there was no immediate rebound.

THE COURT:  What about the other dates?

MS. HOPKINS:  I don't think anyone disputes the May -- May -- excuse me -- the May 12, 2020 either because that's -- did not recover.  The stock price was $49 and declined the next day over $2 and stayed down for several days.  It never -- in the following week did not recover.  Never fully recovered.

The July -- July 19, 2020 corrective disclosure, there was not a full rebound in that either.

And then we already talked about the September drop, which nobody disputes.

THE COURT:  Right.

MS. HOPKINS:  The only stock -- the only corrective disclosure -- well, there's two.  The corrective disclosure in September 2019 did rebound the next day.  But I would, again, argue, your Honor, that you can't just look at that.  That was the initial disclosure of a lawsuit about the allegations and,

as in Facebook, the market needed more information to appreciate the magnitude and severity of the allegations.

And we did allege for the June 4th disclosure, as your Honor had pointed out, that Las Vegas Sands' stock price did not perform as well as some of its other peers. However, I understand it's not in the record, but there is an intraday decline exactly when the news came out on July 4th.

THE COURT: All right.

MS. HOPKINS: So --

THE COURT: We've discussed quite a few things. I'm going to give defendants an opportunity to respond.

MS. HOPKINS: Sure. Yep.

MS. WONG: Thank you, your Honor.

So I'd like to start with the Ninth Circuit's decisions in Metzler and Wochos because I think the facts of those cases are very important to look at thoroughly for understanding the alleged corrective disclosure dates here. And then I'd also like to walk the Court through the alleged corrective disclosure dates that are at issue including the three for which, as we argue in our briefing, there were modest declines followed by rebounds because I think walking through those will -- will explain -- clarify some points that I strongly disagree with that plaintiffs just raised.

Before I do that, though, your Honor, I do want to respond to a couple of very specific things that -- that

Ms. Hopkins said. There have been many parts of her arguments today that are not raised in any of plaintiff's allegations or their briefing. So for example, anything about the size of the market capitalization or the -- any loss in market capitalization on any of the alleged corrective disclosure dates. That is not in the second amended complaint.

The issues that plaintiffs have purported to raise today about the proportion of the Dow Jones U.S. Gambling Index that Las Vegas Sands Corporation comprises, that is not in second amended complaint nor is it in any of plaintiff's briefing on the motion to dismiss or the motion for reconsideration as far as I'm aware.

Plaintiff's arguments about the stock price movements of Las Vegas Sands Corporation in the days or weeks following the September 16, 2020 alleged corrective disclosure date, that's not in the complaint either.

The MGM Mirage case that plaintiffs have discussed today, that is not cited anywhere in the briefing on the motion for reconsideration. Plaintiffs did raise it, I believe, in their opposition to defendant's original request for judicial notice back in 2022. And as we pointed out in our reply brief responding to that, the MGM case is distinguishable because the plaintiffs there had not put any peer companies at issue in their own allegations. And for our argument on that point, your Honor, I would cite the Court to docket number 100, page 9

going by the page numbers at the bottom of the page or page 13 if you're going by the page numbers in the stamps at the top of the pages.  This point is addressed in the footnote on that page.

So I promised I would talk about Metzler and Wochos. Those are two recent Ninth Circuit decisions that affirm dismissals with prejudice for failure to plead loss causation on facts that are indistinguishable from some of those here.

In Metzler, on one of the alleged corrective disclosure dates, June 24th, the stock price fell 10%. Defendant company's stock prices fell 10%.  The Court called that 10% drop modest and noted that after that 10% drop, the stock rebounded within three trading days, and then by June 29th, so five calendar days after June 24th, rose to an amount that exceeded the stock's value before the June 24th disclosure.

Just based on that description of the stock price movements at issue in Metzler, the Court held that plaintiffs had failed to plausibly plead loss causation.  And the reason why is taking into account the factual allegations and judicially noticeable stock prices, it was more plausible -- the most plausible explanation, the Court held, for the company stock price movements following June 24th was just industry-wide market conditions.

Plaintiffs, in order to plead loss causation, need to

2:20-cv-01958-CDS-EJY

offer factual allegations that when considered with stock price -- judicially noticeable stock prices, like those in Metzler, leave the Court to conclude that the most plausible explanation for the stock price movements is that they were caused by fraud, not caused by market conditions, by industry-wide factors or other unrelated factors. And again, Metzler on the fact pattern I just described found that plaintiffs failed to meet that burden.

I'll also note, your Honor, Metzler is before the Ninth Circuit's decision in Apollo, in the Uber Technologies case and in the recent amended Facebook decision, all of which clarify that Rule 9(b) applies to loss causation. So Metzler found that it was appropriate to affirm dismissal for failure to plead loss causation on those facts even before the Ninth Circuit held that Rule 9(b) -- the heightened pleading standard of Rule 9(b) applies to that element.

More recently in the Wochos vs. Tesla decision, the Ninth Circuit considered facts where the company's stock price fell from around $357 to $343. So that's a decline of about 4%. The next day, the stock price rebounded. And this is very important, your Honor. The stock price did not fully rebound all the way back to $357. It rebounded meaning it just -- it went back up and got close. Again, not all the way back to the original 357 price but close, within a dollar or two.

The Ninth Circuit held that also -- that set of stock

price movements also could not support loss causation as a matter of law at the motion to dismiss stage because that type of stock price movement -- and now I'm quoting from the opinion -- "refutes the inference that the alleged fraud caused any material drop in the stock price."

Your Honor, the three alleged corrective disclosure dates that are at issue in this -- this particular category -- so, again, the dates where, as we argue in the briefing, stock price declined modestly and then it rebounded -- fall right within Metzler and Wochos.  And I think -- again, I think it's actually helpful to look at the stock price information in Exhibit 30 together which, again, plaintiffs have conceded is appropriately subject to judicial notice.

So if you -- I don't know if your Honor would like a copy of Exhibit 30, but I do have extra copies with me if that --

THE COURT:  You know what?  I have a copy.  Thank you.

MS. WONG:  Thank you.

So the first of these three dates is September 26, 2019.

THE COURT:  Let me first -- before you continue to make argument.  There doesn't seem to be a disagreement as to taking judicial notice.  And -- and I agree.  So I'm going to take judicial notice of Exhibit 30.  And then I can properly consider any argument that may be raised by either party in

regards to what the stock price shows.

MS. WONG:  Thank you, your Honor.

So on page 1 of Defendant's Exhibit 30, going by the page numbers at the bottom of the pages, you can see the stock price movements around September 26, 2019.  That's the first of the three dates at issue in this category.  And you'll see that the stock price on than date declined to $55.88.  So a decline of about 2.1% from the previous day's price of $57.08.  The very next day, the stock price rebounds.  It fully recovers and it actually exceeds the pre-disclosure stock price.  It goes up to $57.11.  So you have a modest decline and then a rebound. That fits squarely within Metzler.

If you turn ahead to page 4 of Exhibit 30, then you see the stock price movements around May 12, 2020, which is the next alleged corrective disclosure date that's at issue in this category.  There, you can see that the stock price on May 12, 2020 declined to $45.96.  So it's a decline of about 5.2% from the previous day's price of $48.50.  After that, by May 18th, so within four trading days, the stock price rebounds to $48.39.  So that's $0.11 away from that pre-disclosure price of $48.50.  Right away, that falls within Metzler and Wochos.

But then on top of that, two days later on May 20, the stock price rose further still to $50.17.  So now it's above the pre-disclosure price.

Again, your Honor, that's the fact pattern in Metzler.

2:20-cv-01958-CDS-EJY

There's a decline.  Although, in Metzler, the decline was bigger.  Metzler involved a 10% decline that the Court deemed sufficiently modest.  Here, we have a 5.2% decline.  Then the price rebounds within a few days and then, in fact, soon after exceeds the pre-disclosure price.

The last date in this category is Sunday, July 19, 2020.  So if you turn to page 5 of Exhibit 30, you'll see that date.  Since July 19, 2020 was a Sunday, you have to look at the stock price information for -- or excuse me.  Since July 19, 2020 was a Sunday, you have to look at the stock price information for July 20, 2020 here since that was the next day of trading after the disclosure at issue.

On that date, July 20th, the stock price declined to $47.28.  So that's a 2.9% decline from the prior day's price of $48.69.  And then the stock price rebounds the next day closing at $48.  So $0.69 away from the pre-disclosure price.  That's like Wochos.  In Wochos, the stock price didn't rebound all the way above the pre-disclosure stock price, but it got close.  It got within a dollar or two.  I think exact number, your Honor, is somewhere around $1.30.  The exact numbers are in the opinion.

In addition, your Honor --

THE COURT:  But, here, I just want to -- sorry to interrupt you.  But, here, while it went up on the 21st, that doesn't seem to be sustained.

2:20-cv-01958-CDS-EJY

MS. WONG:  Your Honor, looking at just those -- those -- that window of time that I just described is fully consistent with Metzler and Wochos.  Neither Metzler nor Wochos then looked at what happened after a rebound.  Actually -- I'm sorry, your Honor.  Metzler did look at -- excuse me.  Wochos vs. Tesla did look a little bit after what happened after the rebound and said that after the stock price went back up to around $355 or $356, it then fluctuated between $350 and $360 over the course of the next week or so.

So your Honor, it doesn't have to stay -- the stock price doesn't have to stay only up.  It's allowed to still decline a little bit.  There are allowed to be actual fluctuations.  And the reason why, it goes to the heart of what the loss causation inquiry looks for.

Plaintiffs, with particularized allegations under Rule 9(b), need to show that a stock price drop, a significant stock price drop was caused by fraud.  And when there are movements like the ones we've been describing here, a modest drop followed by a rebound, or like in the Wochos vs. Tesla case, a modest drop followed by a rebound and then up and down fluctuations within a $10 range over the course of the next week, that indicates that what's going on, what's causing those stock price movements is, most plausibly, just industry-wide market conditions.

THE COURT:  Right.  But then that's asking me to go

beyond the scope of a motion to dismiss in order to make that determination.

MS. WONG:  Your Honor, Metzler and Wochos makes clear that that's not going beyond the scope of the motion to dismiss and is all properly considered at this stage.  Both of those decisions affirmed dismissals, affirmed grants of motion to dismiss taking into account judicially noticeable stock price information.

And again, your Honor, I'd add to this the overlay, which we didn't even have at the time of Metzler in 2008, the overlay of Rule 9(b).  Plaintiff's allegations need to plausibly show with particularized facts that the most plausible explanation for a stock price drop was that it was caused by disclosure, a revelation of previously concealed information that was previously concealed by fraud.

The language that I'd direct the Court to from Metzler as well as from the Loose vs. Emergent Corporation case as well as the Uber Technologies case, all Ninth Circuit cases, all affirming dismissals at the motion to dismiss stage is that plaintiffs must plausibly allege that a stock price decline was "caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors."  That's the Ninth Circuit's articulation of the test.  That's what plaintiffs need to deal with in trying to plead loss causation in a Section 10(b) case

2:20-cv-01958-CDS-EJY

under the PSLRA.

Your Honor, one other point I'd like to make about Metzler and Wochos is that they looked only at percentages of stock price declines. And there's a -- there's a good reason for that. If you look at different sized companies, of course they'll have different size -- they'll have different market capitalizations, the amount of any stock price decline will just vary significantly based on the industry, based on the size of the company.

Plaintiffs, several times, have said that the stock price declines that they've pointed to here are significant, but they've tried to do that by introducing new facts not pled in their complaint about the absolute dollar amounts involved. Again, that's not -- that's not pled in the complaint. But the important thing is, under Metzler and Wochos, the key thing to look at is the percentage of the stock price movement.

Your Honor, I'd also like to go back briefly to the September 16, 2020 alleged corrective disclosure. That, as we've discussed -- so that's the alleged corrective disclosure for which we have submitted Defendant's Exhibit 31 with the peer company stock price information.

Now, it's true Metzler and Wochos don't deal with the exact same fact pattern as the September 16, 2020 date implicates. But the principles of Metzler and Wochos support dismissal on grounds of failure to plead loss causation as to

September 16, 2020, as well. And the reason why is if you take Metzler and Wochos, the key -- the key roles from them are that when considering the factual allegations and judicially noticeable stock prices, plaintiffs have to, with particularized allegations, show that the most plausible reason for a stock price decline was fraud, not simply market conditions.

Applying that to September 16th, it's clear from the peer stock -- the peer company stock prices and the peer index that we've shown in Exhibit 31 -- and, again, which plaintiffs don't identify by name but refer to several times as a peer index in their own allegations -- that Las Vegas Sands' stock price that day was moving in tandem with peers. It declined that day by about 4.2%. The peer stock prices and the Dow Jones U.S. Gambling Index that same day declined each by about 3.1 or 3.2%.

Now, plaintiffs have characterized the difference between those percentages as significant. Your Honor, that is not significant.

And, again, Metzler and Wochos provide useful data points here. Metzler called a stock price decline of 10% modest. Wochos vs. Tesla called a 4% decline modest. The 4.2% decline in Las Vegas Sands' stock price on September 16th is right on par with that. It's 4.2%.

And then when you take into account the factually

undisputed peer company stock prices in Exhibit 31, you see that that is -- that 4.2% number actually really reduces to 1% because the other -- the -- it a peer and the peer index were declining by about 3.2%.

Plaintiffs have not pointed to any case where any court has found loss causation adequately pled based on a 1% stock price decline. And your Honor, that's for a good reason.

The PSLRA is meant to serve as a gatekeeping function. The U.S. Supreme Court in Dura Pharmaceuticals explained that the reason the --

(Court reporter interruption.)

MS. WONG: The reason that --

THE COURT: Go ahead.

MS. WONG: The reason that the loss causation requirement at the pleadings stage is designed the way it is, is that federal securities laws are not meant to provide investors with insurance when there are routine losses caused by industry-wide or market-wide factors.

Plaintiffs have to -- have to meet multiple requirements that the PSLRA puts in place, that Congress put in place to ensure that private securities plaintiffs really have a particularized basis for proceeding into discovery in one of these cases. That's why there's a particularity requirement for falsity. That's why there's a heightened pleading requirement for scienter. The loss causation requirement fits

in line with that especially given that Rule 9(b) applies as the Ninth Circuit has clarified in its recent decisions. Plaintiffs have the burden of specifying through their allegations reasons to believe that a stock price decline is not just because of industry-wide factors or market-wide conditions that is caused by fraud.

And your Honor, stepping back for a moment here, there's another important part about the September 16, 2020 disclosure that we haven't talked about yet which is, this is right in the middle of the COVID pandemic.  The COVID pandemic, obviously, affected the gaming industry significantly.

And for this point, your Honor, I would direct to you the Bajjuri vs. Raytheon Technologies decision from the District of Arizona that we cite in our briefing.  There, the Court dismissed a Section 10(b) case for failure to plead loss causation.  And one of the factors that it noted in considering an alleged corrective disclosure from October 2020 was that judicially noticeable stock price information plus the backdrop of the COVID pandemic made it by far more plausible that the defendant company's stock prices had declined on this date at issue in October 2020 because of general industry-wide challenges, not because of fraud.

Your Honor, I'd like to also very briefly address the Facebook decision.

As we -- as defendants explained in our response to

plaintiff's leave for motion -- or excuse me -- motion for leave to file that decision as supplemental authority, the Facebook case simply does not read into the facts here.

In Facebook, the issue was whether -- the issues were whether an alleged corrective disclosure in March 2018 and another one in July of 2018 disclosed new information to the market. Both of those disclosures immediately preceded significant stock price declines. I believe one was 18%. The other was 19%. And the defendants argued that the newer loss could not support loss causation because according to the defendants, there was already publicly available information such that the disclosures on those two dates didn't actually tell the market anything new. So that was the issue that the Ninth Circuit was dealing with in Facebook.

In particular, for the July 2018 disclosure in that case, for example, the Court held, well, there is new information on that date. That date, the company disclosed its earning results. It had its quarterly earnings release. And the full quantitative impact of previously disclosed information was not known until defendants announced the earnings result on that day. That's just completely unlike the facts here.

Here, the -- the issues are all about how judicially noticeable stock price information affects the loss causation analysis. That just simply wasn't at issue in the Facebook

case, your Honor.

I'd like to also very briefly note, just for clarity, about which dates are at issue as to loss causation. So we walked through four of them looking at Exhibit 30.

There are four others that plaintiffs point to in their allegations. Those are October 10th -- well, before I list them. There are four others in which Las Vegas Sands' stock price increased on each of the dates in question. And those are October 10, 2019; June 4, 2020; June 5, 2020; and June 7, 2020. Although, for that date, June 7, 2020 was a Sunday, so you have to look at Monday, June 8th, the next trading day to see that the stock price increased following the alleged corrective disclosure on that date. I just want to be clear about those dates, your Honor. I think those are the -- I'd submit that those are the most straightforward ones to deal under the Ninth Circuit's cases.

For example, Metzler says a complaint must allege that a defendant's share price fell significantly after the truth became known. The Supreme Court in Dura Pharmaceuticals said the same thing. Plaintiffs have to point to a decline at a minimum. And on those four dates, the stock price just -- it doesn't decline. Exhibit 30 shows that very clearly. It increases and that cannot support loss causation.

If your Honor has any further questions about loss causation, I'd be happy to address them.

—2:20-cv-01958-CDS-EJY—

THE COURT:  I don't.  At least not for you at this time.

MS. WONG:  Your Honor, I'd also be happy to address, of course, the other issues in our motion to dismiss briefing including scienter but understand if the Court wants to focus --

THE COURT:  I want to focus on loss causation.

MS. WONG:  Of course.

THE COURT:  I think that that is, candidly to the parties, what I struggled with the most given -- given the decisions that were out there at the time I wrote my order and certainly now interplaying the clarification provided by Facebook -- the Facebook decision.  And so I guess the Facebook decision confirmed my struggle, for lack of a better statement.

And so I'm going to allow plaintiffs to respond to some of the arguments you've raised at this time.

MS. HOPKINS:  Thank you, your Honor.  A couple of things.

Counsel keeps saying that plaintiff's burden is to plead the most plausible decline.  That is not what the law says.  Plaintiffs must simply plead a plausible decline.  It has made clear by the Ninth Circuit decision in Gilead and other cases the plaintiffs don't even have to allege the entire decline was related to the fraud.  So I just want to make that correction.  Plaintiff's burden is not to plead, plausibly

allege that the, quote, most plausible decline.

Moreover, your Honor, the Metzler case that counsel keeps referring to did not hold -- neither did the Tesla case, neither of those cases did -- neither of them held that based on the stock price movement alone there was no loss causation. In the both of those cases, the Court first found that the alleged corrective disclosure did not correct the prior misstatements.  And for the Court to find that, it would have to make -- take many leaps and inferences, which the Court wasn't willing to do in light of the stock price rebound.  So the Courts in those cases did not simply find a stock price decline was sufficient.  The Court also found there was no correction.

So I just wanted to make those clarifying points that plaintiffs are not required to plead the, quote, most plausible explanation.  They're simply required to plead the correction of a prior misstatement that caused the stock drop in losses.

And defendants have made several remarks about plaintiffs not putting information about the pleading index in the record.  Well, defendants raise that in their motion to dismiss so of course it's not in complaint.  Plaintiffs are not required to plead all of this.  This is wading well into -- into expert discussion.

But your Honor, if I could just approach the bench, I'd like to show you the stock charts so you could see --

2:20-cv-01958-CDS-EJY

THE COURT:  Well, maybe.  Hold that thought.

MS. HOPKINS:  Okay.

THE COURT:  First, I was looking at a case out of the Southern District of California.  It's a 2010 case, In re Remec, R-E-M-E-C.  There -- and I think you argued that the decline in the stock price must be statistically significant.  Or maybe the plaintiffs in that case argued that.

Tell me where in the second amended complaint there's a reference to a statistically significant decline in the stock price.

MS. HOPKINS:  Your Honor, plaintiff's not required to allege a statistically significant drop.  Again, that requires expert analysis, an events study, a regression analysis to look at all of the other market factors that are affecting a stock price movement at a particular time to even determine whether the stock price movement is statistically significant.  But I will tell you -- it's not our complaint, but I can certainly tell you we do have a statistically significant drop on September 16th, for example.

But, again, this is wading well into expert discovery which requires the regression analysis, the event study to parse out.  So even though a decline may be a smaller percentage, it can still be statistically significant once the other market related factors are removed from the stock price movement, which happens during expert discovery during the

2:20-cv-01958-CDS-EJY

event study, regression analyses, and all those kinds of things.

At this point, plaintiffs may only plausibly allege -- I mean, these -- defendants are asking the plaintiffs to prove loss causation right now.  We're not required to do that.  And defendants are asking the Court --

THE COURT:  I agree with you you're not required to prove it.  The question is whether or not it meets the heightened pleading standard of Rule 9(b).

MS. HOPKINS:  Well, under Facebook, it does, your Honor.  Facebook says, in the case, plaintiffs must allege a disclosure correcting a prior misstatement that caused the loss in investor -- that caused the drop in investor losses.

And Facebook even said, your, Honor, that these other issues -- it was early in the case, and it's very early -- at the very early motion to dismiss stage and discovery and further proceedings are necessary to illuminate the issues surrounding loss causation.  And one of which was the June disclosure where there was no stock drop but the Court found that there was still a correction of that statement because the market appreciated the full extent of it on the second -- the last corrective disclosure in July.

But the Court specifically held that the motion to dismiss based on -- without discovery is not the appropriate time to decide that.  So -- and that was at 16, the Westlaw

2:20-cv-01958-CDS-EJY

cite at 16 where the Court said further proceedings are necessary to illuminate the issues surrounding loss causation. Judge Navarro found the same thing in the MGM case.  We're wading into a lot of factual disputes and discovery issues.

Defendants are asking the Court to dismiss the case as a matter of law based on the incomplete record from cherry-picked facts and a peer index that is weighted 55% to Las Vegas Sands.  It's not required at this stage to allege a statistically significant drop.  That's well beyond what's required at the pleadings stage.

THE COURT:  Let's stay focused on the no need to allege a statistically significant drop.  I think there's kind of mixed case law on that and that's going to be fact specific, so I understand your argument, and pleadings specific based on the particular facts related to what happens with a stock.

But I want to go back to my question about rebound. And I know that there's argument that there wasn't a rebound, but if I'm looking at the allegations set forth in the complaint and now I have judicially noticed the stock prices, how does the complaint show that -- or -- yeah, explain to me or discuss the argument that at most, or at best, for some of the allegations, there was a modest decline and then a rebound two, three, five, seven days later.

How does that fit into loss causation looking at Metzler and Wochos vs. Tesla?

2:20-cv-01958-CDS-EJY

I found some other cases, as well.

Because if I'm looking at the stock prices, there appears to be a rebound.  I'm sure we can argue what the definition of "rebound" is as we're all attorneys and we're good at arguing that.  But if I'm just looking at the stock prices on a day-to-day basis, in the days following the drops, there appears to be a rebound.

So how does that work?  How does that -- explain your argument to me.

MS. HOPKINS:  Well, your Honor, I wish you'd let me show you the graphs so you can see there isn't.  But --

THE COURT:  But your graphs -- there was no request for me to take judicial notice of the graphs, right?  And the graphs weren't included in the complaint.

MS. HOPKINS:  Yep.

THE COURT:  Yeah.

MS. HOPKINS:  Well, your Honor, if you're going to take judicial notice of the stock prices the defendants have put forth, then it's unfair of your Honor to only consider what's in the complaint.  We should be able to rely on all the stock prices that your Honor's taking judicial notice of.

THE COURT:  But I'm asking you to do that, right?  Because the stock prices are here.

MS. HOPKINS:  Right.

THE COURT:  So I'm asking for that explanation.

MS. HOPKINS:  Okay.

THE COURT:  Right.  Yeah.

MS. HOPKINS:  So you just asked me about the complaint and the defendants have now made an argument on the motion to dismiss and put forth the stock prices.  So while we met our pleading burden in the complaint, now that they've interjected these -- all of the stock prices for Las Vegas Sands, then plaintiff should be able to use those, as well.  And I --

THE COURT:  Right.  So I want you to explain to me -- like, am I misreading it because --

MS. HOPKINS:  Yes, your Honor.  So I'm happy to do that.

As I think everyone here can agree, stock prices move every day, all day long in response to all kinds of different news.  And so the cases the defendants rely upon and the graphs -- if you look the stock prices in those, they -- they went back up or nearly fully recovered and stayed there.  That's not what happened in most of these disclosures here.

You can't just look at this in a vacuum and assume no other news came out during those following days afterwards -- the -- after the initial -- after the corrective disclosure and the stock price drops.  Again, this requires expert discovery.

At this point, we can't just take this in a vacuum and say this one disclosure happened, the stock price dropped, and look at the stock price movement for the following days and

assume nothing new came out to the market.  That's not plausible.  Market -- the markets react to stock price -- the stock prices react all the time to news that enters the market all the time during every single day.  So you can't just look at the drop and say, well, this stayed, then came -- you have to look at what happened every single day, which is what's called an event study.

THE COURT:  Right.  And I understand that.

But then, ultimately, you still have to show that it's fraud.  So you're asking me not to look at it in a vacuum but then also telling me to look at it in a vacuum without establishing the fraud.

MS. HOPKINS:  Well, again, your Honor, this is the pleadings stage.  I'm not required to prove loss causation at this point.  I've pled a stock drop.  The stock did not immediately rebound on the May 12th disclosure.

Defendants have just set forth ones they say where the stock price increased.  And, again, even though they keep citing October 10, 2019, June 5, and June 7, 2020, those three disclosures were put in there for context and plaintiffs allege that nothing new came out those days.  But nobody here disputes the stock price went down on May 12th, on July 17th, or 19th -- I'm trying to remember -- 2020 and September 16th.  Those were all drops and sustained drops.

Your Honor, plaintiffs are not required to prove at

this stage why the stock, a week later, you know, in case of the September 16th disclosure, stayed down for two months, why -- plaintiffs are not required to perform an event study for all these days afterwards at this point.  This is the beginning stages of the case.

THE COURT:  Right.  But you do have to plead plausibility in terms of fraud, right?

MS. HOPKINS:  Well, we have -- we have to plead that the -- there was a correction of the prior misstatement, which nobody is -- is saying we haven't sufficiently done that and that the stock price dropped, which we've done that certainly for the May 12, 2020, the July 2020, and the September 16, 2020 disclosures.  And that the investors suffered losses.  We've done that.  We've met our pleading burden, your Honor.

And I would argue, again, with the October 2019 disclosure, as in Facebook, the Court said there's no bright-line test.  And here, the October 2019 disclosure was of the Wang lawsuit.  A later disclosure came out that said the lawsuit had been settled and paid in full.  And as in Facebook, that additional information was needed for the market to understand the degree of severity of the situation.

But three of the corrective disclosures, nobody's disputing there was a drop and a sustained drop for several days.  And you can't find, as a matter of law, that there's no loss causation without looking at all of the other news and

stuff that came out those days that might have also affected the stock price.  But that's not for today.  Today, the plaintiffs have alleged, plausibly, a disclosure, a stock price drop, and losses to investors.

The other cases that they rely on -- the stock prices -- in Metzler and the Tesla case, the stock prices went back up and stayed up.  That's not what happened in most of these disclosures.  If you -- if -- you know, if you saw the stock charts for our corrective disclosure as compared to the Tesla and the Metzler case, you would see the difference.  And the courts in those cases, again, also found there was a lack of correction of the prior misstatement in -- in dismissing on loss causation.  It wasn't just the stock price drop in a vacuum in those cases.

THE COURT:  All right.  So I am concerned based on the decision in Facebook regarding loss causation and it's part of the reason why I set this hearing.  There has been some argument here today about what something could show or would show if we had it.  But I don't have that.

What I do have is Exhibit 30, which I've taken judicial notice of, that, on a simple review -- for example, if I'm looking at May 12, 2020, the price was 45.96.  If I go down six days later, it's actually up to 48.39, just as an example. There seems to be a rebound.

And I understand plaintiff's argument regarding that

doesn't show the whole picture.  That all makes sense to me given the volatility of the market.  But that isn't pled.  And this is where the Facebook decision helps to some degree in taking a look at what we have here.

When I look at the Facebook decision and I look at the information pled, I don't think that it comports with the requirements of the PSLRA.  And so that decision changes how I evaluate the second amended complaint.  And in fairness to plaintiff, that didn't exist at the time this was briefed or at the time that I rendered my decision on the motion to dismiss.

So here is what I am going to do.  First, I am going to find that the plaintiffs did put the peer's company stock at issue.  As I noted when we started this argument that paragraphs 337, 339, and 341 discuss peer company stocks and, as argued by defendants, paragraphs 32 and 33 do, as well.  And so I am going to take judicial notice of Exhibit 31.

Given the clarification provided by the Facebook decision, I am going to find that reconsideration is appropriate and find that plaintiffs do not meet loss causation as set forth in the second amended complaint.  This is a significant change.  And plaintiffs elected not the file a third amended complaint, but that was based on what my written decision was, and so I'm going to allow plaintiffs a chance to amend the complaint given this decision.

In terms of specifically what I rely on in the

2:20-cv-01958-CDS-EJY

Facebook decision is relying on the pleading -- the heightened pleading standard but also the fact that it held that disclosures that are unaccompanied by a stock price drop are not actionable. Again, if I'm looking at Exhibit 30, there does seem to be somewhat of a drop and then there does seem to be a rebound of sorts. I understand plaintiff's argument is, like, no, that's not the full picture. But all of that isn't in front of me in the motion -- in the second amended complaint.

I recognize that the plaintiffs don't have to prove loss causation and that's certainly not the standard in which I am requiring them to plead the case, but I am going to require more because of the Facebook decision. And I need the second amended -- or the amended complaint, if they choose to file one, to address the declines, how it's statistically significant. And this is if they choose to do so. But I do believe that that is the relevant case law in the Ninth Circuit.

So in order to -- and I'll also note that is also true when it comes to looking at the comparative peer stocks. Unless that information is going to be pulled from -- pulled from the amended complaint, then that's something different.

I recognize that loss causation doesn't have to -- or doesn't require a showing that a misrepresentation was the sole reason for a decline in value, but given the information before

the Court, which is different than some of the cases that I'm looking at where there's an obvious 13% drop, 18% drop, etc., I think that there needs to be more.

To hide the -- or to -- hide -- to explain the Court's decision, I will issue an amended decision on the order addressing the motion to dismiss the second amended complaint. Give me one moment here.  Yeah.  I'll issue a written decision on -- or written amended order so the plaintiff has my decision to look at when deciding how to move forward with this case.

I'm granting the motion for reconsideration really based on the intervening change in controlling law.  I'm sure we can argue that there was really no change in controlling law, but I think the clarity provided by the Facebook decision meets that standard and, therefore, the extraordinary remedy of reconsideration is warranted.

I'm going to deny the request -- or the motion to stay in light of my granting of the motion for reconsideration.

We are also running up against the holidays and I am mindful of that.  So I would like to give -- I normally would do less time, but I think 30 days would be appropriate to allow you to file an amended complaint if you choose to do so because of the holidays.

I assume defendants will -- if a third amended complaint is filed that defendants will file a motion to dismiss.  I don't know what that amended complaint will look

like, but to the extent it's similar -- well, I don't know.  I don't want to speculate.  So I would say this, though, for both parties:  In any future briefing where you can incorporate by reference arguments made in previous briefing, you're more than welcome to do so.  There's no need to reiterate what has already been argued before the Court in that regard.

I'm not going to issue a written decision based on my decision here today on the motion for reconsideration.  The transcript of this hearing will serve as the findings of fact and conclusions of law.

I, likewise, won't issue a written decision on the motion to stay.  I think granting the motion for reconsideration moots the need for a stay and kind of resets the system, if you will, in terms of where we go from here with this litigation.

Any questions from the plaintiffs?

MS. HOPKINS:  No, your Honor.  Thank you.

THE COURT:  Any questions from defendants?

MS. WONG:  No, your Honor.  Thank you.

THE COURT:  All right.  All right.  I really appreciate everyone being prepared to answer my questions this afternoon.

And again, I thank everyone for their flexibility with schedules.  Again, running up against the holidays, having you all come in and move the dates around is inconvenient.  I try

to be mindful of everyone's life, if we have one.  But I try to be mindful of that.  So I really do appreciate it.

I hope everyone has safe travels and happy holidays.  Happy New Year.  Happy 2024, which is really strange to say.

All right.  Thank, everyone.  Take care.

(The proceedings concluded at 3:36 p.m.)

* * *

--o0o--

COURT REPORTER'S CERTIFICATE

I, SAMANTHA N. MCNETT, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  January 6, 2024

/s/ Samantha N. McNett
Samantha McNett, RPR, CRR, CCR